UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAIN MALDONADO,

                             Plaintiff,

v.                                                9:17-CV-1303
                                                (BKS/TWD)

VIJAYKUMAR S. MANDALAYWALA, et al.,

                             Defendants.
_____

APPEARANCES:

Shain Maldonado
15-B-2138
Wende Correctional Facility
P.O. Box 1187
Alden, NY 14004
*Plaintiff, pro se*

David A. Rosenberg, Esq.
Hon. Letitia James
Office of New York State Attorney General
The Capitol
Albany, NY 12224
*Attorneys for Defendants*

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

      This matter has been referred to the undersigned for a report-recommendation pursuant to

28 U.S.C. § 636(b) and Local Rule 72.3.  On November 29, 2017, *pro se* Plaintiff Shain

Maldonado, an inmate in custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983,

asserting claims arising out of his incarceration at Upstate Correctional Facility ("Upstate") and Great Meadow Correctional Facility ("Great Meadow").  (Dkt. No. 1.)

On May 29, 2018, the Honorable Brenda K. Sannes, United States District Judge, granted Plaintiff leave to file a second amended complaint.  (Dkt. No. 15.)  Defendants and claims remaining following *sua sponte* review of the second amended complaint and subsequent motion practice are: (1) Eighth Amendment medical indifference claims against Dr. Vijaykumar S. Mandalaywala, a physician at Upstate; (2) Eighth Amendment medical indifference and conditions of confinement claims against Great Meadow Offender Rehabilitation Coordinators Jane Doe #1 and Jane Doe #2; and (3) Eighth Amendment excessive force claims against Great Meadow Corrections Officers D. Bennett and John Doe #1.  (Dkt. Nos. 17, 41.)  By Decision and Order filed July 31, 2018, the "Superintendent of Great Meadow Correctional Facility" was added as a defendant for purposes of service and discovery only.  (Dkt. No. 26.[1])  To date, Plaintiff has not moved to substitute an identified individual as a defendant in place of any Doe Defendant.  (*See* Docket Report.)

Defendants Dr. Mandalaywala, Bennett, and Superintendent Miller (together, "Defendants"), now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 46.)  Plaintiff responded in opposition to the motion, and Defendants filed a reply.  (Dkt. Nos. 53, 54.)  Plaintiff also filed a sur-reply, which this Court has considered in its review.  (Dkt. Nos. 55, 56.)

For the reasons set forth below, the Court recommends Defendants' motion be granted in part and denied in part.

---

[1] On initial review of the second amended complaint under 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b), Plaintiff's claims against Christopher Miller, the Superintendent of Great Meadow, were *sua sponte* dismissed without prejudice for failure to state a claim.  (Dkt. No. 17.)

## II.    CONTENTIONS

### A.    Dr. Mandalaywala

Plaintiff claims Dr. Mandalaywala failed to prescribe Plaintiff speech and physical therapies at Upstate as recommended by the medical professionals at Albany Medical Center Hospital ("Albany Medical"), the hospital where Plaintiff was treated for a stroke in October 2016.  (Dkt. No. 15 at 5, 9-10.[2])  Plaintiff also claims Dr. Mandalaywala delayed issuing Plaintiff a "flats" permit at Upstate.  (*Id*. at 9-10.)

Plaintiff alleges he experienced pain throughout his "whole right side" following his stroke, which has caused him complications with walking.  (*Id*. at 9.)  He also claims Dr. Mandalaywala was aware of Plaintiff's need for physical and speech therapies—which Plaintiff requested on "several occasions"—based on documents provided to him from Albany Medical. (*Id*. at 5, 9.)  In addition, Plaintiff alleges Dr. Mandalaywala could have "sign[ed] off on" a "flats" permit in "minutes[,]" but Plaintiff had to wait "several weeks" after requesting the permit to receive it, during which time his "physical pain" intensified.  (*Id*. at 9-10.)  Plaintiff was issued a flats permit on January 10, 2017.  (*Id*. at 9.)

Defendants contend Dr. Mandalaywala is entitled to summary judgment because (1) Plaintiff cannot establish Dr. Mandalaywala was deliberately indifferent to his serious medical needs; (2) Dr. Mandalaywala was not personally involved in the treatment at issue in this case; and (3) Plaintiff failed to exhaust his administrative remedies   (Dkt. No. 46-2 at 8-20.)

---

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.  Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

### B.    Bennett

On December 26, 2016, while temporarily housed at Great Meadow on a medical trip, Plaintiff claims he was subjected to excessive force by Bennett.  (Dkt. No. 15 at 7-8.)  Plaintiff "returned to Upstate that day."  (*Id*. at 9.)  "On December 27, 2016, [a]t Upstate, [Plaintiff] submitted a grievance for the . . . the physical abuse that [he] received at Great Meadow."  He never received a response.  (*Id*.)

Defendants argue Bennett is entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 46-2 at 16-21.)

### C.    Superintendent Miller

As noted above, Plaintiff's claims against Superintendent Miller were *sua sponte* dismissed without prejudice on initial review for failure to state a claim.  (Dkt. No. 17.) However, Plaintiff's Eighth Amendment medical indifference and conditions of confinement claims against Jane Doe #1 and Jane Doe #2 and Eighth Amendment excessive force claim against John Doe #1, all of whom are claimed to be Great Meadow employees, survived *sua sponte* review.  (*Id*.)

Because of the pendency of Plaintiff's claims against the Doe Defendants, the District Court ordered the Superintendent of Great Meadow be added as a defendant solely for service and discovery purposes, to allow Plaintiff an opportunity to seek the identities of the Doe Defendants through discovery.  (Dkt. No. 26 at 3.)  "By doing so, the Court d[id] not suggest in any way that the Superintendent of Great Meadow Correctional Facility was personally involved in the Eighth Amendment claims asserted against the Doe Defendants."  (*Id*. at 4.)

On October 15, 2018, Superintendent Miller answered the second amended complaint as directed by the District Court.  (Dkt. No. 35.)  Following the joinder of issue, a mandatory

pretrial discovery and scheduling order was issued.  (Dkt. No. 36.)  All discovery was to be

completed by April 22, 2019.  (*Id.*)  Mandatory disclosures were exchanged in December 2018

and Plaintiff was deposed on March 21, 2019.  (Dkt. Nos. 39, 40, 46-5.)

Defendants contend "Plaintiff having been afforded an opportunity to seek discovery

related to the Doe Defendants, and discovery having since concluded, the Superintendent of

Great Meadow (Supt. Miller), should now be dismissed from this action with prejudice."  (Dkt.

No. 46-2 at 15-16.)

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party

moving for summary judgment bears the initial burden of showing, through the production of

admissible evidence, no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d

263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at

273 (citations omitted).  The nonmoving party must do more than "rest upon the mere allegations

. . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). Rather, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## IV.    DISCUSSION

### A.    Plaintiff's Failure to File a Response to Defendants' Local Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3). Where a party has failed to respond to the

movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true to the extent they are (1) supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts, as did the Court. (Dkt. Nos. 46, 48.) While Plaintiff opposes Defendants' motion, he failed to do so in the manner required under Local Rule 7.1(a)(3).[3] (*See generally* Dkt. Nos. 53, 55; *see also* Dkt. No. 54 at 3-5.) "Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules." *Marino v. Watts*, No. 9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a

---

[3] Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." *Id*.

party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record. Accordingly, the Court treats the verified second amended complaint as an affidavit for purpose of this motion, along with Plaintiff's sworn responses and sur-reply, and considers the factual allegations therein to the extent they are not conclusory and supported by the record. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

**B.    Plaintiff's Deliberate Indifference Claim Against Dr. Mandalaywala**

As noted above, Plaintiff contends Dr. Mandalaywala was deliberately indifferent to his serious medical needs by failing to make arrangements for Plaintiff to have speech and physical therapies at Upstate after he was discharged from Albany Medical Hospital Center ("Albany Medical") following a stroke in October 2016, and by delaying Plaintiff's "flats" permit.

Defendants argue insufficient evidence exists in the record to support Plaintiff's medical indifference claim against Dr. Mandalaywala.

### 1.    Legal Standards

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain."  U.S. Const. amend. VIII; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  This standard contains objective and subjective components.  *Hathaway*, 37 F.3d at 66.  The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious."  *Id*.  The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind."  *Id*.

To satisfy the objective element, the alleged deprivation must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id*.  Initially, the court must determine whether the inmate was actually denied adequate care.  *Id*.  "Prison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." *Jones v. Westchester Cty. Dep't of Corr.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (citations and quotation mark omitted).

Second, if the care provided was unreasonable, courts must inquire as to whether that inadequacy was "sufficiently serious." *Salahuddin*, 467 F.3d at 280. Courts must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id*. (citing *Smith*, 316 F.3d at 185-86). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id*. (quotation marks and alterations omitted).

However, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id*. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280. Thus, although courts "sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of medical care is sufficiently grave to establish constitutional liability." *Id*.

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious

inmate harm will result." *Salahuddin*, 467 F.3d at 280 (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" *Wright v. Genovese*, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing *Farmer*, 511 U.S. at 844). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." *Id.* at 154-55 (quoting *Salahuddin*, 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." *Chance*, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." *Randle v. Alexander*, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

Additionally, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under Section 1983. *See Iqbal*, 556 U.S. at 683. Thus, to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). With respect to individuals sued based on their supervisory capacities, "vicarious liability is inapplicable to . . . [Section] 1983 suits." *Iqbal*, 556 U.S. at 676.

In this circuit, a supervisory official is personally involved in a constitutional violation if he or she: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) was grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[4]

### 2.    Analysis

The record evidence demonstrates Plaintiff was not provided with speech, occupational, and physical therapies as part of his post-stroke care at Upstate and he was not assigned to the "flats" until January 10, 2017.[5]  However, the Court finds Plaintiff has failed to provide evidence from which a fact-finder could reasonably conclude Dr. Mandalaywala was deliberately indifferent to his serious medical needs.  *See Salahuddin*, 467 F.3d at 279.  Here, there is no indication in the record that Plaintiff was provided with inadequate medical care; in fact, the record establishes the opposite.

---

[4]  "*Iqbal* has . . . engendered conflict . . . about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict.  *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* . . . 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.'") (citation omitted).  Nevertheless, district courts in this Circuit have consistently held that "[w]here the constitutional claim . . . relies on the . . . deliberate indifference standard[] of the . . . Eighth Amendment[]," *Colon* still applies.  *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009); s*ee also Williams v. Adams*, No. 9:18-CV-1041 (BKS/TWD), 2019 WL 350215, at *7 (N.D.N.Y. Jan. 29, 2019) (collecting cases).

[5]  Plaintiff also testified he did not receive occupational therapy at Upstate, despite Albany Medical indicating the need for same.  (Dkt. No. 46-5 at 62, 65.)

a.    **Record Evidence**

Dr. Mandalaywala is the Facility Health Services Director ("FHSD") at Upstate. (Dkt. No. 46-8 at ¶¶ 1, 6.) As FHSD, Dr. Mandalaywala oversees the medical program at Upstate and is primarily engaged in administrative duties. (*Id*. at ¶ 5.) The medical staff is responsible for primary day-to-day patient care. (*Id*.) However, as he also is a Clinical Physician II, he occasionally sees patients for medical treatment as needed, depending on staffing levels, and when specifically requested by a provider. (*Id*. at ¶ 6.)

On October 1, 2016, Plaintiff presented to the infirmary at Upstate with apparent symptoms of a stroke and was transported to Albany Medical for emergency treatment where he remained for approximately three weeks. (Dkt. No. 46-1 at ¶ 9.) On October 20, 2016, Plaintiff was discharged from Albany Medical and returned to Upstate. (*Id*. at ¶ 10.) Among the medical records provided by Albany Medical to Upstate was a Physical Therapy Plan of Care form, indicating Plaintiff could move, transfer, and ambulate independently. (*Id*. at ¶ 13.) A copy of Plaintiff's Transfer Discharge Summary faxed to Upstate included a handwritten notation that Plaintiff's physical and occupational therapies were discontinued on October 20, 2016. (*Id*. at ¶¶ 11, 12.)

On October 21, 2016, at approximately 3:00 am, Plaintiff was admitted to the infirmary at Upstate for observation, as per protocol. (*Id*. at ¶¶ 10, 15.) Plaintiff remained in the infirmary for approximately three days. (*Id*. at ¶ 16.) Over the course of the weekend, medical staff observed Plaintiff could walk independently without difficulty, had clear speech, voiced no medical complaints, and expressed eagerness to return to his cell block and job in the law library.

(*Id.* at ¶ 17.[6])  In particular, the following observations were recorded in Plaintiff's Progress

Notes:

> October 21, 2016 – Kelly Rabideau, RN: "Returned from [Albany Medical] [at] 3 AM.  Ambulated to infirmary [without] difficulty. . . . Denies any medical complaint [at] present.  Some [right] sided weakness observed.  Speech was clear – expresses some difficulty [with] communication at times, particularly if he attempts to talk too fast.  Provider to evaluate in the AM."
>
> October 21, 2016 – Mary Kowalchuk, PA: "Lying on bed.  He was able to get out of bed [without] difficulty.  Normal gait, has great strength to the hands.  States he does not need speech therapy, OT or PT as the evaluation done at Albany showed no need for it. Able to speak very well – able to understand everything he says. We'll keep in infirmary over [the] weekend - Dr.  Kumar will probably discharge to block.  He works in the law library . . . wants to go back to work."
>
> October 21, 2016 – Denise Reome, RN: "Ambulates and transfers independently [without] difficulty.  Speaks clearly but in short one or two word sentences.  Can answer yes/no questions. . . . Out to phone to call family.  Speaks fluently in native tongue and rapidly. No medical complaints voiced."
>
> October 22, 2016 – Denise Reome, RN: "Speech clear.  Gives simple answers.  Ambulates and transfers independently.  Tolerates soft diet well.  No medical complaints voiced.  Eager to return to cadre cell block."
>
> October 22, 2016 – Christy Conklin, RN: "No medical concerns voiced at this time."
>
> October 23, 2016 – Marla Travers, RN:  "Ambulates [with] steady gait.  Speech clear.  Offers no complaints.  Appears in [no acute distress].  Tolerating diet well.  Will continue to monitor."
>
> October 23, 2016 – Christy Conklin, RN: "Claims he's anxious to return to his cell."

---

[6]  While not material to the pending motion, Plaintiff denies asking to return to his law library job and merely stated he worked in the law library.  (Dkt. No. 46-5 at 30.)

> October 24, 2016 – Brenda Holcombe, RN: "Speaks clearly. Gait steady . . . [no complaints of] medical needs voiced or noted . . . [s]till requesting to return to his cadre job in law library."
>
> October 24, 2016 – Elizabeth Ahern, PA: "[Patient] seen this AM . . . No weakness noted . . . No difficulty swallowing.  Will advance to regular diet.  Discharge to block.  Speech improving."

(Dkt. No. 47-7 at 2-3.)

On October 24, 2016, on the order of PA Ahern, Plaintiff was released from the infirmary to his housing block at Upstate.  (Dkt. No. 46-1 at ¶ 18;[7] *see also* Dkt. No. 47-1 at 2.)

On November 18, 2016, Dr. Glenn Schroyer, a physician at Upstate, referred Plaintiff for a follow-up consultation with a neurologist.  (Dkt. No. 46-1 at ¶ 23.)  Plaintiff was placed on a temporary medical trip to Great Meadow from December 13, 2016, through December 27, 2016.  (*Id*. at ¶ 31.)  Plaintiff was seen by a neurologist for follow-up on or about December 14, 2016.  (Dkt. Nos. 15 at 7, 47-14 at 14.)

Plaintiff's Ambulatory Health Record ("AHR") Progress Notes reflect that on January 10, 2017, during a sick call appointment, Plaintiff asked RN Sturgen for a "flats" permit.  (Dkt. No. 47-12 at 9.[8])  A medical permit, signed by RN Sturgen was issued on January 10, 2017, indicating "flats permit—downstairs only!  Permanent."   (Dkt. No. 47-10 at 2.)  Plaintiff testified he was moved to the lower level of the facility the same day.  (Dkt. No. 46-5 at 36.)

---

[7]  Plaintiff argues he was "discharged to his housing unit by Dr. Mandalaywala as he was in the presence of staff members of his medical department and CO's.  Just because the defendant did not sign any of the documentation approving the return of the Plaintiff to his housing unit, does not mean he did not approve or know about any of the conditions the Plaintiff was in.  (Please see Plaintiff's response to motion to dismiss.)."  (Dkt. No. 53-1 at 36.)  Plaintiff also directs the Court's attention to PA Kowalchuk's October 21, 2016, entry, highlighting "Dr. Kumar will probably discharge to block."  (*Id*.)

[8]  Plaintiff testified, however, that he asked for the flats permit on many prior occasions.  (Dkt. Nos. 46-5 at 36 ("I was asking and asking and asking and they was like, . . . we'll see to it. [] I followed the chain of command.  I spoke to the C.O.s first, then to the nurse and nothing.").)

Plaintiff's periodic medical appointments at Upstate in the months following his return from Albany Medical were with Dr. Glenn Schroyer or Dr. Jonathan Beach. (Dkt. No. 47-12 at 1-9.) In January 2017, Dr. Shroyer noted "no residual muscular problems. [Patient] to continue to active lifestyle." (*Id*. at 9.) In March 2017, Dr. Shroyer noted "good speech pattern, good strength, ambulates well, central nerve intact." (*Id*. at 8.) During sick call visits in May and June 2017, Plaintiff was issued Tylenol to address complaints of joint pain and stiffness. (*Id*. at 7, 8.) In July 2017, Dr. Shroyer noted "no complaints, ambulates [easily], speech normal, central nerve intact." (*Id*. at 7.) In November 2017, Dr. Shroyer continued Plaintiff's medication. (*Id*.)

In March 2018, Dr. Jonathan Beach noted Plaintiff complained of joint pain and stiffness and requested an eye examination. (Dkt. No. 47-12 at 6.) Plaintiff was prescribed Tylenol and referred for an eye examination. (*Id*.) In April 2018, Dr. Beach noted "no complaints, doing well, good hand . . . neuro intact." (*Id*. at 5.)

In May 2018, Plaintiff filed the second amended complaint. (Dkt. No. 15.) Plaintiff was subsequently transferred to Wende Correctional Facility ("Wende") on or about January 18, 2019. (Dkt. No. 42.)

### b.    Objective Prong

As to the first inquiry of the objective prong, the Court finds no reasonable jury could find Plaintiff was "actually deprived of adequate medical care" at Upstate following his discharge from Albany Medical in October 2016. *Salahuddin*, 467 F.3d at 276. As discussed above, the word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones*, 557 F. Supp. 2d at 413 (quoting *Salahuddin*, 467 F.3d at 280).

The record evidence demonstrates Plaintiff's medical needs were reasonably treated and monitored at Upstate following his discharge from Albany Medical.  While Plaintiff contends that he needed physical, occupational, and speech therapies at Upstate following his October 2016 stroke, and believes he should have been issued a "flats" permit prior to January 10, 2017, such assertions amount to nothing more than a mere disagreement with Plaintiff's post-stroke medical care, which is not actionable under the Eighth Amendment.  *See Randle*, 960 F. Supp. 2d at 481 (quoting *Alston v. Bendheim*, 672 F. Supp. 378, 385 (S.D.N.Y. 2009)) ("Indeed, '[a]n inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.'").

Accordingly, Plaintiff has failed to establish Dr. Mandalaywala deprived him of adequate medical care under the objective prong of the deliberate indifference analysis and the Court finds summary judgment is warranted on this ground.  *See, e.g.*, *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (finding inmate could not satisfy objective requirement where he was frequently treated, prescribed pain medication, tested with an X-ray and MRI, and referred to an orthopedic specialist); *Nowinski v. Rao*, No. 6:14-CV-06559 (MAT), 2018 WL 2303780, at *5-6 (W.D.N.Y. May 21, 2018) (finding plaintiff was not deprived of adequate care where, *inter alia*, the inmate was provided with extensive care for his knee problems, medications, and accommodations).

### c.    Subjective Prong and Personal Involvement

Even assuming, *arguendo*, Plaintiff could satisfy the objective component of the Eighth Amendment, Plaintiff fails to establish Dr. Mandalaywala knew of and disregarded an "excessive risk" to his health under the subjective prong.  Simply put, despite Plaintiff's contrary

allegations, the record evidence demonstrates Dr. Mandalaywala was not personally involved in Plaintiff's medical care at Upstate following his discharge from Albany Medical.

For example, although Plaintiff claims his "quarterly" medical appointments were "always" with Dr. Mandalaywala, (*see, e.g.*, Dkt. No. 46-5 at 36-37), as discussed above, Plaintiff's periodic medical appointments in the months following his return from Albany Medical were with Drs. Schroyer and Beach; none were with Dr. Mandalaywala. (Dkt. No. 47-12 at 1-9.) Further, Dr. Mandalaywala states that he "did not evaluate [P]laintiff and was not personally involved in any decisions as to provision of physical, occupational, or speech therapy." (*Id*. at 12.[9])

To the extent Plaintiff claims he also submitted written requests via sick call slips for speech, occupational, and physical therapies, along with a flats permit, Dr. Mandalaywala explains "sick call requests from inmates are addressed and handled directly by the medical staff; they do not cross my desk as a matter of course. Regardless, I was never made aware of any such request by Plaintiff." (Dkt. No. 46-8 at ¶ 19.) Additionally, "the medical records that [Dr. Mandalaywala] reviewed in preparation for this motion show that [P]laintiff did not require such therapies at Upstate." (*Id*. at ¶ 12.) Inmates do not have a constitutional right to the treatment of their choice. *See Wright*, 694 F. Supp. 2d at 155 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)) ("[That the plaintiff] preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation."). As such, disagreements over medications, diagnostic techniques, forms of treatment, the need for

---

[9] Plaintiff's medical records reflect Dr. Mandalaywala saw Plaintiff once for a medical appointment on April 18, 2016, months before his October 1, 2016, stroke, and reviewed Plaintiff's medications on two occasions in 2018. (Dkt. No. 46-8 at ¶ 21.) Dr. Mandalaywala explains this is routine when a patient has medication to be renewed and does not involve a visit with the patient. (*Id*. at ¶ 23.)

specialists, and the timing of medical intervention implicate medical judgment and do not rise to the level of a constitutional violation. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107); *Randle*, 960 F. Supp. 2d at 481 ("[A] difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.") (internal citations and quotation marks omitted); *see, e.g.*, *Santiago v. Johnson*, No. 9:11-CV-635 (LEK/TWD), 2015 WL 9854844, at *15 (N.D.N.Y. Nov. 16, 2015) ("Not ordering physical therapy likewise implicated [the doctor's] medical judgment."), *report-recommendation adopted by* 2016 WL 225695 (N.D.N.Y. Jan. 19, 2016).

As to the flats permit, contrary to Plaintiff's claim, Dr. Mandalaywala explains "[a]ny member of the medical staff, physician assistant or nurse, can write a medical permit if medically necessary. It does not require FHSD's input or approval." (Dkt. No. 46-9 at ¶ 18.) Dr. Mandalaywala further states, "[a]t no time did I have a conversation with [P]laintiff regarding a medical permit for a lower level cell." (*Id.* at ¶ 19.)

Further, to the extent Plaintiff's medical care at Upstate differed from that of other medical facilities, including Albany Medical and/or Wende, (*see* Dkt. Nos. 53 at ¶ 6, 53-2 at 5, 7-10), this assertion does not amount to a constitutional violation. "Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference." *Cole v. Goord*, No. 04 CIV. 8906 (GEL), 2009 WL 1181295, at *8 n.9 (S.D.N.Y. Apr. 30, 2009), *aff'd*, 379 F. App'x 28 (2d Cir. 2010); *see also Chance*, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted).

Even if Dr. Mandalaywala caused Plaintiff unintended harm, negligence is not actionable under Section 1983. *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding negligence is not a cognizable claim under Section 1983); *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) ("[M]ere negligence is not enough to state a claim for deliberate indifference."); *Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Lastly, to the extent Plaintiff aruges Dr. Mandalaywala's "high position of authority over the medical staff" at Upstate establishes his "knowledge" and "deliberate indifference," (*see, e.g.*, Dkt. No. 53-1 at 42), "liability . . . cannot rest on *respondeat superior*." *Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501. Moreover, Plaintiff's conclusory assertion that Dr. Mandalaywala, as FHSD was "fully aware" of Plaintiff's serious medical needs, including the need for speech, occupational, and physical therapies, and that he was "grossly negligent in supervising any other medical providers who have been deliberately indifferent to Plaintiff's serious medical needs" is without merit. (Dkt. No. 53-1 at 42). As discussed above, Plaintiff was provided with reasonable medical care.

Based on the foregoing, there is no evidence in the record that Dr. Mandalaywala acted with the mental state necessary for a deliberate indifference claim and summary judgment is also warranted on this ground.

Therefore, for the reasons stated, the Court finds no reasonable factfinder could conclude Dr. Mandalaywala was deliberately indifferent to Plaintiff's serious medical needs and recommends granting summary judgment to Dr. Mandalaywala.

Because the Court finds Plaintiff's Eighth Amendment deliberate indifference claim against Dr. Mandalaywala fails on the merits, the Court does not reach Defendants' exhaustion argument.

### C.    Excessive Force Claim Against Bennett

Plaintiff alleges he was assaulted by Bennett on December 26, 2016, at Great Meadow in violation of his Eighth Amendment rights. (Dkt. No. 15 at 7-9.) Defendants seek summary judgment on the ground Plaintiff failed to exhaust his available administrative remedies before commencing this action. (Dkt. Nos. 46-2 at 16-21, 54 at 8-11.) Plaintiff counters his administrative remedies were unavailable and, alternatively, requests an exhaustion hearing. (Dkt. Nos. 53-1 at 46-51, 55 at 1, 8-13.)

### 1.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).

As an affirmative defense, it is the defendants' burden to establish the plaintiff failed to meet the exhaustion requirements. *See, e.g.*, *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). 7 N.Y.C.R.R. § 701.5. First, an inmate must submit a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id*. § 701.5(b). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id*. A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. *Id*. §§ 701.5(b)(2), (3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the

Central Officer Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

Where an inmate's grievance complains of employee harassment or other misconduct, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. *Id*. §§ 701.8(b), (c). The superintendent has twenty-five days from the date of its receipt to render a decision. *Id*. § 701.8(g). An inmate may appeal the superintendent's decision to CORC within seven days of its receipt. *Id*. § 701.8(h).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal to 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017 (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see, e.g.*, *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can—and must—be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).").

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). More specifically, Section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted)). In the PLRA context, the Supreme Court has determined "availability" means "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were, in fact, "available" to him.

2.    **Analysis**

Plaintiffs has sworn to and testified under oath that on December 27, 2016, while housed

at Upstate, he submitted a grievance regarding, *inter alia*, the alleged December 26, 2016, assault

at Great Meadow.  (Dkt. Nos. 15 at 9, 46-5 at 106-08, 53-1 at 50-51.)  Although he personally

placed the grievance in the "grievance box" outside the Upstate grievance office, he never

received a response.  (Dkt. Nos. 15 at 9, 46-5 at 106-08, 53-1 at 50-51.)  Plaintiff testified:

> Q:  [W]hat . . . did you write in the grievance?  What was your
> complaint that you put in there?
>
> A:  I filed in the complaint that I went [to Great Meadow] for a
> medical trip and the whole time I was there, I did not receive any
> medication, nor my diet trays, and on the date I was placed on
> transfer -- transit, the [correctional officers] beat me up. . . .  And
> they actually physically beat me up and I . . . mentioned this to
> C.O. Bennett and several, you know, like the other C.O. that's
> John Doe and then Jane Doe and I never got a response."

(Dkt. No. 46-5 at 111.)  There is no indication in the facility records that he filed a grievance or

that he appealed the denial of any grievance to CORC.  (*See generally* Dkt. Nos. 46-9, 46-11, 46-

13.)

In support of their motion, Defendants have submitted the declarations of Sherri Debyah,

the IGP Supervisor at Upstate, Alexandria Mead, the IGP Supervisor at Great Meadow, and

Rachel Seguin, the Assistant Director of IGP for DOCCS.  (*See* Dkt. Nos. 46-9 at ¶¶ 1-3, 46-11

at ¶¶ 1-3, 46-13 at ¶¶ 1-3.)  Supervisors Debyah and Mead explain that "[t]o start the grievance

process, the inmate sends a written complaint to the grievance office at [the facility].  A

complaint may be written on a grievance form that is made available to inmates [at the facility]

or on regular paper.  Grievance complaints may be filed in the facility at which the inmate is

housed even if the complaint pertains to another facility."  (Dkt. Nos. 46-9 at ¶ 5, 46-11 at ¶ 5.)

They further state:

> "Once the complaint is determined to be a timely grievance, it is logged, coded, and titled.  An investigative request is sent in order to investigate the inmate's claims.  After the investigative report is returned, a grievance hearing is conducted by the IGRC. . . .
>
> An expedited procedure is used when an inmate files a grievance alleging harassment or assault by staff. . . .  [T]he Superintendent will arrange for an appropriate investigation and render a decision on that investigation.  Upon issuance of the Superintendent's response, an inmate who is not satisfied can appeal to [CORC], the third and final step under DOCCS' [IGP].

(Dkt. Nos. 46-9 at ¶ 5, 46-11 at ¶ 5.)  According to Supervisor Debyah:

> The grievance process is available to inmates to grieve incidents involving DOCCS staff, whether the incident took place at the inmate's facility or at any outside location.  When an inmate housed at Upstate complains of an incident involving DOCCS staff that took place while at an outside location, such as at a different DOCCS facility, the Upstate grievance office will accept the grievance, process it as usual, and maintain all records related to the grievance.

(*Id*. at ¶ 13.)  She states that all documents related to a particular grievance, including the grievance itself, the investigations, and appeals, are stored in the Upstate grievance office as they are created or received.  (Dkt. No. 46-9 at ¶ 9.[10])

Plaintiff was incarcerated at Upstate from March 7, 2016, until January 17, 2019.  (*Id*. at ¶ 11.)  Supervisor Debyah states that if Plaintiff filed a grievance at Upstate, there would be a record of the grievance in the files, maintained in the grievance office.  (*Id*. at ¶ 10.)

---

[10] "The Upstate grievance office keeps all documents for grievances filed in the current year and in the previous four (4) calendar years – thus, our office has on file all grievances filed in Upstate from January 1, 2015 to the present."  (Dkt. No. 46-9 at ¶ 9.)  The same is true for Great Meadow.  (*See* Dkt. No. 46-11 at ¶ 9.)

Based on her search, there is no record of any grievance filed by Plaintiff with respect to the alleged December 26, 2016, assault at Great Meadow and conditions of his confinement.  (Dkt. No. 46-9 at ¶¶ 1, 14, 15.[11])

Similarly, Supervisor Mead states that all documents related to a particular grievance, including the grievance itself, the investigations, and appeals, are stored in the Great Meadow grievance office as they are created or received.  (Dkt. No. 46-11 at ¶ 9.)  Plaintiff was temporarily incarcerated at Great Meadow from December 13, 2016, until December 27, 2016. (*Id*. at ¶ 10.)  Supervisor Mead states that if Plaintiff filed a grievance while incarcerated at Great Meadow, there would be a record of this in the files maintained at the Great Meadow grievance office.  (*Id*. at ¶ 11.)  According to Supervisor Mead:

> if an inmate housed at a different facility complains of an incident that had taken place at Great Meadow, the grievance office at his facility at the time of filing will accept the grievance and process it as usual.

(*Id*. at ¶ 12.)  Thus, if Plaintiff filed a grievance at Upstate concerning the alleged December 26, 2016, assault at Great Meadow, "there would be a record of it in the files maintained at the Upstate grievance office.  The records would not be on file at the Great Meadow grievance office."  (*Id*. at ¶¶ 13-14.)  Nevertheless, Supervisor Mead searched the records and states Plaintiff has not filed any grievances at Great Meadow.  (*Id*. at ¶ 15.)

---

[11]  While not relevant to Plaintiff's excessive force claim against Bennett, on November 14, 2016, Plaintiff filed Grievance UST-59609-16, entitled "Denied Medical Treatment" which he appealed to CORC on February 1, 2017.  (Dkt. Nos. 46-10 at 2, 46-15 at 3.)  The parties dispute whether Grievance UST-59609-16 exhausted Plaintiff's medical indifference claim against Dr. Mandalaywala.  (Dkt. Nos. 46-2 at 16-21, 53-1 at 46-51, 54 at 8-10, 55 at 8-12.) Inasmuch as the Court finds Dr. Mandalaywala was not deliberately indifferent, the Court did not reach Defendants' exhaustion argument.  Plaintiff also filed two unrelated grievances at Upstate, Grievance UST-58085-16 entitled "Property Destroyed" on April 27, 2016, and Grievance UST-60681-17 entitled "Not Receiving All Items on Menu" on March 28, 2017.  (Dkt. No. 46-10 at 2.)

Assistant Director Seguin states both Upstate and Great Meadow have fully functioning IGPs available to inmates and that inmates have full access to CORC by which to appeal from a facility-level grievance determination. (Dkt. No. 46-13 at ¶¶ 11-12.) She explains that when an inmate appeals to CORC, it is DOCCS policy to maintain records of these appeals for at least four years, and in accordance with that policy, the CORC database contains records of appeals of IGP grievances, including those reviewed under the expedited procedure described above. (*Id*. at ¶ 8.) Assistant Director Seguin conducted a search of the database and found Plaintiff appealed two grievances to CORC, neither of which relate to the alleged December 26, 2016, incident at Great Meadow. (*Id*. at ¶¶ 13-14.) As noted above, Grievance UST-58085-16 entitled "Property Destroyed" was received by CORC on June 28, 2016, and Grievance UST-59609-16 entitled "Denied Medical Treatment" was received by CORC on February 1, 2017. (Dkt. No. 46-15 at 3.)

Based on the foregoing, the Court finds Defendants have satisfied their burden of showing Plaintiff failed to exhaust his administrative remedies with respect to the alleged assault. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by persuading the Court of either exhaustion or unavailability." *Adams v. O'Hara*, No. 16-CV-527 (GTS/ATB), 2019 WL 652409, at *4 (N.D.N.Y. Feb. 15, 2019). Plaintiff advances several arguments for finding unavailability and, alternatively, requests an exhaustion hearing. (Dkt. Nos. 15 at 9, 53-1 at 1, 46-48, 55 at 1, 8-13.)

Here, while it is undisputed Plaintiff never appealed the grievance "to the next step," whether his administrative remedies were available requires closer examination. In *Williams v.*

*Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate-plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. There, the plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a corrections officer to forward to the grievance office on his behalf. *Id*. at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id*. at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id*.

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it "to the next step" and complete the grievance process. *Id*. at 124 (quoting 7 N.Y.C.R.R. § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id*. The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed . . . [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id*.[12]

Following the Second Circuit's decision in *Williams*, several courts—including this Court—have concluded that where a grievance is both *unfiled* and *unanswered*, the "process to appeal . . . is prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126; *see Britt v. Carberry*, No. 9:17-CV-0234 (MAD/DEP), 2019 WL 3365766, at

---

[12] This summary of *Williams* tracks that of Magistrate Judge Baxter in *Means v. Olmstead*, No. 9:17-CV-746 (BKS/ATB), 2019 WL 4395289, at *4 (N.D.N.Y. June 3, 2019), *report-recommendation adopted by* 2019 WL 3451127 (N.D.N.Y. July 31, 2019), which in turns tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report-recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

*8 (N.D.N.Y. Mar. 22, 2019) (collecting cases), *report-recommendation adopted by* 2019 WL

2437912 (N.D.N.Y. June 11, 2019); *see, e.g.*, *Hurst v. Mollnow*, No. 16-CV-1062 (DNH/TWD),

2018 WL 4178226, at *10 (N.D.N.Y. July 20, 2018) ("Therefore, '[a]s long as [the plaintiff's]

grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the

Second Circuit's decision in *Williams*[.]'") (quoting *Juarbe v. Carnegie*, No. 9:15-CV-1485

(MAD/DEP), 2016 WL 8732798, at *6 (N.D.N.Y. Oct. 7, 2016)), *report-recommendation

adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018); *Berman v. Drunkin*, 2017 WL

1215814, at *8 ("*Williams* holds that 'the process to appeal an unfiled and unanswered grievance

is prohibitively opaque, such that no inmate could actually make use of it.'"), *report-

recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *Juarbe v. Carnegie*,

2016 WL 8732798, at *6 (explaining that *Williams* appears to draw a distinction between an

"unfiled and unanswered" grievance and a simply "unanswered grievance," insofar as the

regulations provide that an inmate may appeal an unanswered grievance), *report-

recommendation adopted by* 2016 WL 6901277 (N.D.N.Y. Nov. 23, 2016); *cf. Cicio v.

Wenderlich*, No. 13-CV-195S, 2017 WL 1437206, at *5-6 (W.D.N.Y. Apr. 24, 2017) (granting

summary judgment against plaintiff for failure to exhaust when he failed to appeal a grievance

for which he received a receipt confirming the grievance was it was filed, but for which he never

received a response), *aff'd*, 714 F. App'x 96, 97 (2d Cir. 2018) (affirming grant of summary

judgment, and distinguishing *Williams*, which found the DOCCS grievance process

"unavailable" when an inmate's grievance was never filed); *see also Coleman v. Racette*, No.

9:15-CV-40 (TJM/ATB), 2017 WL 2579084, at *5 (N.D.N.Y. Jan. 17, 2017) ("The court notes,

however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a

number, it would be difficult to 'appeal' a grievance 'to the next step.'"), *report-recommendation adopted by* 2017 WL 2589366 (N.D.N.Y. June 14, 2017).

However, *Williams* has also been distinguished in cases in which the plaintiff claimed to have filed a grievance where, *inter alia*, the inmate was not segregated from the population and had access to the grievance office. *See, e.g.*, *Means v. Olmstead*, 2019 WL 4395289, at *6 (finding remedies available despite the inmate's contention that he filed a grievance where, *inter alia*, the plaintiff was not hampered by confinement in the SHU, nor was he transferred shortly after the incident, and testified that he dropped the grievance in the "box" himself) (citing *Davis v. Grant*, No. 9:15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019)); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *7 (N.D.N.Y. Oct. 4, 2019) ("Because plaintiff successfully utilized the grievance system for unrelated issues, makes no allegation that he was in restrictive housing at the time he attempted to file the alleged grievance, and makes no indication that he attempted to follow up with his alleged grievance, . . . administrative remedies were available to the plaintiff."), *report-recommendation adopted by* 2020 WL 58613 (N.D.N.Y. Jan. 6, 2020).

For example, "[i]n *Davis*, the court found that '[p]laintiff's bare assertions that he submitted grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement.'" *Means*, 2019 WL 4395289, at *7. Thus, an "unsupported assertion" the plaintiff "filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of fact." *Id*. (collecting cases);[13] *see, e.g.*, *Blake*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit

---

[13]    In adopting the report-recommendation in *Means*, *supra*, and finding administrative remedies available, the District Court found the plaintiff's conclusory assertions, raised for the first time in his objections to the report-recommendation, that (1) prison officials "thwarted" his

have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.'") (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2019 WL 7484082, at *5 (N.D.N.Y. May 9, 2017) (citing *Khudan v. Lee*, No. 12-CV-8147(RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016)) (citations omitted) (holding under *Ross* mere standalone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (finding remedies available where the plaintiff claimed officers misplaced his grievances, but offered no evidence to support his claim)); *see also Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed . . . he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report-recommendation adopted by* 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *see also Engles v. Jones*, No. 6:13-CV-6461 (EAW), 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Returning to the case at hand, the Court finds the record, viewed in the light most favorable to Plaintiff, suggests Plaintiff's grievance was *unfiled* and *unanswered*, creating an

---

attempt to exhaust his grievance "through machination, misrepresentation and intimidation"; (2) he "was told that there was no record" of his grievance when he inquired about it; and (3) when he "attempted to re-submit his Grievance he was told that his time had run out" were based on factual assertions nowhere in the record, including the plaintiff's deposition, opposition to the motion to dismiss, and opposition to the motion for summary judgment. *Means*, 2019 WL 3451127, at *1.

issue of fact as to the availability of administrative remedies under *Williams*.  In so finding, the Court has considered Defendants' arguments and, although Plaintiff does not have a copy of the grievance, was not confined in the SHU, and has not submitted any contemporaneous correspondence inquiring about the status of his grievance,[14] Plaintiff testified that he submitted a handwritten grievance on personal plain paper (because Upstate is "very very strict of not giving you the grievance forms" and he had "no carbon paper, no copy machine") by personally placing the grievance in the "grievance box" on the wall in front of the Upstate grievance office on December 27, 2016.  (Dkt. No. 46-5 at 106-07.)  Plaintiff submits he verbally followed up with the Upstate grievance office and the IGRC representatives "informed" Plaintiff that it was "[o]ut of our hands[,] explaining that the grievance was sent to Great Meadow."  (Dkt. No. 53-1 at 51.)  Similarly, Plaintiff testified, in sum and substance, that when he "approached" the grievance office and asked them "what's been going on with the grievance to Great Meadow, Plaintiff was told by Supervisor Debyah that it had been "mail[ed] directly" to Great Meadow because it pertained to that facility.  (Dkt. No. 46-5 at 109-10.)  In particular, Plaintiff testified as follows:

> Q:  [Supervisor Debyah] told you, as well as the inmate, that when you file a grievance at Upstate related to something at another facility –
>
> A:  They mail –
>
> Q:  -- they told you they send it directly to them?
>
> A:  -- they mail it direct to them.

---

[14]  As Defendants correctly point out, the only documentation submitted by Plaintiff on this issue are letters and a FOIL request from September and December 2018, nearly two years after he claims to have filed the grievance, and written only *after* Defendants made a motion to dismiss on the ground of failure to exhaust administrative remedies in this action.  (Dkt. No. 54 at 8; *see* Dkt. No. 53-1 at 20-23.)

Q:  Okay.  Did they acknowledge receipt of your grievance, though?  Did they tell you hey, we received your grievance and we sent it on?

A:  Yes.  She told me that they – they received it and they sent it immediately to Great Meadow Correctional Facility.

(*Id*. at 110.)  For her part, Supervisor Debyah flatly denies having had a conversation with Plaintiff wherein she told him his grievance was mailed to Great Meadow.  (Dkt. No. 46-9 at ¶ 15.)  She states, under oath, "I never told [P]laintiff that his grievance was mailed to Great Meadow, as that would not have been the procedure."  (*Id*. at ¶ 16.)  According to Supervisor Debyah:

"If [P]laintiff had filed such a grievance, it would have been entered and processed at Upstate, in accordance with the procedure outlined above, and all records would be available at Upstate.  The grievance would not be mailed to Great Meadow for processing.  There is no record that [P]laintiff ever filed such a grievance.

In any event, I did not have any conversation with [P]laintiff regarding his claimed grievance.  Plaintiff would not have been in a position to speak to me, as he now claims.

(*Id*. at ¶¶ 15, 17.)  In his sur-reply, Plaintiff explains that because he worked in the law library at Upstate, he was in a unique position to interact with the grievance office, including Supervisor Debyah.  (Dkt. No. 56 at 9.)  "So [Supervisor] Debyah saw the Plaintiff on several occasions and spoke to Plaintiff.  Every time the Plaintiff would ask her or any member of the [IGRC] any information pursuant the grievance at Great Meadow, the Plaintiff would just be given the 'run around.'"  (*Id*.)  Moreover, Plaintiff testified "he never got a grievance number or anything" and argues "[t]here is no way to send in a grievance to the CORC without any prior decision on that grievance."  (Dkt. Nos. 46-5 at 123; 53-1 at 51.)

In light of the foregoing, the Court finds Plaintiff has raised a material issue of fact as to the availability regarding his purported *unfiled* and *unanswered* grievance under *Ross* and

*Williams.*  *See, e.g.*, *Adams v. O'Hara*, 2019 WL 652409, at *3 ("It is important to note that,

where an inmate does not know that an unprocessed grievance (i.e., a grievance that has not been

assigned a grievance number) may technically be appealed, he need not appeal that unprocessed

grievance, because the regulatory scheme advising him of that right is too opaque.") (citing

*Williams*, 829 F.3d at 126 ("Even if Williams technically could have appealed his [unprocessed]

grievance, we conclude that the regulatory scheme providing for that appeal is 'so opaque' and

'so confusing that . . . no reasonable prisoner can use' [it pursuant to *Ross*]")).

However, to the extent Plaintiff raises general complaints about how the IGP process "is

truly flawed" and that inmates "are thwarted, misrepresented and lied to" and subjected to

"intimidation," (Dkt. Nos. 53-1 at 1, 55 at 1), such bare assertions do not excuse exhaustion

requirements.  *Rodriguez v. Cross*, 2017 WL 2791063, at *7-9.  Further, to the extent Plaintiff

argues "special circumstances" should be taken into consideration, particularly his stroke, (*see*

Dkt. No. 55 at 9-10), "that avenue has been foreclosed."  *Riles v. Buchanan*, 656 F. App'x 577,

581 (2d Cir. 2016) (summary order).  In *Ross*, the Supreme Court held "[c]ourts may not engraft

an unwritten 'special circumstances exception' onto the PLRA's exhaustion requirement."  *Ross*,

136 S. Ct. at 1862; *accord Williams*, 829 F.3d at 123.

Therefore, for the reasons stated above, the Court recommends denying Defendants'

motion for summary judgment on this ground without prejudice and that an exhaustion hearing

be held prior to the trial on Plaintiff's Eighth Amendment excessive force claim against Bennett.

**D.**    **Superintendent of Great Meadow**

Defendants contend the Superintendent of Great Meadow is no longer a proper party to

this action.  (Dkt. No. 46-2 at 15-16.)  The Court agrees.

As set forth above, on initial review, the District Court concluded the second amended complaint failed to establish Miller's personal involvement. (Dkt. No. 17.) In an effort to assist Plaintiff in identifying the Doe Defendants, the District Court subsequently issued an Order adding the Superintendent of Great Meadow as a named defendant "**for service and discovery purposes only**." (Dkt. No. 26 at 3 (emphasis in original).) The District Court indicated the Superintendent of Great Meadow would remain as a defendant "until plaintiff has been afforded an opportunity to conduct discovery related to the identity of the Doe defendants." (*Id*. at 4 n.2.)

Miller, the Superintendent of Great Meadow, filed an answer denying any wrong and noted that he was named as a party solely for purposes of service and discovery. (Dkt. No. 35.) The Court then issued an Order setting case management deadlines, including a February 22, 2019, deadline for amendment of pleadings and an April 22, 2019, deadline for completion of discovery. (Dkt. No. 36.) Defendants provided mandatory initial disclosures to Plaintiff on December 18, 2018. (Dkt. No. 40.)

In his response, Plaintiff acknowledges Defendants provided him with the relevant log-book entry for the alleged December 26, 2016, incident. (Dkt. No. 53-1 at 44.) However, Plaintiff raised no issues concerning discovery in this case and never filed a motion to compel discovery. (*See generally* Docket Report; *see also* Dkt. No. 54-2.) Plaintiff admits he has not identified the Doe Defendants and never filed a motion to amend. (Dkt. No. 53-1 at 44.) In sum, all pretrial deadlines have expired without any of the Doe Defendants having been identified by Plaintiff. Therefore, the Court finds the Superintendent of Great Meadow's presence in this lawsuit for discovery purposes is no longer needed. *See, e.g.*, *Reed v. Doe*, No. 9:11-CV-250 (TJM/DEP), 2015 WL 902795, at *5 (N.D.N.Y. Mar. 3, 2015) (granting the defendants' motion for summary judgment and dismissing the Superintendent of Eastern Correctional Facility, who

36

was added as a party solely for discovery purposes, following plaintiff's failure to identify the Doe defendants).

Although Plaintiff had a lengthy period of time during which discovery was available to assist him in identifying the Doe Defendants, only now, in opposition to Defendants' motion, and well after the discovery deadline expired, does Plaintiff request the Great Meadow "log-book" entries for December 12 through December 25, 2016.  (*See* Dkt. No. 53-2 at 44.)  As Defendants point out, if Plaintiff wanted copies of Great Meadow's log-book entries for thirteen additional days, as he now claims, he had four months to request same, but he failed to serve Defendants with *any* discovery requests.  (Dkt. No. 54 at 7.)  Thus, the Court finds Plaintiff has in fact, "been afforded an opportunity to conduct discovery related to the identity of the Doe defendants."  (Dkt. No. 26 at 4 n.2; *see, e.g.*, Dkt. Nos. 23, 35, 36, 39, 40, 46-5, 54-2.)

Lastly, Plaintiff's contention that the Superintendent of Great Meadow should not be terminated as a Defendant because he is the "overseer" of the facility, which, among other things "establishes" his personal "involvement" in this action, (*see* Dkt. No. 53-1 at 45), is without merit.  (*See* Dkt. No. 17 at 9-1.)  If the defendant is a supervisory official, like the Superintendent of Great Meadow, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.  *See Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In other words, supervisory officials may not be held liable merely because they held a position of authority.  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  In this case, the District Court took pains to emphasize the Superintendent of Great Meadow was "named as a defendant **for service and discovery purposes only**.  By doing so, the Court does not suggest in any way that the Superintendent of

Great Meadow Correctional Facility was personally involved in the Eighth Amendment claims asserted against the Doe defendants." (Dkt. No. 26 at 4 (emphasis in original); *see also* Dkt. No. 17 at 9-11.)

Accordingly, for these reasons, the Court recommends granting Defendants' motion as to the Superintendent of Great Meadow.

## V.    CONCLUSION

For the reasons stated above, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 46) be granted in part and denied in part without prejudice. If the above recommendations are accepted, only Plaintiff's Eighth Amendment excessive force claim against Bennett remains for trial. However, the Court recommends that an exhaustion hearing be held prior to the trial.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 46) be **GRANTED** as to Dr. Mandalaywala and the Superintendent of Great Meadow; and **DENIED without prejudice** as to Bennett; and it is further

**RECOMMENDED** that an exhaustion hearing be held prior to the trial on Plaintiff's Eighth Amendment excessive force claim against Bennet; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: February 12, 2020
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[15]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 40 of 284

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

2018 WL 3121612
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Harrell WATTS, et al., Defendants.

Civ. No. 9:12-CV-801 (NAM/DJS)
|
Signed 03/07/2018

**Attorneys and Law Firms**

VINCENT MICHAEL MARINO, 14431-038, FCI FORT DIX, P.O. Box 2000, Joint Base MDL, New Jersey 08640, Pro Se.

HON. GRANT C. JAQUITH, Acting United States Attorney, OF COUNSEL: KAREN FOLSTER LESPERANCE, ESQ., Assistant United States Attorney, Northern District of New York, James T. Foley U.S. Courthouse, 445 Broadway, Albany, New York 12207, Attorney for Defendants.

## AMENDED REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** This action, brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), returns to the Court on Defendants' Motion for Summary Judgment. Dkt. No. 133, Defs.' Mot. Summ. J. The only remaining claims in this action are First Amendment retaliation claims against Defendants Lucas, Sepanek, and Schult. Defendants move for summary judgment on these remaining claims. Plaintiff has opposed Defendants' Motion, and Defendants have filed a Reply. Dkt. Nos. 139, Pl.'s Resp., & 140, Defs.' Reply. After the Court ordered the Defendants to respond to outstanding discovery requests (Dkt. No. 157), and Defendants complied (Dkt. No. 158), Plaintiff filed supplemental papers in opposition to Defendants' Motion. Dkt. Nos. 162 & 163. For the reasons that follow, the Court recommends that Defendants' Motion be **granted** and this action **dismissed**.

## I. BACKGROUND

### A. Plaintiff's Failure to File a Response to Defendants' Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As required by the Local Rules, Defendants' counsel advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts. Dkt. No. 133-1. Plaintiff, however, did not file a response to Defendants' Statement of Material Facts. *See* Pl.'s Resp. & Dkt. No. 162, Pl.'s Reply Brief. [1] Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). The Court therefore will deem the facts as set forth in Defendants' Statement of Material Facts admitted, to the extent they are properly supported by the record. Dkt. No. 133-3, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) ).

[1]     On March 5, 2018 the Clerk's office received Plaintiffs "Reply Motion In Opposition to Defendant's Local Rule 7.1 ..." Dkt. No. 163. This document was in addition to the Plaintiff's Reply Brief. Dkt. No 162. Dkt. No. 163 violates this Court's directives in several respects. First, it is not a properly formulated Rule 7.1 Reply. The local Rules provide as follows: "The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and /or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3). The Plaintiff's

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 41 of 284

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Rule 7.1 reply does not address any of the facts listed in the Defendants Rule 7.1 Statement of Material Facts. Further, Dkt. No. 163 is, in essence, a supplemental reply brief, and when combined with Dkt. No. 162, substantially exceeds the Court-imposed five page limit on this additional brief.

## B. Factual Background

**\*2** On December 3, 2009, Plaintiff was incarcerated at FCI Ray Brook, when unit officers discovered $2,729.32 of postage stamps, gambling paraphernalia, and a homemade intoxicant in his cell during a routine cell search. Defs.' SMF at ¶¶ 26-27. A disciplinary hearing was held on December 15, 2009, at the conclusion of which Plaintiff was found guilty of several disciplinary violations and sentenced to sixty days in disciplinary segregation, twenty-seven days loss of good time credits, and 180 days restriction on his visiting, telephone, and commissary privileges. *Id.* at ¶ 28. Following the disciplinary hearing, the Special Investigative Supervisor ("SIS") conducted an investigation into the incident, which revealed that Plaintiff's girlfriend had entered into a series of financial transactions with a number of different inmates. *Id.* at ¶ 29. The report concluded that Plaintiff had been running an illegal gambling operation and recommended that he be transferred to another institution in order to "shut down" the operation. *Id.* at ¶ 30.

Defendant Lucas, Plaintiff's case manager, accepted the recommendation of the SIS, as was his standard practice, and completed the necessary paperwork to request a transfer for Plaintiff. *Id.* at ¶ 31. Lucas drafted a Request for Transfer, Form 409. *Id.* at ¶ 33; Dkt. No. 133-10, Decl. of Steven Lucas, dated Aug. 18, 2017, Ex. F ("Form 409"). The transfer request was a "Code 323," which, according to Lucas, means that the inmate "need[s] closer supervision as the result of a disciplinary incident." Dkt. No. 133-4, Lucas Decl. at ¶ 14. In stating the reason for the transfer request, Lucas summarized the findings of the SIS report, and noted that Plaintiff had a previous disciplinary violation in 2007 for operating a gambling operation at USP Canaan. Form 409. Lucas recommended "a transfer to a High security facility no closer to [Plaintiff's] release area of Massachusetts." *Id.* On the Form 409, Lucas indicated that Plaintiff's inmate security level [2] was twenty-four. *Id.* After researching suitable facilities, Lucas identified USP Hazelton and USP Big Sandy as potential facilities to which Plaintiff might be

transferred. Lucas Decl. at ¶ 17. Lucas also completed a new BP-338. [3] *Id.* at ¶ 37.

[2] Each inmate in the custody of the Federal Bureau of Prisons ("BOP") is assigned a point score, which is used to determine their security classification. Defs.' SMF at ¶¶ 9-11. An inmate's point score, however, is not the sole factor used in determining a security classification; public safety factors and management variables are also considered. *Id.* at ¶ 11. An inmate's security classification is re-assessed at regular intervals throughout the period of incarceration. *Id.* at ¶ 13.

[3] An Inmate Load and Security Designation Form, or BP-337, is prepared when an inmate first enters federal custody. Defs.' SMF at ¶¶ 7-8. Seven months after the inmate enters federal custody, and annually thereafter, a Custody Classification form, or BP-338, containing updated information relevant to the inmate's security classification, is prepared. *Id.* at ¶¶ 13-14. Additionally, a new BP-338 is issued at any time an event occurs that may affect the inmate's security classification, such as an incident report. *Id.* at ¶ 14.

The Request for Transfer Form was reviewed and approved by the Unit Manager, the Case Management Coordinator, the Assistant Warden, and the Warden, Defendant Schult. *Id.* at ¶ 41. The Request for Transfer Form was then submitted to the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas. *Id.* Once a transfer request is submitted to the DSCC, the determination of whether to approve the request and if approved, what facility the inmate is transferred to, is made solely by the DSCC. *Id.* at ¶¶ 41-42. The staff of the facility submitting the request—in this case, Ray Brook—have no further control over the request after it is submitted. *Id.* at ¶ 42. Plaintiff was transferred out of FCI Ray Brook on February 12, 2010, and arrived at USP Pollock, his new assigned facility, on July 13, 2010. *Id.* at ¶ 43.

**\*3** The remaining claims in this action are First Amendment retaliation claims arising from an affidavit Plaintiff alleges that he submitted in support of a fellow inmate named McCarroll's civil rights action against a BOP employee named Matteau. Am. Compl. at p. 4. [4] Plaintiff claims that on December 2, 2009, Helms and Poirier [5] discovered the affidavit in Plaintiff's cell during a cell search. *Id.* at pp. 6 & 16. Plaintiff claims that the Defendants intentionally

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

retaliated against him based upon this affidavit. *Id.* at pp. 13-15. Plaintiff claims that he experienced the following specific acts of retaliation: [6] (1) Defendants Lucas and Sepanek confiscated his legal work and law books when he was housed in the Special Housing Unit ("SHU") at Ray Brook, *id.* at pp. 34-35; (2) Defendants Lucas and Sepanek falsified his security level from eleven to twenty-four, causing him to be transferred to USP Pollock, which was known to have violent conditions, *id.* at p. 27; and (3) Defendant Schult caused him to be placed in BOP's "Diesel Therapy" program, whereby he was frequently transferred while on route from Ray Brook to Pollock and did not have access to his legal work, *id.* at p. 21.

[4]    Because some paragraphs of the Amended Complaint are not numbered, the Court cites to the pagination assigned by Plaintiff.

[5]    Poirier was dismissed as a Defendant from this action, Dkt. No. 62, and Plaintiff voluntarily discontinued his claims against Helms after he passed away, Dkt. No. 145.

[6]    Plaintiff has alleged other acts of retaliation—including that the incident report filed against him as a result of the cell search was retaliatory—that have been dismissed by the Court. *See* Dkt. No. 49.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

 **\*4** Defendants move for summary judgment on Plaintiff's remaining First Amendment retaliation claims. For the reasons that follow, the Court agrees that Plaintiff's retaliation claims fail as a matter of law and recommends that Defendants' Motion be **granted**. [7]

Marino v. Watts, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 43 of 284

2018 WL 3121612

[7]  Defendants have argued that the Court should reconsider its holding allowing Plaintiff's First Amendment retaliation claim to proceed under *Bivens* in light of the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Dkt. No. 133-2, Defs.' Mem. of Law at pp. 9-10. *Ziglar*—as all of the Supreme Court's recent *Bivens* decisions—emphasizes that *Bivens* is a " 'disfavored' judicial activity." 137 S. Ct. at 1857. However, because the Court finds that summary judgment is appropriate on the merits of Plaintiff's First Amendment claims, it declines to revisit the issue of whether a *Bivens* remedy should be implied under the First Amendment.

## A. Legal Standard [8]

[8]  Due to the similarity between *Bivens* and § 1983 actions, "federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such

evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ).

**\*5** Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

## B. Analysis

Defendants argue that: (1) Plaintiff was transferred to USP Pollock for legitimate non-retaliatory reasons; (2) undisputed evidence shows that Plaintiff's security classification was not falsified; (3) there is no evidence that the Defendants were personally involved in the decision to transfer Plaintiff to USP Pollock or in the manner in which that transfer was conducted; and (4) Plaintiff has not shown that he suffered any injury due to the deprivation of his legal materials. Dkt. No. 133-2, Defs.' Mem. of Law at pp. 2-3.

### 1. Confiscation and Denial of Access to Legal Work while in SHU

Plaintiff alleges that the Defendants confiscated his legal materials—his Federal Rules of Civil Procedure book, in particular—while he was in the SHU at Ray Brook. Am. Compl. at pp. 34-35. According to Plaintiff, the Defendants specifically told him that the reason they were confiscating his legal materials was the affidavit he had filed against Matteau. *See* Dkt. No. 133-25, Dep. of Vincent Michael Marino, dated

2018 WL 3121612

Apr. 18, 2017 ("Pl.'s Dep.") at pp. 16-17. Participation in a lawsuit constitutes a protected activity, *see Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002), and the intentional destruction of an inmate's property may constitute an adverse action for the purposes of a retaliation claim, *Mateo v. Bristow*, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013).

Plaintiff's claim, however, fails because there is insufficient evidence to conclude that he suffered an adverse action. Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated. Pl.'s Dep. at pp. 71-72, & 85. Furthermore, while Plaintiff claims that Defendants confiscated his Federal Rules of Civil Procedure book, Defendants have produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week. Dkt. No. 133-23, Decl. of Karen Folster Lesperance, Esq., dated Aug. 18, 2017, Ex. I, at p. 2. Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library. The lack of evidence demonstrating that Plaintiff suffered an adverse action is insufficient to withstand summary judgment. Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's retaliation claim based on the confiscation and denial of access to legal materials while he was in the SHU at Ray Brook.

### 2. Falsification of Security Level and Transfer to USP Pollock

Plaintiff alleges that the Defendants falsified his security level and caused him to be transferred to a "facility which had harsher prison conditions such as ... over 16 murders, over 300 stabbings & knife shots." Am. Compl. at p. 27. Based on conversations with the Defendants, Plaintiff asserts that he believes this was out of retaliation for filing the affidavit against Matteau. *See* Pl.'s Dep. at pp. 31-32.

**\*6** Although a transfer to a facility with harsher conditions may constitute an adverse action for the purposes of a retaliation claim, *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), in this case Plaintiff has failed to establish a causal connection between his protected conduct (filing the affidavit) and the Defendants' request for his transfer. "As

a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Plaintiff has claimed that certain of the Defendants had conversations with him regarding his placement in SHU and the diesel therapy program in retaliation for his litigation activities, but notably does not allege such conversations regarding his security level and transfer to USP Pollock. While Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment.

Moreover, even if Plaintiff were able to establish a causal connection between his affidavit and Defendants' alleged adverse actions, Defendants have provided significant evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation.

As proof of his claim that Defendants manipulated his security level, Plaintiff compares a BP-338 dated April 27, 2006 where his security level was 11, with a BP-338 dated February 2, 2011 where his security level was 24. *See* Am. Compl. at pp. 47-48. [9] Plaintiff claims that the transfer forms completed by the Defendants contained false information that there were pending drug and criminal enterprise charges against him and that he had been convicted of assaulting a police officer; Plaintiff asserts that these falsifications inflated his security level. Pl.'s Resp. at p. 16.

[9]    Citation is to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

Contrary to Plaintiff's claims, Defendant Lucas explains that on the Form 409 he is required to note any discrepancies between the inmate's initial BP-337 and the BP-338 completed at the time of the transfer request. Lucas Decl. at ¶ 22. Lucas noted two discrepancies between the BP-337 and the information available when he was completing the Form 409: (1) the BP-337 referenced pending drug and criminal enterprise charges, which had never been lodged as a detainer; and (2) a traffic stop had been scored as a crime of Serious Violence instead of a crime of Minor Violence. *Id.* at ¶ 23; Form 409. Lucas states that both of these discrepancies would have lowered Plaintiff's point score. Lucas Decl. at ¶

24. Lucas further explains that in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. *Id.* at ¶¶ 27-28. Lucas' explanations rebut Plaintiff's assertions that the Defendants manipulated his security level in order to transfer him to a higher security facility.

In any event, Lucas explains that the transfer request was "standard practice" following the recommendation of SIS that Plaintiff be transferred in order to "shut down" his gambling operation. *Id.* at ¶¶ 12-13. Plaintiff was transferred pursuant to Program Statement Number P5100.08, "Inmate Security Designation and Custody Classification" Code 323. Lucas Decl. ¶ 14, Ex. A, Chapt. 7, p. 5. Pursuant to that Code, an inmate may be transferred as a result of documented misconduct, to an institution of greater security. *Id.* In such cases, the inmate may only be transferred to a facility of the same level security if placement at a greater security level institution is not possible or other overriding circumstances exist. *Id.* As evidenced on Plaintiff's Form 409, the basis for the transfer was Plaintiff's misconduct. Lucas Decl., ¶ 16, Ex. F ¶ 3 ("An SIS Investigation has recommended the transfer of inmate Marino from FCI Ray Brook to 'shut down' his illicit gambling operation.... Based on the scale of this gambling operation, and the repetitive nature of these infractions, we recommend a transfer to a High security level facility no closer to his release area of Massachusetts. To do otherwise would be a reward for this type of behavior."). Defendants have demonstrated that they would have transferred Plaintiff to a higher security facility independent of any retaliatory motive.

**\*7** Plaintiff also contends that Defendants specifically transferred him to USP Pollock because of its dangerousness. Defendants have demonstrated this is not the case. On Plaintiff's Form 409, Defendant Lucas requested transfer to either USP Hazelton or USP Big Sandy. Lucas Decl. ¶ 17, Ex. F. Thus, even if Plaintiff had established a causal connection between his protected activity and the Defendants' decision to request his transfer, the Defendants have shown that they would have requested Plaintiff's transfer to a higher level security facility even in the absence of the protected activity, and that the assignment to USP Pollock was not Defendants' decision. *See Graham v. Henderson*, 89 F.3d at 79.

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based on the alleged manipulation of his security level. [10]

[10] Since the issuance of the Court's Original Report-Recommendation and Order, Plaintiff has had the benefit of receiving Defendants' Answers to certain Notices to Admit served by Plaintiff, and being able to make further arguments to the Court. *See* Dkt. No. 158-1, Defs' Objections and Responses to Pl.'s First Set of Requests for Admissions; Dkt. No. 162, Pl.'s Reply Brief. The Court has reviewed and considered these additional documents, but nothing contained therein causes the Court to change its analysis. The Defendants generally deny the admissions sought in the Notices to Admit, and provide additional explanations that are wholly consistent with the Affidavit of Defendant Lucas previously submitted. *See* Dkt. No. 133-4. Plaintiff objects to the Defendants' narrative contained within the Responses to the Notices to Admit, and generally claims that those responses constitute "criminal perjury." Pl.'s Reply Brief at pp. 2-4. Aside from the Plaintiff's general characterizations, Plaintiff again emphasizes that the drug and criminal enterprise charges that are referenced in Form 409 were not pending at the time of the creation that Form. Defendant Lucas responds that the reference to those charges was merely to note discrepancies between the BP-338 form he filled out and the original BP-337 Form. Accordingly, despite these additional submissions, and utilizing the standard of "skepticism and care" mandated by the Second Circuit, the Court again finds that summary judgment is warranted on this First Amendment retaliation claim.

### 3. Placement in Diesel Therapy Program

Plaintiff alleges that the Defendants orchestrated his placement in the "Diesel Therapy" program for eight months, where he was denied access to his legal work. Am. Compl. at p. 26. Plaintiff claims that Defendant Schult told him that placement in the "Diesel Therapy" program was retaliation for his litigation activities. Pl.'s Dep. at p. 17.

With respect to this claim, there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants

2018 WL 3121612

had any personal involvement in Plaintiff's placement in the "Diesel Therapy" program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook. As stated by Defendant Lucas, once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request. Lucas Decl. at ¶ 19. "A *Bivens* action lies against a defendant only when the plaintiff can show the defendant's personal involvement in the constitutional violation." *Cohen v. Holder*, 2011 WL 809773, at *2 (E.D.N.Y. Mar. 1, 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* ... a plaintiff must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution.").

**\*8** Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based upon his placement in the "Diesel Therapy" program.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 133) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [11] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[11]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121612

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 47 of 284

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

2018 WL 1578163
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Deborah G. SCHULT, et al., Defendants.

9:12-CV-801 (NAM/DJS)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Vincent Michael Marino, 14431-038, FCI Fort Dix, P.O. Box 2000, Joint Base MDL, NJ 08640, pro se.

Hon. Grant C. Jaquith, Acting United States Attorney, Northern District of New York, Karen Folster Lesperance, Assistant United States Attorney, James T. Foley U.S. Courthouse, 445 Broadway, Room 218, Albany, NY 12207, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U.S. District Court Judge

**I. Introduction**

**\*1** Plaintiff *pro se* Vincent Michael Marino brought this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of his civil rights. (Dkt. No. 52). The only remaining claims are for First Amendment retaliation against Defendants Schult, Sepanek, and Lucas, who at all relevant times were employed at FCI Ray Brook, where Plaintiff was formerly incarcerated. (*See* Dkt. No. 86). Defendants have moved for summary judgment on the remaining claims. (Dkt. No. 133). On December 11, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order, recommending that Defendants' motion be granted and the action dismissed. (Dkt. No. 149). Subsequently, Plaintiff filed objections to the Report-Recommendation,[1] a motion to compel certain discovery and for permission to amend his opposition to summary judgment, and a motion for rejection of the Report-Recommendation, denial of summary judgment, imposition of the sanction of default, and other relief. (Dkt. Nos. 152–154).

[1]     The Court has reviewed Plaintiff's objections to Magistrate Judge Stewart's December 11, 2017 Report-Recommendation, which were based on the outstanding discovery Plaintiff sought in order to respond to Defendants' motion for summary judgment. (Dkt. No. 152). This discovery issue was resolved before the March 7, 2018 Amended Report-Recommendation. (Dkt. Nos. 157, 162–63). Therefore, Plaintiff's objections to the December 11, 2017 Report-Recommendation are not relevant to the March 7, 2018 Amended Report-Recommendation or this decision.

On January 11, 2018, this Court referred Plaintiff's new motions to Magistrate Judge Stewart for decision on non-dispositive issues and/or recommendation on dispositive issues, and held in abeyance the Report-Recommendation and Defendants' motion for summary judgment. (Dkt. No. 155). On January 16, 2018, Plaintiff filed an additional "reply in opposition to Magistrate Judge Stewart's Report-Recommendation and Order," wherein Plaintiff again emphasized the outstanding discovery he needed to oppose Defendants' motion. (Dkt. No. 156). On January 31, 2018, Magistrate Judge Stewart granted Plaintiff's motion to compel, allowed him to submit additional briefing in connection with Defendants' motion for summary judgment, and denied his motion for default judgment. (Dkt. No. 157). Plaintiff then submitted supplemental papers in further opposition to Defendants' motion. (Dkt. Nos. 162–63).

On March 7, 2018, Magistrate Judge Stewart issued an Amended Report Recommendation and Order, which again recommended that Defendants' motion for summary judgment be granted and the action dismissed. (Dkt. No. 164). On March 28, 2018, Plaintiff filed timely objections to the Amended Report-Recommendation.[2] (Dkt. No. 167). For the reasons set forth below, the Amended Report-Recommendation is adopted in its entirety.

[2]     Although Plaintiff's objections were received on March 28, 2018—two days after the March 26, 2018 deadline, they are dated March 20, 2018 and were mailed on March 26, 2018, and therefore, the Court will consider the objections as timely.

**II. Standard of Review**

**\*2** This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen*

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 48 of 284

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

*v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.* "A proper objection is one that identifies the specific portions of the [Report and Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the Report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "To the extent ... that the party makes only conclusory or general arguments ... the Court will review the Report strictly for clear error." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "The objections of parties appearing *pro se* are generally accorded leniency and should be construed to raise the strongest arguments that they suggest." *Id.* at 340 (quotations and citation omitted).

Summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re World Trade Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a summary judgment motion, the court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### III. Discussion

### a. The Amended Report-Recommendation

In the Amended Report-Recommendation, Magistrate Judge Stewart deemed admitted the facts set forth in Defendants'

Statement of Material Facts, to the extent they were properly supported by the record, based on Plaintiff's failure to file a response to Defendants' Statement. (Dkt. No. 164, p. 2). Magistrate Judge Stewart then recommended that Defendants' motion for summary judgment be granted as to Plaintiff's First Amendment retaliation claims, which alleged that after Plaintiff filed an affidavit in support of a fellow inmate's civil rights action, the Defendants took the following actions against him: 1) the confiscation of legal work and law books when Plaintiff was housed in the Special Housing Unit ("SHU") at FCI Ray Brook; 2) the falsification of Plaintiff's security level from eleven to twenty-four, and consequent transfer to USP Pollock, which was known to have violent conditions; and 3) his placement in so-called "Diesel Therapy," whereby he was in transit for eight months from one facility to another. (*Id.*).

As to the first claim, Magistrate Judge Stewart Recommended summary judgment based on "insufficient evidence to conclude that [Plaintiff] suffered an adverse action." (*Id.*, p. 10). Magistrate Judge Stewart observed that "Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated." (*Id.*). Further, while Plaintiff claimed that Defendants confiscated his Federal Rules of Civil Procedure book, it was noted that Defendants "produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week," and "Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library." (*Id.*).

**\*3** For Plaintiff's second claim based on the alleged manipulation of his security level and his transfer to a different facility, Magistrate Judge Stewart found that Plaintiff failed to establish a causal connection between his protected conduct—filing the affidavit, and Defendants' request for his transfer. (*Id.*, pp. 10–11). Magistrate Judge Stewart noted that "[w]hile Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment." (*Id.*, p. 11). Magistrate Judge Stewart also found that even if Plaintiff were able to establish a causal connection between his affidavit and the alleged adverse actions, Defendants "provided significant

2018 WL 1578163

evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation." (*Id.*, p. 11). Defendants' evidence supporting the increase in Plaintiff's security level included that "in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification." (*Id.*, pp. 11–12). Further, there was evidence that "the transfer request was 'standard practice' following the recommendation of SIS that Plaintiff be transferred in order to 'shut down' his gambling operation." (*Id.*, p. 12). Thus, Magistrate Judge Stewart found that Defendants "demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive." (*Id.*, p. 13). In addition, the evidence showed that Defendants had no personal involvement in choosing the particular facility, USP Pollock, where Plaintiff was transferred. (*Id.*).

For Plaintiff's third claim related to "Diesel Therapy," Magistrate Judge Stewart found that "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (*Id.*, p. 14). Furthermore, Magistrate Judge Stewart noted evidence that "once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request." (*Id.*).

**b. Plaintiff's Objections**

As an initial matter, Plaintiff claims for the first time in his objections that he never received Defendants' Statement of Material Facts in support of their motion for summary judgment, which he now seeks to compel. (Dkt. No. 167, p. 1). The Court has considered this claim as an objection to Magistrate Judge Stewart's decision to deemed admitted the facts set forth in Defendants' Statement of Material Facts based on Plaintiff's failure to file a response. (Dkt. No. 164, p. 2).

Contrary to Plaintiff's claim, the record shows that he received Defendants' Statement of Material Facts, along with notice of the consequences of failing to file a response to Defendants' Statement of Material Facts. (Dkt. Nos. 133-1, 133-3, 133-27). In the December 11, 2017 Report-Recommendation, Magistrate Judge Stewart noted

that Plaintiff failed to file a response to Defendants' Statement of Material Facts. (Dkt. No. 149, p. 2). Therefore, under Local Rule 7.1(a)(3), Magistrate Judge Stewart deemed that the facts set forth by Defendants were admitted by Plaintiff, to the extent the facts were properly supported by the record. (*Id.*). Despite that clear notification, Plaintiff never claimed to be missing Defendants' Statement of Material Facts in his objections filed on December 29, 2017. (Dkt. No. 152). Nor did he raise the issue in his motion to compel or letters to the Court thereafter. (Dkt. Nos. 153–54, 156). After Plaintiff obtained additional discovery, Magistrate Judge Stewart permitted Plaintiff to submit a supplemental Rule 7.1 Reply Statement of Material Fact. (Dkt. No. 157). Plaintiff submitted a document entitled "Marino's Reply Motion in Opposition to Defendant's Local Rule 7.1/Statement of Material Fact Motion with Marino's Supportive Affidavit." (Dkt. No. 163). But this document did not specifically address any of the facts listed in Defendants' Statement of Material Facts. Based on Plaintiff's failure to file a proper response, Magistrate Judge Stewart once again, in the Amended Report-Recommendation, deemed admitted Defendants' Statement of Material Facts to the extent they were properly supported by the record. (Dkt. No. 164, p. 2).

After carefully reviewing the issue *de novo*, the Court agrees with Magistrate Judge Stewart's decision because the record shows that Plaintiff received Defendants' Statement of Material Facts, he was warned of the consequences of not responding, and he failed to do so despite multiple opportunities. *See* N.D.N.Y.L.R. 7.1(a)(3). Moreover, Magistrate Judge Stewart only deemed the facts admitted to the extent they were properly supported by the record, and Plaintiff makes no claim that he lacked the record evidence in this case. Indeed, Plaintiff's objections reference such evidence. (*See, e.g.*, Dkt. No. 167, pp. 4–5). Therefore, the Court also denies Plaintiff's request to submit a response to Defendants' Statement of Material Facts.

**\*4** As to the substance of Plaintiff's First Amendment retaliation claims, he does not appear to challenge, with any evidentiary basis, the specific findings made by Magistrate Judge Stewart. Nonetheless, recognizing Plaintiff's *pro se* status, and out of an abundance of caution, the Court has undertaken a *de novo* review. In order to prevail on his retaliation claims, Plaintiff "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

"Because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Id.* (quotations and citations omitted). If a plaintiff adduces evidence of protected conduct, an adverse action, and a causal connection, the burden shifts to the defendant to demonstrate he "would have disciplined or transferred him even in the absence of the protected conduct." *Id.* (quotations and citations omitted). In other words, a defendant is entitled to judgment in his favor if he shows that the adverse action "would have been taken based on the proper reasons alone." *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Id.* (quotations and citations omitted).

First, for all three claims, there is no dispute that Plaintiff engaged in protected conduct by filing an affidavit in support of a fellow inmate's civil rights action. However, for Plaintiff's retaliation claim based on the alleged confiscation and denial of access to legal materials, he has failed to adduce any specific evidence of an adverse action. Plaintiff's vague allegations that, while in SHU, he was deprived of his "legal work & legal mail" are insufficient at this stage. (*See* Dkt. No. 52, pp. 21–22; Dkt. No. 167, p. 18). The record also shows that Defendant had access to a law library while in SHU. (*See* Dkt. No. 133-23, p. 3). Moreover, Plaintiff has not adduced evidence of *who* allegedly deprived him of legal materials; he simply testified that "[t]hey lost a lot of it," and "[t]hey destroyed a lot of it." (Dkt. No. 133-25, p. 40). But there is no evidence that Defendants worked at SHU or exercised control over his legal materials there. Thus, Plaintiff has also failed to raise an issue of material fact as to Defendants' personal involvement in the alleged adverse action. *See Hallock v. Bonner*, 567 F. Supp. 2d 334, 338 (N.D.N.Y. 2008) ("[T]o defeat the defendants' motion for summary judgment, the plaintiffs must raise an issue of material fact as to the requisite personal involvement of the named defendants under *Bivens*."). Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

Second, for Plaintiff's retaliation claim based on the alleged manipulation of his security level and his transfer to a different facility, the Court agrees with Magistrate Judge Stewart's finding that Defendants demonstrated that they would have increased his security level and requested his transfer even in absence of Plaintiff's protected conduct. Plaintiff argues that Defendants put false information in his prison files in order to raise his security level and get him transferred. (Dkt. No. 167, pp. 3–9). But the record shows that Plaintiff's security classification and transfer were driven by his multiple disciplinary incidents for running gambling operations. (*See* Dkt. No. 133-4, ¶¶ 8–16; Dkt. No. 133-7; Dkt. No. 133-8; Dkt. No. 133-9; Dkt. No. 133-10; Dkt. No. 133-20). The allegedly "inaccurate" files submitted by Plaintiff do not show otherwise. (*See* Dkt. No. 167, pp. 15–22). Defendant Lucas explained that in the five years intervening between the two classification forms relied on by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. (Dkt. No. 133-4, ¶¶ 27–28). Moreover, Plaintiff's transfer was specifically recommended by the Special Investigative Supervisor "as a means to 'shut down' Marino's [gambling] operation," and it was "standard practice" for Defendants to follow that recommendation. (Dkt. No. 133-4, ¶¶ 12–13; Dkt. No. 133-9, p. 5). In sum, Defendants have shown that Plaintiff's security classification and transfer would have taken place even if he had never filed an affidavit for a fellow inmate, and no reasonable jury could find otherwise. Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

**\*5** Third, for Plaintiff's retaliation claim based on his alleged placement in so-called "Diesel Therapy," the Court also agrees that Defendants are entitled to summary judgment. Upon review of the record, "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (Dkt. No. 164, p. 14). For example, Plaintiff alleges that Defendant Schult told him that he was going to experience "Diesel Therapy" and that Defendant Sepanek was involved too because all of the Defendants "were conspiring through this whole retaliation." (Dkt. No. 133-25, pp. 72–75). However, the record shows that Defendants requested the transfer based on Plaintiff's disciplinary incidents, and thereafter, they had no control over the request, Plaintiff's transit schedule, or his specific destination. (*See* Dkt. No. 133-4, ¶¶ 16, 19). Thus, Plaintiff's claim cannot survive summary judgment since he has again failed to raise an issue

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 51 of 284

Marino v. Schult, Not Reported in Fed. Supp. (2018)
2018 WL 1578163

of material fact as to Defendants' personal involvement. *See Hallock*, 567 F. Supp. 2d at 338.

Plaintiff also puts forward a hodgepodge of other objections. He correctly asserts that "credibility determinations are jury functions and not those of a Judge," (Dkt. No. 167, p. 2), but Magistrate Judge Stewart made no such credibility determinations. Plaintiff writes that "in ruling on a motion to Dismiss/Summary Judgment Rule 12(b)(6) '[t]he evidence of Marino's Amended Complaint is to be believed and all justifiable inferences are to be drawn in his Marino's favor.' " (*Id.*). But Magistrate Judge Stewart correctly stated the standard of review *for summary judgment.* (Dkt. No. 164, pp. 5–7). Plaintiff also once again takes issue with Defendants' discovery responses, arguing that "they failed to comply with Marino's Discovery Requests using word gymnastics to prevail." (Dkt. No. 167, p. 6). But Magistrate Judge Stewart already resolved this discovery dispute, as discussed above. Finally, Plaintiff rehashes a number of the conclusory allegations from his Amended Complaint. (Dkt. No. 167, pp. 4–5, 11). However, once again, it must be emphasized that "more than conclusory allegations are required to survive a summary judgment motion." *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In sum, the Court finds no error in the Amended Report-Recommendation based on these general objections.

**IV. Conclusion**
**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Stewart's Amended Report-Recommendation (Dkt. No. 164) is **ADOPTED in all respects**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 133) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 52) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York and to serve Plaintiff by both regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578163

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1724573
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwaine GRAY, Plaintiff,

v.

Doctor KANG LEE, Defendant.

No. 9:13–cv–258 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Dwaine Gray, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, The Capitol, Christopher W. Hall, Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Dwaine Gray commenced this action against defendant Doctor Kang Lee,[1] pursuant to 42 U.S.C. § 1983, alleging that Lee was deliberately indifferent to Gray's serious medical needs in violation of the Eighth Amendment.[2] (*See generally* Compl., Dkt. No. 1.)

[1]    Gray also named Ms. Vonda L. Johnson as a defendant, (Compl.), but she has since been dismissed from this action, (Dkt. No. 10 at 6–7, 9).

[2]    In his complaint, Gray also asserted claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act, 29 U.S.C. §§ 701–796*l*, (Compl.), but those claims have been dismissed, (Dkt. No. 10 at 5–6, 9).

On August 12, 2014, Lee filed a motion for summary judgment, (Dkt. No. 32), which Gray opposed, (Dkt. No. 40). In a Report and Recommendation (R & R) issued on March 9, 2015, Magistrate Judge David E. Peebles recommended that Lee's motion for summary judgment be granted and Gray's

remaining Eighth Amendment claim be dismissed. (Dkt. No. 43.) Pending are Gray's objections to the R & R. (Dkt. No. 44.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*[3]

[3]    Gray specifically objects to Judge Peebles' recommendation that the court deem admitted all properly supported facts contained in Lee's statement of material facts. (Dkt. No. 43 at 3 n. 1; Dkt. No. 44 at 2.) The court reviews this portion of the R & R *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). Under this District's Local Rules, the moving party must submit a statement of material facts, which "set[s] forth, in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue." N.D.N.Y. L.R. 7.1(a)(3). The opposing party must file a response to the statement of material facts, which must "mirror the movant's [s]tatement of [m]aterial [f]acts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." *Id.* If the opposing party fails to comply, "[t]he [c]ourt shall deem admitted any properly supported facts set forth in the [s]tatement of [m]aterial [f]acts that the opposing party does not specifically controvert," and, where the opposing party is *pro se,* the moving party must advise the pro se litigant about the consequences of his failure to respond. *Id.* Here, while Gray filed a response opposing Lee's summary judgment motion, (Dkt. No. 40), he did not file anything that even remotely resembles a response to Lee's statement of material facts, despite receiving notice of the consequences of his failure to do so, (Dkt. No. 32 at 3). In his defense, Gray argues that he "submitted various pieces of evidence annexed to his opposition to summary judgment, showing that [Lee]' s narrative was self-serving," and that he "introduced to the [c]ourt documentary evidence that [Lee] obviously did not have a planned course of medical treatment, as [Lee] routinely came to contradictory conclusions, and would often ignore [Gray's] needs." (Dkt. No. 44 at 2.) However, "a district court has no duty

to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding pro se," and an individual's pro se status does not relieve him of the ramifications associated with the failure to comply with the court's local rules. *Davis v. City of Syracuse,* No. 5:12–CV–0276, 2015 WL 1413362, at \*12 (N.D.N.Y. Mar.27, 2015). Therefore, the court adopts Judge Peebles' recommendation to deem admitted all properly supported facts set forth in Lee's statement of material facts. Accordingly, unless otherwise noted, the facts are not in dispute.

Gray is an inmate in the custody of the Department of Corrections and Community Supervision (DOCCS), and, during the time relevant to his claims, was incarcerated at Clinton Correctional Facility. (Def .'s Statement of Material Facts (SMF) ¶¶ 1, 9, Dkt. No. 32, Attach. 1.) Prior to entering Clinton, Gray suffered a shoulder injury, for which he was prescribed Naproxen. (*Id.* ¶ 8.) After arriving at Clinton in or around April 2012, Gray met with Lee, a clinical physician, who asked Gray if he wished to continue taking Naproxen. (*Id.* ¶¶ 3, 10.) Gray declined the medication, claiming that it did not work. (*Id.* ¶ 10.) One month later, Lee again met with Gray, at which time Gray complained of continued shoulder pain and requested stronger pain medication. (*Id.* ¶ 11.) Lee obliged Gray's request and prescribed Flexeril, a muscle relaxer used to relieve acute pain, but not suitable for long-term use. (*Id.* ¶¶ 11, 12.)

Over the Summer of 2012, Gray frequently met with medical staff, including Lee and various nurses at Clinton. (*Id.* ¶¶ 13–17.) During those meetings, Gray continued to complain of pain in his right shoulder, reiterated his refusal of Naproxen, and requested stronger pain medications-including a continuation of Flexeril and/or a narcotic analgesic. (*Id.* ¶¶ 13–17.) Also during those examinations, Lee consistently found that Gray had a good range of motion in his shoulder, despite Gray's complaints that he was unable to move it. (*Id.* ¶¶ 15, 16.)

At the end of September 2012, Lee ordered an x-ray of Gray's right shoulder, which was completed in early October. (*Id.* ¶¶ 18, 19.) Lee discussed the results with Gray, which indicated that there was "early osteoporosis ... present" and "a large spur arising from the inferior aspect of the acromion," ordered a magnetic resonance imaging (MRI) for further testing, and prescribed Motrin for Gray's pain. (*Id.* ¶¶ 19, 20; Dkt. No. 32, Attach. 2 at 4.) The MRI was completed in January 2013, and, once the radiologist's report was received, Lee referred

Gray to an orthopedic specialist, as the MRI suggested that Gray may have a tendon tear. (Def.'s SMF ¶¶ 21, 23, 24.) During the time that Gray was waiting for his consultation with the specialist, Gray continued to meet with medical staff at Clinton, and Lee continued to prescribe Motrin for Gray's pain. (*Id.* ¶ 25.) Ultimately, in April 2013, Gray was transferred to Franklin Correctional Facility, where he now resides, and whose medical staff is now charged with his care. (*Id.* ¶ 26.)

### III. *Standard of Review*

**\*2** Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*45.

### IV. *Discussion*

In his R & R, Judge Peebles recommended dismissal of Gray's Eighth Amendment deliberate indifference claim. (Dkt. No. 43 at 12–21.) Specifically, Judge Peebles first noted that Gray failed to satisfy the objective requirement of this cause of action because Gray's medical records reflect that he was provided with frequent treatment, and therefore, "no reasonable factfinder could conclude that ... Lee's treatment of [Gray]'s shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious." (*Id.* at 16–19.) Judge Peebles further reasoned that, given the extensive treatment that Gray received, including frequent examinations, prescriptions for pain medications, x-rays, MRI testing, and referrals to orthopedic specialists, Gray also failed to prove the subjective component of a deliberate indifference claim. (*Id.* at 19–20.)

Here, Gray raises several objections to the R & R. First, Gray specifically objects to Judge Peebles' findings that Gray received consistent and adequate medical care and that Lee

did not act with deliberate indifference. (Dkt. No. 44 at 3–6.) Gray argues that Lee "often times came to different conclusions based on the same medical information" and failed to comply with both "accepted medical practice" and DOCCS policy by prescribing Motrin for long periods of time, which caused Gray stomach pains. [4] (*Id.*) The court reviews these objections *de novo*. *See Almonte,* 2006 WL 149049, at *3, *5.

[4]     The court notes that this is the first time that Gray has incorporated Lee's long-term prescription of Motrin as part of his Eighth Amendment claim. Indeed, both his complaint and response to Lee's motion for summary judgment are devoid of these allegations. (*See generally* Compl.; Dkt. No. 40.)

A prisoner's claim that he was provided insufficient medical care is analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 101–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted). "To show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." *Taylor v. Goorde,* 548 F. App'x 696, 697–98 (2d Cir.2013). The objective component asks whether the prisoner was actually deprived of adequate medical care and whether the denial in care was "sufficiently serious." *Id.* at 698 (internal quotation marks and citation omitted). The subjective component concerns the defendant's mental state, and requires a showing that the defendant acted "with deliberate indifference to inmate health"-"a mental state equivalent to subjective recklessness," which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

*3 Here, Gray has failed to satisfy both the objective and subjective components. In short, because Gray was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist, he was not actually deprived of adequate treatment-the objective component-and, further, this extensive treatment and care is evidence that Lee did not act with deliberate indifference-the subjective component. The fact that Gray was not prescribed the precise pain medication of his choosing is of no moment; " 'a prisoner does not have the right to choose his medical

treatment as long as he receives adequate treatment.' " *Hanrahan v. Mennon,* 470 F. App'x 32, 33 (2d Cir.2012) (quoting *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011)). Similarly, Gray's contentions that Lee violated DOCCS policy and "accepted medical practice" by prescribing Motrin for long-term use are equally without merit. First, a failure to comply with DOCCS policy directives or regulations is not a constitutional violation. *See Sanders v. Gifford,* No. 9:11–CV–0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov.4, 2014). Second, Gray alleges, at best, a negligence or medical malpractice claim, which also does not give rise to an Eighth Amendment violation. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Accordingly, the court adopts Judge Peebles' findings that Gray was provided with adequate medical care, and that Lee did not act with deliberate indifference.

Second, Gray objects to Judge Peebles' findings of fact that Gray "could not be in severe pain because he worked at the Clinton ... mess hall" and that Gray ultimately "secured a less strenuous work detail at the facility mess hall for reasons other than [his] severe pain." (Dkt. No. 44 at 3 (referring to Dkt. No. 43 at 16–17, 16 n. 4.) Because these proposed findings of fact are not central, or even particularly relevant, to Judge Peebles' ultimate recommendation to dismiss Gray's complaint, the court construes these as general objections, which warrant review only for clear error. *See Almonte,* 2006 WL 149049, at *4–5.

At the outset of his analysis, Judge Peebles noted that the undisputed facts did not support a finding that Gray's pain was severe. (Dkt. No. 43 at 16–17.) Judge Peebles observed that Gray's continued work as a server in the mess hall, and his testimony that he was relieved of certain work duties not because of his injury, but because he was friendly with the corrections officer who assigned job responsibilities, undermined his claims of severe pain. (*Id.* at 16 n. 4.) These facts, however, were but a few of the facts that Judge Peebles considered in determining that Gray's pain was not severe. (*Id.* at 16–17 (noting that Gray's medical records also did not support a finding of severe pain, as medical personnel often discerned no acute distress, and further noting that Gray's voluntary discontinuation of Naproxen also belied his claims of severe pain).) In any event, notwithstanding the severity, or lack thereof, of Gray's pain, Judge Peebles concluded that Gray's claim should be dismissed because he was provided with adequate medical care. (*Id.* at 16–19.) Accordingly, the court finds no clear error in either this portion of the R & R or the remainder of the R & R, and it is adopted in its entirety.

**\*4** Finally, the court notes that, in his objections to the R & R, Gray takes issue with Judge Peebles' denial of his motion to appoint counsel, arguing that, had he been appointed counsel, "summary judgment would not have been granted," and the failure to appoint counsel "may even rise to a violation of [Gray]'s right to Equal Protection." (Dkt. No. 44 at 6–7.) However, Gray's motion to appoint counsel was denied before the R & R was even issued, (Dkt.Nos.35, 37), and, therefore, Gray's dissatisfaction with the disposition of his motion to appoint counsel cannot appropriately be construed as an objection to the R & R at all. To the extent that Gray seeks to renew his motion to appoint counsel in his objections, that request is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' March 9, 2015 Report and Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Lee's motion for summary judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED** that Gray's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Gray's renewed motion to appoint counsel (Dkt. No. 44 at 6–7) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

In this civil rights action, commenced pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Dwaine Gray, a New York State prisoner, alleges that defendant Dr. Kang Lee, a prison physician, was deliberately indifferent to his serious medical needs by failing to provide him with proper pain medication and treatment for a shoulder injury suffered prior to his arrival at the correctional facility where defendant Lee was employed during the relevant time period. As relief, Gray seeks recovery of compensatory damages in the amount of $300,000, as well as injunctive relief directing the defendant to refer him for outside orthopedic consultation and prescribe for him appropriate pain medication.

Now that discovery in the action is closed, defendant has moved for summary judgment dismissing plaintiff's claim against him. In his motion, defendant Lee argues that plaintiff's claim represents little more than his disagreement with the course of treatment prescribed. For the reasons set forth below, I recommend that defendant's motion be granted.

### I. *BACKGROUND* [1]

[1]    Although plaintiff has opposed defendant's motion for summary judgment, he did not file a response to defendant Lee's statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug.22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, J.). Here,

because plaintiff was warned of the consequences of failing to properly respond to defendant's statement of undisputed material facts, *Dkt. No. 32 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant Lee's statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's statement of undisputed material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally Dkt. No. 1.* While he is currently confined elsewhere, at the times relevant to his claims in this action, Gray was incarcerated at the Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *Id.*

 **\*5** In January 2012, while detained at the Westchester County Jail, Gray slipped and fell in the shower, injuring his right shoulder. *Dkt. No. 1 at 4; Dkt. No. 32–2 at 1.* Plaintiff entered into DOCCS's custody two months later, on or about March 2, 2012, and was initially designated to the Downstate Correctional Facility ("Downstate"). *Dkt. No. 32–3 at 16,* 20. On March 16, 2012, while Gray was at Downstate, an x-ray taken of his right shoulder revealed "no fracture, dislocation, soft tissue calcification or significant arthritic change. Large enthesophyte extending from anteroinferior port of acromium measuring about 1.5 cm." *Id.* at 20; *Dkt. No. 32–2 at 57.* The impression stated on the x-ray report by the attending roentgenologist was "NO ACUTE BONE INJURY IDENTIFIED RIGHT SHOULDER STUDY. NO DJD. LARGE ENTHESOPHYTE EXTENDING FROM INFERIOR PORTION OF ACROMIUM. THIS CAN CONTRIBUTE TO SHOULDER IMPINGEMENT SYNDROME IN PROPER CLINICAL SETTING. NO PRIOR STUDY." *Dkt. No. 32–2 at 57.* According to the plaintiff's health records, a physician at Downstate met with Gray on March 20, 2012, at which time he discussed the x-ray results with plaintiff and prescribed 500 milligrams of Naproxen twice daily for thirty days. [2] *Dkt. No. 32–2 at 55; Dkt. No. 32–3 at 20–21*

[2]     Naproxen is a non-steroidal anti-inflammatory drug used to treat pain and inflammation associated with various medical conditions. *Dorland's Illustrated Medical Dictionary,* 1251 (31st ed.2007).

Plaintiff was transferred into Clinton on April 10, 2012. *Dkt. No. 32–3 at 19.* While at Clinton, his medical care was overseen by defendant Kang Lee, M.D., a prison physician employed at that facility. *Dkt. No. 32–2 at 1.*

Defendant Lee first met with Gray on April 13, 2012. *Dkt. No. 32–2 at 3,* 5–52. Plaintiff refused defendant Lee's offer to continue Naproxen at that time because, according to plaintiff, it did not help his pain. *Dkt. No. 32–2 at 3; Dkt. No. 32–2 at 51.*

Defendant Lee met with plaintiff again on May 31, 2012. *Dkt. No. 322 at 3,* 50. During that visit, plaintiff continued to complain of right shoulder pain. *Id.* Defendant Lee observed that Gray had a good range of motion and responded to his request for stronger pain medication with a short term prescription of Flexeril (cyclobenzaprine), a muscle relaxer commonly used to relieve skeletal muscle spasms and pain associated with acute musculoskeletal conditions. *Id.; see also Dorland's Illustrated Medical Dictionary,* 463, 725. During subsequent meetings with facility nurses on June 3, 2012 and June 26, 2012, Gray persisted in his refusal of Naproxen and indicated a desired to continue receiving Flexeril instead. *Dkt. No. 321 at 3; Dkt. No. 32–2 at 3,* 49.

On June 29, 2012, defendant Lee examined plaintiff's shoulder, again finding good range of motion. *Dkt. No. 32–2 at 3,* 48. According to defendant Lee, during this appointment, plaintiff requested a prescription for a narcotic analgesic. *Id.* Discerning no need for it, defendant Lee denied plaintiff's request. *Id.*

Plaintiff was next seen by defendant Lee on August 13, 2012. *Dkt. No. 32–2 at 4,* 47. At that time, despite plaintiff's claim that he could not move his right shoulder, defendant Lee continued to find that he had a good range of motion. *Id.*

 **\*6** During plaintiff's visit with medical staff at Clinton on September 4, 2012, he was not in acute distress, did not ask for pain medicine, and was observed having full range of motion in his right shoulder. *Dkt. No. 32–2 at 4,* 46. On September 8, 2012, medical personnel attended to plaintiff for complaints about a twisted ankle, and notes from that visit do not include

any indication that plaintiff complained of shoulder pain or requested pain medication. *Id.*

On September 29, 2012, defendant Lee ordered a second x-ray of Gray's right shoulder. *Dkt. No. 32–2 at 4,* 45. The x-ray, which was taken on October 4, 2012, was interpreted by the attending radiologist as follows:

> EARLY OSTEOPOROSIS IS
> PRESENT AT THE
> GLENOHUMERAL JOINT. THERE
> IS A LARGE SPUR ARISING
> FROM THE INFERIOR ASPECT
> OF THE ACROMION. THIS MAY
> CONTRIBUTE TO IMPINGEMENT.
> CONSIDER CORRELATION WITH
> MRI EXAM.

*Id.* at 70. During his appointment with plaintiff on October 15, 2012, defendant Lee discussed the results of the x-ray and prescribed Motrin for plaintiff's pain. *Id.* at 4, 44.

Defendant Lee met with plaintiff again on November 8, 2012, at which time he referred Gray for magnetic resonance imaging ("MRI") testing. *Dkt. No. 32–2 at 4,* 42. The MRI testing, conducted on January 11, 2013, resulted in the following findings, rendered by the attending radiologist:

> FINDINGS: Abnormal signal is present in the anterior aspect of the supraspinatus portion of the rotator cuff tendon consistent with a tear. There is also a suggestion of extension to the center portion of the supraspinatus tendon. Abnormal signal in the subscapularis portion of the rotator cuff tendon suggests a tear. Glenoid labrum is intact. There is abnormal signal in the superolateral aspect of the head of the right humerus consistent with bone edema. The acromioclavicular joint is intact.

> IMPRESSION: FINDINGS SUGGESTING A TEAR TO THE ANTERIOR ASPECT OF THE SUPRASPINATUS PORTION OF THE ROTATOR CUFF TENDON. THESE ABNORMALITIES ARE LOCATED ADJACENT TO PROMINENT CORTICAL SPUR ON THE UNDERSURFACE OF THE RIGHT ACROMION. POSSIBLE SUBSCAPULARIS TENDON TEAR.

*Dkt. No. 32–2 at 72.*

After receiving the MRI report, defendant Lee commenced the process for referring the plaintiff to an outside orthopedic specialist on January 31, 2013. *Dkt. No. 32–2 at 5,* 38, 73–74. While Gray awaited his orthopedic consultation, he met with medical staff at Clinton on several occasions, and defendant Lee continued to prescribe Motrin for plaintiff's pain. *Dkt. No. 32–2 at 5,* 33–37.

Plaintiff was transferred out of Clinton and into the Franklin Correctional Facility on April 25, 2013. *Dkt. No. 32–2 at 5; Dkt. No. 32–3 at 31.* At that point, defendant Lee's responsibility for plaintiff's medical treatment was transferred to the medical staff at the new facility. *Dkt. No. 32–2 at 5.*

In general, plaintiff does not dispute the above-described facts. Instead, plaintiff complains that defendant Lee swiftly terminated each appointment without undertaking any examination of him and failed to refer him to an outside specialist. *See, e.g., Dkt. No. 1 at 5–6* ("Upon seeing [defendant Lee in April 2012,] I explained that I try to move my arm, my statement to him was it hurts whenever I try to move it, he then summoned for the officer that for [sic] me to leave.... Upon seeing him, never once did he look in my medical records, all he did was ask me my name, then he said that I'm done.... [Defendant] Lee acted deliberately to deny treatment, and or [sic] to make specialty care[ ] referrals[.]"); *Dkt. No. 32–3 at 50* ("[E]very time I went to [defendant Lee's] office, it was like maybe 30 seconds, I'd been there for 30 seconds."); *Dkt. No. 40 at 3* ("[Defendant Lee] routinely ignored [plaintiff]'s complaints and medical needs and provided only cursory examinations without reviewing his medical file.").

## II. *PROCEDURAL HISTORY*

**\*7** Plaintiff commenced this action on or about March 8, 2013. *Dkt. No. 1.* Although plaintiff's complaint names two defendants, Dr. Kang Lee and Ms. Vonda L. Johnson, the medical supervisor at Clinton, the claims asserted against defendant Johnson were dismissed by Chief Judge Gary L. Sharpe in a decision and order dated September 13, 2013. *Id.* at 1–2; *Dkt. No. 10.* Judge Sharpe's order, issued pursuant to 28 U.S.C. §§ 1915(e) and 1915A, also granted plaintiff's application to proceed in the action *in forma pauperis* and dismissed plaintiff's claims asserted under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, without prejudice. *Dkt. No. 10 at 8–9.*

Plaintiff's Eighth Amendment deliberate medical indifference claim asserted against defendant Lee survived Judge Sharpe's initial order, and is the subject of defendant Lee's pending motion for summary judgment, filed on August 12, 2014. *Dkt. No. 10 at 9; Dkt. No. 32.* In his motion, defendant Lee argues that no reasonable factfinder could conclude he was deliberately indifferent to plaintiff's serious medical needs. *See generally Dkt. No. 32–4.* Plaintiff responded in opposition to defendant's motion on September 26, 2014. *Dkt. No. 40.*

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

   A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477

U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

   B. *Plaintiff's Deliberate Medical Indifference Claim*
In his complaint, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct a full examination, refer him to outside specialist, and prescribe pain medication. *See generally Dkt. No. 1.* Defendant Lee, however, contends that his care and treatment of plaintiff was appropriate, and no reasonable factfinder could conclude otherwise based on the record evidence. *See generally Dkt. No. 32–4.*

   1. *Legal Standard Governing Deliberate Medical Indifference Claims*
The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255,

268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

**\*9** *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain ." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40). [3]

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

    2. *Analysis*

Addressing first the objective element of the governing test, I note that the record evidence demonstrates defendant Lee and other DOCCS medical personnel at Clinton provided plaintiff with frequent treatment for his shoulder condition. *Dkt. No. 32–2 at 33–57.* Plaintiff's medical records, while indicating complaints of pain, do not support his claims that he suffered severe pain, and indeed, in some instances, medical personnel treating plaintiff discerned no acute distress. *See, e.g., id.* at 46. Moreover, despite plaintiff's allegations that he suffered severe pain, the evidence before the court reflects that he was able to work as a server in the facility mess hall for three hours per day, seven days a week, from approximately June 2012 until August of that year, when he began ASAT programing. *Dkt. No. 32–2 at 33–37.* In his job at the mess hall, plaintiff would fill pitchers with water, clean the tables, or disburse bread to inmates. [4] *Id.* at 34. The record also reflects that plaintiff voluntarily discontinued taking the pain medication Naproxen in or about the beginning of June 2012. *Dkt. No. 32–2 at 51; Dkt. No. 32–3 at 21.* At that time, rather than ignoring plaintiff's complaints of pain altogether, defendant Lee provided a prescription for

Flexeril, a muscle relaxer, for two weeks. *Dkt. No. 32–3 at 23.* Thereafter, plaintiff was prescribed Percocet, an analgesic comprised of oxycodone hydrochloride and acetaminophen, and over-the-counter medications for his pain. *Dkt. No. 32–2 at 33–47; Dorland's Illustrated Medical Dictionary, 1377, 1429.* Defendant Lee also thereafter ordered repeat x-rays of plaintiff's shoulder in September 2012, and ordered an MRI in January 2013, based on the x-ray results. *Id.* at 42, 45, 77–78. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that defendant Lee did not provide plaintiff with consistent and appropriate care.

4    At his deposition in connection with this matter, plaintiff first stated that he was removed from "table top" duty, involving filling water pitchers and cleaning table tops, due to the pain in his shoulder. *Dkt. No. 32–3 at 34.* Later, however, plaintiff testified that he began disbursing the bread not "because [his] shoulder was hurting him," but because he knew the corrections officer assigning jobs. *Id.* at 42.

**\*10** Even if the court assumes, for purposes of this motion, that plaintiff's allegations are true, including that defendant Lee's examinations of plaintiff were superficial and short in duration, and that defendant Lee failed to prescribe the pain medication plaintiff requested, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what diagnostic techniques—including x-rays and MRIs—and treatments should be administered to an inmate are "classic example[s] of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). In this case, plaintiff's claim is based on his desire to be examined in a specific manner and provided specific pain medications. This constitutes a disagreement regarding the course of treatment, which does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

As described above, plaintiff's medical records reflect that he was seen by defendant Lee on four occasions between April 2012 and August 2012, before defendant Lee ordered

x-rays of plaintiff's shoulder in September 2012. *Dkt. No. 32–2 at 45,* 47, 48, 50, 52. In between his visits with defendant Lee, other medical personnel at Clinton monitored plaintiff's shoulder condition. *Id.* at 33–57. When a provider callout was requested, defendant Lee timely responded with an examination of plaintiff. *Id.* at 4749. Within six months of plaintiff's arrival at Clinton, and because plaintiff's pain persisted, defendant Lee ordered x-rays, thereafter ordered MRI testing, and then initiated a process for referral of the plaintiff to a specialist. *Id.* at 38, 45, 73–74, 77–78. Under these circumstances, even taking into consideration plaintiff's allegations, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was sufficiently serious to satisfy a deliberate medical indifference claim under the Eighth Amendment.

Similarly, based on defendant Lee's declaration submitted in support of the pending motion and the treatment afforded plaintiff by defendant Lee as documented in plaintiff's medical records, I find that no reasonable factfinder could conclude that defendant Lee acted with deliberate indifference to a serious medical condition. The record reflects that on each occasion he was seen by defendant Lee, plaintiff's range of motion was observed and medication consistent with defendant Lee's professional judgment was prescribed. *Dkt. No. 32–2 at 47,* 48, 50, 52. When plaintiff's shoulder pain persisted, a new x-ray was ordered and, based upon the findings of that x-ray, MRI testing was arranged. *Id.* at 45, 77–78. Upon receipt and review of the MRI report, defendant Lee referred Gray to an outside orthopedic specialist. *Id.* at 38, 73–74. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendant Lee turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

**\*11** Accordingly, because I find that the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or subjective element of plaintiff's medical indifference claim, I recommend defendant Lee's motion for summary judgment be granted.[5]

5    Plaintiff's response in opposition to defendant Lee's summary judgment motion reflects his belief defendant Lee was negligent in providing him with treatment and liable for medical malpractice. *See generallyDkt. No. 40.* For example, in his memorandum of law, plaintiff states the following:

It is clear from Plaintiff's original claim, his response above and comprehensive exhibits that he presents a viable claim that Dr. Lee did not use reasonable care or best judgment in applying the knowledge and skill ordinarily possessed by practitioners in the field and that he deviated from accepted standards of medical practice, and that deviation was the proximate or aggravating cause of the injuries or damage to Petitioner.

*Dkt. No. 40 at 8–9.* Claims of negligence and medical malpractice, however, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ( "[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke,* No. 87–CV–7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct.21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983."). Accordingly, I recommend that, to the extent plaintiff's complaint could be construed as asserting state law negligence and medical malpractice claims, the court declines to exercise supplemental jurisdiction over those claims in the event my recommendation is accepted and plaintiff's federal claim against defendant Lee is dismissed.

## IV. *SUMMARY AND RECOMMENDATION*

Based upon a careful review of the evidence now before the court, including excerpts of plaintiff's medical records and the transcript of plaintiff's deposition, I conclude that no reasonable factfinder could find plaintiff can satisfy either the objective or subjective element of the governing test for establishing a deliberate medical indifference claim under the Eighth Amendment. Accordingly, it is therefore respectfully

RECOMMENDED that defendant Lee's motion for summary judgment (*Dkt. No. 32* ) be GRANTED, and that plaintiff's remaining deliberate indifference claim be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 9, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1724573

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2303780
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Spencer NOWINSKI, Plaintiff,

v.

M.D. RAO, R.H.S. Administrator Eileen Dinisio,
M.D. Kooi, Mthulisi Nyoni, R.N. D. Graft, M.D.
Carl Koenigsmann, and M.D. Dolan, Defendants.

6:14-CV-06559 (MAT)
|
Signed 05/21/2018

**Attorneys and Law Firms**

Spencer Nowinski, Romulus, NY, pro se

Bernard F. Sheehan, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

HON. MICHAEL A. TELESCA, United States District Judge

**I. Introduction**

**\*1** *Pro se* plaintiff Spencer Nowinski("Plaintiff"), a prisoner
currently incarcerated at the Five Points Correctional Facility
("Five Points"), commenced the instant action on September
24, 2014, alleging a violation of his Eight Amendment rights
pursuant to 42 U.S.C. § 1983 ("§ 1983"). Currently pending
before the Court is a motion for summary judgment (Docket
No. 50) filed by defendants M.D. Rao ("Dr. Rao"), R.H.S.
Administrator Eileen Dinisio ("Administrator Dinisio"),
M.D. Kooi ("Dr. Kooi"), Mthulisi Nyoni ("PT Nyoni"), R.N.
D. Graft ("PA Graf" [1]), M.D. Carl J. Koenigsmann ("Dr.
Koenigsmann"), and M.D. Dolan ("Dr. Dolan") (collectively
"Defendants"). For the reasons discussed below, the Court
grants the pending summary judgment motion and orders that
the case be closed.

[1]   The record reflects that the individual referred to by
      Plaintiff as "R.N. D. Graft" is actually physician's
      assistant ("PA") Deborah Graf. The Court has
      accordingly referred to her PA Graf.

**II. Factual Background**

The following facts are taken from the statement of facts,
declarations, and exhibits submitted by Defendants, as well
as the docket in this matter. Plaintiff did not submit any
papers in opposition to Defendants' motion, despite having
been specifically warned of the repercussions of failing to
do so. Accordingly, this Court has accepted Defendants' Rule
56 Statement of Undisputed Facts (which was submitted
in accordance with the Local Rules of Civil Procedure) as
undisputed "to the extent that [the facts set forth therein] are
supported by admissible evidence and are not controverted
by the record." *Brooks v. Piecuch*, 245 F. Supp. 3d 431, 434
(W.D.N.Y. 2017).

Plaintiff's complaint alleges that, sometime in 2002, he tore
his anterior cruciate ligament ("ACL"). In February 2002,
Plaintiff was arrested and jailed in the Cattaraugus County
Jail, where he complained about his knee injury. Over the next
nine years of incarceration, Plaintiff alleges that he was given
various forms of treatment, including knee surgery in 2003
and multiple prescriptions for pain medication. Nevertheless,
Plaintiff contends, his knee pain continued to increase over
time.

In 2011 and 2012, Plaintiff was housed at the Attica
Correctional Facility ("Attica"). During this time, because
of Plaintiff's ongoing complaints and his history of knee
pain, it was recommended that Plaintiff under a total knee
replacement. Dr. Rao, who is now retired but was at that time
employed by the New York State Department of Corrections
and Community Supervision ("DOCCS") and assigned to
Attica, reviewed this recommendation, which was ultimately
approved by DOCCS officials in Albany.

On October 26, 2011, Plaintiff underwent a total knee
replacement of his right knee. Tissues and bone fragments
taken during the surgery indicated that the condition of
his right knee was consistent with arthritis. Plaintiff stayed
in the hospital until October 31, 2011, whereafter he was
returned to Attica. To help with post-surgery pain, Plaintiff
was prescribed Tylenol with codeine.

**\*2** Plaintiff was discharged to his cell in good condition
on November 1, 2011. Dr. Rao saw Plaintiff on November
14, 2011. Plaintiff indicated he was in pain, so Dr. Rao
renewed his pain medication for an additional five days.
Plaintiff requested follow-up for his knee surgery, and Dr.
Rao informed Plaintiff that he was waiting for a note from
the physician who had performed the surgery. Beyond that,
Dr. Rao indicated that he was not able to answer questions

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)

2018 WL 2303780

about the surgery because he was not an orthopedic surgeon. Plaintiff claims to have sent letters to Dr. Rao, but Dr. Rao does not recall receiving such letters. Dr. Rao noted in the system that Plaintiff had requested to see a doctor to follow up on his surgery.

Registered Nurse Eileen Drankhan ("Nurse Drankhan"), who was employed by DOCCS at Attica, saw Plaintiff on November 28, 2011. She noted that Plaintiff was ambulating without difficulty and that he had returned his crutches. Plaintiff told Nurse Drankhan that he was able to walk "okay," but that he was not bending his right knee much. Nurse Drankhan encouraged Plaintiff to bend his knee and gave him 12 packs of ibuprofen. She also instructed him regarding simple exercises he could do to increase his knee's range of motion and minimize his pain.

Plaintiff was next seen by Attica medical staff on March 20, 2012, after he was involved in an altercation with another inmate. No complaints about his knee were noted at that time.

On July 1, 2012, Plaintiff sent a letter to Dr. Koenigsmann, DOCCS Chief Medical Officer, complaining about the medical department at Attica. Plaintiff's letter was referred to Administrator Dinisio, who was at time a regional health services administrator for DOCCS. Administrator Dinisio investigated Plaintiff's complaint and discovered that Plaintiff had recently been evaluated by his primary care provider, that he had been able to ambulate without difficult following his surgery, and that he had an appointment scheduled for July 30, 2012. Administrator Dinisio sent Plaintiff a letter setting forth those facts and encouraging him to discuss his concerns with his primary care provider.

On July 30, 2012, Plaintiff was seen by Attica medical staff and complained that his knee was not bending well and was slightly swollen. Plaintiff was given Motrin and was put on callout for a physician to review.

PA Graf then saw Plaintiff on September 11, 2012. Plaintiff told PA Graf that he had not received physical therapy after his knee surgery, that he was not experiencing relief from nonsteroidal anti-inflammatory drugs ("NSAIDs"), and that he was unable to ambulate short distances or climb stairs. PA Graf noted that Plaintiff's right knee had limited flexion and that his gait was antalgic. She referred Plaintiff to physical therapy and prescribed him Voltaren, which is an anti-inflammatory medication, for his pain and swelling.

Dr. Rao reviewed PA Graf's referral for physical therapy, which was subsequently approved by DOCCS officials in Albany. An initial physical therapy session was scheduled for September 24, 2012. However, prior to that date, Plaintiff was transferred to the Auburn Correctional Facility ("Auburn").

On October 1, 2012, shortly after his transfer to Auburn, Plaintiff was seen on sick call. Plaintiff reported that he had swelling in his right knee and that he was waiting for physical therapy. Based on this report, Dr. Kooi, who was at that time the Facility Health Services Director at Auburn, recommended that Plaintiff be scheduled for physical therapy, and an initial physical therapy appointment was scheduled for October 18, 2012.

PT Nyoni, a licensed physical therapist, saw Plaintiff on October 18, 2012. PT Nyoni would eventually see Plaintiff for physical therapy for his knee 16 times in 2012 and 2013, with Plaintiff failing to report for his physical therapy appointments on five occasions. The goals of this physical therapy were for Plaintiff to decrease his pain, improve his gait, increase his range of motion, and increase the strength in his legs. PT Nyoni employed a variety of techniques in treating Plaintiff, including the use of moist heat, range of motion exercises, and manipulation of Plaintiff's knee.

**\*3** Dr. Dolan, who was a DOCCS physician assigned to Auburn during the relevant time period, first saw Plaintiff on November 19, 2012. Plaintiff complained of right knee pain and a poor range of motion following his surgery. Dr. Dolan saw Plaintiff again one week later. Dr. Dolan noted that Plaintiff had started physical therapy on October 18, 2012, and that he had had four physical therapy sessions scheduled with two no-shows. Dr. Dolan further noted that Plaintiff's right knee had poor strength and a poor range of motion and that there signs of atrophy in his right leg. Based on Plaintiff's complaints of pain, Dr. Dolan ordered an x-ray to see whether Plaintiff's knee appliance might be loose. Dr. Dolan noted that Plaintiff should see him again after the x-ray was performed. An x-ray of Plaintiff's knee was taken on November 30, 2012, and showed that his knee prosthesis was in place without subsidence or loosening.

Dr. Dolan saw Plaintiff again on March 20, 2013. Plaintiff noted that Plaintiff's physical therapy had been somewhat irregular since his surgery and that he had a limited range of motion and pain in his right knee. Dr. Dolan suspected that there might be adhesions in Plaintiff's knee that were affecting his range of motion. Dr. Dolan recommended

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 64 of 284

2018 WL 2303780

further physical therapy for Plaintiff, which was approved by DOCCS officials in Albany. Dr. Dolan further noted that it might ultimately be necessary for an orthopedic surgeon to manipulate Plaintiff's knee under anesthesia to address possible adhesions. Dr. Dolan ordered additional x-rays and blood tests of Plaintiff, and prescribed acetaminophen for his pain. Dr. Dolan did not refuse to refer Plaintiff to a specialist, but instead felt that physical therapy should be tried first, to see if Plaintiff's range of motion could be improved.

Three months later, in June 2013, PT Nyoni recommended that Plaintiff see a physician because he was showing minimal improvement in his range of motion through physical therapy. Dr. Kooi saw Plaintiff on June 27, 2013. Dr. Kooi noted that Plaintiff could walk but occasionally had a limp. Based on PT Nyoni's notes and recommendation and his own evaluation of Plaintiff, Dr. Kooi then referred Plaintiff for a consultation with an orthopedic surgeon, and the referral was approved by DOCCS officials in Albany. Dr. Kooi also prescribed Plaintiff Naprosyn for his pain.

Dr. Kooi saw Plaintiff again on July 12, 2013. Dr. Kooi discontinued the Naprosyn and prescribed Neurontin for pain. He further advised Plaintiff to be active to help with his numbness and range of motion. On August 23, 2013, Dr. Kooi saw Plaintiff and increased his Neurontin dosage from 300 mg to 600 mg.

Plaintiff was seen by orthopedic surgeon Dr. Eldridge Anderson ("Dr. Anderson") on September 10, 2013. Dr. Anderson indicated that Plaintiff should continue with physical therapy and that a consultation with a revision specialist might be appropriate.

Dr. Kooi saw Plaintiff on September 12, 2013. He discussed Dr. Anderson's findings and recommendations with Plaintiff. Plaintiff indicated that he did not believe further physical therapy would be helpful.

On January 17, 2014, Plaintiff was seen by orthopedic surgeon Dr. Mitchell Rubinovich ("Dr. Rubinovich") to discuss possible revision surgery. That same day, Dr. Rubinovich sent a letter to Dr. Daniel Weinstock ("Dr. Weinstock"), a DOCCS physician at Auburn, in which he recommended that Plaintiff be provided a cane. Dr. Rubinovich also indicated that he wanted to further review Plaintiff's imaging results and to discuss the matter with his medical partner. Dr. Rubinovich stated that he would contact Dr. Weinstock after he spoke with his partner.

Dr. Weinstock called Dr. Rubinovich's office on February 10, 2014, and was told that Dr. Rubinovich had been away for two weeks, but would be returning on February 17, 2014, and would call Dr. Weinstock back. Dr. Weinstock subsequently reported on March 3, 2014 that no revision surgery was possible at that time and that Plaintiff should be considered and evaluated for a cane.

**\*4** Dr. Kooi saw Plaintiff on April 3, 2014. Dr. Kooi approved the recommendation that Plaintiff be given a cane and ordered a cane for Plaintiff. Plaintiff received his cane on April 8, 2014. Dr. Kooi subsequently approved Plaintiff's permit for a cane on at least three occasions.

Plaintiff was thereafter transferred to Five Points. He ultimately had knee revision surgery on November 17, 2016. Additional physical therapy was recommended by an orthopedic surgeon, but Plaintiff refused to attend. Plaintiff has been given a handicapped cell with shower access and has a permit to walk with a cane.

## III. Discussion

### A. Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *See Scott v. Harris*, 550 U.S. 372, 372 (2007), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). A party opposing a motion for summary judgment " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).

### B. Failure to Exhaust Administrative Remedies

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 65 of 284

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)

2018 WL 2303780

As a threshold matter, Defendants contend that Plaintiff failed to exhaust his administrative remedies with respect to all of his claims related to events in 2011, 2012, "early 2013," and after August 20, 2013. The Court agrees.

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [§ 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). DOCCS "maintains a three-tiered administrative review and appeals system for prisoner grievances." Torres v. Carry, 672 F. Supp. 2d 338, 343 (S.D.N.Y. 2009). In particular, "[f]irst, an inmate may file an inmate grievance complaint form or a written grievance, if forms are not available, with the Inmate Grievance Resolution Committee ("IGRC"). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Finally, [DOCCS] permits an inmate to appeal the superintendent's written decision to the CORC [Central Office Review Committee]." Id. (internal citations omitted). An inmate must exhaust all three levels of review before he or she can bring a claim under § 1983. Moreover, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

**\*5** In this case, DOCCS has submitted uncontroverted evidence that Plaintiff fully exhausted only one grievance related to his medical care following his knee surgery. That grievance was filed on August 20, 2013. The IGRC investigated and granted Plaintiff's grievance to the extent that it agreed his future health care needs should be tended to in a timely fashion. Plaintiff appealed to the superintendent, who agreed with the findings of the IGRC and noted that Plaintiff had an upcoming appointment with an orthopedic surgeon. Plaintiff appealed to CORC, and on February 12, 2014, CORC issued a decision granting Plaintiff's request in part. In particular, CORC found that Plaintiff's complaints regarding his medical concerns in 2011, 2012, and "early 2013" were untimely. CORC further found that, with respect to the timely aspects of Plaintiff's grievance, there was no evidence to substantiate any claims of improper medical care or malfeasance by DOCCS staff. CORC encouraged Plaintiff to address his medical concerns via sick call.

CORC's conclusion that Plaintiff failed to timely grieve his complaints from 2011, 2012, and early 2013 is well-founded. Under DOCCS' system for inmate grievances, grievances

must be filed "within 21 calendar days of an alleged occurrence." N.Y. Comp. Codes R. & Regs. § 701.5. In this case, Plaintiff did not file his grievance until August 20, 2013. Accordingly, his complaints related to any events occurring before July 30, 2013 were untimely. Plaintiff therefore failed to exhaust his administrative remedies with respect to such complaints.

Plaintiff also failed to exhaust his administrative remedies as to events occurring after August 20, 2013, the date of the only grievance he appealed to completion. Plaintiff never filed a grievance related to these later events, and under the PLRA, may not maintain a § 1983 claim based upon them. Moreover, there is no evidence in the record from which the Court could conclude that Plaintiff was unable to comply with DOCCS' grievance procedures. To the contrary, the fact that Plaintiff filed and appealed to completion his August 20, 2013 grievance demonstrates that grievance procedures were available to him. Accordingly, to the extent Plaintiff's claims are based on events occurring before July 30, 2013 or after August 20, 2013, Defendants are entitled to judgment in their favor.

### C. Plaintiff Cannot Show a Violation of His Eight Amendment Rights

Plaintiff's claims are based on his Eight Amendment right to be free from cruel and unusual punishment. "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). However, the Second Circuit has made it clear that "not every lapse in medical care is a constitutional wrong." Id. Instead, to demonstrate an Eighth Amendment violation, Plaintiff is required to meet two separate requirements. "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." Id. (internal quotation omitted). Determining whether a deprivation was objectively serious in turn involves two inquiries: "The first inquiry is whether the prisoner was actually deprived of adequate medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 279-80.

The second requirement to show an Eighth Amendment deprivation of medical care claim "is subjective: the charged official must act with a sufficiently culpable state of mind."

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 66 of 284

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)
2018 WL 2303780

*Id.* at 280. In particular, "[i]n medical-treatment cases not arising from emergency situations," the party claiming a constitutional violation must show that a defendant "acted with deliberate indifference to inmate health." *Id.*

In this case, even taking into account events before July 30, 2013 and after August 20, 2013, it is clear that no rational factfinder could hold that either of these requirements were met. Turning to the first requirement, there is simply no evidence that Plaintiff was deprived of adequate medical care. To the contrary, the record shows that Plaintiff was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medication, and accommodations such as a cane and a handicapped cell. *See Gray v. Kang Lee*, No. 9:13-CV-258 GLS/DEP, 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (prisoner could not satisfy objective requirement where he was "frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist").

 *6  With respect to the second, subjective requirement, once again there is no evidence from which a rational factfinder could hold in Plaintiff's favor. It is apparent that Defendants made reasonable efforts to provide Plaintiff with appropriate medical care. The medical staff at both Attica and Auburn took Plaintiff's knee complaints seriously, providing him with a wide variety of pain medications, referring him for physical therapy, and seeking the advice of outside orthopedic surgeons. Plaintiff's disagreement with his providers' medical judgment regarding the advisability of ongoing physical therapy is insufficient to demonstrate deliberate indifference to his medical needs. *See Green v. Khrisnaswamy*, 134 Fed.Appx. 465, 466 (2d Cir. 2005). Nor is Plaintiff's belief that he should have been prescribed stronger pain medication

evidence of a culpable state mind by Defendants. "While prisoners have a right to medical care, they do not have a right to chose a specific type of treatment. Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment." *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (internal citations omitted).

Based on the record, Plaintiff is unable to "demonstrate that any of the Defendants was aware of but consciously disregarded a substantial risk to his health." *Day v. Lantz*, 360 Fed.Appx. 237, 239 (2d Cir. 2010). To the contrary, the record in this case shows that Plaintiff's providers actively attempted to address Plaintiff's medical concerns. As such, summary judgment in favor of Defendants as to all of Plaintiff's claims is warranted.

### III. Conclusion

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Docket No. 50). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *See Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of the Court is instructed to enter judgment in favor of Defendants and to close the case.

**ALL OF THE ABOVE IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 2303780

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 9854844

2015 WL 9854844
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Martin SANTIAGO, Plaintiff,
v.
Patrick M. JOHNSON, R.P.A.,
Nancy Smith, N.A., Defendants.

9:11-CV-635 (LEK/TWD)
|
Signed 11/16/2015

**Attorneys and Law Firms**

Martin Santiago, 03-B-1801, Marcy Correctional Facility, P.O. Box 3600, Marcy, New York 13403, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, The Capitol, James Seaman, Esq., Assistant Attorney General, Of Counsel, Albany, New York 12224, for Defendants.

*ORDER AND REPORT AND RECOMMENDATION*

THÉRSE WILEY DANCKS, United States Magistrate Judge

**\*1** Plaintiff Martin Santiago, who is presently confined at Marcy Correctional Facility, commenced this *pro se* civil rights action under 42 U.S.C. § 1983 against Defendants Physician Assistant ("PA") Patrick M. Johnston ("Johnston") and Nurse Administrator ("NA") Nancy Smith ("Smith"). (Dkt. No. 1.) Plaintiff claims that during the two months he was confined at Upstate Correctional Facility ("Upstate"), Defendants were deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment by failing to schedule an appointment for him to see a doctor to obtain a bottom bunk pass which he claims was necessitated by chronic back problems that caused severe pain and old gun shot wounds to his leg that made climbing difficult; failing to prescribe appropriate pain medication for Plaintiff's chronic back pain; failing to properly diagnose, treat, and provide pain medication for injuries Plaintiff sustained when he fell from the ladder while coming down from the top bunk on January 7, 2009; failing to allow him use of a bottom bunk after his fall; and failing to give him a flu shot. *Id.*

This matter is now before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. Nos. 81 and 82.) For the reasons that follow, the Court recommends that Plaintiff's motion for summary judgment (Dkt. No. 81) be denied, and that Defendants' cross-motion for summary judgment (Dkt. No. 82) be granted.

**I. BACKGROUND**

**A. Plaintiff's Bunk Bed History Prior to and Following his Confinement at Upstate**

Plaintiff was originally received into the custody of the Department of Corrections and Community Supervision ("DOCCS") at the Elmira Correctional Facility ("Elmira") in August of 2003. (Dkt. No. 82–6 at ¶ 4.) Plaintiff had been shot multiple times by the police while he was in the process of committing armed robbery in November of 2002. (Dkt. No. 82–17 at 20–21.) According to Plaintiff, he was shot in both legs, his private area, ankle, and shoulder. *Id.* at 21. When Plaintiff arrived at Elmira, he had a fistula of the right femoral artery in the groin area, an open sore on his left buttock, and problems with his legs and left shoulder, all traceable to his gunshot wounds. (Dkt. Nos. 82–6 at ¶ 6; 83 at 83–85.)

The Screening and Physical Assessment for Placement in a Double–Cell ("Double–Cell Assessment") completed by the intake nurse at Elmira on August 8, 2003, concluded that there were medical issues requiring Plaintiff to be placed in a bottom bunk at that time.[1] (Dkt. No. 83 at 85.) Pursuant to DOCCS Lower Bunk Placement Policy (Health Services Policy No. 1.49), issued in September of 2000, an inmate is entitled to a bottom bunk only if he has been issued a bottom bunk permit, and a bottom bunk permit may only be issued if the inmate meets the following clinical criteria:

— On medication for a seizure disorder

— Diabetes/insulin dependent

— Age over 60 years

— Weight over 300 pounds

**\*2** — Documented back problems through physician review and approval (e.g., radiologic or surgical)

— Permanent physical disability, (i.e., amputee, rheumatoid arthritis)

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)

2015 WL 9854844

— Diagnosis of sleep apnea.

(Dkt. No. 82–2 at 1.) Inmates with acute injury or serious medical conditions, i.e. fractures, recent MI, advanced arthritis, may be considered for temporary bottom bunk assignment subject to review every thirty days for continued placement.[2] *Id.*

[1]    Plaintiff testified at his deposition that from 2003 until he was transferred to Upstate, he was never placed in the top bunk. (Dkt. No. 82–17 at 81.) However, a number of the cell assignments listed on a locator system printout of the facilities at which Plaintiff had been housed during that time period end with a "T," which Plaintiff acknowledged at his deposition referred to top bunk. *Id.* at 118; Dkt. No. 93–1. Plaintiff also acknowledged having been placed in top bunks prior to his transfer to Upstate in his reply brief to Defendants' sur-reply brief. (Dkt. No. 94 at 2.) There is no evidence that Plaintiff was ever issued a permanent bottom bunk permit at any facility during his incarceration. (Dkt. No. 82–1 at ¶ 20.)

[2]    Plaintiff concedes that DOCCS has a bottom bunk policy but contends it is unconstitutional. (Dkt. Nos. 82–22 at ¶ 21; 92–2 at ¶ 21.)

Zebra Cicconi–Crozier ("Cicconi–Crozier") has been a licensed Registered Nurse ("RN") since 1996, worked at Elmira for approximately six years beginning in 2003, and returned there as Nurse Administrator in 2012 after working in other DOCCS facilities. (Dkt. No. 82–6 at ¶ 3.) According to Cicconi–Crozier, it is not uncommon for the nursing staff to place inmates just entering DOCCS custody in a bottom bunk when there is evidence of potentially serious medical problems inasmuch as the nurses tend to err on the side of caution with reception inmates when there is no established DOCCS medical records upon which they can rely. *Id.* at ¶ 5. Cicconi–Crozier concluded, based upon her review of Plaintiff's medical records, that it appeared he was initially placed in a bottom bunk due to a fistula in his groin, problems with his legs from multiple gunshot wounds, an open sore in his left buttock, and a problem with his left shoulder, apparently traceable to his gunshot wounds. *Id.* at ¶ 6. Given Plaintiff's medical problems and the fact that he was new to DOCCS, Cicconi–Crozier would herself have placed him in a bottom bunk when he arrived at Elmira. *Id.* at ¶ 7. She noted, however, that if Plaintiff's medical problems resolved,

he would no longer qualify for a bottom bunk unless he met one of the criteria in the DOCCS bottom bunk policy. *Id.*

Plaintiff concedes that when he was transferred to Wende Correctional Facility ("Wende") a few months later in October of 2003, the nurse performing his medical intake review determined that he did not meet any of the DOCCS criteria for a bottom bunk at that time.[3] (Dkt. Nos. 82–22 at ¶ 42; 92–2 at ¶ 42.) In April of 2006, Plaintiff was transferred to Livingston Correctional Facility ("Livingston"). (Dkt. No. 82–1 at ¶ 26.) The intake nurse determined that Plaintiff had "no limitations as a result of his health." (Dkt. No. 83 at 87.) However, on May 2, 2006, an RN at Livingston gave Plaintiff a temporary bottom bunk until his next doctor's appointment. (Dkt. No. 83 at 10, 88.) The RN's May 2, 2006, note in Plaintiff's Ambulatory Health Record ("AHR") refers to documentation of August 8, 2003, when Plaintiff was found to require a bottom bunk at Elmira. *Id.* at 10. When the doctor at Livingston saw Plaintiff on May 8, 2006, he determined that there was no medical necessity for Plaintiff to have a bottom bunk. *Id.* at 11. Plaintiff admits the doctor made that determination. (Dkt. No. 92–2 at ¶ 45.)

[3]    Plaintiff has admitted Defendants' Statement of Material Facts stating that he was found not to meet the criteria for a bottom bunk at Wende, Livingston, Orleans, and Clinton. (Dkt. Nos. 82–22 at ¶¶ 42–43, 46, 51 and 56; 92–1 at ¶¶ 42–43, 46, 51 and 56.) However, Plaintiff has added a comment to each admission to the effect that the particular facility does not have long term double bunking like Upstate. (Dkt. No. 92–1 at ¶¶ 42–43, 46, 51 and 56.) Plaintiff explained in a Reply Brief (Dkt. No. 94) to Defendants' Sur–Reply Brief (Dkt. No. 93) that his comment was not intended to mean that there were no double bunks at the facilities, but that there was no "long term" double bunking, and that he was not required to remain in a top bunk for even half of the two months he spent in a top bunk at Upstate in any other facility where he was housed. (Dkt. No. 94 at 2.)

\*3  Plaintiff was transferred to Orleans Correctional Facility ("Orleans") in September of 2007. (Dkt. No. 82–1 at ¶ 30.) The Double–Cell Assessment completed by the intake nurse at Orleans on September 26, 2007, reveals that the nurse found no medical indications requiring Plaintiff to have a bottom bunk. (Dkt. No. 83 at 91.) Plaintiff was housed at Cayuga Correctional Facility ("Cayuga") from November of

2015 WL 9854844

2007 until late 2008. (Dkt. No. 82–1 at ¶ 32.) A Medical Problem List printout from August of 2008, while Plaintiff was at Cayuga, contains no SR1D code, which would have been present if he had a permanent bottom bunk placement. [4] *Id.* Plaintiff admits that no medical indication for a bottom bunk permit was apparent on his Health Screening for Intrasystem Transfer form prepared on or about December 2, 2008. (Dkt. Nos. 82–22 at ¶ 49; 92–1 at ¶ 49.)

[4]     Plaintiff denies Defendants' Statement of Material Facts regarding the significance of the absence of an SR1D Code in his response. (Dkt. Nos. 82–22 at ¶ 48; 92–2 at ¶ 48.) The reason for the denial is that Plaintiff has no knowledge of SR1D codes. (Dkt. No. 92–1 at ¶ 7.) The SR1D code, as explained by Smith, is included under "Medical Conditions" on the inmate's Medical Problem's List when the inmate has been granted a permanent bottom bunk permit. (Dkt. No. 82–1 at ¶ 20.)

Plaintiff was housed at Upstate from December 5, 2008, to February 4, 2009. (Dkt. Nos. 82–22 at ¶ 50; 92–2 at ¶ 50.) Plaintiff was then transferred to Clinton Correctional Facility ("Clinton"). (Dkt. No. 82–1 at ¶ 77.) As of October 21, 2009, while Plaintiff was at Clinton, his Medical Problem List contained no SR1D code, which meant that as of that date he had still not been issued a permanent bottom bunk permit. (Dkt. Nos. 82–22 at ¶ 51; 92–2 at ¶ 51.)

When Plaintiff was transferred to Franklin Correctional Facility ("Franklin") in October of 2009, the Health Screening for Intrasystem Transfer found no reason for assigning him to a bottom bunk. (Dkt. No. 82–22 at ¶ 52; 92–2 at ¶ 52.) A nurse's note in Plaintiff's AHR, dated October 30, 2009, about a week after his transfer to Franklin, records the following interaction with Plaintiff:

> Objective: Would like bottom bunk. lumbar spine x-ray negative
>
> Assessment: does not meet criteria—threatens to fall off top bunk if not issued 1 bunk. States already has lawsuit in place @ last facility

(Dkt. No. 83 at 59.) Plaintiff denies making any threat. (Dkt. Nos. 82–17 at 101–04; 92–1 at ¶ 9.) According to Plaintiff, the RN ignored his medical condition so he told her that he had problems in the past with the top bunk, sustaining an injury when he fell. (Dkt. No. 92–1 at ¶ 9.) Plaintiff told the nurse that he had spasms sometimes, and she had to take that into

account. *Id.* Plaintiff claims to have informed the nurse that the staff at Upstate had disregarded his medical condition and caused him to be injured. *Id.*

Plaintiff was released on parole in 2011 and was returned to state custody in or about June of 2013 following a parole violation. (Dkt. Nos. 82–22 at 11 54–55; 92–2 at 11 54–55.) Plaintiff was returned to Wende, where an RN determined he did not meet any of the criteria for a bottom bunk. (Dkt. Nos. 82–22 at ¶ 56; 92–2 at ¶ 56.) A week later, a nurse at Elmira reached the same conclusion. (Dkt. Nos. 82–22 at ¶ 57; 92–2 at ¶ 57.)

As of March of 2014, Plaintiff's Medical Problem List did not include an SR1D code, thus indicating that he did not have a permanent bottom bunk permit at that time. (Dkt. Nos. 8222 at ¶ 58; 92–2 at ¶ 58.)

**B. Defendants Smith and Johnston**

Defendant Smith has been employed as an RN by DOCCS for twenty-four years, has been an NA since 2001, and has been NA at Upstate since 2003. (Dkt. No. 82–1 at ¶ 1.) As NA, Smith oversees the administration of nursing care at Upstate and, among other things, hires and schedules nursing staff for Upstate, and serves as a liaison between the nursing staff and facility administration. *Id.* As a part of her job responsibilities, Smith also handles complaint letters from inmates. (Dkt. No. 82–1 at 11 54–55.) Smith typically does not provide hands on nursing care. *Id.* at ¶ 3. Smith never provided hands on nursing care to Plaintiff while he was at Upstate. (Dkt. Nos. 82–22 at ¶ 120; 92–2 at ¶ 120.)

**\*4** Johnston has been registered as a PA in New York for more than thirty-one years, working in the area of internal medicine. (Dkt. No. 82–5 at ¶¶ 1–2.) Johnston worked on a halftime basis at Upstate, splitting a full-time position with another PA from 2006 until May of 2010. *Id* at ¶ 3. Johnston worked two eight hour days one week and three eight hour days the next, beginning at 6:00am. *Id.* During the time he was at Upstate, the facility also generally had one full-time facility physician, one half-time physician, and a nurse practitioner. *Id.* PAs at Upstate functioned in the role of primary care practitioner. *Id.*

Johnston would generally spend his time at Upstate seeing patients who had been scheduled to see him by the RN assigned to the building. *Id.* at ¶¶ 5–6. Johnston did not schedule inmate appointments himself so that unless and until he saw the patient or reviewed his chart, he typically had no

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 70 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)
2015 WL 9854844

knowledge of the patient's medical condition or status. *Id*. at ¶¶ 5–6.

### C. Nursing Coverage at Upstate

Upstate contains four Special Unit Housing ("SHU") blocks, each of which can house up to 300 inmates. (Dkt. Nos. 82–22 at ¶ 5; 92–1 at ¶ 5.) A nurse exam room with two desks (one for the nurse and one for the medical provider), an examination table, a medicine cart, and a medicine cupboard, is located on the first or ground floor of each SHU block. (Dkt. Nos. 82–22 at ¶ 6; 92–1 at ¶ 6.) One RN is assigned to each block on the day and evening shifts, and the day shift nurses make rounds throughout the building one time per day, while the night shift nurse makes rounds twice per day. (Dkt. Nos. 82–22 at ¶ 7; 92–1 at ¶ 7.) During the midnight shift (10:00pm to 6:00am), two nurses cover the entire facility, with one stationed in the infirmary and the other going through the blocks, checking inventory, and pulling charts for inmates who have requested sick call the following day. (Dkt. Nos. 82–22 at ¶ 8; 92–1 at ¶ 8.)

### D. Processing of Medical Prescriptions at Upstate

There is no pharmacy or pharmacist at Upstate. (Dkt. No. 82–8 at ¶ 2.) There is a pharmacy office which has been staffed by Pharmacy Aide, Marlene Perry ("Perry"), since March of 2000. *Id*. at ¶¶ 1–2. Perry's duties and responsibilities as Pharmacy Aide include obtaining prescription medications for Upstate inmates at outside pharmacies. *Id*. at ¶ 1. Perry only works the day shift Monday through Friday, and the pharmacy office is closed when she has the day off and on weekends and state holidays. *Id*. at ¶ 3. When the pharmacy office is closed, the nursing staff procures medication that is needed immediately. *Id*.

There is a locked drop box outside the infirmary for refill sheets, prescriptions that do not have to be filled stat, and other requests directed to Perry. *Id*. at ¶ 5. Perry makes a photocopy of prescriptions she receives and faxes the sheet to Health Direct, one of the pharmacies used by Upstate. *Id*. The original prescription is maintained for seven years. *Id*. Medications from Health Direct generally arrive within a day or so after the prescription is faxed. *Id*. at ¶ 6.

According to Johnston, he normally kept at least one prescription pad in each area where he worked and would carry another one, so that he would have a pad available when he needed to write a prescription. (Dkt. No. 82–5 at ¶ 24.) It was his usual custom and practice when ordering

medication or other treatment to write an accompanying note in the patient's medical chart, documenting the treatment, in addition to writing out the prescription. *Id*. at ¶ 23. Once Johnston wrote a prescription, he generally left it with the file. *Id*. at ¶ 25. The nursing staff and pharmacy aide handled everything from there in terms of processing the prescription and administering the medication to the inmate. *Id*.

### E. Plaintiff's Medical Intake Exam at Upstate

**\*5** When an inmate is transferred to a different DOCCS facility, an RN at the new facility does an "intake" examination. (Dkt. Nos. 82–22 at ¶ 28; 92–1 at ¶ 28.) The RN assesses the inmate's general health to determine if he has any potentially life-threatening or serious conditions that need uninterrupted treatment or immediate attention. *Id*. If so, the RN arranges to have appropriate medical care put in place to address the issues right away, without having to wait for a routine medical provider appointment which could take weeks or months. *Id*.

As a part of the intake exam, the RN obtains information concerning the inmate's medical conditions not only from the inmate himself but from his medical chart, including an "outdraft" note prepared by the medical staff at the facility from which the inmate is transferring that summarizes his medical condition to expedite review at the new facility. (Dkt. Nos. 82–22 at ¶ 29; 92–1 at ¶ 29.)

The RN who conducted Plaintiff's intake examination at Upstate prepared: (1) an entry in Plaintiff's AHR (Dkt. No. 83 at 42–43); (2) Health Screening for Intrasystem Transfer, *id*. at 99100; (3) "S" Block SHU Entrance Exam Form, *id*. at 101–02; Inmate Orientation Form, *id*. at 103–04; and (5) Double–Cell Assessment. *Id*. at 105.

Plaintiff's AHR reveals that when he arrived at Upstate his existing health problems were asthma and chronic back pain as well as a current medical complaint of right leg pain. *Id*. at 42. The medications being taken by Plaintiff immediately prior to his arrival at Upstate included an Albuterol inhaler; Naproxen, 325 mg. twice a day; and Claritin 10 mg., once a day. *Id*. The intake RN noted in Plaintiff's AHR that he needed routine prescriptions written for Naproxen and Claritin. *Id*. at 43.

According to Smith, Plaintiff's intake records gave no indication that he met any of the criteria listed in the DOCCS bottom bunk policy. (Dkt. Nos. 82–1 at ¶ 40; 82–22 at ¶ 62.) The intake RN concluded that there was no known medical

2015 WL 9854844

reason why Plaintiff needed to be placed in a bottom bunk, and Plaintiff was placed in a top bunk. (Dkt. Nos. 82–22 at ¶¶ 63, 67; 92–1 at ¶¶ 63, 67.) Plaintiff claims, however, that he has back problems and he is permanently disabled from his gunshot wounds. (Dkt. No. 92–2 at ¶ 62.)

Plaintiff contends he informed the RN at his intake exam that he had previously received a diagnosis from a qualified PA at the Elmira reception center that his physical condition required him to be housed in a bottom bunk, and that the recommendation had been a part of his medical records since August 4, 2003.[5] (Dkt. No. 1 at ¶ 1.) Plaintiff claims he also verbally reminded the RN that his physical condition would make it extremely difficult, if not impossible, for him to climb in and out of the top bunk. *Id.* According to Plaintiff, the RN told him he would have to see a doctor before he could receive a bottom bunk. *Id.*; Dkt. No. 82–17 at 79–80.

[5]    There is no indication in Plaintiff's medical chart that he requested a bottom bunk at intake. (Dkt. No. 82–1 at ¶ 41.)

### F. Plaintiff's Medical Care at Upstate Pre–January 7, 2009

On December 9, 2008, in response to the intake RN's note, Johnston wrote prescriptions for Plaintiff for Naproxen 325 mg. and Claritin 10 mg., but he did not see Plaintiff. (Dkt. Nos. 82–1 at ¶ 40; 82–22 at ¶ 62.) The same day, Plaintiff asked the sick call nurse for over-the-counter Ibuprofen, which was given to him. (Dkt. Nos. 82–1 at ¶ 62; 82–22 at ¶ 62.) Plaintiff claims that he also asked the sick call nurse for a bottom bunk pass, and the nurse failed to document the request. (Dkt. No. 1 at ¶ 2.) On December 12, 2008, Plaintiff requested a refill of the Naproxen and Claritin prescriptions, and according to the sick call nurse, the refills were processed, leaving Plaintiff with twenty-three remaining refills. (Dkt. Nos. 82–1 at ¶ 46; 83 at 43.)

**\*6** Plaintiff fell from his bunk during the early morning hours of December 16, 2008. (Dkt. Nos. 82–1 at ¶ 71; 82–22 at ¶ 71.) According to Plaintiff, he was half way down the ladder when his leg locked, and he fell to the floor hitting the back of his head. (Dkt. No. 82–17 at 51–52.) At approximately 6:45am, Plaintiff reported to the sick nurse that he fallen and injured his groin. (Dkt. Nos. 82–1 at ¶ 71; 82–22 at ¶ 71.) Plaintiff explained that he was already experiencing pain from his injuries and that his condition had worsened, and he asked to see a doctor and to have an x-ray to make sure nothing was damaged. (Dkt. Nos. 1 at ¶ 3; 82–17 at 52–53,

97.) A nurse, not a party to this action, examined Plaintiff and, as documented on his medical chart, found no apparent injury, concluded that Plaintiff needed no treatment, and did not schedule him to see a medical provider. (Dkt. Nos. 82–1 at ¶ 72; 82–22 at ¶ 72.) Plaintiff asked for another refill of his Naproxen and Claritin prescriptions on December 16th, leaving him with twenty-two refills. (Dkt. Nos. 82–1 at ¶ 73; 82–22 at ¶ 73.)

On December 20, 2008, Plaintiff was seen by a nurse on sick call rounds and asked for, among other things, an appointment with the facility PA to get a flu shot.[6] (Dkt. Nos. 82–22 at ¶ 74; 92–1 at 174.) The nurse told Plaintiff he would receive a flu shot because of his asthma. *Id.* However, Plaintiff did not receive a flu shot while he was confined at Upstate. (Dkt. Nos. 1 at ¶ 4; 82–17 at 46.)

[6]    At Upstate, flu shots were provided by nursing staff, not by medical providers. (Dkt. Nos. 82–22 at ¶ 75; 92–1 at 175.)

Between December 22, 2009, and January 6, 2009, Plaintiff was seen by the RN on sick call seven times, mostly for skin related complaints. (Dkt. Nos. 82–22 at ¶ 85; 92–2 at ¶ 85.) According to his medical records, during that time Plaintiff complained once of allergies and once of back pain. *Id.* Plaintiff requested another refill of his Naproxen and Claritin prescriptions on December 23, 2008, leaving him with twenty-one refills remaining. (Dkt. Nos. 82–22 at ¶ 76; 92–1 at 176.) On December 30, 2008, Plaintiff requested another refill of his Naproxen and Claritin prescriptions, leaving him with twenty refills remaining. (Dkt. Nos. 82–22 at ¶ 86; 92–1 at ¶ 86.)

### G. Plaintiff's Medical Care at Upstate from January 7, 2009, Until his Transfer to Clinton

On January 7, 2009, Plaintiff fell from the bunk bed ladder for a second time and was seen in the facility emergency room. (Dkt. Nos. 82–22 at ¶ 87; 92–2 at ¶ 87.) The non-party RN who saw Plaintiff in the emergency room indicated in Plaintiff's AHR that he reported hitting the back of his head but denied loss of consciousness and complained of discomfort/pain in the left/middle area of his back. Palpation of Plaintiff's left middle back by the nurse revealed muscle tightness associated with spasm. *Id.*; Dkt. No. 83 at 48. The RN's examination revealed that Plaintiff's vital signs were stable, he was alert, and was able to sit up with assistance. (Dkt. No. 83 at 48.) The nurse found no bruising or swelling

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 72 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)

2015 WL 9854844

or open areas on the back of Plaintiff's head. *Id.* Plaintiff was able to bear his full weight. *Id.*

Plaintiff also saw Defendant Johnston for the first time in the facility emergency room on January 7, 2009. (Dkt. Nos. 82–5 at ¶ 18; 82–22 at ¶ 87; 92–2 at ¶ 87.) Johnston documented Plaintiff's chief complaint as low back pain without loss of consciousness. (Dkt. Nos. 82–22 at ¶ 89; 92–2 at ¶ 89.) Upon physical examination, Johnston observed that Plaintiff's gait was slow but steady, and that he was able to move all of his extremities. *Id.* Johnston elicited tenderness to palpitation in Plaintiff's lumbro-sacral spine area and ordered an x-ray of his lumbar spine. *Id.* Johnston read the x-ray as being negative as did the radiologist, who found that the x-ray revealed no abnormality. *Id.* Johnston diagnosed Plaintiff as having sustained a back contusion i.e., bruising of the soft tissues such as muscles, ligaments, and tendons in the area. (Dkt. Nos. 82–22 at ¶ 90; 92–2 at ¶ 90.)

*7 Johnston prescribed Flexeril 10 mg. three times a day for five days; Naproxen 500 mg. twice a day for five days; and a temporary bottom bunk permit for seven days. (Dkt. Nos. 82–5 at ¶ 22; 83 at 48.) Johnston had found the prescribed treatment regimen successful for the type of injury sustained by Plaintiff in a vast majority of cases. (Dkt. No. 82–5 at ¶ 22.)

Plaintiff has complained that Johnston forced him to walk back to his cell when he could not even stand up and his back was feeling like vice grips. (Dkt. No. 82–17 at 38.) According to Johnston, he saw no reason why Plaintiff could not ambulate back to his cell under his own power as he was able to move all his extremities and bear his full weight. (Dkt. No. 82–5 at ¶ 29.) Moreover, Johnston saw no reference in the medical record to Plaintiff requesting transport. *Id.* According to Johnston, transport arrangements are typically handled by security and the nursing staff in any event. *Id.*

Plaintiff's AHR shows that he was occupying the bottom bunk on January 8, 2009, as designated by the "B" following the cell number, and the top bunk, as designated by the "T" again on January 13, 2009. (Dkt. No. 83 at 49.) However, Plaintiff contends he was never moved to a bottom bunk in accordance with Johnston's instructions. (Dkt. No. 82–17 at 39, 56, 74.)

Plaintiff saw Johnston for the second and last time on January 15, 2009, when he had a routine asthma evaluation. (Dkt. Nos. 82–22 at ¶¶ 100, 104; 92–2 at ¶¶ 100, 104.) Plaintiff testified at his deposition that when Johnston asked him about the back injury he had sustained on January 7, 2009, Plaintiff

told him that he was still having pain and had not yet been given a bottom bunk. (Dkt. No. 82–17 at 73–74.) Plaintiff testified that he told Johnston he thought he needed physical therapy since his back was still tight. *Id.* at 74. Plaintiff also complained that he had not received his flu shot. *Id.* Johnston does not recall Plaintiff complaining about either his back or the flu shot, and states that while it is his usual practice to document medical complaints, there is no documentation of such complaints by either him or the nurse with whom he was working that day. (Dkt. No. 82–5 at ¶ 32.)

Although pain medication was apparently delivered to Plaintiff in his cell at 8:00pm on January 7, 2009, as of January 17, 2009, when he saw RN Candy Atkinson ("Atkinson"), he had still not received the Flexeril 10 mg. or Naproxen 500 mg. prescribed by Johnston on January 7, 2009. (Dkt. Nos. 82–7 at ¶¶ 9–10; 83 at 50.) When Plaintiff told Atkinson about the medication, she checked the refill log and determined that there was no record that Plaintiff had ever received the Flexeril or the new Naproxen order increasing the dosage to 500 mg. from 325 mg. (Dkt. No. 82–7 at ¶ 10.) Atkinson determined that the medication did not appear urgent at that point because Plaintiff had seen Johnson on January 15, 2009, and had not mentioned that he had never received the Flexeril and Naproxen 500 mg. (Dkt. No. 82–7 at ¶ 13.) In addition, since the PA had not discontinued Plaintiff's previous Naproxen prescription, Plaintiff could have ordered refills, and he was also receiving over-the-counter pain medication from the medication cart at his request. *Id.*

Atkinson sent a note to Perry regarding the medications and was later told by her that the pharmacy office had never received the January 7, 2009, prescriptions for Plaintiff. (Dkt. Nos. 82–7 at ¶¶ 13, 15; 82–8 at ¶ 18.) Atkinson wrote a note in Plaintiff's AHR alerting the medical provider and indicating that new orders were needed. *Id.* at ¶ 15. Atkinson saw Plaintiff again on January 20, 2009, and he asked her for Tylenol, which she gave him, and for a refill of his Claritin prescription. *Id.* at ¶ 14. Atkinson noted that Plaintiff was able to fully bear his entire weight with an upright posture and exhibited a normal gait. *Id.*

*8 Johnston saw Atkinson's note that Plaintiff had not received the Flexeril and Naproxen 500 mg. when he was doing patient care on January 20, 2009. (Dkt. 82–5 at ¶ 36.) It was the first time he learned that Plaintiff had not received the medications. *Id.* When it was brought to his attention, he re-ordered both medications the same day. *Id.* at ¶ 37; Dkt. No. 83 at 51. Plaintiff signed for the Flexeril (generic

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 73 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)
2015 WL 9854844

Cyclobenzaprine was dispensed) and Naproxen on January 20, 2009, and received refills of both on January 27, 2009, and February 3, 2009, before being transferred out of Upstate. (Dkt. Nos. 82–8 at ¶ 18; 82–9.)

### H. Plaintiff's Grievances and Correspondence to Defendant Smith

#### 1. Inmate Grievance Complaint UST–37792–08

Plaintiff's Grievance Complaint UST–37792–08 is dated December 22, 2008, and was filed on December 30, 2008. (Dkt. Nos. 82–13 at ¶ 6; 82–14 at 4.) Plaintiff complained that he had put in to see the doctor about a bottom bunk because of numerous problems including his back and an injury he sustained while using the ladder on the bunk beds. (Dkt. No. 82–14 at 4.) Plaintiff noted that he had been at Upstate for a little over two weeks and had not seen the doctor and asked that he be allowed to see a doctor in a timely fashion. *Id.* Plaintiff also asked that his file be present when he was at sick call because there was no proof that his problems were being documented, and that his injury be checked out by x-ray to make sure nothing had been damaged in his earlier fall from the bunk bed. *Id.*

The Inmate Grievance Resolution Committee ("IGRC") denied the grievance, as did the Superintendent on appeal. (Dkt. Nos. 82–10 at ¶ 10; 82–14 at 4–7.) Plaintiff appealed to the Central Office Review Committee ("CORC"), which on March 4, 2009, upheld the Superintendent's determination. (Dkt. No. 82–14 at 1.)

#### 2. *Plaintiff's Letter to Defendant Smith dated December 26, 2008*

On December 26, 2008, Plaintiff wrote a letter to Smith concerning a problem he was having with the medical staff and his housing arrangement. (Dkt. No. 81–4 at 24.) Plaintiff explained that he had multiple gunshot wounds in his leg and shoulder which made it difficult for him to climb the bunk ladder. *Id.* According to Plaintiff, he had been informed that he had to see the doctor in order to be placed on the bottom bunk, and it had been over two weeks and nothing had been done. *Id.* Plaintiff wrote that nothing had been done even though he had explained that the medication he was taking was not helping with his pain and had informed the nurse that he had fallen off his bed. *Id.*

Smith denies receiving the letter from Plaintiff and has not found it despite a careful search. (Dkt. No. 82–1 at ¶¶ 53, 57.) According to Smith, she receives an average of fifty to sixty inmate letters each month, and when she receives a letter, she refers it to the nurse on the inmate's housing block with a memo requesting that the nurse who is caring for him and is most familiar with the inmate and his medical problems provide Smith with pertinent information so that she can respond to the inmate. *Id.* at ¶ 54. When Smith sends out a response memo to the inmate, she makes a copy of it and files it stapled to the inmate's letter. *Id.* ¶ 55. When Smith is unavailable, Kelly Rabideau, who is acting nurse administrator when Smith is away, handles letters from inmates following the same procedures as Smith. (Dkt. No. 82–10 at ¶¶ 3–4.)

Smith contends that if she had received Plaintiff's December 26, 2009, letter she would have followed her ordinary procedures and in her response memo to him would have advised him to address the matters raised with the RN making rounds on his block. (Dkt. No. 82–1 at ¶ 58.) According to Smith, one of the reasons she defers to the RN on the block is that requests for a bottom bunk and stronger pain medication are commonly made by inmates when they are not medically warranted, and the RN on the block is in the best position to assess the request. *Id.* In addition, it would undermine the RNs if Smith routinely overrode their judgment on such matters. *Id.* Because there is more than one RN staffed on the block and additional nurses on the night shift, if Plaintiff had a problem with one of the RNs, he could speak with another. *Id.*

**\*9** If Smith had responded to Plaintiff's December 26, 2009, letter, she would have noted in her memo that he had seen five different nurses on eight different occasions during the three weeks he had been at Upstate, and there was no documented request for a bottom bunk or stronger pain medication and nothing in his medical records providing a basis for finding that he met the criteria for a bottom bunk. *Id.* at ¶ 59.

#### 3. *Inmate Grievance Complaint UST–37993–09*

Plaintiff's Inmate Grievance Complaint UST–37993–09 is dated January 12, 2009, and was filed on January 20, 2009. (Dkt. No. 82–15 at 4.) Plaintiff complained that he had been having problems with the medical staff since his arrival at Upstate. *Id.* At one point, Plaintiff had a back problem and was told by a nurse the he would see a doctor soon. *Id.* On

2015 WL 9854844

December 5, 2008, he had requested a bottom bunk and was never granted one. *Id.* Plaintiff stated in the grievance that he had fallen out of his top bunk in mid-December and requested stronger pain medication and not received it, and that he had written to Smith on December 26, 2008, and never received a response. *Id.* When Plaintiff requested sick call, the only thing they could give him was Ibuprofen, which he could not take with Naproxen. *Id.* In addition, when Plaintiff fell from his bunk the second time and injured his back, he was made to walk back to his cell after a back x-ray and was not given pain medication until 8:00pm, after he had suffered about eight hours of severe back pain. *Id.* Plaintiff claimed that at the time he wrote the grievance, he had no medication. *Id.* Plaintiff asked for an MRI, strong pain medication, physical therapy, and a bottom bunk. *Id.*

The IGRC denied the grievance. (Dkt. No. 82–15 at 6.) The IGRC concluded that according to HSPM 1.49, Plaintiff did not meet the criteria for a bottom bunk. *Id.* On appeal, the Superintendent also denied the grievance. *Id.* CORC upheld the Superintendent's determination and unanimously denied Plaintiff's grievance. *Id.* at 1.

#### 4. *Plaintiff's Letter to Defendant Smith dated January 8, 2009*

On January 8, 2009, the day after Plaintiff's second fall from his bed, he wrote a letter to Smith regarding his back injury. (Dkt. Nos. 81–4 at 25; 82–1 at ¶ 67.) Plaintiff informed Smith that he had a limited range of motion and pain and requested that an MRI be done, and that he have physical therapy for his back. *Id.* Smith responded by memo on January 9, 2009. (Dkt. No. 82–4 at 1.) In her response, Smith noted that Plaintiff had been seen by the PA on January 7, 2009, and he had seen no indication for an MRI. Smith noted that it had only been a few days since Plaintiff's fall, and advised him to address the situation at sick call if he was still having problems. *Id.* Smith also informed Plaintiff that she could not order an MRI or physical therapy as that could only be done by the PA. *Id.*

#### 5. *Plaintiff's Letter to Defendant Smith dated January 20, 2009*

Plaintiff wrote a third letter to Smith on January 20, 2009, complaining that he had not received the Naproxen 500 mg and Flexeril prescribed for his back injury. (Dkt. No. 82–4 at 1.) According to Smith, the letter was never received at the

NA's office. (Dkt. No. 82–1 at ¶ 76.) Inasmuch as Plaintiff received the medication on January 20, 2009, there would have been nothing for Smith to do in any event. (Dkt. Nos. 82–8 at ¶ 18; 82–9.)

## II. APPLICABLE LEGAL STANDARDS

**\*10** Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [7] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

[7]   Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 75 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)

2015 WL 9854844

"under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) [8] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

[8]    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

### III. ANALYSIS

#### A. Legal Standard for Eighth Amendment Claims

The Eighth Amendment protects prison inmates from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin* ("*Hathaway I* "), 37 F.3d 63, 66 (2d Cir.1994). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer,* 511 U.S. at 832. To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Id.*

**\*11** A claim alleging that prison conditions violate the Eighth Amendment, including those claiming inadequate medical care, must satisfy both an objective and subjective requirement the conditions must be "sufficiently serious" from an objective point of view and, and the plaintiff must demonstrate that the prison officials acted subjectively with "deliberate indifference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). On an Eighth Amendment claim that prison officials have intentionally disregarded an inmate's serious medical needs, "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." See *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citation omitted).

Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections Medical Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 280).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith,* 316 F.3d at 185. If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing on the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280.

Medical conditions vary in severity, so a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000). A "serious medical condition" is "a condition of urgency, one that may

2015 WL 9854844

produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I,* 37 F.3d at 66. Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin* ("*Hathaway II* "), 99 F.3d 550, 553 (2d Cir.1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (quoting *Hathaway II,* 99 F.3d at 553).

**B. Plaintiff's Claim that He was Wrongfully Denied a Permanent Bottom Bunk Permit at Upstate**

*\*12 Plaintiff claims that Defendants' failure to assign him to a bottom bunk permit at Upstate due to his back pain and pain in his right leg that left him vulnerable to falling from the top bunk, constituted deliberate indifference to his safety in violation of his Eighth Amendment rights. (Dkt. Nos. 1 at 192–2 at ¶ 63.) The record evidence does not support Plaintiff's claim.

*1. Objective Component of Plaintiff's Claim*

Plaintiff's medical records support the conclusion that, while he had chronic back pain, there was no radiologic or surgical documentation of back problems sufficient to meet the back problem criteria for a permanent bottom bunk permit set forth in DOCCS Health Services Policy No. 1.49. (*See* Dkt. No. 83.) Furthermore, there is nothing in Plaintiff's medical records showing that residual problems from his gunshot wounds satisfied any of the other clinical criteria in the Policy, or were sufficiently serious to warrant a permanent bottom bunk pass. *Id.*; Dkt. No. 82–2 at 1.

Plaintiff relies heavily on his having been given a bottom bunk permit when he arrived at the reception center at Elmira in August of 2003. (Dkt. No. 83 at 85.) However, at that point in time, Plaintiff still had significant gunshot injuries, including a fistula in his groin, problems with his legs, an open sore on his left buttock, and a problem with his left shoulder, which are believed to have been the reason why he was issued a bottom bunk permit. (Dkt. No. 82–6 at ¶¶ 3–7.)

Although Plaintiff claims that he was never in the top bunk before arriving at Upstate (Dkt. No. 82–17 at 81), documentary evidence reveals that other than at the time of initial reception at Elmira, the only time Plaintiff was given a bottom bunk permit was when he was given a temporary permit by an RN at Livingston in May 2006. (Dkt. No. 83 at 10, 88.) Plaintiff's records reveal that the rationale for the temporary permit was the August 2003, determination made at Elmira. *Id.* at 10. The temporary permit was revoked by the doctor, who found Plaintiff had no medical necessity for a bottom bunk. *Id.* at 11.

The intake RN at Upstate found that Plaintiff did not meet the clinical criteria for a bottom bunk set forth in Health Services Policy No. 1.49, and Plaintiff has not been found to qualify for a permanent bottom bunk under those criteria at the facilities in which he has been confined since his time at Upstate. (Dkt. No. 83 at 10–11, 85, 87–88.)

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**
2015 WL 9854844

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 77 of 284

Based upon the foregoing, the Court finds that the evidence in the record fails to establish that Plaintiff had a serious medical condition warranting a permanent bottom bunk pass under the established criteria.

### 2. Lack of Personal Involvement

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (citations omitted). The evidence shows that neither Johnston nor Smith was personally involved in the determination made by the intake nurse at Upstate on December 5, 2008, that Plaintiff did not meet any of the criteria for a bottom bunk permit set forth in DOCCS Health Services Policy 1.49, or in the claimed delay in scheduling an appointment with the doctor (or in this case PA) regarding Plaintiff's alleged need for a permanent bottom bunk pass. (Dkt. Nos. 82–2 at 1; 83 at 105.)

**\*13** Plaintiff has not shown that Johnston was involved in, or was even aware of, the intake nurse's determination that he was not entitled a bottom bunk permit. His complaint is that he was not scheduled to see Johnston to request a bottom bunk permit in a timely manner. (Dkt. 8217 at 35–36.) According to Johnston, he did not schedule inmate appointments himself, so unless and until he saw a patient or reviewed his chart, he typically had no knowledge of the patient's medical condition or status. (Dkt. No. 82–5 at ¶¶ 5–6.) The evidence in the record reveals that Johnston first saw Plaintiff on January 7, 2009, after he had fallen from the bunk bed ladder. *Id.* at ¶ 18.

As NA, Smith acted in a supervisory capacity while Plaintiff was housed at Upstate. (Dkt. No. 82–1 at ¶¶ 1, 3, 54–55.) There is no evidence that Smith was personally involved in the determination by the intake nurse that Plaintiff was not entitled to a permanent bottom bunk permit. The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant

exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 872, 873 (2d Cir.1995). [9]

[9]
   In *Raspardo v. Carlone,* 770 F.3d 97, 117 (2d Cir.2014), the Second Circuit noted that it had not determined "the contours of the supervisory liability test ... after *Iqbal*." The Court found it unnecessary to do so in *Raspardo.* Because it is unclear as to whether *Iqbal* overrules or limits *Colon,* this Court continues to apply the categories of supervisory liability set forth in *Colon.*

As a part of her responsibilities as NA, Smith did handle inmate complaint letters at the time Plaintiff claims to have sent her a December 26, 2008, letter complaining that his gunshot wounds made it difficult for him climb the bunk bed ladder, he had been waiting over two weeks to see the doctor about being placed on the bottom bunk, and he had already fallen off the bed. (Dkt. No. 81–4 at 24.) However, Smith denies ever having received the letter and has stated that if she had received it, she would have referred it to the nurse on Plaintiff's housing block with a request for pertinent information so that she could respond to Plaintiff, and in her response memo would have advised him to discuss the issue with the RN making rounds in his block. (Dkt. No. 82–1 at ¶ 58.) Furthermore, according to Smith, she would also have included in her memo that nothing in Plaintiff's medical records provided a basis for finding that he met the criteria for a bottom bunk. *Id.* at ¶ 59. Based upon the foregoing, the Court concludes that there is no basis for supervisory liability against Smith with regard to the determination that Smith did not qualify for a bottom bunk.

Even if Smith had received Plaintiff's December 26, 2008 letter, district courts in this circuit have routinely held that an NA who investigates a grievance does not become personally involved in the alleged underlying constitutional violation. *See DeJesus v. Albright,* No. 08 Civ. 5804(DLC), 2011 WL 814838, at \* 5–6, 2011 U.S. Dist. LEXIS 23710, at \* 18–21 (S.D.N.Y. Mar. 9, 2011); *Gates v. Goord,* No. 99 Civ. 1378(PKC), 2004 WL 1488405, at \*10–11, 2004 U.S. Dist. LEXIS 12299 at \* 32–35 (S.D.N.Y. July 1, 2004); *Patterson v. Lilley,* No. 02 Civ. 6056(NRB), 2003 WL 21507345, at \*6–7, 2003 U.S. Dist. LEXIS 11097, at \*19–22 (S.D.N.Y. June 20, 2003); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 267 (W.D.N.Y.1998).

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)

2015 WL 9854844

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 78 of 284

### 3. *Deliberate Indifference*

**\*14**  Even if the Court were to conclude that Johnston and Smith were personally involved in the denial of a permanent bottom bunk bed permit to Plaintiff, there is no evidence to support deliberate indifference on either of their parts. There is no evidence in the record showing that Plaintiff satisfied any of the criteria for a permanent bottom bunk pass in Health Services Policy No 1.49, or had any serious medical condition warranting a bottom bunk. There are therefore no facts shown from which an inference could have been drawn by Defendants that Plaintiff had a serious medical need for a permanent bottom bunk pass, or that they were aware that there was a need, and either Johnston or Smith consciously or intentionally disregarded or ignored it. *See Farmer* 511 U.S. at 835, 837.

### C. Plaintiff's Claim of Inadequate Medical Treatment at Upstate

#### 1. *Complaint Regarding Failure to Receive a Flu Shot*

According to Plaintiff, he requested but did not receive a flu shot while he was confined at Upstate, even though Defendant Johnston told him on January 15, 2009, that he would receive one shortly. (Dkt. No. 1 at ¶ 10.) There is no evidence in the record showing personal involvement by Smith with regard to Plaintiff not receiving a flu shot. There is also no evidence that Plaintiff suffered any harm as a result of not being given a flu shot at Upstate. Therefore, the Court finds that Plaintiff has failed to show that he suffered sufficiently serious harm from the failure to receive a flu shot at Upstate to establish an Eighth Amendment violation for deliberate indifference to his serious medical needs. *See Grissom v. Rohling,* 431 F. App'x 693, 696 (10th Cir.2011) (dismissing plaintiff's Eighth Amendment claim for failure to give him a flu shot where he failed to show sufficiently serious harm to implicate the Cruel and Unusual Punishment Clause).

#### 2. *Complaints of Inadequate Medication for Pain Prior to January 7, 2009*

When Plaintiff arrived at Upstate, he was taking Naproxen 325 mg. twice a day for chronic back pain. (Dkt. No. 83 at 42.) The intake RN noted in Plaintiff's AHR that he needed routine prescriptions written for the Naproxen, and the prescriptions

were written by Johnston, who did not see Plaintiff at the time. *Id.* at 43; Dkt. No. 82–1 at ¶ 40. Plaintiff has alleged in his complaint that he complained of severe back pain to the sick-call nurse in December 9, 2008, and to the RN on duty when he fell from his bunk bed on December 16, 2008. (Dkt. No. 1 at ¶¶ 2–3.) The complaints are not documented in Plaintiff's medical records. (*See* Dkt. Nos 83; 82–14 at 6.)

There is no evidence of personal involvement by Johnston with regard to Plaintiff's pain medication pre-January 7, 2009, other than writing the prescription that allowed Plaintiff to continue the Naproxen 325 mg. twice a day that he had been taking prior to his transfer to Upstate. The only evidence suggesting personal involvement by Smith is Plaintiff's December 26, 2008, letter stating that he had informed a nurse that his pain medication was inadequate, which Smith denies receiving. Furthermore, as noted above, even if Smith had received Plaintiff's December 26, 2008 letter, and investigated his complaint, that would not be sufficient to constitute personal involvement by Smith in the alleged underlying constitutional violation. *See DeJesus,* 2011 WL 814838, at *5–6 (S.D.N.Y. Mar. 9, 2011).

Given the absence of evidence showing Defendants' personal involvement in determining Plaintiff's pain medication at Upstate pre-January 7, 2009, the Court finds that Plaintiff has failed to establish his Eighth Amendment claim against Defendants regarding his inadequate pain medication claim.

#### 3. *Complaints Regarding Plaintiff's Medical Treatment from January 7, 2009, Until His Transfer Out of Upstate*

**\*15**  Johnston examined and treated Plaintiff when he fell from the bunk bed ladder on January 7, 2009. (Dkt. Nos. 82–5 at ¶ 18; 88–22 at ¶ 87.) Plaintiff complains that Johnston forced him to walk back to his cell when he could not even stand and was in significant pain. (Dkt. No. 82–17 at 38.) According to Johnston, he saw no reason why Plaintiff could not ambulate back to his cell as he was able to move all his extremities and bear his full weight. (Dkt. No. 82–5 at ¶ 29.)

Plaintiff also complains that he did not receive the Flexeril 10 mg. and Naproxen 500 mg., which Johnston prescribed for Plaintiff's injury on January 7, 2009, in a timely manner. (Dkt. Nos. 82–5 at ¶ 22; 83 at 48.) The evidence reveals that the prescriptions Johnston wrote for the Flexeril and Naproxen 500 mg. were not received by the pharmacy office, and when Johnston found out from a note left in the file by Nurse

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 79 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)
2015 WL 9854844

Atkinson, who was told about it by Plaintiff on January 17, 2009, he re-ordered the medications the same day. (Dkt. Nos. 82–5 at ¶¶ 36–37; 83 at 51.) Plaintiff signed for the medication on January 20, 2009, and was given refills on January 27, 2009, and February 3, 2009, before being transferred out of Upstate. (Dkt. Nos. 82–8 at ¶ 18; 82-9.)

On January 8, 2009, Plaintiff sent a letter to Smith complaining of pain and a limited range of motion and requesting that an MRI be done and that he have physical therapy for his back. (Dkt. No. 81–4 at 25.) Smith, who had no authority to order an MRI or physical therapy for Plaintiff, responded to Plaintiff's letter that Johnston had seen no indication for an MRI and that Plaintiff should give it a few days to see if things improved. (Dkt. No. 82–4 at 1.) Smith advised Plaintiff to address any continuing problems at sick call. *Id.*

### a. *Johnson's Diagnosis and Treatment of Plaintiff's Injuries*

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citations omitted). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Id.* The fact that a plaintiff might have preferred an alternative treatment or believes he did not get the medical attention he wanted, does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of medical intervention implicate medical judgment and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Moreover, medical judgments that amount to negligence or malpractice do not become constitutional violations because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence is not actionable under § 1983).

Johnston's decision to order an x-ray of Plaintiff's lumbar spine and not an MRI as Plaintiff wanted implicates medical judgment and not the Eighth Amendment.[10] *Sonds,* 151 F.Supp.2d at 312. Not ordering physical therapy likewise implicated Johnston's medical judgment. According to Johnston, the treatment regimen he prescribed Flexeril and Naproxen for what he diagnosed as a back contusion was successful for that type of injury in a vast majority of cases.

(Dkt. No. 82–5 at ¶ 22.) The fact that Plaintiff disagreed and wanted an alternative diagnostic technique to be used and different treatment to be undertaken does not rise to the level of a constitutional violation. *Sonds,* 151 F.Supp.2d at 311. The record is devoid of evidence that Johnston acted with deliberate indifference in the diagnosis and treatment of Plaintiff's back injury.

[10] Because the evidence reveals that Smith had no authority to order an MRI or physical therapy and so advised Plaintiff, the Court finds that she was not personally involved in Plaintiff's treatment despite his complaint letter to her of January 8, 2009. (Dkt. No. 82–4 at 1.)

**\*16** The Court finds that Plaintiff's claim that being required to walk back to his cell by Johnston after being examined when he could not stand and was in severe pain constituted a violation of his Eighth Amendment right to be free from cruel and unusual punishment fails as well. There is no evidence of a conscious disregard of a substantial risk of serious harm to Plaintiff on Johnston's part in having Plaintiff walk back to his cell. *See Chance,* 143 F.3d at 703. Plaintiff was able to ambulate, and at most, having Plaintiff walk back to his cell constituted negligence or an inadvertent failure to provide adequate medical care on Johnston's part. *See Estelle,* 429 U.S. at 106 (negligence and the inadvertent failure to provide adequate medical care do not state a valid claim under the Eighth Amendment).

### b. *Plaintiff's Failure to Receive the Medication Prescribed by Johnston in a Timely Manner*

While the record clearly supports Plaintiff's claim that he did not receive the Flexeril and Naproxen prescribed by Johnston until January 20, 2009, the evidence establishes that once Johnston prescribed medication, it was his practice to leave the prescription with the file, and the nursing and pharmacy staff handled having the prescription filled. (Dkt. No. 82–5 at ¶ 23, 25.) There is no evidence that Johnston played any role in the delay in filling Plaintiff's prescriptions. In fact, the evidence reveals that Johnston did not learn that the prescriptions had not been filled until he saw Atkinson's January 17, 2009, note to that effect and re-ordered the medications the same day he learned of the error. (Dkt. Nos. 82–5 at ¶¶ 36–37; 83 at 51.)

2015 WL 9854844

c. *Temporary Bottom Bunk Permit*

According to Plaintiff, he was never given a bottom bunk as required by the seven day temporary bottom bunk pass ordered by Johnston. (Dkt. No. 82–17 at 73–74.) Plaintiff claims that he told Johnston on January 15, 2009, that he had not been given a bottom bunk as Johnston had prescribed. *Id.* Johnston has no recollection of being told about the bunk situation, and there is nothing in his medical records supporting Plaintiff's claim that he spoke to Johnston about it. (Dkt. No. 82–5 at ¶ 32.)

The record reflects that Johnston's order for Plaintiff to have a seven day temporary bottom bunk pass was properly entered in Plaintiff's medical records by Johnston. (Dkt. No. 83 at 48.) Furthermore, because Plaintiff's AHR indicates that he was occupying a bottom bunk on January 8, 2009, it remains unclear whether Plaintiff was given a bottom bunk as ordered by Johnston. *Id.* at 49.

There is, in any event, no evidence suggesting that it was a part of Johnston's duties as a PA to make sure the order was followed, and any failure on his part to do so would at best constitute negligence, which is not actionable under § 1983. *Daniels,* 474 U.S. at 332. Moreover, even if Plaintiff did make Johnston aware that he had yet to be given a bottom bunk when he saw him on January 15, 2009, the seven day time period for which the bottom bunk had been ordered had already expired, so that the failure to implement the order on January 15, 2009, without clear evidence that Plaintiff's back injury still required a bottom bunk, would not constitute deliberate indifference to a serious medical condition for Eighth Amendment purposes.

## IV. CONCLUSION

Based upon the evidence in the record, the Court concludes that no reasonable jury could find that Defendants Johnston or Smith violated Plaintiff's Eighth Amendment right to adequate medical care. Therefore, the Court recommends that Plaintiff's motion for summary judgment (Dkt. No. 81) be denied, and Defendants' cross-motion for summary judgment (Dkt. No. 82) be granted. Inasmuch as the Court is recommending that Defendants' be granted summary judgment for the reasons set forth herein, it finds it unnecessary to reach Defendants' qualified immunity argument.

**\*17  ACCORDINGLY**, it is hereby

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 81) be **DENIED** and Defendants' cross-motion for summary judgment (Dkt. No. 82) be **GRANTED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report–Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

ATTACHMENT

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 81 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)
2015 WL 9854844

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
1999 WL 983876

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glennmon, Sgt. Stevens, Lt. Hanbert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all in their capacities, Defendants.

No. 93 Civ. 5981(WHP) JCF.    |    Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

**Background**

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request

form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

**A. Standard for Summary Judgment**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party

must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") (citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *prose,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *prose* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 82 of 284

2015 WL 9854844

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
1999 WL 983876

product of *prose* litigants should be generously and liberally construed, but [the *prose*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department*, 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *prose* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B. *Constitutional Claim***

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock.*Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir.1993); Young v. Coughlin, 866 F.2d 567, 570 (2d Cir1989).* However, this right is not absolute. *SeeBenjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."*Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison.*O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."*Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

**Footnotes**

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *SeeDavidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[1]

**Conclusion**

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
1999 WL 983876

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)
2011 WL 814838

2011 WL 814838
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William DE JESUS, Plaintiff,
v.
Joy ALBRIGHT, et al., Defendants.

No. 08 Civ. 5804(DLC). | March 9, 2011.

**Attorneys and Law Firms**

William De Jesus, Auburn, NY, pro se.

Jeb Harben, Assistant Attorney General, New York, NY, for defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

*1 Plaintiff William De Jesus ("De Jesus"), proceeding *pro se*, brings this action pursuant to 28 U.S.C. § 1983 against various employees of the New York State Department of Correctional Services ("DOC") in their individual capacities.[1] De Jesus alleges that, while he was incarcerated in the Fishkill Correctional Facility ("Fishkill"), defendants violated his constitutional rights by failing to attend to his medical needs. Defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, the motion is granted in part.

**BACKGROUND**

**I. The Parties**

Unless otherwise noted, the following facts are undisputed. Plaintiff De Jesus is a prisoner in the custody of the DOC. At the time he filed the complaint, he was resident at Fishkill. Defendant Dr. John Supple ("Supple") is a physician at the Regional Medical Unit ("RMU") at Fishkill who served as plaintiff's primary health care provider. Defendant Dr. Edward Sottile ("Sottile") is a physician and the Facility Health Services Director at the Fishkill RMU. His duties include supervising all medical treatment and the medical staff at Fishkill, including Supple. Defendant Joy Albright ("Albright") is the Nurse Administrator of the Fishkill RMU, in charge of supervising the clinical practice of nurses at that

facility, but, according to DOC policies, not a supervisor of the medical care given by doctors. Defendant Angie Maume ("Maume") is the Acting Deputy Superintendent of Health Services at the Fishkill RMU, directing the operations and coordination of support services at the facility, but not, according to DOC policies, directing inmate medical care. Defendant Elizabeth Williams ("Williams") is the Deputy Superintendent of Health Services of the Fishkill RMU, who like Maume, directs support services at the Fishkill RMU, not medical care.[2]

**II. Medical Treatment Prior to Arriving at Fishkill**

De Jesus alleges a history of medical ailments that dates back to October 2005 while resident at New York State's Upstate Correctional Facility. His various medical complaints started with a chronic sore throat, and later included eye pain, problems with eyesight, chronic migraine headaches and continued sore throat.

While resident at Great Meadows Correctional Facility ("Great Meadows") and, later, Coxsackie Correctional Facility ("Coxsackie") De Jesus received medical care for his throat and eye complaints. He was examined by an otolaryngologist (an ear, nose and throat specialist, or "ENT") in May 2006, when he underwent a CT scan of his throat and was prescribed medication for acid reflux. He was again seen by an ENT in July 2007. In response to complaints about chest pains and seeing flickering lights, De Jesus was given an electrocardiogram ("EKG") in November 2006, the results of which were normal. De Jesus's vision problems were examined by an optometrist in May 2007, who prescribed him glasses, and an ophthalmologist in July 2007, who could not identify anything wrong with his eyes. His medical history indicates that his first complaint of migraine headaches occurred in July 2007. De Jesus was also twice examined by psychiatrists in the Office of Mental Health ("OMH") at Great Meadows in November 2006, neither of whom referred him for further mental health services related to his physical symptoms.

**III. Plaintiff's Medical Treatment at Fishkill**

*2 De Jesus's complaint concerns the medical care he received during his time at Fishkill, where he was transferred in October 2007. From the beginning of De Jesus's confinement at Fishkill, Supple was assigned to serve as his primary health care provider. De Jesus was seen regularly by Supple and nurses in the RMU starting very shortly after his transfer to Fishkill. These visits were first in reference

to his complaints of eye and throat pain, and seeing flashing lights. His medical records show that while at Fishkill, De Jesus consistently exhibited signs of sore throat, including inflammation, red coloration, and increased mucous. De Jesus was prescribed Claritin, triamcinolone, albuterol and other allergy medications that are designed to relieve eye pain and sore throat, among other symptoms. He was also given an x-ray of his sinuses to investigate his complaints of sore throat in November 2007.

De Jesus sent two letters of complaint about his medical treatment shortly thereafter. The first, dated November 19, 2007, was sent to Sottile, and referenced his persistent eye pain and flashing lights in his vision. The second was dated December 7, 2007 and sent to Albright, referencing his eye and throat pain.

De Jesus filed a formal grievance in January 2008 claiming that he was suffering from serious eye and throat pain and that Supple was not properly treating his condition. Nursing staff, including Albright and Maume, investigated De Jesus's grievance and provided information to the Inmate Grievance Resolution Committee ("IGRC"), which reviews such grievances. In the report denying De Jesus's complaint, the IGRC referenced his visits with Supple, the x-ray he received in November 2007 and the prior medical care plaintiff received at Great Meadows and Coxsackie as evidence that he had been receiving treatment for his eye and throat pain.

On February 19, 2008, De Jesus sent a new letter to Williams, referencing severe eye pain, flashing lights and headaches. De Jesus's headaches were referenced in the record of his March 28 medical exam, the first time they were mentioned in his medical records since arriving at Fishkill. Supple referred De Jesus for an examination by an ophthalmologist in April 2008. This exam did not reveal any abnormalities, although the ophthalmologist suggested that plaintiff's eye pain might be connected to his migraines.

De Jesus filed another grievance complaint in June 2008, complaining of eye pain, flashing lights and violent headaches, and requesting an MRI or CT scan. This grievance was also denied because the IGRC found that De Jesus had been seen by several doctors all of whom had found no "organic basis" for his complaints. Upon appeal to the DOC Central Office Review Committee, De Jesus was told that he should refer his request to Sottile, who would have authority to authorize alternate treatments. De Jesus was also

informed that he could "request a consultation from an outside provider of his choice by making necessary arrangements and assuming financial responsibility" pursuant to Health Services Policy Manual Item 7.2.

*3 Upon Supple's referral, Dr. Ramasree Karri ("Karri"), a psychotherapist, examined De Jesus in July 2008 but could not identify "any psychiatric condition including somatoform disorders" that could be the root of his ailments. Karri's evaluation notes indicate that plaintiff told her that his eye ailment "slows me down and hinders my ability to move around." De Jesus alleges that this evaluation, in addition to the earlier psychiatric evaluations conducted at Great Meadows, found that his complaints were not psychological. He also alleges that Karri advised plaintiff to continue to try to determine the root of his symptoms. De Jesus maintains that he has never suffered from any psychological problems or taken psychotropic medication. Karri, however, stated that although she did not identify any obvious psychiatric disorders at the time of her examination, she had not made a medical diagnosis that plaintiff's symptoms "had a diagnosable medical basis or ... could be alleviated through medical treatment."

Supple again advised De Jesus to seek counseling at OMH during examinations in August and October 2008 because "no physical basis for his symptoms ha[d] been found by several medical providers over 2 1/2 years" and he "advised [De Jesus] to try something new that may help."De Jesus filed another grievance in August 2008, complaining generally of "medical issues" related to his throat and eyes, and seeking that Supple be removed as his primary care provider. In the grievance, De Jesus states that Supple had acted rudely and was refusing to meet his medical needs, including by repeatedly referring him to OMH. Like the prior grievances, this was denied because De Jesus had a history of receiving various types of examinations, medication and other treatment. The denial memorandum also informed De Jesus that his request for a new primary medical provider should be referred to Sottile, as the IGRC did not have authority to change his provider. On August 25 and September 15, De Jesus sent complaint letters to Sottile referencing extreme eye pain, visual complications and throat pain.

In September and October 2008, De Jesus began to complain again about severe headaches. A formal grievance he filed on October 3, which requested a change in medical provider but did not specify any particular ailments, was denied in the same manner as his earlier grievances. In October,

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    17

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**

2015 WL 9854844

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)
2011 WL 814838

De Jesus requested an MRI or CT scan, or examination by a neurologist, but Supple did not order these for him. On October 21, De Jesus filed another grievance in which he complained that Supple had an unprofessional and hostile demeanor and that he was being denied specialized examinations. De Jesus wrote "I fear my life is in danger in Dr. Supple's hands." Responding to this complaint, Sottile examined De Jesus on November 7. According to Sottile's notes from the examination, De Jesus complained about his chronic sore throat, eye problems and "occasional headaches." Sottile identified a persistent sore throat problem, prescribed a flovent spray pump and suggested that a gastro-intestinal consult and/or a UGI endoscope be performed to assess if De Jesus's sore throat was caused by acid reflux. Sottile did not recommend any of the specialized examinations that De Jesus had sought and did not agree that Supple should be removed as his primary care provider. The IGRC thereafter denied De Jesus's October 21st grievance, finding that Supple had performed his duties appropriately and that no change in medical providers was necessary. Supple did not order the gastro-intestinal consult or the UGI endoscopy that Sottile had recommended.

*4 In December 2008 and January 2009, De Jesus continued to complain of eye pain, sore throat, headaches and seeing flashing lights in his visits with medical staff. In January he was prescribed Imitrex, a medication for the treatment of headaches, by a Dr. Mamis, who is not a party in this case. Supple continued to prescribe De Jesus Imitrex for the next two or three months, as well as lozenges for his sore throat.

De Jesus alleges that his headaches have been entirely untreated by prison medical staff, and that he was never even prescribed over-the-counter pain medication for these headaches. De Jesus alleges that he continues to suffer from severe eye and throat pain and daily migraine headaches.

### IV. De Jesus's Medical Care Since the Filing of the Amended Complaint

Both parties have submitted evidence regarding De Jesus's medical care since the amended complaint in this action was filed on February 23, 2009. Supple continued to be De Jesus's primary care provider. In June 2009, De Jesus visited an optometrist who prescribed him new glasses. In December 2009, he was prescribed eye drops and pain medication to address his eye pain. By April 2010, De Jesus's eye pain and headaches had appeared to ameliorate, according to records from his examination by medical staff. In June 2010, Sottile

referred De Jesus for a brain CT scan to check for "cranial pathology."

On August 20, 2010, Dr. Joseph Avanzato, the Acting Facility Health Services Director of Fishkill who replaced Sottile after his retirement, ordered an MRI for De Jesus, which would provide a better analysis of any cranial pathology, if it existed, than a CT scan. The MRI report indicated that De Jesus did not suffer from any brain abnormalities such as a tumor or hemorrhage. Since at least September 2010, De Jesus has been prescribed Propranolol, a medication for the treatment of migraine headaches.

### V. Procedural History

De Jesus filed this action *pro se* on June 27, 2008. An amended complaint was filed on February 23, 2009 and served on all defendants in April 2009. The defendants filed a joint motion to dismiss the amended complaint on July 16, 2009, which was fully submitted on December 23, 2009. On January 29, 2010, it was ordered that the motion to dismiss would be treated as one for summary judgment under Fed.R.Civ.P. 56, and that consideration of the motion would take place after the parties made supplemental submissions that included De Jesus's medical and mental health records. No discovery has been taken in this action, but defendants filed supplemental briefing on summary judgment on June 4, 2010, with declarations attaching plaintiff's health records. [5] De Jesus submitted briefing and affidavits in August 2010. Defendants filed their reply brief and further affidavits on September 27, 2010.

### DISCUSSION

#### I. Summary Judgment Standard

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir.2010). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *El Sayed,* 627 F.3d at 933. When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)
2011 WL 814838

issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings. *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts —facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009). It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citation omitted). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002).

*5 De Jesus asserts a § 1983 claim against defendants for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. De Jesus claims that defendants were deliberately indifferent to his medical needs by ignoring his complaints about and failing to treat his chronic sore throat, eye pain and vision problems, and his chronic migraine headaches. He has only demonstrated, however, that there are genuine disputed issues of fact for trial that defendants Supple and Sottile may have violated his constitutional right to receive adequate medical care for treatment of his migraine headaches.

Defendants present three arguments why they are entitled to summary judgment. First, Albright, Maume and Williams argue that they had no personal involvement in plaintiff's medical treatment, and so could not be held liable for any deliberate indifference of his needs. In addition, all defendants argue that there is no genuine issue of material fact suggesting that there was any deliberate indifference to De Jesus's medical needs. Finally, all defendants also claim that they are entitled to the defense of qualified immunity. This Opinion will address each of these arguments in turn.

#### II. Personal Involvement

Albright, Maume and Williams move for summary judgment on the ground that they were not personally involved in the alleged deprivation of De Jesus's rights. Section 1983 provides in part that

[e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citation omitted). Moreover, on claims of deliberate indifference, a plaintiff must show such indifference on the part of a "particular defendant." *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted). Thus, a plaintiff may establish a supervisor's personal involvement by showing that:

*6 (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 85 of 284

**Santiago v. Johnson, Not Reported in F.Supp. (2015)**

2015 WL 9854844

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)
2011 WL 814838

policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

*Back v. Hastings on Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir.2004) (citation omitted). [4]

De Jesus has not asserted that Albright, Maume and Williams were directly involved in De Jesus's medical treatment. De Jesus argues that they should be liable because during the grievance investigations, they maintained that his complaints were psychological in nature despite their awareness of his prior "negative psychological evaluations." De Jesus also argues that these defendants had supervisory responsibilities over the medical care provided by Supple, his primary care provider. With this awareness and responsibility, De Jesus argues, Albright, Maume and Williams had a duty to override Supple's denial of care and reject his assessment that the medical treatments De Jesus requested should be denied because his ailments had a psychological root.

De Jesus's characterization of the situation is not supported by the facts in three respects. First, Albright, Maume and Williams did not play either a direct or supervisory role in De Jesus's treatment, and therefore cannot be held liable for any deficiencies in his medical care. The letters De Jesus sent to Albright and Williams, to which they did not respond, are insufficient to provide evidence of personal involvement. As De Jesus concedes, their relevant actions were limited to conducting the investigations that would inform the IGRC's review of De Jesus's grievances. [5] This advisory role is confirmed by the grievance reports. De Jesus's failure to demonstrate any genuine issue suggesting that Albright, Maume or Williams were personally involved in any deprivation of his rights means that these defendants are entitled to summary judgment.

Second, there is no evidence that the rationale for the denial of De Jesus's grievance was any opinion that his ailments were psychological rather than physical. Instead, the grievance committee denials each were based on a finding that De Jesus was receiving adequate medical treatment for his ailments. Therefore, the investigation by the grievance committee took under consideration the medical opinion

of Supple that De Jesus was receiving adequate treatment, not, as De Jesus argues, an opinion that plaintiff's ailments were psychological. [6] De Jesus has provided no evidence that Albright, Maume and Williams ever denied De Jesus medical care because they "deliberately maintained" that his ailments were psychological, nor any basis to believe that discovery would provide such evidence. The grounds for the denial of De Jesus's grievances are documented, these documents have been produced, and they do not support De Jesus's arguments.

*7 Finally, although De Jesus argues that Albright, Maume and Williams are supervisory personnel responsible for medical care at Fishkill, they are not supervisors of the individuals whom De Jesus alleges were most directly responsible for violating his constitutional rights—doctors Supple and Sottile. Rather, these individuals are nurses who supervise some nursing and administrative staff, not the doctors in the RMU. Therefore, De Jesus cannot rely on the legal test for a supervisor's personal involvement to find Albright, Maume and Williams liable for any deprivation of his rights.

### III. Deliberate Indifference

#### A. Standard

Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) "Rather, a prison official violates the Eighth Amendment only when two requirements are met." *Salahuddin*, 467 F.3d at 279 (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that "the charged official must act with a sufficiently culpable state of mind." *Id.* at 280.

The first requirement is objective: "[o]nly deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."*Id.* at 279 (citation omitted). Determining whether a deprivation is "sufficiently serious" requires two inquiries. First, a court must determine "whether the prisoner was actually deprived of adequate medical care."*Id.*"As the Supreme Court has noted, the prison official's duty is only to provide reasonable care."*Id.* (citing *Farmer*, 511 U.S. at 844–47). An inmate is not entitled to treatment by every

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)
2011 WL 814838

available medical alternative as long as his treatment is reasonable.*Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."*Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive," if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir.1984).

Second, a court must determine "whether the inadequacy in medical care is sufficiently serious."*Salahuddin*, 467 F.3d at 280. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."*Id.* (citation omitted). If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious."*Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower."*Id.* Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."*Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," these lapses will not sustain an Eighth Amendment claim. *Id.*"[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."*Id.* at 187.

*8 "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case."*Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly

affects an individual's daily activities, and whether it causes chronic and substantial pain."*Salahuddin*, 467 F.3d at 280 (citation omitted).

The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280 (citation omitted); *see also Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir.2009)."Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law."*Salahuddin*, 467 F.3d at 280 (citation omitted)."This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."*Id.* (citation omitted). This means that the prison official "must be subjectively aware that his conduct creates such a risk."*Id.* at 281 (citation omitted).

Prison medical staff is given wide discretion in determining how to treat inmates. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness."*Kulak v. City of New York*, 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom*, 416 F.2d 449, 450 (2d Cir.1969) (Section 1983"does not authorize federal courts to interfere in the ordinary medical practices ... of state prisons."). As such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance*, 143 F.3d at 703. A showing of medical malpractice is therefore insufficient to support a deliberate indifference claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm."*Id.* (citation omitted).

The defendants argue that De Jesus has failed, first, to allege that he suffered from a "sufficiently serious" condition, or that he was deprived of any medical care for his ailments. *Salahuddin*, 467 F.3d at 280 (citation omitted). They also argue that De Jesus has failed to allege that the named individual defendants "act[ed] with a sufficiently culpable state of mind."*Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). The defendants argue that his allegations amount to, at most, a claim of negligence. Defendants are successful in showing that with respect to his sore throat and eye pain, De Jesus has failed to show that he suffered from a deprivation of medical care. But, De Jesus has put forward sufficient facts to raise a material question whether Supple and Sottile deprived him of medical care related to his complaint of chronic migraine headaches, and

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    19

Santiago v. Johnson, Not Reported in F.Supp. (2015)

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 86 of 284

2015 WL 9854844

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)
2011 WL 814838

did so with a sufficiently culpable state of mind. Supple and Sottile, therefore, are not entitled to summary judgment with regard to the medical care provided for De Jesus's migraine headaches.

**B. Deprivation of Medical Care in Connection with a Sufficiently Serious Medical Condition**

**1. Sore Throat, Eye Pain and Visual Problems**

*9 Defendants argue that De Jesus's chronic sore throat, eye pain and visual problems do not rise to the level of a "serious medical condition" as required under analysis of an alleged Eighth Amendment violation. *Smith,* 316 F.3d at 186. De Jesus does not attempt to demonstrate why these ailments should be so classified, instead focusing on the debilitating effects of his chronic headaches. Moreover, De Jesus has failed to show that he was "actually deprived of adequate medical care" for these ailments. *Salahuddin,* 467 F.3d at 279.

During his incarceration at Fishkill and immediately before, De Jesus was consistently treated for his sore throat and eye complaints. He was given medication that targeted these ailments and was examined by specialists, including ENTs, ophthalmologists and optometrists, who investigated the source of his symptoms. De Jesus was given a CT scan, an X-ray, and an EKG. Sottile provided further care by prescribing De Jesus a flovent spray pump.

Against this medical history, De Jesus's allegations that he was not treated for these symptoms are truly only complaints that he was not satisfied with the exact method of treatment given or the results achieved. *See Chance,* 143 F.3d at 703. Although De Jesus claims that Supple denied him medical care because of Supple's belief that De Jesus's ailments were psychological, this is contradicted by the record showing that in addition to his referrals to OMH, Supple and other medical providers provided continuous medical care with respect to his sore throat, eye pain and vision problems. Even if De Jesus's medical care providers could arguably have provided De Jesus with further specialist examinations or medication, such as the UGI endoscopy or the gastro-intestinal consult suggested by Sottile, this is merely a disagreement about a medical judgment, not evidence of a deprivation of care. *See Estelle,* 429 U.S. at 107. The claims related to sore throat, eye pain and vision problems are therefore insufficient to withstand summary judgment. *See Wright,* 554 F.3d at 266.

**2. Chronic Migraine Headaches**

The lack of treatment of De Jesus's chronic migraine headaches leads to the opposite conclusion. First, chronic migraine headaches are often found to be "sufficiently serious" to warrant constitutional protection. *See Benjamin v. Kooi,* No. 07 Civ. 9596, 2010 WL 985844, at *7 (N.D.N.Y. Feb. 25, 2010) (collecting cases); *Moriarty v. Neubould,* No. 02–CV–1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (migraine headaches constitute a sufficiently serious condition because they can be "extremely painful and debilitating"). Plaintiff alleges that these headaches caused him severe and constant pain, and were "so serious and violent that at times he [was] unable to work, read, write, or leave his cell are for [sic] meals or activities.... [T]hey significantly affect[ed] plaintiff's daily activities."Defendants do not contest that De Jesus is suffering from headaches, nor do they argue that they do not cause him severe pain or affect his daily activities. Therefore, De Jesus has satisfied the "serious medical condition" requirement as to his complaints of chronic migraine headaches. *See Salahuddin,* 467 F.3d at 280.

*10 Second, there is no record of any treatment being given for his headaches between February 10, 2008, when he first complained of them once at Fishkill (through a letter of complaint), and January 23, 2009, when Dr. Mamis prescribed Imitrex, a migraine medication.[7] Even taking into account some ambiguities in the record, it appears that De Jesus's chronic migraine headaches went completely untreated for over eleven months.[8] This "failure to provide any treatment for an inmate's medical condition," where the underlying "condition is sufficiently serious," satisfies the objective requirement of the deliberate indifference claim. *Id.* Even though De Jesus has been prescribed medicines to address chronic migraine headaches since 2009 and underwent an MRI in 2010 which determined that he did not suffer from a brain abnormality that might require more aggressive treatment, De Jesus has raised a material question that the eleven-month delay in treatment was a sufficiently serious deprivation, precluding the grant of summary judgment. *See Salahuddin,* 467 F.3d at 281 (refusing to find as a matter of law that it was reasonable to postpone treatment for Hepatitis C for five months).

Defendants cite to *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 31296325, 2002 U.S. Dist. LEXIS 19571, at *21 (S.D.N.Y. Oct. 10, 2002), to argue that De Jesus's allegations fail to recognize the sustained medical treatment he received while at Fishkill, and that his allegations are mere disagreement about proper treatment. Similarly, citing

*Estelle,* 429 U.S. at 106, defendants argue that De Jesus's claims are merely complaints that the medical treatment he received was unsuccessful at alleviating his symptoms. But these arguments are not targeted to address the lack of treatment of De Jesus's headaches for eleven months; instead, defendants gloss over this delay and concentrate on his throat and eye symptoms or speak generally about his complaints. In both *Estelle* and *Woods,* the plaintiff had unquestionably received treatment for the condition at issue. *See Estelle,* 429 U.S. at 107; *Woods,* 2002 U.S. Dist. LEXIS 19571, at * * 20–21. Defendants do not claim that De Jesus was given any treatment for his headaches until January 2009.[9] These arguments are therefore unavailing in the context of the complete failure to treat a condition for eleven months.

**C. Subjective Element**

It having been found that there was no serious deprivation of medical care with regard to his throat and eye complaints, analysis of the subjective element of De Jesus's deliberate indifference claim need only consider whether Supple and Sottile had a "sufficiently culpable state of mind" in denying him care for his chronic migraine headaches. *Salahuddin,* 467 F.3d at 280. It is not necessary to find that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," only that he "evinc[ed] a conscious disregard of a substantial risk of serious harm."*Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted).

*11 De Jesus has introduced evidence to raise a genuine question that Supple and Sottile failed to treat his chronic migraine headaches while actually aware of a substantial risk that De Jesus would suffer serious harm. If, as the evidence suggests, the doctors failed to attempt any treatment of De Jesus's headaches for over eleven months, this was an "unnecessary and wanton infliction of pain."*Farmer,* 511 U.S. at 834. It is undisputed that Supple was aware of De Jesus's complaints of migraines, as they were noted in his medical records throughout 2008 after March 28 and in the grievance De Jesus filed referencing Supple's medical care in June 2008. Sottile acknowledged that he was aware of De Jesus's complaints from his consultations with Supple and noted that De Jesus suffered headaches in the report from his examination in November 2008. De Jesus alleges that his migraines were a topic he discussed with Sottile at that examination.

The defendants argue that De Jesus's complaints only describe a lack of due care or negligence, which is insufficient to sustain a deliberate indifference claim. *LeBounty v. Coughlin,* 137 F.3d 68, 72–73 (2d Cir.1998). They further cite to *Wilson v. Seiter,* 501 U.S. 294, 298–303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), to support their argument that De Jesus has not presented evidence to satisfy the "wantonness" requirement of a deliberate indifference claim.*LaBounty* and *Wilson* require that a plaintiff present evidence that "the defendants knew of the health dangers and yet refused to remedy the situation."*LaBounty,* 137 F.3d at 73 (citing *Wilson,* 501 U.S. at 302–04).

De Jesus has presented medical records that show that Supple and Sottile were aware of De Jesus's complaints of migraine headaches and did not order any treatment. Although there is no specific evidence that the doctors were aware that there was a risk of continued pain in the absence of medication or other treatment for the migraine headaches, this can be inferred from the fact that such a risk is obvious. *Farmer,* 511 U.S. at 842. Supple and Sottile might have rebutted this inference by showing that they "knew the underlying facts but believed ... that the risk to which the facts gave rise was insubstantial or nonexistent,"*id.* at 844, but they have not presented evidence to support such a rebuttal. Just as in *LaBounty,* where the Second Circuit affirmed the district court's decision not to grant summary judgment, the defendants here have not pointed to contrary evidence sufficient to show there is no genuine issue of material fact that they failed to treat a condition that was a danger to De Jesus's health.

Defendants also argue that there is a "presumption of correctness" for "decisions of physicians regarding the care and safety of patients."*Kulak,* 88 F.3d at 77. The physicians' decision in *Kulak* to move the plaintiff to a new ward, however, was supported by their reasoning that this move was needed because his treatment team worked there. Therefore, the *Kulak* defendants supported this presumption of correctness by stating a reason for the challenged action. Here, Supple and Sottile have failed to provide a basis for their decision to not treat De Jesus's headaches for eleven months. Without more from the defendants, the presumption of correctness is overcome by the obvious risk attached to a failure to provide medical care for migraine headaches.

*12 De Jesus spends a great deal of time in his briefs arguing that Supple's decision not to treat De Jesus's headaches was rooted in a belief that his condition was psychological and

2015 WL 9854844

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)

2011 WL 814838

not caused by a pathology that could be addressed by non-mental health medical treatments. He cites to *Wood v. Sun*, 865 F.2d 982 (9th Cir.1998), where the Ninth Circuit found that defendant doctors had been deliberately indifferent to an inmate's medical needs by refusing him treatment because they attributed his complaints to mental health issues. *Id.* at 990. In addressing this argument, defendants argue only that "there is no basis to infer from the record that Dr. Supple took the position that plaintiff's complaints *about his throat* were psychological ..." (emphasis supplied). As defendants have not specifically addressed whether Supple or Sottile declined to treat De Jesus's *headaches* due to a belief that they had a psychological, not a physical, cause, and because even if this was the reason for the lack of treatment, they have not presented any argument that this was a reasonable medical judgment, De Jesus has raised a genuine issue of material fact that precludes summary judgment on the subjective element. [10]

**IV. Qualified Immunity**

The defendants also argue that they have qualified immunity from liability. Qualified immunity shields government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Tracy v. Freshwater*, 623 F.3d 90, 95–96 (2d Cir.2010) (citation omitted)."This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."*Fogler v. Univ. of Connecticut*, 621 F.3d 92, 97 (2d Cir.2010) (citation omitted). Because qualified immunity is both "a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation,"*Iqbal*, 129 S.Ct. at 1946 (citation omitted), it should be determined early in the proceedings if possible. *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 760 (2d Cir.2003).

In evaluating a defense of qualified immunity, the first inquiry is whether, viewing the facts alleged in the light most favorable to the plaintiff, there was a constitutional violation. *Cubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir.2006). The next questions are whether that right was clearly established at the time the challenged decision was made, and whether the defendants' actions were objectively unreasonable. *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir.2003). A constitutional right is "clearly established" where "(1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has

recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful."*Howland v. Hynes*, 460 F.3d 409, 420 (2d Cir.2006) (citation omitted). Courts need not address these questions in this particular order, although "it is often beneficial' to do so."*Finnigan v. Marshall*, 574 F.3d 57, 61 n. 3 (2d Cir.2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).

*13 As described above, De Jesus has established a violation of his Eighth Amendment right to adequate medical care with respect to his chronic migraine headaches. This is a right that has been defined with sufficient specificity and clearly established by the Supreme Court and Second Circuit. *See Estelle*, 429 U.S. at 104; *Salahuddin*, 467 F.3d at 279. De Jesus has raised a genuine issue of material fact with regard to the reasonableness of Supple and Sottile's approach to his chronic migraine headaches, presenting evidence suggesting that they failed to provide any treatment for these headaches for over eleven months.

In support of their contention that Supple and Sottile are entitled to qualified immunity, defendants argue only that the doctors' "actions were objectively reasonable in that they were exercising their medical judgment" without further elaboration. This bald assertion does not provide an adequate ground for finding that Supple or Sottile would have been reasonable in believing that a failure to treat chronic migraine headaches was not a violation of De Jesus's Eighth Amendment rights, and certainly provides no evidence that would indicate that there is no dispute about this material issue. *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.") (citation omitted).

Sottile and Supple also argue that plaintiff has provided no evidence of a doctor disagreeing with their course of treatment for De Jesus's complaints. First, the record on this point is not at all clear. Dr. Mamis prescribed Imitrex for De Jesus's migraine headaches in January 2009, whereas Supple and Sottile had not taken any action with regard to this complaint. Whether or not this prescription is evidence of an actual disagreement depends on circumstances surrounding Dr. Mamis's evaluation that are not yet developed in the record. Secondly, it is not the burden of plaintiff to show an actual disagreement between doctors to defeat a claim of qualified immunity. Rather, qualified immunity should be granted when defendants have shown that a fact

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)

2011 WL 814838

finder could find that "reasonable officers would disagree about the legality of the defendant[s'] conduct under the circumstances." *Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir.2002) (citation omitted). There is a genuine question whether reasonable doctors could have different opinions about the reasonableness of Supple and Sottile's actions and about whether not treating De Jesus's migraine headaches for over eleven months was deliberate indifference to his medical needs. Qualified immunity, therefore, cannot be granted on this ground.

Defendants' motion for summary judgment is granted in full as to Albright, Mamie and Williams. Summary judgment is also granted as to Supple and Sottile for De Jesus's deliberate indifference claim related to his complaints of sore throat, eye pain and vision problems. Summary judgment is denied as to Supple and Sottile for De Jesus's deliberate indifference claim related to his complaint of chronic migraine headaches.

*14 SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 814838

**CONCLUSION**

Footnotes

1   Plaintiff had originally sought also to bring claims against defendants in their official capacities as officers of the DOC, but withdrew those claims in his affirmation in opposition to the defendants' motion to dismiss filed November 16, 2009.
2   In his complaint, De Jesus also asserted claims against William Connolly, Superintendant of Fishkill; Lester Wright, Chief Medical Officer of the DOC; and Dr. Ramasree Karri, a psychiatrist who treated plaintiff. De Jesus voluntarily dismissed the claims against these defendants in his opposition to the defendants' motion to dismiss.
3   Plaintiff complains that defendants did not submit a statement of material facts as to which there is no genuine dispute pursuant to the Southern District's Local Rule 56.1. Because the defendants' motion to dismiss was converted into one for summary judgment, however, they were not required to file such a statement. See *Schnur v. CTC Commc'ns Corp. Grp. Disability Plan*, 621 F.Supp.2d 96, 101 (S.D.N.Y.2008).
4   The Supreme Court's decision in *Ashcroft v. Iqbal*, ——U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), which found that a supervisor can be held liable only "through the official's own individual actions", *id.* at 1948, arguably casts doubt on the continued viability of some of the categories set forth in *Hastings on Hudson.See Qasem v. Toro, No. 09 Civ. 8361(HHS), 2010 WL 3156031, at *3 (S.D.N.Y. Aug.10, 2010) ("The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability ..."). For the purposes of this case, however, it is not necessary to explore this issue, because Albright, Maume and Williams were not supervisors of the defendants primarily responsible for the alleged violation.
5   Even if they had been voting members of the IGRC that had denied De Jesus's grievances, under Second Circuit law, it is "questionable" whether a denial of an inmate's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright*, 386 F.3d 432, 437–38 (2d Cir.2004) (citing *Joyner v. Greiner*, 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (dismissing claim against superintendent whose involvement was limited to denying grievance regarding inadequate medical care)).
6   De Jesus attempts to characterize Supple's alleged opinion that his ailments had a psychological root as an "opinion (belief)" because Supple is not a psychotherapist, and that this "opinion" does not deserve the same kind of deference as a "diagnosis" Supple would make as a medical doctor. Plaintiff provides no support for why this particular opinion, if in fact it was held by Supple, would not be a professional medical opinion or less deserving of deference by non-medical personnel.
7   In his medical records, De Jesus first complained of headaches in July 2007, but they were not mentioned in his medical records once he arrived at Fishkill until March 28, 2008. After that date, his reports of headaches were not as consistent as his complaints of sore throat and eye pain, but his medical records show that he told medical staff that he was experiencing migraine headaches in July, September, October and December 2008, and January 2009.
8   Although De Jesus was referred to OMH in July 2008, defendants do not argue that this referral was meant to address De Jesus's complaints of headaches. The documents produced by defendants indicate that the purpose of the referral was to determine if there was a psychological root of De Jesus's eye pain and vision problems.
9   Although Sottile stated in his declaration that "efforts have been made to reduce" De Jesus's migraine headaches, the only pain relieving medications he mentioned were "Ibuprofen, Motrin, Imitrex ." De Jesus's records indicate that Imitrex was not prescribed until January 2009. Ibuprofen—the generic name for Motrin and the term used in his prescription chart

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)

2015 WL 9854844

De Jesus v. Albright, Not Reported in F.Supp.2d (2011)

2011 WL 814838

—was prescribed by a Dr. Williams in fall 2008 for pain associated with dental issues, including wisdom tooth extraction and toothaches. There is no evidence of ibuprofen being prescribed for the purpose of treating De Jesus's headaches before January 2009.

**10** De Jesus also presented several affidavits to support his contention that the subjective element was satisfied, at least in part, by Supple's allegedly rude behavior or hostility towards him. As defendants argue at length in their reply memorandum, rude behavior has never been found to be sufficient to make a defendant liable for deliberate indifference. *See Smith v. Goord, No. 9:08 Civ. 1364 (NAM/RFT), 2010 WL 3488148, at *6 (N.D.N.Y. Aug.9, 2010)* ("[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.") (citation omitted). This evidence, therefore, does not need to be factored into the analysis here at all. De Jesus has sufficiently shown that there is a genuine dispute precluding summary judgment without any affidavits concerning Supple's attitude or allegedly insensitive statements. Indeed, De Jesus made no allegations that Soltie acted in anything but a professional manner, yet summary judgment is also precluded on the claim against him.

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Gates v. Goord, Not Reported in F.Supp.2d (2004)

2004 WL 1488405

2004 WL 1488405
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gregory GATES, Plaintiff,
v.
Glenn GOORD; Lester Write; Wayne Strack;
John Doe; R. Kirkatrict; St. Agnes Hospital;
William Walsh; John Doe; Wayne Barkley;
H. Klages; T. Hunter; Dr. Sass; G. Bhat; Dr.
Loinaz; G. Stinson; D. Artaz; R. Broaddu; Floyd
Bennet; A. White; A. Rabideau; R. Doane;
Hans Walker; Gregory Matthew; Anthony
Graeffe; C. Coyne; Dr. Kooi; John Shenfdian; K.
Torobley; Dr. Holloway; B. Lucas; J. Richard;
K. Fleury; Karen McDonald, Defendants.

No. 99 Civ. 1378(PKC).   |   July 1, 2004.

*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Gregory Gates, a former inmate in the New York State Department of Corrections ("DOCS"), brought this action in February, 1999, alleging that DOCS officials violated his rights under the First, Eighth and Fourteenth amendments of the U.S. Constitution. As a result of a previous motion to dismiss discussed below, the only claims that remain are those alleging Eighth Amendment violations relating to medical treatment while Gates was incarcerated in DOCS facilities. Defendants move for summary judgment against these claims pursuant to Rule 56, Fed.R.Civ.P. For the reasons explained below, defendants' motion is granted in part and denied in part.

*Background*

After dismissal of the entire Complaint for failure to state a claim, Gates filed an Amended Complaint in July, 2000 ("AC") alleging constitutional violations, pursuant to 42 U.S.C. § 1983. In a Report and Recommendation ("R & R") dated August 29, 2001, Magistrate Judge Frank Maas recommended to Judge Richard Berman, to whom this case was then assigned, that significant portions of the Amended Complaint be dismissed. No objections were filed to the R &

R and Judge Berman adopted it in full. The R & R concluded that all but eight of the defendants should be dismissed from the action, and that damages from these eight defendants were unavailable for actions taken in their official capacities. (R & R at 25) In total, the R & R dismissed 27 defendants, including two John Does, and dismissed in their entirety Gates's claims alleging unlawful retaliation.

The remaining allegations implicate Gates's claim that defendants are liable for Eighth Amendment violations, stemming from their alleged deliberate indifference to his medical needs. Gates claims that while walking across the Fishkill Correctional Facility's ("Fishkill") recreational area, he slipped on a large patch of ice. (AC ¶ 37) He alleges that his fall was due to Fishkill's negligence. (AC ¶ 79) Upon subsequent arrival to St. Agnes Hospital, Gates contends that he was told that he had a break in his fibula. (AC ¶ 39) A metal plate was attached to the fibula, and Gates was informed that he would receive follow-up treatment, including treatment for ligament tears. (AC ¶¶ 41-42) He claims that he subsequently received inadequate medical treatment, and felt "constant excruciating pain" as a result. (AC ¶ 43) Gates was thereafter transferred from the Fishkill facility to the Riverview Correctional Facility ("Riverview"), which he claims was done in an attempt to prevent him from asking questions concerning his ligament damage, and as an effort to conceal Fishkill's negligence. (AC ¶ 79) Gates claims that, although he was transferred from the Fishkill facility, a hold should have been placed to prevent such transfer amid his continuing medical treatments. (AC ¶ 79) "A pattern emerged that clearly shows that Plaintiff was moved from facility to facility to deny Plaintiff his rights to proper medical care." (AC ¶ 79)

**\*2** Gates also alleges facts specific to each of the defendants. He contends that Strack, the superintendent at Fishkill, was aware of Gates's fall on the ice, that Strack received all of Gates's DOCS grievances, and that Strack transferred him in order to conceal Fishkill's liability. (AC ¶ 48) Gates alleges that Loinaz, a physician who attended to him after his transfer from Fishkill to Riverview, failed to provide follow-up medical treatment. (AC ¶ 57) He alleges that Stinson, an official at Riverview, circulated a memorandum containing false information about what medical supplies had been provided to Gates. (AC ¶ 58) When Gates was later transferred to the Auburn Correctional Facility ("Auburn"), he claims, Walker failed to fulfill promises that he would tend to his medical needs. (AC ¶ 65) Gates alleges that Matthew, a physician at the Auburn facility, failed to provide him

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 89 of 284

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)

2015 WL 9854844

Gates v. Goord, Not Reported in F.Supp.2d (2004)

2004 WL 1488405

sufficient medical treatment. (AC ¶ 66) Kooi, also a physician at the Auburn facility, allegedly told plaintiff that nothing was wrong with him, and instructed him to leave his office without examination. (AC ¶ 69) He alleges that Coyne "failed to take appropriate action's" [sic] despite being "repeatedly" notified of his medical problems. (AC * 68)

Defendants Coyne, Struck, Loinaz, Stinson, Walker, Matthew, Stinson, and Kooi bring this motion pursuant to Rule 56(c), Fed.R.Civ.P., arguing that Gates (1) has not established deliberate indifference by the defendants; (2) has not shown personal involvement by defendants Struck, Walker, Coyne, and Stinson; and (3) cannot defeat defendants' defense of qualified immunity. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 2)

Defendants also move for summary judgment dismissing Gates's retaliatory transfer claim, arguing that Gates failed to administratively exhaust this claim. However, it is clear from Judge Maas's R. & R. and Judge Berman's subsequent adoption thereof, that the retaliatory transfer claims already have been dismissed from this litigation. (R. & R. at 19 ("Accordingly, both of the defendants named in the Fishkill Retaliation Claim should be dismissed this case."); R. & R. at 21 ("the Transfer Retaliation Claim should be dismissed as against all four defendants named therein.")) Because the defendants move for summary judgment on claims dismissed from this action, I do not address their arguments pertaining to administrative exhaustion and retaliatory transfer. To the extent that this argument implicates the "total exhaustion" doctrine under the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a), the retaliation claims have already been dismissed from this action for reasons unrelated to exhaustion. (R & R at 18-21) The "total exhaustion" doctrine, if valid and applicable, would require the dismissal of all claims if any claim were subject to dismissal for non-exhaustion. See, e.g., Farid v. Ellen, 2003 WL 23018805 at *4 (S.D.N.Y. Dec. 23, 2003) (collecting cases). The Second Circuit has yet to speak on this issue. See Ortiz v. McBride, 02-0088 (Oral Argument, May 27, 2004). Regardless of how the Circuit rules, it would provide no comfort to defendants in this case because there would be no occasion to determine an administrative exhaustion issue pertaining to a claim dismissed on an entirely different ground earlier in the action.

*Summary Judgment Standard*

*3   Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Rule 56(c), Fed.R.Civ.P. A fact is material if it "might affect the outcome of the suit under the governing law...."Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."Id. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation and quotation marks omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

*Defendant Barkley*

Defendant Wayne Barkley died in January, 2002. (Defendant's Rule 56.1 Statement ("56.1") at 1 n. 1) Nothing in the docket or in the exhibits to this motion reflect that Gates has filed a motion to substitute a representative of Mr. Barkley's estate. Rule 25(a)(1), Fed.R.Civ.P. I must consider whether plaintiff was required to make such a substitution, and, if so, the effect of his failure to do so.

Rule 25(a)(1) reads in relevant part: "If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties ... Unless the motion is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party."Plaintiff was formally placed on notice of Barkley's death on the first page of defendants' Rule 56.1 Statement, which was served and filed on December 24, 2003.[1] The Rule 56.1 Statement was served pursuant to Rule 5, Fed.R.Civ.P., and therefore suffices to provide Gates with proper notice of Barkley's death. More than 90 days have lapsed since the service and filing of the Rule 56.1 Statement. Dismissal therefore is appropriate.

Gates's memorandum of law and the accompanying affidavits mention Barkley's name only in passing. Plaintiff has, at no point in time, raised any opposition to the dismissal of Barkley, nor made any applications concerning the identity of Barkley's estate or a desire to make service thereon. Because Gates has not contested the notice of Barkley's death, and has not moved to substitute Barkley, Barkley is dismissed from this action. See, cf., Hogan v. Metromail, 2002 WL 373245, at *1 n. 1 (S.D.N.Y. Mar. 8, 2002) (notice of plaintiff's death and substitution communicated in summary judgment brief was unopposed, and therefore accepted as valid).

*Gates's Eighth Amendment Claims*

*4   Defendants move for summary judgment on the basis that Gates failed to establish defendants' deliberate indifference to his medical needs. Gates has alleged Eighth Amendment violations by defendants Matthew, Kooi and Coyne of Auburn and defendant Loinaz of Riverview.

The Second Circuit has articulated a two-pronged approach to evaluate deliberate indifference claims. The first, objective prong requires that a deprivation must be "sufficiently serious." See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994), cert. denied, 513 U.S. 1154, 115 S.Ct. 1108 (1995), citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991). A sufficiently serious deprivation is one that could lead to "death, degeneration, or extreme pain." Sneed, quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). The second, subjective prong requires that a defendant-official must have acted with a sufficiently culpable state of mind, one that rises above negligence but is "less than conduct undertaken for the very purpose of causing harm." Id. quoting Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977 (1994). To have a sufficiently culpable state of mind, a prison official must know of and disregard an "excessive risk" to inmate health and safety. Sneed. The official must both be aware of facts predicating an inference that a substantial risk of serious harm exists, and must also draw that inference. Sneed.

Defendants argue that, assuming the existence of a "sufficiently serious" deprivation, Gates cannot establish that defendants knew of and disregarded an excessive risk to Gates's health. (Def. Mem. at 10) Defendants offer a detailed record concerning Gates's history of medical treatment while incarcerated. Following the fracture of Gates's right ankle in December, 1996, he received surgical medical attention. (Singleton Decl. Ex. F, Bates Nos. 0186-0187). After surgery, Gates received follow-up medical treatment. (Singleton Decl.

Ex. F, Bates No. 0218) Once transferred to Riverview, Gates received, *inter alia*, beds for ankle support, black knee-high support stockings, a Motrin prescription for 800/mg, application of an analgesic balm, a walking cane, high-top sneakers, additional x-rays, physical therapy, whirlpool treatment, and medical consultations. (Declaration of Dr. Michael Seidman ("Seidman Decl.") ¶¶ 8-21, 23) At the Auburn Correctional Facility, Gates received advice from or was examined by the facility's medical staff on multiple occasions. The medical staff, *inter alia*, attempted to secure Gates a cane (Singleton Decl. Ex. F, Bates No. 307), attempted to secure the replacement or repair of Gates's New Balance sneakers (Singleton Decl. Ex. F, Bates No. 104-05), and noted Gates's preference to be treated by specific medical staffers (Singleton Decl. Ex. F, Bates No. 107). Gates was incarcerated at Auburn from March 10, 1998 through April 28, 1999, and the record reflects that Gates consulted with medical staff members on 67 occasions during his stay. (56.1 ¶ 2; Singleton Decl. Ex. F, Bates Nos. 98-122) His Ambulatory Health Record while at Auburn indicates that he often communicated with or visited members of the medical staff multiple times per week, and frequently on consecutive days. (Singleton Decl. Ex. F, Bates No. 113-14) At the Bare Hill Correction Facility, medical staffers recommended that Gates use high-top sneakers (Singleton Decl. Ex. F, Bates Nos. 131, 225, 235), administered at least one x-ray to Gates's ankle (Singleton Decl. Ex. F, Bates No. 137), measured Gates for orthopedic boots (Singleton Decl. Ex. F, Bates Nos. 226, 244, 248), and recommended that Gates be referred to an orthopedic consultant to address his concerns. (Singleton Decl. Ex. F, Bates No. 237)

*5   Gates acknowledges that after his transfer to Riverview, he was treated by an orthopedic specialist, Dr. Bhat, who recommended that Gates undergo physical therapy. (Plaintiff's Mem. at 8) "When plaintiff went to see the physical therapist, plaintiff's response to the treatment involved excruciating pain, thus afterwards the therapist told him that his injuries were too serious for physical therapy to have any effect."(Plaintiff's Mem. at 8) Gates argues that his treatment was motivated by the economics of managed health care, and that doctors "conspired" with DOCS officials to prevent effective treatment of his injuries. (Plaintiff's Mem. at 8-9) Gates also argues that he was faced with a sort of Hobson's choice near the end of his prison term, wherein he was offered treatment by a specialist on the eve of his release, done with the knowledge that Gates would prefer release to

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   23

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**

2015 WL 9854844

Gates v. Goord, Not Reported in F.Supp.2d (2004)

2004 WL 1488405

medical treatment, and that prolonged incarceration would be an inevitable result of specialist treatment. (Plaintiff's Mem. at 9) Gates argues that such conduct "should shock the conscience of the [C]ourt." (Plaintiff's Mem. at 9) [2]

Against this background, defendants argue that Gates's single encounters with defendants Kooi, Loinaz and Matthew cannot support a deliberate indifference claim. (Def. Mem. at 12). I address in turn the claims regarding each of these three defendants. In so doing, I note that Gates, who is represented by counsel, failed to provide the court with a counterstatement under Local Rule 56.1. "If the opposing party failed to controvert a fact so set forth in the moving party's Rule 56.1 Statement, that fact will be deemed admitted."*Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003). The moving part must nevertheless offer facts supporting its Rule 56.1 Statement, and must satisfy the movant's Rule 56 burden. *Seid.*Despite Gates's omission, I have weighed the factual materials produced by plaintiff, and, required by Rule 56, draw all reasonable inferences in favor of the non-movant, Gates.

**A. Kooi**

Defendants argue that Gates cannot show that Kooi, a physician at Auburn, treated him with deliberate indifference. (Def. Mem. at 12, *citingMatthews*, 37 F.3d at 66.) According to the Amended Complaint, Kooi's alleged failure to examine plaintiff's right lower leg and ankle constituted deliberate indifference. (AC ¶ 69) Upon Gates's arrival at Auburn, the nursing staff reviewed him in a routine examination. (Singleton Decl. Ex. F Bates No. 100, Declaration of Dr. Pang Kooi ("Kooi Decl.") ¶ 7) A subsequent appointment was arranged with Kooi. (Singleton Decl. Ex. F Bates No. 100; Kooi Decl. ¶ 7) On April 10, 1998, Gates requested a sick call, which was deferred because he was asleep at the appointed time. [3](Singleton Decl. Ex. F Bates No. 100; Kooi Decl. ¶ 9) Kooi examined Gates on April 27, 1998, at which point he requested that Gates be evaluated by an orthopedic specialist for the possible removal of hardware in his injured ankle. (Singleton Decl. Ex. F Bates No. 101; Kooi Decl. ¶ 10) Kooi states that he had no other medical encounters with Gates, and that he believed that Gates underwent successful surgery for the removal of hardware in his right ankle. (Kooi Decl. ¶¶ 11-12)

*6 Neither the document captioned as an "Affirmation in Opposition" and signed by Gates's counsel, nor the affidavit proffered under Gates's name mention Kooi by name, or dispute the facts supported in Kooi's affidavit and the defendants' exhibits. The affirmation of Gates's counsel is further flawed, inasmuch as it purports to convey facts that are outside the scope of counsel's personal knowledge, including representations regarding the types of injuries suffered by Gates and details concerning DOCS procedures. (Affirmation in Opposition ¶¶ 6-8) Such averments are insufficient to defeat summary judgment. *See,e.g.,U.S. v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir.1994) (affidavit not based on personal knowledge insufficient to create issue of fact on summary judgment motion); *Omnipoint Communications, Inc. v. Common Council of the City of Peekskill*, 202 F.Supp.2d 210, 213 (S.D.N.Y.2002) ("An attorney's affidavit which is not based on personal knowledge of the relevant facts should be accorded no weight on a motion for summary judgment."). In any event, plaintiff's memorandum of law references no facts that meaningfully contradict Kooi's affidavit concerning Gates's treatment.

Based on the facts proffered by the defendants, including Kooi's request for a review of Gates's record by an orthopedic surgeon, there is no genuine question of material fact as to Kooi; there is no evidence to support a claim that Kooi engaged in a "sufficiently serious" deprivation of medical treatment, nor a state of mind more culpable than negligence that lesser than a purposeful intent to cause harm. *SeeHathaway,* 37 F.3d at 66. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim" of deliberate indifference. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *accordPritz v. Malcom,* 2000 WL 1876667, at *6 (S.D.N.Y. Dec. 21, 2000) (dismissing on summary judgment plaintiff's deliberate indifference claim). So long as treatment of a prisoner is adequate, no constitutional violation will be found. *Seid.*Plaintiff has come forward with no evidence to show that Kooi's treatment of the plaintiff was anything other than attentive and safely outside the bounds of conduct prohibited by the Eighth Amendment.

Plaintiff's claim against Kooi is dismissed.

**B. Loinaz**

Regarding defendant Loinaz, defendants argue that Loinaz, a physician at Riverview, examined Gates for the first time on September 3, 1997. (56.1 ¶ 43; Declaration of Dr. Frederick Loinaz ("Loinaz Decl.") ¶ 7) The Amended Complaint alleges that Loinaz failed to provide sufficient follow-up treatment and monitoring, in disregard to plaintiff's

Gates v. Goord, Not Reported in F.Supp.2d (2004)

2004 WL 1488405

"excruciating pain." (AC ¶ 57) According to Loinaz, Gates complained to him of pain and stiffness in his right ankle. (Loinaz Decl. ¶ 7) Loinaz observed that there was no redness or swelling at Gates's right ankle. (Singleton Decl. Ex. F ¶ 92), and he was aware that an orthopedic specialist visited Gates on July 17, 1997. [3](Loinaz Decl. ¶ 7) Loinaz states that he was aware that the orthopedist recommended that Gates receive a new cane, knee-high stockings, and high-top sneakers. (Loinaz Decl. ¶ 7) Further, Loinaz indicates that the absence of swelling and redness, Gates's ability to ambulate, and a preexisting Ibuprofen regimen led him to advise Gates that if pain persisted, he should report back to medical officials for follow-up treatment. (Loinaz Decl. ¶ 8) Loinaz states that he did not ignore Gates's complaints or fail to examine him, and that, after the September 3 examination, he had no further medical encounters with Gates. (Loinaz Decl. ¶¶ 9-10)

*7 As with Kooi, neither the Affirmation in Opposition and nor the Gates Declaration mention Loinaz by name, much less dispute the facts supported in Loinaz's declaration and the defendants' exhibits. Similarly, plaintiff's memorandum of law offers nothing that would be sufficient to create an issue of fact as to Loinaz's treatment of the plaintiff. The facts produced by defendants show that Loinaz was attentive and thorough in his examination of the plaintiff, and observed an absence of any redness or swelling around plaintiff's ankle. Loinaz observed that Gates was capable of ambulating, and was aware of that Gates was consuming Ibuprofin. In light of these unchallenged assertions, there is no genuine issue of material fact. Loinaz is not responsible for any "sufficiently serious" deprivation of medical treatment, nor a state of mind more culpable than negligence but lesser than a purposeful intent to cause harm. *SeeHathaway,* 37 F.3d at 66. As noted above, a difference of opinion on the proper course of treatment cannot predicate an Eighth Amendment deliberate indifference claim. *SeeChance,supra* .Therefore, defendants' motion is granted, and Loinaz is dismissed from this action.

**C. Matthew**

During the time period relevant to this action, Matthew had been employed at Auburn as a physician. (56.1 ¶ 9) The Complaint alleges that Matthew denied Gates medical care and footwear without examining Gates's injuries. (Complaint ¶ 66) In denying the motion to dismiss Gates's claim against Matthew, Judge Mass determined that the pleadings provided an insufficient basis for determining whether Matthew's conduct was based on deliberate disregard of serious medical problems, or whether Gates was a malingerer who required no further treatment. (R & R at 15)

In contrast to the materials produced for Kooi and Loinaz, there are no factual submissions pertaining to Matthew's treatment of Gates. As such, the defendants fail to offer any facts that clarify or refute the allegations brought against Matthew in the Amended Complaint. Matthew is discussed in defendants' 56.1 Statement only insofar as he is identified as a physician formerly employed at Auburn. [1](56.1 ¶ 9) He proffers no affidavit. Defendants do not cite to documentary exhibits that pertain to Matthew's treatment of the plaintiff.

As the moving party on a Rule 56 motion, defendants do not direct the Court to any facts sufficient to show that defendant Matthew is not liable for either the sufficient physical deprivation or a state of mind constituting deliberate indifference. Matthew's involvement with the medical treatment of Gates is no clearer now than it was at the Rule 12 stage. As a result, defendants' motion is denied as it pertains to Matthew.

**Gates's Claims for "Supervisory Liability"**

Defendants move for summary judgment dismissing Gates's claims against defendants Walker, Coyne, Stinson, and Strack. In evaluating defendants' Rule 12 motion, the R & R determined that the Amended Complaint, interpreted liberally, stated claims against these four defendants for liability in their roles as direct or indirect supervisors of the alleged wrongdoers. (R & R at 23-24)

*8 In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit set forth the criteria for determining whether a defendant's involvement in a section 1983 claim is sufficient to trigger liability. In addition to direct involvement in a constitutional violation, possible grounds for liability include the following:

> a supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**
Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 91 of 284
2015 WL 9854844

Gates v. Goord, Not Reported in F.Supp.2d (2004)
2004 WL 1488405

in managing subordinates who caused the
unlawful condition or event.

*Id.* at 323-24 (internal citations omitted).*See alsoSealey v.*
*Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (listing same criteria).
As noted in defendants' memorandum of law and the R & R,
the doctrine of *respondeat superior* is insufficient to establish
liability on a section 1983 claim, and a defendant must
have some degree of direct personal involvement with the
wrongdoing. *SeeJohnson v. Glick,* 481 F.2d 1028, 1034 (2d
Cir.1973) (Friendly, J.), *overruled on other grounds,Graham*
*v. Connor,* 490 U.S. 386, 394-95, 109 S.Ct. 1865, 1870-71
(1989). I address in turn Gates's remaining claims asserting
supervisory liability.

**A. Walker**

Defendant Walker was employed by DOCS from August,
1964 to October, 2001. (56.1 ¶ 7; Declaration of Hans Walker
("Walker Decl.") ¶ 1) During the period relevant to this
litigation, he was superintendent at Auburn. (56.1 ¶ 7; Walker
Decl. ¶ 1) The Amended Complaint alleges that Gates wrote
to Walker regarding his medical problems. (AC ¶ 65) It
claims that Gates had "many face to face conversations" with
Walker, who gave Gates "repeated assurances" that he would
speak to Auburn's doctors to ensure that Gates would be
treated. (AC ¶ 65) Gates alleges that Walker never spoke with
doctors on his behalf. (AC ¶ 65)

As part of his responsibilities as superintendent, Walker
states, he annually received approximately 3,000 letters or
complaints from inmates, 900 of which included complaints
about Auburn's medical staff. (56.1 ¶ 75; Walker Decl. ¶
6) According to Walker, the volume of inmate complaints
prevented him from personally investigating or familiarizing
himself with each complaint. (56.1 ¶ 75; Walker Decl. ¶ 6) He
delegated complaints to deputy superintendents to investigate
inmate allegations and respond. (56.1 ¶ 76; Walker Decl. ¶
7) Complaints raising medical issues were directed to doctors
or to the facility health services director. Walker states, all
of whom responded directly to inmate complaints. (56.1 ¶
76; Walker Decl. ¶ 7) Walker confirms that he received
a letter of complaint dated September 29, 1998, in which
Gates complained that the medical staff was not providing
adequate follow-up treatment. (56.1 ¶ 77; Walker Decl. ¶
8; Singleton Decl. Ex. F, Bates Nos. 35-36) He recalls no
personal conversations with Gates. (Walker Decl. ¶ 12)

*9 According to Walker, he forwarded the complaint to
First Deputy Superintendent Gary Hodges on the same day.
(56.1 ¶ 77; Walker Decl. ¶ 8, *attached at* Singleton Decl. Ex.
F Bates No. 37) Walker included instructions that Hodges
was to investigate and handle directly; reply on Walker's
behalf; and forward a copy of the reply to Walker. (56.1
¶ 77; Walker Decl. ¶ 8; Singleton Decl. Ex. F Bates No.
37) On October 5, 1998, Hodges forwarded a reply to
Gates. Copied to Walker, the entire text of the reply stated:
"Your request to see a bone specialist has been approved
and an appointment date has been confirmed."(56.1 ¶ 78;
Singleton Decl. Ex. M) Walker states that he had no reason to
question Hodges's investigation, and that he knew Hodges to
thoroughly investigate inmate complaints. (56.1 ¶ 79; Walker
Decl. ¶ 9-10)

As Judge Koehl observed in *Amaker v. Goord,* 2002 WL
523371, at *16 (S.D.N.Y. Mar. 29, 2002), certain DOCS
officials receive thousands of inmate letters each year, which
are then forwarded to appropriate personnel for further
investigation. Such a circumstance will not support a finding
of liability or personal knowledge on the part of the letters'
recipient. *SeeId.AccordGreenwaldt v. Coughlin,* 1995 WL
232736 at *4 (S.D.N.Y. Apr. 19, 1995) (Preska, J.) ("[I]t is
well-established that an allegation that an official ignored a
prisoner's letter of protest and request for an investigation of
allegations made therein is insufficient to hold that official
liable for the alleged violations.").

Walker's sworn declaration, in combination with the
documentary evidence produced by defendants, is sufficient
to negate any liability to Gates under a theory of supervisory
liability. Gates offers no facts pertaining to Walker's
involvement with any alleged Eighth Amendment violations
he suffered. Indeed, Gates states that "through discovery
and trial, plaintiff would ascertain the exact involvement"
that Walker played in Gates's treatment. This contention,
even if construed under Rule 56(f), fails to defeat summary
judgment. As directed by Judge Berman, discovery in this
five-year-old action closed on August 29, 2003, roughly
five months before plaintiff filed opposition papers. (Docket
Entry # 92) Neither plaintiff's memorandum of law nor the
accompanying declarations refutes the averments contained
in defendants' submission, which reflect that Walker
delegated investigative responsibilities to another DOCS
official, and that Gates's complaint was one of thousands that
arose annually. Gates offers no statements in opposition that
raise a genuine question of material fact. Indeed, his argument
appears to be based on a fundamental misunderstanding of

the role of a summary judgment motion, and the standard
required in its opposition. As such, I grant defendant Walker's
motion for summary judgment dismissing Gates's claim
against him.

**B. Strack**

Defendant Strack was employed by DOCS from September,
1964 through September, 1999. (56.1 ¶ 6; Declaration of
Wayne Strack ("Strack Decl.") ¶ 1) During the time period
relevant to this litigation, Strack served as superintendent at
Fishkill. (56.1 ¶ 6; Strack Decl. ¶ 1) The Amended Complaint
states that Gates personally informed Strack of his need for
medical treatment. (AC ¶ 48) In addition to allegations no
longer included in this action, plaintiff claims that Strack
"should have known that the Plaintiff would experience great
pain(s) as a result of having Plaintiff's right ankle shackled
with Plaintiff was being transferred to Riverview Correctional
Facility."(AC ¶ 48)

*10 As superintendent, Strack received approximately
2,000 letters or complaints per year from the facility's
inmates. (56.1 ¶ 21; Strack Decl. ¶ 6) Strack contends that
approximately 200 of those complaints implicated Fishkill's
medical staff. (56.1 * 21; Strack Decl. ¶ 6) According
to Strack, the volume of complaints precluded him from
personally investigating or reviewing every inmate letter.
(Strack Decl. ¶ 6) Strack delegated to deputy superintendents
the responsibility to investigate and respond to inmate
complaints. (Strack Decl. ¶¶ 7-8) All complaints regarding
medical services were forwarded to the director of the
facility health services, a doctor who "would conduct
thorough investigations into inmates' complaints."(Strack
Decl. ¶¶ 7-8) Strack states that, to his knowledge, his
deputies conducted "thorough routine investigations into
inmates' complaints."(Strack Decl. ¶ 8) According to Strack's
secretary, who maintained a log of inmate complaints, Gates
filed two complaints-one on December 19, 1996, and one on
March 31, 1997. (Declaration of Kristin Woodward ¶¶ 4-6)

Based on the facts offered by defendants and the holdings
of *Amaker,* 2002 WL 523371, at *16, and *Greenwaldt,*
1995 WL 2327236, at *4 (S.D.N.Y Apr. 19, 1995), I
conclude that Strack has satisfied his burden on this motion.
Plaintiff offers no facts pertaining to Strack's involvement
with any alleged Eighth Amendment violations. Indeed,
he states that "through discovery and trial, plaintiff would
ascertain the exact involvement" Strack played in Gates's
treatment. This contention, even if construed under Rule
56(f), fails to defeat summary judgment. As directed by

Judge Berman, discovery in this five-year-old action closed
on August 29, 2003, roughly five months before plaintiff filed
his opposition papers. (Docket Entry # 92) Neither Gates's
memorandum of law nor the accompanying declarations
refute the averments contained in defendants' submissions,
which reflect that Strack delegated certain responsibilities
to other DOCS officials, and that Gates's complaints were
two among thousands considered by the administration that
Strack headed. Gates points nothing that supports a finding
of "supervisory liability" on Strack's part. I grant defendant
Strack's motion for summary judgment dismissing Gates's
claim against him.

**C. Coyne**

From January, 1989 thru May, 2002, defendant Coyne served
as Nurse Administrator at Auburn. (Declaration of Christine
Coyne ("Coyne Decl.") ¶ 1) According to Coyne, her position
required her to maintain the quality of the nursing practice
in the correctional facility. (Coyne Decl. ¶ 2) The Amended
Complaint alleges that Coyne was "was notified repeatedly by the
Plaintiff of said Plaintiff's medical problems yet failed to take
appropriate action[.]" (AC ¶ 68) It offers no further specifics
about Coyne's actions or knowledge.

Prior to being transferred to Auburn, Gates wrote to a DOCS
Chief Medical Officer about the alleged denial of follow-
up medical care; the complaint ultimately was forwarded
to Coyne for review. (56.1 ¶ 50; Singleton Doc. Ex. F at
Bates Nos. 31-33) Coyne received this complaint in April
1998, at which point she reviewed portions of Gates's medical
record. (56.1 ¶ 51; Coyne Decl. * 7) Coyne concluded that
Gates received appropriate follow-up care, and had been
evaluated on four occasions by orthopedic specialists between
January and July, 1997. (56.1 * 51; Coyne Decl. ¶ 7) She also
observed that Gates received physical therapy sessions, and
that upon his discharge from physical therapy, was capable of
ambulating independently with the aid of crutches. (56.1 ¶ 51;
Coyne Decl. ¶ 7) Gates reasoned physical therapy in July and
August, 1997, and was thereafter placed on an independent
exercise program. (56.1 * 52; Coyne Decl. ¶ 8) "I noted
that the nursing staff at Riverview had already scheduled
an appointment for Mr. Gates to be assessed by a medical
health care provider for an orthopedic follow up consult,"
Coyne states. (Coyne Decl. ¶ 8) After Coyne's investigation
of Gates's treatment, she forwarded her findings to Nurse
Administrator Betty Prendergast. (56.1 ¶ 52; Coyne Decl. *
8; Singleton Decl. Ex. F, Bates Nos. 22, 33, 99-101)

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 92 of 284
Santiago v. Johnson, Not Reported in Fed. Supp. (2015)
2015 WL 9854844

Gates v. Goord, Not Reported in F.Supp.2d (2004)
2004 WL 1488405

**\*11** Coyne states that she later became involved in attempting to arrange Gates's appointment with an orthopedic specialist "for possible hardware removal." (56.1 ¶ 66; Coyne Decl. ¶ 9) Following "several phone calls," Coyne "eventually obtained approval for Mr. Gates to be seen at the orthopedic clinic at University Hospital, in Syracuse, New York."(56.1 ¶ 66; Coyne Decl. ¶ 10) Coyne spoke with the orthopedic surgeon, who "assured" her that the hardware removal surgery would be performed. (56.1 ¶ 66; Coyne Decl. ¶ 10) Coyne states that to her knowledge, Gates underwent successful hardware removal surgery on November 28, 1998.[6] (Coyne Decl. ¶ 10) According to Coyne, she had no further involvement with Gates's case, had no medical encounters with him, and lacked the authority to issue medical permits for items such as special boots, high-top sneakers, stockings, or canes. (56.1 ¶ 73; Coyne Decl. ¶¶ 11-12)

As with other defendants who Gates sues under the theory of supervisory liability, plaintiff offers no facts pertaining to Coyne's involvement with any alleged Eighth Amendment violations he suffered. Gates states that "through discovery and trial, plaintiff would ascertain the exact involvement" Coyne played in Gates's treatment. This contention, even if construed under Rule 56(f), fails to defeat summary judgment. As noted above, discovery has been closed for several months. Neither plaintiff's memorandum of law nor the accompanying declarations refute the averments contained in defendants' submission, which reflect that Coyne undertook a diligent review of Gates's medical treatment, and actively worked on Gates's behalf in obtaining consultation with a specialist. Gates offers no fact or legal argument that supports a finding of "supervisory liability" on Coyne's part. I grant defendant Coyne's motion for summary judgment dismissing Gates's claim against her.

**D. Stinson**

During the time period relevant to the complaint, defendant Stinson was employed at Riverview as a deputy superintendent of security. (56.1 ¶ 8) At the request of former Riverview superintendent Wayne Barkley, Stinson responded to Gates's medical complaints. (56.1 ¶ 47) On March 25, September 19, and October 23, 1997, Stinson conducted an investigation into Gates's medical complaints. (56.1 ¶ 47) Following each of these investigations, Stinson wrote Gates concluding that Gates received treatment for his injuries. (56.1 ¶ 47) Stinson concluded that Gates had been evaluated by three physicians, received radiographic studies, learned

that films revealed a healed fracture in Gates's right ankle and received permits for special boots, a bottom bunk, and a cane. (56.1 ¶ 47; Singleton Decl. Ex. F. at Bates Nos. 19, 22, 26)

The Amended Complaint alleges that Stinson issued a memorandum containing false information about medical supplies issued to Gates. (AC ¶ 58) In moving for summary judgment, defendants have not produced facts sufficient to show the veracity of Stinson's memoranda, either via affidavit or other support. Defendants direct the Court to a portion of Gates's deposition in which he acknowledges receiving a pair of Wolverine boots while at Riverview, and that he was also given a pair of high-top sneakers. (See Singleton Decl. Ex. E at 100, 109-10) Although plaintiff proffers no opposing facts or arguments showing that Stinson should be liable under a theory of supervisory liability, neither does Stinson carry his burden of showing that there are no genuine issues of material fact as to his liability. He produces three memos that he authored, without any averments to their accuracy or the methods used to compose them. As the movant for summary judgment, the burden lies with the defendant. Standing alone, I do not consider the Stinson memoranda as a sufficient basis on which to grant summary judgment.

**\*12** Stinson's motion for summary judgment is denied.[7]

**Qualified Immunity for Matthew and Stinson**

Defendants argue that they are shielded by the doctrine of qualified immunity. "Government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."Wilson v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692, 1699 (1999). The Supreme Court has adopted a two-part inquiry to determine whether an official is entitled to qualified immunity. First, the court determines whether the facts alleged show that the official's conduct violated a constitutional right; second, the Court determines whether the constitutional right at issue was clearly established at the time the violation occurred. Saucier v. Katz, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001). The Second Circuit has developed an additional test for evaluating the second prong of the qualified immunity standard: a defendant is entitled to qualified immunity when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not

Gates v. Goord, Not Reported in F.Supp.2d (2004)
2004 WL 1488405

violate such law."Poe v. Leonard, 282 F.3d 123, 132-33 (2d Cir.2002) (citation omitted).

The Supreme Court has noted the difficulties imposed upon government officials when immunity is not established at the summary judgment stage, and observed that broad-ranging inquiries into official actions "can be peculiarly disruptive of effective government."See Harlow v. Fitzgerald, 457 U.S. 800, 816-18, 102 S.Ct. 2727, 2737-38 (1982)."The qualified immunity analysis depends upon an individualized determination of the misconduct alleged."Poe, 282 F.3d at 134. At the Rule 12 stage, Magistrate Judge Maas's R & R ruled that the qualified immunity defense presented an issue of fact that could not be resolved as part of the defendants' motion to dismiss. In this motion, defendants have done little to advance their argument past the Rule 12 stage. It is defendants' "burden at summary judgment to show the nonexistence of a clearly established right and [their] entitlement to qualified immunity."Palmer v. Richards, 364 F.3d 60, 67 (2d Cir.2004).

Defendants have produced no factual evidence as to Matthew's and Stinson's entitlement to qualified immunity. As determined in the preceding discussion, defendants have not met their burden of showing that their conduct did not violate a constitutional right. Defendants have offered no evidence that it was objectively reasonable for them to believe that their alleged actions did not violate clearly established law. It is axiomatic that deliberate indifference to prisoner medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment. See,e.g.,Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.") (citation omitted) Stinson offers no facts to negate the possibility that, pursuant to Williams, he was directly involved in any possible violation. Similarly, if Matthew knowingly ignored any affliction that struck Gates, therein causing "the unnecessary and wanton infliction of pain contrary to contemporary standards of decency,"Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993), he acted in violation of clearly established law. Under the second prong of Poe, defendants have not produced any evidence that supports a finding that their actions did not violate clearly established law. As with the rest of this motion, Gates's submissions are utterly silent as to the factual

circumstances surrounding his treatment at the hands of Matthew and Stinson. Even so, defendants' failure to produce facts concerning plaintiff's allegations against Matthew, and their production of three memoranda authored by Stinson, are insufficient grounds for a grant of qualified immunity and a dismissal of Gates's claims.

**\*13** As the Second Circuit stated in Amoker v. Foley, 274 F.3d 677, 681 (2d Cir.2001), "summary judgment only is 'appropriate' when the moving party has met its burden of production under Fed.R.Civ.P. 56(c) 'to show initially the absence of a genuine issue concerning any material fact,' " quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598, 1608 (1970). Defendants' submissions are silent to such basic issues as whether Matthew ever treated or diagnosed Gates, the methods underlying Stinson's investigation of Gates's complaint, and even whether Stinson's report had a basis in fact. In short, Matthew and Stinson have provided the Court with no relevant facts upon which to ground a qualified immunity analysis.

Without more, I conclude that Matthew and Stinson have failed to demonstrate an entitlement to the relief that they seek and their motion for summary judgment on the grounds of qualified immunity is denied.

**Conclusion**

Defendants' motion is GRANTED as to defendant Buckley, who is dismissed pursuant to Rule 25(a)(1).

Defendants' motion for summary judgment is GRANTED as to defendants Coyne, Strack, Lohuac, Walker, and Kooi.

Defendants' motion is DENIED as to defendants Matthew and Stinson.

I direct the parties to attend a final pretrial conference to be held on July 15, 2004, at 11 a.m. in Courtroom 12C, 500 Pearl Street, New York, NY.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1488405

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 93 of 284

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**

2015 WL 9854844

---

*Gates v. Goord, Not Reported in F.Supp.2d (2004)*

2004 WL 1488405

---

**Footnotes**

1    The docket reflects that the Rule 56.1 Statement was filed on December 24, 2003, although the Statement itself is dated November 12, 2003.

2    Plaintiff confuses the standards used in Rule 12 and Rule 56 motions in arguing that "[i]t is implicit in the Judge's [Rule 12] order that there is a triable issue of fact as to the defendants [sic] personal involvement named above since he dismissed the claims against many other defendants named in the plaintiff's original complaint but he decided not to grant dismissal against the remaining defendants." (Plaintiff's Mem. at 4.) A motion under Rule 12 addresses only the sufficiency of allegations, and not whether there is factual support for them.

3    In his memorandum of law, Gates disputes that he missed an appointment due to sleep. (Plaintiff's Mem. at 10-11) Koo's representation is supported not only by affidavit, but also by contemporaneous documentary evidence. In contrast, Gates's memorandum of law cites to no supporting evidence.

4    That orthopedist, identified as G. Bhat, M.D. (56.1 ¶ 43) was dismissed from this action at the Rule 12 stage. (R & R at 11-12)

5    Other averments refer to a "Nurse Matthews" at Riverview who administered the drug Motrin and an analgesic balm to the plaintiff (56.1 ¶ 30, Seidman Decl. ¶ 10) I make no assumption as to whether "Nurse Matthews" is the same person identified as defendant Gregory Matthew, M.D., of the Auburn facility.

6    Defendants' Rule 56.1 Statement (¶ 70 indicates that the removal surgery occurred on November 25, 1998, citing Singleton Decl., Ex. F at Bates Nos. 110, 211.) do not consider that discrepancy to be material to the resolution of this motion.

7    "Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation." *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir.1999). With defendant Loinaz dismissed from the case, Gates has no remaining claims implicating events at Riverview, with the exception of this supervisory liability claim against Stinson. *Clarke v. Sweeney*, 312 F.Supp.2d 277, 288 (D.Conn.2004), held that a claim for supervisory liability could not stand in a section 1983 action after the court determined that there was no underlying constitutional violation. Stinson has not argued that this is a basis for granting his motion, and preliminary research did not yield any precedent in the Eighth Amendment context. Because defendants do not raise this argument, much less offer any facts that would strengthen it, I do not consider it at this time.

---

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

*Patterson v. Lilley, Not Reported in F.Supp.2d (2003)*

2003 WL 21507345

---

2003 WL 21507345
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Bernard PATTERSON, Plaintiff,
v.
Sharon LILLEY, Wladyslaw Sidorowicz, Ginger
Eggler, and William Brown, Defendants.

No. 02 Civ.6056 NRB.    |    June 30, 2003.

Prisoner brought federal civil rights suit against prison intake nurse, prison doctor, and two supervisors, alleging deliberate indifference to his asthmatic condition. Defendants moved to dismiss complaint for failure to state claim. The District Court, Buchwald, J., held that: (1) prisoner's asthma was not sufficiently serious to require care immediately upon his arrival at prison; (2) intake nurse was not deliberately indifferent to prisoner's medical needs; (3) prisoner's preference for treatment by particular doctor and his disagreements concerning method of treatment did not show deliberate indifference to his medical needs; (4) prison doctor's alleged remark about effect of budgetary constraints on treatment did not give rise to claim under facts; and (5) supervisors were not liable for alleged Eighth Amendment violations.

Motion granted.

West Headnotes (7)

[1]    **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment
        Prisoner's asthmatic condition was not sufficiently serious to give rise to Eighth Amendment violation when intake nurse informed prisoner at midnight that he would have to wait to following morning to receive medication; prisoner did not allege any discomfort at time or experience any symptoms of emergent attack. U.S.C.A. Const.Amend. 8.

10 Cases that cite this headnote

[2]    **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment
        Prison nurse was not deliberately indifferent to prisoner's serious medical needs in violation of Eighth Amendment when she informed him, during intake to prison, that he would have to wait until morning to be evaluated for asthma medications; nothing suggested that nurse acted with requisite mental state of criminal recklessness, where prisoner was not experiencing discomfort at time or any symptoms of emergent attack. U.S.C.A. Const.Amend. 8.

9 Cases that cite this headnote

[3]    **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment
        Prisoner's preference for examination by particular physician did not prove deliberate indifference to his serious medical needs, in violation of Eighth Amendment, where he did receive medical treatment between his arrival at facility and examination by physician of choice. U.S.C.A. Const.Amend. 8.

5 Cases that cite this headnote

[4]    **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment
        Prisoner's disagreements with method in which his asthma was treated, including lowering medication dosage, changing medications, and for some period, taking him entirely off medication, involved mere difference of opinion, rather than deliberate indifference to his serious medical needs and thus could not violate Eighth Amendment. U.S.C.A. Const.Amend. 8.

---

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 94 of 284

2015 WL 9854844

---

Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
2003 WL 21507345

**5 Cases that cite this headnote:**

**[5]  Sentencing and Punishment**
↳ Medical care and treatment

Any alleged negligence on part of prison physician in treating prisoner did not rise to level of Eighth Amendment violation merely because patient was prisoner. U.S.C.A. Const.Amend. 8.

**1 Cases that cite this headnote:**

**[6]  Prisons**
↳ Particular Conditions and Treatments
**Prisons**
↳ Health and medical care
**Sentencing and Punishment**
↳ Medical care and treatment

Prison physician's alleged remark concerning possible effect of budgetary constraints on treatment for prisoner's asthma was insufficient to create Eighth Amendment violation; there was no withholding of treatment contemporaneous to remark, and prisoner did not suffer any attacks as result of later elimination of asthma medications. U.S.C.A. Const.Amend. 8.

**Cases that cite this headnote**

**[7]  Civil Rights**
↳ Criminal law enforcement; prisons
**Prisons**
↳ Particular Conditions and Treatments
**Sentencing and Punishment**
↳ Medical care and treatment

Alleged failure of nurse administrator and another prison supervisor to act on prisoner's information about alleged indifference to his medical needs did not violate Eighth Amendment; supervisors were not personally involved in prisoner's medical treatment, no unconstitutional custom or practice was implicated, supervisory officials were not grossly negligent, and there was no underlying violation by medical personnel. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**3 Cases that cite this headnote**

**Attorneys and Law Firms**

Mr. Bernard Patterson, Green Haven Correctional Facility, Stormville, New York, for Plaintiff.

Kimberly A. Dasse, Assistant Attorney General, New York, New York, for Defendant.

**MEMORANDUM AND ORDER**

BUCHWALD, J.

*1  Plaintiff Bernard Patterson ("plaintiff"), currently incarcerated in Central New York Psychiatric Center's satellite unit at Green Haven Correctional Facility, brings this action *prose* against the following health care workers and staff members of Sullivan Correctional Facility, where plaintiff was formerly imprisoned: Nurse Ginger Eggler; Dr. Wladyslaw Sidorowicz; Nurse Administrator Sharon Lilley; and Deputy of Administrative Services William Brown (collectively, "defendants"). Plaintiff brings suit under 42 U.S.C. § 1983, alleging that defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by their deliberate indifference to his medical care. Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction due to a failure to exhaust administrative remedies required by the Prison Litigation Reform Act 42 U.S.C. § 1997e(a). For the reasons that follow, the defendants' motion to dismiss for failure to state a claim is granted.[1]

**BACKGROUND[2]**

Plaintiff alleges that on December 19, 2001, at approximately twelve o'clock midnight, he arrived at Sullivan Correctional Facility ("Sullivan"). Upon arrival, he advised the processing officer that he was an asthmatic and had not received his medication for that day. The processing officer notified the nurse of plaintiff's condition. Shortly thereafter, the processing officer returned and informed plaintiff that Nurse

Ginger Eggler said plaintiff would have to wait until morning to be seen by any one. Plaintiff was then escorted to a housing unit without being screened for medical or mental disorders and without receiving any asthma medication.

The following morning, December 20, 2001, at approximately 8:20 a. m., plaintiff maintains he suffered an asthma attack. Plaintiff was examined at the facility clinic, given breathing treatment, and provided oral medication. He was advised he would be called to the clinic to pick up his asthma medication that evening, but was never called. The following morning, plaintiff reported to the facility clinic to inquire why he had not been called to pick up his medication. Plaintiff avers he was informed that the doctor had lowered the dosage of his medication. Plaintiff inquired as to why his dosage had been lowered without a personal consultation by a doctor. Plaintiff does not state what the response was to this inquiry.

Plaintiff claims that because the dosage had been lowered, and because he was never evaluated properly, he suffered five additional asthma attacks on January 6, 9, 11, 13 and 14, 2002. However, plaintiff does not allege that he sought treatment at the infirmary for any of the attacks in January. Nonetheless, on January 14, 2002, plaintiff was examined by Dr. Wladyslaw Sidorowicz. During this examination, Dr. Sidorowicz put plaintiff on a different medication and further advised plaintiff to let him know if the new medication did not work and he would change it. Plaintiff also alleges that during this same examination, Dr. Sidorowicz told him that he intended to stop plaintiff's asthma medication in an effort to keep the budget down.

*2  On February 21, 2002, plaintiff alleges that he was placed in the infirmary as a result of inadequate medical treatment for his asthma, but he does not describe the reasons for his admission to the infirmary, the treatment he received, or when he was discharged. Plaintiff claims that on March 8, 2002, he informed a nurse that the new medication was not working and requested to be placed back on his original asthma medication. Several days later, on March 11, plaintiff maintains he reported to sick call and was told by a nurse that she had, in fact, spoken with Dr. Sidorowicz about his asthma medication, and that the doctor had decided to discontinue the medication because it was not working and chose not to prescribe anything in its place. Plaintiff suffered no additional asthma attacks.

Although the precise timing is unclear, plaintiff claims he wrote a letter to Nurse Administrator ("N.A.") Sharon Lilley explaining his unhappiness with the treatment he was receiving for his asthma. In her response letter, plaintiff claims N.A. Lilley justified Nurse Eggler's screening upon his initial intake at Sullivan and Dr. Sidorowicz's decision to discontinue his medication. Plaintiff also claims he wrote a letter to Deputy of Administrative Services William Brown. Plaintiff does not describe the contents of his own letter, only that Deputy Brown advised plaintiff that his medication had been changed to a better regime with more effective medication. Plaintiff further avers that in a later letter from Deputy Brown, he was advised that "testing at this facility does not support your self diagnosis of asthma."

Plaintiff claims that as a result of the mental duress caused by this situation, he chose to cut his right forearm with a shaving razor on March 25, 2002. Plaintiff further avers that Dr. Sidorowicz initially refused to send him to an outside hospital to treat the wound, but that after being pressured by the mental health staff, the doctor sent him to an outside medical center where he received twenty stitches. Thereafter, on April 3, 2002, Dr. Sidorowicz placed plaintiff back on his original asthma medication.

Plaintiff herein has four complaints: (1) Nurse Eggler denied plaintiff his asthma medication upon his initial intake at Sullivan and did not properly screen him, such that if he were properly screened, he would not have been given a shaving razor due to his mental disorder; (2) Dr. Sidorowicz did not properly treat and failed to examine him earlier than January 14, 2002, and that prior thereto, plaintiff suffered six asthma attacks; (3) N.A. Lilley failed to act on the content of the plaintiff's complaint letter, and (4) Deputy Brown, a non-medical professional, should not have given a medical opinion in response to plaintiff's complaint letter, and failed to remedy the inadequate medical care of which plaintiff complained.

Plaintiff filed suit on August 23, 2002. He moved to have counsel assigned, which we denied on October 10, 2002. Defendants moved to dismiss on November 22, 2002.

**DISCUSSION**

**I. Motion to Dismiss Standard**
*3  A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of a complaint and should be

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    28

**Santiago v. Johnson, Not Reported in Fed. Supp. (2015)**

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 95 of 284

2015 WL 9854844

Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
2003 WL 21507345

granted "only if it is clear that no relief could be granted under any set of facts consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In this context, one function is "merely to assess the legal feasibility of the complaint, not to assay the legal feasibility of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). We acknowledge, towards this end, the well-settled principle that the movant bears the burden of persuasion and that the nonmovant's well-pleaded factual allegations must be accepted as true. *Allen v. WestPoint Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Moreover, a complaint submitted *pro se* must be liberally construed and is held to a less rigorous standard of review than formal pleadings drafted by an attorney. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Salahuddin v. Coughlin,* 781 F.2d 24, 28 (2d Cir.1986).

**II. Eighth Amendment Standard**

In an action brought under 42 U.S.C. § 1983, the plaintiff must establish that a person acting under color of state law deprived him of a federal constitutional right. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Here, plaintiff claims that defendants Nurse Eggler and Dr. Sidorowicz violated his Eighth Amendment rights by failing to provide him with proper medical care, and that defendants N.A. Lilley and Deputy Brown violated his Eighth Amendment rights by failing to properly address his complaints regarding such inadequate care.

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment." *SeeFarmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that the Eighth Amendment is applicable to treatment and conditions of confinement for prison inmates). We are additionally mindful of the state's constitutional obligation to provide inmates with adequate medical care. *SeeId.* at 832.Indeed, it is well-established that a prison official's denial of access to medical care or interference with prescribed treatment may constitute the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). To state a cognizable claim under § 1983 for inadequate medical care, an inmate must allege acts or omissions sufficiently harmful to evidence "deliberate indifference" to his serious medical needs. *Estelle,* 429 U.S. at 104.As such, the plaintiff must allege conduct that

is "an unnecessary and wanton infliction of pain," or that is "repugnant to the conscience of mankind." *Id.* at 105–06.

The deliberate indifference standard "embodies both an objective and subjective prong" and the plaintiff must satisfy both prongs in order to establish that prison officials unconstitutionally deprived him of adequate medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert.denied,*subnom.*Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). First, the inmate's medical condition must be, in objective terms, "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A condition is "sufficiently serious" under the Eighth Amendment if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain."*Hathaway,* 37 F.3d at 66 (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). Second, the charged official must act with a sufficiently culpable state of mind. *SeeWilson,* 501 U.S. at 298."Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm."*Hathaway,* 37 F.3d at 66 (citing *Farmer,* 511 U.S. at 835–36). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

**III. Evaluation of Plaintiff's Claims**

**\*4** Having set forth the two-part standard for deliberate indifference, we now consider whether plaintiff's allegations satisfy both the objective and subjective prongs with regard to each individual defendant.

**A. Nurse Eggler**

**[1]** Plaintiff claims that upon his intake at Sullivan he was denied his asthma medication by Nurse Eggler and was not properly screened for mental disorders. Assuming the truth of these allegations and viewed in the light most favorable to the plaintiff, they do not amount to a constitutional deprivation as they meet neither the objective nor subjective elements of the deliberate indifference standard.

At the time of Nurse Eggler's involvement, around midnight on December 19, 2001, she was informed only that plaintiff was an asthmatic and that he desired his medication. Plaintiff

did not allege any discomfort or any symptoms of an emergent attack. Thus, plaintiff does not satisfy the objective component of a deliberate indifference claim. More than minor discomfort or injury is required for plaintiff to meet the objective prong of demonstrating a "sufficiently serious" medical need.

Being an asthmatic (a person susceptible to asthma attacks) is not a condition, in Eighth Amendment parlance, that is severe or "sufficiently serious." The existence of the condition is distinct from the situation in which an inmate is suffering an actual attack. *Cf.Ennis v. Davies,* No. 87 Civ. 1465, 1990 WL 121527 (S.D.N.Y. Aug.15, 1990) (denying a motion for summary judgment based on prison official's refusal to provide an inmate his asthma medication during an actual attack). Indeed, in *Sulkowska v. City of New York,* 129 F.Supp.2d 274 (S.D.N.Y.2001), where plaintiff was denied her asthma medication while a detainee in police custody, the court found that such conduct amounted to no more than mere negligence, not deliberate medical indifference, as asthma was not sufficiently serious to warrant Eighth Amendment protection in the absence of an attack or symptoms of an attack.[3] *Id.* at 292.

**[2]** Plaintiff's allegations concerning Nurse Eggler also fail to meet the subjective prong of the indifference claim. Plaintiff does not provide facts sufficient to find that Nurse Eggler acted with the requisite mental state of criminal recklessness. *SeeJennings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). As noted, plaintiff never complained to Nurse Eggler of any pain, discomfort, or any condition that was "fast-degenerating" or "life-threatening." Nurse Eggler did not refuse to treat plaintiff altogether, but merely informed plaintiff when he arrived at midnight that he would have to wait until morning to be evaluated. Assuming that these allegations amount to negligent treatment, they are insufficient to state a claim for deliberate indifference, and plaintiff has not alleged any denial of care in the face of needed medical attention that would suggest a higher level of culpability. *SeeEstelle,* 429 U.S. at 106 (holding that a negligent diagnosis is not enough to meet the subjective test). Plaintiff's perspective that something more should have been done in light of his medical condition is not sufficient basis for a deliberate indifference claim. *SeeChance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

**\*5** Accordingly, as plaintiff has failed to plead that Nurse Eggler was deliberately indifferent to a serious medical need

of his, he has failed to state a claim against her for which relief may be granted.

**B. Dr. Sidorowicz**

**[3]** Plaintiff makes a variety of claims against Dr. Sidorowicz. First, plaintiff contends that Dr. Sidorowicz did not personally examine him until January 14. However, even plaintiff's own complaint establishes that he did receive medical treatment between his arrival at the facility and his examination by Dr. Sidorowicz, and moreover, that a doctor was involved in that period of treatment. The record is unclear as to whether it was Dr. Sidorowicz or another physician who was involved in plaintiff's treatment before January 14. Indeed, plaintiff does not allege that any serious medical event between his arrival and January 14 (the date of his last alleged attack) was knowingly unnoticed by health officials. Furthermore, on January 14, Dr. Sidorowicz did treat plaintiff. The Eighth Amendment requires that there not be deliberate indifference to a prisoner's serious medical needs, but not that a prisoner receive unfettered access to the medical care of his choice. *Aston v. Howard,* 925 F.Supp. 1034 (S.D.N.Y.1996). "Plaintiff's preference for an examination by a physician does not sustain a claim for denial of medical assistance. There is no right to the medical treatment of one's choice if the prescribed treatment is based upon applicable medical standards." *Reyes v. Turner,* No. 93 Civ. 8951, 1996 WL 93728, at \*2 (S.D.N.Y. Mar.5, 1996) (quoting *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988).

**[4]** Plaintiff also raises issues relating to the treatment of his asthma that involved changing his medication, lowering the dosage, and for some period, taking him off of his medication entirely. These complaints are properly characterized as a difference of opinion—plaintiff's desired treatment versus Dr. Sidorowicz's medical judgment—rather than deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."*Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). In fact, "so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."*Id.* The government must provide medical care for its prisoners, *Estelle,* 429 U.S. at 103, but "the prisoner's right is to medical care—not to the type or scope of medical care which he personally desires."*Linden v. Westchester County,* No. 93 Civ. 8373, 1995 WL 686742, at \*5 (S.D.N.Y. Nov.20, 1995) (quoting *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970)). In fact, plaintiff's allegations,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    29

Santiago v. Johnson, Not Reported in Fed. Supp. (2015)
2015 WL 9854844
Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 96 of 284

Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
2003 WL 21507345

rather than reflecting indifference, reflect attention and include Dr. Sidorowicz's telling statement to plaintiff to let the doctor know if the medication was not effective so it could be changed.

*6    [5]    At worst, plaintiff's allegations against Dr. Sidorowicz amount to negligence or medical malpractice. Even if we assume those conclusions *arguendo*, plaintiff's claim must still fail because a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."*Estelle*, 429 U.S. at 105-06; *Hathaway*, 99 F.3d at 553; *Farmer*, 511 U.S. at 837;*seealsoVento v. Lord*, No. 96 Civ. 6169, 1997 WL 431140, at *4 (S.D.N.Y. July 31, 1997) ("[D]isagreement with the defendants' diagnoses and dissatisfaction with the treatment of her medical condition [are] allegations which are not actionable under the Eighth Amendment."). Further, allegations of negligence, medical malpractice, or errors in professional judgment are insufficient to sustain an Eighth Amendment claim. *SeeZimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383 (S.D.N.Y. Aug.21, 2001); *seealsoGill v. Mooney*, 824 F.2d 192 (2d Cir.1987). It is also clear that medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle*, 429 U.S. at 106.

[6]    Finally, we comment on one particular aspect of plaintiff's allegations, namely, the remark attributed to Dr. Sidorowicz concerning the possible effect of budgetary constraints on plaintiff's treatment. First, based on plaintiff's own allegations, there was no withholding of treatment contemporaneous to the alleged remark. Second, even when plaintiff was taken off his asthma medication weeks later, he did not suffer any attacks. Furthermore, it should be noted that consideration of cost factors in choosing a course of treatment of a prisoner is, in and of itself, no more violative of a prisoner's constitutional rights than is, for example, the consideration of the cost of providing prescription drug coverage to non-incarcerated recipients of Medicare.

**C. N.A. Lilley and Deputy Brown**

[7]    Plaintiff asserts that he wrote letters complaining about his medical treatment to both N.A. Lilley and Deputy Brown. Plaintiff claims that N.A. Lilley failed to properly address the problems outlined in his complaint letter to her and that Deputy Brown improperly offered a medical opinion in his response to plaintiff's complaint letter to him. Plaintiff asserts N.A. Lilley wrote a response to him in support of

the course of treatment plaintiff was receiving from Dr. Sidorowicz and the behavior of Nurse Eggler. In Deputy Brown's alleged response to plaintiff, he justified the medical regime implemented by Dr. Sidorowicz. Neither defendant, based on these facts alleged in plaintiff's complaint, can be said to have violated plaintiff's constitutional rights in any manner.

It is well-established that liability for damages under § 1983 may not be based on the *respondeatsuperior* or vicarious liability doctrines. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Koehl v. Dalsheim*, No. 94 Civ. 3351, 1995 WL 331905, at *2 (S.D.N.Y. June 5, 1995). The mere fact that a defendant occupies a position of authority will not merit the imposition of § 1983 liability. *SeeAl Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir.1989). A supervisor is not liable for civil rights violations committed by his subordinates;[4] to recover damages in a § 1983 claim, a plaintiff must demonstrate that the defendants were personally involved in the alleged wrongdoing. *Id; McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977) (holding that defendants' personal involvement is a prerequisite to recovery of damages under § 1983, since the doctrine of *respondeatsuperior* does not apply), *cert. denied*,434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Personal involvement of a supervisory official within the meaning of § 1983 may be established through: (1) direct participation in a constitutional wrong; (2) failure to remedy a known wrong; (3) creation of an unconstitutional practice or custom; or (4) gross negligence in managing subordinates who have caused the violation. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir.1986), *Candelaria v. Coughlin*, 787 F.Supp. 368, 372 (S.D.N.Y.), *aff'd*,979 F.2d 845 (2d Cir.1992). Plaintiff's complaint fails to meet any of the four circumstances recognized.

*7    Plaintiff does not present any facts to suggest that the supervisory defendants were personally responsible for the alleged denial of medical care or in the alleged deprivation of plaintiff's rights. No unconstitutional practice or custom was created nor were the supervisory defendants grossly negligent in managing their subordinates. Moreover, as we find no underlying constitutional violations were committed by Nurse Eggler or Dr. Sidorowicz, N.A. Lilley's and Deputy Brown's alleged failure to act on information concerning such alleged violations does not support liability under § 1983.[5]

Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
2003 WL 21507345

**CONCLUSION**

A *prose* complaint can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson*, 355 U.S. 41, 45-6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Even applying these liberal standards, plaintiff's claims against each of the defendants is not equitable under § 1983. Accordingly, we conclude that plaintiff's allegations of deliberate indifference to his medical needs fail to state a claim upon which relief can be granted. Defendants' motion to dismiss is granted.

Pursuant to 28 U.S.C. § 1915(a)(3), it is hereby certified that any appeal from this order would not be taken in good faith. *SeeCoppedge v. United States*, 369 U.S. 438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of the Court is hereby requested to close this case on the Court's docket.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21507345

Footnotes

1    While the parties dispute whether the plaintiff has exhausted all of his claims, the defendants concede that he exhausted at least some of his administrative remedies, and as we dismiss the complaint on the merits, we need not resolve the exhaustion issue.

2    Unless otherwise noted, all facts are taken from plaintiff's complaint.

3    In contrast to the response at the time of plaintiff's midnight arrival, he received medical care the next morning when he had an attack. Nurse Eggler's conduct should be examined only in the context of plaintiff's condition at the time of his arrival at the facility. Nurse Eggler could only be held deliberately indifferent to an existing, serious medical condition, not a speculative, future medical injury. The requisite culpable state of mind would necessarily be absent for the unknown, future injury. Plaintiff's allegation that he cut his arm three months after arriving at Sullivan because he was not initially screened for mental disorders by Nurse Eggler (without making any indication or notification of such a disorder) also fails for this reason.

4    We are assuming only for purposes of this decision that the relationship of supervisor/subordinate exists between the relevant actors.

5    Defendants argue additionally that they are not individually liable under § 1983 because they are entitled to qualified immunity. Because we dismiss plaintiff's claims on the merits, it is unnecessary to address this issue.

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9854844

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 97 of 284
Santiago v. Johnston, Not Reported in Fed. Supp. (2016)
2016 WL 225695

2016 WL 225695
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Martin SANTIAGO, Plaintiff,
v.
Patrick M. JOHNSTON, Physician
Assistant, Upstate Correctional Facility;
and Nancy Smith, Nurse Administrator,
Upstate Correctional Facility, Defendants.

9:11-cv-0635 (LEK/TWD)
|
Signed 01/19/2016

**Attorneys and Law Firms**

Martin A. Santiago, Buffalo, NY, pro se.

James Seaman, New York State Attorney General, Albany, NY, for Defendants.

## ORDER

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on November 16, 2015, by the Honorable Thérèse Wiley Dancks, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 98 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-0857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306-07 & 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No.

06 Civ. 13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. See Docket. [1] Accordingly, the Court has reviewed the Report-Recommendation for clear error and has found none.

[1]     On November 30, 2015, Plaintiff filed a Letter Motion requesting an extension of time in which to file objections. Dkt. No. 99. The Court granted Plaintiff an extension to December 21, 2015. Dkt. No. 100. Plaintiff failed to file objections within the time period allotted to him by the extension.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 98) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Plaintiff's Motion (Dkt. No. 81) for summary judgment is **DENIED**; and it is further

**ORDERED**, that Defendants' Cross-Motion (Dkt. No. 82) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 225695

---

     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1181295
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronnie COLE, Plaintiff,

v.

Glenn GOORD et al., Defendants.

No. 04 Civ. 8906(GEL).
|
April 30, 2009.

West KeySummary

1    **Prisons**
     👉 Particular Conditions and Treatments
   **Sentencing and Punishment**
     👉 Medical Care and Treatment

A doctor was not deliberately indifferent to the serious medical needs of an inmate in violation of the Eighth Amendment. The inmate asserted that the doctor violated his constitutional rights when he failed to follow the advice of the urologist. The urologist recommended that the inmate have the urethral reconstruction surgery instead of the stoma/diversion procedure. The doctor believed, and the state's expert concurred, that the urethral reconstruction surgery was not the best option.

U.S.C.A. Const.Amend. 8 .

**Attorneys and Law Firms**

Ronnie Cole, Rome, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, by Susan H. Odessky, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

**\*1** Plaintiff Ronnie Cole, an inmate in the custody of the New York State Department of Correctional Services

("DOCS"), brings this action alleging that defendants Glenn S. Goord, Brian Fischer, Lester Wright, John Perilli, Eileen Hansen, Joyce Gutowski, and Nelson Muthra were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Defendants have moved for summary judgment. For the reasons stated below, their motion will be granted.

**BACKGROUND**

**I. The Parties**

Ronnie Cole is currently a New York State prisoner incarcerated at Mohawk Correctional Facility. The Complaint, however, concerns alleged mistreatment of the plaintiff while he was incarcerated at Sing Sing Correctional Facility ("Sing Sing") between January 13, 2004, the date he was transferred to Sing Sing, and October 1, 2004, the date he filed his Complaint.

Glenn Goord was the Commissioner of DOCS during the time period relevant to the Complaint. Dr. Lester Wright was, and remains, the Deputy Commissioner of DOCS and its Director of Health Services. Brian Fischer was the Superintendent of Sing Sing during the relevant time period.

Dr. John Perilli was the Facility Health Services Director ("FHSD") at Sing Sing during the relevant time period. The FHSD is the medical authority who supervises all health unit staff and is responsible for all aspects of inmate health care services. Prior to his appointment as FHSD, Dr. Perilli practiced as a general internist for 24 years. (Def.'s Rule 56.1 Stmt. ¶ 2.) Eileen Hansen was the Nurse Administrator at Sing Sing during the relevant time period. She supervised Sing Sing's hospital and nursing staff. (*Id.* ¶ 6.) Joyce Gutowski has been a Registered Nurse ("RN") at Sing Sing since October 1999. Her duties include seeing inmate patients at sick call, dispensing medications, and arranging for appointments with doctors and for outside medical trips. (*Id.* ¶ 4.) Nelson Muthra has been a Physician's Assistant ("PA") at Sing Sing since 1998. His duties include treating inmate patients at sick call appointments, following up on medical appointments, arranging consultations with specialists, ordering lab tests and x-rays, and referring inmate patients to physicians at Sing Sing or at outside facilities. (*Id.* ¶ 5.)

**II. Cole's Relevant Medical History Prior to his Arrival at Sing Sing**

Cole v. Goord, Not Reported in F.Supp.2d (2009)
Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 99 of 284
2009 WL 1181295

Cole has been seen and treated throughout his incarceration at different facilities by a number of doctors for his extensive urethral stricture disease. (*See* Declaration of John Perilli, M .D., dated Sept. 19, 2008 ("Perilli Decl."), Ex. B, at 2095–97.)[1] Cole has, a perineal urethrostomy—a surgical construction of an artificial excretory opening from the urethra—through which he catheterizes himself. (Def.'s Rule 56.1 Stmt. ¶ 11.) Before being transferred to Sing Sing, Cole underwent numerous procedures to correct his urological problems; all of these procedures failed, in part due to Cole's poor post-operative compliance. (Perilli Decl ., Ex. B at 2429.)

[1]     The Perilli Declaration is attached to the Declaration of Susan H. Odessky, dated Sept. 22, 2008, ("Odessky DecL") as Ex. B. The page numbers refer to the Bates numbers assigned to Cole's medical records.

**\*2** Doctors who have examined Cole have noted that there are two major procedures that might help alleviate the symptoms of Cole's condition. The first procedure is an abdominal stoma with a urinary diversion ("the stoma/ diversion procedure"); the second is urethral reconstruction surgery. In July 2001, Dr. Kevin Pranikoff, a urologist at SUNY Buffalo, recommended that Cole have the stoma/ diversion procedure. (Perilli Decl., Ex. B at 2095–97.) Addressing the urethral reconstruction surgery option, Dr. Pranikoff's report stated that if Cole "is able to develop urinary control and desires urethral reconstruction, then he needs to understand that it is an extremely high-risk procedure with a high chance of failure" and that Cole "would only become a candidate for [the surgery] should he be able to develop a more normal voiding and continence pattern." (*Id.*)

On June 18, 2002, Cole was seen by another urologist, Dr. Mark White at Albany Medical Center. Dr. White's report noted that Cole would most benefit from the stoma/diversion procedure and that he did not feel that the reconstructive surgery option favored by Cole would be successful. (*Id.* at 1201, 2101–02.) Dr. White also wrote that, while he would be willing to refer Cole to a center specializing in urethral reconstruction surgery, he had counseled Cole that the chances for success from that procedure were quite low and that Cole would most likely still require the urinary diversion. (*Id.* at 2101–02.)

On August 30, 2002, Dr. Pranikoff stated in a letter to DOCS that he was not sure that Cole "understands, or

chooses to understand, the complexity of his problems or my feelings that repairing the urethra will not restore his continence." (*Id.* at 2099.) Dr. Pranikoff noted that Dr. Zahi Makhuli, another urologist to whom Cole had been referred, had also recommended the stoma/diversion procedure rather than the urethral reconstruction. (*Id.*)

Cole did see at least one urologist who felt that the urethral reconstruction surgery would be Cole's best option. A Dr. Lieb[2] saw Cole on June 27, 2003, and reported that Cole needed a "2 stage repair [i.e., the reconstructive surgery] ... at a special center beyond Albany, Syracuse, and Burlington," and that, if that surgery failed, Cole should have the stoma/ diversion procedure. (Declaration of Ronnie Cole, dated Nov. 13, 2008 ("Cole Decl."), Ex. A at 1174.)

[2]     Dr. Lieb's first name is not evident from the record.

On September 12, 2003, DOCS Health Services staff indicated in an e-mail that DOCS was willing to transfer Cole to Sing Sing to facilitate the urethral reconstruction surgery but that Cole's case was medically complicated, and was made more so due to the lack of cooperation from Cole. (Perilli Decl., Ex. B at 2426–28.)[3]

[3]     The record includes numerous examples, dating from 1998, of Cole's refusal of medical treatment or supplies. Among the treatments he refused were self-catheterizations, urethral dilations, a trip to the urology clinic at SUNY Health Science Center, scrotal and bladder examinations, dressing changes and sitz baths, antibiotherapy for possible perineal/urologic infection, and the stoma/ diversion procedure. (*See* Def.'s Rule 56.1 Stmt. ¶ 48; Perilli Decl. ¶ 42.) In May of 2004, Cole also refused all weekly medical supplies. (Perilli Decl. ¶ 44.)

### III. Cole's Relevant Medical Treatment at Sing Sing

On January 13, 2004, Cole was transferred from Clinton Correctional Facility to Sing Sing. (Compl.¶ 19.) Upon his arrival at Sing Sing, Cole was treated first by Dr. Mah, and then by Physician's Assistant Nelson Muthra.[4] (Cole Dep. 84–85.) According to Cole, both Dr. Mah and another doctor whose name Cole does not remember agreed that Cole should have the urethral reconstructive surgery. (*Id.* 84.)

[4]     Dr. Mah's first name is not given in the record.

**\*3** On February 9, 2004, Dr. Perilli had Cole admitted to the infirmary for observation due to skin breakdown at his urethrostomy site. (Perilli Decl. ¶ 13.) On February 19, 2004, after attempting to treat Cole's constant incontinence, bacterial infections, and skin breakdowns, Dr. Perilli referred Cole to an outside urologist. (*Id.* ¶ 14.)

On March 24, 2004, the urologist, Dr. Marc Janis, recommended that Cole have either the stoma/diversion procedure or the urethral reconstruction surgery. (*Id.,* Ex. B at 863.) Dr. Perilli decided that Cole should have the stoma/diversion procedure. In a March 26, 2004, letter to Cole in response to Cole's requests that he be scheduled for the reconstruction surgery, Dr. Perilli explained that

> a continent diversion with a catheterizable stoma has been recommended on many occasions, and that you refused this, most recently on 3/24/04. We note that you have persisted in your demand for DOCS Health Services to authorize a penile (urethal) reconstruction, an elective reconstructive procedure which was previously denied by Albany as not medically indicated treatment. This department agrees with the denial, a denial consistent with not only the provisions of your health coverage under DOCS, but to the best of our knowledge, inconsistent with the general provisions regarding authorization for reconstructive surgeries of most Health Care insurers in this country. Further, we state to you that the reconstructive surgery is not a standard treatment for this condition; that urological consultants have stated this procedure is outside their abilities; that none of the physicians here, with a combined clinical experience of over 100 years, ha[s] ever seen this procedure done; that this procedure is known to have a high complication and failure rate; and in the Northeast

is performed by only a handful of subspecialists.

(*Id.* ¶ 16.)

On April 26, 2004, Dr. Perilli and P.A. Nelson requested another urology consult for Cole. (*Id.* ¶ 19.) Cole was again seen by Dr. Janis on May 26, 2004, at which time Dr. Janis recommended that Cole have a cystoscopy and video urodynamics test and that he be scheduled for the stoma/diversion procedure. (*Id.,* Ex. 2 at 861 .) Although Cole initially refused to sign the consent forms to have the test and the recommended procedure, and refused any medical assessment by Dr. Perilli, he changed his mind and underwent the test on August 4, 2004. (*Id.* ¶¶ 20, 22, 23.) On August 7, 2004, Dr. Aman Bakshi, another doctor at Sing Sing, referred Cole to Dr. Janis again. (*Id.* ¶ 24.) On August 18, 2004, Dr. Janis examined Cole and recommended (1) that he undergo the stoma/diversion procedure, (2) that he be given four catheters a week, and (3) that he be given Tylenol # 3 for pain relief. (*Id.* ¶ 25; Ex. 2 at 1544.)

On September 8, 2004, Cole saw Dr. Janis again as a prerequisite to the scheduling of the stoma/diversion procedure. (*Id.,* Ex. 2 at 1546.) At that visit, Dr. Janis recommended that the diversion procedure be authorized and also that Cole be permitted two showers daily. (*Id.*) On September 29, 2004, Dr. Bakshi referred Cole for the stoma/diversion, but Cole refused to undergo the procedure. (Perilli Decl. ¶ 28.) Cole has continued to refuse to undergo the stoma/diversion procedure, lobbying instead for the urethral reconstruction surgery.

**\*4** Throughout the relevant time period, Cole filed a number of grievance complaints against the medical staff at Sing Sing. The record includes grievances Cole filed against Nurses Hansen, Gutowksi, and Ricks (who is not named in the instant Complaint), alleging among other things that the nurses were unresponsive and rude when he requested that the dispensary restock the diapers he needed. (*See* Cole Decl., Ex. D at 690–93, 714–15, 822.) The record also includes a grievance Cole filed against Dr. Perilli for failing to follow Dr. Janis's recommendations. (*Id.* at 829.)

On October 1, 2004, Cole filed this Complaint, alleging deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments. The Complaint names Goord, Fischer, and Wright in their

individual and official capacities, and Perilli, Muthra, Hansen, and Gutowski in their individual capacities, and seeks an order directing DOCS to comply with the treatments recommended by Dr. Janis. Cole also seeks compensatory damages of $250,000 and punitive damages totaling $1,150,000 from the defendants.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment must be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When a party is proceeding pro se, a judge must assess his pleadings by a more generous standard than that accorded to pleadings drafted by lawyers. *Bussa v. Alitalia Linee Aeree Italiane, S.P.A.,* No. 02 Civ. 10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004). Despite this more lenient treatment, a pro se litigant must still meet the threshold requirements to survive a motion for summary judgment. *Id.* at * 11. *See also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995), *reh'g granted on other grounds,* 914 F.Supp. 1004 (S.D.N.Y.1996) (holding that a "pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (internal quotations omitted).

### II. Eighth Amendment: Deliberate Indifference to Serious Medical Needs

The Eighth Amendment protects against the "unnecessary and war ton infliction of pain," *Hope v. Pelzer.* 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), and its

protection extends to the provision of medical care in prisons, *Estelle v. Gamble.* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *accord Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Inmates are not free to seek out their own doctors or obtain their own private health insurance, and therefore it is the "government's obligation to provide medical care for those whom it is punishing by incarceration." *Gamble,* 429 U.S. at 103.

**\*5** To state a constitutional claim based on the denial of medical care, a plaintiff must satisfy both an objective and a subjective component. To determine whether a plaintiff has satisfied the objective component, courts have taken into account both the seriousness of the plaintiff's medical condition, *Hathaway,* 37 F.3d at 66, and the severity of the alleged deprivation of appropriate care, *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

The subjective prong requires that the accused prison official have acted with a sufficiently culpable state of mind. *Wilson,* 501 U.S. at 297–98. To be sufficiently culpable, the defendant must act with deliberate indifference. That is, he must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This state of mind is equivalent to the familiar standard of "recklessness" as used in criminal law. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003).

Defendants do not dispute that Cole suffers from a serious illness—extensive urethral stricture disease. The primary question in dispute is whether Cole is able:o establish that the defendants knew of and disregarded excessive risks to his health.

### III. Glenn Goord, Brian Fischer, and Lester Wright

#### A. *Official Capacity Claims*

Cole asserts claims against Goord, Fischer, and Wright in both their individual and official capacities. The Eleventh Amendment precludes suits in federal court against a State or its agents absent the State's unequivocal consent to such suits. *Pennhurst Interstate Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Because "[s]uits against state officials in their official capacities [are] treated as suits against the State" for purposes of the Eleventh Amendment,

*Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), Cole's damages claims against Goord, Fischer, and Wright in their official capacities must be dismissed for lack of subject matter jurisdiction. *See Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999). [5]

[5]    Although the Eleventh Amendment does not bar claims for declaratory and injunctive relief, Cole has failed, as will be discussed below, to establish that his constitutional rights were violated so as to merit such relief.

### B. *Individual Capacity Claims*

A claim for money damages under § 1983 may not lie against defendants who were not personally involved in the constitutional violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995): *see also Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987): *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Goord, Fischer, and Wright all held supervisory position within DOCS, and supervisors cannot be held liable under § 1983 solely for the acts of their subordinates. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). The personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*6**  *Colon,* 58 F.3d at 873.

Cole makes no specific allegations against Goord in his Complaint and in fact concedes in his deposition testimony that his claims against Goord are based solely on Goord's position as Commissioner at the time of the events in the Complaint. (Deposition of Ronnie Cole, dated Aug. 20, 2007 ("Cole Dep."), 113–14.) [6]  Accordingly, summary judgment must be granted to Goord.

[6]    Relevant pages of Cole's deposition transcript are attached as Ex. G to the Odessky Declaration.

In his Complaint, Cole alleges no specific misconduct by Fischer, who was the Superintendent of Sing Sing during the relevant time period. In his deposition, however, Cole contends that he spoke to Fischer about his situation— i.e., that he informed Fischer of a purported constitutional violation—and that Fischer told him that Dr. Perilli was a good doctor and that Fischer would defer to Dr. Perilli's judgment—i.e., that Fischer failed to remedy the wrong. (Cole Dep. 114.) Even crediting Cole's version of events, the reliance of Fischer, who is not a doctor, on the advice of Dr. Perilli, who had treated Cole and who was the FHSD, does not amount to a constitutional violation. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (a prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been personally involved if he does so). Furthermore, as discussed below, the refusal of Dr. Perilli to authorize a particular course of treatment did not violate the Eighth Amendment.

In his Complaint, Cole alleges that Wright, the Deputy Commissioner of Health Services for DOCS, also deferred Cole's complaints to Dr. Perilli. (Compl.¶¶ 21–22.) In his deposition, Cole elaborates that he wrote letters complaining about his treatment to Wright and that Wright responded only with what were essentially form letters. (Cole Dep. 114.) Here, too, Cole's assertions do not rise to the level of a constitutional violation. As was the case with Fischer, (1) Wright had every reason to rely upon the advice of Dr. Perilli, who was treating Cole at Sing Sing, and (2) what Cole complained of was not a constitutional violation. Summary judgment is therefore granted as to Fischer and Wright.

### IV. Dr. John Perilli

Throughout 2004, Dr. Perilli and his medical staff treated Cole for his incontinence, bacterial infections, and skin breakdowns. (Def.'s Rule 56.1 Stmt, ¶¶ 17, 18, 23.) In

addition, Dr. Perilli and his staff repeatedly referred Cole to an outside urology specialist, a fact which Cole does not dispute. (*See* Compl. ¶ 17; Cole Dep. at 77.) Cole contends that his rights were violated by Dr. Perilli's failure to follow all of the recommendations of the urology specialist. Specifically, Cole complains that Dr. Perilli did not take the recommendation of Dr. Janis that Cole: (1) have the urethral reconstruction surgery; (2) be given Tylenol # 3 for pain; (3) be given four catheters a week; and (4) be permitted to have two showers a day. [7]

[7]    To the extent that Cole also claims that Dr. Perilli failed to treat his back pain (*see* Compl. ¶¶ 15–16), that contention is belied by the record. Although Dr. Perilli's medical staff referred him to an orthopedic specialist on September 9, 2004, Cole refused to go to his appointment. (Def.'s Rule 56.1 Stmt. ¶¶ 34–35.) Cole's Complaint provides no indication of what treatment he expected Dr. Perilli to provide him with regarding his back pain.

A. *The Urethral Reconstruction Surgery*

**\*7**  The medical records belie Cole's contention that Dr. Janis recommended that Cole have the urethral reconstruction surgery instead of the stoma/diversion procedure. Rather, in his first consultation with Cole, Dr. Janis presented the reconstruction surgery as one of two viable options-the other being the stoma/diversion procedure. (Perilli Decl., Ex. 2 at 863.) At subsequent consultations, Dr. Janis recommended only the stoma/diversion procedure. (*Id.* at 861, 1544, 1546.) Even if Dr. Janis had recommended the urethral reconstruction surgery as the preferred treatment, however, DOCS rules did not require Dr. Perilli to follow a consultant's recommendations if he believed that another course of treatment was more appropriate. (Perilli Decl. ¶ 17.) The record reflects that at least three urologists who treated Cole prior to his transfer to Sing Sing in 2004 opined that the reconstruction surgery was not advisable as it posed a high risk and had a low rate of success. (Def.'s Rule 56.1 Stmt. ¶¶ 11–13.) The defendants' urological expert, Dr. Arthur Smith, reviewed Cole's medical records, as well as Cole's Complaint and deposition transcript, and supported Dr. Perilli's finding that the stoma/diversion procedure, and not the urethral reconstruction, was medically appropriate. (*See* Smith Rpt., dated Apr. 29, 2008, at 1.) [8] Dr. Smith also noted that he did not see any evidence in the medical records that Cole had not received adequate medical attention while at Sing Sing, and that "it is apparent that [Cole] is not a very compliant

patient and this certainly has not help[ed] to maintain his progress." (*Id.*)

[8]    The Smith Report is attached to the Odessky Declaration as Ex. F.

The law is well established that mere differences in medical opinion, or for that matter even malpractice, are not sufficient to make out an Eighth Amendment claim:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment .... [W]hether ... [certain] diagnostic techniques or forms of treatment [are] indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court

*Gamble,* 429 U.S. at 106–07 (internal quotations omitted); *see also Woods v. Goord,* No. 01 Civ. 3255, 2002 WL 31296325, at \*6 (S.D.N.Y. Oct. 10, 2002) ("[D]isagreements over medications, diagnostic techniques ..., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim.")

**\*8**  Cole's claim against Dr. Perilli amounts to just such a disagreement over forms of treatment. Cole clearly believes that the urethral reconstruction surgery is the solution to his

problems. But Dr. Perilli believed, and the State's expert concurs, that this surgery is contraindicated for various reasons. Who is right about which treatment would be better for Cole is, of course, a question of fact. But the record is devoid of any evidence that Dr. Perilli's conclusion was anything other than a conscientious medical judgment, and no reasonable jury could conclude that Dr. Perilli's medical opinion that the stoma/diversion procedure was preferable to the urethral reconstruction surgery desired by Cole-an opinion supported by repeated recommendations by outside urology specialists-amounts to del iberate indifference on the part of Dr. Perilli.

### B. *Pain Medication*

Dr. Perilli did order that Cole be given non-narcotic pain medication as opposed to the Tylenol # 3 recommended by Dr. Janis. Rather than exhibiting deliberate indifference to Cole's medical condition, however, Dr. Perilli had determined that Cole's pain was being managed appropriately and that a narcotic such as Tylenol # 3 was unnecessary; because of concerns regarding the hoarding and selling of narcotic drugs, Sing Sing's policy was to prescribe narcotic drugs to inmates only when absolutely necessary. (Perilli Decl. ¶ 32.) Cole cannot establish that, by changing his medication to a non-narcotic, Dr. Perilli knew of and disregarded a "substantial risk of serious harm" to Cole's health. *Farmer,* 511 U.S. at 837.[9]

[9]     Cole's reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment (*see* Affirmation of Ronnie Cole in opposition to Def.'s motion for summary judgment, dated Dec. 11, 2008, ¶¶ 12–14) does nothing to establish that Dr. Perilli violated Cole's Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference. *See Gamble,* 429 U.S. at 97.

### C. *Catheters*

Next, Cole attempts to establish a claim of deliberate indifference based upon a disagreement about treatment. While Cole asserts that Dr. Perilli was deliberately indifferent because he failed to follow Dr. Janis's recommendation that Cole be provided with four catheters a week, Cole provides

no evidence that four catheters a week are required for his condition. Dr. Perilli's contention that the two or three catheters provided to Cole at Sing Sing were well within the community standard and caused no detriment to Cole's health (Def.'s Rule 56.1 Stmt. ¶ 37) is supported by Dr. Smith, whose opinion is that there is no medical difference whether a patient has one, two, or four catheters a week. (Smith Rpt at 1.) Dr. Smith further noted that most of his patients use a single catheter for several weeks and that a catheter is never sterile when a patient is catheterizing himself. (*Id.*) Cole identifies no evidence in the record, including the recommendation of Dr. Janis, indicating that the failure to provide a specific number of catheters was medically insufficient, let alone that it represented a deliberate indifference to any serious medical risk.

### D. *Additional Showers*

Dr. Perilli's failure to follow Dr. Janis's recommendation that Cole be permitted two showers a day does not rise to the level of a constitutional violation. While Cole attributes his infections to the fact that he did not receive two showers a day (Compl.¶ 4), his only evidence of this is his own conclusory statement. Dr. Perilli's opinion that there was no medical requirement that Cole be permitted two showers a day (Perilli Decl. ¶ 36) is echoed by Dr. Smith's statement that Cole's abscesses would not likely be helped by more frequent showers. (Smith Rpt at 1.) In addition, the uncontradicted evidence is that Cole had access to running water in his cell and could wash as needed at any time. (Perilli Decl., Ex. 2 at 190.)

**\*9**  Dr. Perilli and his medical staff treated Cole's serious medical condition, referred him to a specialist, considered the specialist's recommendations, and rejected some of those recommendations for reasons that, right or wrong, no reasonable jury could find represented deliberate indifference to Cole's needs. Summary judgment must therefore be granted to Dr. Perilli.

### V. Eileen Hansen

While Cole makes no specific allegations against Nurse Administrator Hansen in his complaint, in his deposition Cole asserts that she (1) directed Dr. Perilli to deny medical treatment and supplies to Cole and (2) denied Cole diapers, vitamins, lotion, and access to the urologist. (*See* Cole Dep. 115–17.) Apart from Cole's assertions, nothing in the record supports these allegations. First, Hansen did not have the authority to direct Dr. Perilli—who was the FHSD—or any

other physician, to treat or refuse to treat an inmate patient, nor did she have the authority to decide whether an inmate patient should be seen by a specialist. (*See* Declaration of Eileen Hansen, dated Sept. 23, 2008 ("Hansen Decl"), ¶¶ 7, 8.) [10] As for Cole's claim that Hansen denied him medical supplies, the record includes a memo from Hansen to the Deputy Superintendent of Security in January of 2004, advising him of the medical supplies that were being provided to Cole. (*Id.* ¶ 9.) The list provided Cole with, among other medical supplies, 50 diapers and 15 lubricants per week. (*Id.*) The record does not include any prison hospital records supporting Cole's assertion that Hansen denied him medical supplies and Hansen testified that "[a]t no time did I deny [Cole] access to medical care or medical supplies." (*Id.* ¶ 10.)

[10]   Hansen's Declaration is attached as Ex. E to the Odessky Declaration.

Even assuming, however, that the sworn testimony of Cole and Hansen creates a credibility issue not amenable to resolution on summary judgment, *see Colon,* 58 F.3d at 873, Cole's allegations do not amount to sufficiently serious behavior to rise to the level of a constitutional violation. As noted above, to establish an Eighth Amendment claim based on the denial of medical care, a plaintiff "must make an objective showing that the *deprivation* was sufficiently serious, or that the result of defendant's denial was sufficiently serious." *Smith,* 316 F.3d at 186 (emphasis in original) (internal quotations omitted); *see also Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (in evaluating an Eighth Amendment claim, courts should consider "if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation" (internal quotations omitted)). So, for example, when a prisoner bases an Eighth Amendment claim on a temporary delay in the provision of otherwise adequate medical treatment, "it is appropriate to focus on the challenged *delay* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith,* 316 F.3d at 185 (emphasis in original) (internal quotations omitted).

**\*10** While Cole undoubtedly suffers from a serious medical condition, he offers no evidence that any limitation on supplies for which—taking the evidence in the light most favorable to Cole—Hansen is responsible created a serious health risk to Cole. Summary judgment will therefore be granted in favor of Hansen.

## VI. Joyce Gutowski

Cole makes no specific claims against Gutowski in his Complaint, but in his deposition he alleges that Gutowski violated his constitutional rights by (1) writing a false misbehavior report against him for failing to allow her to check his mouth to see if he had swallowed his medication and (2) by making false entries in Cole's medical records sayir g(a) that he had not taken an annual tuberculosis test, when he had in fact done so; (b) that he had not requested sick call on a certain date when in fact he had; and (c) that she had not treated Cole on a certain date when in fact she had. (*See* Cole Dep. 118–20.) Nurse Gutowksi denies making a false behavior report or false entry into his medical records (Declaration of Joyce Gutowski, dated Sept. 22, 2008 ("Gutowksi Decl."), ¶ 6), [11] and the record provides evidence of numerous occasions when Gutowski examined Cole and cooperated with his requests—referring him to physicians, renewing his medications, and providing him with medical supplies. (*Id.,* Ex. B.)

[11]   Gutowksi's Declaration is attached to the Odessky Declaration as Ex. C.

Even assuming the facts in the light most favorable to Cole, though, the writing of a false misbehavior report does not in itself amount to a constitutional violation. A prisoner has "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Rather, the Constitution provides a prisoner with the light "not to be deprived of a protected liberty interest *without due process of law." Id.* (emphasis added).

Assuming without deciding that a false allegation of misbehavior could entail a risk of consequences to a prisoner's liberty sufficient to trigger a due process right, Cole received the process he was due—a hearing at which he was able to contest the accusation. *See* Declaration of Ronnie Cole, dated Nov. 13, 2008, Ex. F.) Cole has therefore not alleged a constitutional violation and summary judgment must be granted to Gutowski.

## VII. Nelson Muthra

Cole makes no specific claims against Muthra in his Complaint. However, in his deposition, Cole charges that Muthra improperly acted as a go-between between Dr. Perilli

and Cole and refused Cole medical treatment. (Cole Dep. 120.) Cole alleges specifically that Muthra refused him access to "the doctor, treatment for the infection, the urine test, refill, whatever he could deny me. Whatever it was [ab]out, he would say he would take care of it, and he wouldn't take care of it." (Cole Dep. 121.)

Muthra denies all of Cole's allegations and the record includes nine referrals ordered by Muthra for Cole to orthotics, audiology, and urology departments. (Declaration of Nelson Muthra, dated Sept. 22, 2008 ("Muthra Decl."), ¶ 5; Ex. A.)[12] Even assuming that there were other occasions on which Muthra denied Cole treatment for an infection or did not follow through on something he told Cole he would take care of, Cole has not shown that the alleged deprivations were sufficiently serious to rise to the level of Eighth Amendment violations. Summary judgment must therefore be granted in favor of Muthra.

[12]    Muthra's Declaration is attached to the Odessky Declaration as Ex. D.

## VIII. Cole's New Allegations Raised in Response to the Motion for Summary Judgment

 *11  In materials submitted in response to defendants' motion for summary judgment, Cole makes a number of additional allegations that amplify his claims against certain of the defendants. In his Opposition to defendants' motion for summary judgment, Cole alleges for the first time that Fischer worked with Dr. Perilli and Nurse Hansen to delay and deny Cole the urethral reconstruction surgery in retaliation for his having filed complaints. (Pl.'s Opp'n 18.) In his supporting affidavit, Cole alleges, among other things, (1) that he became infected and his scrotum had swollen with an abcess and broken open, and that he reported this to Muthra and Hansen but they denied him medical care; (2) that Dr. Katz of the mental health department referred him to the hospital but that, once Cole arrived there, Dr. Perilli refused to have him seen, Hansen became "real unprofessional," and Muthra refused to see or treat Cole; and (3) that Dr. Perilli, Muthra, Hansen, and Gutowski tampered with Cole's medical records and gave a false written report alleging that Cole had a non-bilateral hearing loss and that the audiologist had not recommended any special care for Cole. (Affirmation of Ronnie Cole, dated Dec. 10, 2008, ¶¶ 35, 60.)

A plaintiff may not submit an affidavit that, "by omission or addition," contradicts his deposition. *Hayes v. New York City Dep't of Corrs.,* 84 F.3d 614, 619 (2d Cir.1996);

*see also Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001); *Bickerstaff v. Vassar College,* 196 F.3d 435, 455 (2d Cir.1999). Cole's deposition afforded him an opportunity to enumerate all of his allegations against the defendants; new allegations raised in his post—summary judgment affidavit contradict—and do not merely supplement-his deposition testimony. The defendants were entitled to conduct discovery, find out what evidence exists in support of the complaint, and then move for summary judgment without having to wonder whether Cole planned to fill in any holes they had found in his story by swearing to extra facts in response to their motion.

Cole is a pro se plaintiff but he is also an experienced litigant[13] who was given repeated opportunities, in his Complaint itself and at his deposition, to list and amplify all his claims. While courts are required to interpret a pro se plaintiff's pleadings liberally, they are not required to let a pro se plaintiff manufacture issues of fact by raising new allegations in response to a summary judgment motion. *See Hayes,* 84 F.3d at 619; *Bennett v. Falcone,* No. 05 Civ. 1358, 2009 WL 816830, at *9 (S.D.N.Y. March 25, 2009); *McCullough v. Burroughs,* No. 04 Civ. 3216, 2008 WL 2620123, at *4, n. 6 (E.D.N.Y. June 30, 2008) (applying to pro se plaintiffs the rule that a party may not create an issue of fact by submitting statements in opposition to a summary judgment motion that contradict the affiant's previous deposition testimony).

[13]    *See, e.g., Cole v. Goord,* No. 05 Civ. 2902, 2005 WL 2777313 (S.D.N.Y. Oct.20, 2005); *Cole v. Khulmann,* No. 97 Civ. 3029, 2003 WL 1193728 (S.D.N.Y. March 13, 2003); *Cole v. Goord,* 47 A.D.3d 1147, 850 N.Y.S.2d 687 (3d Dept.2008); *Cole v. Goord,* 47 A.D.3d 1148, 850 N.Y.S.2d 283 (3d Dept.2008).

Accordingly, this Court will not consider any of the specific claims which Cole raises for the first time through his submission in opposition to the motion for summary judgment.

## CONCLUSION

 *12  For the foregoing reasons, defendants' motion for summary judgment is granted.

SO ORDERED.

2009 WL 1181295

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1181295

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 108 of 284
Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,

v.

G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)

|

Signed January 9, 2016

|

Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing Correctional
Facility, 354 Hunter Street, Ossining, NY 10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney
General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1** This is a civil rights action brought by *pro se* plaintiff
Terrell Eleby against three individuals employed by the
New York State Department of Corrections and Community
Supervision ("DOCCS"), one of whom has since been
dismissed from the action, pursuant to 42 U.S.C. § 1983.
In his complaint, plaintiff alleges that two of the defendants
assaulted him in violation of his Eighth Amendment rights,
and the third defendant violated his Fourteenth Amendment
rights by issuing an allegedly false misbehavior report against
him and confining him in the special housing unit ("SHU") at
the prison facility in which he was housed.

Currently pending before the court is a motion brought by
the remaining two defendants seeking the entry of summary
judgment in their favor based upon plaintiff's alleged failure
to exhaust available administrative remedies before filing
suit. For the reasons set forth below, I recommend that the
defendants' motion be granted.

I. BACKGROUND [1]

[1]     In light of the procedural posture of the case, the
        following recitation is derived from the record now
        before the court, with all inferences drawn and
        ambiguities resolved in plaintiff's favor. *Terry v.
        Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a prison inmate currently held in the custody of the
DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although plaintiff is
now confined elsewhere, at the times relevant to this action he
was housed in the Auburn Correctional Facility ("Auburn")
located in Auburn, New York. *Id.* at 18.

In his complaint, plaintiff alleges that on January 14, 2015, he
was waiting in one of Auburn's hospital dormitory rooms to be
escorted to an outside facility for a medical examination. Dkt.
No. 1 at 4; Dkt. No. 29-2 at 54. At approximately 10:00AM,
defendants Smith and Vevone, both of whom are corrections
officers, arrived at plaintiff's room to escort him on the
medical trip. Dkt. No. 1 at 4. While plaintiff was attempting
to remove his clothes for a mandatory strip search, defendant
Smith "violently and physically attacked [him]." *Id.*; *see also*
Dkt. No. 29-2 at 58. According to plaintiff, both defendants
Smith and Vevone "jumped on [his] back," and defendant
Smith punched him repeatedly in the eye, head, neck, back,
and ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant in the
action, arrived at plaintiff's dorm, physically intervened, and
ordered defendants Smith and Vevone to cease the assault and
leave the room. Dkt. No. 1 at 4-5; Dkt. No. 29-2 at 58-59,
64. As a result of the alleged assault, plaintiff suffered various
injuries, including a bloody and swollen eye, swelling and
redness to his neck, and sore ribs. Dkt. No. 1 at 5; Dkt. No.
29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing him
of violating six prison rules. Dkt. No. 22 at 9; Dkt. No.
29-2 at 72. Following a superintendent's hearing to address
the charges, plaintiff was found guilty on four of the six
counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at 72. As a result
of that finding, plaintiff was sentenced to serve thirty days of
disciplinary SHU confinement, with a corresponding loss of
commissary, package, and telephone privileges. Dkt. No. 22
at 13; Dkt. No. 29-2 at 73-72.

II. PROCEDURAL HISTORY

**Eleby v. Smith, Not Reported in Fed. Supp. (2017)**

2017 WL 986123

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action. [2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

[2]    Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III. DISCUSSION

A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516,

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 110 of 284

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —— Fed.Appx. ——, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

[4]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

[5]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

**\*4**    The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can —and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only

**Eleby v. Smith, Not Reported in Fed. Supp. (2017)**

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 111 of 284

2017 WL 986123

those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

[6]   According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

## 2. Analysis

**\*5**  The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8]  Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January

22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

[7]   Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

[8]   In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/ Directives/0700.pdf.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

2017 WL 986123

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See* Dabney, 604 Fed.Appx. at 3 ("The IGP also has an expedited process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also* Lopez v. Bushey, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g.,* McCoy v. Goord, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

[9]     In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, Terry, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See* Giannullo v. City of N.Y., 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. Hayes, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g.,* Goodson v. Silver, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 113 of 284

2017 WL 986123

 **\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[10]    If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 986123

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 652409
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, III, Plaintiff,

v.

David O'HARA, Corr. Officer, Auburn Corr.
Fac.; K. Kirkwood, Corr. Officer, Auburn Corr.
Fac.; C. Curtis, Corr. Officer, Auburn Corr.
Fac.; L. Seery, Corr. Officer, Auburn Corr.
Fac.; P. Dilallo, Corr. Officer, Auburn Corr.
Fac.; and S. Walshvelo, Corr. Serg., Auburn
Corr. Fac., a/k/a S. Walshevo, Defendants.

9:16-CV-0527 (GTS/ATB)
|
Signed 02/15/2019

**Attorneys and Law Firms**

OF COUNSEL: NOLAN J. LAFLER, ESQ., BLITMAN
& KING LLP, 443 North Franklin Street, Franklin Center,
Suite 300, Syracuse, NY 13204-1415, Pro Bono Counsel for
Plaintiff.

HON. LETITIA A. JAMES, OF COUNSEL: DENISE P.
BUCKLEY, ESQ., KONSTANDINOS D. LERIS, ESQ.,
Assistants Attorney General, Attorney General for the State
of New York, The Capitol, Albany, NY 12224, Counsel for
Defendants.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** The trial in this prisoner civil rights action, filed
*pro se* by Robert Adams, III ("Plaintiff") pursuant to 42
U.S.C. § 1983, began with an evidentiary hearing before the
undersigned on February 12, 2019, regarding the affirmative
defense of the six above-captioned correctional employees
("Defendants") that Plaintiff failed to exhaust his available
administrative remedies, before filing this action on May 4,
2016, as required by the Prison Litigation Reform Act. At the
hearing, documentary evidence was admitted, and testimony
was taken of Plaintiff as well as Defendants' three witness
(Auburn Correctional Facility Lieutenant Timothy C. Abate,
Auburn Correctional Facility Inmate Grievance Program
Supervisor Cheryl Parmiter, and New York State Department

of Corrections and Community Supervisor Inmate Grievance
Program Assistant Director Rachael Seguin), whom Plaintiff
was able to cross-examine through *pro bono* trial counsel.
At the conclusion of the hearing, the Court indicated that a
written decision would follow. This is that written decision.
For the reasons stated below, Plaintiff's Second Amended
Complaint is dismissed because of his failure to exhaust his
available administrative remedies before filing this action.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires
that prisoners who bring suit in federal court must first
exhaust their available administrative remedies: "No action
shall be brought with respect to prison conditions under §
1983 ... by a prisoner confined in any jail, prison, or other
correctional facility until such administrative remedies as are
available are exhausted." 42 U.S.C. § 1997e.

The PLRA was enacted "to reduce the quantity and improve
the quality of prisoner suits" by "afford[ing] corrections
officials time and opportunity to address complaints internally
before allowing the initiation of a federal case." *Porter
v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard,
exhaustion serves two main purposes. First, it protects
"administrative agency authority" by giving the agency "an
opportunity to correct its own mistakes with respect to the
programs it administers before it is haled into federal court,
and it discourages disregard of the agency's procedures."
*Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion
promotes efficiency because (a) "[c]laims generally can be
resolved much more quickly and economically in proceedings
before an agency than in litigation in federal court," and (b)
"even where a controversy survives administrative review,
exhaustion of the administrative procedure may produce
a useful record for subsequent judicial consideration."
*Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion
requirement applies to all inmate suits about prison life,
whether they involve general circumstances or particular
episodes, and whether they allege excessive force or some
other wrong." *Porter*, 534 U.S. at 532.

In accordance with the PLRA, the New York State
Department of Corrections and Community Supervision
("DOCCS") has made available a well-established inmate
grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the
DOCCS Inmate Grievance Program ("IGP") involves the
following three-step procedure for the filing of grievances. 7
N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [1]

1    *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

**\*2**  First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2]  If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing.

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal.

Third, a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by correction officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint in one of three

ways: "in-house," by the New York State Office of the Inspector General, or by the New York State Police's Bureau of Criminal Investigation. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar special procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

These procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3]  Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process. [4]

3    *See Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 & n.3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight,* No. 09-3641, Mandate [2d Cir. filed Jan. 15, 2010].)

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray,* 2010 WL 1235591, at *2 & n.4 [collecting cases]; *cf.* 7 N.Y.C.R.R. § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

**\*3**  It is important to note that, where an inmate does not know that an unprocessed grievance (i.e., a grievance that has not been assigned a grievance number) may technically be appealed, he need not appeal that unprocessed grievance, because the regulatory scheme advising him of that right is too opaque. *See Williams v. Corr. Officer Priatno,* 829 F.3d 118, 126 (2d Cir. 2016) (finding that, "even if Williams technically could have appealed his [unprocesseed] grievance, we conclude that the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use' [it pursuant to *Ross v. Blake,* 136 S. Ct. 1850 (2016) ]").

It is also important to note that DOCCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

"An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. This is because certain exceptions exist to the exhaustion requirement.

In particularly, in 2004, in *Hemphill v. State of New York*, the Second Circuit held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord, Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may

have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

**\*4** However, in 2016, in *Ross v. Blake*, the Supreme Court abrogated *Hemphill*'s third prong and effectively enveloped its second prong within its first prong. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). More specifically, under *Ross*, any inquiry that previously would have been considered under the second or third prongs of *Hemphill* is now considered entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *Ross*, 136 S. Ct. at 1858. This is because, the Supreme Court explained, the PLRA "contains its own, textual exception to mandatory exhaustion." *Id.* In particular, 42 U.S.C. § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. *Id.* In the PLRA context, the Supreme Court determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation marks omitted).

To guide courts in this new analysis, the Supreme Court has identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross*, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a

jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord,* 652 F.3d 305, 308-10 (2d Cir. 2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of providing that a prisoner has failed to exhaust his available administrative remedies.[5] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by persuading the Court of either exhaustion or unavailability.[6] As a result, practically speaking, while the burden of proving this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

[5]  *Id.* at *4 [citation omitted].

[6]  *Id.* at *4 & n.17 [citing cases]; *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir. 2004) (noting that special circumstances must be "plausibly alleged, ... justify[ing] the prisoner's failure to comply with administrative procedural requirements"); *Grant v. Kopp,* 17-CV-1224, 2019 WL 368378, at *4 (N.D.N.Y. Jan. 3, 2019) (Peebles, M.J.) ("I conclude that although the burden of proof on this affirmative defense remains with the defendant at all times, the plaintiff can be required to produce evidence in order to defeat it.") (citing cases), *adopted,* 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) (Sharpe, J.).

## II. ANALYSIS

According to Plaintiff, he made three attempts to exhaust his available administrative remedies regarding the claims at issue in this action: (1) he filed a grievance at Auburn Correctional Facility ("Auburn C.F."); (2) he sent a letter of complaint to the New York State Office of the Inspector General ("Inspector General"); and (3) he filed a grievance at Southport Correctional Facility ("Southport C.F."). (Hrg. Tr.)[7]

[7]  The Court notes that Defendants' Answers timely asserted this affirmative defense. (Dkt. No. 101, at ¶ 18 [Defs.' Answer]; Dkt. No. 102, at ¶ 17 [Def. Walshvelo's Answer].)

### A. Plaintiff's First Attempt: Filing a Grievance at Auburn C.F.

**\*5** The Court begins by finding that, if a correctional sergeant ripped up Plaintiff's grievance in front of him and threatened him not to further pursue the grievance as Plaintiff testified, sufficient grounds would exist to deem his administrative remedies to have been effectively rendered unavailable (despite his having continued to complain through avenues other than the grievance process at Auburn C.F.). This is because the unavailability inquiry is an objective one,[8] which survives the Supreme Court's decision in *Ross.*[9]

[8]  *See Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir. 2004) ("The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available.... Moreover, it should be pointed out that threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts.").

[9]  *See, e.g., Davis v. Doe,* 16-CV-0994, 2017 WL 8640829, at *4 (N.D.N.Y. Dec. 29, 2017) (Stewart, M.J.) (continuing to apply objective test after *Ross* ), *adopted,* 2018 WL 1582230 (N.D.N.Y. March 27, 2018) (D'Agostino, J.); *accord, Allen v. Graham,* 16-CV-0047, 2017 WL 9511168, at *6 (N.D.N.Y. Sept. 26, 2017) (Baxter, M.J.), *adopted,* 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017) (Suddaby, C.J.); *White v. Dishaw,* 14-CV-0002, 2017 WL 4325770, at *3 (N.D.N.Y. June 20, 2017) (Stewart, M.J.), *adopted,* 2017 WL 4326074 (N.D.N.Y. Sept. 27, 2017) (Sharpe, J.); *Cole v. N.Y.S. Dep't of Corr. and Cmty. Supervision,* 14-CV-0539, 2016 WL 5394752, at *10 (N.D.N.Y. Aug. 25, 2016) (Peebles, M.J.), *adopted,* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.).

However, after carefully considering the matter, the Court finds that Plaintiff has failed to offer any credible evidence that, while he was at Auburn C.F. between January 20 and January 22, 2015, he submitted a grievance that a correctional employee either ripped up or threatened him not to continue to pursue. (*See generally* Hrg. Tr.) In finding that

Plaintiff's hearing testimony lacks credibility, the Court relies on the following eight facts: (1) Plaintiff's unconvincing demeanor and body language (including, but not limited to, his demeanor, tone of voice, facial expressions, and eye contact or lack thereof) during his testimony;[10] (2) the fact that Plaintiff contradicted himself by initially testifying at the hearing that he did not "actually observe" (but only "heard") the correction officer who picked up his grievance and then later testifying that he *did* see, and indeed made eye contact with, that correction officer (which is consistent with his prior deposition testimony);[11] (3) the inconsistency between Plaintiff's testimony that he had "[a]t least twice" filed grievances at Auburn C.F. "on the standard form for inmate grievances" (other than the grievance he purportedly submitted regarding the events of this litigation) and the unchallenged hearing testimony of IGP Supervisor Parmiter that Plaintiff *never* filed a grievance at Auburn C.F. (as well as Plaintiff's apparent stipulation that he never filed a grievance at Auburn C.F.);[12] (4) the inconsistency between Plaintiff's hearing testimony that an unidentified sergeant ripped up his first grievance about the assault (which stopped Plaintiff from filing another grievance at Auburn C.F.) and Plaintiff's assertion (in his letter of June 1, 2015) that the interception of his grievance about the assault occurred "on two separate occasions, by S.H.U. Supervisors";[13] (5) the inconsistency between Plaintiff's hearing testimony that complaining about the individual who had threatened him would have been like "throwing a ball in the dark" because Plaintiff "wasn't able to identify [him]"[14] and the fact that Plaintiff knew the individual's (a) rank ("sergeant"), (b) hair color ("brown"), (c) approximate height ("5-10 to 6 foot"), (d) approximate weight ("two [hundred pounds] and some change, 220"), and most importantly (e) his *job assignment* (as the admitted supervisor of the correction officers who had allegedly assaulted Plaintiff);[15] (6) the fact that it is difficult to believe that Plaintiff would not have even *tried* to avail himself of the opportunity to place his sealed grievance directly through a slot into the locked mailbag (beyond the reach of correctional employees until it reaches the grievance office), given his belief that "keep[ing] everything inside quiet, on the hush" is "what they do up there [in S.H.U.] ... they want total control";[16] (7) the fact that it is difficult to believe that a correctional sergeant would take off his name tag (which in itself would subject him to discipline) and then stand before an inmate's cell in SHU and tear up the inmate's grievance, knowing that the act would be captured on video and that the video would be retained for a period of two weeks (and even longer if the inmate complained of

the incident, in which case the video would be saved to a DVD);[17] and (8) the fact that it is difficult to believe that Plaintiff would write to the Inspector General on January 22, 2015, complaining about the intimidation he experienced two days before by Correction Officer "K. Deford" (who purportedly banged on Plaintiff's cell in the Mental Health Unit and stated, *inter alia*, "There's more where that came from. We're not finished w[ith] you yet") without mentioning that a sergeant purportedly ripped up Plaintiff's grievance earlier in the day on January 22.[18]

[10]    Cf. *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996) ("[W]e must accord great deference to the trial court's findings regarding credibility because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.").

[11]    (*Compare* Hrg. Tr. at 10, 21 [Plf.'s Hrg. Testimony] *with* Hrg. Tr. at 10, 22-23, 31-32 [Plf.'s Hrg. Testimony] *and* Hrg. Ex. D-5, at 127 [Plf.'s Depo. Tr.].)

[12]    (*Compare* Hrg. Tr. at 7-8 [Plf.'s Hrg. Testimony] *with* Hrg. Tr. at 55 [Parmiter Hrg. Testimony] *and* Hrg. Tr. at 4 [Tr. of Parties' Stipulations, in which Plaintiff's counsel stated, "We also understood that there was going to be testimony from the defense that the internal grievance files at Auburn were searched and that no record of a grievance from the plaintiff was located. We can stipulate to that issue as well."].)

[13]    (*Compare* Hrg. Tr. at 6-7, 24, 33 [Plf.'s Hrg. Testimony] *with* Hrg. Ex. P-2 [Plf.'s Letter to Southport C.F. IGP Supervisor dated June 1, 2015].)

[14]    (Hrg. Tr. at 32 [Plf.'s Hrg. Testimony].)

[15]    (Hrg. Tr. at 11-14 [Plf.'s Hrg. Testimony, stating, *inter alia*, that the sergeant referred to the offending corrections officers as "my officers"]; Dkt. No. 138, Attach. 4, at ¶ 3 [Plf.'s Sworn Statement, identifying the individual as "the SHU Block Sgt." and stating that he referred to the offending correction officers as "my officers"]; Dkt. No. 138, Attach. 3, at ¶ 18 [Plf.'s Sworn Statement,

identifying the individual as "the SHU Block Sgt.".)

16    (Hrg. Tr. at 41-44, 38, 50 [Abate's Hrg. Testimony]; Hrg. Tr. at 33 [Plf.'s Hrg. Testimony].) The Court notes that, despite Lieutenant Abate's (somewhat vague) indication that a prisoner had to "hand[ ] [his grievance] to an officer," a fair reading of Lieutenant Abate's hearing testimony leads the Court to believe that, had he wanted to, Plaintiff could have "directly place[d] his grievance "into the mailbag." (Hrg. Tr. at 42, 44, 50 [Abate's Hrg. Testimony].)

17    (Hrg. Tr. at 11-14, 32 [Plf.'s Hrg. Testimony]; Hrg. Tr. at 39-41, 45-47 [Abate's Hrg. Testimony].)

18    (Hrg. Tr. at 28-31, 33-34 [Plf.'s Hrg. Testimony]; Hrg. Ex. P-1, at 7 [attaching page "5" of Plf.'s Letter to IG dated Jan. 22, 2015].)

**B. Plaintiff's Second Attempt: Sending a Letter of Complaint Directly to the Inspector General**

*6    Setting aside (for the sake of brevity) the fact that Plaintiff never obtained a referral from the superintendent before complaining to the Inspector General, no record evidence exists either that Plaintiff received a finding of substantiation by the Inspector General or that he appealed to CORC any finding of unsubstantiation by the Inspector General. (Hrg. Tr. at 15-17, 24-27, 29, 32-35 [Plf.'s Hrg. Testimony]; Hrg. Tr. at 58 [Seguin's Hrg. Testimony]; Hrg. Ex. D-1 [Record of Plf.'s Appeals to CORC]; D-5, at 129-32 [Plf.'s Depo. Tr.]; Hrg. Ex. P-1 [Plf.'s Letter to IG dated Jan. 22, 2015]; Dkt. No. 89, at ¶¶ 147-49 [Plf.'s Verified Second Am. Compl.].)

As this Court has previously explained, "There is no exhaustion where an inmate complains directly to the Inspector General (i.e., instead of complaining to the superintendent and having the complaint referred to the Inspector General pursuant to 7 N.Y.C.R.R. § 701.8[d] ), the Inspector General renders a finding of unsubstantiation, and the inmate fails to appeal that finding to CORC." *Smith v. Kelly*, 985 F. Supp.2d 275, 285 (N.D.N.Y. 2013) (Suddaby, J.) (collecting cases), *accord, McPherson v. Rogers*, 12-CV-0766, 2014 WL 675830, at *7 (N.D.N.Y. Feb. 21, 2014) (report-recommendation of Peebles, M.J., adopted by Hurd, J.).

This is especially true after the Supreme Court's June 6, 2016, decision in *Ross. See, e.g., Kearney v. Gebo,*

15-CV-0253, 2017 WL 61951, at *6 (N.D.N.Y. Jan. 4, 2017) ("As discussed above, however, the Supreme Court recently rejected the Second Circuit's 'special circumstances' exception to the PLRA's exhaustion requirement. Therefore, Plaintiff's complaint to the Inspector General, which does not constitute complete and proper exhaustion under New York's grievance scheme, cannot excuse his failure to exhaust."), *aff'd,* 713 F. App'x 39 (2d Cir. 2017) ("Kearney's pursuit of alternative relief from the Inspector General's Office and Commission of Correction did not render the ordinary inmate grievance procedures unavailable to him, such that he is excused from complying with those ordinary procedures. Their pendency did not preclude him from filing a grievance. Nor do any assurances Kearney received that these offices were considering his complaint warrant a finding that prison administrators thwarted Kearney from pursuing the ordinary grievance procedures through machination, misrepresentation, or intimidation.") (internal quotation marks omitted).

Analyzed through the framework set forth by *Ross,* here, the pending nature of the Inspector General's investigation in no way precluded Plaintiff from filing a grievance. *See Kearney v. Gebo,* 713 F. App'x 39, 42 (2d Cir. 2017) ("[The pendency of] Kearney's pursuit of alternative relief from the Inspector General's Office and Commission of Correction ... did not preclude him from filing a grievance."). Nor did any assurance that Plaintiff received that the Inspector General was considering his complaint warrant a finding that prison administrators thwarted Plaintiff from pursuing the ordinary grievance procedures "through machination, misrepresentation, or intimidation." *See Kearney,* 713 F. App'x at 42 ("Nor do any assurances Kearney received that these offices were considering his complaint warrant a finding that prison administrators thwarted Kearney from pursuing the ordinary grievance procedures through machination, misrepresentation, or intimidation.") (internal quotation marks omitted). To the contrary, Plaintiff swears that, after interviewing Plaintiff for an hour, the Inspector General's investigator instructed Plaintiff to contact the Inspector General if he experienced further issues or retaliation. (Hrg. Tr. at 15-17, 24-27, 29, 32-35 [Plf.'s Hrg. Testimony]; Dkt. No. 89, at ¶¶ 147-49 [Plf.'s Verified Second Am. Compl.].)

**C. Plaintiff's Third Attempt: Filing a Grievance at Southport C.F.**

*7    The grievance that Plaintiff filed at Southport C.F. was rejected as untimely, and there was no subsequent finding of mitigating circumstances to excuse that untimeliness. (Hrg.

Tr. at 19-20 [Plf.'s Hrg. Testimony]; Hrg. Ex. D-5, at 138-39 [Plf.'s Depo. Tr.]; Hrg. Ex. P-2 [Plf.'s Letter to Southport C.F. IGP Supervisor dated June 1, 2015]; Hrg. Ex. P-3 [Southport C.F. IGP Supervisor's Letter to Plf. dated June 2, 2015]; Hrg. Ex. D-1 [Record of Plf.'s Appeals to CORC].)

Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies. *See Cole v. Miraflor*, 02-CV-9981, 2006 WL 457817, at *5 (S.D.N.Y. Feb. 23, 2006) ("Contrary to Cole's claim that administrative remedies were no longer available to him because DOCS did not find mitigating circumstances to excuse his late grievance, ... the very fact that DOCS' policies provide for the filing of late grievances where there are mitigating circumstances, demonstrates that administrative remedies were available to Plaintiff."), *aff'd*, 305 F. App'x 781 (2d Cir. 2009); *Galberth v. Durkin*, 14-CV-0115, 2016 WL 11480153, at *7 (N.D.N.Y. Apr. 21, 2016) (Baxter, M.J.) ("An inmate has not exhausted his administrative remedies when he has requested permission to file an untimely appeal and been denied by CORC due to an unpersuasive showing of mitigating circumstances."), *adopted*, 2016 WL 3910270 (N.D.N.Y. July 14, 2016) (Sannes, J.); *Burns v. Zwillinger*, 02-CV-5802, 2005 WL 323744, at *3 (S.D.N.Y. Feb. 9, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher*, 339 F.Supp.2d 592, 595 (S.D.N.Y. 2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") (collecting cases).

As explained by the Court,

> If exhaustion were permissible under such circumstances, every inmate could exhaust his available administrative remedies without fulfilling the functions of the exhaustion requirement: affording corrections officials the time and opportunity to quickly and economically correct its own mistakes internally, and producing a useful

record for litigation, before allowing the initiation of a federal case.

*Smith v. Kelly*, 985 F. Supp.2d 275, 290-91 (N.D.N.Y. 2013) (Suddaby, J.); *see also Murray v. Palmer*, 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (report-recommendation of Lowe, M.J., adopted by Hurd, J.) ("If the rule were to the contrary, then, as a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement.").

**D. Conclusion**

None of Plaintiff's three attempts to exhaust his available administrative remedies was sufficient under the PLRA, *Ross* and *Hemphill*. As for Plaintiff's first attempt (on which he appeared to rely most strongly at the hearing), simply stated, the Court agrees with Defendants that, after Plaintiff learned that his hasty complaint directly to the Inspector General had not been substantiated, and after he learned that he would not be able to file a timely grievance at Southport C.F., he fabricated the story that his grievance had been destroyed and he had been threatened while at Auburn C.F. (Hrg. Tr. at 31.) The Court is not convinced by Plaintiff's contradictory and incredible hearing testimony.

**\*8 ACCORDINGLY**, it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 89) is **DISMISSED in its entirety with prejudice**[19] for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

[19]    The Court notes that this dismissal is with prejudice because "it is not possible for Plaintiff to obtain a waiver to file a late appeal to CORC." *Nickelson v. Annucci*, 15-CV-0227, 2019 WL 396003, at *1 & n.2 (N.D.N.Y. Jan. 31, 2019) (Suddaby, J.) (citing 7 N.Y.C.R.R. § 701.6[g] [2007] and *Murray v. Goord*, 03-CV-1010, 2008 WL 2522324, at *19 [N.D.N.Y. June 20, 2008] ); *see also Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2003) ("[T]he broader dictum that dismissal for failure to exhaust 'should

be without prejudice would extend too far if applied to cases where exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust."); *McCoy v. Goord*, 255 F. Supp.2d 233, 252 (S.D.N.Y. 2003) ("[W]here a plaintiff is effectively barred from administrative exhaustion–such as when the time for administrative exhaustion

has expired and the inmate has been denied a waiver to file a late grievance–courts have not hesitated to dismiss with prejudice.").

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Slip Copy, 2019 WL 652409

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3365766
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy BRITT, Plaintiff,

v.

Anne CARBERRY, et al., Defendants.

Civil Action No. 9:17-CV-0234 (MAD/DEP)

|

Signed 03/22/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: TROY BRITT, Pro Se, 781 E. 135th Street, Bronx, NY 10454.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: KYLE W. STURGESS, ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224.

<u>REPORT AND RECOMMENDATION</u>

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Troy Britt, a former New York State prison inmate, against several individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983. As narrowed by a series of decisions of this court, plaintiff's claims include his assertion that certain medical personnel were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment rights, while other corrections personnel violated his due process rights under the Fourteenth Amendment in connection with a disciplinary hearing held in July of 2016.

Now that discovery is complete, defendants have moved for the entry of summary judgment dismissing plaintiff's remaining causes of action, both on the merits and, in connection with his medical indifference claims, based upon his alleged failure to exhaust available remedies before commencing suit. For the reasons set forth below, I recommend that defendants' motion be granted.

I. <u>BACKGROUND</u> [1]

[1] Defendants' motion papers properly included a statement of undisputed material facts, as required under Local 7.1(a)(3) of this court. Dkt. No. 73-1. In his opposition papers, plaintiff failed to respond to defendants' statement.

By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases involving a non-moving party's failure to properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).

*Pro se* litigants are undeniably entitled to some measure of deference when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). That deference, however, does not extend to relieving *pro se* plaintiffs of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Plaintiff was expressly warned twice regarding the consequences of a failure to properly respond to defendants' Local Rule 7.1(a)(3) Statement. Dkt. No. 73 at 3; Dkt. No. 76 at 1. Based upon plaintiff's response in opposition to defendants' motion—which either consents to defendants' Local Rule 7.1(a)(3) Statement or simply fails to respond to it—I will deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.); *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

**\*2** Prior to December 2016, plaintiff was held in the custody of the DOCCS. *See generally* Dkt. No. 73-2 at 145-49. Although he was confined to several different facilities during his incarceration, at the times relevant to his claims, plaintiff was housed at the Ogdensburg Correctional Facility ("Ogdensburg"), located in Ogdensburg, New York, the Riverview Correctional Facility ("Riverview"), also located in Ogdensburg, New York, or Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id.* at 148-49.

A. Plaintiff's Medical Treatment

On February 20, 2015, plaintiff was transferred to Ogdensburg. Dkt. No. 73-2 at 57, 148. Upon his intake at that facility, plaintiff was evaluated by medical staff who documented his medical history, including a history of chronically low blood platelets requiring periodic blood work, and his vital signs. Dkt. No. 74-1 at 33. At that time, plaintiff was not experiencing any symptoms consistent with cellulitis. [2] Dkt. No. 73-2 at 136.

[2]   "Cellulitis is 'an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation.' " *Nelson v. Dougherty*, No. 10-CV-1568, 2012 WL 4026682, at *1 (N.D.N.Y. Aug. 13, 2012) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31st ed. 2007)).

On July 30, 2015, plaintiff requested that he be seen at emergency sick call due to redness and itchiness in his lower right leg. Dkt. No. 73-2 at 131-32; Dkt. No. 74 at 2; Dkt. No. 74-1 at 30. Plaintiff was examined by defendant Dr. Mark Chalom ("Dr. Chalom"), a physician at Ogdensburg, who believed that his complaints were likely due to cellulitis. Dkt. No. 73-2 at 132; Dkt. No. 74 at 2-3; Dkt. No. 74-1 at 30. Dr. Chalom prescribed plaintiff a ten-day course of Bactrim, noted that he had easy access to hydrocortisone cream, and directed him to follow up in two weeks for a reassessment. Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30; *see also* Dkt. No. 50 at 10.

Plaintiff, however, did not follow up again until January 26, 2016, when he presented to sick call complaining of pain, warmth, and redness in his right leg. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. At that time, plaintiff did not appear to be in significant distress, and his vital signs were noted to be within normal ranges. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. On this occasion, Dr. Chalom prescribed plaintiff a course of doxycycline. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28.

In a declaration submitted in support of defendants' motion, Dr. Chalom states that he did not provide any further medical treatment to plaintiff; a claim that is supported by plaintiff's ambulatory health records ("AHR"). Dkt. No. 74 at 3-4; *see generally* Dkt. No. 74-1. At various times during this action, plaintiff has suggested that Dr. Chalom provided additional treatment to him in July of 2016. *See, e.g.*, Dkt. No. 73-2 at 86; Dkt. No. 77 at 4 ("Dr. Chalom ... failed to still treat the [c]ellulitis-like infection."). During his deposition, however, plaintiff clarified that Dr. Chalom did not provide any further medical treatment following the January 26, 2016 sick call, but instead testified that Dr. Chalom visited him at Riverview in July of 2016 to discuss his cellulitis. *Compare* Dkt. No. 73-2 at 86 ("[Dr. Chalom] visited me at Riverview in the isolation room."), 137 *with* Dkt. No. 74 at 4 (observing that plaintiff received treated from Dr. Seidman upon intake at Riverview). Accordingly, Dr. Chalom's treatment of plaintiff's complaints is limited to the July 30, 2015 and January 26, 2016 sick calls.

B. The June 29, 2016 Incident

**\*3** On June 29, 2016, plaintiff requested emergency sick call through his dormitory officer, and he was taken to the infirmary. Dkt. No. 73-2 at 74. Plaintiff claimed that he went to "use the bathroom and felt light headed and passed out," slumping against a nearby wall for approximately thirty seconds. Dkt. No. 73-7 at 18; *see also* Dkt. No. 73-2 at 73-76. Plaintiff was examined by defendant Terri Penn ("Nurse Penn"), a registered nurse employed by the DOCCS and stationed at Ogdensburg, who documented plaintiff's injuries, including a right eyebrow laceration, scratched elbow, and a patch of inflamed, warm red skin on his lower right leg, the latter of which she believed to be consistent with cellulitis. Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3.

Plaintiff was then interviewed by Sergeant Costello ("Sgt. Costello"), who concluded that plaintiff's injuries, as well as the evasive answers he provided under questioning, were consistent with his having been involved in an altercation. Dkt. No. 73-7 at 3, 13-14; Dkt. No. 73-2 at 79. As a result,

2019 WL 3365766

Sgt. Costello issued plaintiff an inmate misbehavior report ("MBR"), charging him with fighting, violent conduct, and lying. Dkt. No. 73-7 at 9; *see also* Dkt. No. 73-2 at 65; *see generally* 7 N.Y.C.R.R. § 270.2. According to the MBR,

> [u]pon closer inspection of [plaintiff's] injuries[,] it was clear that they were consistent with being involved in a fight. [Plaintiff] denied being involved in any type of altercation and continued to state that he fell while in the bathroom. [Plaintiff] was uncooperative and refused to answer questions about who was in the area at the time of the incident, refusing to identify other inmates. [Plaintiff] appeared very nervous and was inconsistent with his answers when I questioned him about w[h]ere he fell and how he landed.

Dkt. No. 73-7 at 9.

Upon learning that plaintiff would be transferred to an isolation room at Riverview as a result of the MBR, Nurse Penn contacted medical staff regarding plaintiff's history of cellulitis. Dkt. No. 73-9 at 3. When plaintiff was examined upon his intake at Riverview, medical staff at that facility documented "recurrent cellulitis" on his right lower leg. Dkt. No. 74-1 at 25-26. Plaintiff was ultimately prescribed a course of Augmentin, an antibiotic, which resolved the issue. Dkt. No. 73-2 at 137-38; Dkt. No. 74-1 at 37.

### C. The July 2016 Tier III Disciplinary Hearing

On June 30, 2016, after plaintiff was served with the charges stemming from the MBR, plaintiff selected defendant Sergeant Thomas McKinley ("Sgt. McKinley"), as an employee assistant to help him in marshaling materials for his defense. Dkt. No. 73-2 at 156, 158; *see generally* Dkt. No. 73-8. According to an assistance form executed by plaintiff and Sgt. McKinley, plaintiff requested testimony from Inmates Drepaul and Green, as well as his medical records. Dkt. No. 73-8 at 6; *see also* Dkt. No. 73-2 at 94-96; Dkt. No. 73-8 at 3. Plaintiff alleges, however, that he also requested a copy of the dormitory logbook, a copy of DOCCS Directive 4932,[3] "and any other documentary evidence," but

that those items were not noted by Sgt. McKinley on the executed assistance form. Dkt. No. 73-2 at 97-98, 107.

[3]     DOCCS Directive 4932 refers to the procedures for implementing standards of inmate behavior, *see* 7 N.Y.C.R.R. § 250 *et seq.*, including the requirements for an MBR. *See* 7 N.Y.C.R.R. § 251-3.1.

Sgt. McKinley relayed the requests reflected on the assistance form to Ogdensburg's tier hearing office. Dkt. No. 73-8 at 3; *see also* Dkt. No. 73-8 at 6. Sgt. McKinley was "informed that the [p]laintiff would be shown relevant medical documents at the hearing[,]" but plaintiff claims, however, that he was not provided with those records at the hearing. *Compare* Dkt. No. 73-8 at 3; Dkt. No. 73-7 at 4-5, *with* Dkt. No. 73-2 at 106-07. Plaintiff concedes that he did not object to any purported lack of medical records during the hearing. Dkt. No. 73-2 at 106-07.

**\*4** When Inmate Drepaul was approached to testify, he refused and indicated, "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Despite a clear expression that he did not wish to testify, plaintiff alleges that efforts should have been made to inquire further regarding Inmate Drepaul's refusal. Dkt. No. 73-2 at 103-04.

On July 1, 2016, a Tier III disciplinary hearing was commenced before defendant Anne Carberry, superintendent of administration at Riverview.[4] Dkt. No. 73-7 at 1-2. Although Inmate Green was called to testify at the hearing, he refused, stating that "he wanted no involvement" in the disciplinary proceeding because "he was in the yard at the time." Dkt. No. 73-2 at 102-03.

[4]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

In addition to Inmate Green, defendant Carberry heard testimony from plaintiff, Sgt. Costello, and Nurse Penn. Dkt. No. 73-2 at 101-02, 105; Dkt. No. 73-7 at 11, 28. At the conclusion of the hearing, defendant Carberry determined that plaintiff was guilty as charged. Dkt. No. 73-7 at 2. Plaintiff was sentenced to ninety days of disciplinary confinement in a special housing unit ("SHU"), coupled with a corresponding loss of commissary, telephone, and package privileges. Dkt. No. 73-7 at 28-29. Plaintiff served the first sixteen days of his disciplinary sentence at Riverview, before serving the remainder of the disciplinary sentence at Upstate. Dkt. No. 73-2 at 56, 121-22, 148-49

In November of 2016, plaintiff brought a proceeding in Supreme Court, Albany County, pursuant to Article 78 of the New York Civil Practice Law and Rules, challenging the disciplinary determination. Dkt. No. 73-2 at 162-178. During that proceeding, personnel from the DOCCS learned that the tape from the hearing was "profoundly distorted," precluding the production of a reliable hearing transcript. Dkt. No. 73-6 at 3. In the face of an incomplete hearing record, on January 23, 2017, the determination of guilt was administratively reversed and expunged from plaintiff's disciplinary record. Dkt. No. 73-6 at 5. Thereafter, on April 3, 2017, Denise A. Hartman, Acting Supreme Court Justice, dismissed the petition. Dkt. No. 73-2 at 181-82.

### D. Plaintiff's Grievance Efforts

According to plaintiff, when he entered Ogdensburg, he underwent an orientation, which included information regarding the DOCCS inmate grievance procedure. Dkt. No. 73-2 at 58-59. During his deposition, plaintiff expressed a general understanding of how the DOCCS grievance procedure operated, including that most grievances must be filed within twenty-one calendar days of an alleged occurrence. Dkt. No. 73-2 at 59.

According to plaintiff, he filed three grievances with respect to the medical treatment provided to him. The first grievance was filed in October 2015, while he was confined at Ogdensburg. Dkt. No. 73-2 at 60-63. When plaintiff did not receive a response to that grievance, he followed up by sending a letter to the DOCCS Deputy Chief Medical Officer, Carl J. Koenigsmann. Dkt. No. 73-2 at 60-63. Plaintiff maintains that a second grievance, also submitted while he was confined to Ogdensburg, was filed in January of 2016. Dkt. No. 73-2 at 63. Plaintiff did not receive a response, and he did not follow up. Dkt. No. 73-2 at 64. In contrast to plaintiff's allegation, however, Courtney

Armstrong, the Inmate Grievance Program Supervisor for Ogdensburg, indicates that a search of her records failed to uncover any medical grievances filed by plaintiff from 2015 through mid-2016. Dkt. No. 73-3 at 3.

**\*5** Plaintiff claims that while he was confined to the SHU at Riverview he filed a third grievance on July 7, 2016 by handing the grievance to officers in the SHU to mail on his behalf. Dkt. No. 73-2 at 64; see also Dkt. No. 50 at 3. Once again, plaintiff did not receive a response, and he did not appeal. Dkt. No. 73-2 at 64. Similarly, in contrast to plaintiff's allegation, Cassie Bayne, the Inmate Grievance Program Supervisor for Riverview, indicates that a search of her records failed to uncover any medical grievances filed by plaintiff in June or July of 2016. Dkt. No. 73-4 at 2.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about March 1, 2017. Dkt. No. 1. On March 3, 2017, District Judge Mae A. D'Agostino issued an order, directing that the action be administratively closed and denying plaintiff's application to proceed in forma pauperis ("IFP") as incomplete. Dkt. No. 4. On March 13, 2017, plaintiff filed a second, completed application for IFP status, together with an inmate authorization form. Dkt. Nos. 6, 7. As a result, on April 12, 2017, Judge D'Agostino reopened the action and issued a decision and order granting plaintiff's IFP application. Dkt. Nos. 8, 9. In that same decision and order, in accordance with 28 U.S.C. §§ 1915(e) and 1915A, Judge D'Agostino directed defendant Carberry to respond to plaintiff's Fourteenth Amendment due process claims, concluded that plaintiff's Fourteenth Amendment claims against the John Doe defendant survived sua sponte review, and dismissed certain claims and defendants without prejudice for the failure to state a claim upon which relief could be granted. See generally Dkt. No. 9.

After two prior motions by plaintiff for leave to amend his complaint were denied, on June 15, 2017, plaintiff filed a third motion for leave to amend the complaint. Dkt. Nos. 11, 16, 17, 20, 21. Over defendant Carberry's opposition, see Dkt. No. 22, plaintiff's motion was granted only with respect to Eighth Amendment deliberate indifference claims against Dr. Chalom and Nurse Penn. Dkt. No. 24.

Following the filing of defendants' answer, see Dkt. No. 35, plaintiff filed a fourth motion for leave to file an amended complaint. Dkt. No. 41. Over defendants' opposition, see Dkt. No. 42, plaintiff's motion was granted in part and denied

in part. Dkt. No. 49. Judge D'Agostino undertook a review of plaintiff's second amended complaint ("SAC") pursuant to sections 1915(e) and 1915A, and concluded that pleading be accepted only to the extent that it asserts claims against defendants Carberry, McKinley, Dr. Chalom, and Nurse Penn, Dkt. Nos. 49, 50. Plaintiff's fifth motion for leave to file an amended complaint, which defendants opposed, was denied by the court on June 25, 2018. Dkt. Nos. 64, 65, 68.

Discovery now closed, defendants now move seeking the entry of summary judgment, dismissing plaintiff's claims. Dkt. Nos. 73, 74, 75. On October 19, 2018, plaintiff responded in opposition to defendants' motion, Dkt. No. 77, and defendants have since filed a reply in further support of their motion, Dkt. No. 78. Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

**\*6** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n.4; Sec. Ins. Co., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255; Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan, 311 F.3d 501, 507-08 (2d Cir. 2002); see also Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Available Administrative Remedies

In support of their motion for summary judgment, defendants argue that plaintiff's medical indifference claim should be dismissed because he failed to fully exhaust his administrative remedies prior to commencing this action. Dkt. No. 73-11 at 11-14. Plaintiff does not specifically address this contention in his opposition papers. See generally Dkt. No. 77.

#### 1. Legal Standard

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see also Ross v. Blake, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. Ross, 136 S. Ct. at 1856; Woodford v. Ngo, 548 U.S. 81, 84 (2006); Porter v. Nussle, 534 U.S. 516, 524, 532 (2002); Williams v. Corr. Officer Priatno, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. See Woodford, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); see also Wilson v. McKenna, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." Woodford, 548 U.S. at 95; accord, Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007).[5]

5    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

**\*7** In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[6] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

6    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[7] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

7    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(f). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availab[ility] of administrative remedies." (alteration in original) (internal quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (internal quotation marks omitted).

**\*8** In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[8] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates

as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

8    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

### 2. Analysis

Plaintiff, who has been in and out of DOCCS custody since 1995, is not unfamiliar with the IGP. Dkt. No. 73-2 at 146-49. During his deposition, he expressed a general understanding of how the grievance process operates, including that in most cases, a grievance must be filed within twenty-one days of the alleged occurrence giving rise to a complaint. Dkt. No. 73-2 at 58-60; *see generally* 7 N.Y.C.R.R. § 701.5(a)(1). Moreover, since 2005, plaintiff fully exhausted six unrelated grievances, evincing his understanding and familiarity with the IGP Dkt. No. 73-5 at 6-7.

Plaintiff contends that he submitted three grievances in connection with the medical treatment he received from Dr. Chalom and Nurse Penn. Dkt. No. 73-2 at 59-60. Plaintiff asserts that he filed his first medical grievance in October 2015 by presenting it to the grievance office at Ogdensburg. Dkt. No. 73-2 at 60-61. That grievance, which was filed more than two months following the medical treatment he received on July 30, 2015, Dkt. No. 74-1 at 30, was untimely, and therefore insufficient to exhaust his administrative remedies. 7 N.Y.C.R.R. § 701.5(a)(1); *see, e.g., Adams v. O'Hara*, No. 16-CV-0527, 2019 WL 652409, at *7 (N.D.N.Y. Feb. 15, 2019) (Suddaby, C.J.) ("Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies."); *Girard v. Cuttle*, No. 15-CV-0187, 2018 WL 4190140, at *5 (Aug. 10, 2018) (Stewart, M.J.) ("An untimely grievance does not satisfy the exhaustion requirement."), *report and recommendation adopted by* 2018 WL 4190140 (N.D.N.Y. Aug. 31, 2018) (Mordue, J.).[9] Although plaintiff

wrote a letter to Carl J. Koenigsmann, Dkt. No. 73-2 at 61-62, a prison official outside of the grievance chain of command, this too was insufficient to properly exhaust his administrative remedies. *See Louis-Charles v. Barker*, No. 16-CV-1417, 2018 WL 4299982, at *2 (N.D.N.Y. Sept. 10, 2018) (D'Agostino, J. *adopting report and recommendation of* Hummel, M.J.) (citing *Geer v. Chapman*, No. 15-CV-952, 2016 WL 6091699, *5 (Sept. 26, 2016) (Baxter, M.J.), *report and recommendation adopted by* 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (Sharpe, J.)); *see also Macias*, 495 F.3d at 44-45.

9    All unpublished opinions are appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions have been deleted for online purposes.]

Plaintiff asserts that he submitted a second grievance to the grievance office at Ogdensburg at an unspecified point in January 2016. Dkt. No. 73-2 at 63. While this is not necessarily clear from the record, it appears that this second grievance followed plaintiff's sick call on January 26, 2016. Dkt. No. 74-1 at 28, 30. Although this grievance was undoubtedly timely, during his deposition, plaintiff claimed that he did not receive a response, and has conceded that he did not follow up or file an appeal. Dkt. No. 73-2 at 63-64.

**\*9** In addition, plaintiff claims that on July 7, 2016, he filed a third grievance concerning his medical treatment by handing the grievance to officers while he was confined in the SHU at Riverview. Dkt. No. 73-2 at 64. Much like the second grievance, however, plaintiff claims that he did not receive a response, did not follow up, and did not appeal.[10] Dkt. No. 73-2 at 64.

10    Plaintiff alleges in his SAC that he "filed a timely administrative appeal" to the CORC on July 17, 2016. *See, e.g.*, Dkt. No. 50 at 3. Upon questioning at his deposition, however, plaintiff conceded that he was referring to an appeal regarding his disciplinary hearing. Dkt. No. 73-2 at 68-69; *see* Dkt. No. 73-2 160 ("Appeal Form to Commissioner"). Nonetheless, if plaintiff filed a grievance on July 7, 2016, and then an appeal to the CORC a mere ten days later, plaintiff would have effectively bypassed several steps of the IGP, negating any contention that he properly exhausted the remedies available under the program.

Although there is no disputed issue of material fact that plaintiff failed to exhaust his administrative remedies with respect to the three grievances, whether those remedies remained available to him—in particular with respect to the timely second and third grievances—requires closer examination. Following the Second Circuit's decision in *Williams*, several courts—including this court—have concluded that where a grievance is both *unfiled* and *unanswered*, "the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126; *see also id.* ("In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed."); *see, e.g., Hurst v. Mollnow*, No. 16-CV-1062, 2018 WL 4178226, at *10 (Jul. 20, 2018) (Dancks, M.J.) ("Therefore, '[a]s long as the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]' "), *report and recommendation adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018) (Hurd, J.); *Berman v. Drunkin*, No. 13-CV-0136, 2017 WL 1215814, at *8 (Mar. 10, 2017) (Stewart, M.J.) ("*Williams* holds that 'the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.' "), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017) (Kahn, J.); *Coleman v. Racette*, No. 15-CV-40, 2017 WL 2579084, at *5 (Jan. 17, 2017) (Baxter, M.J.) ("The court notes, however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it would be difficult to 'appeal' a grievance 'to the next step.' "), *report and recommendation adopted by* 2017 WL 2589366 (N.D.N.Y. Jun. 14, 2017) (McAvoy, J.); *Juarbe v. Carnegie*, No. 15-CV-1485, 2016 WL 8732798 (Oct. 7, 2016) (Peebles, M.J), *report and recommendation adopted by* 2016 WL 8732798 (N.D.N.Y. Nov. 25, 2016) (D'Agostino, J.).

Complicating matters, however, is a recent summary order from the Second Circuit in *Cicio v. Wenderlich*, 714 F. App'x 96 (2d Cir. 2018). In summarizing the evidence contained in the record in that case, the Second Circuit observed:

> [Plaintiff] claims that ... he filed a written grievance to the Inmate Grievance Resolution Committee ("IGRC") .... However, an IGRC supervisor filed a declaration in the [d]istrict [c]ourt stating that he could find no record of [the plaintiff's]

> grievance. In any event, the parties agree that [the plaintiff] never received a response to his grievance.

**\*10** *Id.* at 97. The Second Circuit concluded that the plaintiff's situation was not so opaque that it became "incapable of use" because "[w]hen a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal." *Id.* at 97-98 (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)) ("[M]atters not decided within the time limits may be appealed to the next step.").

In so holding, the Second Circuit compared and distinguished the plaintiff's situation from that of the plaintiff in *Williams*. In particular, the inmate in *Cicio* alleged that he filed a grievance directly with IGRC, whereas the inmate in *Williams* provided his grievance to a prison guard to file on his behalf. *Compare Cicio*, 714 F. App'x. at 97-98 ("The parties agree that Cicio received no response to the grievance he purportedly filed."), *with Williams*, 829 F.3d at 126 (finding that appellate process was too opaque in circumstances where inmate alleged that a prison guard did not file his grievance and the inmate had since been transferred); *see, e.g., Pizarro v. Ponte*, No. 17-CV-4412, 2019 WL 568875, at *5 (S.D.N.Y. Feb. 11, 2019) ("Failing to pursue a grievance for which no response is received is not excused."); *Ramos v. New York*, No. 17-CV-0259, 2018 WL 7133696, at *4 (Dec. 27, 2018) (Hummel, M.J.) (collecting cases), *report and recommendation adopted by* 2019 WL 330869 (N.D.N.Y. Jan. 25, 2019) (Sannes, J.).

On the spectrum between *Cicio* and *Williams*, plaintiff's situation regarding the filing of his second and third grievances falls somewhere in the middle. Plaintiff alleges that he handed the second grievance to the grievance office, and the third grievance to a prison guard, yet he failed to provide a copy of either grievance for the court's consideration. *Cf. Ramos*, 2018 WL 7133696, at *4 ("Plaintiff proffers a copy of the alleged grievance[.]"). Nonetheless, plaintiff claims that he did not receive a response to either grievance, and simultaneously concedes that he made no attempt to follow up or otherwise appeal to the superintendent. At the same time, there is no allegation that the staff at either facility discarded or otherwise interfered with plaintiff's grievances. Nonetheless, the IGP supervisors at both Ogdensburg and Riverview submitted declarations stating they could find no record of plaintiff's grievances in their respective offices. Dkt. Nos. 73-3, 73-4. Plaintiff's third

grievance, arising out of his medical treatment at Ogdensburg on June 29, 2016, is complicated by his immediate transfer to Riverview and further transfer to Upstate. Dkt. No. 73-2 at 147-49.

Although I am able to easily conclude that plaintiff's first, untimely grievance was insufficient to exhaust his administrative remedies, I cannot reach the same conclusion with respect to the second and third grievances, although I acknowledge that this is a somewhat nebulous issue in light of the decisions in *Cicio* and *Williams*, as well as the specific facts of this case. Accordingly, I recommend that defendants' motion for summary judgment based upon an alleged failure to exhaust available administrative remedies be granted with respect to only the medical treatment rendered by Dr. Chalom on July 30, 2015, but that the motion otherwise be denied on this procedural basis.

### C. Deliberate Indifference Claim

Defendants argue plaintiff's medical indifference claims must still be dismissed because there is no genuine issue of material fact to be resolved and, based upon the uncontested facts, plaintiff cannot establish either prong of the medical-indifference inquiry. Dkt. No. 73-11 at 14-17; Dkt. No. 78 at 6-8. In opposition, plaintiff argues that Dr. Chalom and Nurse Penn provided him with inadequate medical treatment. *See generally* Dkt. No. 77.

### 1. Standard

**\*11** The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citations omitted). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

2. Analysis

In this case, while plaintiff occasionally frames his allegations as a complete deprivation of medical treatment, it is clear that his claims arise out of a disagreement over the medical treatment that he received while he was confined. *See generally* Dkts. No. 50, 77. Plaintiff's disagreement, without more, "does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v. Lantz*, 549 F. App'x 18, 21 (2d Cir. 2013); see also *Estelle*, 429 U.S. at 107 (concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment" and does not give rise to a constitutional claim). At times, however, plaintiff's claims fall closer to an allegation that he was denied adequate medical care, which requires a narrower inquiry into seriousness. *See Salahuddin*, 467 F.3d at 279.

**\*12**  Addressing first the objective element of the governing test, I note that the record evidence demonstrates plaintiff was provided with treatment on each of the three occasions that he complained regarding his lower right leg. Dkt. No. 74-1 at 25-26, 28, 30. Although plaintiff's filings make frequent reference to suffering from "serious bacteria," methicillin-resistant Staphylococcus aureus ("MRSA"), and/or a "deadly infection," *see* Dkt. No. 50 at 3; Dkt. No. 77 at 8, plaintiff's medical records reflect that while he suffered from recurring cellulitis, that condition did not cause him any acute distress and merely manifested itself in redness and itchiness in plaintiff's lower right leg. Dkt. No. 74-1 at 25-26, 28, 30. Plaintiff's medical records simply do not support any claim that the pain he suffered as a result of the cellulitis, even if chronic, was severe. Based upon these circumstances, it is doubtful that a reasonable fact finder could conclude that plaintiff's cellulitis was sufficiently severe as to support the objective requirement of the controlling test.

I note, moreover, that to the extent that a reasonable fact finder could conclude that plaintiff's condition was sufficiently severe as to support the objective requirement of the controlling test—for example, by causing him to pass out in the bathroom on June 29, 2016, as he claimed—I nonetheless find that no reasonable fact finder could conclude that defendants' treatment was inadequate or, to the extent it could be construed as inadequate, the inadequacy that was sufficiently serious. In *Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986), the Second Circuit observed that a "correctional

facility is not a health spa, but a prison in which convicted felons are incarcerated." *Id.* at 215; *see also Clay v. D'Silva*, No. 09-CV-1245, 2011 WL 1135937, *3 (N.D.N.Y. Mar. 25, 2011)* (Suddaby, C.J.). Accordingly, the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what treatment should be administered to an inmate is a "classic example of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107; *see also Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998).

Plaintiff's claims against Dr. Chalom are based upon, *inter alia*, his desire to be referred to a specialist, prescribed physical therapy, and sent for diagnostic testing. Dkt. No. 77 at 10; *see also* Dkt. No. 50 at 10. Following Dr. Chalom's first examination, the physician prescribed plaintiff a ten-day course of Bactrim, noted that he had easy access to hydrocortisone cream, and directed him to follow up in two weeks for a reassessment. [11] Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30; *see also* Dkt. No. 50 at 10. When plaintiff presented nearly six months later complaining of similar symptoms, Dr. Chalom prescribed a course of doxycycline. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. There is nothing in the record now before the court to suggest that Dr. Chalom's decision to prescribe certain medications was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to plaintiff. *See Estelle*, 429 U.S. at 107.

[11]    Any claims against Dr. Chalom based upon this examination are procedurally barred. *See ante*, at 21-27.

Plaintiff's claims against Nurse Penn are based upon her purported failure to treat him for cellulitis. [12] Dkt. No. 73-2 at 76; *see also* Dkt. No. 50 at 9. Plaintiff concedes, however, that when Nurse Penn examined him on June 29, 2016, she cleaned his lacerations with alcohol, and observed that he required further medical attention from a doctor. Dkt. No. 73-7 at 18; *see generally* Dkt. No. 73-9. Upon plaintiff's transfer to Riverview a mere two hours later, Nurse Penn contacted medical staff at the facility to explain that plaintiff had a history of cellulitis. Dkt. No. 73-9 at 3; Dkt. No. 74-1 at 26 ("Also reported is ... 'recurrent cellulitis[.]' "). Plaintiff concedes that he was examined by a doctor at Riverview that same day, and that he received a prescription for Augmentin,

which completely resolved his complaints. Dkt. No. 73-2 at 137-38; *see also* Dkt. No. 74-1 at 25-26. The record before the court indicates that Nurse Penn appropriately exercised her judgement to determine the method of care and treatment to be provided to plaintiff, within the scope of her authority as a registered nurse. *See Estelle*, 429 U.S. at 107.

12    As a registered nurse, Nurse Penn is not authorized to "make definitive diagnoses, write prescriptions (beyond dispensing over-the-counter drugs such as anti-inflammatories or aspirin), or make ultimate determinations about the need for medical devices (such as hearing aids or orthopedic inserts), or consultation with medical specialists." Dkt. No. 73-9 at 2; *see generally* N.Y. Education Law § 6902(1). Such determinations are made by the DOCCS doctors or outside specialists. Dkt. No. 73-9 at 2.

**\*13** Even assuming that plaintiff could satisfy the objective prong, I conclude that no reasonable fact finder could conclude that Dr. Chalom or Nurse Penn acted with the requisite deliberate indifference. The record reflects that on every occasion that plaintiff was seen, his concerns were addressed, albeit apparently not to his liking. Nothing in the record now before the court suggests that defendants turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

Based on the evidence of record, I conclude that no reasonable fact finder could find, objectively, that defendants deprived plaintiff of adequate medical care or that, subjectively, any of them exhibited deliberate indifference to plaintiff's serious medical needs. Accordingly, I recommend that plaintiff's Eighth Amendment deliberate medical indifference claims be dismissed in their entirety.

### D. Plaintiff's Procedural Due Process Claim

In support of their motion for summary judgment, defendants argue that there is no genuine issue of material fact that plaintiff's ninety-day disciplinary confinement did not constitute an atypical and significant hardship. Dkt. No. 73-11 at 18-19; Dkt. No. 78 at 10-11. Defendants further argue that even if he was deprived of a cognizable liberty interest, plaintiff was afforded sufficient process. Dkt. No. 73-11 at 19-24; Dkt. No. 78 at 9-10. In his opposition to defendants' motion, plaintiff fails to address defendants' liberty interest argument, but contends that he was deprived of procedural due process in connection with the Tier III disciplinary

hearing held at Riverview in July of 2016. *See generally* Dkt. No. 77.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must first determine whether the conditions of plaintiff's ninety-day SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [13] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

13    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey*, 197 F.3d at 585.

**\*14** In cases such as this involving a period of restrictive confinement of less than 101 days, and where the confinement occurs under ordinary conditions found in a typical SHU setting, the disciplinary punishment does not rise to the level of an atypical and significant hardship.[14] *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Id.* (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).

14    On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

For example, in *Palmer v. Richards*, 364 F.3d 60 (2d Cir. 2004), the Second Circuit denied the prison officials' motion for summary judgment because even though the inmate's SHU confinement was only seventy-seven days, he was deprived of his personal effects, and was kept completely "out of communication from his family." *Id.* at 66. The Second Circuit agreed that "at least based on the record as it stands now, [the inmate] should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh' to violate a liberty interest despite the 'comparative shortness' of his confinement." *Id.* at 66 (quoting *Palmer v. Goss*, No. 02-CV-5804, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003),); *see also Davis*, 576 F.3d at 134 (holding that a more detailed factual record was required to determine whether unsanitary

conditions of forty-one-day administrative confinement, in which plaintiff was denied books, commissary privileges, and his one hour of exercise per day, entitled plaintiff to due process).

Here, plaintiff was held in disciplinary SHU confinement for ninety days, the first sixteen days of which were served at Riverview, with the remainder being served at Upstate. Dkt. No. 73-2 at 147-49. According to plaintiff, during the sixteen-day period at Riverview, he was subjected to a light in his cell that was illuminated from 6:00 a.m. until 11:00 p.m.; showers that were dirty with mildew on the walls and floors; and rats and roaches running freely through his cell. Dkt. No. 50 at 18; Dkt. No. 73-2 at 121-25. Although plaintiff did not have issues with the illumination of his cell and dirty showers for the remainder of his SHU confinement at Upstate, there continued to be rodent issues at that facility. Dkt. No. 73-2 at 121-25. Plaintiff alleged that as a result of these conditions, he lost weight, was unable to sleep and developed "severe migraines, dizziness ... extreme fatigue[,] and hallucinations[.]" Dkt. No. 50 at 18; *see also* Dkt. No. 73-2 at 126.

Although plaintiff testified regarding the actual conditions of his confinement, "the record lacks any evidence of the conditions for other inmates in administrative confinement, or in the general prison population." *Davis*, 576 F.3d at 135. A detailed factual record containing information as to the actual conditions in both administrative segregation and for the general population is necessary for the court to make the type of comparison required by the Second Circuit. Because this evidence is lacking in the current record, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his ninety-day disciplinary SHU confinement. *See Davis*, 576 F.3d at 135. For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally-significant liberty interest during the course of his ninety-day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

### 2. Procedural Safeguards

**\*15** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,*

418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

### a. Inadequate Notice and Vague MBR

Plaintiff maintains that his due process rights were violated when defendant Carberry provided inadequate notice of the disciplinary hearing and relied upon a vague MBR. *See generally* Dkt. No. 50.

"Due process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing." *Sira v. Morton*, 380 F.3d 57, 70 (2d Cir. 2004) (citing *Wolff*, 418 U.S. at 564; *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999)). Plaintiff acknowledges, however, that he received the challenged MBR within the prescribed time. He was served with the charges against him at 7:40 a.m. on June 30, 2016, *see* Dkt. No. 73-2 at 156, and the disciplinary hearing commenced twenty-seven hours later—at 10:40 a.m. the following day. *See* Dkt No. 73-2 at 100-01; Dkt. No. 73-7 at 11.

To the extent that plaintiff's allegations and submissions can be construed as challenging the MBR as being too general to provide meaningful notice of the misconduct at issue, that claim must fail. Due process does not mandate "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct." *Sira*, 380 F.3d at 72. Rather, due process requires notice with "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.* The MBR at issue satisfies this standard. *See, e.g., Samuels v. Selsky*, 166 F. App'x. 552, 554-55 (2d Cir. 2006). The MBR is neither vague

nor conclusory, and it provides plaintiff with notice of the "specific facts" underlying the accusations against him. Dkt. No. 73-7 at 9. In particular, in the MBR, Sgt. Costello noted that plaintiff was uncooperative, refused to identify inmates in the area, provided inconsistent answers, and appeared to have suffered injuries that were consistent with having been involved in an altercation. *Id.*; *see, e.g., McAllister v. Call*, No. 10-CV-610, 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 24, 2014) (Scullin, J., *adopting report and recommendation of* Hummel, M.J.). Sgt. Costello then concluded in the MBR that "[b]ased on my experience, [plaintiff] sustained several injuries as a result of being involved in a fight[,] and then lied about falling in the bathroom as an attempt to conceal what actually took place and to avoid [an MBR.]" Dkt. No. 73-7 at 9.

Accordingly, I conclude that plaintiff was provided with adequate notice of the disciplinary hearing, as well as notice of the "specific facts" underlying the accusations against him.

### b. Employee Assistance

"Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). Because, however, "[a]n inmate's right to assistance with his disciplinary hearing is limited[,]" *Neree v. O'Hara*, No. 09-CV-802, 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (Baxter, M.J.), "[t]he assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Grant v. Fischer*, No. 14-CV-1382, 2017 WL 1180866, at *2 (N.D.N.Y. Mar. 29, 2017) (D'Agostino, J. *adopting report and recommendation of* Stewart, M.J.), *aff'd*, No. 17-1283-PR, 2019 WL 190512 (2d Cir. Jan. 15, 2019); *see also Lewis v. Johnson*, No. 08-CV-482, 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5. 2010). "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (quoting *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)).

**\*16** Here, because plaintiff was confined to an isolation room while at Riverview, he was entitled to assistance in marshaling evidence and presenting a defense. According

to the assistance form that was executed by plaintiff and Sgt. McKinley, the assigned employee assistant, plaintiff requested testimony from Inmates Drepaul and Green, as well as his medical records. Dkt. No. 73-8 at 6; *see also* Dkt. No. 73-2 at 94-96; Dkt. No. 73-8 at 3. Sgt. McKinley then relayed those requests to the tier hearing office at Ogdensburg. Dkt. No. 73-8 at 3, 6. Sgt. McKinley was informed by prison personnel that plaintiff would be able to review the medical records at the hearing, and efforts were made to secure the testimony of plaintiff's requested witnesses. Sgt. McKinley was not required to undertake additional efforts and "go beyond the inmate's instructions." *Grant*, 2017 WL 1180866, at *2 (quoting *Moore*, 92 F. Supp. 3d at 126).

Plaintiff alleges that he also requested information that was not reflected on the executed assistance form, including a copy of the dormitory logbook, a copy of DOCCS Directive 4932, "and any other documentary evidence[.]" Dkt. No. 73-2 at 97-98, 107. Even assuming that this is true, there is no evidence that the failure to provide plaintiff with this information would have impacted the outcome of the hearing. Thus, viewing the evidence in the light most favorable to the plaintiff, any alleged failure by Sgt. McKinley to perform his duties as an assistant amounts to harmless error not warranting denial of summary judgment. *See, e.g., Young v. Polizzi*, No. 16-CV-0660, 2018 WL 3949967, at *8 (Jul. 11, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 3949942 (N.D.N.Y. Aug. 16, 2018) (Scullin, J.); *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (concluding that because the plaintiff failed to show how outcome of hearing would have been, any alleged inadequate assistance was harmless error not warranting denial of summary judgment).

### c. Denial of Plaintiff's Witnesses

In his SAC, plaintiff alleged that defendant Carberry refused to call certain witnesses and that in denying those witnesses, "she never stated that the denial was based on institutional safety concerns, or that plaintiff's alibi-witness testimony was irrelevant or redundant." Dkt. No. 50 at 5. To that end, "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff*, 418 U.S. at 566-67).

In this case, however, there is nothing in the present record to indicate that defendant Carberry "denied" plaintiff's requested witnesses. Instead, the undisputed record reveals that plaintiff requested testimony from two inmates, Drepaul and Green. Dkt. No. 73-8 at 6. When inmate Drepaul was approached to testify, he refused and indicated "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Inmate Green, on the other hand appeared for the hearing, but also refused to testify and stated that "he wanted no involvement" in the hearing because "he was in the yard at the time." Dkt. No. 73-2 at 102-03. As a result, plaintiff's claim that defendant Carberry denied his witness is flatly contradicted by the record before the court, and her purported failure to call a witness, who refused to testify, fails to attend procedural due process. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) (Sharpe, J.); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses.").

### d. Impartiality of the Hearing Officer

**\*17** Lastly, plaintiff alleges that defendant Carberry was biased. *See, e.g.,* Dkt. No. 50 at 9. The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). "A hearing officer may satisfy the standard of impartiality if there is *'some evidence* in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (emphasis in

original) (quoting *Hill,* 472 U.S. at 455); *see also Francis,* 891 F.2d at 45 (responding to the plaintiff's allegations that the hearing officer's bias allowed for "*no* chance to prevail at the [disciplinary] hearing]" by concluding that "it is axiomatic that a prison disciplinary hearing in which the result is arbitrarily and adversely predetermined violates [an inmate's] right [to be free from arbitrary governmental action]" (emphasis in original)).

Here, there is no record evidence from which a reasonable fact finder could conclude that defendant Carberry was biased against plaintiff or that she predetermined the outcome of the disciplinary hearing. Although DOCCS personnel subsequently learned that the hearing tape was profoundly distorted, precluding the production of a transcript of the proceeding, the record as a whole reflects that defendant Carberry heard testimony from plaintiff, Sgt. Costello, Nurse Penn, as well as the inmate witness that plaintiff requested. Dkt. No. 73-7 at 11. In addition, plaintiff was afforded the opportunity to question Sgt. Costello. Dkt. No. 73-2 at 105.

Plaintiff's bare assertions with respect to defendant Carberry's alleged bias are unsupported by the record and, accordingly, are insufficient to give rise to a dispute of material fact. *See Francis,* 891 F.2d at 47 ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"); *Boose v. Schneider,* 14-CV-0518, 2016 WL 8732644 (N.D.N.Y. Feb. 19, 2016) (Peebles, M.J.), *report and recommendation adopted,* 2016 WL 1175224 (N.D.N.Y. Mar. 24, 2016) (D'Agostino, J.).

Accordingly, because no reasonable fact finder could conclude that plaintiff's due process rights were violated, I recommend that defendants' motion be granted.

IV. SUMMARY AND RECOMMENDATION

The record currently before the court demonstrates that although plaintiff did not receive his preferred course of medical treatment, it is undisputed that plaintiff received timely and appropriate medical treatment that was tailored to address his medical condition. The record similarly indicates that there is no disputed issue of genuine material fact and that plaintiff received due process in connection with his disciplinary hearing. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 73) be GRANTED and plaintiff's second amended complaint (Dkt. No. 50) be dismissed in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [15] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

[15]    If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation/order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

*18  It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Slip Copy, 2019 WL 3365766

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2437912
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy BRITT, Plaintiff,
v.
Anne CARBERRY, et al., Defendants.

9:17-CV-0234 (MAD/DEP)
|
Signed 06/11/2019

**Attorneys and Law Firms**

TROY BRITT, 781 E. 135 th Street, Bronx, New York 10454,
Plaintiff, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL, OF COUNSEL: KYLE W. STURGESS, AAG,
The Capitol, Albany, New York 12224, Attorneys for
Defendants.

### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge

### I. INTRODUCTION

*1  *Pro se* plaintiff, Troy Britt ("Plaintiff"), a former
New York State prison inmate, commenced this civil
rights action against several individuals employed by New
York State Department of Corrections and Community
Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983.
Dkt. No. 1. As narrowed by a series of decisions of this
Court, Plaintiff's claims currently at issue include allegations
that (1) Defendants T.L. Penn ("Nurse Penn") and Dr.
M. Chalom violated Plaintiff's Eight Amendment rights
by exhibiting deliberate indifference to Plaintiff's medical
needs; and (2) Defendants Anne Carberry and Sergeant
Thomas McKinley ("Sgt. McKinley") violated Plaintiff's
Fourteenth Amendment due process rights in connection
with Plaintiff's Tier III disciplinary hearing. *See* Dkt.
Nos. 1, 4, 8, 9, 24, 25, 49, 50. Plaintiff's claims arose
from events between July 30, 2015 and about October 7,
2016, while he was in custody of DOCCS as an inmate
in Ogdensburg Correctional Facility ("Ogdensburg C.F."),
Riverview Correctional Facility ("Riverview C.F."), and

Upstate Correctional Facility ("Upstate C.F."). *See* Dkt. No.
50.

On September 27, 2018, Defendants moved for entry of
summary judgment dismissing Plaintiff's remaining claims
on the merits. *See* Dkt. No. 73. In a February 1, 2019
Report and Recommendation, Magistrate Judge Peebles
recommended Plaintiff's second amended complaint be
dismissed in its entirety for failure to prosecute and comply
with this Court's orders and local rules of practice and that
Defendants' motion for summary judgment be denied as
moot. *See* Dkt. No. 81. On February 14, 2019, Plaintiff filed
objections to the February 1 Report and Recommendation.
*See* Dkt. No. 84. Subsequently, Magistrate Judge Peebles
issued the March 22, 2019 Report and Recommendation
presently before this Court. *See* Dkt. No. 87.

In the March 22, 2019 Report and Recommendation,
Magistrate Judge Peebles recommended that Defendants'
motion for summary judgment be granted and Plaintiff's
second amended complaint be dismissed in its entirety. *See*
Dkt. No. 87. Specifically, Magistrate Judge Peebles found (1)
Plaintiff failed to exhaust his administrative remedies with
respect to his October 2015 grievance; (2) Plaintiff failed
to establish a sufficiently serious deprivation and failed to
establish that Defendants Dr. Chalom and Nurse Penn had
the requisite state of mind with respect to his deliberate
indifference claims and; (3) although Plaintiff had a liberty
interest, he was afforded the necessary procedural protections
with respect to his disciplinary hearing and due process
claims against Defendants Sgt. McKinley and Carberry.
*See id.* Neither party objected to the March 22 Report-
Recommendation and Order.

A litigant's failure to file objections to a magistrate judge's
report and recommendation, even when that litigant is
proceeding *pro se*, waives any challenge to the report on
appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir.
2003) (holding that, "[a]s a rule, a party's failure to object
to any purported error or omission in a magistrate judge's
report waives further judicial review of the point" (citation
omitted)). A *pro se* litigant must be given notice of this rule;
notice is sufficient if it informs the litigant that the failure
to timely object will result in the waiver of further judicial
review and cites pertinent statutory and civil rules authority.
*See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small
v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir.
1989) (holding that a *pro se* party's failure to object to a report
and recommendation does not waive his right to appellate

review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

## II. DISCUSSION

### A. Standard of Review

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v.*

*Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *Id.* at 295 (citing *Showers v. Eastmont*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") expressly provides that "no action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). In the event a defendant establishes that an inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006); *see also Wilson v. McKenna*, 661 Fed. Appx. 750, 752 (2d Cir. 2016). "Proper exhaustion requires a plaintiff to procedurally exhaust his claims by compl[ying] with the system's critical procedural rules," and "demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90, 95. In the context of a Section 1983 claim, the court must look at the relevant state's prison procedures to determine if the inmate-plaintiff complied with the appropriate procedures. *See Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford*, 548 U.S. at 88-90.

**\*3** New York State has a three-step administrative review process, or Inmate Grievance Program ("IGP"). *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, a grievance must be submitted to the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence giving right to the complaint. *See* 7 N.Y.C.R.R. § 701.5(a)(1). After the grievance has been filed, the IGRC reviews and investigates the formal complaint and must informally resolve the issue within sixteen days of the filing or conduct a hearing. *See id.* at § 701.5(b). Second, within seven days after receipt of the IGRC's written decision, the inmate-plaintiff may appeal to the superintendent of the facility, who must then issue a written decision within a certain number of days. [1] *See id.* at § 701.5(c). Third, within seven days after the receipt of the superintendent's decision, the

inmate-plaintiff may appeal it to the Central Office Review Committee ("CORC"), who will issue the final administrative decision. *See id.* at § 701.5(d). When an inmate does not receive a timely response to a filed grievance, the inmate is permitted to appeal "to the next step." *See id.* at § 701.6(g)(2).

1       Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3).

If all three of these levels of review are exhausted, then the inmate may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. N.Y.*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, the plaintiff has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

In the current case, Defendants claim Plaintiff failed to satisfy the exhaustion requirements for all claims contained in the second amended complaint. *See* Dkt. No. 73. During Plaintiff's deposition on July 30, 2018, Plaintiff expressed a general understanding of how the grievance process operates. Dkt. No. 73-2 at 58-59. DOCCS computer printouts show that Plaintiff properly appealed at least six other grievances prior to commencing this action, thereby demonstrating that Plaintiff generally knew how to exhaust his administrative remedies prior to filing suit. Dkt. No. 73-5 at 6.

Although DOCCS records do not show any grievances which were filed and appealed regarding the claims of deliberate indifference against Defendants Dr. Chalom and Nurse Penn, Plaintiff contends he filed three grievances for "medical," or inadequate medical care, in October 2015, January 2016, and on July 7, 2016. Dkt. No. 73-2 at 59-64; *See* Dkt. No. 73-5 at 6. Plaintiff alleges he filed a grievance with the grievance

office at Ogdensburg C.F. in October 2015 in connection with the medical treatment Plaintiff received on July 30, 2015. Dkt. No. 73-2 at 60-61. Even assuming the DOCCS records were incorrect and the grievance was filed, it would have been filed over two months after Plaintiff received the complained of medical treatment and therefore untimely. Dkt. No. 74-1 at 30; *see* 7 N.Y.C.R.R. § 701.5(a)(1). Untimely grievances are insufficient to exhaust administrative remedies. 7 N.Y.C.R.R. § 701.5(a)(1); *see, e.g., Adams v. O'Hara*, No. 16-CV-0527, 2019 WL 652409, *7 (N.D.N.Y. Feb. 15, 2019) ("Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies"); *Girard v. Cuttle*, No. 15-CV-0187, 2018 WL 4190140, *5 (N.D.N.Y. Aug. 10, 2018) ("An untimely grievance does not satisfy the exhaustion requirement").

**\*4** Although Plaintiff wrote a follow up letter on the October 2015 grievance to the Ogdensburg C.F. Deputy Chief Medical Officer Carl J. Koenigsmann, this too was insufficient to properly exhaust Plaintiff's administrative remedies because Koenigsmann is a prison official outside of the grievance chain of command. Dkt. No. 73-2 at 60-62; *see Louis-Charles v. Barker*, No. 16-CV-1417, 2018 WL 4299982, *2 (N.D.N.Y. Sept. 10, 2018) (citing *Geer v. Chapman*, No. 15-CV-952, 2016 WL 6091699, *5 (N.D.N.Y. Sept. 26, 2016)); *see also Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007). [2]

2       While placing prison officials on notice of a grievance through less formal channels may constitute a claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004)) (emphasis omitted)).

Plaintiff asserted he submitted a second grievance to the grievance office at Ogdensburg C.F. in January 2016. Dkt. No. 73-2 at 63. Plaintiff also alleges he filed a third grievance on July 7, 2016 by handing the grievance to an officer to mail for him while he was confined in the Riverview C.F. Special Housing Unit ("SHU"). Dkt. No. 73-2 at 63-64. Although these grievances would have been timely with the corresponding medical treatment, Plaintiff did not receive a response and did not follow up or file any appeals. Dkt. No. 73-2 at 63-64. Therefore, Magistrate Judge Peebles correctly

2019 WL 2437912

found that Plaintiff failed to properly use the IGP and proceeded to address a possible exception to the exhaustion requirement.

Although the PLRA requires inmates to exhaust all available administrative remedies prior to filing a § 1983 claim, courts have interpreted this Act to contain an important textual exception: an inmate is not required to exhaust administrative remedies if such remedies are not "available." *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). There are three circumstances in which the Supreme Court has found administrative remedies are not available. *Id.* at 1855. "First, an administrative remedy may be unavailable when 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* at 123 (quoting *Ross*, 136 S. Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

In this case, there is no allegation that the staff at Ogdensburg C.F. or Riverview C.F. discarded or otherwise interfered with Plaintiff's grievances. *See generally* Dkt. No. 50. Therefore, Magistrate Judge Peebles proceeded to address the Second Circuit's treatment of the availability of New York's IGP when the inmate does not receive a response to filed grievances.

**\*5** In *Williams*, an inmate-plaintiff allegedly gave a prison guard a grievance to file on his behalf, but it was never filed and the inmate was subsequently transferred and never received a response. *Williams*, 829 F.3d at 120-21. The Second Circuit addressed whether administrative remedies were "available" to the inmate-plaintiff and concluded that New York regulations do not clearly outline the process to appeal an unfiled and unanswered grievance. *See id.* at 124. As such, the Court held that "the grievance procedures that were technically available to [the plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859).

In contrast, the Second Circuit in *Cicio* found that when an inmate claimed he filed a written grievance with the IGRC, but the IGRC supervisor could not find a record of the grievance and the parties agreed the plaintiff never received a response, the situation was not so opaque that it became "incapable of use." *Cicio v. Wenderlich*, 714 Fed. Appx. 96, 97-98 (2d Cir. 2018). There, the Court found that "[w]hen a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal." *Id.*

Magistrate Judge Peebles appropriately reasoned that the facts of the present case fall somewhere in between *Williams* and *Cicio*. The IGP supervisors at both Ogdensburg C.F. and Riverview C.F. submitted declarations stating they could find no record of Plaintiff's grievances in their respective offices. Dkt. Nos. 73-3, 73-4. However, Plaintiff alleges that he handed the second grievance to the Ogdensburg C.F. grievance office, and the third grievance to a prison guard while in Riverview C.F. SHU. Dkt. No. 73-2 at 63-64. Plaintiff claims that he did not receive a response to either grievance, and simultaneously concedes that he made no attempt to follow up or otherwise appeal. Dkt. No. 73-2 at 61-64. Plaintiff's third grievance is further complicated by his transfer from Riverview C.F. SHU to Upstate C.F. SHU. Dkt. No. 73-2 at 147-49.

Although Plaintiff's first, untimely grievance was clearly insufficient to exhaust his administrative remedies, the Court is unable to come to the same conclusion with respect to the second and third grievances. The Court agrees with Magistrate Judge Peebles' acknowledgment that whether administrative remedies were available is a somewhat nebulous issue in light of *Cicio* and *Williams*, as well as the specific facts of this case. Therefore the Court finds that Magistrate Judge Peebles' correctly determined Defendants' summary judgment motion cannot be granted with regard to the alleged January 2016 and July 7, 2016 grievances on this procedural basis.

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' Motion for Summary Judgment should be granted with respect only to the grievance allegedly filed in October 2015 regarding the medical treatment rendered by Dr. Chalom on July 30, 2015. As such, Plaintiff's claim as to his first grievance is dismissed for his failure to exhaust.

## C. Deliberate Indifference

For a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the accused prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious deprivation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted).

### *1. Sufficiently Serious Deprivation*

**\*6** The sufficiently serious deprivation inquiry is the objective prong of the deliberate indifference standard. *See Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (citation omitted). Under this prong, relevant considerations include "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (other citation omitted). Further, the court may examine whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted). As the Second Circuit has stated, the relevant inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition[.]" *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

In this case, Plaintiff's deliberate indifference claims generally arise out of a disagreement over the medical treatment Plaintiff received from Dr. Chalom and Nurse Penn while he was an inmate. *See* Dkt. No. 50. Standing alone, Plaintiff's disagreement "does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v. Lantz*, 549 Fed. Appx. 18, 21 (2d Cir. 2013); *see also Estelle*, 429 U.S. at 107 (concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment") and does not give rise to a constitutional claim).

Nevertheless, Plaintiff also alleges he was denied adequate medical care. *See generally* Dkt. Nos. 50, 77. Although Plaintiff references suffering from "serious bacteria," "Methicillin-Resistant Staphylococcus Aureus" ("MRSA"),

and a "deadly infection," the record reflects he suffered from recurring cellulitis[3] and received treatment on each occasion that he requested medical assistance. Dkt. No. 50 at ¶¶ 13-15; Dkt. No. 74-1 at 25-26, 28, 30; Dkt. No. 77 at 8.

3    "Cellulitis is 'an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation.' " *Nelson v. Dougherty*, No. 10-CV-1568, 2012 WL 4026682, \*1 (N.D.N.Y. Aug. 13, 2012) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31 st ed. 2007)).

When Plaintiff requested medical attention while in custody in Ogdensburg C.F. on July 30, 2015 and January 26, 2016, Dr. Chalom examined him and prescribed him antibiotics for cellulitis. Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30, 28; *see also* Dkt. No. 50 at 10. Although at varying points in the record Plaintiff contends otherwise, Plaintiff's medical records indicate Dr. Chalom did not provide any further medial treatment to Plaintiff. *See* Dkt. No. 50; Dkt. No. 74 at 3-4; *see generally* Dkt. No. 74-1. There is nothing in the record to suggest Dr. Chalom's decision to prescribe certain medications was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to Plaintiff. *See Estelle*, 429 U.S. at 107.

When Plaintiff requested emergency medical attention on June 29, 2016, Nurse Penn examined Plaintiff at Ogdensburg C.F. and aware of Plaintiff's impending transfer, then contacted medical staff at Riverview C.F. to examine Plaintiff upon his intake. Dkt. No. 73-2 at 74; Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3; Dkt. No. 74-1 at 25-26. Plaintiff concedes he was subsequently examined by a doctor at Riverview C.F. and given a prescription for antibiotics, which resolved his complaints. Dkt. No. 73-2 at 137-38; *see also* Dkt. No. 74-1 at 25-26. The record indicates that Nurse Penn appropriately exercised her judgment to determine the method of care and treatment to be provided to Plaintiff, within the scope of her authority as a registered nurse. Dkt. No. 73-9 at 2; *see Estelle*, 429 U.S. at 107.

**\*7** Therefore, the Court agrees with Magistrate Judge Peebles' assessment that a reasonable fact finder would not conclude that Plaintiff's cellulitis was sufficiently severe as to support the first factor or objective test for deliberate medical indifference. The Court further finds Magistrate Judge Peebles correctly determined that even if a reasonable fact

finder could conclude Plaintiff's condition was sufficiently severe, no reasonable fact finder could conclude that Defendants' care was inadequate, or if in any way inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing and prison medical personnel have broad discretion to determine what method of care and treatment to provide to their patients. *See Estelle*, 429 U.S. at 107; *see also Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986).

### 2. Culpable State of Mind

The second prong of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. *Hathaway*, 37 F.3d at 66. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

In this case, the record shows Plaintiff's condition was addressed and Defendants did not turn a blind eye or fail to act while aware of a substantial risk of harm to Plaintiff's health or safety. Dkt. No. 73-2 at 74; Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3; Dkt. No. 74 at 3-4, 25-26; *see generally* Dkt. No. 74-1; *see also* Dkt. No. 50 at 10. Therefore, the Court agrees with Magistrate Judge Peebles' conclusion that even if Plaintiff could satisfy the objective prong, no reasonable fact finder could conclude that Dr. Chalom or Nurse Penn acted with the requisite deliberate indifference.

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' Motion for Summary Judgment should be granted with respect to Plaintiff's deliberate medical indifference claims.

### D. Due Process Claim

Defendants argue there is no genuine issue of material fact as to whether Plaintiff's ninety-day disciplinary confinement constituted an atypical and significant hardship. Dkt. No. 73-11 at 18-19; Dkt. No. 78 at 10-11. Further, Defendants argue even if Plaintiff was deprived of a cognizable liberty interest, Plaintiff was afforded sufficient due process. Dkt. No. 73-11 at 19-24; Dkt. No. 78 at 9-10. Plaintiff has not addressed Defendants' liberty interest argument, but contends he was deprived of procedural due process in connection with his disciplinary hearing held in July of 2016. *See* Dkt. No. 77.

### 1. Liberty Interest

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)); *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In *Sandin*, the Supreme Court held that although states may create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 483-84 (internal citations omitted).

**\*8** The prevailing view in the Second Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, \*6 (N.D.N.Y. Feb. 6, 2001). Accordingly, Magistrate Judge Peebles appropriately addressed whether Plaintiff's SHU confinement rose to the level of an atypical and significant hardship under *Sandin*. Dkt. No. 87 at 38-39.

The Second Circuit has not set a bright line rule on when confinement becomes atypical. "In order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement ... and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (citations omitted). While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin*, the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of 101 days or less will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *see Colon v. Howard*, 215 F.3d 227, 231, 232

n.5 (2d Cir. 2000)). The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

In the present case, at Plaintiff's July 2016 disciplinary hearing, Defendant Carberry found Plaintiff guilty and imposed a ninety-day SHU confinement. Dkt. No. 73-7 at ¶¶ 13, 14. As Plaintiff has alleged unusual conditions, the Court must address whether the record reflects that Plaintiff was subject to "conditions more onerous than usual" during his confinement. *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citing *Colon*, 215 F.3d at 232-33 n.5 (2d Cir. 2000)). The Court must examine the conditions of confinement " 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Id.* at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).

For the duration of Plaintiff's ninety-day disciplinary confinement, he was confined in Riverview C.F. SHU for the first sixteen days, and then in Upstate C.F. SHU for the remainder of the ninety days. Dkt. No. 73-2 at 147-49. Plaintiff alleges that in Riverview C.F. SHU, the shower walls and floors were dirty with mildew, there was a rodent infestation in his cell, and there was a light in his cell illuminated from 6:00 a.m. to 11:00 p.m. Dkt. No. 50 at 18. Plaintiff further alleged that Upstate C.F. SHU had similar rodent issues. Dkt. No. 50 at 8; Dkt. No. 73-2 at 121-25. Plaintiff alleged these conditions resulted in weight loss, an inability to sleep, "severe migraines, dizziness, [and other] ailments, which included extreme fatigue and hallucination[s.]" Dkt. No. 50 at 18.

Although Plaintiff testified to the SHU conditions and alleges they were inferior to conditions "for the general pop[ulation] inmates[,]" "the record lacks any evidence of the conditions for other inmates in administrative confinement or in the general prison population." Dkt. No. 50 at 18; *Davis*, 576 F.3d at 135. Therefore, Magistrate Judge Peebles correctly concluded that without the necessary evidence in the record for the Court to determine if Plaintiff suffered an atypical and significant hardship during his confinement, the Court must assume Plaintiff was deprived of a liberty interest. Dkt. No. 87 at 41. Accordingly, the Court must proceed to analyze whether Defendants provided Plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearing. *Id.*

**2. Procedural Safeguards**

**\*9** The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

These due process requirements include procedural protections such as (1) written notice of the charges, (2) the opportunity to appear at a disciplinary hearing with a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns, (3) a written statement by the hearing officer explaining the decision and the reason for the action being taken, and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

*a. Written Notice*

While Plaintiff acknowledged he received written notice of the charges against him in the form of a misbehavior report ("MBR") within the prescribed time of at least twenty-four hours prior to his disciplinary hearing, Plaintiff challenged the MBR as being too general to provide meaningful notice. Dkt. No. 50 at 6; *see* Dkt. No. 73-2 at 98. In reviewing this claim, Magistrate Judge Peebles correctly articulated that due process does not require "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct[,]" but rather only requires "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue[.]" *Sira*, 380 F.3d at 72. As Magistrate Judge Peebles correctly determined, the MBR provided Plaintiff sufficient notice under this standard because it included "specific facts" of his charged misconduct. Dkt. No. 87 at 44 (quoting Dkt. No. 73-7 at 9).

*b. Opportunity to Present Witnesses*

In the second amended complaint, Plaintiff alleged Defendant Carberry, in her role as disciplinary hearing officer, denied

witness testimony that would have provided compelling evidence of his innocence. Dkt. No. 50 ¶ 17. Although a prisoner's right to call witnesses at a disciplinary hearing may be denied "on the basis of irrelevance or lack of necessity," the record indicates Plaintiff's request for inmates Drepaul and Green to testify was not denied. *See* Dkt. No. 73-7 at 6, 16; *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (citations omitted). Instead, Drepaul refused to testify, saying "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Further, Defendant Carberry's hearing report reflected that Green did testify, but also indicated his testimony was not credible and that he stated he was in the yard at the time of the incident. Dkt. No. 73-7 at 27.

Therefore, this Court agrees with Magistrate Judge Peebles' determination that Plaintiff's claim is flatly contradicted by the record and that Defendant Carberry's failure to call Drepaul, a witness who refused to testify, does not violate Plaintiff's procedural due process rights. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, *5 (N.D.N.Y. Oct. 29, 2018); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, *7 (N.D.N.Y. Sept. 11, 2014) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses").

### c. Employee Assistant

**\*10**  "Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). "New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing." *Id.* at 126 (citing 7 N.Y.C.R.R. §§ 251-4.1, 251-4.2). "The assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Id.* (quotation and other citation omitted). "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (quoting *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)).

In the present case, Plaintiff received an employee assistant, Defendant Sgt. McKinley, who relayed Plaintiff's requests

to the hearing office and executed an assistance form with him. Dkt. No. 73-8 at 2, 3, 6. Plaintiff alleged he requested additional information that was not listed on the executed assistance form or requested by Defendant Sgt. McKinley. *Id.*; Dkt. No. 73-2 at 94-98, 107. Upon review of Plaintiff's claim, Magistrate Judge Peebles correctly found, nothing in the record supports the notion that providing Plaintiff with this information would have impacted the outcome of the hearing. *Clyde*, 714 F. Supp. 2d at 437 (quoting *Pilgrim*, 571 F.3d at 206); *see, e.g., Young v. Polizzi*, No. 16-CV-0660, 2018 WL 3949967, *8 (N.D.N.Y. July 11, 2018); *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (concluding that because the plaintiff failed to show how outcome of hearing would have been impacted, alleged inadequate assistance was harmless error not warranting denial of summary judgment). Accordingly, Defendants' motion for summary judgment is granted as to this claim.

### d. Impartial Hearing Officer

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing cases). Nevertheless, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* at 259 (citing cases). In addition to the greater flexibility accorded prison disciplinary hearing officers, the due process impartiality standard is satisfied if "some evidence" in the record supports the decision of the prison disciplinary proceeding. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 447 (1985). Further, the inmate must demonstrate prejudice in connection with the alleged denial of due process by showing that it affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)) (other citations omitted).

In the second amended complaint, Plaintiff alleges that Defendant Carberry was not an impartial hearing officer and that she had predetermined the results of the hearing in an "arbitrary and capricious" and "bad-faith manner[.]" Dkt. No. 50 at ¶ 19. As Magistrate Judge Peebles correctly determined, Plaintiff's claim against Defendant Carberry is without merit. Although the hearing tape was so distorted that the Court was unable to review it, the Court was able to review other evidence in the record, including the hearing

record sheet and Defendant Carberry's handwritten hearing report. Dkt. No. 73-7 at 11, 27-29. The Court finds that Magistrate Judge Peebles correctly concluded that Plaintiff's bare assertions with respect to Defendant Carberry's alleged bias are unsupported by these documents and the record as a whole, and as such, are insufficient to give rise to a dispute of material fact. *See generally* Dkt. No. 73-7; *see Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"); *Boose v. Schneider*, No. 14-CV-0518, 2016 WL 8732644 (N.D.N.Y. Feb. 19, 2016).

**\*11** Accordingly, because no reasonable fact finder could conclude that Plaintiff's due process rights were violated, Defendants' motion for summary judgment is granted as to this claim.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, Magistrate Judge Peebles' March 22, 2019 Report and Recommendation, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' March 22, 2019 Report and Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment (Dkt. No. 73) is **GRANTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's amended complaint is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 2437912

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)**

2018 WL 4178226

2018 WL 4178226
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith I. HURST, Plaintiff,
v.
A. MOLLNOW and Eisenschmidt, Defendants.

9:16-cv-1062 (DNH/TWD)
|
Signed 07/20/2018

**Attorneys and Law Firms**

KEITH I. HURST, 105 Hunter Ave., #2, Albany, NY 12206, pro se.

BARBARA D. UNDERWOOD, OF COUNSEL: MARK G. MITCHELL, ESQ., Attorney General of the State of New York, The Capitol, Albany, NY 12224, Attorney for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** This matter was referred for Report and Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3(c). *Pro se* Plaintiff Keith I. Hurst, a former inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), has commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights while confined at Washington Correctional Facility ("Washington"). (Dkt. No. 1.) The sole remaining claim is Plaintiff's Eighth Amendment excessive force claim against Defendants A. Mollnow, a Corrections Officer ("C.O.") and Eisenschmidt, a Sergeant ("Sgt."). (Dkt. No. 12.)

Presently pending is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 41) for Plaintiff's failure to exhaust administrative remedies before commencing this action. (Dkt. No. 41-11 at 6-13. [1]) Defendants also contend, to the extent Plaintiff's seeks monetary damages against them in their

official capacities, they are entitled to Eleventh Amendment immunity. (Dkt. No. 41-11 at 13.) Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 57.) Defendants filed a reply. (Dkt. No. 60.) For reasons that follow, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 41) be granted in part and denied in part.

[1]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

**II. BACKGROUND**

**A. July 1, 2016, Incident**
Plaintiff alleges that on July 1, 2016, while an inmate at Washington, he was subjected to excessive force by C.O. Mollnow and Sgt. Eisenschmidt. (Dkt. No. 1 at 4-5.) On that date, Plaintiff claims he requested to speak to an "area supervisor" regarding his keeplock status. *Id.* at 4-5. In response, C.O. Mollnow "pulled the pin on her walkie talkie" and several officers, including Sgt. Eisenschmidt responded. *Id.* The officers physically assaulted Plaintiff, inflicting numerous injuries, while hurling racial epithets at him. *Id.* Specifically, C.O. Mollnow kicked Plaintiff in the left side of his face and spit on him while he was on the ground. (Dkt. Nos. 1 at 5, 41-2 at 86-88.) Sgt. Eisenschmidt punched Plaintiff in the head, face, and chest, banged his head into the wall, and choked him. (Dkt. Nos. 1 at 5, 41-2 at 157.) The assault lasted approximately ten minutes. (Dkt. No. 41-2 at 98-100.) Afterwards, Plaintiff was taken by bus to Sgt. Eisenschmidt's office. *Id.* There, Sgt. Eisenschmidt punched, kicked, and choked Plaintiff, and slammed his head against a wall. *Id.* at 103-104. Plaintiff was then sent to the Special Housing Unit ("SHU"). *Id.*

**B. Plaintiff's Inmate Misbehavior Reports**
On July 1, 2016, C.O. Mollnow issued Plaintiff two inmate misbehavior reports for creating a disturbance, harassment, refusing a direct order, making threats, and being out of place. (Dkt. No. 1 at 9, 11-12.) As described in those misbehavior reports, at approximately 1:00 p.m., Plaintiff was "cube visiting" without permission. (Dkt. No. 41-4 at 5.) When C.O. Mollnow told Plaintiff that he was not allowed to cube visit, Plaintiff yelled, "fuck you" and returned to his cube. *Id.* At Sgt. Eisenschmidt's direction, C.O. Mollnow told Plaintiff he was keeplocked. *Id.* Plaintiff argued with C.O. Mollnow about his keeplock status, but returned to his

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 147 of 284

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

cube. *Id.* At approximately 1:20 p.m., Plaintiff approached C.O. Mollnow's desk and resumed arguing about his keeplock status. *Id.* at 6. C.O. Mollnow ordered Plaintiff to leave the desk and return to his cube. *Id.* Plaintiff stepped onto the officer's podium in a threatening manner. *Id.* C.O. Mollnow activated her alarm; Plaintiff ran to his cube. *Id.* A response team arrived; Plaintiff was sent to the SHU. *Id.* No physical force was used in the incident. *Id.* at 5, 6.

**\*2** At two Tier III disciplinary hearings conducted on July 11, 2016, Plaintiff pleaded guilty to two counts of creating a disturbance and was found guilty of all other charges. *Id.* at 7; Dkt. No. 41-2 at 122, 125. He was sentenced to 90 days in the SHU, 90 days loss of recreation, and 90 days loss of good time credits, along with 120 days loss of package, commissary, and telephone privileges. (Dkt. No. 41-2 at 126.) The hearing officer's determinations were affirmed on administrative appeal. (Dkt. No. 41-6 at 1.) On July 15, 2016, Plaintiff was transferred to Upstate Correctional Facility ("Upstate"). (Dkt. No. 41-2 at 142.)

### C. Plaintiff's Grievance

In his verified complaint, [2] Plaintiff declares, "I exhausted all of my administrative remedies, grievance, commissioner, governor, inspector general, special litigation of Washington, D.C." (Dkt. No. 1 at 2.) Plaintiff further states, "I filed grievances to the higher authority & never received a response. The facility of Washington never responded to my grievance." *Id.* at 3.

[2]     The Court finds Plaintiff's complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 1.)

At his deposition, Plaintiff testified that on or about July 14, 2016, while confined in the SHU at Washington, he filed a grievance with Inmate Grievance Resolution Committee ("IGRC") regarding the July 1, 2016, assault:

Q: Did you file an inmate grievance with the IGRC about the incident on July 1, 2016?

A: Yeah.

Q: You did? On what date?

A: July 14th or 13th. It was the -- it was before they packed me up.

Q: And that was at Washington Correctional?

A: Yeah.

Q: All right. Where did you put the grievance?

A: In the mailbox.

Q: What did the grievance say?

A: It was on a -- it was on a regular piece of paper and it says that I was assaulted July 1st by several officers and -- the sergeant.

Q: What else?

A: I don't remember what it says.

Q: All right. And you put that in the mailbox at Washington?

A: Yeah. I know it was about my -- the assault.

(Dkt. No. 41-2 at 141.) The next day, on or about July 15, 2016, Plaintiff was transferred to Upstate. *Id.* at 142. Plaintiff testified he never received a response to his grievance that he filed at Washington:

Q: Did you get a response to that [grievance]?

A: I never got a response from it. I contacted the Upstate box -- Inmate Grievance Program to make sure they got my grievance and they said that they never had received it.

Q: All right. So, you put -- you put this grievance in the mailbox at Washington. And then you were transferred to a different facility?

A: Yes, sir.

Q: What date?

A: On the 15th or 16th. I think it was July 15th, when I was transferred out of -- out of there.

Q: Where did you go?

A: Upstate Correctional Facility.

*Id.* Plaintiff further explained, "I filed a grievance on [the July 1, 2016, assault] and they made it disappear. They said they never got it. I wrote a grievance...." *Id.* at 93-94. Plaintiff testified he wrote the Commissioner, the Governor,

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 148 of 284

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)
2018 WL 4178226

and Special Litigations. *Id.* at 94. He "wrote everybody that [ ] could consider a grievance." *Id.*

For example, by letter dated August 14, 2016, Plaintiff sent a letter to the Commissioner, regarding the July 1, 2016, incident:

> I was assaulted by several officers, including a sergeant. I was called racial slurs & repeatedly kicked & punched. The female officer even kicked me in the face, causing my left eye to become blurry & spit on me. They assaulted me for a very long time.... I was beaten on the bus, then I was assaulted in the Sergeant office. He choked me & started banging my head into wall." ... The Sergeant name is "Eisenschmidt" and the female office name is "A. Mollnow.... She also lied on the misbehavior report. I am not letting them get away with this & they should be placed under investigation.... Still heard no response from Inmate Grievance—dated 7.14.16. I hope you could look into this matter & save me from doing unnecessary box time. Do your job.

> **\*3** (Dkt. No. 1 at 6.)

Plaintiff testified that he also contacted Upstate's IGRC regarding the status of his grievance:

> Q: What response did you get?

> A: That Washington never received no grievances from Hurst.

> Q: Did you do an appeal to the superintendent?

> A: No -- I don't recall. I don't know. I know I -- I filed my grievance with Albany and the Governor.

> Q: So, you sent some letters to the Governor?

> A: Yeah. To back up the grievance.

> Q: All right. And when you say Albany, what do you mean?

> A: The Commissioner and I --.

> Q: All right. So, you wrote to the Commissioner and you wrote to the Governor?

> A: And I wrote the Inspector General and he came about five months later to see me.

(Dkt. No. 41-2 at 143.) Plaintiff admitted he never appealed to the Central Office Review Committee ("CORC"):

> Q: Did you appeal to the Central Office Review Committee?

> A: I'm saying, if they never received it, how could I appeal it?

*Id.* at 144-45.

During his deposition, Plaintiff confirmed that he never filed a grievance at Upstate regarding the July 1, 2016, incident:

> Q: How about when you -- when you got to Upstate on July 15, 2016, did you try putting a grievance in -- filing a grievance there about --

> A: No.

> Q: -- what had happened at Washington?

> A: No. Because I thought it -- my grievance had already -- I thought they already had it. I thought they received it. But after like a month of not hearing nothing from them, I decided to take it upon myself to respond to Upstate grievances, to respond to them because you can't send mail out like that. You got it do it through the Grievance Program.

> Q: All right. Am I correct though you could of filed a grievance at Upstate, about something that happened at Washington? Correct?

> A: Yes. Because it was -- it was less than twenty-one days that it occurred.

> Q: All right. But you didn't -- you didn't do that?

> A: No. Because I already did it.

> Q: Okay. Do you have a copy of the grievance that you say you filed on July 13 or July 14?

> A: No. If I had carbon paper I would of made one, but I didn't have no carbon paper. Usually I do that, but I didn't have carbon paper at the time.

> Q: Do you have written proof that you -- you filed that grievance?

> A: No. Oh, yeah.

> Q: What?

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 149 of 284

Hurst v. Molinow, Not Reported in Fed. Supp. (2018)
2018 WL 4178226

A: I have written proof that I wrote to Albany -- Upstate Inmate Grievance, asking about that grievance and they wrote --

Q: Okay.

A: -- me back saying that they going to contact Washington Correctional Facility and they going to contact me, when they get a response. And when they got a response, they saying that Washington never received a -- a grievance.

*Id.* at 145-47. Plaintiff confirmed he sent a letter to Upstate regarding his grievance:

Q: You're saying that there was a letter from you to Upstate and you said something to the effect, what happened to my grievance at Washington?

A: Yes.

Q: And you said that Upstate wrote back and said we'll look into it?

A: Yeah.

Q: And then eventually, Upstate said there -- nothing was filed?

A: Yeah.

*Id.* at 149. [3]

[3]  Plaintiff did not have a copy of the letters with him at the September 13, 2017, deposition. (Dkt. No. 41-2 at 147.) Plaintiff indicated he would provide copies of the letters to Defendants, provided they were not destroyed in his sister's house fire. *Id.* at 147-48.

**\*4**  Defendants have submitted evidence in support of their motion establishing Washington has no record of any grievance filed by Plaintiff regarding the alleged July 1, 2016, incident. (Dkt. No. 41-9 at 2-3.) Matthew L. Waters, Inmate Grievance Program ("IGP") Supervisor, is one of the individuals responsible for keeping records of the grievances filed by inmates at Washington. *Id.* at 2. In his declaration, Waters explains he searched the IGP files to determine if Plaintiff filed any grievance at Washington relating to the alleged July 1, 2016, incident. *Id.* Based upon his search, Waters determined Washington has no record of any grievance filed by Plaintiff relating to any issue connected to

the alleged use of excessive force incident at Washington in July 2016. *Id.* at 2-3.

Defendants have also submitted evidence establishing CORC has no record of an appeal relating to the alleged July 1, 2016, assault. (Dkt. No. 41-8 at 1-2.) Rachel Seguin is the Assistant Director of the DOCCS IGP. *Id.* at 1. In that capacity, she is the custodian of the records maintained by CORC, which is the body that renders final administrative decisions under DOCCS' three-step IGP. *Id.* In her declaration, Seguin explains she searched CORC records and, based upon her search, determined Plaintiff did not file a grievance appeal with CORC related to any issue involving an alleged use of excessive force incident at Washington in July 2016. *Id.* Seguin has attached a computer printout showing that the only CORC appeal filed by Plaintiff was in 2015, concerning an incident at Downstate, and that there are currently no active CORC appeals pending for Plaintiff. *Id.* at 2.

## III. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 150 of 284

Hurst v. Molinow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[4] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

[4]    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

*5  In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at the point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ...

interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). While Plaintiff has opposed Defendants' motion, he has failed to respond to Defendants' statement of material as required under L.R. 7.1(a)(3).[5] (Dkt. No. 57.) His response does not mirror Defendants' statement of material facts, nor does Plaintiff specifically admit or deny the statements therein or cite references to evidence in the record supporting of refuting Defendants' statements. *See id.* Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a) (3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[6] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[7] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

[5]    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[6]    L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, see *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 151 of 284

Hurst v. Molinow, Not Reported in Fed. Supp. (2018)
2018 WL 4178226

genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

7   Plaintiff was notified of the consequences of his failure to respond to Defendants' summary judgment motion pursuant to L.R. 56.2. (Dkt. No. 43.)

**\*6** This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V. DISCUSSION

### A. Exhaustion of Administrative Remedies
Defendants argue Plaintiff's excessive force claim arising from the July 1, 2016, incident should be dismissed on the ground that he failed to exhaust his administrative remedies.

### 1. Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) ); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. tit. 7 ("7 NYCRR"), § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3) (ii).

**\*7** Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. *Id.* § 701.8. [8] The superintendent is required to initiate an in-house investigation by higher

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 152 of 284

Hurst v. Molinow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id.* § 701.8(d).

[8]     Section 701.8 has been found applicable to claims of excessive force. *See Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id.* § 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

As set forth above, at each step of the IGP process, a decision must be rendered within a specified time period. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* §§ 701.6(g), 701.8(g). Generally, if a plaintiff fails to follow each of the required three step of the above-described IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies and required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.")) (internal quotations and citations omitted ); *see, e.g., Martin, II v. Niagara Cty. Jail*, No. 05-CV-868 (JTC), 2012 WL 3230435, at *6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his administrative remedies is barred from commencing a federal lawsuit).

Because non-exhaustion is an affirmative defense, Defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95.

**2. Plaintiff's Failure to Exhaust**

Plaintiff has averred that on or about July 14, 2016, he submitted a grievance regarding the July 1, 2016, incident while he was in the SHU at Washington. (Dkt. No. 41-2 at 141-43.) The undisputed record evidence establishes there is no record of this grievance having been filed at Washington or appealed to CORC. (Dkt. Nos. 41-9 at ¶ 9; 41-8 at ¶¶ 3, 4; 41-2 at 143-45.) Therefore, the Court finds Defendants have satisfied their burden of showing that Plaintiff failed to satisfy the exhaustion requirements before commencing this action. *See Woodford*, 548 U.S. at 93. [9]

[9]     To the extent Plaintiff suggests he "exhausted" his administrative remedies by contacting the Commissioner, Governor, and Inspector General, among others, regarding the July 1, 2016, incident, "[t]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, Nos. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Salmon v. Bellinger*, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), *report-recommendation adopted by*, 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (collecting cases); *see also Geer v. Chapman*, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."). Thus, Plaintiff's informal complaints, whether written or verbal, outside of the grievance process, are insufficient to exhaust his administrative remedies. *See also Jones*, 549 U.S. at 218 (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

**3. Availability of the DOCCS IGP**

**\*8** A prisoner's failure to exhaust does not end a court's exhaustion review. While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first

be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and citations omitted).

To guide courts in the "availability" analysis, the Supreme Court has identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. When one of the three circumstances is found, "an inmate's duty to exhaust 'available' remedies does not come into play." *Id.* at 1859. Once a defendant has satisfied the burden of establishing a failure to exhaust, the plaintiff must establish that the IGP was unavailable to him. *See Jones*, 549 U.S. at 216.

The Court finds that the question of availability in this case is governed by *Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), in which the Second Circuit held that the opacity of 7 NYCRR § 708.1(g) rendered the DOCCS IGP procedure unavailable to the plaintiff inmate and found that the plaintiff had exhausted his administrative remedies by giving his grievance to the corrections officer. Defendants' attempt to distinguish *Williams* from the case at bar is unpersuasive. (*See* Dkt. No. 41-11 at 12.)

As in this case, the inmate plaintiff in *Williams* claimed to have drafted a grievance complaining of an assault by corrections officers. *Williams*, 829 F.3d at 120-21. The plaintiff alleged he gave the grievance to a corrections officer for delivery to the IGP office because he was in the SHU. *Id.* Here, Plaintiff testified he placed the grievance in the

mailbox located in the SHU and, in his opposition submission, explains he handed the grievance to a corrections officer to be placed in the SHU mailbox. (Dkt. Nos. 41-2 at 141-43; 57 at 4, 6. [10]) Significantly, the plaintiff in *Williams*, like Plaintiff herein, was transferred to another facility before hearing anything regarding the grievance he had attempted to file. *Id.* As in this case, it was undisputed in *Williams* that the inmate plaintiff never received a response to the unfiled grievance and did not appeal the grievance to CORC under 7 NYCRR § 701.8(g). *Id.* at 125.

[10]  In his opposition submission, Plaintiff states, "Plaintiff is 100% positive that he gave the on duty officer, that was working the special housing unit on July 14, 2016, the inmate grievance envelope to be placed into the facility out-going mailbox. (Dkt. No. 57 at 6.) The Court notes that according to the regulations, inmates in the SHU are instructed to file grievances by giving them to a corrections officer to file on behalf of the inmate. *See* 7 NYCRR § 701.7.

**\*9** The Second Circuit acknowledged in *Williams* that under the DOCCS regulation relevant in both *Williams* and this case, an inmate may appeal a grievance "to the next step" if he does not receive a timely response from the Superintendent. *Williams*, 829 F.3d at 124. The Court concluded, however, that:

even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross*, 136 S. Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Id.* (alternations in original). Accepting Williams' allegation that the officer to whom he had given the grievance did not file it, the Court found:

[u]nder that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 154 of 284

Hurst v. Molinow, Not Reported in Fed. Supp. (2018)
2018 WL 4178226

triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See. id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 day calendar day time limit the grievant may appeal his/her grievance to CORC.") Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

*Id.* The Court noted in *Williams* that the obscurity of the regulation was compounded by Williams' transfer to another facility approximately two weeks after having given the grievance to the corrections officer. *Id.* at 126.

Here, Defendants contend Plaintiff has failed to sustain his burden of demonstrating unavailability under *Ross* sufficient to raise a material issue of fact. Specifically, Defendants argue Plaintiff has failed to show that the grievance procedure was so opaque as to render it incapable of use because "the regulations contemplate the very situation Plaintiff allegedly believed he was in—a filed grievance that went unanswered." (Dkt. No. 60 at 5.) In support of their motion, Defendants explain the regulations provide that an inmate who receives no response within the time allotted for response may go directly to the next step of the grievance process. *Id.* (citing 7 NYCRR §§ 701.6(g)(2), 701.8(g) ). Thus, after receiving no response from the facility superintendent within 25 days of purportedly submitting his grievance, Plaintiff could have appealed to CORC. *Id.* In short, Defendants argue, "the grievance process provided Plaintiff with a 'clear avenue to proceed.' " *Id.* (quoting *Cicio v. Wenderlich*, 714 F. App'x 96, 97-98 (2d Cir. 2018) (summary order) ("When a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal.") ). [11]

[11]    In *Cicio*, the Second Circuit found that the grievance process in Cicio's case was not so opaque that it became "incapable of use." *Cicio*, 714 F. App'x at 97-98 (citing *Ross*, 136 S. Ct. at 1859). In so holding, the Court compared and distinguished Cicio's situation from that of the plaintiff in *Williams*. *See id.* (*cf. Williams v. Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding that appellate process was too opaque in circumstances where inmate alleged that a prison guard did not file his grievance and the inmate had since been transferred) ). Here, by contrast, the Court finds Plaintiff's circumstances more closely resemble that of the plaintiff in *Williams*. Thus, for the same

reasons, Defendants' reliance on recent rulings by summary order by the Second Circuit are easily distinguishable and inapposite. (*See* Dkt. No. 41-11 at 12.)

**\*10**    However, "*Williams* holds that the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Berman v. Drunkin*, No. 9:13-CV-0136 (LEK/DJS), 2017 WL 1215814, at \*8 (N.D.N.Y. Mar. 10, 2017) (emphasis in original), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *see also Juarbe v. Carnegie*, No. 9:15-CV-01485 (MAD/DEP), 2016 WL 6901277, at \*1 (N.D.N.Y. Oct. 7, 2016) ("In *Williams*, the Second Circuit held that when a plaintiff's grievance is both unfiled and unanswered, the regulations do not clearly outline the process to appeal or otherwise exhaust administrative remedies, and therefore, the administrative remedies are unavailable under *Ross*."). Therefore, "[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]" *Juarbe*, 2016 WL 6901277, at \*1.

Here, Plaintiff claims he submitted a grievance at Washington, and the next day he was transferred to Upstate. (Dkt. No. 41-2 at 141-42.) The undisputed evidence demonstrates Washington has no record of Plaintiff's grievance. (Dkt. No. 41-9 at 2-3.) Drawing all inferences in the non-moving party's favor, Plaintiff's grievance was both unfiled and unanswered. In that situation, the Second Circuit has held the procedures "are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Williams*, 829 F.3d at 126 (quoting *Ross*, 136 S. Ct. at 1859). In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment. *See, e.g., Fann v. Graham*, No. 9:15-CV-1339 (DNH/CFH), 2018 WL 1399331, at \*6 (N.D.N.Y. Jan. 11, 2018) (finding issue of fact as to the availability of administrative remedies where the record suggested the plaintiff submitted grievances, which were unfiled and unanswered), *report and recommendation adopted by* 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018).

Therefore, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied without prejudice and with the opportunity to renew by way of an exhaustion hearing should Defendants request such a hearing.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 155 of 284

Hurst v. Molinow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

**B. Official Capacity Claims**

The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted to the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state, *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006), and, unless waived, bars all money damage claims against state officials acting in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (observing that an inmate-plaintiff's claims for damages against individual corrections department employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity).

Therefore, to the extent Plaintiff seeks monetary damages from C.O. Mollnow and Sgt. Eisenschmidt in their official capacities (*see* Dkt. No. 1 at 2, 15), the Court agrees with Defendants that such claims must be dismissed on Eleventh Amendment grounds. (*See* Dkt. No. 41-11 at 13.)

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **GRANTED in part and DENIED in part**; and it is further

 **\*11 RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants in their official capacities, the motion be **GRANTED**; and it is further

**RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants on exhaustion grounds, the motion be **DENIED without prejudice** to Defendants renewing this argument and requesting an exhaustion hearing, and it is further

 **\*12 ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

 **\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [12] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[12]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4178226

---

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 156 of 284
Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)
2016 WL 8732798

2016 WL 8732798
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose JUARBE, Plaintiff,

v.

Corrections Officer John
CARNEGIE, et al., Defendants.

Civil Action No. 9:15-CV-1485 (MAD/DEP)
|
Filed 10/07/2016

**Attorneys and Law Firms**

JOSE JUARBE, 14-A-5209, Southport Correctional Facility,
P.O. Box 2000, Pine City, NY 14871, Pro se.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL: HELENA
LYNCH, ESQ., Assistant Attorney General, The Capitol,
Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  This is a civil rights action brought by *pro se* plaintiff
Jose Juarbe, a New York State prison inmate, against three
corrections officers employed at the correctional facility in
which he was confined at the relevant times pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that he was
assaulted by four corrections officers and, as a result, suffered
significant injuries. In his complaint, Juarbe requests recovery
of damages in the amount of $5 million.

Currently pending before the court are cross-motions for
summary judgment. In lieu of answering plaintiff's complaint,
defendants initiated the motion process by requesting the
entry of summary judgment dismissing plaintiff's complaint,
arguing that his claims are procedurally barred based upon
his failure to exhaust the available administrative remedies
before filing suit. Plaintiff opposes that motion and has cross-
moved for the entry of summary judgment in his favor on
the merits. For the reasons set forth below, I recommend that both
motions be denied.

I. BACKGROUND[1]

[1]    In light of the procedural posture of the case, the
following recitation is derived from the record now
before the court, with all inferences drawn and
ambiguities resolved in plaintiff's favor. *Terry v.
Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In
this case, in light of the parties' cross-motions for
summary judgment, the court draws "all factual
inferences ... against the party whose motion is
under consideration." *Tindall v. Poultney High Sch.
Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation
marks omitted).

Plaintiff is a prison inmate currently being held in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"). *See generally* Dkt.
No. 1. While he is currently incarcerated elsewhere, he was
confined in the Mid-State Correctional Facility located in
Marcy, New York, at the time of the events forming the basis
of his claims in this action. *Id.*

According to plaintiff, late in the evening on June 24, 2015, he
was taken from his cube by defendant Tolman, a corrections
officer, and escorted to the dayroom at Mid-State, where he
was thrown against the wall. Dkt. No. 1 at 3; Dkt. No. 28-1
at 2. Defendants Hart and Carnegie, who are also corrections
officers, and a fourth unidentified officer subsequently arrived
at the housing unit and took plaintiff into the hallway, where
he was allegedly beaten. Dkt. No. 1 at 3-4; Dkt. No. 28-1 at 2.
Plaintiff was taken to the ground, at which point the officers
continued to assault him, kicking him in the face and body,
and dragging him across the floor. Dkt. No. 1 at 4; Dkt. No.
28-1 at 2.

Following the incident, plaintiff was examined at the Mid-
State infirmary. Dkt. No. 28-1 at 2; Dkt. No. 29 at 1-3. Various
injuries were noted in plaintiff's medical records based on
that examination, including minor swelling on the left side of
his forehead, a red scuff mark on the right side of his eye,
reddened streak marks on both sides of his neck, a scrape
on his left shoulder, a minor scratch, swelling on his right
upper shin, an abrasion to his right knee, and complaints of
pain in his right shoulder. Dkt. No. 28-1 at 2; Dkt. No. 29 at
1-3. Photographs were taken of plaintiff depicting his injuries.
Dkt. No. 29 at 4-12.

 **\*2**  According to plaintiff, he was transferred into the
Auburn Correctional Facility ("Auburn") the morning after
the alleged assault, where he was placed into a special housing

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 157 of 284
Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)
2016 WL 8732798

unit ("SHU") cell. Dkt. No. 26-2 at 2; Dkt. No. 28 at 2; Dkt. No. 28-2 at 9. Plaintiff alleges that he filed two grievances at Auburn concerning the assault at Mid-State but never received any response or decision. Dkt. No. 1 at 2, 5; Dkt. No. 26-2 at 2; Dkt. No. 28-2 at 8-9. When he asked a sergeant at Auburn about the status of his grievances, he was told that there was nothing that could be done at Auburn concerning the matter because the offending officers work at Mid-State, and Mid-State "still owned [him]." Dkt. No. 26-2 at 3; *see also* Dkt. No. 1 at 5; Dkt. No. 28-2 at 9.

## II. PROCEDUAL HISTORY

Plaintiff commenced this action on or about December 16, 2015, and sought both leave to proceed *in forma pauperis* ("IFP") and appointment of *pro bono* counsel. Dkt. Nos. 1-4. Plaintiff's IFP application was granted, but his application for appointment of counsel was denied, without prejudice, by order issued on December 21, 2015. Dkt. No. 5. Named as defendants in plaintiff's complaint are Corrections Officers John Carnegie, Robert Hart, and Mark Tolman. [2] Dkt. No. 1.

[2]     Plaintiff's complaint identified these individuals by only their last names. Dkt. No. 1 at 1-2. In plaintiff's statement of undisputed material facts submitted in support of his motion for summary judgment, however, those individuals are identified by both their first and last names. Dkt. No. 28. The clerk of the court is respectfully directed to amend the court's docket sheet to reflect the defendants' full names.

On March 7, 2016, in lieu of answering, defendants moved for the entry of summary judgment dismissing plaintiff's complaint based upon his alleged failure to exhaust the available administrative remedies before commencing suit. [3] Dkt. No. 20. Plaintiff has opposed that motion, Dkt. Nos. 26, 30, 33, and defendants have since submitted a reply memorandum in further support of their motion, Dkt. No. 27.

[3]     While a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no similar rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56. *Compare* Fed. R. Civ. P. 12(a)(4) *with* Fed. R. Civ. P. 56; *see also* 10A Alan Wright *et al.*, *Federal Practice*

*& Procedure* § 2718 (4th ed.). Most courts that have determined that Rule 12(a)(4) operates by analogy to a defendant that has filed a pre-answer summary judgment motion and, therefore, have declined to find a defendant in default by failing to file an answer until after disposition of the motion. *See* Rashidi v. Albright, 818 F. Supp. 1354, 1356 (D. Nev. 1993) ("Although Rule 12 does not specifically allow for a summary judgment motion to toll the running of the period within which a responsive pleading must be filed, by analogy the language would seem to apply[.]"); *but see* Poe v. Cristina Copper Mines, Inc., 15 F.R.D. 85, 87 (D. Del. 1953) (finding that the "extension of time to file a response pleading until determination of a motion for summary judgment is not a definite and fixed right but a matter to be granted or denied under Rule 6(b)"). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until fourteen days after a final determination is issued with respect to the parties' motions, in the event that the action survives. *Snyder v. Goord*, 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.).

 **\*3** On April 8, 2016, plaintiff moved for the entry of summary judgment in his favor on the issue of liability. Dkt. Nos. 28, 29. Defendants have since responded in opposition to plaintiff's motion. Dkt. No. 36.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion*

2016 WL 8732798

*Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where the parties have filed cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Boy Scouts of Am. V. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quotation marks omitted).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1917e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding

the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —— Fed.Appx. ——, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). [4] "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). [5]

[4]     All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.

[5]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

*4  In New York, state prison inmates have available to them a grievance procedure, which is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [6] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

6      The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. 7 *Id.* at § 701.5(c)(3)(i), (ii).

7      Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* at § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for

the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. 8 *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

8      According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaust[.]" *Williams*, 829 F.3d at 123 n.2.

*5 Shortly after the Supreme Court issued its decision in *Ross*, the Second Circuit had occasion to determine whether a plaintiff's complaint should be dismissed for failure to exhaust administrative remedies where the plaintiff alleged that he had submitted a grievance concerning misconduct by corrections officers, but the grievance was allegedly never actually processed and filed, and plaintiff received no response and took no further action with respect to it. *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, the plaintiff alleged that in December 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items, including his legal papers, were searched, and he was assaulted by corrections officers. *Williams*, 829 F.3d at 120. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in a special housing unit ("SHU"), he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* at 120-21. One week later, while the superintendent of the facility was making rounds, the plaintiff inquired into the status of the grievance because he had not yet received a response. *Id.* at 121. The superintendent promised the plaintiff she "would look into it." *Id.* Shortly after that conversation, the plaintiff was transferred to another facility. *Id.* He never received a response to the grievance, nor did he ever appeal

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 160 of 284

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

to the superintendent and/or the CORC. *Id.* The Second Circuit credited plaintiff's allegation, at the motion-to-dismiss stage, that the corrections officer to whom plaintiff gave his grievance never filed it. *Id.* at 124.

After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the district court's dismissal of the plaintiff's complaint, concluding that the pertinent provisions of the IGP, which purportedly provided recourse in situations such as those presented, were opaque, therefore making the IGP functionally unavailable to the plaintiff. *Williams*, 829 F.3d at 124. Although not the centerpiece of its decision in *Williams*, the Second Circuit also noted that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by the plaintiff's transfer to a different facility, and concluded that the governing regulatory scheme "do[es] not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* at 126.

The facts of the case now before the court are similar to those that confronted the Second Circuit in *Williams*. Plaintiff Juarbe alleged that he was transferred out of the facility in which the relevant events the day after the incident occurred. [9] Dkt. No. 1 at 2, 5. While the plaintiff in *Williams* filed his grievance at the facility in which the incident of which he complained occurred and then was transferred to a different facility before receiving a response, plaintiff Juarbe claims to have attempted to file his grievances at the new facility. *Id.*

[9]  Defendants admit that plaintiff was eventually transferred to Auburn after the alleged assault, but deny that the transfer occurred the morning after the assault. Dkt. No. 36-1 at 1. As support for their denial, defendants cite the fact that plaintiff signed a Protective Custody Waiver Form at Mid-State on June 25, 2015. Dkt. No. 36-3 at 2. In my view, the form does not conclusively establish that plaintiff was not transferred to Auburn on June 25, 2012. Instead, the form merely gives rise to a genuine dispute of material fact regarding whether plaintiff was transferred to Auburn on June 25, 2015. Mindful of my of obligation to view the facts regarding defendants' summary judgment motion in the light most favorable to plaintiff, I have operated under the assumption that plaintiff was

transferred to Auburn on June 25, 2015, the day immediately following the alleged assault.

Defendants contend that the IGP required plaintiff Juarbe to file his grievances at Mid-State because that is where the incident of which plaintiff complained occurred. *See* Dkt. No. 20-1 at 11 ("[F]iling a grievance at the facility other than where the alleged conduct occurred does not satisfy the exhaustion requirements."). For this proposition, defendants cite *Richardson v. N.Y. State Dep't of Corrs.*, No. 13-CV-6189, 2014 WL 3928785, at *5 (S.D.N.Y. Aug. 11, 2014), and *Finger v. McGinnis*, No. 99-CV-9870, 2004 WL 1367506, at *4 (S.D.N.Y. June 16, 2004). *Id.* *Richardson* does not support defendants' position, [10] and defendants misconstrue *Finger*. The court in *Finger* merely concluded that the relevant regulations require that an IGRC hearing occur at the facility in which the incident occurred. *Finger*, 2004 WL 1367506, at *4 (quoting 7 N.Y.C.R.R. § 701.3(k)(2)). Even if the holding in *Finger* remains viable, [11] however, defendants in this case have failed to square their argument with the regulation within the IGP that requires inmates to file their grievances "only ... at the facility where [they are] housed even if it pertains to another facility." 7 N.Y.C.R.R. § 701.5(a)(1).

[10]  *Richardson* simply states that an inmate initiates the grievance procedure "by filing a complaint with the facility's [IGRC]"; it does not specify that "the facility" to which it refers is the facility at which the allegedly offending conduct occurred. *Richardson*, 2014 WL 3928785, at *5.

[11]  It is not clear that the IGP continues to include this rule because 7 N.Y.C.R.R. § 701.3, the provision cited to by the court in *Finger*, has been amended since the decision was issued and no longer includes the provision on which the court relied.

*6  Plaintiff alleges that, although he did file two grievances at Auburn, he did not receive a response to either of them from any DOCCS official. Dkt. No. 26-2 at 2-3. According to plaintiff, when he inquired of a sergeant at Auburn regarding the status of his grievances after not receiving a response, the sergeant told him that, because the incident occurred at Mid-State, "there was not much that could be done" and that "Mid-State ... still owned [him]." *Id.* at 3. Defendants neither confirm nor deny that plaintiff filed those grievances, arguing only that there is no record of plaintiff filing a grievance at Mid-State or appealing a grievance to the CORC. Dkt. No. 20-3 at 2; Dkt. No. 20-4 at 2. Viewing the facts in the light most favorable to plaintiff, I find that the record evidence

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 161 of 284

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

does not conclusively reflect that plaintiff's grievances were actually recorded as having been filed at Auburn. While plaintiff alleges, in no uncertain terms, that he did file them, the sergeant's response to plaintiff's inquiry regarding their status raises a suspicion as to whether officials at Auburn actually received them such that plaintiff's "filing" became complete. [12] Under the IGP regulations, once a grievance is "filed," the grievance clerk numbers and logs it. 7 N.Y.C.R.R. § 701.5(a)(2); *see also* *Williams* 829 F.3d at 119. Because defendants have provided no evidence that any Auburn official, including the grievance clerk, received plaintiff's grievances, provided them with numbers, or logged them, the factual circumstances in this case are, at least when drawing all inferences in favor of plaintiff, identical to those in *Williams*, where the plaintiff's grievances were both unfiled and unanswered. Under those exact facts, the Second Circuit concluded that the "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." [13] *Williams*, 829 F.3d at 126; *see also id.* ("In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed.").

[12]    Although plaintiff does not provide the court with any information regarding the mechanism he used to file his grievances, according to the IGP, inmates housed in the SHU are instructed to file their grievances by giving them to a corrections officer to file for them. 7 N.Y.C.R.R. § 701.7; *see also* *Williams,* 829 F.3d at 119.

[13]    It is worth noting that, if the court is or becomes satisfied that plaintiff's grievances were, in fact, filed at Auburn, *Williams* may not control. Under those circumstances, plaintiff Juarbe's grievances would only be "unanswered," rather than both "unfiled *and* unanswered." *Williams,* 829 F.3d at 126 (emphasis added). The IGP clearly permits an inmate to file an appeal with either the superintendent or the CORC when he does not receive a response "within the time limits" outlined in section 701.5. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."). Prior to *Williams*, courts in this circuit have determined that, even where a grievance goes unanswered, in order to properly exhaust administrative remedies, the inmate *must* avail himself of the permissive appeal outlined in section 701.(g)(2). *See, e.g.,*

*Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.) (collecting cases).

Indeed, *Williams* suggests that there is a distinction to be drawn between an "unfiled and unanswered" grievance and simply an "unanswered" grievance because the unfiled grievance does not trigger a response from the IGRC, superintendent, or the CORC. *Williams,* 829 F.3d at 124. In that scenario, "the regulations give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* On the other hand, where a grievance was filed but the inmate simply never received a response, the Second Circuit seemingly acknowledged that "[t]he regulations ... provide that an inmate may appeal a grievance 'to the next step[.]' " *Id.* (quoting 7 N.Y.C.R.R. § 701.6(g)(2)).

Whether or not an appeal is actually "available" to an inmate where he does not receive a response to a grievance that was actually filed, however, is a question that remains outstanding after *Williams*. Section 701.6(g)(2) does not provide guidance regarding the mechanism an inmate may or must use to file his permissive appeal when he does not receive a response to his grievance. 7 N.Y.C.R.R. § 701.6(g)(2). Under normal circumstances, where the inmate does receive a response to his grievance from the IGRC and/or superintendent, the regulations state that "he or she *must* complete and sign" the form provided by the IGRC and/or superintendent to effectuate the appeal. *Id.* at §§ 701.5(c)(1), 701.5(d)(1)(i) (emphasis added). In the absence of a written decision from either the IGRC or superintendent, it would be impossible for the inmate to file an appeal utilizing the mechanisms set forth in section 701.5.

This problem was loosely addressed in *Williams*, where the defendants argued that the plaintiff could have appealed the untimely response to his grievance after he was transferred to a different facility. *Williams,* 829 F.3d at 126. As support, the defendants cited section 701.6(h)(2), which provides that "[i]f the transferred grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed[.]" 7 N.Y.C.R.R. § 701.6(h)(2). The Second Circuit, however, dismissed this argument finding that section 701.6(h)(2) "presumes not only that the

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 162 of 284
Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

grievance was actually filed, but *also that the inmate received an appeal form that he can sign and mail back.*" *Williams*, 829 F.3d at 126 (emphasis added). The court's focus on the procedural mechanism for appealing at least suggests that, if that identified mechanism is absent because the grievance was never responded to, the appeal is, in fact, unavailable to the inmate.

In this case, because I find that the record is not clear as to whether plaintiff's grievances were actually filed, however, I perceive no reason to address whether plaintiff should have filed an appeal after not receiving a response in order to properly exhaust administrative remedies.

**\*7** In light of *Williams*, which underscored the confusion inherent to the IGP under factual circumstances similar to those experienced by plaintiff Juarbe, and mindful of my obligation to draw all reasonable inferences regarding defendants' exhaustion argument in the favor of the non-moving party, I recommend that defendants' motion for summary judgment dismissing plaintiff's complaint on the basis of his alleged failure to exhaust the available administrative remedies be denied, without prejudice.

### C. Plaintiff's Cross-Motion for Summary Judgment
In his cross-motion, plaintiff contends that no reasonable factfinder could conclude that unconstitutionally excessive force was not used against him on June 24, 2015, and that he is therefore entitled to summary judgment at least on the question of liability. Dkt. No. 28-2. Defendants oppose plaintiff's motion, arguing that there are genuine disputes of material fact that must be resolved before a determination can be made with regard to plaintiff's excessive force claim. Dkt. No. 36.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. [14] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

[14]    Courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also* *Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

**\*8** "The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also* *Blyden*,

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 163 of 284

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)
2016 WL 8732798

186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

It should be noted that on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal of the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). The converse is equally true: if a reasonable factfinder could conclude that corrections officers did not use force maliciously and sadistically, then the grant of summary judgment in plaintiff's favor is also inappropriate.

In his complaint and declaration submitted in support of his motion, plaintiff alleges that on June 24, 2015, he was removed from his cube, at which point defendant Carnegie punched him in the ribs and smashed his head into the wall. Dkt. No. 1 at 4; Dkt. No. 28-1 at 2. He further claims that thereafter defendants Tolman and Hart, as well as another unnamed corrections officer, joined the assault, punching his face and body. *Id.* During the incident, defendant Carnegie allegedly struck plaintiff with his baton, which resulted in plaintiff falling to the ground. *Id.*

In their opposition to plaintiff's motion, defendants contest his version of the relevant events and offer a different account. According to the defendants, on the night in question, defendant Tolman observed plaintiff in the bathroom acting suspiciously. Dkt. No. 36-4 at 2. When defendant Tolman observed plaintiff's furtive behavior, including placing his right hand into his right front pants pocket, the officer ordered plaintiff to turn over the item from his pocket. *Id.* Plaintiff disobeyed, however, and continued to walk toward the toilet with his hand behind his back. *Id.* Plaintiff then refused to obey a second order to cooperate and flushed an item down the toilet. *Id.* Defendant Tolman then radioed for assistance, and defendants Hart and Carnegie responded. *Id.*

Following the arrival of the additional officers, plaintiff was escorted into the hallway and was instructed to place his hands on the wall. Dkt. No. 36-4 at 2; Dkt. No. 36-5 at 2; Dkt. No. 36-6 at 2; Dkt. No. 36-7 at 2. Plaintiff allegedly struck defendant Carnegie in the face with his elbow when Carnegie attempted to place hand restraints on plaintiff. *Id.* Plaintiff then turned and punched defendants Tolman and Hart several times. *Id.* Plaintiff was ordered to return to the wall, but refused and attempted to grab defendant Carnegie's baton. *Id.* When defendant Carnegie pulled his baton back, plaintiff fell and was restrained. *Id.* As a result of the incident, defendant Carnegie suffered injuries, including a broken nose and several broken ribs, that required medical attention at the Mid-State infirmary and later at an outside hospital. Dkt. No. 36-6 at 2; *see also* Dkt. No. 36-9 at 15.

**\*9** These starkly contrasting versions of the relevant events underscore the existence of genuine disputes of fact that can only be resolved by a jury, including whether the use and extent of the force applied was justified given plaintiff's alleged failure to comply with defendants' seemingly legitimate directives. In light of the existence of these pivotal issues of material fact, I recommend that plaintiff's summary judgment motion be denied. [15]

15    As a result of the incident, plaintiff was indicted by an Oneida County grand jury and charged with two counts of second-degree assault based upon the injuries sustained by defendant Carnegie. Dkt. No. 36-8. On February 29, 2016, plaintiff entered a plea of guilty to one count of second-degree assault in satisfaction of the charges set forth in that indictment. Dkt. No. 36-9; Dkt. No. 36-10. In his reply in further support of his motion, plaintiff admits that he pleaded guilty to assault,

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 164 of 284

but correctly insists that the salient issue for the court is whether defendants used excessive force as prohibited by the Eighth Amendment, not whether plaintiff used force against them. Dkt. No. 41 at 6, 12.

IV. SUMMARY AND RECOMMENDATION

Based upon the foregoing, I recommend that both cross-motions for summary judgment currently pending before the court be denied. Addressing defendants' motion, I conclude that there are issues of fact surrounding whether administrative remedies were available to plaintiff at the relevant times, thus precluding a determination of whether he should be excused from fulfilling all three steps of the IGP. With respect to plaintiff's motion, I conclude that there are genuine disputes of material fact as to whether the use of force incident occurred as alleged by plaintiff, and whether the extent of the force that was administered was reasonable.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 20) be DENIED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 28) similarly be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk amend the court's records to reflect that the full names of the named defendants are John Carnegie, Robert Hart, and Mark Tolman; and it is further hereby

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8732798

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4153926

2018 WL 4153926
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith I. HURST, Plaintiff,

v.

A. MOLLNOW, Correctional Officer, Washington
Correctional Facility; and Eisenschmidt, Sergeant,
Washington Correctional Facility, Defendants.

9:16-CV-1062 (DNH/TWD)
|
Signed August 29, 2018
|
Filed 08/30/2018

**Attorneys and Law Firms**

KEITH I. HURST, 105 Hunter Avenue, #2, Albany, NY
12206, pro se.

BARBARA D. UNDERWOOD, OF COUNSEL: MARK
G. MITCHELL, ESQ., Ass't Attorney General, Attorney
General for the State of New York, The Capitol, Albany, NY
12224, Attorney for Defendants.

## <u>DECISION and ORDER</u>

DAVID N. HURD, United States District Judge

 **\*1** Pro se plaintiff Keith I. Hurst brought this civil rights
action pursuant to 42 U.S.C. § 1983. On July 20, 2018, the
Honorable Thérèse Wiley Dancks, United States Magistrate

Judge, advised by Report-Recommendation that defendants'
motion for summary judgment be granted in part and denied
in part. No objections to the Report-Recommendation were
filed.

Based upon a careful review of the Report-Recommendation,
the Report-Recommendation is accepted in whole. See 28
U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED
in part and DENIED in part;

2. Defendants' motion for summary judgment dismissing
plaintiff's Eighth Amendment excessive force claim against
defendants in their official capacities is GRANTED and those
claims are DISMISSED;

3. Defendants' motion for summary judgment dismissing
plaintiff's Eighth Amendment excessive force claim based on
non-exhaustion is DENIED without prejudice to defendants
renewing this argument and requesting an exhaustion hearing;
and

4. Trial is scheduled for February 5, 2019 in Utica, New York.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4153926

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 166 of 284
Berman v. Durkin, Not Reported in Fed. Supp. (2017)
2017 WL 1215814

2017 WL 1215814
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Barry BERMAN, Plaintiff,
v.
Charles DURKIN, et al., Defendants.

Civ. No. 9:13-CV-0136 (LEK/DJS)
|
Signed 03/10/2017

**Attorneys and Law Firms**

BARRY BERMAN, 20 Glenn Cove Rise, Rochester, New
York 14617, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
JOSHUA E. McMAHON, ESQ., Assistant Attorney General,
Attorney General of the State of New York, The Capitol,
Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** *Pro se* Plaintiff Barry Berman commenced this civil
rights action on February 1, 2013. Dkt. No. 1, Compl.
The following claims remain: (1) an Eighth Amendment
excessive force claim against Defendants Correction Officer
("C.O.") Devereaux, Sergeant ("Sgt.") King, and John Does
## 1-3 and # 5 arising from an alleged assault on May
27, 2010; (2) an Eighth Amendment excessive force claim
and a First Amendment retaliation claim against Defendants
C.O. Mitchell and Sgt. Durkin arising from an alleged
assault on June 13, 2010 that occurred in retaliation when
Plaintiff reported the May 27, 2010 incident; and (3) Eighth
Amendment deliberate medical indifference claims against
Defendant Drs. Ramineni and Mannava. *See* Dkt. No. 127,
Am. Compl.

Presently before the Court is Defendants' Motion for
Summary Judgment. Dkt. No. 190, Defs.' Mot. Summ. J.
Defendants argue that: (1) Plaintiff's claims against the
unidentified John Doe Defendants should be dismissed; (2)
Plaintiff failed to exhaust his administrative remedies with
respect to his claims arising from the incidents alleged to
have occurred on May 27, 2010 and June 13, 2010; and (3)

Defendants are entitled to summary judgment on each of
Plaintiff's claims. *Id.* Despite being granted two extensions
of time to file a response, Plaintiff has not filed a response.
Dkt. Nos. 194 & 198. For the reasons that follow, the Court
recommends that Defendants' Motion be **granted in part and
denied in part**.

**I. SUMMARY JUDGMENT STANDARD**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." The moving party bears the burden to demonstrate
through "pleadings, depositions, answers to interrogatories,
and admissions on file, together with [ ] affidavits, if any,"
that there is no genuine issue of material fact. *F.D.I.C. v.
Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial, and cannot rest merely on allegations or
denials of the facts submitted by the movant. FED. R. CIV.
P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d
Cir. 2003) ("Conclusory allegations or denials are ordinarily
not sufficient to defeat a motion for summary judgment
when the moving party has set out a documentary case.");
*Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26
(2d Cir. 1994). To that end, sworn statements are "more than
mere conclusory allegations subject to disregard ... they are
specific and detailed allegations of fact, made under penalty
of perjury, and should be treated as evidence in deciding
a summary judgment motion" and the credibility of such
statements is better left to a trier of fact. *Scott v. Coughlin*,
344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10,
13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872
(2d Cir. 1995)). "A verified complaint is to be treated as an
affidavit for summary judgment purposes, and therefore will
be considered in determining whether material issues of fact
exist." *Colon v. Coughlin*, 58 F.3d at 872.

**\*2** When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages, Inc.
v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.
1998). "[T]he trial court's task at the summary judgment
motion stage of the litigation is carefully limited to discerning
whether there are any genuine issues of material fact to be

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 167 of 284

2017 WL 1215814

tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*' " *Amaker v. Foley*, 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)). "In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014).

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). However,

the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that the court may in its discretion opt to conduct a review of the entire record even where one of the parties has failed to file a 7.1 statement. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Jackson v. Fed. Exp.*, 766 F.3d at 194 (noting that "the court may rely on other evidence in the record even if uncited" in determining the undisputed material facts). Due to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record to ascertain the undisputed material facts. The Court will cite to the facts as set forth in Defendants' Rule 7.1 Statement of Facts only when properly supported by the record. Dkt. No. 190-16, Defs.' Rule 7.1. Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

## II. MAY 27, 2010 AND JUNE 13, 2010 EXCESSIVE FORCE INCIDENTS

### A. Background

**\*3** The Court here summarizes Plaintiff's allegations and sets forth the undisputed material facts regarding the alleged assaults that occurred on May 27 and June 13, 2010, when he was incarcerated at Clinton Correctional Facility ("Clinton").

On May 27, 2010, Plaintiff was going to the yard when he was stopped by Defendant C.O. Devereaux for a pat frisk. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 15. Plaintiff stated that there was nothing in his pockets, but alleges that he forgot that he was carrying a pencil. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 16. As C.O. Devereaux searched Plaintiff, he reached into Plaintiff's right front pocket and pricked his finger on the pencil. Defs.' SMF at ¶ 38. Plaintiff alleges that he returned to his cell and that C.O. Devereaux later came and discussed the incident. Am. Compl. at ¶ 17. Plaintiff apologized and explained that he was taking medication and C.O. Devereaux stated that he would meet with his supervisor regarding whether to issue a misbehavior report. *Id.*

2017 WL 1215814

Approximately ten minutes after his conversation with C.O. Devereaux, Plaintiff claims that C.O. Devereaux, Defendant Sgt. King, and John Does ## 1-3 came and ordered him to exit his cell. *Id.* at ¶ 18. The Defendants ordered Plaintiff to face and grab the cell bars, which Plaintiff did. *Id.* at ¶ 19. Plaintiff was then punched repeatedly in his head, sides, and back. *Id.* Plaintiff collapsed, but was ordered to get up, and when he did, was again punched repeatedly in his head, sides, and back. *Id.* at ¶¶ 21-23. Plaintiff attempted to look at one of the John Doe Defendant's name tags, but was ordered to look away. *Id.* at ¶ 23. The Defendants warned Plaintiff that if he reported the assault, they would return and "it would be worse." *Id.* at ¶ 24. No Unusual Incident Report was filed regarding the alleged assault. Defs.' SMF at ¶ 45. Defendants C.O. Devereaux and Sgt. King deny that they assaulted Plaintiff on any occasion. *Id.* at ¶¶ 51-52. [1]

[1] Defendants' Motion papers do not include affidavits of the correctional officer Defendants, but rather contain unsworn statements taken during investigation of Plaintiff's allegations. *See* Dkt. No. 190-5, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. D, at pp. DEF000473-486.

On May 28, 2010, the following day, Plaintiff went to sick call. Am. Compl. at ¶ 25. Plaintiff claims that he was accompanied by C.O. Bushey who threatened him not to report the assault. *Id.* Plaintiff complained of pain on his right side and stated that he had fallen down some stairs. Dkt. No. 190-1, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. A, [2] at p. 413. No bruising or marks were noted and Plaintiff was observed getting onto and off of the exam table without signs of pain or discomfort. *Id.*

[2] Exhibit A to the McMahon Declaration is at Docket Number 190-2.

As a result of the pat frisk conducted by C.O. Devereaux, Plaintiff was issued a misbehavior report, which charged him with making false statements, refusing a direct order, and refusing a search or frisk. Defs.' SMF at ¶ 40. A Tier II Disciplinary Hearing was held on June 1, 2010. *Id.* at ¶ 41. Plaintiff testified at the hearing, but was found guilty of the charges and assessed with fifteen days loss of recreation, phone, packages, and commissary. *Id.* at ¶ 43. Plaintiff appealed the determination and it was affirmed. Dkt. No. 190-3, McMahon Decl., Ex. B, [3] at p. 23.

[3] Exhibit B to the McMahon Declaration is at Docket Number 190-3.

 **\*4** On June 8, 2010, Plaintiff sent a complaint concerning the alleged assault to the New York Inspector General ("IG"). McMahon Decl., Ex. D, [4] at pp. DEF000511-000514. In his Amended Complaint, Plaintiff alleges that Defendant Sgt. Durkin acquired a copy of the letter to the IG and attempted to instigate other inmates to retaliate against Plaintiff for being a "snitch." Am. Compl. at ¶ 29. Plaintiff claims that on June 13, 2010, Defendants Sgt. Durkin and C.O. Mitchell came to his cell and escorted him to a room at the front of the block. *Id.* at ¶ 30. Sgt. Durkin then told Plaintiff that he was going to ask him questions about his letter to the IG and that whenever he gave a wrong answer, C.O. Mitchell would punch him in the face. *Id.* Sgt. Durkin proceeded to ask Plaintiff questions and C.O. Mitchell punched Plaintiff at least ten times in the face. *Id.*

[4] Exhibit D to the McMahon Declaration is at Docket Numbers 190-5, 190-6, 190-7, and 190-8.

Defendants then escorted Plaintiff to Sgt. Durkin's office. *Id.* at ¶ 31. Prior to entering the office, Sgt. Durkin ordered Plaintiff to face and grab the bars in order to be searched. *Id.* While Plaintiff was holding the bars, C.O. Mitchell repeatedly punched Plaintiff in his head, back, and sides. *Id.* Plaintiff was then taken into the office and further questioned. *Id.* at ¶ 32. The Defendants accused Plaintiff of having contraband tattoo guns and threatened him not to report the incident. *Id.* at ¶¶ 33 & 35. Again, no Unusual Incident Report was filed regarding this alleged assault. Defs.' SMF at ¶ 45. Plaintiff was not taken to medical following the incident and next went to sick call on June 24, 2010, where he again did not report any assault by staff. *Id.* at ¶ 36. Plaintiff alleges that, on June 17, 2010, photographs were taken of the "visible injuries" to his face. [5] Am. Compl. at ¶ 38.

[5] These photographs are not in the record.

Following the alleged incidents on May 27 and June 13, Plaintiff alleges that Sgt. Durkin continued to harass and threaten him. Plaintiff alleges that Sgt. Durkin moved Plaintiff's cell twice and confiscated some of his legal papers, envelopes, and toilet paper. *Id.* at ¶¶ 46, 48, & 52. Sgt. Durkin allegedly threatened Plaintiff to not talk about the incidents. *Id.* at ¶ 47. Plaintiff also claims that Sgt. Durkin stated that he planned to "set [P]laintiff up" by submitting a memo identifying Plaintiff as a drug dealer. *Id.* at ¶ 49. Plaintiff

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 169 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

alleges that he suffered lasting abdominal pain following the alleged assaults. *Id.* at ¶ 71.

## B. John Doe Defendants

Defendants first move to dismiss Plaintiff's claims against the unidentified John Doe Defendants, who allegedly participated in the May 27, 2010 assault. Dkt. No. 190-15, Defs.' Mem. of Law at pp. 2-3. In the District Court's initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), Plaintiff was advised that he must "take reasonable steps through discovery to ascertain the identity of any Doe Defendants and, if appropriate, file a motion to amend his Amended Complaint ... to add any such individual." Dkt. No. 17 at p. 11. Through discovery, Plaintiff was able to identify "John Doe # 4" as Sgt. King, but was unable to identify any of the other Doe Defendants. *See* Dkt. No. 112 at pp. 28-29. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of New York*, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010). Dismissal of an unidentified Doe Defendant is appropriate pursuant to FED. R. CIV. P. 41(b), which permits a court to dismiss an action for failure to prosecute or to comply with a court order, and FED. R. CIV. P. 4(m), under which a court must dismiss, absent a showing of "good cause," claims against a defendant who is not served within ninety days of the filing of the complaint. *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 501-02 (N.D.N.Y. 2009). Therefore, because discovery is closed and Plaintiff has not identified Defendant John Does ## 1-3 and John Doe # 5, the Court recommends that Plaintiff's claims against those Defendants be **dismissed**.

## C. Exhaustion

**\*5** Defendants argue that Plaintiff's claims arising from the May 27, 2010 and June 13, 2010 incidents should be dismissed on the ground that he failed to exhaust his administrative remedies.

### 1. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or

any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [6]

> [6] Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answer. *See* Dkt. Nos. 143 at ¶ 14 & 170 at ¶ 14.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 170 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

116, 121 (2d Cir. 2001), *overruled on other grounds by* Porter v. Nussle, 534 U.S. 516.

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

**\*6** If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the IG's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also* Perez v. Blot, 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002) (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See* Perez v. Blot, 195 F. Supp. 2d at 544. Such a process is wholly consistent with the underlying concern of employee harassment.

*2. Plaintiff's Failure to Exhaust Administrative Remedies*

The record establishes that Plaintiff did not file grievances with the IGP at Clinton relative to his claims arising from the May 27, 2010 and June 13, 2010 incidents. In the records provided by Defendants, it appears that the Clinton IGP received seven grievances filed by Plaintiff, all of which concerned Plaintiff's medical problems. *See* McMahon Decl., Ex. B. These seven grievances do not complain of the alleged assaults or of injuries that Plaintiff incurred in such assaults. *See id.* Plaintiff only appealed five of these grievances to CORC. *See* Dkt. No. 190-19, Decl. of Jeffery Hale, dated Aug. 17, 2016, Ex. B.

Normally, the absence of records of an appeal to CORC would be sufficient to establish Plaintiff's failure to exhaust his administrative remedies. However, in addition to the seven grievances received by the Clinton IGP, the record contains numerous other letters sent by Plaintiff, which require further discussion. These letters include the following:

- Two letters addressed to legal aid attorneys, dated June 3, 2010 and June 6, 2010, in which Plaintiff complains of the May 27 assault and numerous other assaults allegedly occurring in Clinton. McMahon Decl., Ex. D, at pp. DEF000491-495 & DEF000497-499.

- Three letters addressed to Superintendent LaValley and Deputy Superintendent Racette, dated July 11, 2010, July 12, 2010, and July 13, 2010, requesting protective custody on account of fear of assaults by staff. *Id.* at pp. DEF000528-529 & DEF000538-539.

- A letter addressed to the IG's office, dated June 8, 2010, complaining of the May 27 assault. *Id.* at pp. DEF000511-514.

- Grievance letters addressed to the supervisor of the IGP, dated June 4, 2010 and June 30, 2010, complaining, respectively, of the May 27 and June 13 assaults. *Id.* at pp. DEF000533-536. These letters are notated as "received" in the upper right corners, but are not stamped as received by the IGP and do not have assigned grievance numbers. *Id.*

- A letter addressed to Superintendent LaValley, dated July 6, 2010, claiming that Plaintiff's grievances were not being processed. *Id.* at p. DEF000545.

**\*7** The record also includes Grievance No. MS-20123-10, which was filed on July 28, 2010 at Mid-State. Hale Decl., Ex. C. In MS-20123-10, Plaintiff claims that he filed grievances following the May 27 and June 13 incidents that were

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 171 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

never processed. *Id.* at p. DEF000611. MS-20123-10 was denied because there were no grievances on record at Clinton alleging staff misconduct. Hale Decl., Ex. C at p. DEF000610. Additionally, in his Amended Complaint, Plaintiff alleges, in conclusory terms, that grievances filed against corrections officers at Clinton would not be processed; Plaintiff claims that he attempted to file several grievances that were either not processed or accepted. Am. Compl. at ¶¶ 58 & 61.

Many of the letters noted above—in particular, the letters addressed to the Superintendent requesting protective custody and raising other complaints and the letter requesting investigation by the IG's office—are insufficient to satisfy the exhaustion requirement. Generally, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Muhammad v. Pico*, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk*, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures."). Thus, Plaintiff's informal complaints outside of the grievance process, even if they might have had the effect of providing notice of his claims, are insufficient to exhaust his administrative remedies.

However, a different conclusion follows from the two grievances addressed to the IGP and MS-20123-10. Together, this record evidence indicates (1) that Plaintiff attempted to raise his assault complaints by filing grievances with the IGP, (2) that Clinton staff notated/stamped the grievances as "received," and (3) that his grievances were never processed or filed with the IGP. This record evidence creates an issue of fact as to whether administrative remedies were available to Plaintiff. Specifically, although both grievances are notated as "received," it is unclear how or if they were processed. Were these grievances simply not processed? Or were they treated as harassment grievances and investigated by the Superintendent's office (the June 4 grievance is stamped as received by the Superintendent's office)? Notably, Defendants do not provide an affidavit of either the inmate grievance supervisor at Clinton or any other individual with personal knowledge of how these grievances were processed. As the Court describes below, the failure to resolve such

questions creates an issue of fact as to whether administrative remedies were available to Plaintiff.

Defendants' argument as to the unfiled grievances is that even if the grievances were never processed, Plaintiff was nonetheless obligated under DOCCS regulations to appeal and complete the grievance process when he did not receive a response. *See* Defs.' Mem. of Law at p. 8 (citing *Goodson v. Silver*, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012)). This, however, is no longer an accurate statement of the law after the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016).

*Williams* was issued following the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Supreme Court clarified the circumstances in which a failure to exhaust may be excused. As the *Ross* Court stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." 136 S. Ct. at 1858. The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

**\*8** In *Williams*, after the district court granted the defendants' motion to dismiss on non-exhaustion, the Second Circuit considered whether administrative remedies had actually been "available" to the plaintiff, applying the "unavailability" inquiry outlined in *Ross*.[7] *Williams v. Priatno*, 829 F.3d at 123. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and he alleged that it was never filed by the correction officer to whom he had given it. *Id.* It was undisputed that he never appealed the grievance. *Id.*

[7]    The Circuit recognized that *Ross* "supplant[ed]" the inquiry which had been set forth in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), excusing the failure to exhaust when: "(1) administrative

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 172 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d at 686).

The defendants argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126 (emphasis added); *see also Juarbe v. Carnegie*, 2016 U.S. Dist. LEXIS 140241, at *19 in (N.D.N.Y. Oct. 7, 2016) (explaining that *Williams* appears to draw a distinction between an "unfiled and unanswered" grievance and a simply "unanswered" grievance, insofar as the regulations provide that an inmate may appeal an unanswered grievance), *report and recommendation adopted by*, 2016 U.S. Dist. LEXIS 162262, 2016 WL 6901277 (N.D.N.Y. Nov. 23, 2016).

Returning to the case at hand, the Court finds that the record, viewed in the light most favorable to Plaintiff, suggests that Plaintiff's grievances were unfiled and unanswered, creating an issue of fact as to the availability of administrative remedies under *Williams*. Defendants' failure to provide an affidavit explaining how Plaintiff's grievances were processed is insufficient to carry their burden of proving the affirmative defense on the present record. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's claims arising from the May 27 and June 13 incidents be **denied**. If this recommendation be accepted, the Court recommends that an exhaustion hearing be scheduled prior to any trial of this case.

### D. Whether Summary Judgment is Appropriate on Plaintiff's Excessive Force Claims

Under the Eighth Amendment's prohibition on "cruel and unusual punishment," "inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In the context of an inmate's excessive force claim, the core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 302-21 (1986)). To assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) an objective component focusing "on the harm done in light of contemporary standards of decency," and (2) a subjective component showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. at 8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

**\*9** With respect to the objective component, the inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident." *Hudson v. McMillian*, 503 U.S. at 9 (citation omitted). Nonetheless, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Eighth Amendment's prohibition of 'cruel and unusual punishment' necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to a conscience of mankind.' " *Id.* at 9-10 (quoting *Whitley v. Albers*, 475 U.S. at 327). In this regard, "[t]he extent of injury may ... provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "Injury and force, however, are only imperfectly correlated, and it is the latter

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 173 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

that ultimately counts." *Id.* at 38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7.

To determine whether defendants acted maliciously or wantonly at the subjective prong, a court must consider:

> the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Romano v. Howarth*, 998 F.2d 101 at 105 (citing *Hudson v. McMillian*, 503 U.S. at 7). As stated by the Second Circuit, "*Hudson* simply makes clear that excessive force is defined as force not applied in a 'good faith effort to maintain or restore discipline.' " *Blyden v. Mancusi*, 186 F.3d at 263 (quoting *Hudson v. McMillian*, 503 U.S. at 7).

In this case, Plaintiff asserts excessive force claims arising out of the May 27, 2010 and June 13, 2010 incidents. On both occasions, Plaintiff alleges that he was "repeatedly" punched, without provocation, in his head, back, and sides. *See* Am. Compl. at ¶¶ 21 & 30. The basis of Defendants' Motion is that (1) under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), no reasonable jury could credit Plaintiff's version of events and (2) Plaintiff's medical records establish that he suffered only minor injuries and therefore, Defendants, at most, applied *de minimis* force. Defs.' Mem. of Law at pp. 10-13. For the reasons stated below, the Court recommends that Defendants' Motion be **denied**.

Defendants argue that Plaintiff's allegations are not credible because: (1) he did not seek medical attention immediately following the May 27 incident; (2) he did not mention an assault when he was seen at sick call on May 28, June 1, and June 7, but instead claimed that he had fallen down stairs; (3) he did not request medical attention immediately following the June 13 incident and was not seen in sick call until June 24, and he again did not report that he had been assaulted; (4) Plaintiff testified at the Tier II Disciplinary Hearing for the May 27 misbehavior report but did not mention the assault; and (5) the IG's investigation of Plaintiff's allegations found

that they could not be proven. *Id.* Defendants rely on *Jeffreys*, where the Second Circuit held that "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff' ... without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d at 554 (citation omitted).

The Court does not agree that the "rare circumstance" described in *Jeffreys* applies here. Although it is correct that Plaintiff's claims are almost exclusively based on his own allegations in his verified Amended Complaint, in order for *Jeffreys* to apply, Plaintiff's accounts must be "contradictory and incomplete." *Id.* at 554. In *Jeffreys*, for example, the plaintiff claimed that several police officers had beaten him and thrown from a third story window. *Id.* at 551. However, before he filed his federal action, he had confessed on at least three occasions that he had jumped out of the window. *Id.* at 552. Furthermore, he was unable to identify or even describe any of the officers who allegedly participated in the attack. *Id.* Here, by contrast, Plaintiff's account of the events has been entirely consistent; there are no significant discrepancies between the allegations in the verified Amended Complaint and Plaintiff's claims in his grievances and other complaint letters. *Compare* Am. Compl. at ¶¶ 15-35 *with* McMahon Decl., Ex. D, at pp. DEF000492-493, DEF000498, DEF000511-512, & DEF000533-536. Defendants do not identify any contradictory account or explain how Plaintiff's account is incomplete.

**\*10** Instead of pointing to any inconsistencies in Plaintiff's account, Defendants focus on evidence in the record that undermines Plaintiff's account—namely, the minimal medical evidence. However, the "narrow exception" in *Jeffreys* applies where the plaintiff's account is "so lacking in credibility that no reasonable juror could find for the plaintiff." *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). Although the minimal medical evidence may tend to undercut Plaintiff's credibility, it does not render it so thoroughly unbelievable that the Court should reject it as a matter of law. Defendants ignore certain allegations and record evidence that the Court must consider in viewing the evidence in the light most favorable to Plaintiff. First, Plaintiff claims that he was threatened not to report the assaults and was accompanied by a corrections officer to sick call. Am. Compl. at ¶¶ 24-26 & 35. He alleges that he reported that he injured himself falling down the stairs in order to

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 174 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

avoid retaliation. *Id.* at ¶ 26. Second, Plaintiff's medical records show that he reported pain in his ribs, consistent with his allegations of the assaults, for several weeks. *See* Hale Decl., Ex. C at pp. DEF000627-628 & DEF000633. Plaintiff also received x-rays of his ribs on May 28, 2010, *id.* at p. DEF000624, although he claims that the x-rays were of the wrong area, *id.* at p. DEF000611. Thus, the medical records provide some corroboration for Plaintiff's version of the events. Furthermore, even in the absence of medical evidence, "[c]ourts in this district have not required that injuries caused by the alleged use of excessive force be corroborated by medical records." *Ninortey v. Shova*, 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008).

Considering all of the evidence,[8] the Court finds that Plaintiff's account of the events is not so implausible that it may be rejected as a matter of law. The evidence pointed to by Defendants essentially goes to Plaintiff's credibility, and "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

[8]    The Court again notes that Defendants have not offered affidavits from any of the officers accused of using excessive force contradicting Plaintiff's version of events. The only evidence offered by Defendants are unsworn statements. McMahon Decl., Ex. D at pp. DEF000473-486. Under *Jeffreys*, the defendant "still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York*, 426 F.3d at 554.

Defendants next argue that even if the Court accepts Plaintiff's allegations at true, his medical records establish that he suffered, at most, minor and temporary injuries and therefore any forced applied was necessarily *de minimis.* Defs.' Mem. of Law at pp. 13-14. Defendants' contention fails because while "[t]he extent of injury may ... provide some indication of the amount of force applied ... it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. at 37-38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7. Here, Plaintiff's alleges more than a *de minimis* application of force: namely, that Defendants "repeatedly" punched him in his head, ribs, and back in order to cause him harm on two occasions. Am. Compl. at ¶¶

22 & 30-31. Plaintiff's medical records document that he complained of pain in his ribs consistent with his excessive force allegations for several weeks following the assaults. The medical records do not disclose injuries that are so minor that the Court can conclude that Defendants applied *de minimis* force.

Accordingly, for the foregoing reasons, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's excessive force claims be **denied**.

### E. Whether Summary Judgment is Appropriate on Plaintiff's Retaliation Claim

Defendants also move for summary judgment on Plaintiff's retaliation claim against Defendants Sgt. Durkin and C.O. Mitchell. To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). Briefly stated, Plaintiff's retaliation claim is that (1) he engaged in a protected conduct by sending a complaint letter to the IG's office and (2) after Sgt. Durkin obtained a copy of the letter, he and C.O. Mitchell assaulted Plaintiff. *See* Am. Compl. at ¶¶ 29-35. Defendants argue that summary judgment is appropriate on Plaintiff's retaliation claim on the same ground that they argued for summary judgment on his excessive force claim: that is, "no reasonable jury could conclude that Plaintiff was subjected to the adverse action." Defs.' Mem. of Law at p. 15. Since the Court has found a disputed issue of fact on whether Plaintiff was subjected to excessive force, the Court therefore recommends that Defendants' Motion also be **denied** as to Plaintiff's retaliation claim.

### III. PLAINTIFF'S MEDICAL INDIFFERENCE CLAIMS

#### A. Legal Standard

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 175 of 284
Berman v. Durkin, Not Reported in Fed. Supp. (2017)
2017 WL 1215814

**\*11**  To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### B. Analysis

**\*12**  The basis of Plaintiff's Eighth Amendment claims against Defendants Dr. Ramineni and Dr. Mannava is that he was denied adequate medical treatment for his complaints of headaches, fungus on his hands and feet, sinus problems, abdominal pain, back pain, left shoulder pain, right elbow pain, high cholesterol, and a wart on his right finger. Am. Compl. at ¶¶ 96 & 111-17. The record, however, documents that Plaintiff received extensive treatment for his medical conditions. Between July 16, 2010 and June 14, 2013, Plaintiff was seen by medical personnel at Mid-State approximately 250 times. Defs.' SMF at ¶ 55. Based on the voluminous medical records provided by Defendants, and for the reasons set forth below, the Court recommends that summary judgment be **granted** on Plaintiff's deliberate medical indifference claims.

#### 1. Shoulder Pain

Plaintiff repeatedly complained of left shoulder pain, which was incident to acromioplasty surgery that he had five years earlier. *See* Ramineni Decl. at ¶ 22 (citing dates on which Plaintiff complained of shoulder pain at pp. DEF000362, DEF000365, DEF000366, DEF000390,

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 176 of 284
Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

DEF000391, DEF000392, DEF000393, DEF000394, DEF000396, DEF000397, DEF000434, DEF000436, and DEF000438). "[C]hronic pain can be a serious medical condition." *Price v. Reilly*, 697 F. Supp. 2d 344, 363 (E.D.N.Y. 2010) (citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003)). Furthermore, courts have found allegations of "severe pain" and "reduced mobility" in the shoulder sufficient to raise issues of fact as to whether a "shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard." *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006). However, based on its review of the record, the Court finds that there is nothing that suggests that Plaintiff's shoulder injury was a sufficiently serious condition to satisfy the objective prong of the Eighth Amendment analysis. Even if Plaintiff was able to show that his shoulder injury was sufficiently serious, he is also unable to show that Defendants deprived him of adequate care in response to his complaints of shoulder pain.

Despite Plaintiff's complaints of pain, on examination Plaintiff did not have an "obvious deformity" or "muscle wasting", *id.* at p. DEF000394 and was noted to have a good range of motion in his shoulder, *id.* at p. DEF000378. For treatment, Dr. Ramineni prescribed Motrin 600mg three times daily and referred Plaintiff to physical therapy. Pl.'s AHR at p. DEF000397. In his evaluation for physical therapy, Plaintiff's physical therapist assessed him with "residual [rotator cuff] weakness from old injury" and "possible AC [joint] separation." Pl.'s AHR at p. DEF000438. The physical therapist opined that Plaintiff did not have "much potential for significant improvement" due to "heavy muscle build and workout lifestyle." *Id.* at p. DEF000438. Plaintiff attended two sessions of physical therapy, but did not tolerate the exercises and reported increasing pain. *Id.* at pp. DEF000433-434. Although he did not the tolerate physical therapy, *id.* at p. DEF000433, Plaintiff continued to lift weights throughout the relevant time period on a daily basis, *see id.* at pp. DEF000378, DEF000392, & DEF000438. Dr. Ramineni determined that there was no indication to refer Plaintiff to an orthopedic specialist. *See id.* at pp. DEF000390 & DEF000394. Throughout Plaintiff's complaints, Dr. Ramineni "found nothing other than discomfort arising from earlier surgery or resulting from his continued weight lifting." Ramineni Decl. at ¶ 31. Dr. Ramineni attests that shoulder pain is common following acromioplasty surgery. *Id.* at ¶ 23.

Here, even viewed in the light most favorable to Plaintiff, the record does not suggest that Plaintiff's shoulder injury was "a condition of urgency that [could] result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. The record documents that Plaintiff retained a normal range of motion in his shoulder and was able to lift weights on a daily basis. There is no evidence that Plaintiff suffered "severe pain." Dr. Ramineni determined that Plaintiff was experiencing normal discomfort incident to acromioplasty surgery. Under the objective prong, "an assertion of pain sensation alone, unaccompanied by any large medical complications, does not amount to a serious medical need." *Evan v. Manos*, 336 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (citation omitted). Furthermore, even if Plaintiff's shoulder pain was a serious medical need, the record establishes that the treatment Defendants provided him—over-the-counter pain medication and a referral to physical therapy—was adequate. Plaintiff's claim that he should have been referred to an orthopedic specialist, *see* Am. Compl. at ¶ 112, is insufficient to establish that Defendants acted with deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *See Chance v. Armstrong*, 143 F.3d at 703; *see also Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

**\*13** The record also contains complaints of an injury Plaintiff sustained to his right shoulder lifting weights. Pl.'s AHR at p. DEF000366. Dr. Ramineni determined that it was a muscle strain and x-rays were taken that showed minor degenerative changes in Plaintiff's acromioclavicular joint. *Id.* at pp. DEF000317 & DEF000365. A month after the injury, Plaintiff was noted to be in no significant discomfort. *Id.* at p. DEF000362. Based on this record, there is nothing that suggests that Plaintiff's injury to his right shoulder was a sufficiently serious injury.

*2. Sinusitis*

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 177 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Plaintiff repeatedly complained of nasal and sinus congestion, which caused difficulty breathing, pain, and bleeding. *See* Ramineni Decl. at ¶ 45 (citing dates on which Plaintiff complained of sinus problems at Pl.'s AHR at pp. DEF000292, DEF000370, DEF000371, DEF000380, DEF000385, & DEF000394); Mannava Decl. at ¶¶ 16, 22, & 28. Plaintiff had sinus surgery in the past and Dr. Ramineni observed that Plaintiff had thickening of the sinus lining on a past x-ray. Pl.'s AHR at p. DEF000394.

Plaintiff's medical records establish that he cannot show that his sinus problems were a serious medical need or that he was deprived of adequate care. Throughout his incarceration at Mid-State, Plaintiff was provided with over-the-counter NACL nasal spray and prescriptions for Nasacort AQ and Claritin for sinus irritation and allergies. Ramineni Decl. at ¶¶ 13 & 43; Mannava Decl. at ¶ 16. On occasions when he complained of sinus infections, Plaintiff was prescribed Augmentin 875mg twice daily. Pl.'s AHR at pp. DEF000292 and DEF000394. Plaintiff was examined for complaints of difficulty breathing, but his nasal passages were found to be normal and without inflammation. *Id.* at pp. DEF000380 & DEF000385. Plaintiff also once claimed that he was bleeding from his nose, but Dr. Ramineni did not observe any blood or yellow discharge. *Id.* at p. DEF000380. On August 9, 2011, x-rays were taken that showed no evidence of sinusitis; Plaintiff had some post-surgical changes in the mandible, some soft tissue swelling over the nasal region, but no convincing air fluid level indicative of sinusitis. *Id.* at p. DEF000319.

Even viewed in the light most favorable to Plaintiff, Plaintiff's nasal congestion does not amount to a condition that could "result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. Furthermore, the record demonstrates that Defendants appropriately responded to Plaintiff's complaints of sinus problems, providing over-the-counter nasal sprays, prescription allergy medication, antibiotics for sinus infections, and referring him for x-rays. Plaintiff's claim that Defendants should have referred him to an Ear, Nose, and Throat specialist, *see* Am. Compl. at ¶ 113, amounts to a mere dispute over the proper course of treatment and is insufficient to establish that Defendants acted with deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703.

*3. Headaches*

In late 2012, Plaintiff began complaining of headaches and other symptoms that he believed were indicative of a stroke, including numbness, the feeling of "pins and needles" in his left arm, pain in his left biceps extending to his armpit and chest, and slowness of gait and confusion. *See* Pl.'s AHR at p. DEF000282. In his Amended Complaint, Plaintiff alleges that his headaches were "severe," occurred "almost daily," and interfered with his daily activities. Am. Compl. at ¶¶ 77, 90, & 100.

Contrary to Plaintiff's claims that Defendants ignored a possible stroke, the record shows that Defendants evaluated Plaintiff's symptoms and found no symptoms indicative of a stroke. Plaintiff first expressed that he thought he suffered a stroke on September 12, 2012. Pl.'s AHR at p. DEF000285. He stated that he had a headache for four days and his arm felt "weird and trembly" *Id.* The nurse noted that Plaintiff did not appear to be in acute distress, had a normal gait, spoke clearly, and had actively been going to the law library and gym. *Id.* Plaintiff saw Dr. Ramineni two days later, who noted that Plaintiff had a normal gait and was fully oriented. *Id.* Dr. Ramineni found no evidence that Plaintiff had suffered a stroke or that he was at an elevated risk of suffering one. Ramineni Decl. at ¶ 73. Plaintiff raised similar complaints to Dr. Mannava three months later, who similarly found no symptoms indicative of a stroke. Mannava Decl. at ¶¶ 21 & 24. Specifically, Plaintiff denied nausea, vomiting, burning, tingling, and weakness in his extremities; was alert and fully oriented; had no tenderness or masses on his head; his pupils equally reacted to light; he could move his extremities well with good strength; and had no sensory or motor deficits. *Id.* at ¶ 21. Dr. Mannava ordered blood tests, which came back normal. *Id.* at ¶¶ 21-22. With respect to his numbness in his left arm, an electromyogram was completed on November 28, 2012, which showed mild C7 radiculopathy, chronic C5 radiculopathy, and early, mild neuropathy of the median nerve. *Id.* at ¶ 20. Thus, Plaintiff's concern that he had suffered a stroke was unfounded and provides no basis for an Eighth Amendment claim.

**\*14** As to Plaintiff's headaches, the record contains numerous complaints of chronic and severe headaches beginning in September 2012. *See generally* Pl.'s AHR at pp. DEF000252-285. Painful and debilitating headaches may constitute an objectively serious medical need. *See Peterson v. Miller*, 2007 WL 2071743, at \*7 (N.D.N.Y. July 13, 2007). However, even assuming for the purposes of this Motion that Plaintiff's headaches were a sufficiently serious condition, Plaintiff is unable to show that Defendants

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 178 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

denied him adequate treatment. Based on his assessment that Plaintiff's headaches were either tension headaches or psychogenic, Dr. Mannava directed Plaintiff to take ibuprofen for his headaches. Mannava Decl. at ¶¶ 14, 21-22, 25, & 29. Dr. Mannava also referred Plaintiff for an eye exam as a result of which new glasses were ordered. Pl.'s AHR at pp. DEF000257 & DEF000265. The record therefore demonstrates that Defendants reasonably responded to Plaintiff's complaints of headaches. See Peterson v. Miller, 2007 WL 2071743, at *10 (finding that migraine headaches were appropriately treated with pain relief medication). To the extent that Plaintiff claims that Defendants should have prescribed a stronger pain medication or ordered a CT scan, "disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment." Wright v. Genovese, 694 F. Supp. 2d 137, 155 (N.D.N.Y. Mar. 9, 2010).

### 4. Fungus

Plaintiff complains of a fungal infection that spread along his right hand and on his toe nails. Am. Compl. at ¶¶ 94 & 106. Plaintiff claims that the infection "consumed" a fingernail and caused his fingers to bleed. Id. Plaintiff claims the fungus caused him severe pain and exposed him to the risk of other infections. Id. at ¶ 111. The medical records contradict Plaintiff's claims that his fungal infection was a serious medical condition, and further demonstrate that Defendants provided adequate treatment and were not deliberately indifferent towards the condition.

Plaintiff complained twice to Dr. Ramineni of a fungal infection on his toenail, but on examination, Dr. Ramineni determined that it was a dystrophic nail, and no intervention was necessary. Pl.'s AHR at pp. DEF000306 & DEF000400. Plaintiff also complained of fungus on his fingernails and was given an over-the-counter fungal cream. Id. at p. DEF000305. Plaintiff complained to Dr. Mannava of "scaling and pimply" skin on his feet and right hand and deformed toenails and a right finger nail. Id. at p. DEF000279. Dr. Mannava assessed Plaintiff with onychomycosis and athlete's foot, but referred him for a dermatology consult before determining a treatment plan. Id. The dermatology consult confirmed the diagnoses of dystrophic finger and toenails and onychomycosis. Id. at p. DEF000271. Dr. Mannava put in a request for a prescription for Lamisil 250mg daily, but the request was denied because the treatment was considered "cosmetic."

Id. at pp. DEF000268 & DEF000271. Plaintiff continued to complain that the fungus on his hands was spreading, but no changes were observed. Id. at pp. DEF000254 & DEF000264. A nurse noted that Plaintiff was complaining about the "same small areas" that he had previously complained of, and that the condition was neither "acute" or "consuming." Id. at p. DEF000264. Later, a nurse noted peeling skin on Plaintiff's palm, but no fungus. Id. at p. DEF000254.

Based on these records, there is nothing that suggests that Plaintiff's fungal infections were an objectively serious medical need. See Thompson v. Carlsen, 2010 WL 3584409, at *6 (N.D.N.Y. Aug. 16, 2010) (finding that "dry, cracked, and itchy skin" did not amount to an objectively serious medical condition); Scott v. Laux, 2008 WL 4371778, at *5 (N.D.N.Y. Sept. 18, 2008) ("Fungal infections of the feet have not been found to constitute serious medical needs in federal court."). Furthermore, the records evidence that Defendants provided appropriate treatment and were not deliberately indifferent towards Plaintiff's fungal infections.

### 5. Abdominal Pain

Plaintiff made repeated complaints of right abdominal pain. Pl.'s AHR at pp. DEF000380, DEF000389, DEF000390, DEF000395, DEF000400, & DEF000402. On different occasions, Plaintiff expressed concern that the pain indicated problems with his liver, pancreas, and gall bladder. Id.

**\*15** However, the record shows that Plaintiff's concern about his abdominal pain was unfounded. On repeated examinations, Plaintiff's abdomen was soft, non-tender, and without any masses. Id. at pp. DEF000380, DEF000390, DEF000400, & DEF000402. Plaintiff had multiple negative liver function tests and a negative Hepatitis C test at pp. DEF000390 & DEF000389. Thus, there was no objective evidence to support Plaintiff's complaints of abdominal pain. See Ramineni Decl. at ¶ 42. In January 2011, after Plaintiff made undocumented complaints of vomiting and doubling over in pain, Pl.'s AHR at p. DEF000389, he was admitted to the infirmary for observation for one week, during which time he was not observed to have any episodes of abdominal pain, vomiting, or nausea, id. at p. DEF000346. On this record, there is nothing indicating that Plaintiff's abdominal pain was an objectively serious medical condition. See Thomas v. Nassau Cty. Correctional Ctr., 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003) ("[S]ubjective complaints of pain are not sufficient to satisfy [the objective prong].").

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 179 of 284
Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Furthermore, Plaintiff cannot show that Defendants failed to adequately respond to his complaints, as they conducted physical examinations and ordered Hepatitis C and liver function tests.

*6. Right Elbow Pain*

Throughout the Summer of 2012, Plaintiff complained of pain in his right elbow, which he believed to be bursitis. Pl.'s AHR at pp. DEF000288, DEF000290, DEF000293, DEF000297, DEF000298, & DEF000299. Plaintiff repeatedly requested that his elbow be drained or that he receive a cortisone shot, and, on August 17, 2012, requested surgery. *Id.* at pp. DEF000288 & DEF00297.

The record again does not evidence that Plaintiff's elbow pain was an objectively serious medical condition, or that Defendants failed to adequately respond to his complaints. During his examinations, Dr. Ramineni observed that Plaintiff's elbow moved normally and without discomfort and that there was no bursal swelling. Ramineni Decl. at ¶ 56. His assessment was that Plaintiff had mild musculoskeletal pain. Pl.'s AHR at p. DEF000298. He found no indication for intervention since there was no evidence of bursitis. *Id.* at p. DEF000297. He did, however, note a small bony projection on Plaintiff's elbow and ordered x-rays. *Id.* at pp. DEF000290 & DEF000297. The x-rays showed a small spur on the olecranon that Dr. Ramineni determined was clinically insignificant. *Id.* at p. DEF000298. Dr. Ramineni recommended that Plaintiff use an elbow brace if he continued to experience pain. *Id.* Thus, there is nothing in the record that demonstrates that Plaintiff's elbow pain was a condition that could result in "degeneration or extreme pain." Nor does the record suggest that Defendants failed to appropriately respond to Plaintiff's complaints.

*7. Plaintiff's Remaining Medical Conditions*

In his Amended Complaint, Plaintiff also complains of back pain, a wart on his finger, and high cholesterol. However, a review of the record shows that none of these conditions amounted to an objectively serious medical condition.

Plaintiff complained to Dr. Ramineni of his back pain on a single occasion; Dr. Ramineni noted that x-rays of Plaintiff's spine showed minimal changes, that Plaintiff's gait was normal, and that there was no tingling in Plaintiff's legs.

Pl.'s AHR at p. DEF000402. Dr. Ramineni recommended that Plaintiff take NSAIDs as needed and complete back exercises to strengthen the area. *Id.* While severe back pain can amount to a serious medical need, nothing in the record suggests that Plaintiff's back caused him extreme pain. *See Nelson v. Rodas,* 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002).

Plaintiff's complaints of a wart on his finger are similarly insufficient. Plaintiff complained of a wart on his right index finger on several occasions. Pl.'s AHR at pp. DEF000293, DEF000300, DEF000301, DEF000310, DEF000357, & DEF000359. Dr. Ramineni observed a pinhead sized wart, which did not have the characteristics of a true wart. *Id.* at pp. DEF000357 & DEF000359. He prescribed Plaintiff Condylox gel for treatment. *Id.* at pp. DEF000301 & DEF000357. The record does not suggest that Plaintiff's wart was a serious medical condition. *See Whitfeld v. O'Connell,* 2010 WL 1010060, at *8 (S.D.N.Y. Mar. 18, 2010) ("Warts do not constitute a serious medical need under the Eighth Amendment.").

**\*16** Finally, as to Plaintiff's high cholesterol, it is undisputed that Plaintiff's prescriptions for Lipitor 60mg and Lopid 600mg twice daily were continued when he arrived at Mid-State. Ramineni Decl. at ¶ 13. Lab work was ordered on July 28, 2010, in order that Plaintiff's medications could be adjusted if he was not within the target cholesterol range. Pl.'s AHR at p. DEF000403. On July 14, 2011, Dr. Ramineni noted that results of Plaintiff's cholesterol lab work and ordered that Plaintiff's Lipitor be increased and that Plaintiff be placed on a low cholesterol diet. *See id.* at pp. DEF000365, DEF000370, & DEF000374. Thus, Plaintiff's high cholesterol is insufficient to give rise to an Eighth Amendment claim.

**IV. CONCLUSION**

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 190) be **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Dr. Ramineni and Dr. Mannava who should be dismissed as Defendants to this action; and **GRANTED** as to the Doe Defendants who should also be dismissed as Defendants to this action; and **DENIED** in all other respects; and it is further

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 180 of 284
**Berman v. Durkin, Not Reported in Fed. Supp. (2017)**
2017 WL 1215814

**RECOMMENDED**, that if the Court's recommendations are accepted, that this matter be deemed trial ready and an exhaustion hearing should be scheduled prior to such trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1215814

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 181 of 284

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1207834

2017 WL 1207834
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Barry BERMAN, Plaintiff,

v.

Charles DURKIN, et al., Defendants.

9:13-CV-0136 (LEK/DJS)
|
Signed 03/31/2017

**Attorneys and Law Firms**

Barry Berman, Rochester, NY, pro se.

Joshua E. McMahon, Maria E. Lisi-Murray, New York State Attorney General, Albany, NY, for Defendants.

### **ORDER**

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on March 10, 2017, by the Honorable Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 200 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug.

25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. Docket. Thus, the Court has reviewed the Report-Recommendation for clear error and has found none.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 200) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against defendants Dr. Ramineni and Dr. Mannava and as to the claims against the Doe Defendants, and **DENIED** in all other respects; and it is further

**ORDERED**, that the Clerk of the Court terminate Dr. Ramineni, Dr. Mannava, and the Doe Defendants from this action; and it is further

**ORDERED**, that this matter is trial ready and an exhaustion hearing conducted by the magistrate judge shall be held before trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1207834

---

2016 WL 6901277

2016 WL 6901277
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose JUARBE, Plaintiff,

v.

John CARNEGIE, Correctional Officer, Mid-
State Correctional Facility; Robert Hart,
Correctional Officer, Mid-State Correctional
Facility; Mark Tolman, Correctional Officer,
Mid-State Correctional Facility, Defendants.

9:15-CV-01485 (MAD/DEP)
|
Signed 11/23/2016

**Attorneys and Law Firms**

JOSE JUARBE, 14-A-5209, Southport Correctional Facility,
P.O. Box 2000, Pine City, New York 14871, Plaintiff Pro Se.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL, The Capitol, OF COUNSEL: HELENA
LYNCH, AAG, Albany, New York 12224, Attorneys for
Defendants.

**ORDER**

Mae A. D'Agostino, U.S. District Judge:

**\*1** *Pro se* Plaintiff, Jose Juarbe ("Plaintiff"), currently
incarcerated at Southport Correctional Facility, brings this
civil rights action pursuant to 42 U.S.C. § 1983 ("Section
1983"). *See* Dkt. No. 1. On March 7, 2016, Correction
Officers John Carnegie, Robert Hart, and Mark Tolman
(collectively, "Defendants") moved for summary judgment in
lieu of an answer, *see* Dkt. No. 20, and Plaintiff opposed that
motion, *see* Dkt. Nos. 26, 30, 33. On April 8, 2016, Plaintiff
cross-moved for summary judgment on the issue of liability,
*see* Dkt. No. 28, and Defendants opposed that motion,
*see* Dkt. No. 36. On October 7, 2016, Magistrate Judge
David E. Peebles issued a Report and Recommendation,
recommending that both motions for summary judgment be
denied. *See* Dkt. No. 44. The parties have not filed any
objections to the Report and Recommendation.

Plaintiff alleges that, on June 24, 2015, while he was
incarcerated at Mid-State Correctional Facility ("Mid-State"),

Defendant Tolman removed Plaintiff from his cube and took
him to a dayroom, where Defendant Tolman threw Plaintiff
against a wall. *See* Dkt. No. 1 at 2-3. Plaintiff claims that
Defendants Hart, Carnegie, and an unknown corrections
officer then took Plaintiff into the hallway and assaulted him.
*See id.* at 3. Plaintiff was examined at the Mid-State infirmary
after the incident and complained of various injuries to his
face, shoulders, and leg. *See* Dkt. No. 28-1 at 2-3. Plaintiff
claims that he was transferred to the Auburn Correctional
Facility ("Auburn") the morning after the alleged assault and
placed into a special housing unit ("SHU") cell, where he filed
two grievances regarding the assault at Mid-State. *See* Dkt.
No. 26-2 at 2-3. However, Plaintiff never received a response
or decision regarding the grievances, and a sergeant at
Auburn told Plaintiff that nothing could be done at Auburn
concerning the assault that allegedly occurred at Mid-State. *See id.*

In their motion for summary judgment, Defendants argue that
Plaintiff failed to exhaust his administrative remedies that
were available to him prior to commencing this Section 1983
action, which is in violation of the Prison Litigation Reform
Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a). *See* Dkt. No.
20-1 at 7. Specifically, Defendants argue that Plaintiff was
required to file a grievance at Mid-State instead of Auburn
because the alleged conduct occurred at Mid-State. *See id.*
In Plaintiff's motion for summary judgment, he argues that
there are no questions of material fact regarding the force
that Defendants used against him, and that he is entitled to
judgment as a matter of law. *See* Dkt. No. 28-2 at 10-14.
Defendants counter that Plaintiff cannot establish that he was
subjected to excessive force as a matter of law, and that
Plaintiff's motion is premature as there has been no discovery.
*See* Dkt. No. 36 at 10-13.

In an October 7, 2016 Report and Recommendation,
Magistrate Judge Peebles recommended that both motions
for summary judgment be denied. *See* Dkt. No. 44 at 25.
Specifically, Magistrate Judge Peebles found that Defendants'
motion should be denied since Defendants have not shown
that Plaintiff was required to file a grievance at Mid-State
instead of Auburn. *See id.* at 15-16. Further, Magistrate
Judge Peebles concluded that administrative remedies were
"unavailable" to Plaintiff under the Supreme Court's decision
in *Ross v. Blake*, 136 S. Ct. 1850 (2016), and as such,
Plaintiff was not required to exhaust administrative remedies.
Magistrate Judge Peebles concluded that, although Plaintiff
claims that he filed two grievances at Auburn, there is
no conclusive evidence that Plaintiff's grievances were
actually recorded as having been filed at Auburn. *See* Dkt.

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 183 of 284

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 6901277

No. 44 at 16-17. As long as Plaintiff's grievances were not actually filed, then Plaintiff's current situation falls squarely within the Second Circuit's decision in *Williams v. Correction Officer Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, the Second Circuit held that when a plaintiff's grievance is both unfiled and unanswered, the regulations do not clearly outline the process to appeal or otherwise exhaust administrative remedies, and therefore, the administrative remedies are unavailable under *Ross*. See *Williams*, 829 F.3d at 123-25. As such, Magistrate Judge Peebles recommended that Defendants' motion for summary judgment be denied. Magistrate Judge Peebles further recommended that Plaintiff's cross-motion be denied because of the parties' starkly contrasting versions of events and because questions of fact remain as to whether Defendants' use of force was justified. *See* Dkt. No. 44 at 24.

**\*2** In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. *See id.*; *Farid v. Bouey*, 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. *See Farid*, 554 F. Supp. 2d at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, \*1 (S.D.N.Y. Nov. 29, 2004). Here, the parties have not filed any objections to the Report and Recommendation.

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C.

§ 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

In assessing the record to determine whether any such issues of material fact exist, courts are required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)).

Case 9:17-cv-01303-BKS-TWD Document 58 Filed 02/12/20 Page 184 of 284
Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 6901277

**\*3** The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. See Porter v. Nussle, 534 U.S. 516, 532 (2002).

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), and the IGRC has up to sixteen days to informally resolve the issue. See N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5(b). If the issue is not informally resolved, there is a formal IGRC hearing to answer the grievance or make a recommendation to the superintendent. See id. Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. See id. § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the Central Office Review Committee ("CORC"). See id. § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to Section 1983. See Bridgeforth v. Bartlett, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing Porter v. Nussle, 534 U.S. 516, 524 (2002)); Singh v. Goord, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Section 1997e(a) of the PLRA provides that only administrative remedies that are "available" must be exhausted before a plaintiff brings a Section 1983 action. See 42 U.S.C. § 1997e(a). The Supreme Court's recent decision in Ross identified several situations in which administrative remedies are "unavailable": (1) when the procedure operates as a simple dead end, with officers consistently unwilling to provide any relief; (2) when an administrative scheme is so opaque that it becomes essentially incapable to use; and (3) when prison administrators prevent inmates from using the grievance process. See Ross, 136 S. Ct. at 1859-60.

In Williams, the Second Circuit had to determine whether administrative remedies were "available" when the plaintiff's grievance was allegedly never filed and the plaintiff received no response. Williams, 829 F.3d at 120-21. The Second Circuit concluded that the regulations do not clearly outline the process to appeal an unfiled and unanswered grievance. See

id. at 124. As such, the Second Circuit held that "the grievance procedures that were technically available to [the plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " Id. (quoting Ross, 136 S. Ct. at 1859).

In the present matter, the Court agrees with Magistrate Judge Peebles that Defendants' motion for summary judgment should be denied. At the outset, Defendants' argument that Plaintiff was required to file the grievance at Mid-State is unavailing. The cases cited by Defendants do not directly support their assertion, and the regulations state that grievances should "only be filed at the facility where the inmate is housed even if it pertains to another facility." See 7 N.Y.C.R.R. § 701.5(a). Since Plaintiff claims that he was transferred to Auburn after the incident and filed the grievance at Auburn, he was not required to file the grievance at Mid-State. [1]

[1]
> Defendants argue that Plaintiff's transfer to Auburn did not occur the day after the alleged incident. See Dkt. No. 36-1 at 1. The Court agrees with Magistrate Judge Peebles that questions of fact still remain as to when Plaintiff was transferred. See Dkt. No. 44 at 14 n.9. However, in viewing the facts most favorable to the non-moving party, the Court assumes for the purposes of Defendants' motion that Plaintiff was transferred the day after the incident.

**\*4** The Court also agrees with Magistrate Judge Peebles that Plaintiff's situation is, at least when drawing all inferences in Plaintiff's favor, very similar to the situation in Williams where the grievances were both unanswered and unfiled. Here, Plaintiff's grievance was certainly unanswered, and Defendants do not seem to contest that point. See Dkt. No. 26-2 at 2-3; Dkt. No. 20-1 at 3. The only question is whether Plaintiff's grievances can be considered unfiled. Magistrate Judge Peebles noted that, while Plaintiff alleges that he filed two grievances at Auburn, there is no conclusive evidence that the grievances were recorded as having been filed. Moreover, Defendants have provided no evidence that any Auburn official received or processed Plaintiff's grievances. Although Plaintiff does not specify exactly how he "filed" the grievances, according to the Inmate Grievance Program, inmates in the SHU are instructed to file grievances by giving them to a corrections officer to file on behalf of the inmate. See 7 N.Y.C.R.R. § 701.7. Here, when Plaintiff asked the SHU sergeant about his grievances, the sergeant allegedly replied that since the incident happened at Mid-

State, there was nothing that could be done at Auburn concerning the alleged assault. *See* Dkt. No. 26-2 at 2-3. There is no clear indication from Defendants that the grievances were ever technically filed at Auburn. At the very least, questions of fact remain regarding the filing of the grievances, which precludes summary judgment. As such, at least when drawing all inferences in the non-moving party's favor, Plaintiff's grievances were both unfiled and unanswered. The Second Circuit has held that in that situation, the procedures "are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Williams*, 829 F.3d at 126 (quoting *Ross*, 136 S. Ct. at 1859). Since the procedures were incapable of use, they are considered "unavailable" to Plaintiff, and Plaintiff "need not exhaust remedies if they are not 'available.' " *Ross*, 136 S. Ct. at 1855. Accordingly, Defendants' motion for summary judgment is denied without prejudice.

The Court also agrees with Magistrate Judge Peebles that Plaintiff's motion for summary judgment should be denied. The parties offer very different versions of events regarding the alleged assault. Defendants contend that, on the night of the incident, Plaintiff was acting suspiciously and tried to conceal an item in his pocket. *See* Dkt. No. 36-4 at 2. Defendants also claim that Plaintiff struck Defendant Carnegie in the face with his elbow when Defendant Carnegie tried to restrain him. *See id.* Plaintiff also allegedly punched Defendants Tolman and Hart several times. *See id.*; Dkt.

No. 36-6 at 2. As such, genuine issues of material fact exist regarding the incident, including whether the force applied by Defendants was justified. Accordingly, Plaintiff's motion for summary judgment is denied.

After carefully considering Magistrate Judge Peebles's October 7, 2016 Report and Recommendation, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles's October 7, 2016 Report and Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 20) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment (Dkt. No. 28) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6901277

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 186 of 284
Cicio v. Wenderlich, Not Reported in Fed. Supp. (2017)
2017 WL 1437206

2017 WL 1437206
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Terry CICIO, Plaintiff,
v.
Deputy WENDERLICH,
Superintendent Security, Defendant.

13-CV-195S
|
Signed 04/24/2017

**Attorneys and Law Firms**

Terry Cicio, Dannemora, NY, pro se.

George Michael Zimmermann, Office of the New York State
Attorney General, Buffalo, NY, for Defendant.

## DECISION AND ORDER

WILLIAM M. SKRETNY, United States District Judge

## I. INTRODUCTION

**\*1** Plaintiff Terry Cicio, an inmate formerly held at the
Elmira Correctional Facility in the care and custody of
the New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action under 42 U.S.C.
§ 1983 alleging that Defendant Stephen Wenderlich, Deputy
Superintendent for Security at Elmira during the time in
question, failed to protect him from being attacked by two
prisoners in September 2012.

Presently before this Court is Wenderlich's Motion for
Summary Judgment. (Docket No. 36.) Having considered the
parties' written submissions and the applicable law, this Court
will grant Wenderlich's motion and dismiss Cicio's complaint
for failure to exhaust administrative remedies.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted.
They are drawn from Wenderlich's Statement of Undisputed
Facts (Docket No. 36-1) and Cicio's Declaration (Docket No.
50).

Cicio was an inmate at Elmira from July 2012 to December
2012. On his first day at Elmira, Cicio met a fellow Muslim
inmate named Malik. Malik was a member of the Muslim
"security team" that apparently existed among inmates at
Elmira. At some point before September 10, 2012, Cicio and
Malik had a falling out. Malik allegedly threatened Cicio, but
Cicio believes that Malik told other Muslim inmates that he
(Cicio) had actually threatened Malik.

On September 10, 2012, Cicio heard two unknown Muslim
inmates talking about a knife and his cell location. This
prompted Cicio to write a letter to Wenderlich that same night
to inform him that he was threatened by a Muslim inmate
and to request that he be placed in protective custody. Cicio
claims that he sent the letter to Wenderlich the next day, September
11, 2012, but never received a response. Wenderlich denies
ever receiving Cicio's letter, and Cicio does not know if
Wenderlich ever received it. Cicio claims that he sent a similar
second letter to Wenderlich on September 13, 2012, which
Wenderlich also denies receiving.

The day after Cicio allegedly sent his second letter to
Wenderlich, he was attacked in the Elmira Field House. The
evening of September 14, 2012, Plaintiff was in the Field
House watching television with other inmates. At some point
during the evening, an inmate sitting behind Cicio struck him
in the face with a razor and then fled, while a second inmate
sitting in front of Cicio turned and began fighting with him.
Cicio did not know the two individuals who attacked him,
though he had seen them at Muslim services. Cicio did not
have problems with either attacker in the past and neither
previously posed a threat to him. After corrections officers
broke up the fight, Cicio was placed in Involuntary Protective
Custody.

Cicio claims that he filed a grievance regarding this incident
on September 15, 2012, but he never received a response.
He admits that he did not appeal the non-response to his
grievance or otherwise pursue any further administrative
remedies. Instead, he filed the instant suit on February 22,
2013. DOCCS's records indicate that Cicio never filed a
grievance while at Elmira and never appealed a grievance
from Elmira. (Declaration of William Abrunzo, Docket No.
36-4, ¶ 8; Declaration of Jeffery Hale, Docket No. 36-5, ¶ 6.)

## III. DISCUSSION

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 187 of 284

Cicio v. Wenderlich, Not Reported in Fed. Supp. (2017)

2017 WL 1437206

**\*2** Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L.Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is especially important when reviewing pro se complaints alleging civil rights violations. See Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001). Since Cicio is proceeding pro se, this Court has considered his submissions and arguments accordingly.

Wenderlich moves for summary judgment on the grounds that (1) Cicio failed to exhaust his administrative remedies, (2) Cicio did not suffer an Eighth Amendment violation, (3) Wenderlich was not personally involved in the alleged constitutional violation, and (4) Wenderlich is entitled to qualified immunity. Because it is plain that Cicio failed to exhaust his administrative remedies, dismissal of the complaint is required, and this Court need not reach Wenderlich's remaining grounds for summary judgment.

## A. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L.Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a

"metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the non-moving party. Anderson, 477 U.S. at 252.

As noted, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.' " Triestman v. Fed. Bur. of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)). "A *pro se* plaintiff, however, cannot defeat a motion for summary judgment by simply relying on the allegations of his complaint; he must present admissible evidence from which a reasonable jury could find in his favor." Belpasso v. Port Auth. of NY & NJ, 400 Fed. Appx. 600, 601 (2d Cir. 2010); see Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996) (summary judgment properly entered against *pro se* plaintiff who failed to oppose motion with admissible evidence after receiving plainly worded warning of the consequences of such failure).

**\*3** In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

## B. 42 U.S.C. § 1983: Eighth Amendment Failure-to-Protect Claim

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L.Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L.Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought under § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Cicio's failure-to-protect claim falls under the Eighth Amendment.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 188 of 284

Cicio v. Wenderlich, Not Reported in Fed. Supp. (2017)

2017 WL 1437206

The Eighth Amendment requires prison officials "to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. NYC Dep't. of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33, 114 S. Ct. 1970, 1977, 128 L.Ed. 2d 811 (1994)). Thus, "allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." Rosen v. City of New York, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) (quoting Baker v. Tarascio, No. 3:05-CV-548, 2009 WL 581608, at *4 (D. Conn. Mar. 6, 2009)). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Stewart v. Schiro, No. 13-CV-3613, 2015 WL 1854198, at *6 (E.D.N.Y. Apr. 22, 2015).

Pursuant to § 1983, prison officials may be held liable for an inmate's injuries only if the officials acted with "deliberate indifference" to a substantial risk to the inmate's safety. Morales v. NYS Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To demonstrate such deliberate indifference, a plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official had "knowledge that an inmate face[d] a substantial risk of serious harm and he disregard[ed] that risk by failing to take reasonable measures to abate the harm." Hayes, 84 F.3d at 620; see also Warren v. Goord, 476 F. Supp. 2d 407, 410 (S.D.N.Y. 2007).

Cicio alleges a failure-to-protect claim arising out of his attack in the Elmira Field House, but as stated below, he has failed to exhaust his administrative remedies with respect to this claim. His complaint must therefore be dismissed.

## C. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see also Woodford v. Ngo, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L.Ed. 2d 368 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); Hargrove v. Riley, No. 04–CV–4587, 2007 WL 389003, at *5-*6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion

requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L.Ed. 2d 12 (2002).

*4 In the event the defendant establishes that the inmate plaintiff failed to fully complete the administrative review process before commencing the action, the plaintiff's complaint is subject to dismissal. Pettus v. McCoy, No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006); see also Woodford, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." Woodford, 548 U.S. at 95; accord Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007).

In New York, formal exhaustion of administrative remedies for prison inmates requires compliance with a detailed three-step grievance and appeal procedure. See Morrison v. Parmele, 892 F. Supp. 2d 485, 487 (W.D.N.Y. 2012) (citing 7 N.Y.C.R.R. § 701.5). The grievance process outlined at § 701.5 provides that: (1) the inmate must submit a written complaint to the Grievance Clerk within 21 calendar days of the alleged occurrence; the Grievance Clerk then submits the complaint to the Inmate Grievance Resolution Committee ("IGRC") for investigation and review; (2) if the IGRC denies the grievance, the inmate may appeal to the superintendent of the facility by filing an appeal with the IGP clerk; (3) after the superintendent issues a decision, the inmate may appeal to the Central Office Review Committee ("CORC"), which makes the final administrative determination. See Thousand v. Corrigan, 9:15-CV-01025 (MAD/ATB), 2017 WL 1093275, at *3 (N.D.N.Y. Mar. 23, 2017); Turner v. Goord, 376 F. Supp. 2d 321, 323 (W.D.N.Y. 2005). "A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." Hairston v. LaMarche, Case No.05 Civ. 6642, 2006 WL 2309592, at *7 (S.D.N.Y. Aug. 10, 2006) (citing cases). If all three levels of review are exhausted, the prisoner may seek relief in federal court under § 1983. See Thousand, 2017 WL 1093275, at *3; Bridgeforth v. DSP Bartlett, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010).

Cicio v. Wenderlich, Not Reported in Fed. Supp. (2017)

2017 WL 1437206

While the Supreme Court has deemed the exhaustion of administrative remedies generally mandatory, it has held that a prisoner's duty to exhaust is limited to "available" administrative remedies. [1] Ross v. Blake, ––– U.S. ––––, 136 S. Ct. 1850, 1855, 195 L.Ed. 2d 117 (2016) ("A prisoner need not exhaust remedies if they are not 'available.' "). "An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." Id. at 1858. To be "available," administrative remedies (e.g., grievance procedures) must be "capable of use to obtain some relief for the action complained of." Id. at 1859 (quoting Booth v. Churner, 532 U.S. 731, 738, 121 S. Ct. 1819, 149 L.Ed. 2d 958 (2001)). The Court in Ross identified three circumstances in which an administrative remedy may be unavailable:

> First, an administrative remedy may be unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In other words, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. Third, an administrative remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

**\*5** Williams v. Correction Officer Priatno, 829 F.3d 118, 123-24 (2d Cir. 2016) (citing Ross, 136 S. Ct. at 1859-60) (quotation marks and citations omitted).

[1] With this holding, the Court in Ross rejected the Second Circuit's "extra-textual" exception to the exhaustion requirement, which allowed courts to consider whether "special circumstances" justified a prisoner's failure to exhaust administrative remedies. See Williams, 829 F.3d 118, 123 (2d Cir. 2016) (recognizing that Ross largely abrogates the framework set forth in Giano v. Goord, 380 F.3d

670, 675-76 (2d Cir. 2004) and Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004), which set forth a "special circumstances" exception to the PLRA's exhaustion requirement).

It is undisputed that Cicio failed to exhaust his administrative remedies by pursuing all three steps of the grievance and appeal procedures. Cicio's only argument concerning his failure to exhaust is that he was prevented from doing so because he never received a response to the grievance he allegedly filed. See Docket No. 50 ("[P]laintiff provided the court with a receipt for filing [h]is first step grievance, but received no response, thereby preventing him from appealing the grievance.") He therefore maintains that he could not complete the second and third stages of the administrative review process.

Even assuming that Cicio filed an initial grievance—an assumption directly contrary to DOCCS's records—it is well settled that the lack of response to that grievance does not excuse Cicio's failure to appeal to the next level. [2] Cicio was thus required to appeal his grievance despite the alleged lack of response. See Atkins v. Menard, No. 11–CV–0366, 2012 WL 4026840, at *4, (N.D.N.Y. Sept. 12, 2012) (finding that plaintiff failed to exhaust where he had the "ability, and indeed the duty, to appeal the IGRC's nonresponse (to his grievance) to the next level, including CORC, to complete the grievance process."); Murray v. Palmer, 03-CV-1010, 2010 WL 1235591, at *2 & n. 4 (N.D.N.Y. Mar. 31, 2010) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can —and must be—appealed to the next level, including CORC, to complete the grievance process.") (collecting cases); Williams v. Hupkowicz, 04-CV-0051S, 2007 WL 1774876, at *3 (W.D.N.Y. June 18, 2007) ("Even assuming that an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process, the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA."); see also 7 N.Y.C.R.R. § 701.6 (g)(2) ("[M]atters not decided within the time limits may be appealed to the next step.").

[2] Cicio's reliance on cases from outside the Second Circuit that may state a contrary rule is misplaced. See Docket No. 51, p. 4 (citing Brengettcy v. Horton, 423 F.3d 674 (7th Cir. 2005) and Boyd v. Corr. Crop. of Am., 380 F.3d 989 (6th Cir. 2004)).

Cicio v. Wenderlich, Not Reported in Fed. Supp. (2017)

2017 WL 1437206

**\*6** Because it is undisputed that Cicio failed to appeal his grievance and consequently failed to exhaust all administrative remedies that were available to him, his complaint must be dismissed. See Guarneri v. West, 782 F. Supp. 2d 51, 59 (W.D.N.Y. 2011) ("Each level of the grievance procedure must be exhausted before an inmate may commence litigation in federal court.").

## IV. CONCLUSION

For the reasons stated above, Wenderlich has established that he is entitled to summary judgment dismissing Cicio's complaint in its entirety for failure to exhaust administrative remedies. The complaint will therefore be dismissed.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 36) is GRANTED.

FURTHER, that the complaint (Docket No. 1) is DISMISSED.

FURTHER, that the Clerk of the Court is directed to CLOSE this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1437206

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Coleman v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 2579084

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 191 of 284

2017 WL 2579084
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

9:15-CV-40 (TJM/ATB)
|
Signed 01/17/2017

**Attorneys and Law Firms**

TOWAUN COLEMAN, Plaintiff, pro se.

NICOLE E. HAIMSON, Asst. Attorney General for Defendants.

### REPORT-RECOMMENDATION

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge. Presently before the court is defendant Nolan's [1] motion for summary judgment pursuant to Fed. R. Civ. P. 56, arguing only that plaintiff has failed to exhaust his administrative remedies as to his allegations of excessive force, which is the only remaining claim in this action. (Dkt. No. 50). Plaintiff has responded in opposition to the motion. (Dkt. No. 52). For the following reasons, this court agrees with plaintiff and will recommend denial of the defendant's motion.

[1]     Defendant Nolan is the only remaining defendant.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Salahuddin, 467 F.3d at 272.

### II. Relevant Facts

The amended complaint alleges that, on December 4, 2014, plaintiff was "assaulted," while asleep in his cell, by defendant L. Nolan. (Amended Complaint ("AC") at 8, Dkt. No. 19). Plaintiff states that he felt a very sharp pain in his lower right leg and ankle area. He awoke to see defendant Nolan putting away his baton. Plaintiff commented that Nolan should not be putting his "hands" on plaintiff, and asked Nolan his name so that plaintiff could "report" him. Defendant Nolan allegedly told plaintiff to " 'write whatever the fuck you want,' " " 'you see what writing just got you,' " and " 'keep on writing and see how far that gets you.' " [2] (Id.)

[2]     Plaintiff's amended complaint contains additional facts that he believed led up to this assault. (AC *generally*). On December 7, 2015, I issued an Order and Report-Recommendation following a motion to dismiss, filed by defendant Nolan and former defendant Racette. (Dkt. No. 34). Included in my Order and Report-Recommendation is a detailed description of the facts as stated by plaintiff in his amended complaint. (Dkt. No. 34 at 2-7). The District Court approved the Recommendation in its entirety on January 4, 2016. (Dkt. No. 38). The court assumes familiarity with the facts as stated in the Report-Recommendation. Defendant has filed a number of exhibits, including plaintiff's deposition. (Dkt. No. 50, Exs. A-C). I will discuss the facts contained in the defendant's

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 192 of 284
Coleman v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 2579084

current exhibits, but have not included a complete recitation of the amended complaint. I will only discuss the original facts as necessary to the resolution of this motion for summary judgment.

**\*2** Plaintiff alleges that this incident constitutes excessive force by defendant Nolan. Plaintiff also claimed that the assault was in retaliation for plaintiff's grievances. The retaliation claim was dismissed as a result of the prior motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[3] The only issue remaining is whether defendant Nolan used excessive force on plaintiff on December 4, 2014, when he allegedly struck him in the leg with his baton.

3        (Dkt. No. 34 at 14-16). Defendant Nolan did not move to dismiss plaintiff's claim of excessive force in the motion to dismiss. (Dkt. No. 34 at 1 n.3 & 15 n.13).

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. See Giano v. Goord, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing Porter v. Nussle, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. Id. at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. Jones v. Bock, 549 U.S. 199, 216 (2007); Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. See, e.g., Key v. Toussaint, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. Jones, 549 U.S. at 218-19 (citing Woodford v. Ngo, 548 U.S. 81 (2006)). In Woodford, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in

accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). Id. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." Id. § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. Id. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. See Brownell v. Krom, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing Hemphill v. State of New York, 380 F.3d 680, 686 (2d Cir. 2004)). The Hemphill inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. Id.

**\*3** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." Ross v. Blake, —— U.S. ——, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " Riles v. Buchanan, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting Ross, —— U.S. at ——, 136 S. Ct. at 1857). Although Ross did away with the "special circumstances" exception, the other two factors in Hemphill—availability and estoppel—are still valid. The court in Ross referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. Ross, —— U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. Id.;

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 193 of 284

Coleman v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 2579084

*see also Riles*, 2016 WL 4572321 at \*2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ––– U.S. at ––––, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ––– U.S. at ––––, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B. Application

Defendant argues that plaintiff never brought a grievance complaining about defendant Nolan's alleged use of excessive force on December 4, 2014. In support of this motion, defendant has filed the declarations of Jeffrey Hale, the Assistant Director of the Inmate Grievance Program ("IGP") for the Department of Corrections and Community Supervision ("DOCCS"), and of Christine Gregory, the IGP Supervisor at Clinton Correctional Facility ("CCF"). (Hale Decl., Gregory Decl.) (Dkt. Nos. 50-4, 50-5). Jeffrey Hale states that the DOCCS records reflect that plaintiff was incarcerated at CCF at the time of the alleged incident until March 25, 2016, and that during the entire time, CCF had a "fully functioning inmate grievance process available" to which all inmates had access. (Hale Decl. ¶ 11). Jeffrey Hale states that he examined the CORC records for "determinations upon grievance appeals brought by [plaintiff]." (Hale Decl. ¶ 10). A copy of the computer print-out listing this information is attached as Exhibit A to the Hale Declaration. The records show that plaintiff filed one grievance appeal to the CORC, and this appeal was filed

while he was incarcerated at Auburn Correctional Facility in December of 2010. (Hale Decl. ¶ 12 & Ex. A). No appeals to the CORC were filed by plaintiff as the result of grievances filed at CCF. (*Id.*)

In her declaration, Christine Gregory asserts that she supervises the IGP program and maintains its records in the regular course of business. (Gregory Decl. ¶¶ 2, 10). Ms. Gregory also searched the records maintained by DOCCS of inmate grievances filed at CCF. (Gregory Decl. ¶ 4). Ms. Gregory's search of the relevant documents showed that plaintiff filed a total of seven (7) grievances while he was housed at CCF. (Gregory Decl. ¶ 12). He filed three (3) grievances in 2014; three (3) grievances in 2015; and one (1) grievance in 2016. (*Id.*) None of these grievances were filed at CCF between December 2014 and January 2015. (*Id.*) Ms. Gregory also states that none of these grievances concern the December 4, 2014 incident. (*Id.*) Ms. Gregory has attached the computer print-out from which she obtained this information. (*Id.* ¶ 12 & Ex. A—Inmate Grievance Summary).

**\*4** The information submitted by Ms. Gregory shows that plaintiff's last grievance in 2014 was filed in June of 2014, and plaintiff did not file any other grievances until April 29, 2015, in which he alleged "Verbal Harassment by CO." [4] (*Id.* Ex. A). His next grievance was dated July 1, 2015 and was entitled "Allegs [sic] Assaulted by Security." (*Id.*) Ms. Gregory concluded that "plaintiff never submitted any grievances against Defendant Nolan concerning an alleged excessive force incident on December 4, 2014," rendering plaintiff's excessive force claim unexhausted. (Gregory Decl. ¶ 13).

4    The court notes that the claim of verbal harassment was also against defendant Nolan. (Dkt. No. 52-9 Ex. Z-3) (Pl.'s appeal to the CORC).

However, plaintiff alleges that he wrote a grievance on December 5, 2014, and gave it to another inmate to put in the facility mailbox. (AC at 9, Pl.'s Dep. 108, 110). [5] Plaintiff stated that the grievance included declarations from two inmates who witnessed the incident. (AC at 9). During his deposition, plaintiff testified that he later made a Freedom of Information Law request [6] for a copy of his grievance just to make sure the IGRC received a copy. [7] However, he was told that no such grievance existed. (AC Ex. R-1 at 13 & V-1).

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 194 of 284

Coleman v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 2579084

5    Plaintiff's deposition is attached as Exhibit A to the Declaration of AAG Haimson. (Dkt. No. 50-7). The court will cite to the deposition as "(Pl.'s Dep.)."

6    It appears that the FOIL request was made on December 22, 2014. (Pl.'s Dep. at 111).

7    Plaintiff's theory for submitting a FOIL request was that, if the IGRC had received his grievance, they would be able to send him a copy, and this would be a way to confirm receipt of the grievance. (Pl.'s Dep. at 109).

Plaintiff alleges that he "resubmitted" the grievance on December 30, 2014, but he never received a response. (AC at 9, Pl.'s Dep. at 108, 110). Plaintiff attached, to his amended complaint, a copy of the grievance, dated December 4, 2014 and the two inmate declarations. (AC Ex. R-1 at 1-8). The "resubmitted" grievance contains a cover-letter, addressed to the IGRC, stating that plaintiff had been informed through his FOIL request that the IGRC never received his December 5, 2014 grievance, and plaintiff was "re-submitting [his] initial grievance regarding retaliatory treatment/ assault." (AC Ex. R-1 at 9-11). This purported grievance clearly addresses the alleged assault by defendant Nolan. (*Id.*)

The court notes that this was not the first time that plaintiff "resubmitted" a grievance. The Amended Complaint also contains the copy of an unrelated grievance that plaintiff stated he was "resubmitting," after being told that the initial grievance was not received. (AC Ex. L-1). The resubmission letter for this unrelated grievance is dated June 30, 2014, and there is a notation at the top of the letter, that the grievance was "consolidated" with CL65724-14." (*Id.*) This grievance apparently was filed after plaintiff resubmitted it because it was assigned a number, and it does appear on the Inmate Grievance Summary submitted by Ms. Gregory. (Gregory Decl. Ex. A).

Plaintiff does not challenge the defendant's assertion that no grievance was "filed" regarding the alleged assault by defendant Nolan. Rather, plaintiff argues that his ability to file the grievance was impeded because plaintiff attempted to file the grievance twice, but the IGRC never received either grievance.

Defendant references prior authority from this district for the proposition that "an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (Def.' Mem. of Law at 10) (citing *Rosado v. Fessetto*, No. 9:09-CV-67 (DNH/ATB), 2010 WL 3808813, at *7, 2010 U.S. Dist. LEXIS 108238, at *19 (N.D.N.Y. Aug. 4, 2010) (Rep't-Rec.), *adopted*, 2010 WL 3809991, 2010 U.S. Dist. LEXIS 99073 (N.D.N.Y. Sept. 20, 2010)). At the time I wrote the Report-Recommendation in *Rosado*, this was a correct statement of the law. However, *Ross, supra* has changed the law with respect to exhaustion of administrative remedies. 8 Now, the only relevant inquiry in an exhaustion case is whether the administrative remedies were "available" to the inmate. 136 S. Ct. at 1859-60. If prison administrators "thwart" inmates from taking advantage of the grievance process through "machination, misrepresentation, or intimidation," the administrative remedies are "unavailable," and the inmate is excused from the exhaustion requirement, regardless of which "official" prevented plaintiff from filing the grievance. *Id.* at 1860.

8    Defense counsel recognizes this in a footnote. (Def.'s Mem. of Law at 12 n.2).

**\*5** In any event, plaintiff is not making a "general claim" that his grievance was lost or destroyed. He has submitted a great deal of documentary evidence in an effort to show that he was prevented from filing a grievance through no fault of his own. He has filed exhibits consisting of his original grievance, a resubmitted grievance, letters to superior officers reporting problems with filing grievances. He also claims that CCF has had problems in the past with the receipt and filing of inmate grievances. (Dkt. No. 52-4 at 7) (Agenda from a 2009 Inmate Liaison Committee Meeting at CCF where the grievance issue was discussed).

In *Moreau v. Peterson*, No. 15-2534-pr, slip op. at 3 & n.1 (2d Cir. Jan. 12, 2017), the Second Circuit affirmed a dismissal of civil rights claims for failure to exhaust, even though the plaintiff claimed that he was prevented from doing so, because his argument was "inconsistent with the fact that he filed grievances for other claims in the same time period, and those grievances were processed fully." *Id.* at 3 n.1. A review of the District Court's opinion in *Moreau* shows that plaintiff provided "no evidence" of filing grievances related to the claims in question, all of which occurred after the last grievance that was attached to the complaint. *Moreau v. Peterson*, No. 7:14-CV-201, 2015 WL 4272024, at *7 (S.D.N.Y. July 13, 2015).

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 195 of 284

**Coleman v. Racette, Not Reported in Fed. Supp. (2017)**

2017 WL 2579084

This case is distinguishable from *Moreau* and from cases decided prior to *Ross*. Plaintiff has produced evidence indicating that he did write a grievance on December 4, 2010, and that he attempted to submit it twice without success and without response from the IGRC. On January 23, 2015, plaintiff wrote a letter to Superintendent Racette complaining about "grievances disappearing." (Pl's Ex. U-1, Dkt. No. 52-8 at CM/ECF pp. 3-6). The letter was very specific and complained about the grievance program. On January 28, 2015, Superintendent Racette responded to plaintiff stating that "[y]our recent communication has been referred to S. Brown, Deputy Superintendent—Security, for review and appropriate action." (*Id.* Ex. V-2, Dkt. No. 52-8 at CM/ECF p.7). Plaintiff's deposition testimony is consistent with these allegations and the accompanying documents he has submitted in response to the defense motion. (Pl.'s Dep. at 115).

Plaintiff stated that "[o]nce again I FOILed for a copy of that grievance to see if they actually received it and, once again, I got back the response that they didn't receive it. So, I then wrote a letter to the superintendent in regards to that whole situation." (Pl.'s Dep. at 115-16).

Defense counsel asked why plaintiff did not appeal to the Superintendent. The regulations provide that an inmate may appeal a grievance to the "next step" if he does not receive a timely response. 7 N.Y.C.R.R. § 701.6(g)(2), 701.8(g). The court notes, however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it would be difficult to "appeal" a grievance "to the next step." The regulations, allowing an inmate to appeal to the "next step" if he does not receive a timely response, envision a situation in which the grievance is filed, but no response is received in the time allotted by the regulations. *See Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016) ("On their face, the regulations only contemplate appeals of grievances that were actually filed.... Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.")

This case is very similar to *Williams*. Plaintiff in this case would not have been able to file a formal "appeal," because his grievance was never filed with the IGRC or

assigned a number. Plaintiff stated that he appealed by writing the January 23, 2015 letter. (*Id.* at 116). Plaintiff's letter to the Superintendent was a logical step for him to take after two of his grievances were not received by the IGRC. The Superintendent responded that he was referring plaintiff's complaint for investigation. Plaintiff had no reason to believe the he was required to take another step after the Superintendent's letter. There is no evidence that plaintiff received a formal response after the promised investigation.

**\*6** Defendants argue that plaintiff was able to file a subsequent grievance complaining about defendant Nolan's alleged verbal harassment in April of 2015 and another grievance about assault by staff in July of 2015, in addition to mailing other letters. However, the court notes that both of these grievances were filed after plaintiff complained to the Superintendent, and after his complaint was referred for investigation. This case represents more than a plaintiff claiming, without support, that his grievances disappeared. After *Ross*, this court cannot find that defendant has established on the existing record, that there is no material question of fact with respect to the exhaustion of plaintiff's remedies, and I will recommend denying defendant's motion for summary judgment based on failure to exhaust administrative remedies.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 50) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2579084

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 196 of 284

**Coleman v. Racette, Not Reported in Fed. Supp. (2017)**

2017 WL 2589366

2017 WL 2589366
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

9:15-CV-40
|
Signed 06/14/2017

**Attorneys and Law Firms**

Towaun Coleman, Stormville, NY, pro se.

Nicole E. Haimson, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to Magistrate Judge Baxter's January 17, 2017 Report-Recommendation [dkt. # 53] have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ADOPTS** the Report-Recommendation [dkt. #53] for the reasons stated therein. The defendants' motion for summary judgment [dkt. # 50] is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2589366

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 498277
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tiquan DAVIS, Plaintiff,
v.
Correction Officer T. GRANT and
Sgt. Todd Paroline, Defendants.

No. 15-CV-5359 (KMK)
|
Signed 02/08/2019

**Attorneys and Law Firms**

Tiquan Davis, Ossining, NY, Pro Se Plaintiff.

Yan Fu, Esq., New York State Attorney General, New York, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

*1 Tiquan Davis ("Plaintiff"), proceeding pro se, brings this Action against Correction Officer T. Grant ("Grant") and Sergeant Todd Paroline ("Paroline") (collectively, "Defendants"), employees of the New York State Department of Correction and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging retaliation arising out of allegedly false misbehavior reports filed by Defendants. (See Second Am. Compl. ("SAC") (Dkt. No. 88).)[1] Before the Court is Defendants' Motion for Summary Judgment. (See Not. of Mot. (Dkt. No. 94).) For the reasons explained herein, Defendants' Motion for Summary Judgment is granted.

[1]    Plaintiff's retaliation claims against Defendants Grant and Paroline are the only remaining claims in this case. The Court dismissed all other Defendants and claims in a September 30, 2016 Opinion and Order, (see Opinion & Order (Sept. 30, 2016) ("Sept. 30, 2016 Opinion") (Dkt. No. 52) ), and a January 8, 2018 Opinion and Order (see Opinion & Order (Jan. 8, 2018) ("Jan. 8, 2018 Opinion") (Dkt. No. 86).)

I. Background

A. Factual Background
The Court has described the allegations and procedural history of this case in two prior published Opinions. See Davis v. Jackson, No. 15-CV-5359, 2016 WL 5720811 (S.D.N.Y. Sept. 30, 2016); Davis v. Jackson, No. 15-CV-5359, 2018 WL 358089 (S.D.N.Y. Jan. 8, 2018). The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motion.

The following facts are taken from Defendants' statements pursuant to Local Civil Rule 56.1, (Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 95) ), and Plaintiff's "Reply to Summary Judgment" and "Declaration in Support of Reply," both filed in the same document, (Pl.'s Reply in Opp'n to Mot. for Summ. J. ("Pl.'s Reply") (Dkt. No. 101); Decl. of Tiquan Davis ("Pl.'s Decl.") (Dkt. No. 101) ), and the admissible evidence submitted by the Parties.[2] The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted).[3] The facts as described below are in dispute only to the extent indicated.

[2]    Plaintiff submitted a Declaration in which he stated that he made his Declaration "pursuant to 28 U.S.C. § 1746." (Pl.'s Decl. 1.) The Court notes that Plaintiff's Declaration is nearly identical to a supplement to the SAC Plaintiff filed on April 10, 2018. (See Letter from Tiquan Davis to Court ("SAC Supp.") (Dkt. No. 93).) That Supplement, like the Declaration, fails to include the "under penalty of perjury" language. The Second Circuit has held that the absence of the "under the penalty of perjury" language constitutes a substantial departure from § 1746. See In re World Trade Ctr. Disaster Site Litig., 722 F.3d 483, 488 (2d Cir. 2013) (holding that failure to include the phrase "under penalty of perjury" in a declaration constituted a substantial departure from § 1746 such that the district court did not err in invalidating a declaration that lacked such language); LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65–66 (2d Cir. 1999) (reversing summary judgment granted to plaintiff where district court excluded defendant's

unsworn letter that "substantially" complied with the requirements of § 1746, because it included the language "[u]nder penalty of perjury, I make the statements contained herein," and was signed and dated, even though it did not include language that the contents of the letter were "true and correct"); *Stair v. Calhoun*, No. 12-CV-6121, 2015 WL 1966345, at *1 (E.D.N.Y. May 1, 2015) (finding that pro se plaintiff's unsworn declaration that did not include the language "true under penalty of perjury" did not meet the requirements of § 1746 because "[i]nclusion of the language 'under penalty of perjury' is an integral requirement of the statute" (citations, quotation marks, and alterations omitted) ); *Ed-George v. Burns*, 09-CV-0869, 2009 WL 2957796, at *2 (N.D.N.Y. 2009) (finding that although § 1746 "requires only that a declaration [ ] 'substantially' " conform with its requirements, the words "under penalty of perjury" are "expressly required" because without them "it is far from clear to the court that [the] [p]laintiff fully appreciates the consequences, or is impressed with the solemnity of his declaration" (citations, quotation marks, and alterations omitted) ).

Plaintiff's Declaration does not include the language "under penalty of perjury" nor does it state that the contents are "true and correct." It therefore lacks precisely the "integral requirement of the statute" that is meant to impress upon every declarant "the specific punishment to which he or she is subjected for certifying to false statements." *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d at 488. The Court could therefore decide this Motion without considering Plaintiff's Declaration. However, because Plaintiff fails to raise a triable issue of fact even if his Declaration is considered, the Court will consider Plaintiff's Declaration, especially in light of the "special solicitude" afforded to pro se litigants. *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

3      Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing

a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "If the opposing party ... fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted). Here, Defendants filed and served their 56.1 Statement, (Defs.' 56.1), in addition to a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 99). Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendant's 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham*, 848 F.2d at 344, the Court will "in its discretion opt to conduct an assiduous review of the record," when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment]

in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper ...Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and quotation marks omitted) ). The Court also will consider Plaintiffs' opposition papers.

**\*2**  At all times relevant to the claims in the SAC, Plaintiff was incarcerated at Sing Sing Correctional Facility ("Sing Sing"). (Defs.' 56.1 ¶ 1.) DOCCS has an inmate grievance procedure. (*Id.* ¶ 3.) An Inmate Grievance Program ("IGP") procedure exists at Sing Sing. (*Id.* ¶ 4.)

In his SAC, Plaintiff alleges that: (1) at some time in March 2014, Grant issued a false misbehavior report against him in retaliation for an incident involving Plaintiff and Correction Officer Angela Jackson;[4] (2) on October 31, 2015, Grant issued a misbehavior report against Plaintiff in retaliation for filing a lawsuit against Jackson; (3) on August 4, 2015, Paroline confiscated Plaintiff's belt buckle, falsely told Office of Mental Health ("OMH") officials that Plaintiff was suicidal, and wrote a false misbehavior report; and (4) on August 8, 2015, Paroline wrote Plaintiff another misbehavior report after Plaintiff was found not guilty of the charges in the August 4, 2015 misbehavior report. (*Id.* ¶ 2; *see generally* SAC.)

[4]    Defendant Jackson was dismissed from this Action with prejudice by the Jan. 8, 2018 Opinion.

Plaintiff filed a grievance on August 13, 2015, which was assigned grievance number 55380-15 (the "55380-15 Grievance"). (Defs.' 56.1 ¶ 5.) In the grievance, Plaintiff claimed, among other things, that on August 4, 2015, Paroline confiscated his belt buckle, falsely told OMH officials that Plaintiff was suicidal, and wrote a false misbehavior report. (*Id.* ¶ 6.) Because Plaintiff alleged harassment by DOCCS staff, his grievance was forwarded to the Sing Sing Superintendent pursuant to 7 NYCRR § 701.8. (*Id.* ¶ 7.) Following an investigation, Plaintiff's grievance was denied on September 3, 2015. (*Id.* ¶ 8.) Sing Sing has no record of any appeal by Plaintiff of the denial of the 55380-15 Grievance

to the DOCCS Central Office Review Committee ("CORC"). (*Id.* ¶ 9.)

With respect to the August 4, 2015, Paroline grievance report, Plaintiff claims that after he received his "response from the superintendent," which the Court takes to mean the September 3, 2015 denial of the grievance, Plaintiff "wrote [his] appeal out for CORC ... and was personally able to hand [his] appeal to the grievance sgt who told [him] that they would make sure [his] appeal got filed." (Pl.'s Decl. ¶ 4.) Plaintiff claims he has still not heard from CORC regarding his appeal. (*Id.*)

With respect to the October 31, 2015, incident involving Grant, Plaintiff states in his Declaration that on October 31, 2015, he wrote a harassment and retaliation grievance and gave this grievance to the B-block IGRC representative to file. (*Id.* ¶ 2.) After three weeks Plaintiff claims he asked the same representative whether he had filed his grievance because he had not heard anything. (*Id.*) The representative told him he had filed the grievance and that he would check on the status with the IGP supervisor. (*Id.*) A week later the representative told Plaintiff that the IGP had told him they would get back to him but never did. (*Id.*) The representative suggested to Plaintiff that he appeal it to the CORC "because the grievance was a 'code 49' and would be sent straight to the superintendent." (*Id.*) Plaintiff alleges he then drafted his appeal "that night," included a copy of his original grievance dated October 31, 2015, and gave it to the representative the next morning. Plaintiff claims he has still not heard anything regarding this grievance. (*Id.*)

**\*3**  Plaintiff filed eight other grievances while at Sing Sing between 2014 and 2017, including complaints that (1) the "staff failed to follow instructions," (2) he "wants cooling system in the hallways," (3) he "claims dental is not providing him treatment," (4) he "wants decision of tier 2," (5) involve "in-cell movie and DVD issue," (6) he "wants to know why he was not allowed to run for ILC," (7) involve "staff interference with AVP," and (8) he "wants to be placed in the program." (Decl. of Quandera Quick ("Quick Decl.") ¶¶ 6–7, Ex. A (Plaintiff's Sing Sing Grievance Record) (Dkt. No. 96).) Besides the 55380-15 Grievance, none of the grievances filed by Plaintiff between 2014 and 2017 involved an allegedly false misbehavior report or harassment by staff. (Quick Decl. ¶ 12.) Since Plaintiff has been incarcerated under his current Department Identification Number (#95-A-0305), he has appealed 39 grievances to CORC. (Decl. of Rachael Seguin ("Seguin Decl.") ¶ 6, Ex. A, at 3 (Plaintiff's CORC

Grievance Record) (Dkt. No. 97).) [5] According to CORC records, Plaintiff did not appeal any grievances to CORC between 2012 and 2016. (Seguin Decl. ¶ 8; Plaintiff's CORC Grievance Record at 3.) Plaintiff appealed one grievance in 2016 and it involved television programming. (Plaintiff's CORC Grievance Record at 3.)

[5]    For non-paginated exhibits, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

In his Declaration, Plaintiff claims that he made copies of his grievances but cannot find them. (Pl.'s Decl. ¶ 6.) He states that he knows he followed the "steps of the PLRA [Prison Litigation Reform Act of 1995] to the best of [his] abilities," because he used to be a grievance representative himself and was "fully aware that in order to exhaust [his] claims [he] had to follow thr[ough] all the way to the CORC." (*Id.*) Plaintiff further states that in doing so he had to "rely on the IGRC to carry out their functions which they clearly did not do." (*Id.*) [6]

[6]    In his Declaration, Plaintiff also makes several general statements about Sing Sing's grievance-filing process. "Between 2014 until the present there have been numerous complaints made by the ILC to the administration about the IGRC's failure to hold timely hearing, lose and not file appeals, especially those made against corrections staff. These complaints caused the director of CORC to physically come to [Sing Sing] to investigate." (Pl.'s Decl. ¶ 5.) However, "where a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4) ). Plaintiff does not point to any admissible evidence documenting any complaints that other inmates allegedly made about the grievance-filing process, nor does he explain the basis of his personal knowledge of the CORC director's alleged visit to Sing Sing. Plaintiff does not explain how he knows or what he knows about these alleged complaints made by the ILC. Defendants, on the other hand, have submitted evidence to show that an IGP exists at Sing Sing, (Defs.' 56.1 ¶ 4), and that Plaintiff had successfully used the IGP, given that he filed eight other grievances while at

Sing Sing between 2014 and 2017, (*id.* ¶ 10), and appealed 39 grievances to CORC, (*id.* ¶ 13). Thus, although the Court considers portions of Plaintiff's Declaration that are based on personal knowledge and set out facts that would be admissible as evidence, *DiStiso*, 691 F.3d at 230, the Court will not consider these statements by Plaintiff about the general flaws in Sing Sing's grievance process and the issues other inmates allegedly had with filing grievances, of which Plaintiff has no personal knowledge. *See Baity*, 51 F. Supp. 3d at 419–20 (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on [the] [p]laintiff's personal knowledge and conclusory statements that are nothing more than speculation").

### B. Procedural History

On July 7, 2015, Plaintiff filed his Complaint, (*see* Compl. (Dkt. No. 2) ), and sought leave to proceed in forma pauperis, (*see* Dkt. No. 1), which was granted on July 15, 2015, (*see* Dkt. No. 4). On December 28, 2015, Defendants filed their Motion to Dismiss and accompanying papers. (*See* Dkt. Nos. 22–27.) After several extensions, Plaintiff filed his Opposition on June 7, 2016, (*see* Dkt. No. 33), and, on June 29, 2016, Defendants submitted their Reply, (*see* Dkt. No. 37). Plaintiff submitted a surreply on July 22, 2016, (*see* Dkt. No. 41), and Defendants filed their own surreply and accompanying papers on September 13, 2016, (*see* Dkt. Nos. 48–50).

**\*4**  On September 30, 2016, the Court issued an Opinion and Order dismissing, without prejudice, Plaintiff's official capacity claims and finding that Plaintiff's due process and retaliation claims were time-barred absent application of an applicable tolling doctrine. (*See generally* Opinion & Order (Sept. 30, 2016) ("Sept. 30, 2016 Opinion") (Dkt. No. 52).) The Opinion allowed Plaintiff time to file an Amended Complaint. (*Id.* at 28.)

On December 1, 2016, Plaintiff filed an Amended Complaint. (*See* Am. Compl. (Dkt. No. 65).) On June 20, 2017, Defendants filed their motion to dismiss the Amended Complaint and accompanying papers, (*see* Dkt. Nos. 77–80). On August 14, 2017, Plaintiff filed his Opposition papers. (*See* Dkt. Nos. 83–84.) Defendants filed a letter brief in Reply in lieu of a formal Memorandum of Law. (*See* Letter from Yan Fu, Esq., to Court (Aug. 29, 2017) (Dkt. No. 85).)

On January 8, 2018, the Court issued an Opinion and Order granting in part and dismissing in part Defendants' Motion to Dismiss. (*See* Opinion & Order (Jan. 8, 2018) ("Jan. 8, 2018 Opinion") (Dkt. No. 86).) The Court dismissed Plaintiff's retaliation and due process claims against Defendants Jackson, Ortiz, Shibah, Donahue, George, and O'Cana with prejudice as time-barred and barred by the collateral estoppel doctrine. (*Id.* at 19, 24, 29.) Plaintiff's retaliation claim against Grant was also dismissed, but without prejudice. (*Id.* at 25–26.) Plaintiff's retaliation claims as to Paroline survived. (*Id.* at 29.)

On February 16, 2018, Plaintiff filed a Second Amended Complaint. (*See* SAC.) On February 28, 2018, the Court granted the remaining Defendants request for an extension to answer the SAC. (Dkt. No. 90.) On March 23, 2018, Defendants submitted a pre-motion letter requesting permission to file a Motion for Summary Judgment. (*See* Letter from Assistant Attorney General Yan Fu, Esq., to Court (Dkt. No. 91).) On April 10, 2018, the Court granted Defendants' request and set a briefing schedule. (Dkt. No. 92.) On April 10, 2018, Plaintiff submitted a letter supplementing the SAC. (*See* Letter from Tiquan Davis to Court ("SAC Supp.") (Dkt. No. 93).)

On May 3, 2018, Defendants filed the instant Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement. (Not. of Mot.; Defs.' 56.1; Quick Decl.; Seguin Decl.; Defs.' Mem. Of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 98).) That same day, on May 3, 2018, Defendants sent a Rule 56.2 notice to Plaintiff. (Dkt. No. 99.) On May 14, 2018, Plaintiff filed his Opposition to the Motion and a Declaration in support of his Opposition. (Pl.'s Mem.; Pl.'s Decl.) Plaintiff did not file a response to Defendants' Rule 56.1 Statement. On June 29, 2019, Defendants filed a reply. (Defs.' Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 103).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

**\*5** "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation

marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4) ).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted) ). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence ... are insufficient to overcome a motion for summary judgment," *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

**\*6** Defendants argue that the Court should grant summary judgment in their favor because Plaintiff failed to exhaust his available administrative remedies as required by the PLRA. (Defs.' Mem. 1, 4–7.) Plaintiff counters that he "followed all the requirements needed to satisf[y] the exhaustion prongs of the PLRA" and that "[t]he fact that there is no record on file is not due to the [P]laintiff not filing his grievance or appeals,

and [that] he should not be faulted because of such." (Pl.'s Mem. 1–2.)

### 1. Applicable Law

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citation and some quotation marks omitted). The exhaustion requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 520, 532 (2002)," and includes actions for monetary damages even if monetary damages are not available as an administrative remedy, *see Booth v. Churner*, 532 U.S. 731, 741 (2001)." Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, alterations, and quotation marks omitted). Indeed, the PLRA demands "strict compliance with the grievance procedure ..., or else dismissal must follow inexorably." *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (citations, alteration, and quotation marks omitted). Exhaustion must occur *prior* to Plaintiff's filing suit; "[s]ubsequent exhaustion after suit is filed therefore is insufficient." *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001).

The PLRA contains a "textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. "[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Available "grievance procedures ... are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (citation and quotation marks omitted). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* An administrative remedy is unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," *id.* (citation omitted); (2) where the procedure is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary

2019 WL 498277

prisoner can discern or navigate it," *id.*; or (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," *id.* at 1859–60. It bears noting, however, that the "three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2 (declining to opine on "what other circumstances might render an otherwise available administrative remedy actually incapable of use"), but rather "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (citation omitted).

**\*7** "[I]t is well settled that conclusory allegations of intimidation are not sufficient to create a genuine disputed issue of fact regarding the availability of administrative remedies." *Khudan*, 2016 WL 4735364, at *6 (citations, quotation marks, and alterations omitted); *see also Heyliger v. Gebler*, No. 06-CV-6220, 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding the plaintiff's testimony that his "original grievance was discarded by prison officials," where he "never described or named the individual who allegedly took this action"), *aff'd*, 624 F. App'x 780 (2d Cir. 2015); *Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting summary judgment where there was "no evidence" that the "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct"); *Rosado v. Fessetto*, No. 09-CV-67, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *report and recommendation adopted*, 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming the [plaintiff] did submit the grievances," he "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006). Finally, failure to exhaust is an affirmative defense, not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). As such, Defendants bear the burden of proving failure to exhaust. *See McCoy*, 255 F. Supp. 2d at 248.

## 2. Application

The grievance program applicable here is the DOCCS IGP, which provides for a three-step grievance process. *See Colon v. Annucci*, No. 17-CV-4445, 2018 WL 4757972, at *17 (S.D.N.Y. Sept. 28, 2018); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *6 (S.D.N.Y. Sept. 28, 2018).

> To initiate the process, an inmate must file a written complaint with the [IGRC], a facility committee composed of inmates and appointed staff members. *See* N.Y.C.R.R. § 701.4–5. ... Second, the inmate can appeal an unfavorable IGRC determination to the superintendent of the facility. *See* [ ] N.Y.C.R.R. § 701.5(c)[ ]. Finally, an inmate can appeal an unfavorable superintendent's determination to [ ]CORC[ ]. *See* [ ] N.Y.C.R.R. § 701.5(d) [ ]; Directive No. 4040.

*Amador v. Andrews*, 655 F.3d 89, 97 (2d Cir. 2011) (alterations and quotation marks omitted); *see also Khudan*, 2016 WL 4735364, at *1 (describing three-step IGP procedure). Grievances alleging misconduct by staff are subject to an expedited administrative review—they are immediately referred to the superintendent of the facility and must also be exhausted through a final appeal to CORC. *Amador*, 655 F.3d at 97 (citing 7 N.Y.C.R.R. § 701.8.). Only after completing all three steps of the IGP may an inmate initiate suit, *see Ross*, 136 S. Ct. at 1856; *Williams*, 829 F.3d at 122, "provided no exception to exhaustion applies," *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *6 (S.D.N.Y. Dec. 21, 2018).

### a. The March 2014 and the August 8, 2015 Incidents

Plaintiff's SAC summarily states that "Plaintiff has exhausted all the herein claims at Sing Sing and Southport Correctional Facilities." (SAC at 1.) Plaintiff has submitted no evidence, other than his own unsworn Declaration, that relates to his filing of grievances or his appeal of unfavorable determinations.

Plaintiff only filed one grievance related to the misconduct alleged in this case, namely the 55380-15 Grievance, which

related to the August 4, 2015 Paroline incident. Records show that while Plaintiff filed other grievances while at Sing Sing between 2014 and 2017, none involved the misconduct alleged in this case. (Quick Decl. ¶¶ 6–7, 12; Plaintiff's Sing Sing Grievance Record.) Neither Plaintiff's Declaration, nor any of his other submissions, mentions filing a grievance for the March 2014 Grant incident or the August 8, 2015 Paroline incident. Moreover, records show that Plaintiff did not appeal the 55380-15 Grievance. Plaintiff's only appeal between 2012 and 2016 involved television programming. (Plaintiff's CORC Grievance Record at 3.) Plaintiff offers no evidence whatsoever with respect to the March 2014 Grant incident or the August 8, 2015 Paroline incident, and has thus failed to "come forward with admissible evidence sufficient to raise a genuine issue of fact." *CILP Assocs., L.P.*, 735 F.3d at 123. Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua*, No. 09-CV-7227, 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656–57 (2d Cir. 2009) (affirming grant of summary judgment where the "plaintiffs rel[ied] almost exclusively upon" their "speculative" and "vague" testimony in the face of the defendants' documentary evidence); *Toro v. City of New York*, No. 12-CV-4093, 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence—beyond the allegations in his complaint and his own unsupported deposition testimony— that the [plaintiff] actually reported such misconduct to the authorities").

**\*8** Nor does any exception to exhaustion apply. Plaintiff makes no showing whatsoever that the IGP is "unable" to provide relief to grievances, or that prison officials are "consistently unwilling" to provide relief, or that he has been "thwart[ed] ... from taking advantage" of the IGP "through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60. Nor can Plaintiff show that the IGP is "so opaque that it [is] ... incapable of use," *id.* at 1859, given that Plaintiff successfully used the IGP, filing eight grievances while at Sing Sing between 2014 and 2017, (Defs.' 56.1 ¶ 10), appealing 39 grievances to CORC since he has been in prison, (Seguin Decl. ¶ 6, Plaintiff's CORC Grievance Record at 3), and having served as a grievance representative himself, (Pl.'s Decl. ¶ 6). *See, e.g., Mckinney v. Prack*, 170 F. Supp. 3d 510, 516–17 (W.D.N.Y. 2016) (finding that the plaintiff failed to present a question of fact as to whether

the grievance process was available to him where the record showed the plaintiff appealed and exhausted 20 grievances during his 29 years of incarceration including four during the relevant period); *Taylor v. Thames*, No. 09-CV-72, 2010 WL 3614189, at *4 (N.D.N.Y. July 22, 2010) (finding that the plaintiff failed to present a question of fact as to whether the grievance process was available to him where the record showed he "utilized the administrative procedure over twenty times in the twenty-eight months [he] was incarcerated"). Moreover, here, Plaintiff makes no allegations in his SAC or his Declaration that anyone or anything prevented him from filing grievances related to these two incidents.

The Court concludes that Plaintiff failed to complete any of the steps of the IGP with respect to the March 2014 Grant incident or the August 8, 2015 Paroline incident, and that no exception to the exhaustion requirement applies.

#### b. The August 4, 2015 and October 31, 2015 Incidents

Defendants admit that Plaintiff filed a grievance on August 13, 2015, namely the 55380-15 Grievance, (Defs.' 56.1 ¶ 5), that related to the August 4, 2015 Paroline incident. (*Id.* ¶ 6.) Plaintiff's grievance was ultimately denied on September 3, 2015. (*Id.* ¶ 8.) Defendants presented admissible evidence that Sing Sing has no record of any appeal by Plaintiff of the denial of grievance 55380-15 to CORC. (Seguin Decl. ¶ 6, Plaintiff's CORC Grievance Record at 3.) In the section of Plaintiff's Declaration where he addresses Paroline, Plaintiff claims that after he received his "response from the superintendent," which the Court takes to mean the September 3, 2014 denial of the grievance, he "wrote [his] appeal out for CORC ... and was personally able to hand [his] appeal to the grievance sgt who told [him] that they would make sure [his] appeal got filed." (Pl.'s Decl. ¶ 4.) Plaintiff claims he has still not heard from CORC regarding his appeal. (*Id.*)

Defendants deny that Plaintiff ever filed a grievance related to the October 31, 2015 Grant incident. Defendants submitted evidence outlining what grievances Plaintiff filed between 2014 and 2017, and the October 31, 2015 Grant incident was not among them. (Defs.' 56.1 ¶¶ 10–11; Sing Sing Grievance Record.) Plaintiff counters in his Declaration that on October 31, 2015, he wrote a harassment and retaliation grievance and gave this grievance to the B-block IGRC representative to file. (Pl.'s Decl. ¶ 2.) Plaintiff then followed up repeatedly with the representative who told him he would check with the IGP supervisor and who assured Plaintiff the IGP would get

back to him. (*Id.*) Plaintiff claims that the representative then suggested to Plaintiff that he appeal it to the CORC, and that Plaintiff drafted his appeal "that night," included a copy of his original grievance dated October 31, 2015, and gave it to the representative the next morning. Plaintiff claims he has still not heard anything regarding this grievance. (*Id.*)

In this case, Defendants have met their initial burden of demonstrating that Plaintiff failed to exhaust his retaliation claims. Defendants submitted admissible evidence showing that there is no record of Plaintiff filing a grievance regarding the October 31, 2015 incident, and no record of Plaintiff filing an appeal regarding the August 4, 2015 incident. (*See generally* Plaintiff's Sing Sing Grievance Record; Plaintiff's CORC Grievance Record.) Plaintiff maintains that, notwithstanding the lack of any record, he did file a grievance regarding Grant's October 31, 2015 retaliation, (Pl.'s Decl. ¶ 2), and that he did appeal the denial of his grievance regarding Paroline's August 4, 2015 retaliation, (*id.* ¶ 4).

**\*9** The Court takes Plaintiff's assertions that his grievances and appeals were lost or not properly processed as an argument that the grievance process was unavailable to him, either because the process "operates as a simple dead end," was "practically speaking, incapable of use," or because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1858–60.

"Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Engles v. Jones*, No. 13-CV-6461, 2018 WL 6832085, at \*10 (W.D.N.Y. Dec. 28, 2018) (granting summary judgment to defendants for failure to exhaust where defendants demonstrated through admissible evidence that there was no record of the plaintiff filing his grievance and where the plaintiff merely alleged without any documentary support that his grievance was lost or destroyed); *see also Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."); *Mims v. Yehl*, No. 13-CV-6405, 2014 WL 4715883, at \*4 (W.D.N.Y. Sept. 22, 2014) (holding that inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); *Khudan*, 2016 WL 4735364, at \*5 (granting summary judgment to defendants where the plaintiff asserted he filed

his grievance with the IGRC, received no response, and then sent an appeal to "Albany," because the "[p]laintiff's self-serving and incomplete testimony ... is insufficient to create a genuine dispute of fact, particularly in light of [d]efendants' evidence that no grievance was ever sent" (quotation marks and alterations omitted) ); *Rosado*, 2010 WL 3808813, at \*7 (granting summary judgment to defendants where the plaintiff alleged that he filed a grievance, did not receive an answer, thereafter sent two letters to the superintendent, because the plaintiff's claim that officials must have "messed with" his grievance and his letters was insufficient to excuse the exhaustion requirement and the plaintiff could have further appealed the grievance to CORC); *Veloz*, 339 F. Supp. 2d at 515–16 (granting summary judgment to defendants because the plaintiff failed to exhaust available administrative remedies where the plaintiff alleged that his grievances were misplaced or destroyed by corrections officers but there was no evidence that any grievance was filed and the plaintiff failed to offer "evidence that any particular officer thwarted his attempts to file").

It is true that courts in the Second Circuit have excused failure to exhaust where a plaintiff identified an officer or officers who took some specified action to prevent the plaintiff from filing a grievance, *see Lopez v. Bushey*, No. 11-CV-0418, 2013 WL 1294477, at \*6 (S.D.N.Y. Mar. 4, 2013) (denying summary judgment because pro se plaintiff raised a triable issue of fact that special circumstances justified his failure to exhaust his administrative remedies where he named a specific officer and alleged that officer repeatedly tore up his grievances before he could file them); *Gill v. Frawley*, No. 02-CV-1380, 2006 WL 1742738, at \*8–9 (N.D.N.Y. June 22, 2006) (denying summary where plaintiff named three officers to whom he submitted his grievances and attached copies of correspondences with those officers in which they assured him his grievances had been submitted, and where defendants failed to submit admissible evidence that plaintiff had not filed the grievances at issue), or threatened the plaintiff for attempting to file a grievance, *see Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (holding that "administrative remedies may ... be deemed unavailable if the plaintiff can demonstrate ... threats from correction officers—rendered a nominally available procedure unavailable"); *Grafton v. Hesse*, No. 15-CV-4790, 2017 WL 9487092, at \*7 (E.D.N.Y. Aug. 25, 2017) (finding that "specific threats of retaliation or intimidation by prison officials may render administrative remedies unavailable"). Here, however, Plaintiff offers no evidence that any particular officer thwarted his attempts to

file his grievance or appeal. Plaintiff also does not allege that anyone threatened him. Instead, Plaintiff claims that he filed his October 31, 2015 grievance and appeal with the "B-block IGRC representative," (Pl.'s Decl. ¶ 2), and that he handed his August 4, 2015 appeal directly to the "grievance sgt," (*id.* ¶ 4). Putting aside that Plaintiff does not provide enough information about these officers to clearly identify them, he does not allege they destroyed his papers or attempted to keep him from filing them. (*Id.* ¶¶ 2, 4.) Plaintiff does not even expressly allege that his submissions were lost—he summarily states that it is not his fault that there is no record of his papers having been filed. (Pl.'s Mem. 1–2.)

**\*10** Courts in the Second Circuit have also held that administrative remedies are unavailable in extraordinary circumstances where, for example, an inmate must rely on prison officials to submit his grievance. *See Williams,* 829 F.3d at 122 (reversing dismissal of case where plaintiff was in a special housing unit segregated from the regular prison population, gave his grievance to a correction officer to file, and that officer failed to file it, because the applicable grievance regulations "gave no guidance whatsoever" to a prisoner in plaintiff's position); *Rodriguez v. Cross,* No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (noting that "[c]ourts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU"); *Mena v. City of New York,* No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that *Williams,* 829 F.3d 118, "hinged on the 'extraordinary circumstances' specific to the case before it"). Here, Plaintiff was not segregated from the regular prison population and does not allege or submit any evidence that he did not have access to the grievance process—he in fact admits repeatedly speaking to the grievance representative and handing his appeal to the grievance sergeant directly. (Pl.'s Decl. ¶¶ 2, 4.) Instead, Plaintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement. "Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Engles,* 2018 WL 6832085, at *10; *see also Scott,* 298 F. Supp. 3d at 555 (holding that "an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement"); *Shaw v. Ortiz,* No. 15-CV-8964,

2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) (finding that the IGP *does* contemplate the circumstance where a plaintiff merely alleges that he filed his grievance but never received a response because "the failure to render a timely decision at a lower level" is appealable "to the next level," and that this scenario is distinguishable from *Williams,* 829 F.3d 118, where the IGP did *not* contemplate the circumstances of a plaintiff in SHU).

Considering Plaintiff's statements, which "stand alone and unsupported," *Veloz,* 339 F. Supp. 2d at 516, along with the evidence Defendants have submitted showing there is no record of Plaintiff filing an appeal regarding the August 4, 2015 incident, or filing a grievance or appeal regarding the October 31, 2015 incident, (Defs.' 56.1 ¶¶ 9–12; Plaintiff's Sing Sing Grievance Record; Plaintiff's CORC Grievance Record), and evidence that Plaintiff has successfully used the IGP on 39 previous occasions, (*id.* ¶¶ 10, 13; Pl.'s Decl. ¶ 6), the Court concludes that no exception to the exhaustion requirement applies.

Because Plaintiff has failed to exhaust his available administrative remedies as to the remaining four instances of retaliation he alleges in his SAC, the Court grants summary judgment to Defendants on all remaining claims. *Khudan,* 2016 WL 4735364, at *5 (granting summary judgment to defendants because "[p]laintiff's self-serving and incomplete testimony ... is insufficient to create a genuine dispute of fact, particularly in light of [d]efendants' evidence that no grievance was ever sent").

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 94), enter judgment for Defendants, close this case, and mail a copy of this Opinion and Order to Plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 498277

2019 WL 7484052
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph BLAKE, Plaintiff,

v.

M. PORLIER, Defendant.

No. 9:18-CV-1008 (DNH/CFH)
|
Signed 10/04/2019

**Attorneys and Law Firms**

Joseph Blake, 04-B-3582, Attica Correctional Facility, Box 149, Attica, New York 14011, Plaintiff pro se.

OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendant.

### REPORT-RECOMMENDATION AND ORDER

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1**  Plaintiff pro se Joseph Blake, an inmate in the custody of the New York Department of Corrections and Community ("DOCCS") Supervision, commenced this action while incarcerated at Great Meadow Correctional Facility ("Great Meadow") by filing a complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"). Dkt. No. 11 ("Am. Compl."). Plaintiff alleges that defendant corrections officer ("C.O.") M. Porlier violated his Eighth Amendment rights. See id. Presently pending before the court is defendant's motion for summary judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt No. 23-1. For the following reasons, it is recommended that defendant's motion be granted.

### I. Background

#### A. Plaintiff's Recitation of the Facts

Plaintiff alleges that while incarcerated at Great Meadow, C.O. Porlier subjected him to excessive physical force. Am. Compl. at 4-5. In his opposition papers, plaintiff further alleges that he filed a grievance pertaining to C.O. Porlier's use of excessive physical force through the Department of Corrections. See Dkt. No. 26 ("Pl. Opp.") at 1. Plaintiff contends that DOCCS removed his grievance and all copies of it and is "simply pretend[ing] that they never received [it]." Id. Plaintiff further alleges a history of DOCCS "going in [inmates] pack-up bag[s]" and "remov[ing] all traces" of grievances. Id. Plaintiff refers to the alleged removal of his grievance documents by contending that DOCCS "got rid" of his grievance documents so the department could "turn around and claim [he] never [filed a grievance]." Id.

#### B. Defendant's Recitation of the Facts

In support of this motion for summary judgment, defendant filed a Statement of Material Facts. [1] Dkt. No. 23-4. Throughout plaintiff's incarceration at Great Meadow, he had access to the Inmate Grievance Program ("IGP"), an inmate grievance process, as well as the Central Office Review Committee ("CORC"), the final appellate level that can be used to appeal facility-level grievance determinations. See id. ¶ 3. Inmates at Great Meadow receive instruction on how to file and appeal grievances through the IGP and receive a handbook with this information. See id. ¶ 4. Grievances are preserved within the CORC database for the current year, plus the previous four calendar years. Dkt. No. 23-2 at ¶ 7.

[1]    Local Rule 7.1(a)(3) states:
    Summary Judgment Motions
    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the statement of material facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
    The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual

issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3)

**\*2** Plaintiff previously used the IGP to file grievances, however, plaintiff allegedly failed to file a grievance and an appeal for the excessive force claim that serves as the basis of his action. See Dkt. No. 23-1 at 8; Dkt. No. 23-2 ¶ 12; Dkt. No. 23-4 ¶ 7, 8. Plaintiff also allegedly did not file a late grievance regarding his excessive force claim nor an appeal to CORC about the incident. See Dkt. No. 23-1 at 8-9; Dkt. No. 23-2 ¶ 8. Therefore, defendant contends that plaintiff did not exhaust his administrative remedies with respect to his Eighth Amendment claim. Dkt. No. 23-1 at 11.

## II. Discussion

Defendants move for summary judgment on the basis that plaintiff failed to exhaust his administrative remedies before bringing this action. Dkt. No. 23-1. In the event that the action survives, defendant requests a stay of time to answer the amended complaint until fourteen days after the issuance of a final determination. Dkt. No. 23-1 at 3. If the amended complaint is not dismissed in its entirety, defendant requests an evidentiary hearing on the issue of exhaustion. Id. at 3. Plaintiff opposes defendant's motion for summary judgment. Dkt. No. 27.

## 1. Motion for Summary Judgement

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which support the motion. Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining

whether summary judgement is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. There is no genuine issue of material fact such that a grant of summary judgment is proper when "no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight...." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Additionally, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Thomas v. Kinderman, No. 9:17-CV-00425 (DNH/TWD), 2017 WL 8293605, at \*1 (N.D.N.Y. December 4, 2017) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). The Second Circuit has stated that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original) (quoting Anderson, 477 U.S. at 252, 106 S.Ct. 2505).

**\*3** An allegation in an affidavit or verified complaint must not be "conclusory or overly general" in order to give rise to a "factual issue." See Bishop v. Presser, No. 9:16-CV-1329 (MAD/ATB), 2018 WL 7917915, at \*2 (N.D.N.Y. Dec. 28, 2018) (quoting Smith v. Woods, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 & n.10 (N.D.N.Y. Apr. 24, 2006)). Despite containing specific assertions, allegations in an affidavit may still be considered conclusory if they are "(1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " Smith, 2006 WL 1133247, at \*3 & n.11 (quoting Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005)).

Where summary judgement is sought against a pro se litigant, the non-movant must be afforded "special solicitude" by the court. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

[477 (2d Cir. 2006).](#) To afford a pro se litigant special solicitude means that

> a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigants allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law ....

[Id.](#) (citations and footnotes omitted); see also [Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).](#) "The latitude accorded a pro se litigant does not 'relieve him of the obligation to respond to a motion for summary judgement with sufficient admissible evidence.'" [Jackson v. Yando, No. 9:13-CV-01279, 2016 WL 11478235, at *4 (N.D.N.Y. Jan. 19, 2016)](#) (quoting [Hamlett v. Srivastava, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007)](#) (citing [Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)](#))). Additionally, a pro se plaintiff's " 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." [Cole v. Artuz, No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)](#) (citing [Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)](#)).

## 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgement to file and serve a Statement of Material Facts. See N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." [Id.](#) The opposing party is required to file a response to the Statement of Material Facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." [Id.](#) "The Court shall deem admitted any properly supported facts set forth in the Statement of Material facts that the opposing party does not specifically controvert." [Id.](#) (emphasis omitted).

In accordance with N.D.N.Y. L.R. 7.1, defendant filed a statement of material facts. N.D.N.Y.L.R.7.1(a)(3); Dkt. No. 23-4. Plaintiff was notified of the proper procedural method

to provide a response; however, in his response, plaintiff did not "admit or [deny] each of the defendant's assertions in matching numbered paragraphs," nor did he "provide or cite to copies of record evidence." See Dkt. No. 24 at 2; Pl. Opp.; N.D.N.Y.L.R. 7.1.(a)(1), (2). When a party fails to respond to the movant's statement of material facts in the manner required by N.D.N.Y.L.R.7.1, the "facts in the movant's statement will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion." [Jackson, 2016 WL 11478235, at *5](#) (citing [Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996)](#)).

**\*4** The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." [Prestopnik v. Whelan, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003)](#) (concluding that the "plaintiff's suggestion that the transcript and videotape of the [incident] be reviewed to identify support for her Statement of Material Facts Not in Dispute does not cure her failure to comply with Rule 7.1(a)(3)."). However, in deference to a plaintiff's pro se status, the Court will conduct an independent review of the record, and "treat [plaintiff's] opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement." [Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017);](#) see [Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016)](#) (determining that "although [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgement."). Therefore, in deference to plaintiff's status, the undersigned will accept plaintiff's response in opposition to defendant's Motion for Summary Judgment. See [Johnson, 2017 WL 3822047, at *2.](#)

## B. Exhaustion of Administrative Remedies

Pursuant to the Prisoner Litigation Reform Act ("PLRA"), a prisoner is required to exhaust any administrative remedies available to him before bringing an action for claims arising out of his or her incarceration. See [Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002);](#) see also [Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378,](#)

165 L.Ed.2d 368 (2006). This exhaustion requirement applies to "all inmate suits about prison life whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. A prisoner is required to exhaust all their claims even when the relief they seek is not available in the administrative grievance process. See id. (quoting Porter, 534 U.S. at 524, 122 S.Ct. 983). To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility where he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

The Supreme Court has deemed exhaustion mandatory, however, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the Hemphill test, a plaintiff's failure to exhaust could be excused if he or she established that his or her failure to exhaust was justified by "special circumstances." Id. As explained by the Supreme Court, "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ––– U.S. ––––, 136 S. Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Despite there no longer being a "special circumstances" exception to mandatory exhaustion under the PLRA, courts must still consider a textual exemption. See id. at 1858. There are three circumstances the Supreme Court has identified where administrative remedies may be unavailable to a prisoner. See id. at 1959-60. "... [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

**\*5** A claim that is dismissed for failure to exhaust administrative remedies will be dismissed without prejudice if "the time period for pursuing administrative remedies has not expired." Thomas v. Kinderman, No. 9:17-CV-00425 (DNH/TWD), 2017 WL 8293605, at \*6 (N.D.N.Y. Dec. 4, 2017) (citing Berry v. Kerik, 366 F.3d 85, 86-87 (2d Cir. 2004)). If the time for pursuing a remedy has expired, the claim will be dismissed with prejudice, as "any attempt to exhaust would be futile." Id.

### 1. Did Plaintiff Exhaust his Remedies? [2]

[2]

First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). When a grievance is filed on the basis of staff misconduct, it is sent directly to the superintendent, who must issue a decision within twenty-five days. Id. at § 701.8(f). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii)

In affording plaintiff discretion and reviewing the record in its entirety, the record contains no evidence in support of plaintiff's allegation that he had copies of grievance paperwork. Plaintiff alleges that removing grievance forms is a "tactic that the department has been doing for years," and "the department got rid of the first step so then could then turn around and claim [he] never followed the first step...." Pl. Opp. at 1. Courts within the Second Circuit have continuously held that "mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the

allegations." Rodriguez v. Cross, No. 15-CV-1079 (GTS/ CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (citing Khudan v. Lee, No. 12-CV-8147(RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016)) (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (holding that summary judgment is proper where plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). Plaintiff's conclusory allegations are unsupported by evidence in the record as he does not proffer copies of his alleged grievances. As such, plaintiff's assertions that he failed to exhaust his administrative remedies due to tampering are insufficient to overcome defendant's motion for summary judgment. See Veloz, 339 F. Supp. 2d at 516 (holding that summary judgement should be granted where plaintiff contends that officers misplaced his grievances, but does not provide evidence in support of his claim); Khudan, 2016 WL 4735364, at *2 (concluding that the plaintiff failed to show a genuine issue of material fact when he did not produce evidence other than his own declaration and deposition); see also Bolton v. City of New York, Nos. 13-CV-5749 (RJS), 13-CV-6090 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) (holding that plaintiff's allegations, which "[stood] alone and unsupported," did not excuse plaintiff from failing to exhaust his administrative remedies).

*6 Even considering that plaintiff swore under penalty of perjury that he mailed a grievance within the allotted time frame, he did not provide any evidence to substantiate his allegations. See Pl. Opp. Therefore, plaintiff's unsupported allegations cannot give rise to an issue of material fact sufficient to defeat a motion for summary judgement. See Smith, 2006 WL 1133247, at *3 & n.11; see Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005).

Next addressing plaintiff's allegation that DOCCS tampered with his grievance, courts have held that a plaintiff who alleges that corrections officers have misplaced or destroyed a particular grievance is not relieved of "the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming." Veloz, 399 F. Supp. 2d at 516 (citing Martinez v. Williams, 186 F. Supp. 2d 353, 357 (S.D.N.Y. 2002)). Defendant produces evidence that the IGP has no record of the plaintiff filing a grievance or an appeal regarding his excessive force claim. See Dkt. No. 23-2 at 8, 9. Even assuming that plaintiff's allegations of mail tampering are

true, he does not allege that he ever inquired about the status of his grievance or attempted to file an appeal with the Superintendent or CORC regarding the grievance at issue. See Pl. Opp. In fact, a review of the record in its entirety also provides no evidence that plaintiff ever filed an appeal. See Jackson, 2016 WL 11478235, at *5 (concluding that plaintiff had not met his burden of demonstrating a genuine issue of fact after a review of the record in its entirety produced "very little in the way of admissible evidence."). Therefore, the undersigned concludes that plaintiff never filed a grievance appeal and thus failed to exhaust his remedies.

### 2. Availability of Administrative Remedies

The Court must next determine whether administrative remedies were available to the plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Under the second prong of Ross, administrative remedies may have been rendered unavailable to the plaintiff as a result of the regulatory scheme being so "opaque that it becomes, practically speaking, incapable of use." Ross, 136 S. Ct. at 1859. In Williams v. Correction Officer Priatno, the Second Circuit held that "regulations plainly do not describe a mechanism for appealing" an unfiled grievance. Williams v. Correction Officer Priatno, 829 F.3d 118, 126 (2d Cir. 2016). Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams Court held that a plaintiff in the Special Housing Unit ("SHU")[3] who personally handed his grievance to a corrections officer, had exhausted his administrative remedies despite his grievance never being delivered. Id. at 126. The plaintiff followed up when he did not receive a response to his grievance but was transferred one week later without being notified that his grievance had been resolved. Williams, 829 F.3d at 120-21. Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures. See Rodriguez, 2017 WL 2791063 at *7 (citing Mena, 2016 WL 3948100 at *5). In Rodriguez v. Cross, the court held that a plaintiff in keeplock[4] was not entitled to an exhaustion exception when he alleged that his grievance had not been

2019 WL 7484052

filed due to mail tampering, and subsequently never inquired about it. See Rodriguez, 2017 WL 2791063 at *7. Plaintiff makes no allegation that he was in restrictive housing at the time he allegedly completed his grievance, nor does he allege that he attempted to follow up when he did not receive a response to his grievance; therefore, plaintiff's failure to exhaust is not entitled to an exception. See Pl. Opp.; Rodriguez, 2017 WL 2791063 at *7; Williams, 829 F.3d at 121.

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

4    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6.

 *7  Additionally, plaintiff demonstrated that the grievance process was available to him when he successfully filed and appealed two grievances on February 2, 2009 and November 21, 2017. [5] See Dkt. No. 23-2 ¶ 12. Although plaintiff does not provide a date as to when he filed the alleged grievance in this matter, he contends that the incident occurred on January 15, 2016, while defendant contends that the incident occurred on January 15, 2017. Dkt 23-1 at 3; Dkt. No. 11 at 4. A timely grievance would have needed to be filed within twenty-one calendar days of January 15, 2016 or January 15, 2017. 7 N.Y.C.R.R. 701.5(a)(1). Considering that plaintiff's previous grievances were filed in February of 2009 and November of 2017, plaintiff availed himself of the grievance system both before and after a grievance regarding the incident at hand was due. Dkt. No. 23-2 ¶ 12. Therefore, plaintiff has failed to demonstrate that grievance procedures were unavailable to him. See Rodriguez, 2017 WL 2791063 at *7 ("... [A] grievance [that] was subsequently filed and not appealed within close proximity to [a previously filed] grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable."); see Artis v. Dishaw, No. 9:14-CV-1116

(MAD/ATB), 2016 WL 11266599, n.13 (N.D.N.Y. Sept. 12, 2016) (finding in part that a plaintiff who claimed he was prevented from exhausting his remedies through threats and tampering was not excused because he subsequently filed five grievances, did not submit copies of his allegedly destroyed grievances, and did not specify when he attempted to file his grievances); see Hill v. Tisch, No. 02-CV-3901 (DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff had not "demonstrate[d] that the [grievance] procedures were essentially unknowable").

5    Both the February 2009 and November 2017 grievances are unrelated to the cause of action before the Court. See Dkt. No. 23-2 ¶ 12.

Because plaintiff successfully utilized the grievance system for unrelated issues, makes no allegation that he was in restrictive housing at the time he attempted to file the alleged grievance, and makes no indication that he attempted to follow up with his alleged grievance, the undersigned concludes that administrative remedies were available to the plaintiff. Plaintiff therefore does not qualify for an exception excusing him from completing the grievance process before bringing his claim.

As such, defendants have met their burden in showing that there is no genuine issue of material fact. Accordingly, it is recommended that defendant's motion be granted.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 23) be **GRANTED**; and it is further

**RECOMMENDED** that plaintiff Joseph Blake's amended complaint (Dkt. No. 11) be **DISMISSED** in its entirety, without prejudice; and it is

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

2019 WL 7484052

**REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2019 WL 7484052

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 58613
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph BLAKE, Plaintiff,
v.
M. PORLIER, Correction Officer, Great
Meadow Correctional Facility, Defendant.

9:18-CV-1008 (DNH/CFH)
|
Signed 01/06/2020

**Attorneys and Law Firms**

JOSEPH BLAKE, Plaintiff, Pro Se, 04-B-3582, Attica
Correctional Facility, Box 149, Attica, NY 14011.

HON. LETITIA JAMES, Attorney General for the State of
New York, OF COUNSEL: ERIK BOULE PINSONNAULT,
ESQ., Ass't Attorney General, Attorney for Defendant, The
Capitol, Albany, NY 12224.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

 *1  Pro se plaintiff Joseph Blake brought this civil rights
action pursuant to 42 U.S.C. § 1983. On October 4,

2019, the Honorable Christian F. Hummel, United States
Magistrate Judge, advised by Report-Recommendation that
defendant's motion for summary judgment be granted and
that plaintiff's Amended Complaint be dismissed in its
entirety. No objections to the Report-Recommendation have
been filed.

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report-
Recommendation is accepted in whole. See 28 U.S.C. §
636(b)(1).

Therefore, it is

ORDERED that

1. Defendant's motion for summary judgment is GRANTED;

2. Plaintiff's Amended Complaint is DISMISSED; and

3. The Clerk is directed to enter judgment accordingly and
close the file.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 58613

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7484082 (S.T.B.)

Surface Transportation Board (S.T.B.)

LIMITING EXTENSIONS OF TRAIL USE NEGOTIATING PERIODS
RAILS-TO-TRAILS CONSERVANCY—PETITION FOR RULEMAKING

Decided: November 27, 2019
Service Date: December 4, 2019

**SURFACE TRANSPORTATION BOARD DECISION**

Docket No. EP 749 (Sub-No. 1)
Docket No. EP 753

**\*1** By the Board, Board Members Begeman, Fuchs, and Oberman.

AGENCY: Surface Transportation Board.

ACTION: Final Rule.

SUMMARY: The Surface Transportation Board (Board or STB) is adopting a final rule amending its regulations related to the National Trails System Act to: (1) provide that the initial term for Certificates or Notices of Interim Trail Use or Abandonment will be one year (instead of the current 180 days); (2) permit up to three one-year extensions of the initial period if the trail sponsor and the railroad agree; and (3) permit additional one-year extensions if the trail sponsor and the railroad agree and extraordinary circumstances are shown.

DATES: This rule is effective on February 2, 2020.

ADDRESSES: Requests for information or questions regarding this final rule should reference Docket No. EP 749 (Sub-No. 1) et al., and be submitted either via e-filing or in writing addressed to Chief, Section of Administration, Office of Proceedings, Surface Transportation Board, 395 E Street, S.W., Washington, DC 20423-0001.

FOR FURTHER INFORMATION CONTACT: Sarah Fancher at (202) 245-0355. Assistance for the hearing impaired is available through the Federal Relay Service at (800) 877-8339.

SUPPLEMENTARY INFORMATION: On June 14, 2018, the National Association of Reversionary Property Owners (NARPO) filed a petition requesting that the Board consider issuing three rules related to 16 U.S.C. § 1247(d), the codification of section 8(d) of the National Trails System Act (Trails Act), Pub. L. No. 90-543, § 8, 82 Stat. 919, 925 (1968) (codified, as amended, at 16 U.S.C. §§ 1241-1251). Specifically, NARPO asked that the Board open a proceeding to consider rules that would: (1) limit the number of 180-day extensions of a trail use negotiating period to six; (2) require a rail carrier or trail sponsor negotiating an interim trail use agreement to send notice of the issuance of a Certificate of Interim Trail Use or Abandonment (CITU) or Notice of Interim Trail Use or Abandonment (NITU) [1] to landowners adjacent to the right-of-way covered by the CITU or NITU; and (3) require all entities, including government entities, filing a request for a CITU or NITU, or extension thereof, to pay a filing fee. After considering NARPO's petition for rulemaking and the comments received, the Board granted the petition in part as it pertained to NARPO's first request and instituted a rulemaking proceeding in Limiting Extensions of Trail Use Negotiating Periods, Docket No. EP 749 (Sub-No. 1), to propose modifications to 49 C.F.R. § 1152.29 that would limit the number of 180-day extensions of the interim trail use/railbanking negotiating period to a maximum of six extensions,

absent extraordinary circumstances. Nat'l Ass'n of Reversionary Prop. Owners—Pet. for Rulemaking (NPR), EP 749 et al. (STB served Oct. 2, 2018) (83 Fed. Reg. 50,326). The Board, however, denied NARPO's petition with regard to its other requests.

**\*2** On March 22, 2019, after the comment period closed in Docket No. EP 749 (Sub-No. 1), Rails-to-Trails Conservancy (RTC) petitioned the Board in Rails-to-Trails Conservancy— Petition for Rulemaking, Docket No. EP 753, to institute a rulemaking proceeding to further revise § 1152.29 to establish a one-year period for any initial interim trail use negotiating period and codify the Board's authority to grant extensions of the negotiating period for good cause shown. Because Docket Nos. EP 479 (Sub-No. 1) and EP 753 both pertain to the same regulation, § 1152.29, and concern procedures for the extension of interim trail use negotiation/railbanking negotiating periods, the Board consolidated the two proceedings. After carefully reviewing all the comments on the NPR and the RTC petition, the Board, in a supplemental notice of proposed rulemaking, proposed to establish a one-year period for any initial interim trail use/railbanking negotiating period, permit up to three one-year extensions if the trail sponsor and railroad agree, and provide that requests for additional one-year extensions (beyond three extensions of the initial period) would not be favored but may be granted if the trail sponsor and railroad agree and good cause is shown. Limiting Extensions of Trail Use Negotiating Periods (SNPR), EP 749 (Sub-No. 1) et al., slip op. at 6, 8-9 (STB served June 6, 2019) (84 Fed. Reg. 26,387).

The Board received comments from over 100 parties in response to the SNPR. After consideration of the comments, the Board is adopting a final rule amending its regulations related to the Trails Act as explained below.

## Background

Pursuant to the Trails Act, the Board must "preserve established railroad rights-of-way for future reactivation of rail service" by prohibiting abandonment where a trail sponsor agrees to assume certain responsibilities for the right-of-way for use in the interim as a trail. 16 U.S.C. § 1247(d); Nat'l Wildlife Fed'n v. ICC, 850 F.2d 694, 699-702 (D.C. Cir. 1988). The statute expressly provides that "if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for [any] purposes ... as an abandonment." § 1247(d). Instead, the right-of-way is "railbanked,"[2] which means that the railroad is relieved of the current obligation to provide service over the line but that the railroad (or any other approved rail service provider,[3] in appropriate circumstances) may reassert control over the right-of-way to restore service on the line in the future. See Birt, 90 F.3d at 583; Iowa Power— Const. Exemption—Council Bluffs, Iowa, 8 I.C.C.2d 858, 866-67 (1990); 49 C.F.R. § 1152.29.[4]

**\*3** The Trails Act is invoked when a prospective trail sponsor files a request with the Board to railbank a line that a rail carrier has proposed to abandon. The request must include a statement of willingness to assume responsibility for management of, legal liability for, and payment of taxes on, the right-of-way and an acknowledgement that interim trail use/railbanking is subject to possible future reconstruction and reactivation of rail service at any time. 49 C.F.R. § 1152.29(a).[5] If the railroad indicates its willingness to negotiate an interim trail use/railbanking agreement for the line, the Board will issue a CITU or NITU. 49 C.F.R. § 1152.29(c)(1), (d)(1). Currently, pursuant to the Board's regulations, a CITU or NITU grants parties a 180-day period (which can be extended by Board order) to negotiate an interim trail use/railbanking agreement. Id.; Birt, 90 F.3d at 583, 588-90 (affirming the agency's authority to grant reasonable extensions of the Trails Act negotiating period). See also Grantwood Vill. v. Mo. Pac. R.R., 95 F.3d 654, 659 (8th Cir. 1996) (stating that the ICC "was free to extend [the 180-day CITU or NITU] time period for an agreement").

If parties reach an agreement during the interim trail use/railbanking negotiating period, the CITU or NITU automatically authorizes interim trail use/railbanking. Preseault, 494 U.S. at 7 n.5. If no interim trail use/railbanking agreement is reached by the expiration of the CITU or NITU 180-day negotiation period (and any extension thereof), the CITU or NITU authorizes the railroad to exercise its option to "fully abandon" the line by consummating the abandonment, without further action by the agency, provided that there are no legal or regulatory barriers to consummation. Birt, 90 F.3d at 583; see also 49 C.F.R. §

1152.29(c)(1), (d)(1), (e)(2); Consummation of Rail Line Abans. That Are Subject to Historic Pres. & Other Envtl. Conditions, EP 678, slip op. at 3-4 (STB served Apr. 23, 2008). [6]

### Duration of the Initial Interim Trail Use/Railbanking Negotiating Period

As noted above, RTC petitioned the Board to institute a rulemaking proceeding to revise 49 C.F.R. § 1152.29 to establish a one-year period for any initial interim trail use negotiating period and codify the Board's authority to grant extensions of the negotiating period for good cause shown. RTC states that, since 1987, it has tracked all abandonment filings by the Board-assigned docket number and filing and decision dates, and has included in its database, among other things, information on whether the Board issued a CITU or NITU to allow interim trail use/railbanking negotiations between a prospective trail sponsor and a railroad. (RTC Pet. 2.) RTC further notes that, as of November 2018, its database contained records for 718 issued CITUs/NITUs dating from 1987. (Id. at 6.) RTC asserts that, of the 718 CITUs/NITUs, at least 393 corridors— representing 5,895.53 miles of right-of-way—were successfully railbanked and remain railbanked today. (Id. at 7.) RTC further asserts that, of the 370 railbanked corridors for which its database indicated the length of negotiations, [7] 289 railbanking agreements (78.1%) required more than 180 days to negotiate, while approximately half (183 of the 370 corridors) were negotiated within one year. (RTC Pet. 7.) RTC, therefore, argues that its data supports the conclusion that an initial railbanking negotiating period of one year, rather than 180 days, would more closely reflect the actual length of time required to complete railbanking negotiations. (Id.) After considering the comments filed in response to the Board's NPR, and the comments filed in response to RTC's petition, the Board issued the SNPR, proposing a rule establishing a one-year initial period for interim trail use/railbanking negotiations.

**\*4** Most of the parties commenting on the SNPR [8] support the Board's proposal, asserting that the proposal effectively balances the interests of all affected parties and stakeholders. Many agree that establishing a one-year interim trail use/railbanking negotiating period would reduce burdens on prospective trail sponsors and railroads related to the filing of extension requests, reduce the number of filings requiring Board action (thereby conserving Board resources), and more closely reflect the actual time needed to complete interim trail use/railbanking negotiations. (See, e.g., Hunter Area Trail Coalition Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; City of St. Charles Comments 1, July 3, 2019, EP 749 (Sub-No. 1) et al.)

Few commenters oppose this aspect of the Board's SNPR proposal. One commenter argues that negotiations should be open-ended to allow parties more time to finalize their agreements, (see Stimson Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.), but, as discussed below, the Board seeks to bring administrative finality to the interim trail use/railbanking negotiating process. Two commenters express general concerns that extended interim trail use/railbanking negotiations and trail use harm property owners, and, without further explanation beyond those general concerns, also seem to oppose the Board's proposal to establish one-year negotiating periods. (See Pennsylvania Transit Expansion Coalition Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; Presnell Comments 1, June 19, 2019, EP 749 (Sub-No. 1) et al.) The Board, however, is taking action here to protect against unduly protracted interim trail use/railbanking negotiating periods and is unpersuaded by the few comments that raise general concerns about the Board's proposed one-year initial trail use/railbanking negotiating period.

In light of the data from RTC and for the reasons cited in the many comments received in support of the Board's SNPR proposal, the Board will adopt its proposed rule changing the duration of the initial interim trail use/railbanking negotiating period to one year. This change would reduce burdens on parties before the Board, conserve Board resources, and reflect more closely the actual length of time in which many interim trail use/railbanking negotiations are completed.

### Extensions of the Interim Trail Use/Railbanking Negotiating Period

In the SNPR, EP 749 (Sub-No. 1) et al., slip op. at 8-9, the Board sought comment on whether it should limit the number of extensions of an interim trail use/railbanking negotiating period to three one-year extensions, unless good cause for additional extension(s) is shown.

**\*5**  Most commenters support the Board's proposed rule that would permit up to three one-year extensions of the interim trail use/railbanking negotiating period. Commenters, however, disagree as to whether a "good cause" standard of review or an "extraordinary circumstances" standard should apply to additional one-year extensions requested beyond the first three. Landowners and related interested parties generally oppose any rule that would extend the interim trail use/railbanking negotiating period for "good cause" and would prefer an ""extraordinary circumstances" standard.[9] (See, e.g., Rahmer Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; Borek Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; West Comments 1, June 27, 2019, EP 749 (Sub-No. 1) et al.) Many of these commenters argue that a "good cause" standard of review is too vague, lenient, subjective, or broad. (See, e.g., Falcsik Comments 1, July 3, 2019, EP 749 (Sub-No. 1) et al., Watt Comments 1, June 27, 2019, EP 749 (Sub-No. 1) et al.; Pennsylvania Transit Expansion Coalition Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.) Many commenters that support an ""extraordinary circumstances" standard also support the inclusion of language stating that requests for extensions are not favored. (See, e.g., Falcsik Comments 2, July 3, 2019, EP 749 (Sub-No. 1) et al.)

Trail proponents, which include government entities, individuals, and other interested parties, support the Board's proposal, which was sought by RTC to require a showing of "good cause" for extensions beyond the first three. (See, e.g., Alabama Trails Commission Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; Humboldt Trails Council Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; Capps Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; City of Chicago Comments 1, July 5, 2019, EP 749 (Sub-No. 1) et al.) Most trail proponents urge the Board to adopt the regulations proposed in the SNPR, including the "good cause" standard for granting extensions beyond the first three, but request that the Board eliminate the proposed language that more than three extensions are "not favored." According to some, the inclusion of this language would undermine the purposes of the Trails Act based on what they characterize as "vague and unsubstantiated concerns about reducing 'uncertainty for some property owners.'" (See, e.g., Alabama Trails Commission Comments 1, July 8, 2019, EP 749 (Sub-No. 1) et al.; Hummingbird Trail Alliance Comments 1, June 27, 2019, EP 749 (Sub-No. 1) et al.) RTC also argues that the "not favored" language is not supported by any demonstrated need to discourage extension requests, would create a higher standard governing extensions of ordinary regulatory deadlines that is unprecedented in the Board's regulations, and would create uncertainty and invite baseless challenges that could delay and discourage railbanking negotiations. (RTC Comments 1, July 8, 2019, (filing ID 248138) EP 749 (Sub-No. 1).)

**\*6**  The Board has considered the comments received following issuance of the NPR and the SNPR, and it continues to conclude that reasonably limiting the number of extensions of the interim trail use/railbanking negotiating period would foster administrative efficiency, clarity, and finality. See NPR, EP 749 et al., slip op. at 5. Moreover, having reviewed all the comments with respect to the different standards of review for extension requests beyond three, the Board finds the "extraordinary circumstances" standard originally proposed in the NPR—together with the proposed language in the SNPR that more than three extensions are "not favored"—to be more consistent with the Board's intent than the "good cause" standard of review proposed in the SNPR. The Board desires to bring more efficiency, clarity, and finality to the interim trail use/railbanking process as Trails Act negotiations at times have gone on for many years. NPR, EP 749 et al., slip op. at 5. An "extraordinary circumstances" standard would achieve this goal more effectively than a more permissive "good cause" standard by making clear that extensions beyond the third would be unusual and by giving participants in Trails Act proceedings a clear understanding of the appropriate timeframe for reaching an interim trail use/railbanking agreement, as well as a more definitive deadline under which to work.[10]

Advocates of the "good cause" standard assume that the more stringent "extraordinary circumstances" standard would result in legitimate, diligently pursued negotiations being truncated, preventing consummation of trail use agreements and frustrating the policy of the Trails Act to encourage railbanking. (See, e.g., RTC Comments 5-6, 9-10, July 8, 2019, (filing ID 248138) EP 749 (Sub-No. 1)). Similarly, many of the commenters who oppose language stating that additional extensions beyond three "are not favored" argue that such language suggests an unnecessary presumption against granting additional extensions. (See, e.g., Friends of the Cheat Comments 1-2, July 16, 2019, EP 749 (Sub-No. 1) et al.; Transportation for America Comments 1; June 21, 2019, EP 749 (Sub-No. 1) et al.) Indeed, these commenters appear to support a "good cause" standard precisely because that standard would be liberal and would allow for potentially open-ended extensions. (See, e.g., RTC Pet. 10-12.)

**\*7** However, adopting a more liberal standard would undercut the Board's goals in this rulemaking. The Board must balance the need to allow parties enough time to complete their negotiations and finalize an interim trail use/railbanking agreement with the need to conclude the Trails Act process within a reasonable amount of time. Four years is a significant amount of time to reach an interim trail use/railbanking agreement. Based on the record here, the Board does not anticipate that the "extraordinary circumstances" standard will impair the ability of prospective trail sponsors and railroads, operating diligently and in good faith, to successfully conclude interim trail use/railbanking agreements. The record supports the conclusion that an ""extraordinary circumstances" standard would be implicated in only a relatively small percentage of cases. Based on RTC's data, 327 out of 370 negotiated Trails Act agreements (approximately 88%) have been reached within four years— that is, before an "extraordinary circumstances" requirement would even apply under the rule adopted here. (See RTC Pet., Decl. Griffen 2.) Therefore, in the vast majority of cases, parties who have reached an interim trail use/railbanking agreement have been able to do so within a four-year period such as that established by this final rule (a one-year initial negotiation period followed by three one-year extensions). The Board anticipates that, with a clearer understanding of the deadlines that will apply under the final rule, parties would be better incentivized to conclude their negotiations and enter into an agreement in a more timely manner, which would both give landowners more certainty by providing a timeline for the conclusion of negotiations and conserve Board resources. Moreover, where, due to extraordinary circumstances, parties are unable to finalize an agreement within four years, they will retain the ability to demonstrate those extraordinary circumstances to the Board and obtain further extensions. Given that the Board does not anticipate this rule would impair the ability of trail sponsors and railroads to successfully conclude interim trail use/railbanking agreements, the final rule is consistent with the underlying purposes of the Trails Act: to preserve established railroad rights-of-way for future reactivation of rail service and encourage their use in the interim as recreational trails. Preseault, 494 U.S. at 17-18.

RTC argues that there is little precedent in the Board's regulations or regulatory practice to adopt a standard that strongly disfavors extensions, regardless of "any good cause for the requests." (RTC Comments 11, Nov. 21, 2018, EP 749 (Sub-No. 1).) According to RTC, the Board routinely waives its regulatory deadlines for other stakeholders based on "good cause shown." (Id. (citing Buckingham Branch R.R.—Change in Operators Exemption—Cassatt Mgmt., LLC, FD 36202 (STB served July 31, 2018).) However, based on the Board's experience with Trails Act negotiations, some of which have gone on for more than a decade, the Board finds that a different, "extraordinary circumstances" standard of review for such cases is warranted and appropriate. As noted above, the Board believes that this standard will improve the efficiency, clarity, and finality of the Trails Act process while balancing the objectives of trail proponents, landowners, railroads, and the agency. It has been long recognized that agencies have broad discretion to manage and control their own dockets and proceedings. See Neighborhood TV Co. v. FCC, 742 F.2d 629, 636 (D.C. Cir. 1984) ("There is a general principle that '[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business when in a given case the ends of justice require it.'") (quoting Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 539 (1970)). [11] Therefore, the Board may, in its discretion, modify its Trails Act procedures to accomplish the goals set forth in the NPR and SNPR. [12]

**\*8** Finally, in jointly filed comments in response to both the NPR and SNPR, Madison County Mass Transit District and the Iowa Natural Heritage Foundation (MCTD/INHF) argue that the Board's sole basis for any limitation on the CITU or NITU negotiation period is dicta in Birt, 90 F.3d at 589, which notes that NITU extensions "ad infinitum" could have the undesirable effect of "allowing the railroad to stop service without either relinquishing its rights to the easement or putting the right-of-way to productive use." (MCTD/INHF Comments 6-7, Oct. 25, 2018, EP 749 et al.); MCTD/INHF Comments 6-7, July 5, 2019, EP 749 (Sub-No. 1) et al.) MCTD/INHF asserts that there is no authority in 16 U.S.C. § 1247(d) or in rail transportation policy generally to impose any limitations on the NITU negotiating period. (MCTD/INHF Comments 11, Oct. 25, 2018, EP 749 et al.) Similarly, the Missouri Central Railroad Company (MCRR) argues that the Board's proposal is unnecessary given that the Board can and does evaluate extension requests on a case-by-case basis. (MCRR Comments 2, Nov. 1, 2018, EP 749 (Sub-No. 1); MCRR Comments 1, July 2, 2019, EP 749 (Sub-No. 1) et al.) Nevertheless, MCRR states that it understands the need for administrative finality. (MCRR Comments 1, July 2, 2019, EP 749 (Sub-No. 1) et al.)

MCTD/INHF misinterpret Birt. The court in Birt found that the Board's predecessor, the Interstate Commerce Commission (ICC), could, in its discretion, interpret 16 U.S.C. § 1247(d) to allow it to grant reasonable extensions of the Trails Act negotiating

period. See 90 F.3d at 588-89. That holding is entirely consistent with the Board's determination in the final rule here. Nothing in Birt or the rest of MCTD/INHF's comments provides support for the proposition that the Board may not impose reasonable restrictions on the number of extensions it grants. As noted above, agencies have the discretion to modify procedural rules "when in a given case the ends of justice require it." See Neighborhood TV, 742 F.2d at 636. Here, as discussed above, adoption of a rule establishing a one-year initial negotiating period, allowing three one-year extensions, and permitting additional one-year extensions if extraordinary circumstances are shown is reasonable and strikes an appropriate balance between the interests of landowners, trail proponents, railroads, and the agency. The final rule will lead to more efficiency, clarity, and finality in the Trails Act process, reducing burdens on parties, conserving Board resources, and providing greater overall certainty, while also providing a reasonable amount of time (at least four years) for railroads and prospective trail sponsors to negotiate voluntary agreements for interim trail use/railbanking. [13]

### Other Issues

  **\*9**  In its petition, NARPO requested that the Board require a rail carrier or trail sponsor to "send notice" to adjoining landowners following the issuance of a CITU or NITU. (NARPO Pet. 4.) In the NPR, the Board found that NARPO had not provided a sufficient basis for altering the existing notice requirements. NPR, EP 749 et al., slip op. at 6-7. In its comments in response to the NPR, NARPO asks the Board to further consider NARPO's request to require rail carriers to provide "due process notice" to property owners. (NARPO Reply 1-2, Nov. 20, 2018, EP 749 (Sub-No. 1).) As stated in the NPR, the Board, and its predecessor, the ICC, have repeatedly considered similar notice proposals by NARPO and declined to adopt such a rule. See Nat'l Ass'n of Reversionary Prop. Owners v. STB, 158 F.3d 135 (D.C. Cir. 1998); Nat'l Trails System Act & R.R. Rights-of-Way, EP 702, slip op. at 7-8 (STB served Feb. 16, 2011); Rail Abans.—Use of Rights-of-Way as Trails— Supplemental Trails Act Procedures, EP 274 (Sub-No. 13) (ICC served July 28, 1994). NARPO has provided the Board no basis for altering that position.

NARPO also argues that the Board should "rein in the games the railroads are playing" with NITU extensions and the Section 106 process of the National Historic Preservation Act, 54 U.S.C. § 306108. (NARPO Reply 6, Nov. 20, 2018, EP 749 (Sub-No. 1).) According to NARPO, rail carriers use the need to complete the Section 106 process and comply with certain other types of environmental conditions imposed during the environmental review process to extend the time available to consummate abandonments under 49 C.F.R. § 1152.29(e)(2)—with the goal that prospective trail sponsors, during such time, can raise the necessary capital to acquire rights-of-way for interim trail use/railbanking. (Id.)

Similarly, certain landowners collectively filed comments arguing that the Board's SNPR omits "a necessary corollary concern to extensions of temporary and permanent trail use negotiating periods." (Nelson et al. Comments 1, June 28, 2019, EP 749 (Sub-No. 1) et al.) These landowners assert that, if there are limits on the number of extensions of the CITU or NITU negotiating period, there, likewise, "should be a concurrent amendment pertaining to the limitation of consummation of abandonment after these newly enlarged negotiation periods, and the likelihood of the termination/vacation of a NITU." (Id. at 4.) They propose four amendments to the Board's regulations at § 1152.29(e), governing notices of consummation of abandonments; these proposed changes include a proposal that "a railroad's consummation of abandonment shall automatically occur 180 days after the expiration or vacation of a NITU." (Id. at 5.)

  **\*10**  A notice of consummation is required in every abandonment case in which a railroad decides to exercise its authority to abandon a rail line and thereby terminate the Board's jurisdiction—not just in abandonment proceedings where a trail use condition has been imposed. 49 C.F.R. § 1152.29(e)(2); Honey Creek, FD 34869 et al., slip op. at 5. Moreover, certain other conditions commonly imposed in abandonment proceedings to implement provisions of law unrelated to the Trails Act can affect the timing and permissibility of a railroad's filing a notice consummating an abandonment. See Consummation of Rail Line Abans. that are Subject to Historic Pres. & Other Envtl. Conditions, EP 678 (STB served Apr. 23, 2008). Any proposal that would alter or otherwise impact how and when consummation of abandonment can take place is beyond the scope of this proceeding, which relates only to restrictions on the negotiating periods for interim trail use/railbanking, not the broader issues

implicated in the consummation of abandonments in general. Thus, the Board declines to address the comments and proposals relating to the filing of a consummation notice under § 1152.29(e).

FINAL RULE

For the reasons discussed above, and as set forth in the Appendix, the Board is adopting a final rule to amend its regulations to: (1) provide that the initial term for CITUs or NITUs will be one year (instead of the current 180 days); (2) permit up to three one-year extensions of the initial period if the trail sponsor and the railroad agree; and (3) permit additional one-year extensions if the trail sponsor and the railroad agree and extraordinary circumstances are shown. Requests for additional extensions will not be favored but may be granted if the trail sponsor and railroad agree and "extraordinary circumstances" are shown. [14] A showing of "extraordinary circumstances" will depend on the specific facts of each case but might include, for example, specific evidence that necessary financing is imminent or specific evidence of problems or complications demonstrably beyond the negotiators' control that arise in connection with an unusually lengthy, multi-jurisdictional trail. It is unlikely that issues within negotiators' control, such as insurance coverage, title review, appraisal issues, or personnel turnover, will constitute extraordinary circumstances.

The aspect of the final rule establishing a one-year duration for any initial interim trail use/railbanking negotiating period will apply to any new CITU or NITU requested on or after the effective date of the rule. Parties in negotiations under existing CITUs or NITUs on the effective date of these rules who wish to extend their negotiating period will be required to seek extensions of one year, rather than 180 days as is the current common practice (or any other duration). The aspect of the final rule that limits the number of one-year extensions of an interim trail use/railbanking negotiating period to three will apply both to new CITUs or NITUs requested on or after the rule's effective date and to cases where a CITU or NITU was requested before the final rule took effect. In the latter instance, a showing of extraordinary circumstances will be required for any request that would extend the interim trail use/railbanking negotiating period to a date after the four-year anniversary of the issuance of the CITU or NITU (including cases where the existing CITU or NITU already extends beyond that anniversary), unless the request is eligible for the transitional measure described below.

**\*11**  In the NPR, the Board stated that it may more liberally provide additional extensions for extraordinary circumstances in certain instances in which a CITU or NITU is pending when this rule takes effect. NPR, EP 749 et al., slip op. at 8. The Board clarifies now that, as a transitional measure, parties engaged in negotiations under an existing CITU or NITU that was originally issued before February 2, 2017, may request **one** additional extension of one year, beyond the four-year anniversary of the issuance of the CITU or NITU, without showing extraordinary circumstances.

<u>Regulatory Flexibility Act</u>

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. §§ 601-612, generally requires a description and analysis of new rules that would have a significant economic impact on a substantial number of small entities. In drafting a rule, an agency is required to: (1) assess the effect that its regulation will have on small entities; (2) analyze effective alternatives that may minimize a regulation's impact; and (3) make the analysis available for public comment. §§ 601-604. In its final rule, the agency must either include a final regulatory flexibility analysis, § 604(a), or certify that the proposed rule would not have a "significant impact on a substantial number of small entities," § 605(b). The impact must be a direct impact on small entities "whose conduct is circumscribed or mandated" by the proposed rule. White Eagle Coop. v. Conner, 553 F.3d 467, 480 (7th Cir. 2009).

In the SNPR, the Board certified under 5 U.S.C. § 605(b) that the proposed rule would not have a significant economic impact on a substantial number of small entities within the meaning of the RFA. [15] The Board explained that its proposed changes to its regulations would improve the efficiency, clarity, and finality of its interim trail use/railbanking procedures and would not mandate the conduct of small entities. Indeed, the changes proposed are largely procedural and would not have a significant economic impact on Class III rail carriers or prospective trail sponsors (whether as small businesses, not-for-profits, or small governmental jurisdictions) to which the RFA applies. The proposed rules would lengthen, from 180 days to one year,

the duration of the initial voluntary interim trail use/railbanking negotiating period and the current typical extension periods, reducing the frequency with which trail sponsors and railroads would need to file extension requests and replies. The Board, therefore, noted that the impact of the proposed rule would be a reduction in the paperwork burden for small entities. Further, the Board asserted that the economic impact of the reduction in paperwork, if any, would be minimal and entirely beneficial to small entities as such entities would have reduced filing burdens associated with negotiating an interim trail use/railbanking agreement. Therefore, the Board certified under 5 U.S.C. § 605(b) that these proposed rules, if promulgated, would not have a significant economic impact on a substantial number of small entities within the meaning of the RFA.

**\*12**  The final rule adopted here revises the rules proposed in the SNPR; however, the same basis for the Board's certification of the proposed rule applies to the final rule. Therefore, the Board again certifies under 5 U.S.C. § 605(b) that the final rule will not have a significant economic impact on a substantial number of small entities within the meaning of the RFA. A copy of this decision will be served upon the Chief Counsel for Advocacy, Offices of Advocacy, U.S. Small Business Administration, Washington, DC 20416.

Paperwork Reduction Act

In this proceeding, the Board is modifying an existing collection of information that is currently approved by the Office of Management and Budget (OMB) through September 30, 2021, under the collection of Preservation of Rail Service (OMB Control No. 2140-0022). In the SNPR, the Board sought comments pursuant to the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501-3549, and OMB regulations at 5 C.F.R. § 1320.8(d)(3) regarding: (1) whether the collection of information, as modified in the proposed rule in the Appendix, is necessary for the proper performance of the functions of the Board, including whether the collection has practical utility; (2) the accuracy of the Board's burden estimates; (3) ways to enhance the quality, utility, and clarity of the information collected; and (4) ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology, when appropriate. No comments were received pertaining to the collection of this information under the PRA.

This modification to an existing collection will be submitted to OMB for review as required under the PRA, 44 U.S.C. § 3507(d), and 5 C.F.R. § 1320.11.

Congressional Review Act

Pursuant to the Congressional Review Act, 5 U.S.C. §§ 801-808, the Office of Information and Regulatory Affairs has designated this rule as a non-major rule, as defined by 5 U.S.C. § 804(2).

List of subjects:

49 C.F.R. Part 1152

Administrative practice and procedure, Railroads, Reporting and recordkeeping requirements, Uniform System of Accounts.

It is ordered:

**\*13**  1. The Board adopts the final rule set forth in this decision. Notice of the final rule will be published in the Federal Register.

2. All pleadings received by the Board as of the date of issuance of this decision are accepted into the record.

3. A copy of this decision will be served upon the Chief Counsel for Advocacy, Office of Advocacy, U.S. Small Business Administration, Washington, DC 20416.

4. This decision is effective on February 2, 2020.

Appendix

For the reasons set forth in the preamble, the Surface Transportation Board amends part 1152 of title 49, chapter X, of the Code of Federal Regulations as follows:

**PART 1152—ABANDONMENT AND DISCONTINUANCE OF RAIL LINES AND RAIL TRANSPORTATION UNDER 49 U.S.C. 10903**

1. The authority citation for part 1152 continues to read as follows:

Authority: 11 U.S.C. 1170; 16 U.S.C. 1247(d) and 1248; 45 U.S.C. 744; and 49 U.S.C. 1301, 1321(a), 10502, 10903-10905, and 11161.

2. Amend § 1152.29 by:
a. In paragraph (a), adding a paragraph heading;

b. In paragraph (b), adding a paragraph heading;

c. In paragraph (b)(1)(ii), removing the words "§ 1152.29(a)" and adding in its place the words "paragraph (a) of this section";

d. In paragraph (c), revising the paragraph heading;

e. Revising paragraph (c)(1);

f. In paragraph (c)(3), removing the words "49 CFR part 1150" and adding in its place the words "part 1150 of this title";

g. In paragraphs (d) revising the paragraph heading and (d)(1);

h. In paragraph (d)(3), removing "49 CFR part 1150" and adding in its place the words "part 1150 of this title";

i. In paragraph (e), adding a paragraph heading;

j. In paragraph (f), adding a paragraph heading;

k. In paragraph (g), adding a paragraph heading and removing the words "180 days" and adding in its place the words "one year";

l. In paragraph (h), adding a paragraph heading.

The revisions and additions read as follows:

**§ 1152.29 Prospective use of rights-of-way for interim trail use and railbanking.**

**\*14**  (a) *Contents of request for interim trail use.* * * *

(b) *When to file.* * * *

(c) *Abandonment application proceedings.*

(1) In abandonment application proceedings, if continued rail service does not occur pursuant to 49 U.S.C. 10904 and § 1152.27, and a railroad agrees to negotiate an interim trail use/railbanking agreement, then the Board will issue a CITU to the railroad and to the interim trail sponsor for that portion of the right-of-way as to which both parties are willing to negotiate.

(i) The CITU will permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and material consistent with interim trail use and railbanking, as long as such actions are consistent with any other Board order, 30 days after the date the CITU is issued; and permit the railroad to fully abandon the line if no interim trail use agreement is reached within one year from the date on which the CITU is issued, subject to appropriate conditions, including labor protection and environmental matters.

(ii) Parties may request a Board order to extend, for one-year periods, the interim trail use negotiation period. Up to three one-year extensions of the initial period may be granted if the trail sponsor and the railroad agree. Additional one-year extensions, beyond three extensions of the initial period, are not favored but may be granted if the trail sponsor and the railroad agree and extraordinary circumstances are shown.

* * *

(d) *Abandonment exemption proceedings.*

(1) In abandonment exemption proceedings, if continued rail service does not occur under 49 U.S.C. 10904 and § 1152.27, and a railroad agrees to negotiate an interim trail use/railbanking agreement, then the Board will issue a Notice of Interim Trail Use or Abandonment (NITU) to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are willing to negotiate.

(i) The NITU will permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and railbanking, as long as such actions are consistent with any other Board order, 30 days after the date the NITU is issued; and permit the railroad to fully abandon the line if no interim trail use agreement is reached within one year from the date on which the NITU is issued, subject to appropriate conditions, including labor protection and environmental matters.

(ii) Parties may request a Board order to extend, for one-year periods, the interim trail use negotiation period. Up to three one-year extensions of the initial period may be granted if the trail sponsor and railroad agree. Additional one-year extensions, beyond three extensions of the initial period, are not favored but may be granted if the trail sponsor and railroad agree and extraordinary circumstances are shown.

**\*15** * * *

(e) *Late-filed requests; notices of consummation.* * * *

(f) *Substitution of trail user.* * * *

(g) *Consent after Board decision or notice.* * * *

(h) *Notice of interim trail use agreement reached.* * * * * *

1   NARPO's proposed rules only refer to NITUs, but, presumably, NARPO intended to propose the same changes to CITU procedures as there are no substantive differences between CITUs (issued in an abandonment application proceeding) and NITUs (issued in an abandonment exemption proceeding).

2   If a line is railbanked and designated for interim trail use, any reversionary interests that adjoining landowners might have under state law upon abandonment are not activated. 16 U.S.C. § 1247(d); Preseault v. ICC, 494 U.S. 1, 8 (1990); Birt v. STB, 90 F.3d 580, 583 (D.C. Cir. 1996).

3   See King Cty., Wash.—Acquis. Exemption—BNSF Ry., FD 35148, slip op. at 3-4 (STB served Sept. 18, 2009).

4   The Board and its predecessor, the Interstate Commerce Commission (ICC), have promulgated, modified, and clarified rules to implement the Trails Act a number of times. See, e.g., Nat'l Trails System Act & R.R. Rights-of-Way, EP 702 (STB served Apr. 30, 2012); Aban. & Discontinuance of Rail Lines & Rail Transp. Under 49 U.S.C. 10903, 1 S.T.B. 894 (1996); Policy Statement on Rails to Trails Conversions, EP 274 (Sub-No. 13B) (ICC served Jan. 29, 1990); Rail Abans.—Use of Rights-of-Way as Trails—Supplemental Trails Act Procedures, 4 I.C.C.2d 152 (1987); Rail Abans.—Use of Rights-of-Way as Trails, 2 I.C.C.2d 591 (1986).

5   The prospective trail sponsor's request must also include a map depicting, and an accurate description of, the right-of-way, or portion thereof (including mileposts), proposed to be acquired or used for interim trail use/railbanking. 49 C.F.R. § 1152.29(a)(1).

6   The Board retains jurisdiction over a rail line throughout the interim trail use/railbanking negotiating period, any period of interim trail use/railbanking, and any period during which rail service is restored. The Board's jurisdiction is terminated once the CITU or NITU is no longer in effect and the railroad has fully abandoned the line by filing a notice of consummation under 49 C.F.R. § 1152.29(e)(2). See 16 U.S.C. § 1247(d); Hayfield N. R.R. v. Chi. & N. W. Transp. Co., 467 U.S. 622, 633 (1984); Honey Creek R.R.—Pet. for Declaratory Order, FD 34869 et al., slip op. at 5 (STB served June 4, 2008). Upon such occurrence, the right-of-way is no longer part of the national transportation system and will revert to any reversionary landowner. Preseault, 494 U.S. at 5, 8.

7   RTC states that its database lacks information on the length of railbanking negotiations for 23 railbanked corridors. (RTC Pet., Decl. Griffen 2.)

8   The Board notes that comments regarding the SNPR were due by July 8, 2019, and replies were due by July 26, 2019. A number of comments, however, were filed late. In the interest of having a more complete record, all pleadings received as of the date of issuance of this decision will be accepted into the record.

9   One commenter further asserts that a more acceptable and reasonable standard by which to provide NITU extensions would be "extraordinary circumstances" limited to "circumstances beyond a party's control that normal prudence and experience could not foresee, anticipate or provide for." (Falcsik Comments 1, July 3, 2019, EP 749 (Sub-No. 1) et al.)

10  The Board notes that courts have held that the issuance of a CITU or NITU and the duration of the interim trail use negotiation period can impact takings claims cases. See Ladd v. United States, 630 F.3d 1015, 1024-25 (Fed. Cir. 2010); Caldwell v. United States, 391 F.3d 1226, 1233 (Fed. Cir. 2004).

11  See also GTE Serv. Corp. v. FCC, 782 F.2d 263, 273-74 & n.12 (D.C. Cir. 1986) (affirming agencies' inherent power to control their own dockets); Ass'n of Buss. Advocating Tariff Equity v. Hanzlik, 779 F.2d 697, 701 & n.6 (D.C. Cir. 1985) (same); FTC v. Owens-Corning Fiberglas Corp., 626 F.2d 966, 975 (D.C. Cir. 1980) (same). Nat. Res. Def. Council, Inc. v. SEC, 606 F.2d 1031, 1056 (D.C. Cir. 1979) (same).

12  In any event, "extraordinary" circumstances is not an uncommon standard and is used in a variety of regulatory and procedural contexts, including in the Board's own regulations. See, e.g., Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33

(1980) (per curiam) (mandamus); City of Orville v. FERC, 147 F.3d 979 (D.C. Cir. 1998) (timeliness of intervention); 43 C.F.R. § 4.403 (reconsideration of final decision); 5 C.F.R. § 185.110 (late filing of answer); 49 C.F.R. § 1002.2(e)(2) (Board will accept requests for fee waivers in extraordinary situations).

13    As noted above, based on RTC's data, approximately 88% of voluntary interim trail use/railbanking agreements have been reached within four years. (See RTC Pet., Decl. Griffen 2.)

14    In addition to the changes described here, the Appendix includes other non-substantive changes to the rules in § 1152.29 (e.g., adding paragraph headings).

15    For the purpose of RFA analysis for rail carriers subject to Board jurisdiction, the Board defines a "small business" as only including those rail carriers classified as Class III rail carriers under 49 C.F.R. § 1201.1-1. See Small Entity Size Standards Under the Regulatory Flexibility Act, EP 719 (STB served June 30, 2016) (with Board Member Begeman dissenting). Class III carriers have annual operating revenues of $20 million or less in 1991 dollars, or $39,194,876 or less when adjusted for inflation using 2018 data. Class II rail carriers have annual operating revenues of less than $250 million but in excess of $20 million in 1991 dollars, or $489,935,956 and $39,194,876 respectively, when adjusted for inflation using 2018 data. The Board calculates the revenue deflator factor annually and publishes the railroad revenue thresholds in decisions and on its website. 49 C.F.R. § 1201.1-1; Indexing the Annual Operating Revenues of R.Rs., EP 748 (STB served June 14, 2019).

2019 WL 7484082 (S.T.B.)

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 227 of 284

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

2016 WL 4735364
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ramesh KHUDAN, Plaintiff,
v.
Superintendent William LEE, et al., Defendants.

No. 12-cv-8147 (RJS)
|
Signed 09/08/2016

**Attorneys and Law Firms**

Amy L. Bellantoni, The Bellantoni Law Firm, LLP, Scarsdale, NY, for Plaintiff.

Jeb Harben, Office of the Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff brings this action against various officers of the New York State Department of Corrections and Community Supervision ("DOCCS") under 42 U.S.C. § 1983 alleging violations of his Eighth and Fourteenth Amendment rights while he was an inmate at Green Haven Correctional Facility ("Green Haven"). Now before the Court is Defendants' motion for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND [1]

[1] The following facts are taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 61 ("Rule 56.1 Statement" or "56.1 Stmt.")), and Plaintiff's Counter Rule 56.1 Statement (Doc. No. 67 ("Counter Statement" or "Counter Stmt.")). In deciding Defendants' motion for summary judgment, the Court also has considered Defendants' memorandum of law in support of their motion (Doc. No. 60 ("Mem.")), Plaintiff's memorandum of law in opposition (Doc. No. 66 ("Opp'n")), and Defendants' reply (Doc. No. 70

("Reply")), as well as the declarations and exhibits submitted in connection with the instant motion.

A. Facts

Plaintiff, a New York State prisoner currently housed at the Franklin Correctional Facility, was formerly incarcerated at Green Haven, a prison administered by the DOCCS. Plaintiff alleges that on October 31, 2009, while he was an inmate at Green Haven, he was "violently attacked and stabbed in the eye" by a fellow inmate in the facility's recreational yard (the "October 31 Incident"). (Counter Stmt. ¶¶ 3, 18, 20-22; *see also* 56.1 Stmt. ¶¶ 1-3.) Plaintiff attributes his injuries to the fact that Defendants Duane Malark and Jeffrey Erns, Corrections Officers at Green Haven, falsely informed members of a gang that he was a sex offender and rapist, and that Defendants Superintendent William Lee, Lieutenant Neal Greene, and Corrections Officers Rory Hamilton, David Deming, Arthur Andrews, Robert Sherman, and P. Allen failed to provide security in the recreational yard and take other security measures that would have prevented the attack. (Counter Stmt. ¶¶ 3-4.) For several days after the attack, Plaintiff was hospitalized at Putnam County Hospital, where he was treated for his injuries. (Counter Stmt. ¶ 12.)

For purposes of this motion, the parties' dispute centers entirely on whether Plaintiff properly exhausted the administrative remedies available to him with respect to the October 31 Incident. Specifically, DOCCS administers the Inmate Grievance Program ("IGP"), which ordinarily requires prisoners to complete a three-step process in order to exhaust administrative remedies. *See* N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5; *see also* Espinal v. Goord, 558 F.3d 119, 125 (2d Cir. 2009) (describing IGP regulations in effect in 2009).[2] At step one, the prisoner is obligated to file a grievance, consisting of, among other things, "a concise, specific description of the problem and the action requested," with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one calendar days of the incident. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a). The IGRC then has sixteen calendar days from receipt of the grievance to informally resolve the issue, and if there is no informal resolution, the IGRC must conduct a hearing within sixteen calendar days of receiving the grievance and issue a written decision within two working days after the hearing concludes. *Id.* § 701.5(b). At step two, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility within seven calendar days by completing and signing the

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 228 of 284

appeal section on his IGRC response form and submitting it to the grievance clerk. *Id.* § 701.5(c). The superintendent then has twenty calendar days to respond to the prisoner's appeal. *Id.* Finally, at step three, the prisoner may appeal an adverse decision from the superintendent by submitting a "notice of decision to appeal" form to the Central Officer Review Committee ("CORC") within seven days.[3] *Id.* § 701.5(d). If at any level of review the decisionmaker fails to timely respond to the grievance, the inmate may appeal to the next level. *Id.* § 701.6(g); *see also Heyliger v. Gebler,* 624 Fed.Appx. 780, 782 (2d Cir. 2015). While an inmate may also ask the DOCCS Inspector General to investigate a complaint, "such an investigation is not a formal part of the IGP." *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015).

[2]    By contrast, grievances that allege "harassment" by prison staff – in other words, "employee misconduct meant to annoy, intimidate or harm an inmate" – may be subject to expedited review and immediately referred to the superintendent, who must make a decision within twenty-five calendar days of receipt of a harassment grievance. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.2(e), 701.8(f)-(h); *see also Leer v. Fisher,* No. 13-cv-8529 (JPO), 2015 WL 413253, at *4-5 (S.D.N.Y. Feb. 2, 2015) (describing the procedure for harassment allegations). However, Plaintiff avers, and Defendants do not dispute, that the ordinary three-step review process applied in this case. (Opp'n 3, 5; *see also* Doc. No. 31 at 2.) Accordingly, the Court assumes that Plaintiff's grievance was not eligible for expedited review.

[3]    Although the superintendent must forward grievances regarding DOCCS-wide policies directly to the CORC, *id.* at § 701.5(c)(3)(i), Plaintiff does not allege that he complained of DOCCS-wide policies.

 *2  Here, Defendants contend that Plaintiff failed to complete any step of the three-step grievance process, and point to the absence of any records at Green Haven reflecting that Plaintiff ever filed a grievance related to the October 31 Incident. Specifically, Defendants rely on an affidavit from the inmate records coordinator at the facility, Jennifer Hotaling, who attests that a diligent search of Green Haven's records reveals no grievance being filed by Plaintiff in relation to the October 31 Incident, notwithstanding the fact that it is Green Haven's policy to maintain records of all grievances filed within the facility. (Doc. No. 64 ("Hotaling Decl.") ¶ 2.)

Significantly, Ms. Hotaling's search did uncover a grievance from Plaintiff in Green Haven's records, filed March 2, 2010, in which Plaintiff made "general complaints about [his] medical care" at the facility and alleged violations of, among other things, the Health Insurance Portability and Accountability Act, but that grievance made no reference to the October 31 Incident. (*Id.* ¶ 2; *see also id.* at 7-12 (enclosing a copy of Plaintiff's grievance regarding medical care at Green Haven)). Defendants also point to the lack of evidence that Plaintiff ever appealed an adverse disposition of his purported grievance at step two or step three. (56.1 Stmt. ¶ 4.) Specifically, Jeffrey Hale, the assistant director of the IGP, attests that, having conducted a diligent search of the CORC's database for records of appeals, he could not locate any grievances relating to the claims presented in this case, even though the CORC maintains computer records of all appeals received from facilities participating in the IGP since 1990. (Doc. No. 63 ("Hale Decl.") ¶¶ 2-3, 9.)

For his part, Plaintiff claims that he completed all three steps of the IGP, although he provides no evidence other than his own declaration and deposition, which, as discussed further below, are insufficient to create a genuine dispute of material fact. Plaintiff also attests that the staff of Green Haven repeatedly interfered with his efforts to have his grievance adjudicated by ransacking his cell, threatening to kill him if he complained to the superintendent, and threatening him whenever he attempted to learn the status of his grievance. (Counter Stmt. ¶¶ 6, 23-24, 26-28; *see also* Doc. No. 65-2 ("Khudan Dep") 13:12-16, 14:22-15:4, 16:6-9.) However, Plaintiff fails to point to any specific dates when these incidents occurred, does not identify any names of officers who purportedly threatened him, fails to identify the specific locations in Green Haven where these alleged threats took place, and does not provide any other details of the improper conduct.

## B. Procedural History

On October 29, 2012, Plaintiff, then proceeding *pro se* and *in forma pauperis,* submitted his first complaint in this action, which was originally assigned to the Honorable Loretta A. Preska. (Doc. Nos. 2, 6.) In April 2013, then-Chief Judge Preska ordered Plaintiff to file an amended complaint. (Doc. No. 7.) After retaining counsel, Plaintiff filed the first amended complaint on October 7, 2013. (Doc. No. 13.) That same date, this action was reassigned to my docket. On April 23, 2014, Plaintiff filed the operative

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 229 of 284

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

pleading in this action, the second amended complaint, asserting two distinct violations of his Eighth and Fourteenth Amendment rights pursuant to Section 1983. (Doc. No. 32.) On October 17, 2014, Defendants moved to dismiss the second amended complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to 12(b)(6). (Doc. Nos. 40, 43.) Specifically, Defendants argued for dismissal based on Plaintiff's failure to exhaust administrative remedies under the PLRA, among other grounds. (Doc. No. 43.) On September 17, 2015, the Court denied the motion to dismiss without prejudice to renewal as a motion for summary judgment on the issue of administrative exhaustion. (Doc. No. 55 at 11.) Nevertheless, because "the question of exhaustion of administrative remedies *must* be addressed before the Court can consider the merits of [P]laintiff's claims" (*id.* at 5) (quoting *Foreman v. Comm. Goord,* No. 02-cv-7089 (SAS), 2004 WL 385114, at *6 (S.D.N.Y. Mar. 2, 2004)), the Court authorized the parties to conduct limited, expedited discovery on the issue of administrative exhaustion and directed Defendants to promptly file the instant motion for summary judgment solely on the issue of administrative exhaustion (*id.* at 10-11). Accordingly, Defendants submitted their motion for summary judgment on November 13, 2015 (Doc. Nos. 59, 60), Plaintiff submitted his opposition on December 3, 2015 (Doc. No. 66), and the motion was fully briefed when Defendants submitted their reply on December 29, 2015 (Doc. No. 70).

## II. LEGAL STANDARD

**\*3** Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson,* 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## III. DISCUSSION

Defendants argue that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the PLRA. The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake,* 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (internal quotation marks and alterations omitted)). As the Supreme Court and Second Circuit have instructed, "proper exhaustion ... means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford,* 548 U.S. at 90). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 230 of 284

to determine whether the prisoner has complied with those procedures." *Espinal,* 558 F.3d at 124. Furthermore, factual disputes related to administrative exhaustion are properly resolved by the Court, not by the jury. *See Messa v. Goord,* 652 F.3d 305, 309 (2d Cir. 2011).

**\*4** Under the IGP, an inmate must exhaust all available administrative remedies by completing all three steps before filing suit in federal court, and "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Laguna v. Kwan,* No. 13-cv-7079 (VB), 2015 WL 872366, at \*3 (S.D.N.Y. Jan. 28, 2015) (quoting *Gardner v. Daddezio,* No. 07-cv-7201 (SAS), 2008 WL 4826025, at \*2 (S.D.N.Y. Nov. 5, 2008)). Here, under the IGP's three-step procedure, Plaintiff was initially required to file a grievance with the IGRC within twenty-one calendar days of the October 31 Incident, that is, no later than November 21, 2009. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)-(b). Even assuming Plaintiff filed such a grievance, and even assuming he received no response, as he alleges (Counter Stmt. ¶ 8), Plaintiff was required to complete steps two and three as well – appealing both to the superintendent and to the CORC if the superintendent had adversely disposed of his grievance or failed to timely respond. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.5(c)-(d), 701.6(g); *see also Heyliger,* 624 Fed.Appx. at 782 (noting that if a decisionmaker fails to timely respond to a grievance under the IGP, the inmate must appeal to the next step in order to properly exhaust).

As noted above, Defendants contend that no grievance was ever filed by Plaintiff regarding the October 31 Incident, and, as proof of that fact, point to the Hotaling Declaration, which indicates that a diligent search found no records of such grievance in Green Haven's records, and the Hale Declaration, which also attests that a diligent search of the CORC's database of appeals turned up no grievances relating to the claims in this case. (Hotaling Decl. ¶ 2; Hale Decl. ¶ 9.)[4] And while Defendants acknowledge that Plaintiff sent a complaint to the Inspector General, Defendants note, correctly, that the submission to the Inspector General did not constitute a proper appeal. *See Dabney,* 604 Fed.Appx. at 3. Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua,* No. 09-cv-7227 (SAS), 2010 WL 2159199, at \*3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed)

[4] Although Plaintiff urges the Court to disregard Ms. Hotaling's declaration because it is not based on her personal knowledge and contains hearsay (Opp'n 4-5), the Court is unpersuaded by this argument. Here, Defendants may offer Ms. Hotaling's declaration pursuant to Rule 803(10), which exempts from the hearsay bar statements offered to prove the absence of a public record after a diligent search in order to prove that a matter did not occur, where "a public office regularly kept a record or statement for a matter of that kind." Fed. R. Evid. 803(10)(A)(ii). Ms. Hotaling attests to being familiar with Green Haven's grievance record retention system in her capacity as inmate records coordinator. (Hotaling Decl. ¶¶ 1, 3.) She also attests that grievance records were "maintained and kept as records in the ordinary course of operations at Green Haven" pursuant to the facility's "policy and procedure." (*Id.* at ¶ 3.) Accordingly, Defendants may offer Ms. Hotaling's declaration for the purpose of proving that Plaintiff never filed a grievance with the IGRC. The fact that Ms. Hotaling did not herself conduct the search, but merely directed that it be conducted, is also not a basis for striking the declaration. *See Davis v. U.S. Dep't of Homeland Sec.,* No. 11-cv-203 (ARR) (VMS), 2013 WL 3288418, at \*7 (E.D.N.Y. June 27, 2013) ("[D]istrict courts within this circuit ... have found an official with broader supervisory authority who is not necessarily involved in the specific search for the records at issue to be capable of submitting a sufficient declaration."(collecting cases)). Furthermore, the fact that Ms. Hotaling did not attest to having been a "custodian" of Green Haven's records also is not reason to exclude her affidavit. *See United States v. Parker,* 761 F.3d 986, 992 (9th Cir. 2014); *United States v. McDonald,* 905 F.2d 871, 875 (5th Cir. 1990).

**\*5** For his part, Plaintiff has failed to produce a copy of his grievance and has introduced no other evidence, beyond his own testimony, that his grievance was actually filed pursuant to the IGP. Moreover, even if Plaintiff's testimony were enough to create a disputed issue of fact with respect to whether he filed a grievance form with the IGRC at Green Haven (Counter Stmt. ¶¶ 5, 12; Doc. No. 65-1 ("Khudan Decl.") ¶ 5; Khudan Dep. 7:21-23, 8:9-10), he fails to point to evidence that he properly appealed his grievance to the superintendent at step two. As noted above, Plaintiff was

Case 9:17-cv-01303-BKS-TWD Document 58 Filed 02/12/20 Page 231 of 284

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

required to complete the appeal section on his IGRC response form and submit it to the grievance clerk. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(c). In his deposition, Plaintiff claimed that he "tried to speak with the [s]uperintendent about the grievance," but that unnamed officers in his unit deterred him from doing so through threats. (Counter Stmt. ¶ 27 (citing Khudan Dep. 15:5-17).) But the law is clear that prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison staff. *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir. 2007); *see also Bolton v. City of New York,* No. 13-cv-5749 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) ("The law is well settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient" to satisfy the "PLRA exhaustion requirement." (collecting cases)). Furthermore, although Plaintiff asserts that he never received a response to his grievance (Counter Stmt. ¶ 25), he was still required to appeal to the superintendent. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *see also Heyliger,* 624 Fed.Appx. at 782. Accordingly, the Court concludes, as a matter of law, that Plaintiff failed to complete step two of the three-step IGP.

Plaintiff similarly fails to create a genuine dispute of fact as to whether he completed step three of the IGP – the filing of an appeal to the CORC. In his affidavit, Plaintiff makes no mention of submitting an appeal to the CORC, but curiously characterizes his complaint to the Inspector General's Office as his "effort to appeal to the highest level of the grievance process" (Doc. No. 65-1 ¶ 9), even though appeals to the Inspector General's Office are "not a formal part of the IGP," *Dabney,* 604 Fed.Appx. at 3. At his deposition, Plaintiff asserted that he sent an appeal of his grievance to "Albany" (Khudan Dep: 16:10-14), but Plaintiff fails to specify where in Albany he sent his grievance and fails to provide any other details, including the approximate date he submitted his appeal and whether he properly used a "notice of decision to appeal" form. Relying entirely on this vague and confusing deposition testimony, Plaintiff argues that he submitted his grievance to the CORC, which Plaintiff asserts is located in Albany. (Opp'n 5-6.)

While the Court recognizes that it "cannot resolve issues of credibility on summary judgment," it nonetheless finds that Plaintiff's "self-serving" and "incomplete" testimony that he sent an appeal to "Albany" is insufficient to create a *genuine* dispute of fact, particularly in light of Defendants' evidence that no grievance was ever sent to the CORC and Plaintiff's testimony that his complaint

to the Inspector General was his "effort to appeal" his grievance. *See Lozada v. Delta Airlines, Inc.,* No. 13-cv-7388 (JPO), 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014) (concluding that plaintiff's "self-serving, incomplete, and inconsistent" deposition testimony was "not sufficient to create a genuine dispute of fact in light of [defendant's] documented evidence"); *see also Deebs v. Alstom Transp., Inc.,* 346 Fed.Appx. 654, 656-57 (2d Cir. 2009) (affirming grant of summary judgment where "plaintiffs rel[ied] almost exclusively upon" their "speculative" and "vague" testimony in the face of defendants' documentary evidence); *Toro v. City of New York,* No. 12-cv-4093 (RRM) (RLM), 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence – beyond the allegations in his complaint and his own unsupported deposition testimony – that [plaintiff] actually reported such misconduct to the authorities"). Accordingly, the Court concludes as a matter of law that Plaintiff failed to complete step three of the IGP. Because Plaintiff failed to complete steps two and three of the IGP process, the Court thus finds that Plaintiff failed to properly exhaust administrative remedies under the IGP.

Plaintiff fares no better with his argument that the IGP's grievance process was not "available" to him at Green Haven. In June, the Supreme Court forcefully rejected judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *Ross,* 136 S. Ct. at 1858-59. As the Supreme Court clarified, an inmate's failure to exhaust may only be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Id.* The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief" and therefore constructively unavailable. *Id.* at 1859. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross,* 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner,* 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Ross,* 136 S. Ct. at 1859. To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, a grievance process is unavailable

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 232 of 284

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

"when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at *1860*. While the Second Circuit has suggested that these scenarios are merely illustrative and "not ... exhaustive," these illustrations nonetheless guide the Court's inquiry. See *Williams v. Correction Officer Priatno,* ___ F.3d ____, No. 14-4777, 2016 WL 3729383, at *4 n.2 (2d Cir. July 12, 2016).

**\*6** Here, Plaintiff essentially asserts the third scenario, alleging that prison officials routinely interfered with his attempts to file grievances. However, much of Plaintiff's Rule 56.1 Counterstatement relies on inadmissible hearsay. For example, Plaintiff attests that he "was informed by other [unnamed] inmates that grievances routinely go 'missing' and are not responded to" at Green Haven. (Counter Stmt. ¶ 7 (citing Khudan Decl. ¶ 7).) Plaintiff also maintains that he was warned on November 23, 2009 by an unidentified officer from the Inspector General's Office not to file a grievance because "in this facility, the officers ... will set you up" and "hurt you." (*Id.* ¶ 33 (citing Khudan Dep. 16:14-22).) Because Plaintiff offers these out-of-court statements in order "to prove the truth of the matter asserted" in them, Fed. R. Evid. 801(c)(2), and because these statements do not qualify for any exceptions to the hearsay rules, such testimony is not cognizable on summary judgment and will not be considered by the Court, *see, e.g. ABB Indus. Sys., Inc. v. Prime Tech., Inc.,* 120 F.3d 351, 357 (2d Cir. 1997) (noting that hearsay that is inadmissible at trial is not cognizable on summary judgment motion); *Baity v. Kralik,* 51 F. Supp. 3d 414, 419-20 (S.D.N.Y. 2014) (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on Plaintiff's personal knowledge and conclusory statements that are nothing more than speculation," including an averment that corrections officer "developed a reputation for missing time during his probationary period").

Plaintiff also claims that certain unnamed officers in Green Haven "ransacked" his room, tampered with his grievances and his mail, and threatened to kill him when he attempted to learn the status of his grievance from the superintendent and other officers. (Counter Stmt. ¶¶ 6, 15-16, 23-24, 26-28, 32; *see also* Khudan Dep. 6:24-7:5, 11:11-12, 11:14-21, 13:12-16.) However, Plaintiff fails to specify the dates of any threats, the names of any officers who threatened him, and the locations in Green Haven where these alleged threats took place. Courts generally review claims of "retaliation by prisoners 'with skepticism' because of the ease with

which a retaliation claim may be fabricated." *Bolton,* 2015 WL 1822008, at *2 (quoting *Nunez v. Goord,* 172 F. Supp. 2d 417, 431 (S.D.N.Y. 2001)). Thus, it is well settled that "[c]onclusory allegations of intimidation are not sufficient" to create a genuine disputed issue of fact regarding the availability of administrative remedies. *See, e.g., Hooks v. Howard,* No. 907-cv-0724 (TJM) (RFT), 2010 WL 1235236, at *5 n.3 (N.D.N.Y. Mar. 30, 2010) (collecting cases). Accordingly, Plaintiff's accusations, which "stand alone" and are "unsupported," are insufficient to withstand summary judgment. See *Bolton,* 2015 WL 1822008, at *2; *accord Heyliger v. Gebler,* No. 06-cv-6220 (FPG), 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding plaintiff's testimony that his "original grievance was discarded by prison officials," where plaintiff "never described or named the individual who allegedly took this action"), *aff'd,* 624 Fed.Appx. 780 (2d Cir. 2015); *Litchmore v. Williams,* No. 11-cv-7546 (DAB) (JCF), 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting summary judgment where there was "no evidence" that "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct"); *Bennett v. James,* 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) (granting summary judgment where plaintiff provided only "conclusory allegations" regarding unavailability of administrative remedies in his affidavit), *aff'd,* 441 Fed.Appx. 816 (2d Cir. 2011); *Rosado v. Fessetto,* No. 9:09-cv-67 (DNH) (ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *report and recommendation adopted,* 2010 WL 3809919 (N.D.N.Y. Sept. 21, 2010); *Winston v. Woodward,* No. 05-cv-3385 (RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (granting summary judgment where plaintiff failed to "specify the dates of [officers'] alleged misconduct, the details of the particular incidents of threats and harassment, the officers who allegedly made threatening or harassing statements, or a copy of the alleged appeal that Plaintiff claims he sent through the mail that was, as he claims, fraudulently tampered with"); *Veloz v. New York,* 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming [plaintiff] did submit the grievances," plaintiff "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd,* 178 Fed.Appx. 39 (2d Cir. 2006).

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 233 of 284

Khudan v. Lee, Not Reported in Fed. Supp. (2016)
2016 WL 4735364

**\*7** With respect to the other two "scenarios" identified in *Ross*, Plaintiff has not argued, nor pointed to any admissible evidence, that the IGP operated as a simple dead end – "with officers unable or consistently unwilling to provide any relief to aggrieved inmates" – or that it was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially 'unknowable.' " *Ross,* 136 S. Ct. at 1859. Although the Second Circuit recently found that certain grievance procedures under the IGP met this latter standard, the court's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams,* 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams*, who was housed in a special housing unit and segregated from the regular prison population, gave his grievance complaint to a correction officer to file on his behalf. *Williams,* 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.,* and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the district court's dismissal for failure to exhaust. Here, by contrast, Plaintiff asserts that he filed his grievance with Green Haven's IGRC. (Opp'n 4.) And while Plaintiff claims that his grievance received no response, the IGP clearly required him to properly appeal the IGRC's failure to respond to the superintendent and ultimately to the CORC. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *Heyliger,* 624 Fed.Appx. at 782. Given this unambiguous directive, Plaintiff has clearly failed to show that the IGP was "essentially unknowable." *See Ross,* 136 S. Ct. at 1859.

In light of the fact that none of the exceptional scenarios outlined by the Supreme Court in *Ross* apply, the Court concludes that Plaintiff has failed to establish a genuine dispute of material fact regarding the availability of administrative remedies at Green Haven. Therefore, the Court grants Defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is granted. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis,* any appeal would not be taken in good faith. *See Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir. 1995) (instructing that *in forma pauperis* status should be denied for the purpose of an appeal where the appeal would "lack ... an arguable basis in law or fact"). The Clerk is respectfully directed to terminate the motion pending at docket number 59 and to close this case.

SO ORDERED.

Dated: September 8, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4735364

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 234 of 284

2016 WL 11266599
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Clarence Lee ARTIS, Jr., Plaintiff,
v.
J. DISHAW, Defendant.

9:14-CV-1116 (MAD/ATB)
|
Signed 09/12/2016

**Attorneys and Law Firms**

CLARENCE LEE ARTIS, JR., Plaintiff pro se.

RYAN W. HICKEY, Asst. Attorney General for Defendants.

### REPORT-RECOMMENDATION

Hon. Andrew T. Baxter, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff originally filed this action against several defendants, alleging a variety of civil rights violations, relating to plaintiff's confinement at Upstate Correctional Facility ("Upstate"). (Complaint ("Compl.") ) (Dkt. No. 1). On February 4, 2015, the Honorable Mae A. D'Agostino, granted plaintiff's motion to proceed in forma pauperis ("IFP"), but ordered dismissal of the entire action without prejudice for failure to state a claim. (Dkt. No. 8). In her order, Judge D'Agostino gave plaintiff thirty (30) days to file an amended complaint in which he could attempt to cure the deficiencies in the original. (Id. at 8, 11).

On February 23, 2015, plaintiff filed his amended complaint, making claims against several defendants. (Amended Complaint ("AC") ) (Dkt. No. 9). On April 1, 2015, Judge D'Agostino reviewed the amended complaint and ordered dismissal of all defendants except J. Dishaw. (Dkt. No. 11). The remaining claims against this defendant are as follows:

> (1) Defendant Dishaw violated plaintiff's right to be free from cruel and unusual punishment when he refused to provide plaintiff food, after plaintiff was transferred "down stairs in December 2014." (Dkt. No. 11) (citing AC at 8).

> (2) On December 31, 2014, defendant Dishaw wrote a false misbehavior report against plaintiff in retaliation for a grievance that plaintiff filed against Dishaw on July 10, 2014 in violation of plaintiff's First Amendment rights. (Id.) (citing AC at 8).

Presently before the court is the defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 25). Plaintiff has responded in opposition to the motion, defendant has filed a reply, and plaintiff has filed a sur-reply. (Dkt. Nos. 28, 31, 32). For the following reasons, this court agrees that the amended complaint should be dismissed.

### DISCUSSION

#### I. Facts

For clarity, in this section the court will summarize the facts relative to plaintiff's remaining claims which appear in the amended complaint itself. I will then discuss additional facts below that have been developed through discovery and that are reflected in exhibits to the summary judgment motion.

On July 10, 2014, after a disagreement over a religious meal on July 9th, with officers who are no longer defendants in this action, plaintiff was told that he was going to be moved "back down stairs and stripped of his level and items." [1] (AC ¶ 4, CM/ECF p.7-8). Plaintiff states that, on the way downstairs, defendant Dishaw told plaintiff that if he wanted to "eat regular trays" and "get extra trays and [tobacco] for the rest of [his] stay," he would have to assault another inmate. [2] (Id. at 8). Plaintiff alleges that he "grieved" defendant Dishaw's conduct on the same day. (Id.) Plaintiff claims that after that grievance, defendant Dishaw threatened him and tried to encourage fights between plaintiff and any other inmate who happened to be his cell mate. (Id.)

[1]     Plaintiff's "level" refers to his Progressive Inmate Movement System ("PIMS") level. (Dishaw Decl. ¶ 21). Inmates at Upstate may earn privileges for good behavior under PIMS. (Id.) Inmates with a higher PIMS level are eligible to be house on a higher floor. (Id. ¶ 23). When an inmate receives a misbehavior report, his PIMS level is reduced, and he is moved back to a lower floor. (Id. ¶ 24). Thus, when plaintiff states that he lost his "level,"

Case 9:17-cv-01303-BKS-TWD Document 58 Filed 02/12/20 Page 235 of 284

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

this means that he was moved to a lower floor of the facility due to his misbehavior.

[2]      Plaintiff claims that defendant Dishaw asked plaintiff to break the other inmate's fingers "every time he wrote a grievance." (AC at CM/ECF pp.8-9).

**\*2** Plaintiff claims that on December 31, 2014, defendant Dishaw wrote a false misbehavior report against plaintiff in "retaliation," and "on New Year, he moved me down stairs,"[3] telling plaintiff that he made a big mistake going against his orders. Plaintiff claims that he filed "at least" three grievances against defendant Dishaw, but then stopped filing grievances because defendant Dishaw would stop feeding him. Plaintiff states that the was "really hungry," and he had lost thirty pounds "already." (*Id.*) The amended complaint then states that "[n]ow I've lost 52 pounds because of me grieving and not wanting to be used as goon for CO's [sic]—[s]pecifically CO J. Dishaw." (*Id.*)

[3]      Plaintiff's PIMS level was restored on September 13, 2014, and plaintiff was moved back upstairs until the December 31, 2014 misbehavior report. (Dishaw Decl. Ex. C at 4—Internal Movement History) (Dkt. No. 25-13).

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*; *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006)*. "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for

trial. *Salahuddin v. Goord, 467 F.3d at 273*. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*. However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)*; *Salahuddin, 467 F.3d at 272*.

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), *42 U.S.C. § 1997e(a)*, requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord, 380 F.3d 670, 675-76 (2d Cir. 2004)* (citing *Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)* ). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id. at 675*.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)*; *Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004)*. As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009)* (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock, 549 U.S. at 218-19, 127 S.Ct. 910* (citing *Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)* ). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *548 U.S. at 90-103, 126 S.Ct. 2378*.

**\*3** The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 236 of 284

Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004) ). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1857, 195 L.Ed.2d 117 (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, ––– U.S. at ––––, 136 S.Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel— are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ––– U.S. at ––––, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See Riles*, 656 Fed.Appx. at 580–81. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ––– U.S. at ––––, 136 S.Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ––– U.S. at ––––, 136 S.Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**B. Application**

In this case defendant argues that plaintiff failed to exhaust his administrative remedies with respect to both remaining claims against defendant Dishaw. (Def.'s Mem. at 8-10) (Dkt. No. 25-2). Defendants have filed declarations by Jeffrey Hale, Assistant Director of the DOCCS Inmate Grievance Program ("IGP") and Donna Wilcox, IGP Supervisor at Upstate. [4] (Dkt. Nos. 25-6–27-9). Defendants claim that the Upstate inmate grievance office has no record of any grievances relating to defendant Dishaw retaliating against plaintiff for his grievances against the defendant by issuing a false misbehavior report on December 31, 2014 or "sometimes" refusing to provide plaintiff food, causing plaintiff to lose between thirty and fifty-two pounds. (Def.'s Mem. at 10).

[4]    Assistant Director Hale's Exhibit lists grievances filed by plaintiff that he appealed all the way to the CORC, while IGP Supervisor Wilcox's list also includes grievance that may have been filed at the facility level which were not appealed to the CORC.

**\*4** Assistant Director Hale states that the CORC has "no record of any appeals of grievances by plaintiff" which relate either to the retaliatory misbehavior report or to the alleged denial of food. (Hale Decl. ¶ 11). Exhibit A to the Hale Declaration is a list of the plaintiff's grievances that were appealed to the CORC between August 22, 2012 and April 1, 2015. (Hale Decl. Ex. A) (Dkt. No. 25-7). Assistant Director

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

Hale cites to a grievance filed by plaintiff on December 24, 2014 (prior to the alleged retaliatory misbehavior report), in which plaintiff alleges that he was denied kosher food and was "provoked" to fight with another inmate on December 17, 2014. (Hale Decl. ¶ 12 & Ex. A). However, Assistant Director Hale states that the grievance does not claim that defendant Dishaw denied plaintiff his meal. [5] (*Id.*)

[5]     Copies of the grievance documents were not included.

IGP Supervisor Wilcox states that the Upstate IGP has no record of any grievances relating to the allegations plaintiff makes in this federal case. (Wilcox Decl. ¶ 12 & Ex. A). IGP Supervisor Wilcox also cites the plaintiff's December 17, 2014 grievance, and she also states that it does not relate to the facts in this case. (Wilcox Decl. ¶ 13). Exhibit A to the Wilcox Declaration is a list of grievances that plaintiff filed at the facility level between April 28, 2014 and March 19, 2015. (Wilcox Decl. Ex. A) (Dkt. No. 25-9).

The Hale declaration shows that, on July 17, 2014, plaintiff filed a grievance, which was appealed to the CORC, alleging that he was "Forced to Break [his] Fast" and he was "Goaded to Fight." (Hale Decl. Ex. A). A copy of the actual grievance documents are attached to the Dishaw Declaration. (Dishaw Decl. Ex. B at CM/ECF pp.4-12). The facts recited by plaintiff in the July 17, 2014 grievance coincide with the facts stated in plaintiff's amended complaint, in which he claims that he argued with two former defendants about breaking his Ramadan fast and was later asked by defendant Dishaw if he would assault another inmate. [6] (AC ¶ 4). Thus, plaintiff did file a grievance against Dishaw that he claims was the cause of all the subsequent harassment and "retaliation." The question, for exhaustion purposes, is whether plaintiff exhausted his claim that defendant Dishaw retaliated against plaintiff because of the July 17, 2014 grievance.

[6]     The date of this grievance does not match the facts stated in the amended complaint. Plaintiff alleges that he filed the grievance against defendant Dishaw on July 10, 2014, but the actual grievance is dated July 17, 2014, and the amended complaint does not mention that the grievance included the Ramadan claims.

Plaintiff filed a grievance on September 4, 2014, entitled: "Refused Treatment." (Hale Decl. Ex. A). The September 4, 2014 grievance was appealed to the CORC, but it does not appear to be related to defendant Dishaw. (*Id.*) The last grievance that plaintiff appealed to the CORC was originally filed on December 24, 2014, prior to the allegedly false misbehavior report of December 31, 2014, and it is entitled "Denied Tray/Tried to Provoke Fight." (*Id.*) It is unclear what facts plaintiff alleged in that grievance because the court only has the title of the grievance. However, it would not suffice to exhaust any claims that the false misbehavior report dated December 31, 2014 was in retaliation for the July 2014 grievance. Although plaintiff alleges that defendant Dishaw retaliated against him beginning after the first grievance, there are no grievances which complain about this retaliatory behavior, and only one grievance that alleges that plaintiff was denied any food, as retaliation for grievances or simply as a stand-alone claim for cruel and unusual punishment.

The list of grievances attached to the Wilcox Declaration includes a few more grievances that were filed by plaintiff, but were not appealed to the CORC because they do not appear on the CORC list. (Wilcox Decl. Ex. A). On August 26, 2014, plaintiff filed a grievance claiming that he was called names by a corrections officer. (*Id.*) On December 22, 2014, plaintiff filed a grievance, complaining about a cell search and a racial epithet. (*Id.*) Finally, on March 19, 2015, plaintiff filed a grievance complaining that he was given a "rotten apple" and that someone made a sexual gesture. (*Id.*)

**\*5** In his response to defendant's motion for summary judgment, plaintiff claims that he exhausted his administrative remedies. He claims that he spoke to sergeants and lieutenants and "constantly grieved" his situation "to no avail." (Dkt. No. 28 at 3). Plaintiff also claims that some of his grievances were destroyed, and his "life was threatened" so he "had to stop or be killed." (*Id.*) Plaintiff states that "they" did not allow "a lot of his grievances to be filed." (Dkt. No. 28 at 2). Plaintiff states that, in his possession, he has a grievance which relates to food portions that does not appear on the Wilcox list or the Hale list of grievances. Plaintiff claims that this shows that the grievance summary submitted by IGP Supervisor Wilcox "is incorrect." (*Id.*)

"Speaking" to sergeants and lieutenants does not excuse the failure to use the grievance process. *See Macias v. Zenk,* 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies); *Gizewski v. NY DOCCS,* No. 9:14-CV-124, 2016 WL 3661434, at \*14 (N.D.N.Y. July 5, 2016) (notice through informal channels, including verbal complaints, is insufficient to exhaust administrative remedies). Plaintiff's grievance

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 238 of 284

records do not support his statement that he "constantly grieved [his] situation.". In an effort to show that he did file grievances about food, and that IGP Supervisor Wilcox's list is "incorrect," plaintiff has submitted a copy of a CORC response to a grievance filed on July 10, 2014, [7] complaining about food "portion" sizes. (Dkt. No. 28-1).

[7]    As stated in the "Fact" section above, plaintiff states in his amended complaint that he filed his grievance against defendant Dishaw on July 10, 2014. (AC ¶ 4 at p.8). However, the records reveal that the grievance mentioning defendant Dishaw was actually filed on July 17, 2014, and the July 10, 2014 grievance was related to food "portions." Plaintiff may simply be confused about the dates.

The CORC response states that the Food Service Administrator investigated plaintiff's allegations and determined that portion sizes were consistently maintained. (*Id.*) The response suggested that, if plaintiff had a problem with his tray, he should bring it to the attention of the gallery officer to allow for corrective action. (*Id.*) In her reply declaration, IGP Supervisor Wilcox states that this grievance was a consolidated request from plaintiff and three other inmates which simply complained about portion sizes, relative to the kitchen staff filling the food trays with the appropriate amount of "scoops" of food. (Wilcox Reply Decl. ¶ 7). This is the reason that the grievance was not listed on plaintiff's list of grievances. (*Id.*)

Plaintiff also argues that the CORC response to the July 10, 2014 grievance shows that he complained about food, but also shows that gallery officers "can easily tamper with trays." (*Id.*) Plaintiff argues that this proves that defendant Dishaw could have tampered with his tray after it came from the kitchen, regardless of the portion of food that was originally on the tray. In defendant's reply, IGP Supervisor Wilcox has filed the rest of the documents associated with the "consolidated" July 10, 2014 grievance. (Wilcox Reply Decl. Ex. A). A review of the grievance filed by plaintiff and three other inmates only states that they would like "the maximum servings of 3 scoops of food as the main cours[e]. Now that we have new bigger trays we are being served less food." (Wilcox Reply Decl. Ex. A at 5). The grievance states that inmates were being served 1 ½ to 2 scoops, and that he and the "rest of the population here at upstate would like for the food portion to resume back to normal serving sizes...." (*Id.* at 6).

The portion of the consolidated grievance that was signed by the plaintiff is actually dated July 7, 2014 and states that he had "approximately 8 (eight) french fries in my feed up tray." [8] (*Id.* at 7). Plaintiff states that he showed his tray to the "Sgt. and C.O.s working the gallery during the last feed up of the day." (*Id.*) The other inmates whose grievances were consolidated were making the same complaint about the portions, including friench fries and pizza. (Wilcox Reply Decl. Ex. A at 8-15). Defendant Dishaw is not even mentioned in the grievance, and in fact, this incident took place three days prior to the incident described by plaintiff as the beginning of defendant Dishaw's alleged retaliation, when plaintiff allegedly refused to assault another inmate at Dishaw's behest. [9] The part of the consolidated grievance signed by plaintiff also states that he had already lost 30 pounds, that this was against his will, and was "cruel and unusual punishment." [10] (*Id.*)

[8]    A review of the amended complaint shows that the french fry incident related to a dismissed claims as against former defendant Labarge. (AC ¶ 3). Plaintiff stated that defendant "came to my cell one day during breakfast with another C.O. and placed something on my cell door to indicate some sort of message to give me a specially made up tray with like 7 french fries and half a chicken pattie [sic] this was on June 7, 2014. This is a constant assaulting and harassment since that first 5-22-14 encounter." (*Id.*)

[9]    In the amended complaint, plaintiff states that the incident with defendant Dishaw happened on July 10, 2014.

[10]    In the CORC's November 19, 2014 response to the grievance, the CORC advised plaintiff to "address his weight loss concerns via sick call." (Wilcox Reply Decl. Ex. A at 18).

**\*6** This grievance did not exhaust any claims against defendant Dishaw. [11] There are no grievances which complain that plaintiff lost fifty two pounds as a result of defendant Dishaw's conduct. The amended complaint vaguely states that "sometimes" he would not give me a tray at all." (AC ¶ 4 at p.8). Plaintiff's amended complaint is so vague, that it is unclear whether plaintiff was alleging that he had "already" lost 30 pounds, and then after December 31, 2014, he lost more weight or whether plaintiff claims

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 239 of 284

that defendant Dishaw denied him food beginning in July of 2014. Under either interpretation of the amended complaint, plaintiff has failed to exhaust his claim that defendant Dishaw was denying him food in violation of the Eighth Amendment.

[11]    The court notes that the Wilcox Reply Declaration also contains an older grievance complaining about "Inadequate Portions," filed on January 15, 2014, and decided by the CORC on June 11, 2014, long before the Dishaw incident. In plaintiff's sur-reply, he now states that he and other inmates used to "beat up" inmates for defendant Dishaw for extra food and cigarettes. (Dkt. No. 32). Plaintiff states that "after April of 2014," he decided to stop that behavior, and that is when defendant Dishaw began harassing, threatening, and not feeding plaintiff. (*Id.*) Plaintiff changes his facts every time that he files papers. There is nothing in the amended complaint that indicates that plaintiff had trouble with defendant Dishaw prior to July of 2014, and the amended complaint began with incidents dating back to March of 2014. (AC ¶ 1). A review of the grievances that plaintiff filed shows that he filed at least four grievances prior to July of 2014, and none of them appear to deal with defendant Dishaw. In fact, all the grievances prior to July 17, 2014 can be associated with facts that plaintiff alleged in the amended complaint, relating to dismissed claims, none of which involve defendant Dishaw. (Wilcox Decl. Ex. A; AC ¶¶ 1-3). During his deposition, plaintiff testified that his "best estimate" was that he started filing grievances against defendant Dishaw in July of 2014. (Pl.'s Dep. at 16-17). He testified that the "whole thing started with Officer Dishaw" "around June 9[th] or July 9[th]." (*Id.* at 16).

On December 24, 2014, plaintiff filed a grievance entitled "Denied Tray/Tried to Provoke Fight," which he appealed to the CORC. (Dkt. No. 25-7). Defendant argues that this does not suffice to exhaust plaintiff's administrative remedies because it happened before the December 31, 2014 misbehavior report, and defendant Dishaw was not mentioned. The court notes that defendant has interpreted the amended complaint to allege that the denial of food occurred after the December 31, 2014 misbehavior report. Although as stated above, the complaint can be interpreted liberally to claim that defendant Dishaw denied plaintiff food before and after December 31, 2014, plaintiff has still failed to exhaust his Eighth Amendment claim.

In his amended complaint, plaintiff claims that the retaliation started when plaintiff filed a grievance against Dishaw in July of 2014, and Dishaw retaliated by depriving plaintiff of food and "ultimately" filing an allegedly false misbehavior report against plaintiff on December 31, 2014. (AC at 8). The July 17, 2014 grievance includes the allegation that plaintiff was "Goaded to Fight." (Hale Decl. Ex. A). In this grievance, plaintiff did claim that "Officer D" offered him trays or tobacco to assault another inmate." (Dishaw Decl. Ex. C at 4). However, the question is not whether plaintiff brought the original grievance against defendant Dishaw. Clearly, he did. [12] The issue is whether plaintiff exhausted the allegations that defendant Dishaw retaliated against plaintiff because of the grievance that plaintiff brought on July 17, 2014, by denying him food or filing a false misbehavior report.

[12]    The record contains defendant Dishaw's statement to the grievance interviewer, denying that he offered plaintiff extra trays and tobacco if he would assault another inmate. (Dishaw Decl. Ex. B) (Dkt. No. 25-12 at 12).

**\*7** The grievance filed on December 24, 2014 does not exhaust plaintiff's claim that the misbehavior report on December 31, 2014 was retaliatory. In addition, denying plaintiff "a tray," even if defendant Dishaw was the individual who did deny the tray, would not alert the prison officials to plaintiff's claim that he was being tortured with the denial of food. Thus, the court could recommend dismissal for failure to exhaust the Eighth Amendment claim. However, as discussed below, the court finds that plaintiff's second claim is exhausted and will consider the merits of both claims. [13]

[13]    In his response to the summary judgment motion, plaintiff alleges that he tried to file several grievances, but that "some" grievances were destroyed or plaintiff's life was threatened, so that he had to "stop or be killed." (Dkt. No. 28 at 3). *Ross* holds that if a defendant prevents plaintiff from filing grievances through malfeasance or threats, the grievance procedure is "unavailable." 136 S.Ct. at 1860. Plaintiff raises this allegation only in his response to defendant's motion for summary judgment. The court also notes that plaintiff filed five grievances after the July 17, 2014 grievance against defendant Dishaw and others. Plaintiff also called defendant Dishaw as a witness at the disciplinary hearing held after the allegedly false misbehavior report and

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 240 of 284

2016 WL 11266599

questioned him about retaliation. It does not appear that plaintiff feared for his life, and it did not stop him from filing subsequent grievances. After *Ross*, it is unclear what sort of intimidation is sufficient, and how plaintiff would need to establish the intimidation in order to make the grievance procedure "unavailable." Additionally, plaintiff states that some grievances were destroyed, but he has not submitted any copies of these grievances, nor does he specify when he attempted to file them. In any event, even if the administrative remedies were "unavailable" under *Ross*, this court also finds that plaintiff's claim is meritless.

Although defendant also alleges that there was no grievance filed regarding the retaliatory misbehavior report, it is clear that plaintiff raised this claim in his defense to the disciplinary hearing. (Hickey Decl. Ex. B) (Disciplinary Hearing Transcript ("T") at 7). The hearing officer specifically asked defendant Dishaw "[d]id [the misbehavior report] have anything to do with retaliation for this inmate writing grievances." (*Id.*) Defendant Dishaw responded "[a]bsolutely not." Plaintiff even raised his allegation that defendant Dishaw asked plaintiff to assault another inmate. (*Id.* at 8-9). This issue was discussed thoroughly, plaintiff named the inmate who defendant Dishaw asked plaintiff to assault, and defendant Dishaw stated that he did not even know who this inmate was. (*Id.* at 9).

Although defendant claims that plaintiff could file a grievance alleging harassment or retaliation by a corrections officer, it would have been futile to do so, after the issue was fully discussed at the disciplinary hearing. Plaintiff would have had no reason to think that a grievance would have been successful or available under the circumstances. In fact, a review of the CORC response to plaintiff's July 17, 2014 grievance shows that when the interaction with officers results in a misbehavior report, the disciplinary "appeal mechanism affords the opportunity to remedy any factual or procedural errors in a disciplinary report." [14] (Dishaw Decl. Ex. B at 4). Thus, according to the CORC's own decision, it would lack the authority to provide plaintiff the "remedy" he seeks because the issue would have to be determined through the appeal mechanism for disciplinary hearings. Plaintiff's attempt at raising the issue as a defense to his misbehavior report, and his subsequent appeal thereof, would suffice to exhaust his claim that defendant Dishaw retaliated against him by filing an allegedly false misbehavior report. *See Ross*, —— U.S. ——, 136 S. Ct. at 1859 (grievance procedure is "unavailable" when the relevant "administrative

procedure" lacks the authority to provide "any" relief). Thus, plaintiff's second claim is exhausted, and the may proceed to a consideration of the merits.

[14]   In addition, "[w]here an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing, ... (e.g., a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F.Supp.2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted). *See also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). While the plaintiff's challenges in this case do not relate to due process, it is clear that plaintiff's issue with defendant Dishaw was thoroughly discussed at the disciplinary hearing.

## IV. Eighth Amendment Claim

### A. Legal Standards

**\*8** The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298, 111 S.Ct. 2321). "Because society does not expect or intend prison

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions—of—confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) ) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300, 111 S.Ct. 2321). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

"Under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) (citations omitted); *Moss v. Ward*, 450 F.Supp. 591, 596-97 (W.D.N.Y. 1978) (disciplinary penalty that denied inmate all food for four days violated the Eighth Amendment). The Eighth Amendment requires that prisoners be served nutritionally adequate food that does not present " 'an immediate danger to heath and well being of the inmates who consume it.' " *Johnson v. Fischer*, No. 9:12-CV-210, 2015 WL 670429, at *41 (N.D.N.Y. Feb. 17, 2015) (quoting *Robles*, 725 F.3d at 15).

The subjective prong of the Eighth Amendment analysis is met when the defendant knows that the diet was inadequate and likely to inflict pain. *Id.* (citing *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) ). However, courts in this circuit have held that missing a single meal is insufficient to state a claim for relief. *Rush v. Fischer*, 923 F.Supp.2d 545, 555-56 (S.D.N.Y. 2013) (citing *Hankerson v. Nassau Cnty. Corr. Facility*, No. 12 Civ. 5282, 2012 WL 6055019, at *3 (E.D.N.Y. Dec. 4, 2012) ) (allegation that plaintiff was denied a single meal while incarcerated ... does not give rise to a constitutional deprivation); *Scarbrough v. Evans*, No. 11 Civ. 131, 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012)

(denial of a single meal is insufficient to state a claim for relief).

**B. Application**

**\*9** Plaintiff alleges that defendant Dishaw "sometimes" would not give him his tray of food. (AC at 8). Plaintiff's never specifies any dates or how long the alleged deprivation would last. In his response to defendant's motion for summary judgment, he alleges that defendant would give plaintiff the "loaf" when he was supposed to get regular trays, [15] but "most times," he would not give plaintiff any tray at all. (Dkt. No. 28 at 3).

[15]  The court would point out that plaintiff was on a restricted diet twice during the time period relevant to this amended complaint. Both times, the "restricted diet" was imposed in relation to a disciplinary hearing and was approved and monitored by the medical department. (Smith Decl. Ex. A at 54-57—Feb. 11, 2015 to Feb. 13, 2015, 105-114—July 10, 2014 to July 16, 2014).

The court first notes that plaintiff initially claimed that as a result of the alleged deprivation of food, he lost from 30 to 52 pounds. However, plaintiff claimed the grievance that he filed in conjunction with other inmates that he lost 30 pounds because the portions were too small. This initial weight loss had nothing to do with defendant Dishaw or his alleged occasional denial of a food tray. During his deposition, he admitted that he did not lose 52 pounds, and that it could have seemed worse than it was. (Pl.'s Dep. at 51). He testified that he "felt" like he lost 52 pounds, but that it could have been because of the "poison" and the diarrhea. (*Id.* at 52). Plaintiff admitted that he was exaggerating, but that he did lose 30 pounds. (*Id.*) As stated above, in the course of the consolidated grievance, he told prison officials that he lost 30 pounds, ostensibly because of the portion sizes that were coming from the kitchen. (Wilcox Reply Decl. Ex. A at 7). Thus, defendant Dishaw's conduct was not the cause of plaintiff's allegedly excessive weight loss.

Defendant Dishaw denies that he ever deprived plaintiff of a meal tray or tampered with his meal trays at any time. (Dishaw Decl. ¶ 28). Defendant Dishaw also states that he is normally assigned to "Tour II" at Upstate which runs from 6:00 am to 2:00 pm each day, and he is not on duty during the dinner distribution which occurs at approximately 4:30 pm. (*Id.* ¶ 31). In addition, defendant Dishaw states that he is normally assigned to the A Gallery in 9 Building, and, thus,

he was not responsible for the distribution of meals in the "C" Gallery where plaintiff was housed following the December 31, 2014 misbehavior report. (*Id.* ¶ 32). Thus, to the extent that plaintiff alleges that he was denied food after December 31, 2014, defendant Dishaw could not have been the individual responsible for that denial. [16]

[16]     As stated above, defendant has justifiably interpreted plaintiff's amended complaint to allege that he was deprived of food only after the misbehavior report. However, in his response to the motion, plaintiff alleges that he was denied food at various times after the initial July 17, 2014 grievance, although plaintiff never specified when this denial occurred or how often it occurred.

Defendant Dishaw states that the distribution of meals to inmates is noted in the 9 Building Logbook, which is attached as Exhibit D to his declaration. (*Id.* ¶ 30 & Ex. D). Defendant has also submitted plaintiff's internal movement history, indicating his cell location from July 10, 2014 until March 28, 2015. (*Id.* Ex. D at 2). The court notes that defendant Dishaw was generally on duty for two day intervals, and he states that for each of the dates that he was on duty, the logbook indicates that breakfast and lunch were distributed to all inmates, including plaintiff at the appropriate times. (*Id.* ¶ 35 & Ex. D). The attached log book records corroborate this statement. Defendant Dishaw also states that if an inmate refuses his tray for any reason, it is noted in the logbook. (*Id.* ¶ 36). Defendant Dishaw states that although he was not on duty, the logbook indicates that plaintiff refused a tray during the 11:06 am lunch distribution on February 12, 2015. (*Id.* ¶ 37 & Ex. D—Dkt. No. 25-19 at 19). [17] There is no explanation as to why the "chow" was refused. (*Id.*)

[17]     Exhibit D spans six documents on CM/ECF. Thus, I am citing to the portion of Exhibit D that is located at Dkt. No. 25-19.

**\*10** Defendant has filed the declaration of Nancy Smith, Nurse Administrator ("NA") at Upstate. (Smith Decl.) (Dkt. No. 26). Attached to NA Smith's declaration are plaintiff's medical records. (Dkt. No. 26-1). Defendant argues that plaintiff's medical records show that, even assuming plaintiff lost thirty pounds, there were no adverse medical or health effects as a result of the weight loss. In fact, plaintiff's body mass index ("BMI") remained at an overweight level, even at his lowest weight. (Def.'s Mem. at 17).

In his grievance dated July 7, 2014, plaintiff claims that his normal weight was 238 and that he had already lost 30 pounds. (Wilcox Reply Decl. Ex. A at 8-15). His medical records show that on July 10, 2014, plaintiff was on a "restricted diet," [18] and his weight was being monitored. [19] (Smith Decl. Ex. A at 114). He was evaluated daily during this diet, and on July 10, 2014, the evaluation indicates that plaintiff's weight and blood pressure were "stable." (*Id.*) His weight was listed as 205 pounds. (*Id.*) Thus, as he stated, he had already lost 30 pounds before the alleged denial of food by defendant Dishaw started, after July 10, 2014. On July 11 and 15, 2014, plaintiff refused to be weighed. [20] (*Id.* at 112, 107). On July 12, 2014, plaintiff came to his cell door "smiling" and voiced "no complaints." (*Id.* at 110).

[18]     Plaintiff's medical records indicate that plaintiff was placed on a pre-hearing restricted diet beginning July 10, 2014 and ending on July 16, 2014. (Smith Decl. Ex. A at 105).

[19]     NA Smith has also filed plaintiff's ambulatory health record ("AHR") beginning in June of 2014. The July 10, 2014 AHR entry repeats the information relative to plaintiff's weight and "clearance for pre-hearing restricted diet." (Smith Decl. Ex. A at 93) (July 10, 2014 AHR entry).

[20]     Plaintiff has refused to have his "vital signs" taken and has refused to be weighed on other occasions. (Smith Decl. Ex. A at 102) (refusal on January 30, 2015).

According to NA Smith, BMI is the measure of body fat based upon height and weight, used as a guide to healthy weight for patients. (Smith Decl. ¶ 8). NA Smith states that according to the National Heart, Lung, and Blood Institute, in association with the the United States Department of Health and Human Services and the National Institutes of Health, a normal BMI is between 18.5 and 24.9, while a BMI between 25 and 29.9 is considered overweight, and a BMI of 30 or more is considered obese. (Smith Decl. ¶ 9). Plaintiff's medical records indicate that plaintiff is 5'11" tall, and even at 205 pounds, plaintiff's BMI is 28.6, according to the BMI scale. [21] (Smith Decl. ¶¶ 10, 14). Plaintiff's BMI was in the overweight range, even at 205 pounds.

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)
2016 WL 11266599

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 243 of 284

[21]    The relevant BMI calculator has been filed as Exhibit B to NA Smith's declaration. (Dkt. No. 26-2).

Plaintiff went to sick call on August 8 and 9, 2014, complaining about his feet and requesting anti-fungal cream. (Smith Decl. Ex. A at 92, 93). He requested self-carry Claritin for allergies, but did not mention any other problems and did not complain that he was hungry or that he was being denied food. On August 13, 23, 28, and 2014, he was still complaining about foot fungus and allergies. (*Id.* at 90, 92). He was seen again on September 8, 9, 10, and 23 2014, with the same complaints. (*Id.* at 87, 88). On September 23, 2014, plaintiff weighed 204 pounds. (*Id.* at 87). On October 2, 3, 10 and 14, 2014, plaintiff discussed his Claritin prescription, but there are no other complaints listed. (*Id.* at 83, 85). On October 13 and 20, 2014, plaintiff discussed both Claritin and Naproxen prescriptions. (*Id.* at 82). On October 21, 2014, plaintiff complained about allergy symptoms, and on October 25, 2014, he complained about constipation. (*Id.* at 81). He was told to increase his intake of fluids and increase his activity. (*Id.*) On November 1, 2014, plaintiff complained of flu symptoms. (*Id.* at 80).

**\*11**  On November 12, 2014, plaintiff complained of decreased urine output, and he was told to increase his fluids. (*Id.* at 79). On November 17, 18, 20, 21, and 22, 2014, plaintiff complained of constipation and was given Ducolax, but did not indicate that he was being denied food or that this could be the reason for his constipation. (*Id.* at 77, 78). On November 20, 2014, he was advised to increase his fluid intake and activity level. (*Id.* at 77). On November 23, 2014, the medical provider determined that the constipation could be caused by the overuse of one of the medications that plaintiff was taking. (*Id.* at 76). Plaintiff was seen several more times during November and December of 2014, and into January of 2015. (*Id.* at 66-76). On December 9, 2014, he swore at the nurse because she told him that the light had to be on in his cell in order for him to be seen. (*Id.* at 73).

Plaintiff refused "vital signs" during an mental health "special watch" [22] on January 21, 22, and 28, 2015. (*Id.* at 64, 65). On January 29, 2015, plaintiff allegedly threatened to kill himself. (*Id.* at 62). On January 30, 2015, plaintiff was cleared to return to his cell block. (*Id.* at 61). Plaintiff was again placed on a restricted diet for two days as the result of a disciplinary issue from February 11 to 13, 2015. (*Id.* at 54). Plaintiff weighed 195 pounds on February 6, 2015. (*Id.* at 17). However, he refused to be weighed at the beginning of his restricted diet on February 11, 2015. (*Id.* at 55). On April 24, 2015, plaintiff complained of low back pain, he was examined for these complaints, and was prescribed medication. (*Id.* at 9). Plaintiff was seen again for his low back pain on May 11, 2015. (*Id.* at 8). On May 21, 2015, plaintiff was seen about his back, but admitted that he was non-compliant with his medications. (*Id.* at 7). On May 27, 2015, plaintiff was examined for his back problems, but the record shows that his weight was back up to 214. (*Id.* at 6).

[22]    He was on a "special watch" because he had apparently said something about harming himself. (Smith Decl. Ex. A at 96-101).

NA Smith states that "contrary to plaintiff's claims of significant weight loss, his medical records indicate that plaintiff experienced a total weight loss of ten pounds between July 10, 2014 and February 6, 2015. (Smith Decl. ¶ 24). Plaintiff subsequently gained back the ten pounds, and then he gained an additional nine pounds between February 6, 2015 and May 27, 2016. (*Id.*) At no time did plaintiff's weight drop to below an "overweight" range. (*Id.*) Thus, after the time that plaintiff claims defendant's alleged conduct started, he only lost ten pounds—205 to 195, and not once did he mention to medical personnel that he was being denied food. NA Smith states that in her medical opinion, plaintiff did not suffer from significant weight loss from July 1, 2014 until July 30, 2015. There is absolutely no indication that plaintiff's health or nutrition was affected by his weight loss, or that it had anything to do with defendant Dishaw, because the thirty pounds that plaintiff lost initially was lost prior to July 10, 2014, when plaintiff alleges that he filed the grievance against defendant Dishaw which caused the alleged harassment and food deprivation. Plaintiff's Eighth Amendment claim may be dismissed.

## V. First Amendment Retaliation

### A. Legal Standards
In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004) (citations

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

### B. Application

**\*12** Plaintiff claims that the misbehavior report issued by defendant Dishaw on December 31, 2014 was in retaliation for the July 17, 2014 grievance that plaintiff filed against the defendant. Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Roseboro v. Gillespie*, 791 F.Supp.2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases). Thus, plaintiff meets the first requirement of a retaliation claim. However, defendant argues that plaintiff cannot establish a causal connection between the plaintiff's activity and the defendant's alleged conduct.

A number of factors may be considered in evaluating whether such a causal connection exists. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ). These factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.* The causal connection "must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

In this case, the grievance that plaintiff alleges was the cause of the retaliation was filed in July of 2014, and the defendant's misbehavior report was filed five months later, on December 31, 2014. In *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009), the Second Circuit found that a six month lapse in time between the protected activity and the adverse action was sufficient to support the inference of a causal connection. In his response to the summary judgment motion, plaintiff also alleges that the misbehavior report was only the culmination of the harassment that he underwent from defendant Dishaw. (Dkt. No. 28 at 3). If this were true, these facts would further support the temporal proximity factor.

An analysis of the remaining factors do not support plaintiff's retaliation claim. Although this court is not aware of plaintiff's prior disciplinary record, the fact that he was incarcerated at Upstate indicates that he was already in disciplinary housing. In addition, plaintiff did not prevail at the disciplinary hearing, and defendant Dishaw denied any retaliatory motivation for the misbehavior report.

Finally, and most importantly in this case, even if plaintiff sufficiently alleges a causal connection, the claim will fail if the defendant can show that he would have taken the same action, even in the absence of the protected conduct. *Quezada v. Roy*, No. 14 Civ. 4056, 2015 WL 5970355, at \*20 (S.D.N.Y. Oct. 13, 2015) (quoting *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ). In *Scott*, the court found that

> Regardless of the presence of retaliatory motive ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred. Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive.

*Id.*

The misbehavior report charged plaintiff with having an untidy cell, harassment, refusing to obey a direct order, and threats. (Hickey Decl. Ex. B at 1). Plaintiff was afforded a Tier II disciplinary hearing on January 13, 2015. (*Id.* at 2). The misbehavior report stated that defendant Dishaw was making rounds on 9 upper A gallery and observed that plaintiff had a sheet hanging up in his cell along with a towel. (T. at 3). Plaintiff had previously been warned about such behavior, and defendant Dishaw stated that he gave plaintiff a direct order to remove the hanging items, to which plaintiff responded " 'yeah I'll get to it later C.O.' " (*Id.*) Defendant Dishaw asked plaintiff to remove the items again, and plaintiff responded " 'go fuck yourself. I am a grown man you ain't telling me what to do.' " (*Id.*) Plaintiff then told defendant Dishaw that he would "fuck [him] up." (*Id.*) At that point, plaintiff's cell-

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 245 of 284

Artis v. Dishaw, Not Reported in Fed. Supp. (2016)

2016 WL 11266599

mate got up and removed the items even though they belonged to plaintiff. (*Id.*) Plaintiff's sheets and towels were confiscated and deprivations were issued. (*Id.*)

**\*13**  Plaintiff called his cell-mate, Anthony Huger, as a witness, and the hearing officer called defendant Dishaw to testify. (*Id.*) Defendant Dishaw repeated a summary of what he wrote in his misbehavior report, and then he was asked, at length, about the alleged retaliation, which he denied. (*Id.* at 6-10). Plaintiff's cell-mate that Dishaw came to the cell and asked "to take down the a [sic] (inaudible) or something." (*Id.* at 11). Inmate Huger then stated that plaintiff said "give me a minute," but Dishaw asked plaintiff to "take it down now." (*Id.*) Inmate Huger stated that he saw that "the situation was about to get out of hand ***so I jumped down and took it down***." (*Id.*) (emphasis added). It is clear from Inmate Huger's testimony that there was something hanging in the cell that defendant Dishaw told plaintiff to take down. It is also clear that plaintiff did not take the items down immediately, even though Inmate Huger stated that defendant Dishaw was harassing plaintiff and trying to instigate a fight between the two cell-mates. (*Id.* at 11-12).

The hearing officer then asked plaintiff:

> Spinner: Okay did you at any point say to the officer "Go fuck yourself I'm a grown man. You ain't telling me what to do. I'll fuck you up."? Did you say that to the officer?
>
> Artis: Did I say that to the officer?
>
> Spinner: Yeah did you?
>
> Artis: Yeah.
>
> Spinner: You said that to the officer?
>
> Artis: Yeah.

(*Id.*) Plaintiff and Inmate Huger attempted to explain that plaintiff's conduct was justified because defendant Dishaw was constantly harassing both inmates, and harassing plaintiff in particular. However, plaintiff admitted the conduct with which he was charged, regardless of any attempts to justify it. [23] He was found guilty accordingly. Plaintiff admitted during his deposition that the sheet was hanging in the cell, although plaintiff testified that the sheet belonged to Inmate Huger. (Pl.'s Dep. at 44). Thus, regardless of defendant Dishaw's motivation, Dishaw could have filed the misbehavior report in the absence of the protected conduct. At worst, defendant Dishaw could have had a dual motivation, and plaintiff's retaliation claim would still fail.

[23]   Later during the disciplinary hearing, plaintiff stated that "I would a did [sic] everything he wanted to had he would a said [sic] it respectfully. I was about to do it until he started cursing and my cellie just jumped off cause he was asleep." (T. at 13). This statement is additional evidence that plaintiff committed the misbehavior. He believed that he was justified in doing so because defendant Dishaw was allegedly harassing them and was not "respectful." Unfortunately for plaintiff this was not a defense, and negates his retaliation claim.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 25) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2016 WL 11266599

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 350215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas WILLIAMS, Plaintiff,

v.

R. ADAMS, et al., Defendants.

9:18-CV-1041 (BKS/TWD)
|
Signed 01/29/2019

**Attorneys and Law Firms**

THOMAS WILLIAMS, Pro Se, 96-A-3375, Fishkill
Correctional Facility, P.O. Box 1245, Beacon, NY 12508.

**DECISION AND ORDER**

Brenda K. Sannes, U.S. District Judge

**I. INTRODUCTION**

**\*1** Pro se plaintiff Thomas Williams ("plaintiff"), a prison
inmate in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS"),
commenced this action on or about August 31, 2018, with
the filing of a complaint, accompanied by an application to
proceed in the action in forma pauperis ("IFP"). Dkt. No. 1
("Compl."); Dkt. No. 2 ("IFP Appl."). Following its review
of plaintiff's IFP Application, the Court issued a Decision and
Order dated November 5, 2018, determining that plaintiff had
acquired "three strikes" for purposes of 28 U.S.C. § 1915(g)
prior to commencing this action and that the complaint failed
to allege any facts that would support a finding that plaintiff
was in imminent danger at the time of filing. Dkt. No. 5
("Nov. Order"). Accordingly, the Court denied plaintiff's IFP
Application and directed him to pay the full statutory filing
fee of $400 if he wished to proceed in the action. Nov. Order at
7. On or about December 6, 2018, the Court received the full
filing fee from plaintiff. Dkt. No. 8. The Clerk of the Court has
now forwarded to the Court plaintiff's complaint for review.

**II. DISCUSSION**

**A. Standard of Review**

In accordance with 28 U.S.C. § 1915A ("Section 1915A"), a
court must review any "complaint in a civil action in which a
prisoner seeks redress from a governmental entity or officer
or employee of a governmental entity" and must "identify
cognizable claims or dismiss the complaint, or any portion
of the complaint, if the complaint ... is frivolous, malicious,
or fails to state a claim upon which relief may be granted;
or ... seeks monetary relief from a defendant who is immune
from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin,
171 F.3d 115, 116 (2d Cir. 1999)* (per curiam) (holding that
Section 1915A applies "to all civil complaints brought by
prisoners against governmental officials or entities regardless
of whether the prisoner has paid the filing fee"); *Abbas v.
Dixon, 480 F.3d 636, 639 (2d Cir. 2007)* (finding that both
28 U.S.C. §§ 1915(e)(2)(B) and 1915A provide a basis for
screening prisoner's complaints).

In reviewing a pro se litigant's complaint, the Court has a
duty to liberally construe the pleadings, *Nance v. Kelly, 912
F.2d 605, 606 (2d Cir. 1990)* (per curiam), and should exercise
"extreme caution ... in ordering sua sponte dismissal of a
pro se complaint *before* the adverse party has been served
and both parties (but particularly the plaintiff) have had an
opportunity to respond." *Anderson v. Coughlin, 700 F.2d 37,
41 (2d Cir. 1983)* (emphasis in original). Therefore, a court
should not dismiss a complaint if the plaintiff has stated
"enough facts to state a claim to relief that is plausible on its
face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).*
"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (citing
*Twombly, 550 U.S. at 556*). Although the Court should
construe the factual allegations in the light most favorable
to the plaintiff, "the tenet that a court must accept as true
all of the allegations contained in a complaint is inapplicable
to legal conclusions." *Iqbal, 556 U.S. at 678.* "Threadbare
recitals of the elements of a cause of action, supported by
mere conclusory statements, do not suffice." *Id.* "[W]here
the well-pleaded facts do not permit the court to infer more
than the mere possibility of misconduct, the complaint has
alleged–but it has not 'show[n]'–'that the pleader is entitled
to relief.' " *Id. at 679* (quoting Fed. R. Civ. P. 8(a)(2) ).
Rule 8 of the Federal Rules of Civil Procedure "demands
more than an unadorned, the-defendant-unlawfully-harmed-
me accusation." *Id. at 678* (citing *Twombly, 550 U.S. at 555*).
Thus, a pleading that only "tenders naked assertions devoid
of further factual enhancement" will not suffice. *Id.* (internal
quotation marks and alterations omitted).

**B. Summary of the Complaint**

**\*2** The following facts are as alleged in plaintiff's complaint.

Between 2005 and 2007, plaintiff was confined in Clinton Correctional Facility ("Clinton C.F."), a prison operated by DOCCS, and under the care of defendant Medical Director Vivian Johnson. Compl. at 4. Similarly, between 2009 and 2010, defendant Doctor R. Adams was plaintiff's medical provider during a separate period of confinement in Clinton C.F. *Id.* As a result of acting as plaintiff's medical providers during those time periods, defendants Johnson and Adams became aware of plaintiff's medical conditions, which are described as follows:

> [L]ife long chronic neck and lower back spinal conditions that required use of backbrace; hammer toes, wide feet and flat feet that required customized medical boots; and pain medication 'Ultram' helping serious, daily, pain and suffering.

*Id.* (errors in original).

On or about October 13, 2015, plaintiff returned to Clinton C.F. Compl. at 5. Defendant Adams was assigned as plaintiff's medical care provider. *Id.* Plaintiff informed defendant Adams in appointments in November 2015 and February 2016 that his customized back brace and medical boots were stolen in June 2015. *Id.* at 5-6. Plaintiff notified defendant Adams during those appointments that he experienced "daily, serious" pain in his back and needed an ankle brace for an old Achilles tendon injury "that causes soreness and weakness in plaintiff's right ankle." *Id.* Plaintiff requested that defendant Adams prescribe Ultram (morphine) for his pain. *Id.* At the November appointment, defendant Adams told plaintiff that he could not prescribe plaintiff anti-inflammatory medications because plaintiff is allergic to them, and that he would not prescribe Ultram "or any other medication" to plaintiff. *Id.* at 5. At the February appointment, defendant Adams promised plaintiff that he would consult with defendant Johnson about prescribing plaintiff morphine pain medication. *Id.* at 6. During both appointments, defendant Adams denied plaintiff's requests for back and ankle braces and medical boots. *Id.* at 5-6.

On November 30, 2016, plaintiff had a third appointment with defendant Adams. Compl. at 7. Plaintiff requested replacement of his customized back brace and medical boots, a right ankle brace, and "pain medication." *Id.* Plaintiff informed defendant Adams that he was experiencing pain from his back and foot conditions and showed defendant Adams the "blisters, corns and calluses developing o[n] plaintiff's feet from being forced to wear State issued non medical boots." *Id.* Defendant Adams told plaintiff that he was going to request x-rays and for plaintiff to be seen by a specialist for his "feet, neck and back." *Id.* Defendant Adams also "took plaintiff's defective, old, customized medical boots" so he could "take pictures of [them]." [1] *Id.* at 8. The boots were returned to plaintiff on December 5, 2016. *Id.*

[1]    The complaint explains that plaintiff's customized boots were stolen in June 2015 and that they were thereafter replaced by "defective customized medical boots." Compl. at 7. The complaint does not explain why the second pair of medical boots were defective. *Id.*

**\*3** On November 23, 2016, plaintiff was again seen by defendant Adams. Compl. at 8. At that appointment, defendant Adams told plaintiff that the x-rays showed that plaintiff has "severe degenerative disc disease in plaintiff's neck," "a herniated disc in plaintiff's lower back," and "hammer toes deformities on both feet." *Id.* Defendant Adams ordered an MRI of plaintiff's back and told plaintiff that his foot condition required customized medical boots. *Id.*

Plaintiff arrived at the Clinton C.F. clinic on January 25, 2017, and was given a "pair of regular State boots with a different outter [sic] sole." Compl. at 8. Plaintiff was told by the nurse that defendant Adams ordered the boots for plaintiff and directed that "plaintiff ... try them on." *Id.* at 9. The boots caused plaintiff pain because they were "to[o] tight and narrow, had no arch support insoles, [did not] support plaintiff's weak right old achilles tendon injury and had no boot high toe for plaintiff's hammer toes to have space." *Id.* Accordingly, plaintiff refused the boots. *Id.*

On May 19, 2017, plaintiff complained to defendant Adams again about his pain and asked for pain medication and customized medical boots. Compl. at 9-10. Defendant Adams told plaintiff he would request that plaintiff receive "the orthopedic medical boots plaintiff [was] suppose[d] to receive." *Id.* at 10.

Defendant Adams prescribed plaintiff physical therapy, and plaintiff attended sessions between February 6, 2017 and June 6, 2017. Compl. at 9. Physical therapy provided plaintiff pain relief for "less than a half hour after [each session]." *Id.* Upon completion of physical therapy in June 2017, plaintiff received a permit for a Tens-Unit device, but it "was not effective in reducing plaintiff's serious, daily[ ] pains alone." *Id.* at 9, 11.

On unknown dates, defendant Adams (1) referred plaintiff to an orthopedic specialist for approval of customized medical boots, (2) prescribed plaintiff Motrin for his pain, (3) informed plaintiff that narcotic pain medication is not prescribed in New York State prisons, and (4) denied plaintiff's request for back and ankle braces. Compl. at 11. At some point in time, plaintiff stopped taking Motrin because it was ineffective. *Id.* Plaintiff then received a prescription for Cymbalta. *Id.* It was also ineffective in treating his pain and caused him to suffer allergic reactions. *Id.* Plaintiff stopped taking Cymbalta on August 29, 2017.

Plaintiff learned on September 4, 2017, during a "sickhall" visit, that defendant Adams "never put plaintiff in to be seen by an outside foot specialist," and that the reason plaintiff was denied medical boots was because defendant Adams "failed to give adequate information to support plaintiff's need for [them]." Compl. at 12.

Plaintiff was transferred to Bare Hill Correctional Facility on September 11, 2017, and his medical provider at that facility ordered plaintiff back and ankle braces in November 2017, and plaintiff received "new, customized replacement medical boots on or about July 5, 2018." Compl. at 12-13.

In her capacity as Medical Director, defendant Johnson was complicit in defendant Adams' inadequate medical treatment of plaintiff while he was confined in Clinton C.F. between October 2015 and September 2017. Compl. at 14-16. Defendant Carl Koenigsmann, the Chief Medical Officer for DOCCS, adopted an unwritten policy in or about May 2015, discontinuing the practice of recommending and prescribing narcotic pain medications to DOCCS inmates. *Id.* at 17. Defendant Koenigsmann also contributed to defendant Adams' inadequate medical treatment by failing to properly train, manage, and supervise him. *Id.*

**\*4** Plaintiff's complaint asserts Eighth Amendment deliberate medical indifference claims against defendants Adams, Johnson, and Koenigsmann. Compl. at 18-20.

**C. Analysis**

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights[ but] provides ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To state a cognizable claim under Section 1983, a complaint must allege "(1) 'that some person has deprived [the plaintiff] of a federal right,' and (2) 'that person who has deprived [the plaintiff] of that right acted under color of state law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ) (alteration omitted); *accord*, *Byng v. Delta Recovery Servs. LLC*, 568 F. App'x 65, 65-66 (2d Cir. 2014).

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citations omitted). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's

daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

**\*5** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

### 1. Defendant Adams

Because the Court assumes, for purposes of this Decision and Order, that the complaint sufficiently alleges facts that satisfy the objective element of a deliberate medical indifference claim, the Court has confined its analysis to the subjective element.

According to the complaint, between November 2015 and November 2016, defendant Adams learned from plaintiff at two separate appointments that he was suffering from chronic back, neck, ankle, and foot conditions that left him in serious chronic pain. Compl. at 5-7. Defendant Adams responded to

plaintiff's complaints at an appointment on February 3, 2016, by indicating to plaintiff that he would consult with defendant Johnson about prescribing plaintiff morphine medication. *Id.* at 6. According to plaintiff, defendant Adams never consulted with defendant Johnson. *Id.* Otherwise, during the one-year period between November 2015 and November 2016, defendant Adams took no action to address plaintiff's conditions or complaints, despite his role as plaintiff's primary care provider. *Id.* at 5-7. In light of the Court's obligation to liberally construe a pro se litigant's pleadings, defendant Adams will be required to respond to plaintiff's medical indifference claim for his treatment of plaintiff between November 2015 and November 2016.

The Court reaches a different conclusion with respect to the medical indifference claim arising between November 2016 and September 2017. According to plaintiff's complaint, during that period of time, defendant Adams took a number of steps to treat plaintiff's conditions and symptoms. In particular, defendant Adams (1) ordered x-rays of plaintiff's back, feet, and neck; (2) ordered an MRI of plaintiff's lower back; (3) special-ordered a pair of (non-customized) boots for plaintiff; (4) prescribed four months of physical therapy; (5) prescribed plaintiff 400 milligrams of Motrin for his pain, and then Cymbalta when plaintiff stopped taking the Motrin; and (6) told plaintiff that he would refer him to an orthopedic specialist for customized medical boots.[2] *Id.* at 7-9, 11. In addition, both in February 2016 and November 2016, defendant Adams promised to discuss with defendant Johnson the possibility of prescribing plaintiff morphine for his pain. *Id.* at 6, 8. Presumably defendant Adams' ability to prescribe morphine pain medications was hampered by the prison and/or DOCCS policy (to which the complaint refers) regarding a restriction against prescribing inmates narcotic pain medications. Even assuming these allegations are true, however, defendant Adams' consistent treatment of plaintiff – through diagnostic examinations, prescription of non-narcotic pain medications, physical therapy, and consultations with other medical providers – reflects constitutionally adequate care in the context of a prison facility. Moreover, there are no allegations in the complaint that the failure to prescribe plaintiff's preferred choice of pain medication was in reckless disregard to plaintiff's health and safety, especially in light of the other treatment defendant Adams provided between November 2016 and September 2017.

[2]      Although it is alleged that plaintiff later learned that defendant Adams never took the necessary steps for plaintiff to be seen by a specialist, there are no

allegations supporting an inference that the failure to do so amounted to deliberate indifference (rather than, for instance, negligence). Compl. at 12.

**\*6** In summary, even liberally construed, the allegations in the complaint concerning the period between November 2016 and September 2017 amount to a mere disagreement with the course of treatment administered by defendant Adams, which is not sufficient to state a plausible deliberate medical indifference. *See, e.g., Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998) ("[M]ere disagreement over the proper treatment does not created a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see also Hill,* 657 F.3d at 123(finding that plaintiff's complaint failed to state a deliberate medical indifference claim where it alleged that defendants prescribed plaintiff Motrin instead of a stronger pain medication and declined to order a nerve conduction study as requested by the plaintiff). Accordingly, plaintiff's deliberate medical indifference claim asserted against defendant Adams with respect to the period of treatment between November 2016 and September 2017 is dismissed for failure to state a claim on which relief may be granted pursuant to Section 1915A(b)(1).

### 2. Defendants Johnson and Koenigsmann

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) ). As the Supreme Court has noted, a defendant may only be held accountable for his actions under Section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). With respect to individuals sued based on their supervisory capacities (like defendants Johnson and Koenigsmann in this action) it is well settled that "vicarious liability is inapplicable to ... [Section] 1983 suits." *Iqbal* 556 U.S. at 676.

The complaint alleges that defendant Johnson learned of the allegedly inadequate medical treatment plaintiff was being

provided at Clinton C.F. and did not take any action to resolve the problem, and that defendant Koenigsmann enacted the policy on which defendant Adams relied in denying plaintiff narcotic pain medication. Prior to the Supreme Court's decision in *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" under five different circumstances. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). In particular, supervisors can be found personally involved if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986) ).

In *Iqbal,* however, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. The Court noted that "[t]he factors necessary to establish a Bivens violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion, or national origin in violation of the First and Fifth Amendments. *Id.* at 668-69. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.* at 677.

**\*7** In this Circuit, "*Iqbal* has engendered conflict ... about the continued vitality of the supervisory liability test set forth in *Colon,*" *Reynolds v. Barrett,* 685 F.3d 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict. *See, e.g., Hogan v. Fischer,* 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal,* ... 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.' " (quoting *Grullon v. New Haven,* 720 F.3d 133, 139 (2d Cir. 2013) ) ).

Recently, this Court had occasion to consider the impact of *Iqbal* on the supervisor liability/personal involvement test

2019 WL 350215

set forth in *Colon*. *Montanez v. City of Syracuse*, No. 16-CV-0550, 2019 WL 315058 (N.D.N.Y. Jan. 25, 2019). In that case, the Court concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Id.* at 18 (citing *Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ) (quoting *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010) ); *see also Marom v. City of N.Y.*, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009). Because the constitutional claim asserted in this case (Eighth Amendment deliberate medical indifference) does not require a showing of discriminatory intent and is based, instead, on whether defendants acted with deliberate indifference to the plaintiff's health and safety, the Court will apply the *Colon* factors.

### a. Defendant Johnson

Plaintiff alleges that he wrote defendant Johnson three letters during his confinement in Clinton C.F. in July 2016, October 2016, and May 2017. Compl. at 15-16. In each of the letters, plaintiff complained of the medical treatment he was receiving from defendant Adams. *Id.* Defendant Johnson did not respond to any of the letters. *Id.* According to plaintiff, defendant Johnson contributed to defendant Adams' deliberate medical indifference by failing to respond to his letters. *Id.* Given the nature of these allegations, the Court has considered whether they plead sufficient facts to plausibly allege that defendant Johnson was personally involved in denying plaintiff constitutionally adequate medical treatment under the second *Colon* factor.

In this Circuit, "[a] supervisor may be liable in an action brought under [section] 1983 if he exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013) (internal quotation marks and emphasis omitted); *Toliver v. City of N.Y.*, 530 F. App'x 90, 93 (2d Cir. 2013) (remanding to allow the plaintiff to file an amended complaint that included allegations of ongoing injuries "and that supervisory personnel were, as he claims, aware that particular officers were harassing and assaulting inmates"). In the context of a medical indifference claim, the Second Circuit has recognized that

individual defendants who hold supervisory positions may be held liable where they learned of ongoing constitutionally deficient treatment being provided to a plaintiff and took no action to remedy the violation. *See McKenna v. Wright*, 386 F.3d 432, 437-38 (2d Cir. 2004) (determining that the complaint included sufficient allegations against the defendant-supervisor where the plaintiff alleged the defendant rejected his grievance complaining of inadequate medical treatment and the defendant was responsible for the prison's medical program); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (reversing the district court's summary judgment determination in favor of the DOCCS Commissioner because the record contained a dispute of material fact concerning whether the plaintiff sent a letter to the commissioner complaining of the ongoing inadequate medical treatment being provided to him at the prison in which he was confined). Regardless of the specific ongoing constitutional violation alleged, to find that the supervisor was personally involved under the second *Colon* factor, a complaint must allege sufficient facts to place the supervisor on notice of the continuing constitutional violation and that the supervisor had the authority and ability to remedy the violation. *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (concluding that, at the pleading stage, a plaintiff is "entitled to have the court draw the reasonable inference–if his ... complaint contain[s] factual allegations indicating that [a l]etter was sent to [the defendant] at an appropriate address and by appropriate means–that [the defendant] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff complained]"); *McKenna*, 386 F.3d at 437-38 (noting that the defendant-supervisor was responsible for the prison's medical program); *Richardson*, 347 F.3d at 435 (noting that whether the defendant-supervisor was personally involved under the second *Colon* factor depended on the contents of the plaintiff's letter because the contents would reflect what the defendant-supervisor knew); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("[A] supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it.").

**\*8** In this case, the allegations in plaintiff's complaint against defendant Johnson do not plausibly suggest that she was sufficiently on notice of a constitutional violation. According to the complaint, plaintiff wrote to defendant Johnson on July 25, 2016, "[c]omplaining about the deliberate denial/ and or delay of adequate medical care and treatment

by [defendant] Adams, for plaintiff's daily, serious, neck and lower spinal pains; replacement of stolen 'customized backbrace; customized medical boots; hammer toes, flat feet, corns and calluses serious pains; right ankle achilles tendon soreness and weakness; right anklebrace and pain medication." Compl. at 15 (errors in original). Plaintiff wrote defendant Johnson again on October 18, 2016, "about the same medical issues and needs," and then a third letter on May 22, 2017, "[c]omplaining about [defendant] Adams['] continous, deliberate, delibe denial in providing plaintiff the needed medical care and treatment plaintiff's medical conditions warranted." *Id.* at 16. Even assuming defendant Johnson received plaintiff's letters and read them, the contents of the letters, as alleged in plaintiff's complaint, do not give rise to a plausible inference that defendant Johnson was on notice that plaintiff was receiving constitutionally inadequate medical treatment. As described in plaintiff's complaint,[3] the letters describe only plaintiff's specific requests and then conclusorily accuse defendant Adams of "deliberate ... [in]adequate medical care and treatment." *Id.* at 15. And, as described above, plaintiff's disagreement with defendant Adams' course of treatment does not create a constitutional claim. Without more, the Court finds that the complaint fails to allege sufficient facts to plausibly allege defendant Johnson's personal involvement in any deliberate medical indifference claim. For that reason, that claim is dismissed as asserted against defendant Johnson for failure to state a claim upon which relief may be granted pursuant to Section 1915A(b)(1).

[3]   The Court notes that plaintiff only described the contents of the letters in his complaint and did not attach the letters to the complaint or otherwise provide them as exhibits.

### b. Defendant Koenigsmann

With respect to defendant Koenigsmann, plaintiff alleges that he created an unwritten DOCCS policy and/or custom discontinuing the prescription of narcotic pain medications to prison inmates. Compl. at 17. Given the nature of these allegations, the Court has considered whether they plead sufficient facts to plausibly allege that defendant Koenigsmann was personally involved under the third *Colon* factor.

Although the complaint alleges that defendant Adams indicated to plaintiff that there was a policy in place in which

inmates were being denied narcotic pain medication, the complaint otherwise alleges no facts whatsoever concerning the details or scope of the policy. Plaintiff's allegations that defendant Adams promised to consult with defendant Johnson about the possibility of prescribing plaintiff narcotic pain medication suggests that whatever policy was in effect (if any) had contours and exceptions, and that it was not (as plaintiff suggests) a blanket policy that refused all inmates narcotics under all circumstances. Accordingly, plaintiff's complaint does not sufficiently allege facts plausibly suggesting that defendant Koenigsmann enacted an unconstitutional policy or that the policy, as alleged, was carried out in a manner in which defendant Koenigsmann knew or should have known violated plaintiff's constitutional rights.

Plaintiff's additional allegation that defendant Koenigsmann is responsible for the alleged inadequate medical treatment provided by defendant Adams because he failed to "train, manage and supervise [defendant] Adams," Compl. at 19, is vague and conclusory and does not support a cognizable constitutional claim.

For all of these reasons, plaintiff's deliberate medical indifference claim asserted against defendant Koenigsmann is dismissed for failure to state a claim pursuant to Section 1915A(b)(1).

### III. SERVICE OF PROCESS

As indicated above, the only claim that survives the Court's initial review is plaintiff's Eighth Amendment medical indifference claim asserted against defendant Adams concerning defendant Adams' treatment of plaintiff between November 2015 and November 2016. Because plaintiff paid the filing fee in this action (following the denial of his application for in forma pauperis status), plaintiff is responsible for serving the summons and complaint on defendant Adams. In light of the fact that plaintiff is incarcerated and proceeding pro se, and in order to advance the disposition of this action, plaintiff may request an order from the Court directing service by the United States Marshal, **provided** that plaintiff pays the service fee to the United States Marshal in full **in advance** by money order or certified check.[4] For service by mail, the fee is $8.00 per summons and complaint. Plaintiff is advised that, if initial service is unsuccessful, he will be required to pay the United States Marshal any additional fee, also in advance, for subsequent

service attempts according to the fee schedule set by the United States Marshal.

4    Payment in cash or by personal check is not acceptable.

IV. CONCLUSION

**\*9 WHEREFORE**, it is

**ORDERED** that plaintiff's complaint (Dkt. No. 1) is **accepted for filing** to the extent it asserts an Eighth Amendment deliberate medical indifference claim against defendant Adams concerning the medical treatment defendant Adams provided to plaintiff at Clinton C.F. between November 2015 and November 2016; and it is further

**ORDERED** that the remainder of plaintiff's Eighth Amendment deliberate medical indifference claims asserted against defendant Adams, Johnson, and Koenigsmann are **DISMISSED without prejudice** for failure to state a claim on which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1); 5 and it is further

5    Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant that plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by plaintiff must also comply with the pleading

requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

**ORDERED** that plaintiff is afforded an opportunity to request an order from the Court directing service by the United States Marshal and provide payment of the service fee ($8.00) to the United States Marshal in full by money order or certified check; and it is further

**ORDERED** that, upon plaintiff's submission of a request for assistance with service of process, the Clerk shall return the file to the Court for consideration; and it is further

**ORDERED** that, if plaintiff does not submit a request for assistance with service of process **within 14 days** of the filing date of this Decision and Order, the Clerk shall issue a summons and forward it to plaintiff, who shall be responsible for effecting service of process on defendant Adams. Upon issuance of the summons, the Clerk shall send a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court serve on plaintiff a copy of this Decision and Order, along with a copy of any unreported cases cited to in this Decision and Order.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 350215

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4395289
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Antuane MEANS, Plaintiff,
v.
Jared OLMSTED et al., Defendants.

9:17-CV-746 (BKS/ATB)
|
Signed 06/03/2019

**Attorneys and Law Firms**

ANTUANE MEANS, Plaintiff, pro se.

DAVID A. ROSENBERG, Asst. Attorney General, for defendants.

## REPORT and RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Brenda K. Sannes, United States District Judge. Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 42). Plaintiff has responded in opposition to the motion, and the defendants have filed a reply. (Dkt. Nos. 44, 47). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

## I. Procedural History

Plaintiff signed his complaint on June 26, 2017. (Complaint ("Compl.") at CM/ECF p.11)[1] (Dkt. No. 1). The action was received by the court and filed on July 10, 2017. (Dkt. No. 1). The case was administratively closed due to plaintiff's failure to properly complete his application to proceed in forma pauperis ("IFP"). (Dkt. No. 4). The case was reopened on August 2, 2018, after plaintiff complied with the court's direction to correct the IFP application, and on September 6, 2017, Judge Sannes issued an order after an initial review of the complaint. (Dkt. No. 9). In Judge Sannes's order, she granted plaintiff's application to proceed IFP, and allowed plaintiff's Eighth and Fourteenth Amendment claims against defendants Jolsten and C.O. Doe to proceed, directing that the defendants file an answer. (*Id.*)

[1]     Although plaintiff has used a form-complaint for this action, he has also inserted additional pages in between the numbered pages of the form. Thus, the court will cite to the page of the complaint as assigned by the court's electronic filing system (CM/ECF).

The claims against defendants "Jolsten" and "Doe" involve a challenge to their treatment of plaintiff when they escorted him on a hospice trip to visit his mother from Coxsackie Correctional Facility ("CCF") to Staten Island, New York. (Compl. at p.5, 7-8). Judge Sannes issued an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997), directing defendants to assist plaintiff in ascertaining the name of the John Doe defendant, who was one of the officer-escorts on the hospice trip. (Dkt. No. 9 at 8-9). Judge Sannes dismissed the remaining claims against the remaining defendants - Ms. Tolomeo, Therapist and Mr. Galant, M.D. (Dkt. No. 9 at 9-10).

The dismissal against defendants Tolomeo and Galant was without prejudice, and plaintiff was directed to file an amended complaint if he wished to pursue his action against these dismissed defendants. (*Id.* at 11 n.11). Plaintiff did not amend his complaint to pursue claims against former defendants Tolomeo and Galant, but was able to correct defendant "Jolsten's" name to defendant Jared Olmsted and was able to identify and serve Corrections Officer ("CO") Bergmann, replacing the John Doe defendant. (Dkt. Nos. 15-18, 35).

Prior to service on defendant Bergmann, the defendants made a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[2] (Dkt. No. 28). I recommended denying the motion, without prejudice to filing a properly supported motion for summary judgment, containing more information regarding plaintiff's grievance. (Dkt. No. 34). My Report-Recommendation was adopted on April 9, 2018. (Dkt. No. 36). Defendant Bergmann answered the complaint on April 23, 2018. (Dkt. No. 37). Defense counsel provided plaintiff with mandatory disclosures on September 13, 2018. (Dkt. No. 40). On December 21, 2018, the remaining defendants moved for summary judgment, plaintiff responded in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 42, 44, 47). The fully-briefed motion for summary judgment is before me for my review. For the following reasons, this court agrees with defendants and will recommend dismissing the complaint in its entirety.

2
    On April 2, 2018, subsequent to defendants' motion to dismiss, defendants filed an authorization to accept service of process on behalf of defendant Bergmann. (Dkt. No. 35).

## II. Summary Judgment

**\*2** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

## III. Exhaustion of Administrative Remedies/Statute of Limitations

### A. Legal Standards

#### 1. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d).

**\*3** There is a special section for complaints of "harassment." *Id.* § 701.8. Harassment grievances are defined in another section of the regulations as "those grievances that allege employee misconduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.2(e). Based on this definition, section 701.8 has been found applicable to claims of excessive force by staff. *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*7 n.7 (S.D.N.Y. Sept. 28, 2018) (citing *Torres v. Carry*, 691 F. Supp. 2d 366, 369-70 (S.D.N.Y. 2009)).

Complaints of harassment are handled by an *expedited* procedure which provides that such grievances are forwarded directly to the superintendent of the facility, [3] after which the inmate must appeal any negative determination to the CORC by filing a form within seven calendar days of the inmate's receipt of the Superintendent's response. *Id.* §§ 701.8(h) & (i), 701.5. The regulations then provide that "unless otherwise stipulated in this section, all procedures, rights, and duties pertaining to the processing of other grievances as set forth in section 701.5 of this Part shall be followed." *Id.* § 701.8(i). Thus, if a procedure is not described in 701.8, the inmate must refer to section 701.5. [4]

[3]    The regulation states that "[a]llegations of employee harassment are *of particular concern to the administrators of department facilities.*" 7 N.Y.C.R.R. § 701.8 (emphasis added).

[4]    The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake,* 136 S. Ct. at 1857. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan,* No. 15-3336-pr, 2016 WL 4572321, at *2, 656 Fed.Appx. 577 (2d Cir. Sept. 1, 2016) (quoting *Ross,* ––– U.S. ––––, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory

exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross,* ––– U.S. ––––, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles,* 2016 WL 4572321 at *2, 656 Fed.Appx. 577. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use;" or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*\*4 Riles, supra* (quoting *Ross,* ––– U.S. ––––, 136 S. Ct. at 1859-60).

In *Ross,* the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross,* ––– U.S. ––––, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were "available" to him.

In *Williams v. Priatno,* 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross,* after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a Department of Corrections and Community Services ("DOCCS") regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)).

The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [5] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[5]    My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

## 2. Statute of Limitations

**\*5** Federal courts borrow the state law personal injury statute of limitations period for purposes of filing section 1983 actions. *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure*, 488 U.S. 235, 250–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action. Federal law governs the question of when a section 1983 claim accrues. *Covington v. City of New York*, 171 F.3d 117, 121 (2d. Cir. 1999) (citing *Morse v. University of Vermont*, 973 F.2d 122, 125 (2d. Cir. 1992)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) (internal quotation marks

omitted)). Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997).

The Supreme Court has held that an inmate's papers may be deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court. *Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). This rule became known as the "prison mailbox rule," and has been applied to inmates filing complaints for purposes of the statute of limitations. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), modified on other grounds, 25 F.3d 81 (2d Cir. 1994).

The statute of limitations is tolled while a plaintiff is exhausting his administrative remedies pursuant to the PLRA. *Gonzalez v. Hasty*, 651 F.3d 318, 323 (2d Cir. 2011). However, the statute is tolled only tolled while the plaintiff is "actively exhausting", and is not tolled between the time that the cause of action accrues and the time that plaintiff begins the administrative exhaustion process. *Id.* at 324.

In "rare and exceptional" cases, the doctrine of equitable tolling may apply to defeat an argument that the action was not timely filed. *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). *See also Veltri v. Bldg. Serv. 32B J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). Equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances. *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). In order to apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 159 (2d Cir. 2004)).

## B. Application

Defendants argue that plaintiff's claim is barred both by the failure to exhaust and by the statute of limitations. The hospice trip occurred, and plaintiff's claim accrued on May 30, 2014. Normally, the statute of limitations would begin to run on that date and would run until plaintiff filed his grievance. *Gonzalez*, 651 F.3d at 324. The statute of limitations would then be tolled while plaintiff was "actively"

exhausting his administrative remedies, and would begin to run again when those remedies were completed until he filed his federal action. *Id.*

If as defendants claim, plaintiff never filed a grievance, the statute of limitations would have begun to run on May 30, 2014 and would have expired on May 30, 2017. Plaintiff did not even sign his complaint in this case until June 26, 2017. Thus, if plaintiff never filed a grievance, this action would be barred both by his failure to exhaust and by the statute of limitations. [6] There are no facts stated by the plaintiff that would justify affording equitable tolling. Plaintiff simply states that he filed his grievance, and it is not his fault that the Grievance Committee failed to answer him. However, he does not allege that he acted with "reasonable diligence" during any part of the three years that passed prior to filing this action. There is no indication that plaintiff was "actively" exhausting his administrative remedies, so equitable tolling would not apply in plaintiff's situation.

[6]    The statute of limitations bar would be relevant if the plaintiff attempted to exhaust his remedies after the court dismissed the action. Generally, when a plaintiff has failed to exhaust his remedies, the dismissal is without prejudice to plaintiff exhausting the grievance procedure and refiling the action after the appeal to the CORC is complete. *Greene v. Desousa*, No. 14-CV-6290, 2016 WL 3460376, at *3 (E.D.N.Y. June 21, 2016) (citations omitted); *Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009). However, if the statute of limitations has run, there would be no opportunity for plaintiff to return after exhaustion.

**\*6** Plaintiff alleges that he filed a grievance, and he has submitted a copy of the document that he states that he filed. (Dkt. No. 1-1 at 1). However, there is no indication in the facility records that he did so or that he appealed the denial of any grievance regarding his hospice trip to the Superintendent or the CORC. As exhibits to their motion for summary judgment, defendants have submitted the declarations of Jeffrey Hale, Rachael Seguin, and Raymond Shanley. (Dkt. Nos. 42-12 - 42-15). Jeffrey Hale is the Inmate Grievance Supervisor at Coxsackie (Hale Decl. ¶ 1) (Dkt. No. 42-12), Rachael Seguin is the Assistant Director of the IGP for DOCCS (Seguin Decl. ¶ 1) (Dkt. No. 42-13), and Raymond Shanley is the current Superintendent of Coxsackie (Shanley Decl. ¶ 1) (Dkt. No. 42-15).

Supervisor Hale states that all documents related to a particular grievance, including the grievance itself, the investigations, and appeals are stored in the Coxsackie grievance office as they are created or received. (Hale Decl. ¶ 9). Supervisor Hale states that if plaintiff had filed a grievance at Coxsackie, there would be a record of the grievance in the files, maintained in the grievance office. (Hale Decl. ¶ 10). Plaintiff was incarcerated at Coxsackie from December 16, 2013 until June 6, 2016. (Hale Decl. ¶ 12). Supervisor Hale states that there is "no record of any grievance filed by inmate Means related to the above mentioned May 30, 2014 trip." (Hale Decl. ¶ 13). In fact, there is no record of plaintiff filing any grievances while incarcerated at Coxsackie. (*Id.*)

Assistant Director Seguin is the custodian of records maintained by the CORC. (Seguin Decl. ¶ 2). Assistant Director Seguin states that, when an inmate appeals a grievance to CORC, it is DOCCS policy to maintain records of these appeals for four years, and in accordance with that policy, the CORC database contains records of appeals of IGP grievances, including those reviewed under the expedited procedure described above. (Seguin Decl. ¶ 8). Assistant Director Seguin conducted a search of the database and found that plaintiff appealed only one grievance to the CORC, which was filed in February of 2018, and which was unrelated to the claims in this action. (Seguin Decl. ¶ 12 & Ex. A). Thus, DOCCS records reflect that plaintiff did not file a grievance nor appeal the "denial" of any grievance to the CORC during the time that he was incarcerated at Coxsackie, relating to the hospice trip. Thus, plaintiff failed to exhaust his administrative remedies, and his claims are also now barred by the statute of limitations.

As stated above, a failure to exhaust may be excused if the administrative remedy was not "available" to the plaintiff. *Williams*, 829 F.3d at 123-24. In *Williams*, the court found that the remedy was unavailable to Williams because the regulatory scheme governing Williams's situation was " 'so opaque' " and " 'so confusing that ... no reasonable prisoner can use [it].' " *Id.* at 124 (quoting *Ross*, 136 S. St. at 1859 (alterations in original)). In *Williams* plaintiff was in disciplinary housing, he gave his grievance to an officer to file, but the grievance was never filed, and Williams was thereafter transferred out of the facility shortly thereafter. *Id.*

*Williams* was decided in the context of a motion to dismiss. 829 F.3d at 121. In *Williams*, the court accepted as true that the officer never filed the grievance and held that the regulations did not adequately outline the process for appeal

in that situation because "[o]n their face, the regulations only contemplate appeals of grievances that were actually filed," not those whose time limits never began to run because the textual provisions allowing an inmate who does not receive a response to his grievance to appeal to the "next step" would never have "come into effect." *Id.* *Williams* has been distinguished in cases in which the plaintiff was not segregated from the population and was able to have access to the grievance sergeant. *Davis v. Grant*, No. 15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019).

 *7 In *Davis*, the court found that "[p]laintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement." *Id.* An "unsupported assertion" that plaintiff filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Id.* (citations omitted). *See also Engles v. Jones*, No. 6:13-CV-6461, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (quotation omitted)); *Mims v. Yehl*, No. 13-CV-6405, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers ... fails to excuse [the] inmate from fully grieving remedies[.]" (citation omitted)).

This case is similar to *Davis* and the cases cited therein. The case comes to the court on a motion for summary judgment, there has been opportunity for discovery, and plaintiff has been deposed. Plaintiff was not hampered by confinement in the SHU, nor was he transferred shortly after the incident. During his deposition, plaintiff testified that he dropped the grievance in the "box" himself. (Pl.'s Dep. at 16). Plaintiff also testified that he was at Coxsackie until 2016. (Pl.'s Dep. at 10). Thus, he had ample time within which to file his grievance and within which to follow up if he failed to get a response.

He does not allege that any officer tampered with, or took, his grievance. In his complaint, plaintiff simply states that

he filed his grievance, but never received any response "as normal." (Compl. at 5, 6). He has not documented, or testified to, any effort to re-submit the alleged grievance, nor does he allege that he made any inquiries about the lack of response from DOCCS. The grievance that he has attached to his complaint is not stamped, nor does it indicate anywhere on the face of the document that it was received by the IGRC. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by persuading the Court of either exhaustion or unavailability." *Adams v. O'Hara*, No. 16-CV-527, 2019 WL 652409, at *4 (N.D.N.Y. Feb. 15, 2019).

In this case, defendants have properly supported their claim that plaintiff failed to exhaust his administrative remedies, and plaintiff has not substantiated his conclusory allegation that he filed a grievance with any further evidence, or even additional statements of fact that would lead the court to find that he exhausted his remedies or that the grievance program was "unavailable" within the meaning of *Ross*. Thus, this court finds that plaintiff has failed to exhaust his administrative remedies with respect to his treatment by defendants during his hospice visit, and his complaint must be dismissed.

Generally, a dismissal for failure to exhaust administrative remedies is without prejudice. *Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009). However, when the plaintiff is unable to exhaust his remedies because of the expiration of the time to do so, or in this case, where he is both barred at the administrative level, [7] and would be barred from returning to federal court because the statute of limitations expired prior to the original filing, the complaint should be dismissed with prejudice. *See Carlton v. Annucci*, No. 9:17-CV-245, 2019 WL 422530, at *2 (N.D.N.Y. Feb. 4, 2019) (dismissing with prejudice when the failure to exhaust was incurable because it was past the deadline for bringing such a grievance through the internal grievance program).

[7]    The court in *Hilbert v. Fischer*, No. 12 Civ. 3843, 2013 WL 4774731, at *7 (S.D.N.Y. Sept. 4, 2013), explained why, in circumstances essentially the same as in this case, the dismissal of plaintiff's claims for failure to exhaust, well after the DOCCS deadlines for filing grievances or requests for late filing have expired, should be with prejudice:

[New York] [p]risoners have 21 days from the date of the alleged occurrence to initiate the first formal step of the IGP, subject to exceptions "based on mitigating circumstances." 7 NYCRR §§ 701.5(a)(1), 701.6(g)(1)(i)(a). However, an exception to the time limit may not be granted if the request is made more than 45 days after the alleged occurrence. 7 NYCRR § 701.6(g)(1)(i)(a). Accordingly, because the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance with respect to his deliberate indifference claim, the claim is dismissed with prejudice.

*See also Felix v. Simon*, 303 F. App'x 21, 22 (2d Cir. 2008) (upholding dismissal of a civil rights action with prejudice where the time permitted for filing a grievance had expired because "dismissal with prejudice, when remedies are no longer available,

is required in the absence of any justification for not pursuing such remedies.")

**\*8 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED**, and the complaint be **DISMISSED WITH PREJUDICE IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2019 WL 4395289

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3451127
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Antuane MEANS, Plaintiff,
v.
Jared OLMSTED and John Bergman, Defendants.

9:17-cv-0746 (BKS/ATB)
|
Signed 07/31/2019

**Attorneys and Law Firms**

Plaintiff pro se: Antuane Means, 13-A-4436, Sing Sing Correctional Facility, 354 Hunter Street, Ossining, NY 10562.

For Defendants: Letitia James, Attorney General of the State of New York, David A. Rosenberg, Esq., Assistant Attorney General, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

 **\*1** Plaintiff Antuane Means, a New York State inmate, commenced this action under 42 U.S.C. § 1983 asserting claims arising out of his incarceration at Coxsackie Correctional Facility. (Dkt. No. 1). On December 21, 2018, Defendants filed a motion for summary judgment. (Dkt. No. 42). The motion was fully briefed, with a response filed by Plaintiff on February 4, 2019 and a reply filed by Defendants on February 11, 2019. (Dkt. Nos. 44, 47). This matter was assigned to United States Magistrate Judge Andrew T. Baxter who, on June 3, 2019, issued a Report and Recommendation recommending that Defendants' motion for summary judgment be granted and that the Complaint be dismissed with prejudice. (Dkt. No. 48). Magistrate Judge Baxter determined that: (i) Plaintiff had failed to exhaust his administrative remedies; (ii) the failure to exhaust was incurable because the statute of limitations expired before Plaintiff filed this action; and (iii) as a result, the Complaint should be dismissed with prejudice. (*Id.*). Magistrate Judge Baxter advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 48, at 17–18).

On June 14, 2019, Plaintiff filed a notice of appeal from the Report and Recommendation to the United States Court of Appeals for the Second Circuit. (Dkt. No. 49). [1] The Court issued a text order on June 27, 2019, reminding Plaintiff that objections to the Report and Recommendation had to be filed with this Court, and, in light of Plaintiff's pro se status, extending the time for filing objections to July 12, 2019. Plaintiff filed an objection to the Report and Recommendation on July 11, 2019. (Dkt. No. 52).

[1]     The Report and Recommendation is not subject to appeal, and thus the notice of appeal does not deprive this Court of jurisdiction to consider it. *See In the Matter of Wooten*, No. 15-mc-1496, 2016 WL 5900150, at \*1 n.1, 2016 U.S. Dist. LEXIS 140812 (E.D.N.Y. Oct. 11, 2016).

This Court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

Here, Plaintiff objects to Magistrate Judge Baxter's determination that Plaintiff failed to exhaust his administrative remedies. Plaintiff, however, bases his argument on factual assertions that are nowhere in the record. Plaintiff argues that: (1) prison officials "thwarted" his attempt to exhaust his grievance "through machination, misrepresentation and intimidation"; (2) he "was told that there was no record" of his grievance when he inquired about it; and (3) when he "attempted to re-submit his Grievance he was told that his time had run out." (Dkt. No. 52, at 1–2). These assertions are not supported by any record evidence. (*See* Dkt. No. 42-5 (Plaintiff's deposition); *see also* Dkt. No. 31 (Plaintiff's opposition to motion to dismiss); Dkt. No. 44 (Plaintiff's opposition to motion for summary judgment)). As Magistrate Baxter noted, Plaintiff "does not allege that any officer tampered with, or took, his grievance." (Dkt. No. 48, at 15). Plaintiff has consistently asserted that he put his grievance in the grievance box, (Dkt. No. 42-5, at 53; Dkt. No. 52, at 2), and he was not confined in the SHU or transferred around the time of his grievance. While Plaintiff argues that this case is in accord with *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 195 L.Ed.2d 117 (2016), and *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016), Magistrate

Judge Baxter thoroughly considered both of those cases in his Report and Recommendation and concluded that Plaintiff was not excused from the exhaustion requirement. (*See* Dkt. No. 48, at 7–9, 13–16). The Court concurs in that analysis.

**\*2** Plaintiff notes that here, unlike the case of *Davis v. Grant*, No. 15-cv-5359, 2019 WL 498277, 2019 U.S. Dist. LEXIS 20989 (S.D.N.Y. Feb. 8, 2019), he has provided a copy of the grievance that he claims to have filed. (Dkt. No. 52, at 2). That is insufficient here to warrant an exception to the exhaustion requirement. Having reviewed the record *de novo*, the Court agrees with Magistrate Judge Baxter's determination that Plaintiff failed to substantiate "his conclusory allegation that he filed a grievance with any further evidence, or even additional statements of fact that would lead the court to find that he exhausted his remedies or that the grievance program was 'unavailable' within the meaning of *Ross*." (Dkt. No. 48, at 16).

Having reviewed for clear error the portions of the Report and Recommendation to which Plaintiff has not objected, and found none, the Court adopts the Report and Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report and Recommendation (Dkt. No. 48) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 3451127

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 263 of 284

Artis v. Dishaw, Not Reported in Fed. Supp. (2017)

2017 WL 1076343

2017 WL 1076343
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Clarence Lee ARTIS, Jr., Plaintiff,
v.
J. DISHAW, Defendant.

9:14-CV-1116 (MAD/ATB)
|
Signed 03/22/2017

**Attorneys and Law Firms**

CLARENCE LEE ARTIS, JR 10-B-0810, Clinton Correctional Facility, P.O. Box 2000, Dannemore, New York 12929, Plaintiff pro se.

OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, The Capitol, OF COUNSEL:, RYAN W. HICKEY, AAG, Albany, New York 12224, Attorneys for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

*1  Plaintiff *pro se* Clarence Lee Artis, Jr. commenced this action pursuant to 42 U.S.C. § 1983, alleging that Defendant and others committed several civil rights violations during his confinement at the Upstate Correctional Facility ("Upstate C.F."). Dkt. No. 1. Plaintiff also filed an application to proceed *in forma pauperis* ("IFP"). Dkt. No. 2. On February 4, 2015, the Court granted Plaintiff's IFP application, but determined that, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the complaint was subject to dismissal for failure to state a claim upon which relief could be granted. Dkt. No. 8. In light of Plaintiff's *pro se* status, the Court provided Plaintiff an opportunity to file an amended complaint. Dkt. No. 8 at 11. Plaintiff filed an amended complaint on February 23, 2015. Dkt. No. 9. On April 1, 2015, this Court issued a Decision and Order dismissing the following claims for failure to state a claim upon which relief may be granted: harassment and verbal abuse; Eighth Amendment deliberate indifference; Eighth Amendment conditions of confinement; Eighth Amendment excessive force; Eighth Amendment

food tampering claims against Debouchie; First Amendment religion claims; conspiracy; and claims against Uhler and Schneiderman. Dkt. No 11 at 17. The only remaining claims from the amended complaint are those against Defendant Dishaw. Dkt. No. 11 at 10-11. Plaintiff alleges that Defendant Dishaw (1) violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment when Defendant refused to provide Plaintiff with food and (2) violated Plaintiff's First Amendment rights when Defendant wrote a false misbehavior report against Plaintiff in retaliation for a grievance that Plaintiff filed against Defendant. Dkt. No. 11 (citing Dkt. No. 9 at 8).

On April 22, 2016, Defendant filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 arguing that Plaintiff (1) failed to exhaust administrative remedies, (2) failed to establish a First Amendment retaliation claim, (3) failed to establish an Eighth Amendment food tampering claim, and (4) Defendant is entitled to qualified immunity. Dkt. No. 25-2. On May 2, 2016, Plaintiff filed a response in opposition to the Defendant's motion. Dkt. No. 28. On May 26, 2016, Defendant filed a reply to Plaintiff's response and Plaintiff filed a sur-reply on June 3, 2016. Dkt. Nos. 31, 32.

On September 12, 2016, Magistrate Judge Baxter issued a Report-Recommendation in which he recommended granting Defendant's motion for summary judgment. Dkt. No. 33. On October 3, 2016, Plaintiff objected to the Report-Recommendation, alleging Defendant starved, assaulted and harassed him, "used [him] as a fighting dog," and "started writing [him] up in retaliation." Dkt. No. 34. For the following reasons, this Court agrees with Magistrate Judge Baxter that Defendant's motion for summary judgment should be granted.

**II. BACKGROUND**

**A. Plaintiff's Allegations**

The conduct giving rise to this case occurred at Upstate C.F. On July 9, 2014, Plaintiff got into a disagreement with Correction Officer McQuinn regarding Plaintiff breaking his fast for Ramadan. Dkt. No. 9 at 7. The next day, Plaintiff was moved "back down stairs" and was "stripped of his level." [1]  Plaintiff asserts that while being escorted to a lower level, Defendant told Plaintiff that he would need to assault Victor A. Deponceau, another inmate, "if [he] wanted to eat regular trays and get extra trays and [tobacco]." Dkt. No. 9 at 8. Plaintiff filed a grievance against Defendant with respect to this issue on July 10, 2014. Dkt. No. 25-12 at

Artis v. Dishaw, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 264 of 284

2017 WL 1076343

7. Plaintiff alleges that Defendant wrote a false misbehavior report on December 31, 2014 in retaliation. Dkt. No. 9 at 8. Plaintiff claims that he filed at least three grievances against Defendant, but stopped filing grievances because Defendant stopped feeding him, which caused him to be "really hungry" and lose thirty pounds. *Id.* Plaintiff further alleged that by the time he filed his amended complaint, he had lost fifty-two pounds as a result of filing grievances against Defendant and "not wanting to be used as a goon" for Defendant. *Id.*

[1]    Plaintiff's "level" refers to the Progressive Inmate Movement System ("PIMS"), a system in which inmates may earn privileges for good behavior. Dkt. No. 25-10 at ¶ 21. In the PIMS, inmates with a higher PIMS level are eligible to be housed on a higher floor. *Id.* ¶ 23. An inmate's PIMS level is reduced when they receive a misbehavior report and consequently, the inmate is moved to a lower floor. *Id.* ¶ 23. Thus, as Judge Baxter inferred, when Plaintiff stated that he was "stripped of his level," this means that he was moved down to a lower floor of Upstate C.F. as a result of misbehavior. Dkt. No. 33 at 3 n.1.

## III. DISCUSSION

### A. Standard of Review
**\*2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden of showing that no genuine issue of material fact exists, through the production of admissible

evidence, lies with the party moving for summary judgment. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citation omitted). Once the moving party has met its burden, the nonmoving party must produce evidence demonstrating that genuine issues of material fact remain in dispute. *Id.* at 273 (citations omitted). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Finally, granting summary judgment is only justified when the court finds that no reasonable trier of fact could rule in favor of the nonmoving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L.Ed. 2d 652 (1972)) (other citations omitted). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### B. Plaintiff's Objection
In Plaintiff's objection to Magistrate Judge Baxter's Report-Recommendation, Plaintiff asserts that Defendant "used [Plaintiff] as a fighting dog" and when Plaintiff protested, Defendant starved, assaulted and harassed Plaintiff and "started writing [Plaintiff] up in retaliation." Dkt. No. 34. Plaintiff's assertions in the objection to the Report-Recommendation are nearly identical to Plaintiff's assertions made in the amended complaint. Dkt. No. 9 at 8.

### C. Exhaustion of Administrative Remedies
Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is applicable in this case because it "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to correctly exhaust administrative remedies under

Artis v. Dishaw, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 265 of 284

2017 WL 1076343

the PLRA, the inmate must complete the administrative review process in accordance with the rules applicable to the particular institution in which he is confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

**\*3** In general, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for filing grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the incident. *Id.* at § 701.5(a)(1). Upon receipt of the grievance, a representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has up to sixteen calendar days to informally resolve the issue. *Id.* at § 701.5(b)(1). If the matter is not resolved informally, then the full IGRC must conduct a hearing within sixteen calendar days of receipt of the grievance, *id.* at § 701.5(b)(2), and issue a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Next, the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days. *Id.* at § 701.5(c)(1). The superintendent must issue a written decision within twenty calendar days for all grievances that do not involve a DOCCS-wide policy issue. *Id.* at § 701.5(c)(3)(ii). Finally, within seven working days of receipt of the superintendent's written decision, a grievant may appeal to the Central Office Review Committee ("CORC"). *Id.* at § 701.5(d)(1)(i). Upon receipt of the appeal, CORC has thirty calendar days to issue a written decision. *Id.* at § 701.5(d)(3)(ii).

Until recently, the Second Circuit applied a three-prong analysis, the *Hemphill* inquiry, to determine if a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004). The *Hemphill* inquiry first asked "whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Id.* at 686. If those remedies were available, the second inquiry was "whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* If the remedies were available and the defendant did not forfeit and was not estopped from raising the non-exhaustion defense, the final inquiry was "whether 'special circumstances' have been

plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.*

In 2016, the Supreme Court rejected the Second Circuit's "extra-textual" exception of taking into account of "special circumstances" to justify a prisoner's failure to comply with administrative procedural requirements. *See Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016). The Court indicated that the mandatory exhaustion regime of the PLRA "foreclos[es] judicial discretion." *Riles v. Buchanan*, 656 Fed. Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1857). The Court in *Ross* held that the only limit to the PLRA's exhaustion requirement is that "[a]n inmate need exhaust only such administrative remedies as are 'available.' " *Ross*, 136 S.Ct. at 1862. An administrative procedure is unavailable when

> (1) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that is becomes, practically speaking, incapable of use; or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Riles v. Buchanan*, 656 Fed. Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1859-60) (internal citations omitted).

Defendant asserts that Plaintiff has failed to exhaust his administrative remedies for both the Eighth Amendment food tampering claim and the First Amendment retaliation claim.

### 1. Exhaustion of Food Tampering Claim

**\*4** Defendant claims that the Upstate C.F. inmate grievance office does not have any record of any grievances filed by Plaintiff against Defendant for denial of food causing him to lose between thirty and fifty-two pounds. Dkt. No. 25-2 at 10. Additionally, Assistant Director Hale states that the CORC has no record of any appeal related to Defendant refusing to provide food to Plaintiff. Dkt. No. 25-6 at ¶ 11. Plaintiff did file several grievances regarding denial of

Case 9:17-cv-01303-BKS-TWD Document 58 Filed 02/12/20 Page 266 of 284

Artis v. Dishaw, Not Reported in Fed. Supp. (2017)

2017 WL 1076343

food, but none of these grievances constitute an exhaustion of administrative remedies against Defendant. On July 10, 2014, Plaintiff filed a complaint regarding portion sizes, indicating that he "used to weigh 248 pounds now [he weighed] less than 210 pounds," but this grievance makes no mention of Defendant. Dkt. No. 28-1. Plaintiff filed a grievance on July 17, 2014 which asserted that Defendant offered to give Plaintiff more trays of food if he assaulted another inmate, but this grievance does not allege that Defendant denied Plaintiff food. Dkt. No. 25-12 at 7. On December 24, 2014, Plaintiff filed a grievance entitled "Denied Tray/Tried to Provoke Fight," but this grievance was not appealed to the CORC. Dkt. No. 25-12 at 2. In response to Defendant's motion for summary judgment, Plaintiff claims that he spoke to sergeants and lieutenants and "constantly grieved" his situation. Dkt. No. 28 at 3. However, speaking to sergeants and lieutenants does not excuse failure to use the grievance process. *Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007). Since Plaintiff did not appeal any of his grievances to the CORC regarding denial of food by Defendant, he did not exhaust his administrative remedies with respect to his Eighth Amendment food tampering claim. As such, since none of the exceptions to the exhaustion requirements are applicable, the Court finds that this claim is subject to dismissal for Plaintiff's failure to exhaust.

**D. Eighth Amendment Claim**

Prisons are required under the Eighth Amendment to provide for the basic human needs of those incarcerated, including "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (per curium) (citation and internal quotation marks omitted). The deprivation must be sufficiently serious to warrant Eighth Amendment protection. *See, e.g., Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) (finding a deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward*, 450 F. Supp. 591, 596-597 (W.D.N.Y. 1978) (finding the denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights). Where a particular diet is medically required, denial of a smaller number of meals may be sufficient in some circumstances. *See Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (citing *Robles*, 725 F.2d at 15-16).

Plaintiff asserts that Defendant violated his Eighth Amendment right to be free from cruel and unusual punishment when Defendant allegedly deprived him of food over an extended period of time causing him to lose between thirty and fifty-two pounds. Dkt. No. 9 at 8. While Plaintiff alleges "sometimes [Defendant] wouldn't give [him] a tray at all," he does not specify any dates that he was deprived food. *Id.*

Defendant contends that he has never deprived Plaintiff of his meal tray or tampered with Plaintiff's food. Dkt. No. 25-10 at ¶ 29. Defendant states that he is normally assigned to the "A" Gallery in 9 Building and, following the December 31, 2014 misbehavior report, Plaintiff was housed in the "C" gallery; therefore, Defendant could not be responsible for the alleged denial of food to Plaintiff after December 31, 2014. *Id.* at ¶ 32. Further, Defendant is normally assigned to "Tour II" which runs from 6:00 a.m. to 2:00 p.m.; thus, he is not on duty during the dinner distribution which occurs at approximately 4:30 p.m. *Id.* at ¶ 31. To support this argument, Defendant presents Plaintiff's internal movement history, which shows Plaintiff's cell location from July 10, 2014 to March 28, 2015, and the 9 Building Logbook, which shows when Defendant was on duty and keeps track of the distribution of meals. *See* Dkt. No. 25-14. The 9 Building Logbook also indicates that when Defendant was on duty, breakfast and lunch were distributed to all inmates, including Plaintiff at all relevant times. *See id.*; *see also* Dkt. No. 25-10 at ¶ 35. The Logbook shows that on February 12, 2015, Plaintiff refused a tray during lunch distribution; however, Defendant was not on duty on February 12, 2015. Dkt. No. 25-19 at 19.

**\*5** Moreover, in his July 10, 2014 grievance, which is prior to the allegations Plaintiff made against Defendant for retaliation and food deprivation, Plaintiff claimed that he used to weigh 248 pounds, but that he lost over thirty pounds due to insufficient portions. Dkt. No. 28-1 at 3. This grievance made no mention of Defendant or the alleged outright denial of food. *Id.* Further, on July 10, 2014, Plaintiff's weight was being monitored after being placed on a "restricted diet" and his weight was listed at 205 pounds. Dkt. No. 26 at ¶ 14. Plaintiff's weight loss prior to the incidents at issue further supports the fact that Defendant was not the cause of Plaintiff's weight loss.

Defendant also argues that Plaintiff's weight loss does not amount to an objectively serious condition under the Eighth Amendment. Dkt. No. 25-2 at 17. Nurse Administrator Nancy Smith indicates that, according to Plaintiff's medical

2017 WL 1076343

records, Plaintiff experienced a total weight loss of ten pounds between July 10, 2014 and February 6, 2015. Dkt. No. 26 at ¶ 24. Between February 6, 2015 and May 27, 2015 Plaintiff gained back these ten pounds plus nine additional pounds. *Id.* Even at Plaintiff's lowest weight of 195 pounds, his temporary weight loss was not sufficient to create a serious danger to the health of the inmate because, while Plaintiff's Body Mass Index ("BMI") fluctuated slightly, his BMI never went below the overweight range. [2] *Id.* at ¶¶ 14, 25.

[2]      BMI is a measure of body fat based upon height and weight, used as a guide to healthy weight for patients. Dkt. No. 26 at ¶ 8. According to the National Heart, Lung and Blood Institute, a BMI less than 18.5 is considered underweight; a BMI between 18.5 and 24.9 is considered normal; a BMI between 25 and 29.9 is considered overweight; and a BMI over 30 is considered obese. *Id.* at ¶ 9. Between July 10, 2014 and May 27, 2015, Plaintiff's BMI fluctuated between 27.2 and 29.8. *Id.* at ¶¶ 14-23.

Based on the foregoing, the Court finds that Plaintiff has failed to put forth any evidence that could lead a reasonable juror to find that Defendant caused his weight loss or that his weight loss caused serious damage to his health; therefore, Plaintiff's Eighth Amendment claim is dismissed.

### E. First Amendment Retaliation

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation and other citation omitted). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show ... '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation

marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L.Ed. 2d 1 (2002) (internal quotation marks and citations omitted). The "test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling." *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 447 (S.D.N.Y. 2006) (citations omitted).

**\*6** In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, factors to be considered include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Cole v. New York State Department of Correctional Services*, No. 9:10-CV-1098, 2012 WL 4491825, *11 (N.D.N.Y. Aug. 31, 2012) (citing *Colon*, 58 F.3d at 872-73).

Upon satisfying his initial burden, "the burden shifts to defendants to establish that the same adverse action would have been taken even in the absence of the plaintiff's protected conduct, *i.e.*, 'even if they had not been improperly motivated.' " *Davidson v. Desai*, 817 F. Supp. 2d 166, 194 (W.D.N.Y. 2011) (quoting *Graham*, 89 F.3d at 80). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999); *see also Murray v. Hulihan*, 436 Fed. Appx. 22, 23 (2d Cir. 2011) ("Defendants cannot be liable for First Amendment retaliation if they would have taken the adverse action even in the absence of the protected conduct").

In the present matter, the Court finds that the undisputed facts do not support Plaintiff's retaliation claim. First, although the five-month period between the alleged protected activity —the July 10, 2014 grievance—and the issuance of a misbehavior report could create an inference of a causal connection based on temporal proximity, none of the other factors support such a causal connection. The record makes clear that Plaintiff was disciplined on several occasions between May 2014 and December 2014, as evidenced through the reduction of his PIMS level. *See* Dkt. No. 25-13 at

**Artis v. Dishaw, Not Reported in Fed. Supp. (2017)**
Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 268 of 284
2017 WL 1076343

3-4. Further, Plaintiff was not vindicated at the disciplinary hearing on the misbehavior report. Finally, Defendant denied any retaliatory motive for his conduct. Rather, as discussed below, both Plaintiff's and his roommate's testimony at the disciplinary hearing demonstrate that the misbehavior report was issued not for any alleged retaliatory reasons, but because Plaintiff engaged in the conduct described in the misbehavior report. As such, the Court finds that Plaintiff has failed to put forth sufficient facts "to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).

Additionally, the Court finds that Magistrate Judge Baxter correctly determined that, even had Plaintiff demonstrated a causal connection, his claim still fails because the undisputed facts establish that Defendant would have taken the same action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003). The misbehavior report at issue charged Plaintiff with having an untidy cell, harassment, refusing to obey a direct order, and threats. *See* Dkt. No. 25-5 at 1. As set forth in Magistrate Judge Baxter's Report-Recommendation, at the disciplinary hearing, Plaintiff and his cell-mate both admitted that Defendant accurately set forth the events at issue and admitted that Plaintiff engaged in the charged conduct. *See* Dkt. No. 33 at 29-30. Although they attempted to explain why Plaintiff's conduct was justified, the admission to the charged conduct clearly establishes that Defendant would have taken the same action absent any protected activity.[3]

[3]    In fact, during the disciplinary hearing, Plaintiff even admitted that he yelled the following at

Defendant: " 'Go fuck yourself I'm a grown man. You ain't telling me what to do. I'll fuck you up.' "

**\*7** Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should grant Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

## IV. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report-Recommendation is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendant Dishaw's motion for summary judgment (Dkt. No. 25) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1076343

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 269 of 284

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

2018 WL 6832085
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Jessie ENGLES, Plaintiff,
v.
Sgt. Jerry JONES, et al., Defendants.

6:13-CV-6461 EAW
|
Signed 12/28/2018

**Attorneys and Law Firms**

Donald W. O'Brien, Jr., Woods Oviatt Gilman LLP, Rochester, NY, for Plaintiff.

Bernard F. Sheehan, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff Jessie Engles ("Plaintiff") commenced the instant action on August 16, 2013. (Dkt. 1). The operative pleading is the Second Amended Complaint (Dkt. 60), which asserts various claims under 42 U.S.C. §§ 1983 and 1985 related to Plaintiff's incarceration at the Five Points Correctional Facility ("Five Points") and his treatment at the Central New York Psychiatric Center ("CNYPC").

Discovery in this matter has closed (Dkt. 85), and defendants Sgt. Jerry Jones ("Sgt. Jones"), C.O. Richard Hardy, C.O. Jeffrey Cavalussi, C.O. Elmer Parish, Sgt. Eric Morton, C.O. Travis Hill, C.O. Eric Farly, C.O. P. Harrison ("C.O. Harrison"), Nurse Audrey C. Sykes ("Nurse Sykes"), and Assistant Commissioner Mike Rasmus ("A.C. Rasmus") (collectively "Defendants") have filed a motion for partial summary judgment (Dkt. 88). In particular, Defendants seek summary judgment as to: (1) Plaintiff's claims against C.O. Harrison, Nurse Sykes, and A.C. Rasmus; (2) Plaintiff's claim for denial of access to the courts; (3) Plaintiff's claim for denial of his right to practice his religion; (4) Plaintiff's claim of "threats and intimidation" against Sgt. Jones; and (5) Plaintiff's claims for violations of 42 U.S.C. § 1985. (*Id.*). For the reasons set forth below, Defendants' motion is denied as to Plaintiff's claims against C.O. Harrison and granted in all other respects.

**BACKGROUND**

**I. Procedural Background**

Plaintiff, then proceeding *pro se*, commenced this action on August 16, 2013. (Dkt. 1).[1] By leave of court, Plaintiff filed an Amended Complaint on June 17, 2014. (Dkt. 12). Defendants moved for dismissal or summary judgment as to the Amended Complaint (Dkt. 25; Dkt. 33); the Court granted in part and denied in part Defendants' motions on November 16, 2015, while also granting Plaintiff leave to file a second amended complaint as to certain claims (Dkt. 46).

[1] Plaintiff initially commenced this action in the United States District Court for the Northern District of New York; the matter was transferred to this Court pursuant to 28 U.S.C. § 1406(a) on August 29, 2013. (Dkt. 6).

Thereafter, on January 11, 2016, the Court appointed counsel to represent Plaintiff. (Dkt. 57). Through counsel, Plaintiff filed the Second Amended Complaint on February 25, 2016. (Dkt. 60). The Second Amended Complaint contains the following causes of action: (1) excessive use of force and failure to intervene as to defendants Morton, Hill, Farly, Hardy, Parish, and Cavalussi; (2) "threats and intimidation" as to Sgt. Jones; (3) deliberate indifference/failure to provide proper medical care as to Nurse Sykes; (4) deprivation of Plaintiff's First Amendment right to practice his religion as to Sgt. Jones and various John Doe defendants; (5) denial of access to the Courts as to various John Doe defendants; and (6) denial of due process in connection with a disciplinary hearing as to A.C. Rasmus. (*Id.* at 10-13).

Discovery in this matter closed on June 1, 2017. (Dkt. 79). On May 16, 2018, Defendants filed the instant motion for partial summary judgment. (Dkt. 88). Plaintiff filed a response on September 4, 2018 (Dkt. 97) and Defendants replied on October 1, 2018 (Dkt. 99).

**II. Factual Background**

**\*2** The following facts are taken from Defendants' Local Rule 56 Statement of Facts (Dkt. 88-1) and Plaintiff's response thereto (Dkt. 97-3), as well as the declarations

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 270 of 284

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

and accompanying exhibits submitted by the parties. With respect to background facts that the parties have not briefed in connection with the instant motion, the Court has referenced the Second Amended Complaint.

In August 2010, Plaintiff was incarcerated at Five Points. Plaintiff testified at his deposition that he was entitled to have headphones as a special accommodation, but that no headphones had been provided to him. (Dkt. 97 at 25-26). Plaintiff further testified that on August 16, 2010, he informed C.O. Harrison that he needed his headphones or he was going to "wind up cutting up." (*Id.* at 25). Plaintiff maintains that CO. Harrison stated he would "look and check into it" and "do what [he could] do to get [Plaintiff] some" headphones. (*Id.*).

Plaintiff testified that, thereafter, Sgt. Jones "made rounds" and Plaintiff told him that he was "losing it" and that if he did not get his headphones, he was "going to wind up hurting [himself]." (*Id.*). Plaintiff also repeated his warnings to non-defendant Lieutenant Lavack, stating that if he did not receive the headphones that day, he was "going to wind up cutting up." (*Id.* at 26). Lieutenant Lavack allegedly replied that the staff would "deal with [Plaintiff] then when [he] cut up," which Plaintiff interpreted as Lieutenant Lavack "calling [his] bluff." (*Id.*).

Approximately 15 minutes after Plaintiff spoke with Lieutenant Lavack, C.O. Harrison came to Plaintiff's cell with the "shower cart" and gave Plaintiff a razor and a nail clipper. (*Id.* at 27). Plaintiff testified that he immediately clipped the safety guard off the razor and used it to slit his wrist. (*Id.*). Plaintiff stated that he was bleeding for approximately 30 minutes before C.O. Harrison returned to collect the razor, and that he "let[ ] [the blood] leak out all over the floor" and "rubb[ed] it on the walls, into the toilet area." (*Id.*).

Plaintiff was thereafter transported for treatment for his wounds. (Dkt. 60 at ¶¶ 30-34). Plaintiff claims that while he was on a stretcher being transported, he was restrained by defendants Cavalussi, Hardy, and Farly, and defendants Parish, Hardy, and Hill assaulted him, which resulted in defendant Hill breaking Plaintiff's finger, among other injuries. (*Id.* at ¶¶ 34, 36). Plaintiff further alleges that defendant Morton and Sgt. Jones were present during the assault and failed to intervene. (*Id.* at ¶ 38).

Plaintiff was taken to the Cayuga Medical Center ("CMC") on August 16, 2010. (Dkt. 97 at 30). Plaintiff was treated for a laceration to his left wrist and a fracture of his left

third metacarpal bone. (*Id.*). A splint was placed on Plaintiff's left hand. (*Id.* at 35). Plaintiff was discharged from CMC on August 17, 2010. (*Id.*). The discharge instructions related to his hand fracture state that "[t]he usual treatment is splinting for four to six weeks" and that he should not remove the splint until instructed to do so by his doctor. (*Id.*).

In the Second Amended Complaint, Plaintiff alleges that upon his return from CMC on August 17, 2010, and until he was admitted to CNYPC, he was held in the "observation stripped cell" at Five Points. (Dkt. 60 at ¶ 43). Plaintiff claims that during this period of time, he was "supposed to receive his Ramadan meals following his daily fast" but that Sgt. Jones, who was supervising his suicide watch, ordered that Plaintiff's Ramadan meals be withheld. (*Id.* at ¶ 44). Plaintiff alleges that pursuant to Sgt. Jones' directions, defendants John Doe Nos. 6-10 withheld all meals from Plaintiff for a seven-day period. (*Id.*).

**\*3** On August 27, 2010, Plaintiff was admitted to CNYPC. (Dkt. 88-1 at ¶ 10; Dkt. 97-3 at ¶ 10). Nurse Sykes, a registered nurse, was assigned to CNYPC at that time. (Dkt. 88-1 at ¶¶ 3-5; Dkt. 97-3 at ¶¶ 3-5). Upon admission, Plaintiff was examined by non-defendant Dr. Ahmed for psychiatric issues and by non-defendant Dr. Kaskiw for physical issues. (Dkt. 88-1 at ¶ 14; Dkt. 97-3 at ¶ 14). At the time of admission, a notation was made incorrectly stating that Plaintiff had a splint on his left hand for a fracture of the fourth metacarpal (as opposed to his actual injury, a fracture of his third metacarpal). (Dkt. 88-1 at ¶ 18; Dkt. 97-3 at ¶ 19). Dr. Kaskiw examined Plaintiff's hand when he was admitted and noted that there was slight swelling and a decreased range of motion but that Plaintiff was not in any pain. (Dkt. 88-1 at ¶¶ 20-23; Dkt. 97-3 at ¶¶ 20-23).

Splints are not allowed on the wards at CNYPC because they contain metal, which presents a safety concern. (Dkt. 88-1 at ¶ 31; Dkt. 97-3 at ¶ 31). In accordance with this policy, Plaintiff's splint was removed, and Dr. Kaskiw ordered that the fourth and fifth fingers on Plaintiff's left hand be "buddy taped" together." (Dkt. 88-1 at ¶¶ 32-33; Dkt. 97-3 at ¶¶ 32-33). Non-defendant Nurse Mullaly removed the splint from Plaintiff's finger and Nurse Sykes applied the buddy tape. (Dkt. 88-5 at ¶ 14). Plaintiff's hand continued to be monitored and the buddy taping was discontinued by Dr. Kaskiw on September 14, 2010. (Dkt. 88-1 at ¶¶ 45, 52; Dkt. 97-3 at ¶¶ 45, 52). Plaintiff's medical records do not show any lasting issues related to his fractured metacarpal. (Dkt. 88-1 at ¶ 55; Dkt. 97-3 at ¶ 55).

Case 9:17-cv-01303-BKS-TWD    Document 58    Filed 02/12/20    Page 271 of 284

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

In opposition to Defendants' motion for summary judgment, Plaintiff has submitted a sworn declaration by Maria Martins, M.D. ("Dr. Martins"), an emergency medicine physician. (Dkt. 97-2). Dr. Martins states that the removal of Plaintiff's splint and the buddy taping of his fourth and fifth fingers "was not consistent with the standard of care" and "did not result in the appropriate immobilization of [Plaintiff's] left hand." (*Id.* at ¶ 6). Dr. Martins further indicates that Dr. Kaskiw and Nurse Sykes "proceeded on the basis of inaccurate information and, as a result, implemented an incorrect plan of care." (*Id.* at ¶ 7).

Upon returning to Five Points from CNYPC, Plaintiff was charged with various rules violations related to the events of August 16, 2010. (Dkt. 88-1 at ¶ 59; Dkt. 97-3 at ¶ 59). A.C. Rasmus conducted a disciplinary hearing related to the charges that concluded on January 5, 2011 (the "Disciplinary Hearing"). (Dkt. 88-1 at ¶ 60; Dkt. 97-3 at ¶ 60). A.C. Rasmus found Plaintiff guilty of four rules violations and imposed a punishment of 60-days confinement in the special housing unit (the "SHU"), two months loss of good-time credits, and loss of package, commissary, and phone privileges. (Dkt. 88-2 at 24). The SHU sentence was suspended until August 7, 2011, and was ultimately never served by Plaintiff. (Dkt. 88-1 at ¶¶ 62-63; Dkt. 97-3 at ¶¶ 62-63). Moreover, the time for implementing that sentence has now passed, and so Plaintiff will never be required to serve it. (Dkt. 88-2 at ¶¶ 17-19). There is no record that A.C. Rasmus's determination based on the Disciplinary Hearing was ever reversed or expunged. (Dkt. 88-1 at ¶ 68; Dkt. 97-3 at ¶ 68).

Plaintiff alleges that on February 3, 2011, Sgt. Jones verbally threatened him, telling him that if he filed a lawsuit regarding the events of August 16, 2010, his "stay [at Five Points] won't be nice." (Dkt. 60 at ¶ 41). Plaintiff alleges that Sgt. Jones told him, in sum and substance, that if he pursued a claim against Sgt. Jones, Sgt. Jones would harm Plaintiff and cause him to be housed in the SHU. (*Id.*). Plaintiff claims that he filed a grievance regarding Sgt. Jones' verbal threats against him, but that "[u]pon information and belief, John Does Nos. 1 through 5 either failed or refused to process" his grievance. (*Id.* at ¶ 42).

**\*4** The Department of Corrections and Community Supervision's ("DOCCS") records indicate that Plaintiff filed and appealed to completion only one grievance during the time period relevant to this litigation. (Dkt. 88-1 at ¶ 75; Dkt. 97-3 at ¶ 75). That grievance relates solely to Plaintiff's claims of assault and denial of medical treatment related to the events of August 16, 2010, and makes no mention of any threats by Sgt. Jones, the denial of Ramadan meals, or failure to process any other grievances submitted by Plaintiff.

## DISCUSSION

### I. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact...." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) ). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### II. Claims Against C.O. Harrison

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 272 of 284

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

Defendants seek summary judgment as to Plaintiff's claims against C.O. Harrison. In support of this request, Defendants note that: (1) the sole allegation against C.O. Harrison is that he gave Plaintiff the razor Plaintiff used to cut himself; (2) Plaintiff does not allege that C.O. Harrison was present for or participated in the assault upon him; and (3) Plaintiff has not included C.O. Harrison as a defendant in any of the six causes of action set forth in the Second Amended Complaint. (Dkt. 88-7 at 6-7). Plaintiff argues in opposition that the allegations in the Second Amended Complaint, which Plaintiff reiterated at his deposition, establish that CO. Harrison was deliberately indifferent to a risk of danger to Plaintiff's safety. (Dkt. 97-4 at 6-7). In reply, Defendants argue that the Second Amended Complaint does not contain a deliberate indifference claim with respect to C.O. Harrison. (Dkt. 99-2 at 1-2).

**\*5** The Court finds, on the record before it, that summary judgment as to C.O. Harrison is not warranted. The Court acknowledges that the Second Amended Complaint does not explicitly state a deliberate indifference claim as to C.O. Harrison. However, it is well-established that "[t]he function of the pleadings is to give opposing parties notice of the facts on which the pleader will rely, and, in the absence of prejudice to the opposing party, the court may allow the pleadings to be amended to conform them to the evidence at any time, even after judgment." *Wierzbic v. Cty. of Erie*, No. 13-CV-978S, 2018 WL 550521, at \*11 (W.D.N.Y. Jan. 25, 2018) (quotation omitted). Moreover, "an issue raised for the first time in a motion for summary judgment may start the amendment process." *Id.* (quotation omitted); *see also Chartier v. Matthews Assocs.*, No. 93 CIV. 1212 (PKL), 1994 WL 582938, at \*2 (S.D.N.Y. Oct. 20, 1994) ("A district court may, in its sound discretion, 'construe[ ] [a party's] summary judgment motion also as a motion to amend [that party's pleading] under *Fed. R. Civ. Pro. 15(a).*' ") (alterations in original) (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993) ).

Here, the Court finds it appropriate to construe Plaintiff's opposition to Defendants' motion for summary judgment as a request to amend the Second Amended Complaint to assert a deliberate indifference claim as to C.O. Harrison and to grant that request. For the reasons set forth below, the factual allegations set forth in the Second Amended Complaint (and reiterated by Plaintiff at deposition) are sufficient to support a deliberate indifference claim as to C.O. Harrison and the allegations put Defendants on notice as to the basis for that claim. Accordingly, "there is no basis for Defendants to claim surprise or prejudice by the ... claim[.]"

*Wierzbic*, 2018 WL 550521, at \*11 (on a motion for summary judgment, deeming complaint amended to include trespass claim because although "trespass was not a named cause of action," the factual allegations were "sufficient to state a claim for trespass and put Defendants on notice of a trespass claim"). Accordingly, the Court will permit Plaintiff to file a Third Amended Complaint that contains an express claim for deliberate indifference to serious medical needs against C.O. Harrison. To be clear, the Third Amended Complaint cannot contain new factual allegations, but is solely for the purpose of clarifying the record and setting forth explicitly the legal theory on which C.O. Harrison was included as a defendant in this matter. Plaintiff must file the Third Amended Complaint by no later than January 11, 2019, and Defendants must file their Answer thereto by no later than January 25, 2019. <u>The Third Amended Complaint should comport with the instant Decision and Order in all respects and include only those claims (and Defendants) as to which the Court has allowed Plaintiff to proceed.</u>

The Court further finds that there are genuine issues of material fact regarding Plaintiff's deliberate indifference claim against CO. Harrison. "The Eighth Amendment explicitly prohibits the infliction of cruel and unusual punishment.... A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need." *Jean v. Barber*, No. 9:09-CV-430 MAD/GHL, 2011 WL 2975218, at \*4 (N.D.N.Y. July 21, 2011) (quotation omitted). "[T]here are both objective and subjective requirements to succeed on an Eighth Amendment claim regarding serious mental health needs. First, the danger posed by the deliberate indifference must be 'sufficiently serious' from an *objective* perspective; and second, the defendant must have acted with deliberate indifference to that need (*i.e.*, *subjectively* failed to address the danger)." *Young v. Choinski*, 15 F. Supp. 3d 194, 199 (D. Conn. 2014) (emphasis in original).

**\*6** In the specific context of a suicide risk, "[c]ourts which have considered the issue have ruled that in the context of suicide, jailers are not required to safeguard every inmate;" however, they are required to protect inmates "presenting a 'strong likelihood of suicide.' " *Jean*, 2011 WL 2975218, at \*4 (quoting *Burke v. Warren County Sheriffs Dep't* No. 90-CV-597, 1994 WL 6755042, at \*6 (N.D.N.Y. Nov. 25, 1994) ); *see also Young*, 15 F. Supp. 3d at 199 ("propensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks" are "sufficiently serious" to support an Eighth Amendment claim). A "previous threat"

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

Case 9:17-cv-01303-BKS-TWD   Document 58   Filed 02/12/20   Page 273 of 284

is sufficient to establish a strong likelihood of suicide. *Jean,* 2011 WL 2975218, at *4.

Here, Plaintiff testified at his deposition that he informed C.O. Harrison that, if he did not receive his requested headphones, he was going to "wind up cutting up." (Dkt. 97 at 25). A reasonable jury could find that this was a threat of suicide. Plaintiff further testified that despite having witnessed this explicit threat of self-harm, C.O. Harrison nonetheless provided Plaintiff with a razor the very same day. (*Id.* at 27). Were a jury to credit this testimony, it could reasonably conclude that C.O. Harrison was deliberately indifferent to Plaintiff's serious mental health needs—namely, his propensity to attempt suicide or otherwise harm himself. *See Young v. Choinski,* 15 F. Supp. 3d 172, 185 (D. Conn. 2014) (denying motion for summary judgment where the plaintiff inmate informed the defendant corrections officer that he was "feeling suicidal" and the defendant failed to take any action to obtain mental health assistance for the plaintiff); *cf. Kelsey v. City of N.Y.,* 306 F. App'x 700, 703 (2d Cir. 2009) (noting that "deliberate indifference [is] lacking where officers take affirmative and reasonable steps to protect detainees from suicide"). Accordingly, summary judgment as to Plaintiff's claim against C.O. Harrison is not warranted.

### III. **Claims Under** 42 U.S.C. § 1985

In the Second Amended Complaint, Plaintiff purports to assert his excessive use of force and failure to intervene, "threats and intimidation," and free exercise of religion claims pursuant to 42 U.S.C. § 1985, as well as 42 U.S.C. § 1983. (Dkt. 60 at ¶¶ 53, 56, 62). Defendants argue that, to the extent these claims are premised on 42 U.S.C. § 1985, no reasonable jury could find in Plaintiff's favor. The Court agrees.

Section 1985 prohibits conspiracies to violate an individual's civil rights. To prevail on a § 1985 conspiracy claim, a plaintiff must show: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly,* 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia,* 457 F.3d 264, 269 n.4 (2d Cir. 2006) ). "The conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.* (quotation omitted).

Here, Defendants argue that there is no evidence tending to show a conspiracy, nor any evidence of discriminatory animus. (Dkt. 88-7 at 7-8). Defendants further argue that, in any event, the intracorporate conspiracy doctrine bars a § 1985 claim against DOCCS employees acting within the scope of their employment. (*Id.* at 8). Plaintiff's opposition papers fail to respond to these arguments.

 **\*7** "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. Mar. of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995). Here, Defendants have pointed to an absence of any evidence to support a finding of conspiracy or a finding of discriminatory animus, both of which are essential elements of a § 1985 claim. Plaintiff has failed, in opposition, to produce or identify any such evidence. *See Hall v. Bevier,* No. 06-CV-00505F, 2009 WL 3165604, at *4 (W.D.N.Y. Sept. 28, 2009) (granting summary judgment as to § 1985 claim where the plaintiff failed to submit any evidence supporting a claim of discriminatory animus or establishing the existence of a conspiracy). Moreover, Defendants are correct that Plaintiff's § 1985 claims are barred by the intracorporate conspiracy doctrine. *See Richard v. Leclaire,* No. 915CV00006BKSTWD, 2017 WL 4349381, at *5 (N.D.N.Y. Sept. 29, 2017) (noting the "appropriateness of applying the [intracorporate conspiracy] doctrine in a prison setting" and dismissing claims against DOCCS employees). Accordingly, Defendants have satisfied their burden of establishing their entitlement to summary judgment as to Plaintiff's § 1985 claims.

### IV. **Deliberate Indifference Claim as to Nurse Sykes**

Defendants request summary judgment as to Plaintiff's Eighth Amendment deliberate indifference claim as to Nurse Sykes. Defendants argue that no reasonable jury could conclude that Nurse Sykes had the required state of mind to support a deliberate indifference claim. For the reasons that follow, the Court agrees.

As noted above, the Eighth Amendment prohibits cruel and unusual punishment, which encompasses deliberate indifference to an inmate's serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). "The deliberate indifference standard requires the plaintiff to prove that the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998). " ' Deliberate indifference' describes a mental

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

state more blameworthy than negligence; but a plaintiff is not required to show that the defendant acted for the very purpose of causing harm or with knowledge that harm will result. Deliberate indifference is a state of mind that is the equivalent of criminal recklessness." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) (internal quotations and citations).

Here, Defendants argue that regardless of whether Plaintiff has established that he had a serious medical need, there is no evidence that Nurse Sykes acted with deliberate indifference. (Dkt. 88-7 at 10-14). Instead, Defendants argue the evidence of record demonstrates that Nurse Sykes (and the other medical staff at CNYPC) "did their best to address [Plaintiff's] concerns." (*Id.* at 11). The Court agrees with Defendants that, on the record before it, no reasonable jury could find that Nurse Sykes knew of and disregarded Plaintiff's medical needs.

Plaintiff's claims against Nurse Sykes are based on his contention that she and Dr. Kaskiw "disregard[ed] the discharge instructions" from CMC and did not "bother[ ] to review the [CMC] records" before deciding that buddy taping Plaintiff's fingers was medically appropriate. (Dkt. 97-4 at 8-9). Plaintiff argues that, because of this purported failure to review the CMC records, Nurse Sykes had a "mistaken understanding of the nature of Plaintiff's injuries"—namely, she was unaware that he sustained a fracture to his third metacarpal, "which is not a finger but a bone of the hand"—based on which she incorrectly thought that buddy taping Plaintiff's fingers "would provide the necessary immobilization to allow the fracture of Plaintiff's hand to heal properly." (*Id.*).

Plaintiff's deliberate indifference claim against Nurse Sykes is defective in several ways, most significantly because it is inconsistent with the uncontroverted evidence of record. In direct contradiction to Plaintiff's claim that Nurse Sykes and Dr. Kaskiw simply disregarded the discharge instructions from CMC, Nurse Sykes has submitted a sworn declaration indicating that she did not have access to Plaintiff's medical records from CMC when she treated him in August 2010. (Dkt. 99 at ¶¶ 8-12). Nurse Sykes further explained that it was not unusual, when a patient is admitted to CNYPC from DOCCS, for "paperwork from an outside hospital" not to accompany that patient. (*Id.* at ¶¶ 13-16). As such, the only information Nurse Sykes had at the time she was treating Plaintiff was a statement from DOCCS that he had fractured his fourth metacarpal. (*Id.* at ¶ 19). Nurse Sykes cannot be held liable for information that was unavailable to her, nor

could any reasonable jury find, on the record before the Court, that she deliberately ignored the discharge instructions from CMC, as Plaintiff argues.

**\*8** Plaintiff's reliance on Dr. Martins' declaration to establish deliberate indifference is also unavailing, for multiple reasons. [2] First, Dr. Martins has offered her expert opinion that Nurse Sykes' actions did not comport with the appropriate medical "standard of care." (Dkt. 97-2 at ¶ 6). However, it is well-established that expert testimony that a defendant "deviated significantly from the appropriate standard of care ... constitutes, at most, a medical malpractice claim which may be cognizable in a state court but not in a federal § 1983 action." *Bowman v. Campbell,* 850 F. Supp. 144, 147 (N.D.N.Y. 1994); *see also Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998) ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."). Second, Dr. Martins' opinion is based on her knowledge that Plaintiff had suffered a fracture in the third metacarpal, but that information was not available to Nurse Sykes at the time she treated Plaintiff. In other words, nothing in Dr. Martins' declaration suggests that Nurse Sykes' actions in buddy taping Plaintiff's fingers were taken recklessly or in bad faith, as opposed to being a sincere (if ultimately ineffectual) attempt to immobilize the fracture in Plaintiff's hand. To the contrary, Dr. Martins acknowledges that the buddy taping was based on a "misunderstanding of the true nature of [Plaintiff's] fracture." (Dkt. 97-2 at ¶ 13). Mistakes and misunderstandings in providing medical treatment do not constitute deliberate indifference. *See Estelle,* 429 U.S. at 105-06 ("an inadvertent failure to provide adequate medical care" does not violate the Eighth Amendment).

[2]     Defendants argue that Dr. Martins' declaration should be disregarded because Plaintiff did not identify her as an expert witness or provide an expert report. (Dkt. 99-2 at 3-4). Because the Court concludes that Dr. Martins' declaration is insufficient to establish deliberate indifference by Nurse Sykes, it does not reach this argument.

The Court rejects Plaintiff's argument that it was inappropriate for Dr. Kaskiw and Nurse Sykes to take into account the potential danger of allowing Plaintiff to possess a metal splint in determining the appropriate medical course of action. Plaintiff presented a known suicide risk. As the Court discussed in the context of Plaintiff's claims against C.O. Harrison, Nurse Sykes and the other personnel at CNYPC

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

were therefore under an obligation to take reasonable steps to prevent Plaintiff from harming himself. As such, it was wholly appropriate for CNYPC staff to take into account the potential of a metal splint to be sharpened and used for inflicting harm in determining whether buddy taping was a preferable alternative. The same is true for the other alternative treatments suggested by Dr. Martins. In particular, Nurse Sykes explained that it would be inappropriate for a suicidal patient to be given an ACE bandage or lengths of gauze because they could be used in an attempt to hang oneself, and that an Orthoglass cast could be removed and used as a weapon. (Dkt. 99 at ¶¶ 38-43). These are not merely arbitrary rules, as Plaintiff seems to suggest, but necessary considerations when dealing with patients with a propensity for self-harm.

In sum, the record before the Court establishes, at most, that Nurse Sykes was mistaken in her opinion that buddy taping Plaintiff's fingers was a medically appropriate course of treatment, because she lacked all the pertinent information. This is insufficient to demonstrate deliberate indifference to Plaintiff's medical needs. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's claim against Nurse Sykes. [3]

[3] Defendants argue in the alternative that Nurse Sykes is entitled to qualified immunity. (Dkt. 88-7 at 14-16). Because the Court finds that Plaintiff has failed to adduce evidence sufficient to maintain a claim against Nurse Sykes, it need not and does not consider this alternative argument.

## V. Failure to Exhaust Administrative Remedies

In his Second Amended Complaint Plaintiff asserts a claim for "threats and intimidation" against Sgt. Jones and a claim for deprivation of Plaintiff's First Amendment right to the free exercise of his religion (based on the alleged denial of Ramadan meals) as to Sgt. Jones and several John Doe defendants. (Dkt. 60 at ¶¶ 54-56, 60-62). Defendants seek summary judgment as to these two claims, contending that Plaintiff failed to exhaust his administrative remedies with respect to them.

**\*9** The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ..., or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e. "[T]he PLRA's exhaustion

requirement applies to 'all inmate suits about prison life, whether they involve general circumstances or particular episodes.' " Lawrence v. Goord, 304 F.3d 198, 200 (2d Cir. 2002) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002) ).

To satisfy the PLRA's exhaustion requirement, "prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ('CORC'). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983." Crenshaw v. Syed, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (internal citation omitted).

"[T]he PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate. To be "available" under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.' " Hubbs v. Suffolk Cty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015) (quoting Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) ). The Supreme Court has recognized three circumstances in which an administrative remedy is "unavailable": (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the "administrative scheme" is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 136 S. Ct. 1850, 1859-60 (2016). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." Id.

With respect to the burden of proof, "failure to exhaust is an affirmative defense" which "must be pleaded and proved by a defendant." Lopez v. Cipolini, 136 F. Supp. 3d 570, 580 (S.D.N.Y. 2015) (citations and quotations omitted). However, once a defendant demonstrates that the plaintiff has not exhausted his administrative remedies, "the burden of proof shifts to the plaintiff to show that his case falls under at least one of the exceptions" to the exhaustion requirement. Perry v. Rupert, No. 9:10-CV-1033 LEK/TWD, 2013 WL 6816795, at \*4 (N.D.N.Y. Dec. 20, 2013); see also Hubbs v. Suffolk Cty. Sheriffs Dep't, 788 F.3d 54, 59 (2d Cir. 2015)

(once defendants meet their initial burden of showing failure to exhaust, the burden shifts to the plaintiff to "demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact").

In this case, Defendants have met their initial burden of demonstrating that Plaintiff failed to exhaust his threats and intimidation claim and his free exercise claim. DOCCS' records regarding Plaintiff show that he "filed and appealed to completion only one grievance at Five Points Correctional Facility around the time of the alleged attack in August 2010." (Dkt. 88-1 at ¶ 75). This grievance, a copy of which has been submitted to the Court, relates solely to Plaintiff's claims of assault and denial of medical care and contains no mention of threats and intimidation by Sgt. Jones or denial of Ramadan meals. (Dkt. 88-3 at 30).

 **\*10** Plaintiff maintains that, notwithstanding the lack of any record, he did file a grievance regarding Sgt. Jones' actions, which was improperly processed. (Dkt. 97-4 at 12-14). Plaintiff states that he cannot provide proof of such filing because "all of his legal paperwork was lost at Wende Correctional Facility." (*Id.*). In the alternative, Plaintiff argues that the "extreme emotional turmoil" he was experiencing excuses his failure to file grievances. (*Id.* at 14).

On the record before the Court, there are no genuine issues of material fact regarding Plaintiff's failure to exhaust his administrative remedies. Defendants have demonstrated through admissible evidence that there is no record of Plaintiff having grieved his threats and intimidation claim or his free exercise claim. Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact. *See Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (quotation omitted) ); *Mims v. Yehl*, No. 13-CV-6405-FPG, 2014 WL 4715883, at \*4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); *Veloz v. N.Y.*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers ... fails to excuse [the] inmate from fully grieving remedies[.]" (citation omitted) ).

Plaintiff's argument that he was experiencing emotional turmoil that prevented him from filing grievances is similarly

unavailing. Plaintiff rests his argument on the "special circumstances" exception to the exhaustion requirement previously recognized by the Second Circuit. (*See* Dkt. 97-4 at 14 (citing *Hemphill v. N.Y.*, 380 F. 3d 680, 686 (2d Cir. 2004) ). However, the Supreme Court in *Ross* expressly rejected the application of any such exception, holding that "the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " 136 S. Ct. at 1856; *see also Scott*, 298 F. Supp. 3d at 551 (noting that "the third prong of *Hemphill*, relating to 'special circumstances,' was abrogated by the Supreme Court's decision in *Ross*"). "This Court is not aware of any cases *post-Ross* ... to have found ... that a prisoner's failure to exhaust was excused because that prisoner's mental health condition rendered unavailable otherwise-available administrative remedies." *Galberth v. Washington*, No. 14 CIV. 691 (KPF), 2017 WL 3278921, at \*10 (S.D.N.Y. July 31, 2017), *aff'd*, 743 F. App'x 479 (2d Cir. 2018). To the contrary, as noted by the *Galberth* court, "[w]here courts have been presented with inward-looking justifications for a failure to exhaust, which are based in a prisoner's subjective sense of what was available, such justifications have been rejected." *Id.* (collecting cases).

In any event, even assuming that Plaintiff's emotional turmoil could excuse his failure to exhaust in theory, there is no evidence that Plaintiff was actually rendered incapable of using the grievance process. To the contrary, Plaintiff's emotional state did not prevent him from filing and appealing to completion a grievance related to the alleged assault and denial of medical care. *See Bennett v. James*, 737 F. Supp. 2d 219, 227 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 816 (2d Cir. 2011) (inmate's claim that his physical and emotional condition prevented him from exhausting his administrative remedies was inconsistent with having filed two federal lawsuits during the relevant time period). Under these circumstances, Defendants have borne their burden of demonstrating that Plaintiff failed to exhaust his administrative remedies, and Plaintiff has not shown that any exceptions to the exhaustion requirement apply. As such, Defendants are entitled to summary judgment as to Plaintiff's claim for threats and intimidation by Sgt. Jones and Plaintiff's claim for denial of his right to the free exercise of his religion.

## VI. Denial of Access to Courts Claim

 **\*11** In the Second Amended Complaint, Plaintiff asserts a denial of access to the courts claim as to five John Doe defendants, based on the alleged failure to properly process his grievance. (Dkt. 60 at ¶¶ 63-68). These John

Case 9:17-cv-01303-BKS-TWD Document 58 Filed 02/12/20 Page 277 of 284

Engles v. Jones, Not Reported in Fed. Supp. (2018)

2018 WL 6832085

Doe defendants have never been identified. Defendants seek summary judgment on this claim based on the failure to identify the John Doe defendants and further argue that, in any event, there is no constitutional right to a grievance process. (Dkt. 88-7 at 20-21). Plaintiff has not responded to these arguments.

Defendants are entitled to summary judgment on Plaintiff's claim for denial of access to the courts. Discovery in this matter has closed and there is no indication in the record before the Court that the identity of the John Doe defendants has been ascertained. Dismissal of claims against John Doe defendants is appropriate where a plaintiff "has had ample time and opportunity to discover the identity of the John Doe Defendants and serve them," but has failed to do so. *Jones v. Rock*, No. 9:12-CV-0447 NAM/TWD, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015); *see also Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 299 (S.D.N.Y. 2009) ("The John Doe Defendants are entitled to summary judgment on the grounds ... that Plaintiff had ample time to identify them but has failed to do so or to demonstrate why he has been unable to do so in the five years since he initiated this lawsuit."). As such, the Court finds that Defendants are entitled to summary judgment as to Plaintiff's denial of access to the courts claim because that claim is asserted solely against John Doe defendants who have never been identified.

## VII. Due Process Claim Against A.C. Rasmus

In the Second Amended Complaint, Plaintiff alleges that A.C. Rasmus' conduct of the Disciplinary Hearing violated his right to due process. (Dkt. 60 at ¶¶ 69-72). Defendants seek summary judgment as to this claim, arguing that Plaintiff cannot show the deprivation of a protected liberty interest, because (1) the 60-day SHU sentence was suspended and never served and (2) the loss of good-time credits cannot be challenged in a § 1983 proceeding. (Dkt. 88-7 at 21-25). Plaintiff has not responded to this aspect of Defendants' motion.

To maintain a claim for violation of the right to either procedural or substantive due process, Plaintiff must demonstrate the deprivation of a protected liberty interest. *Baez v. Pinker*, 673 F. App'x 50, 52 (2d Cir. 2016); *see also Israel v. Bradt*, 228 F. Supp. 3d 237, 239 (W.D.N.Y. 2017). "However, lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Klos v. Haskell*, 48 F.3d 81, 86 (2d Cir. 1995) (quotation omitted). "To establish a constitutionally protected liberty interest triggering due process concerns, plaintiff must show that he was subjected

to an atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Israel*, 228 F. Supp. 3d at 239. If a prisoner-plaintiff "cannot establish that he had a protected liberty interest in being free from the punishment that was imposed upon him as a result of [a] hearing, he has no due process claim under the Fourteenth Amendment." *Scott v. Albury*, 156 F.3d 283, 286 (2d Cir. 1998).

Defendants are correct that the suspended 60-day SHU sentence does not constitute a protected liberty interest. *See Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (where the plaintiff did not serve the sentence imposed at a disciplinary hearing, he "suffered no interference with a liberty interest and has no valid claim for relief"); *Crenshaw v. Korbar*, No. 09-CV-6167L, 2013 WL 1681833, at *3 (W.D.N.Y. Apr. 17, 2013) ("To make out a valid Fourteenth Amendment claim for a denial of due process, plaintiff must show that defendants deprived him of a protected liberty interest. Plaintiff can make no such showing, for the simple reason that he never served any time on the charges [at issue].").

 *12 Defendants are also correct that Plaintiff cannot maintain a § 1983 claim based on the loss of good-time credits. The loss of good-time credits "impacts the overall length of confinement" and "[w]hen a litigant makes a constitutional challenge to a determination that affects the overall length of his imprisonment, the 'sole federal remedy is a writ of habeas corpus.' " *King v. Wenderlich*, No. 14-CV-6491-FPG, 2018 WL 3756751, at *5 n.1 (W.D.N.Y. Aug. 8, 2018) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ). Moreover, pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), a plaintiff seeking money damages "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid ... must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called in question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-487. "In a subsequent case, *Edwards v. Balisok*, 520 U.S. 641 (1997), the Court made clear that *Heck's* favorable termination rule applies to challenges made under § 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good-time credits." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006). Here, there is no indication (and Plaintiff does not argue) that A.C. Rasmus' determination at the Disciplinary Hearing has ever been reversed, expunged, or otherwise called into question.

**Engles v. Jones, Not Reported in Fed. Supp. (2018)**

2018 WL 6832085

Accordingly, Plaintiff cannot challenge the loss of his good-time credits in this § 1983 action.

The other penalties imposed by A.C. Rasmus (loss of package, commissary, and phone privileges) (*see* Dkt. 88-2 at 24) do not rise to the level of deprivation of a protected liberty interest. *See, e.g., Johnson v. Enu*, No. 08-CV-158 (FHS/DNH), 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges does not implicate a protected liberty interest); *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) ("the loss of phone, package, and commissary privileges does not give rise to a protected liberty interest"). Accordingly, the Court agrees with Defendants that Plaintiff cannot establish that he was deprived of a protected liberty interest and therefore cannot maintain a claim for deprivation of due process. The Court accordingly grants Defendants' motion for summary judgement as to Plaintiff's due process claim against A.C. Rasmus.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for partial summary judgment (Dkt. 88) is denied as to Plaintiff's claim against C.O. Harrison and granted in all other respects. Plaintiff's opposition to Defendants' motion (Dkt. 97) is deemed a request to amend the Second Amended Complaint to assert a deliberate indifference claim as to C.O. Harrison and is granted. Plaintiff is directed to file a Third Amended Complaint in conformity with the instant Decision and Order by no later than January 11, 2019. Defendants shall file an Answer to the Third Amended Complaint by not later than January 25, 2019. The Clerk of Court is directed to terminate Nurse Audrey C. Sykes, Assistant Commissioner Mike Rasmus, and John Does Nos. 1 through 10 as defendants in this matter.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6832085

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 902795
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE, 1 and Superintendent,
Eastern Correctional Facility, Defendants.

No. 9:11–CV–250.
|
Signed March 3, 2015.

**Attorneys and Law Firms**

Benji D. Reed, Pine City, NY, for Plaintiff.

Hon. Eric T. Schneiderman, New York State Attorney General, James Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

## DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

 **\*1**  This *pro se* action brought pursuant to 42 U.S.C. § 1983 and state law, alleges violations of Plaintiff's civil rights as a result of being served contaminated food while a prisoner at Eastern Correctional Facility in New York. The matter was referred to David E. Peebles, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In the Report–Recommendation, dated January 30, 2015, Magistrate Judge Peebles recommends that the Defendants' Motion for Summary Judgment be granted with prejudice with respect to the Superintendent and without prejudice with respect to John Doe, 1. *See* dkt. # 56. The Plaintiff did not respond to the motion.

Defendants filed timely objections to the Report–Recommendation pursuant to 28 U.S.C. § 636(b)(1), arguing that the motion should be granted with prejudice with respect to both the Superintendent and the unnamed Defendant. When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings

or recommendations to which the objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Defendants' objections, this Court has determined to accept the recommendation of Magistrate Judge Peebles for the reasons stated in the Report–Recommendation.

It is therefore ordered that:

(1) Defendants' Objections, dkt. # 57, to the Report–Recommendation of Magistrate Judge Peebles, dkt. # 56, are hereby OVERRULED;

(2) The Report–Recommendation is hereby ADOPTED;

(3) The Defendants' Motion for Summary Judgment, dkt. # 53, is GRANTED. Plaintiff's claims against the Defendant Superintendent are hereby DISMISSED WITH PREJUDICE. Plaintiff's claims against Defendant John Doe 1 are hereby DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Benji D. Reed, a New York State prison inmate, commenced this action in March 2011 alleging, *inter alia,* that some of the defendants employed at the Eastern Correctional Facility violated his civil rights and committed negligence during the course of his incarceration in that facility. The scope of this action has been narrowed as a result motion practice, and the only remaining cause of action is an Eighth Amendment conditions of confinement claim asserted against defendant John Doe 1, who has not been identified by plaintiff. To assist plaintiff in identifying defendant John Doe 1, the court substituted the superintendent of Eastern for purposes of service and discovery only. Following the close of discovery, the superintendent filed the currently pending motion seeking the entry of summary judgment in his favor in light of the absence of any record evidence that he was personally involved in the allegations giving rise to this

action. For the reasons set forth below, I recommend that the superintendent's motion be granted.

## I. *BACKGROUND* [1]

[1]   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiffs favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). In light of the severance and transfer of plaintiffs claims arising out of his confinement in the Southport Correctional Facility to the Western District of New York, and dismissal of plaintiffs retaliation claim against defendants M. Soto and John Doe 2, as will be discussed below, I have included only the facts relevant to plaintiff's remaining claim asserted against defendant John Doe 1.

**\*2**   Plaintiff is a prison inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally Dkt. No. 30.* Although he is now incarcerated elsewhere, at the times relevant to his claims Reed was confined in the Eastern Correctional Facility ("Eastern"), located in Napanock, New York. *Id.; Dkt. No. 55.*

Plaintiff commenced this action on March 8, 2011, asserting the deprivation of his constitutional and federal statutory rights, as well as common law claims, against two unnamed defendants, designated as John Doe 1 and John Doe 2, and defendant M. Soto, a Corrections Counselor at Eastern. [2] *See generally Dkt. No. 30.* In his complaint, as amended, plaintiff alleges that on September 14, 2010, he became ill after consuming spoiled corn and rice at the Eastern mess hall. *Id.* at 3. As a result, plaintiff suffered abdominal pain and extreme bouts of diarrhea. *Id.* Plaintiff alleges that defendant John Doe 1 was advised that the corn and rice emitted a foul odor and could be contaminated, but failed to heed the warning and ordered that it be served to the general prison population. *Id.* at 4.

[2]   Plaintiff's complaint also named seven corrections employees assigned to the Southport Correctional Facility ("Southport") as defendants. All claims stemming from events occurring at Southport were severed from those arising out of Eastern, however, and were transferred to the Western District of

New York by order issued by Senior District Judge Thomas J. McAvoy on August 2, 2011. *Dkt. No. 4.*

Plaintiff was initially treated on the following day at the Eastern medical clinic, along with several other infected inmates, and was given "dymo tablets" to address the condition. *Dkt. No 30 at 3.* He was subsequently directed to return to the clinic later that day, however, and instructed to discontinue the use of the dymo tablets and told that he would instead be placed on a water diet and confined to his cell for one day to flush out any infection. *Id.* at 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 8, 2011. *Dkt. No. 1.* As defendants, plaintiffs complaint named two "Doe" defendants, M. Soto, and seven corrections employees assigned to Southport. *Id.* at 2. The complaint asserted claims under the Eighth Amendment to the United States Constitution; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* section 504 of the Rehabilitation Act of 1973 ("section 504"), 29 U.S.C. § 794; and New York State common law. *See generally id.* Based upon an initial review of plaintiffs complaint and an accompanying *in forma pauperis* application, pursuant to 28 U.S.C. § 1915(e)(2), Senior District Judge Thomas J. McAvoy directed all claims arising from the events occurring at Southport severed and transferred to the Western District of New York. *Dkt. No. 4.*

In response to plaintiff's complaint, defendant Soto, the sole remaining named defendant in the action following Judge McAvoy's decision, moved for dismissal of plaintiffs claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Dkt. No. 11.* Plaintiff followed with a motion, filed on December 7, 2011, seeking leave to amend his complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. *Dkt. No. 14.* Plaintiff's motion was intended, in part, to clarify and expand upon the allegations set forth in his original complaint related to the events at Eastern and eliminate claims and references to the defendants affected by the transfer to the Western District of New York. [3] *Id.* In a report issued on July 26, 2012, I recommended dismissal of plaintiff's claims against defendant Soto with leave to amend regarding plaintiff's cause of action for retaliation. *Dkt. No. 22.* Judge McAvoy adopted that recommendation on September 30, 2012, and plaintiff was granted leave to replead within thirty days. *Dkt. No. 28.*

[3]   In his motion, plaintiff also sought the appointment of *pro bono* counsel to represent him in the action.

2015 WL 902795

*Dkt. No. 15.* That motion was denied without prejudice. *Dkt. No. 17.*

**\*3** Plaintiff availed himself of the opportunity to amend, and submitted an amended complaint on October 12, 2012. *Dkt. No. 30.* Upon review of that amended complaint, I issued a report dated November 9, 2012, in which I recommended that (1) the amended complaint be rejected insofar as it asserts a retaliation claim against defendant Soto and that the claim be dismissed with prejudice; (2) the amended complaint be rejected with respect to plaintiffs state common law claims against defendant John Doe 2; (3) plaintiffs amended complaint be accepted as it relates to the constitutional claims asserted against defendant John Doe 1; (4) the superintendent at Eastern be added as a defendant for the purposes of service and discovery to assist plaintiff in identifying defendant John Doe 1; and (5) Judge McAvoy direct plaintiff to take reasonable steps to ascertain the identity of defendant John Doe 1 and seek permission to add that individual by name as a defendant in the action. *Dkt. No. 33 at 18–21.* On September 27, 2013, Judge McAvoy adopted these recommendations. *Dkt. No. 39.*

Following the joinder of issue, I issued a standard Rule 16 scheduling order, which, *inter alia*, required that both parties provide mandatory disclosures and established April 4, 2014 as a deadline for completion of all discovery in the action. *Dkt. No. 49.*

Following the close of discovery, the Eastern superintendent filed the pending motion seeking the entry of summary judgment in his favor. *Dkt. No. 53.* The superintendent contends that dismissal is appropriate in light of the fact that he is not implicated in plaintiffs claims and plaintiff has failed to identify and join the individual identified in the amended complaint as defendant John Doe 1. Plaintiff has not responded to defendant's motion, which is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Failure to Respond to the Superintendent's Motion*

Pursuant to local rule 7.1(b)(3), by failing to oppose the Eastern superintendent's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-

moving party's failure to file or serve
any papers as this Rule requires shall
be deemed as consent to the granting
or denial of the motion, as the case may
be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,
766 F.3d 189, 194 (2d Cir.2014)* (holding that the district
courts may enter summary judgment in favor of the moving
party where the non-moving party fails to respond in
opposition, but not without first "ensur[ing] that each
statement of material fact is support by record evidence
sufficient to satisfy the movant's burden of production" and
"determin[ing] whether the legal theory of the motion is
sound").

In this case, plaintiff has not responded to the pending
motion, which was properly filed by the superintendent.
Through his motion, the superintendent has satisfied his
burden of demonstrating entitlement to the relief requested.
With respect to the question of the superintendent's burden,
I note that his "burden of persuasion is lightened such
that, in order to succeed, [their] motion need only be
'facially meritorious.' " *See Rodriguez v. Goord, No. 04–
CV–0358, 2007 WL 4246443, at *1* (Scullin, J., *adopting
report and recommendation by* Lowe, M.J.) (finding that
whether a movant has met its burden to demonstrate
entitlement to a dismissal under local rule 7.1(b)(3) "is a
more limited endeavor than a review of a contested motion
to dismiss" (citing cases)). [4] Because the superintendent has
accurately cited both proper legal authority and evidence in
the record supporting the grounds upon which his motion
is based, and plaintiff has failed to respond in opposition,
I find the motion is facially meritorious. *Jackson, 766 F.3d
at 194.* Accordingly, I recommend that the court grant the
superintendent's motion on this basis. [5]

[4]    Copies of all unreported decisions cited in this
document have been appended for the convenience
of the *pro se* plaintiff. [Editor's Note: Attachments
of Westlaw case copies deleted for online display.]

[5]    For the sake of completeness, I have addressed the
merits of the superintendent's motion for summary
judgment as well.

C. *Eastern Superintendent*

**\*5**  The superintendent at Eastern, the sole remaining named
defendant in the action, has moved for the entry of summary
judgment dismissing plaintiff's claims against him based
upon lack of personal involvement. *Dkt. No. 53–14 at 5–7.*
"Personal involvement of defendants in alleged constitutional
deprivations is a prerequisite to an award of damages under
[section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d
Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880,
885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934
(2d Cir.1977)). As the Supreme Court has noted, a defendant
may only be held accountable for his actions under section
1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be
held liable unless they themselves acted on account of a
constitutionally protected characteristic"). To prevail on
a section 1983 cause of action against an individual, a plaintiff
must show "a tangible connection between the acts of a
defendant and the injuries suffered." *Bass v. Jackson,* 790
F.2d 260, 263 (2d Cir.1986). "To be sufficient before the
law, a complaint must state precisely who did what and how
such behavior is actionable under law." *Hendrickson v. U.S.
Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at *3
(S.D.N.Y. Jan. 24, 1994).

When the superintendent was added as a defendant by the
court, it was done for the express purpose of permitting
plaintiff to engage in discovery in an attempt to ascertain
the identity of defendant John Doe 1. In my report dated
November 9, 2012, I stated the following:

I recommend that the clerk of the court
be directed to add the superintendent
of Eastern as a defendant for service
and discovery purposes only. By doing
so, I do not suggest in any way
that the superintendent of Eastern
was personally involved in the events
allegedly giving rise to the Eighth
Amendment claim asserted against
defendant John Doe # 1.

*Dkt. No. 33 at 16.* Since the issuance of that report and
recommendation, plaintiff has not identified defendant John
Doe 1, and there is no record evidence suggesting that the
superintendent was personally involved in the decision to
serve allegedly spoiled food to the inmates at Eastern. [6]

6    As a supervisory employee, the superintendent at Eastern cannot be held liable for damages under section 1983 solely because he occupies that position of authority, or on the basis of *respondeat superior*. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).* To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501. The record evidence, including plaintiff's amended complaint, does not suggest that any of these grounds are applicable in this instance.

In light of the fact that plaintiff has failed to adduce any evidence suggesting that the superintendent was personally involved in the alleged constitutional violation, and his presence in the lawsuit for discovery purposes is no longer needed, I recommend that plaintiff's claims against him be dismissed.

### D. *John Doe 1*

In his motion, the Eastern superintendent also urges the court to dismiss plaintiff's claims against defendant John Doe No. 1. *Dkt. No. 53–14* at 7.

In the court's order issued on September 27, 2013, plaintiff was directed to take reasonable steps to ascertain the identity of defendant John Doe 1. *Dkt. No. 39 at 6.* In that decision, Judge McAvoy pointedly advised that "[p]laintiff's failure to ascertain the identity of Defendant John Doe # 1 will result in the dismissal of this action[.]" *Id.* Because plaintiff failed to heed that warning and take timely measures reasonably calculated to ascertain the identity of John Doe # 1, I recommend that his claims against that defendant be dismissed without prejudice. 7 *See, e.g., Pravada v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998) (Scullin, J.)

(dismissing the unidentified "John Doe" and "Jane Roe" defendants after the plaintiff had been provided "over two years to identify and serve these individuals, including the full discovery period").

7    On or about April 29, 2014, plaintiff mailed to Assistant Attorney General James J. Seaman, Esq., a request for the production of documents. *Dkt. No. 53–11.* The request bears the correct caption but an incorrect civil action number (No. 10–CV–1446) (LEK/RFT)) and was not received by Attorney Seaman until May 22, 2014. *Id.; Dkt. No. 53–1 at 3.* Plaintiff's demands, however, relate to the allegations in his amended complaint, confirming that they were served in connection with this matter. *Dkt. No. 53–11 at 1.* In response, the superintendent properly objected to the discovery demands as untimely in light of the fact that (1) the deadline for completion of all discovery was April 4, 2014, and (2) plaintiff was alerted to his obligation to serve written discovery demands sufficiently in advance of the discovery deadline to ensure that the latest date on which responses would be due would fall on or before the discovery deadline. *See Dkt. No. 49 at 4; Dkt. No. 53–12.*

## IV. *SUMMARY AND RECOMMDATION*

**\*6** The sole remaining claim in this action is asserted against an unidentified corrections employee based on plaintiff's allegation that he served spoiled food to the general inmate population at Eastern. In deference to his *pro se* status, the court directed that the superintendent at Eastern be named as a defendant so that plaintiff could be afforded a reasonable opportunity to engage in discovery calculated to lead to the identity of defendant John Doe 1. Despite this and the court's warnings that the failure to identify defendant John Doe 1 would result in dismissal of plaintiff's claims against him, plaintiff has not yet done so. Accordingly, I recommend that all of the remaining claims in this action, which was commenced nearly four years ago, be dismissed with regard to the superintendent, who was not personally involved in the constitutional violations alleged, and as against defendant John Doe 1, who remains unidentified. Accordingly, it is hereby respectfully

RECOMMENDED that the Eastern superintendent's motion for summary judgment (*Dkt. No. 53* ) be GRANTED; and it is further

2015 WL 902795

RECOMMENDED that plaintiff's claims against defendant superintendent be DISMISSED with prejudice and his claims against defendant John Doe 1 be DISMISSED without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Jan. 30, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 902795

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.