**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

SHAIN MALDONADO,

                                        Plaintiff,                    9:17-cv-01303 (BKS/TWD)

v.

D. BENNETT, et al.,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Matthew Robert McGarry
Melissa A. DelGuercio
Olinsky Law Group
250 South Clinton Street
Suite 210
Syracuse, NY 13202

*For Defendant Bennett:*
Letitia James
Attorney General of the State of New York
Keith J. Starlin
Assistant Attorney General
The Capitol
Albany, New York 12224-0341

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff pro-se Shain Maldonado, an inmate of the New York State Department of

Corrections and Community Supervision ("DOCCS"), brought this action against, inter alia,

Defendant D. Bennett and John Doe #1, corrections officers at Great Meadow Correctional

Facility ("Great Meadow"), under 42 U.S.C. § 1983 alleging that they violated the Eighth Amendment by subjecting Plaintiff to excessive force. (Dkt. No. 15).

On July 11, 2019, Defendant Bennett and other now-dismissed Defendants filed a motion for summary judgment seeking dismissal of the second amended complaint[1] based upon, inter alia, Plaintiff's failure to exhaust administrative remedies. (Dkt. No. 46). This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks who issued a Report-Recommendation on February 12, 2020, recommending that Defendants' motion for summary judgment be granted in part, but denied as to Plaintiff's excessive force claim. *Maldonado v. Mandalaywala*, No. 17-cv-1303, 2020 WL 1159426, 2020 U.S. Dist. LEXIS 25281 (N.D.N.Y. Feb. 12, 2020). In light of Plaintiff's testimony that he had "submitted a handwritten grievance" "by personally placing the grievance in the 'grievance box' on the wall in front of the Upstate [Correctional Facility] grievance office," and then spoke with Inmate Grievance Program Supervisor Sherri Debyah who said the grievance had been forwarded to Great Meadow, Magistrate Judge Dancks found that "the record, viewed in the light most favorable to Plaintiff, suggests Plaintiff's grievance was *unfiled* and *unanswered*, creating an issue of fact as to the availability of administrative remedies under *Williams*." *Id*. at \*17, 2020 U.S. Dist. LEXIS 25281, at \*43, 45-46 (citing *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016)). On March 10, 2020 the Court adopted the Report-Recommendation in its entirety. *Maldonado v. Mandalaywala*, No. 17-cv-1303, 2020 WL 1157643, 2020 U.S. Dist. LEXIS 40988 (N.D.N.Y. March 10, 2020).

---

[1] Plaintiff's complaint, (Dkt. No. 1), was dismissed without prejudice upon *sua sponte* review by this Court. (Dkt. No. 8). Plaintiff filed an amended complaint, (Dkt. No. 10), which was dismissed in part upon review by this Court. (Dkt. No 11). Plaintiff filed the operative second amended complaint, (Dkt. No. 15), on May 15, 2018.

The Court appointed counsel for Plaintiff and, on January 26, 2021, held an evidentiary hearing on the issue of exhaustion. Both parties submitted letter briefs prior to the hearing. (Dkt. Nos. 69, 72). For the reasons set forth below, the Court does not credit Plaintiff's testimony that he filed a grievance.  The Court finds that the grievance procedures were available to Plaintiff and that his claim is thus barred by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), based upon a failure to exhaust administrate remedies. Accordingly, Defendant's motion for summary judgment as to Defendant Bennett is granted.

## II.    BACKGROUND[2]

Plaintiff has alleged the following. In September 2016, while incarcerated at Upstate Correctional Facility ("Upstate"), Plaintiff suffered a stroke. (Dkt. No. 15, ¶¶ 4, 11, 18). He went to the hospital in an ambulance, and returned to Upstate on October 22, 2016. (*Id.*). On December 12, 2016, Plaintiff was sent from Upstate to Great Meadow "on a medical trip" for neurological evaluation. (Dkt. No. 46-5, at 83). At Great Meadow, Plaintiff continually requested his prescribed medication and "diet tray" but never received either. (*Id*. at 88-90). The lights, sink, and toilet in his cell at Great Meadow were defective. (*Id*. at 92-94).

On December 26, 2016, Defendant Bennett told Plaintiff that he was returning to Upstate. (Dkt. No. 15, ¶ 31). Bennett placed Plaintiff's property in a bag and instructed Plaintiff "to approach him walking backwards." (*Id*. ¶¶ 32-34). Bennett told Plaintiff "to spread [his] legs and touch the gate above the cells [sic] entrance with [his] hands," (*id*. ¶ 34), for a contraband pat-down, (Dkt. No. 46-5, at 102). Because of physical symptoms related to his prior stroke, Plaintiff "could not extend [his] right arm or stretch out [his] right leg" and "physically could not do do as

---

[2] The facts have been drawn from Plaintiff's second amended complaint, (Dkt. No. 15), and his deposition testimony, (Dkt. No. 46-5).

the officer ordered [him] to do." (Dkt. No. 15, ¶ 35). Bennett began "making threats and yelling at [Plaintiff] to do as he wanted," and Plaintiff tried "to communicate to him that [he] couldn't because [he] had a stroke and [his] whole right side was debilitated." (*Id*. ¶ 36).

Another officer, John Doe #1, "came over and hit [Plaintiff] on the back of [his] head." (*Id*. ¶ 38). The officer yelled for Plaintiff "to put [his] right arm on the gate and place [his] feet shoulder length apart." (*Id*.). Plaintiff was "hit again" before his "vision went blank" and "moments later [he] passed out." (*Id*.). "The next thing [Plaintiff] remember[s] was a sharp slap on the back of [his] neck and an intense pain running through [his] right under arm." (*Id*. ¶ 39). John Doe #1 hit Plaintiff again, grabbed him by his armpit, and then "kicked [his] right foot to force it" in the desired position. (*Id*. ¶ 40). Bennett hit Plaintiff in the back of his head and yelled for him to "[s]top being stubborn" and to "put [his] hand on the gate." (*Id*. ¶ 42). John Doe #1 maneuvered Plaintiff's arm and pulled it until his hand was on the gate. (*Id*. ¶ 44). Bennett told Plaintiff: "[y]ou see, that wasn't complicated," and escorted him out of his cell while Plaintiff "staggered" behind him. (*Id*. ¶ 46). Plaintiff was then placed on a "transit bus" and returned to Upstate the same day. (*Id*.; Dkt. No. 46-5, at 104-105). Plaintiff alleges that the following day— December 27, 2016—when he was back at Upstate, he submitted a grievance concerning the broken toilet and light, the physical abuse, and his lack of medication and diet trays at Great Meadow. (Dkt. No. 15, ¶ 47; Dkt. No. 46-5, at 111). Plaintiff "never received a response" to his grievance. (Dkt. No. 15, ¶ 47).

## III.   DISCUSSION

### A.   Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42

U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007).

The grievance procedure in New York is generally a three-tiered process. An inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the incident. N.Y. Comp. Codes R. & Regs. (NYCRR) tit.7, §§ 701.5(a)(1), (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility, *id.* at § 701.5(c), and adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). The appeal to CORC must be submitted within seven days after receipt of the Superintendent's decision. *Id.* at § 701.5(d)(1)(i).

Because "[a]llegations of employee harassment are of particular concern," there is an expedited procedure for harassment grievances. *Id.* at § 701.8. Such grievances are forwarded directly to the prison superintendent, who determines "whether the grievance, if true, would represent a bona fide case of harassment." *Id.*; *see also Torres v. Carry*, 691 F. Supp. 366, 369-70 (S.D.N.Y. 2009). If the grievance presents a "bona fide harassment issue," "then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance." *Williams v. Priatno*, 829 F.3d 118, 120 (2d Cir. 2016); NYCRR tit.7, §§ 701.8(d), (f). The superintendent's decision may be appealed by filing a "notice of decision to appeal form (Form 2133)" with "the inmate grievance clerk within seven calendar days of receipt of that response." *Id.* § 701.8(h). However, "[i]f the superintendent fails to respond within the required 25-day time limit the grievant may appeal

his/her grievance to CORC." *Id*. § 701.8(g). "This is done by filing a Notice of Decision to Appeal (Form 2133) with the inmate grievance clerk." *Id.*

"Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Supreme Court has identified three examples of unavailable administrative procedures: (1) those that "operate[] as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) those that are "so opaque that [they] become[], practically speaking, incapable of use," where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;" and (3) those where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

Failure to exhaust administrative remedies is an affirmative defense; accordingly, a defendant bears the burden of persuasion on whether a plaintiff failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015); *Nelson v. Plumley*, No. 12-cv-422, 2015 WL 4326762, at *7, 2015 U.S. Dist. LEXIS 91905, at *20 (N.D.N.Y. July 14, 2015) ("As an affirmative defense, the party asserting failure to exhaust administrative remedies typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence.") (citation omitted). The defendant discharges its initial burden of production by "demonstrating that a grievance process exists" and that the plaintiff failed to utilize the grievance procedure. *White v. Velie*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order); *Williams*, 829 F.3d at 126 n.6 ("[D]efendants bear the initial burden of establishing the affirmative defense of non-exhaustion by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures which demonstrate that a grievance process exists and applies to the underlying dispute.") (internal quotation marks omitted). The burden of

production then shifts to the plaintiff, who must show that "other factors rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59; *see Ross*, 136 S. Ct. at 1856 ("Under the PLRA, a prisoner need exhaust only 'available' administrative remedies.").

In *Williams*, the Second Circuit addressed whether an inmate whose grievance was unfiled and unanswered had satisfied the PLRA's exhaustion requirement. Williams alleged that while incarcerated at Downstate Correctional Facility, he was assaulted by corrections officers. 829 F.3d at 120. He was placed in SHU after the assault, where he drafted a grievance "detailing the officers' misconduct." *Id*. Williams "gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU." *Id*. at 120-21 (citing NYCRR tit. 7, § 701.7). A week later, Williams informed the superintendent of Downstate Correctional Facility that he had not received a response to his grievance, and she responded that "she had no knowledge of the grievance and that she would look into it." *Id*. at 121. A week after that, Williams was transferred to another facility. *Id*. Williams never received a response to the grievance and alleged that the correction officer he gave it to never filed the grievance. *Id*.

Accepting the allegations in the complaint as true, the Second Circuit reversed the district court's dismissal of the complaint for failure to exhaust. The Second Circuit noted that the regulatory scheme "contemplate[s] appeals of grievances that were actually filed," and found that "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed." *Id*. at 126. The Court found that because "the process of appealing an unfiled grievance is practically unavailable to inmates under current" regulations, defendants failed to meet their "initial burden" of establishing that a grievance process applied to the underlying dispute. *Id.* at 126 n.6. In *Williams*, the obscurity of the regulations "was compounded by the fact

that Williams was transferred to another facility approximately two weeks after giving his grievance to the corrections officer," and "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id*. at 126. The Court concluded that "the grievance procedures that were technically available to Williams are so opaque and confusing that they were, 'practically speaking, incapable of use.'" *Id*. (quoting *Ross*, 136 S. Ct. at 1859). Therefore, "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." *Id*.

Following *Williams*, this Court has found that the grievance appeal process is unavailable to inmates who have submitted grievances that were unfiled and unanswered. *See Hamlett v. Stotler*, 17-cv-0939, 2019 WL 4306999, at *9, 2019 U.S. Dist. LEXIS 142026, at *26 (N.D.N.Y. Aug. 15, 2019) (applying *Williams* and holding that administrate remedies were unavailable for an inmate who submitted a grievance that was unfiled and unanswered), *report and recommendation adopted*, 2019 WL 4305449, 2019 U.S. Dist. LEXIS 154525 (N.D.N.Y. Sept. 11, 2019); *Zulu v. Barnhart*, 16-cv-1408, 2019 WL 2997226, at *13, U.S. Dist. LEXIS, at *34 (N.D.N.Y. April 22, 2019) (finding that the grievance appeal process was unavailable where "plaintiff credibly met his burden of production by documenting his efforts to file grievances"), *report and recommendation adopted*, 2019 WL 2150628, 2019 U.S. Dist. LEXIS 83511 (N.D.N.Y. May 17, 2019); *Coleman v. Nolan*, 15-cv-40, 2018 WL 4732778, at *8-11, 2018 U.S. Dist. LEXIS 169979, at *29 (Oct. 2, 2018) (finding that *Williams* establishes that grievance process was unavailable where "plaintiff credibly testified that, despite two attempts, plaintiff's grievances with respect to defendant['s] alleged assault were never filed"); *see also Trahan v. Capozzola*, No. 12-4353, 2017 WL 9512406, at *5, 2017 U.S. Dist. LEXIS 99594, *14-16

(E.D.N.Y. June 26, 2017) (denying motion for summary judgment with respect to an unfiled and unanswered grievance because the defendants failed to meet their initial burden of showing that a grievance process exists and applies to the underlying dispute).

**B.    Evidence Regarding Exhaustion**

Here, the evidence establishes that the DOCCS grievance procedures applied at both Upstate and Great Meadow in 2016, and that there was no record of a grievance on file at Upstate or Great Meadow concerning the December 26, 2016 excessive force incident. (Dkt. No. 46-9; Dkt. No. 46-11). The issues to be decided are whether the Plaintiff submitted a grievance that did not reach the grievance department at Upstate or Great Meadow and, if so, whether there were grievance procedures available to Plaintiff under such a circumstance. Two witnesses testified for Defendant Bennett at the January 26, 2021 evidentiary hearing: Great Meadow Inmate Grievance Program Supervisor Alexandria Mead and Upstate Inmate Grievance Program Supervisor Sherri Debyah. Plaintiff testified on his own behalf and called no other witness.

**1.    Plaintiff's Testimony**

Plaintiff testified that the incident occurred on December 26, 2016, during his transfer from Great Meadow back to Upstate. Plaintiff testified that upon his return to Upstate, he reported the alleged assault to Sergeant Debyah.[3] Plaintiff testified that the day after the incident, on December 27, 2016, he wrote out two grievances on plain paper: he placed one in the box in front of the grievance department at Upstate, and he placed the other one in the mailbox to be mailed to Great Meadow. He never heard back from Upstate or Great Meadow regarding either grievance.

---

[3] Sergeant Debyah is not related to Upstate Correctional Facility Inmate Grievance Program Supervisor Sherri Debyah.

Plaintiff testified that after filing his grievance with Upstate, he spoke to several people about his grievance. Specifically, Plaintiff testified that he spoke with the IGRC inmate representative first, and then spoke with correction officers and civilian personnel that work in the grievance department. Plaintiff testified that he had at least ten conversations with employees or inmate clerks in the grievance office concerning his grievance. He generally asked these individuals if they had any knowledge about the results of the grievance or what was going on with the grievance because it was past the estimated timeframe for a response. Plaintiff testified that while being escorted to the law library, he would often walk by and just step into the grievance office to ask about his grievance. According to Plaintiff, this occurred at least four times, and he spoke to four difference inmate clerks, all of whom told him that his grievance had been forwarded to Great Meadow.

Plaintiff testified that outside of the grievance office, he also spoke with Upstate Inmate Grievance Program Supervisor Sherri Debyah, as well as another female civilian that she worked with. Plaintiff testified that because his job at the law library involved receiving a written monthly report from Debyah, he would have a conversation with her every other day or at a minimum once a month. Plaintiff testified that Debyah had to physically give him the monthly report so he could put it in the computer and file it. During these interactions, he would ask her about the grievance. Plaintiff testified that he spoke with Debyah and her employee about his grievance about six times in total, and that two of those conversations were with Debyah personally. Plaintiff testified that these conversations occurred in 13 building, which was closer to the law library, instead of the grievance department. Some of the conversations took place in the law library and others were in the corridor in front of the law library.

Plaintiff testified that Debyah, and every member of the grievance department including the inmates, said that his grievance had been forwarded to Great Meadow. Plaintiff did not remember when exactly his conversations with Debyah occurred. Plaintiff testified that while he never spoke with Debyah in the grievance office itself: twice his concerns about his grievance were related through the correction officers to Debyah while he was being escorted past the grievance office.

Plaintiff testified that he followed up on his grievance in writing in 2018. Plaintiff testified that he sent a handwritten letter to Upstate concerning his grievance around 2018, but could not recall the month, and did not make a copy. He then wrote a second letter to the IGRC supervisor at Upstate on September 5, 2018. Plaintiff introduced into evidence a copy of that letter, in which he stated that he filed a grievance "around the 27th of December, 2016" and "still [had] not received a response." (Pl. Ex. 6). On September 10, 2018, Plaintiff received a response from IGRC inmate representative McLeod informing him that he would "have to submit a FOIL request to the FOIL office to obtain copies of anything in that folder." (Pl. Ex. 7). McLeod's September 10, 2018 letter referenced a medical grievance unrelated to the December 26, 2016 incident and informed Plaintiff that he "had a formal hearing on that grievance, also received a response from the Superintendent, and an Appeal for CORC in Albany." (Pl. Ex. 7). Plaintiff testified that after receiving this letter, he clarified with McLeod that he was looking for information regarding a different grievance, and that McLeod responded that he would look into it. Plaintiff testified he also had conversations in person with McLeod concerning his letter. Plaintiff had previously asked McLeod whether he had any knowledge about the grievance that [he] submitted towards Great Meadow because he had not received any response from them.

Plaintiff testified that McLeod indicated that he would look into it and let Plaintiff know the status of it.

On September 11, 2018, Plaintiff received a response from Upstate regarding his FOIL request indicating that the records he "requested do[] not exist at this facility" and that he should contact Great Meadow. (Pl. Ex. 8). On December 10, 2018 Plaintiff wrote to Great Meadow requesting "any and all Records or Documentation pertaining to I, Shain Maldonado, pertaining to and not limited to the dates of December 10, 2016 through December 27, 2016." (Pl. Ex. 9) (emphasis omitted). Plaintiff testified that he sent the letter to see if they had any knowledge or anything that had to do with the grievance itself. In a response dated December 18, 2018, Plaintiff was informed that his "request for records is unclear and we are unable to understand the request well enough to seek specific clarification." (Pl. Ex. 10). Plaintiff testified that he did not follow-up with Great Meadow because he was transferred to Wende Correctional Facility a month later.

Plaintiff testified to his general understanding of the grievance process. He explained that generally a response to a grievance is received 21 days after a grievance is submitted, but that it might take a little bit longer for altercations away from the facility.

### 2.    Mead's Testimony

Great Meadow Inmate Grievance Program Supervisor Mead testified that she began working at Great Meadow in August, 2018, over a year after Plaintiff allegedly filed his grievance. Mead testified that records are kept of grievances filed at Great Meadow, and a search of records from 2014 through 2018 showed no record of a grievance filed by Plaintiff related to any excessive force or assault by staff at Great Meadow. Mead never received any correspondence from Plaintiff about his grievance, and never had any personal interaction with

Plaintiff. Mead testified that in accord with Directive 4040[4] inmates have to file grievances at the facility they are housed at even where the grievance concerns something that occurred at a different facility.

### 3.      Debyah's Testimony

Upstate Inmate Grievance Program Supervisor Debyah testified as follows. She has been in her current position since October 2016. A search of Upstate's grievance office records from 2015 through 2019 did not show any grievances filed by Plaintiff concerning an alleged assault by staff at Great Meadow. If an inmate wanted to file a grievance about an incident that happened at a facility where he was not currently housed, under Directive 4040, the inmate must submit it to the facility he is housed in at the time he files the grievance. Regardless of where the incident occurred, an inmate must submit a grievance to the facility he is housed in, and the housing facility would code, log, and process the grievance.

At Upstate, Plaintiff was housed in the cadre general population unit, 12 building. An inmate housed there could submit a grievance either on a grievance form or a plain piece of paper and drop it in the grievance mailbox outside the grievance office, which is located in the same housing unit. The mail from the grievance mailbox is then brought to the grievance office by an officer assigned to the grievance office. The grievance mailbox is a locked mailbox; the assigned officer has the only key that opens that box and he opens it every morning Monday through Friday. The grievance officer is responsible for the grievances for these inmates. He reads them, and either titles and codes them, or calls the inmate down to start conducting an investigation, depending on the contents of the grievance. In December 2016, Debyah would not

---

[4] *See* Directive 4040 ("The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility. (quoting 7 N.Y.C.R.R. § 701.5(a)(1)).

have been involved in handling the grievance of an inmate housed in Plaintiff's building 12 because she only handled grievances from inmates housed in the special housing unit. She is not responsible for collecting grievances from the locked box; that responsibility belongs solely to the assigned officer.

Debyah testified that a grievance alleging an assault by staff would be coded 49, the staff misconduct code, and that it would be automatically processed to be directed to the superintendent's office for an investigation by a supervisor. The procedure would be the same even if the alleged assault occurred at a different facility; if there is an alleged assault or alleged misconduct at a different facility, the Upstate supervisor contacts that facility for it to conduct its own investigation and forward all the necessary memos back to Upstate to respond to the grievance. If an inmate filed a grievance that contained allegations of both staff assault and medical issues or conditions in a cell, the inmate would be called down to meet with the grievance officer and asked to separate his issues on separate pieces of paper so they could be processed separately because the other issues would not be handled as a staff misconduct grievance.

Debyah testified that if an inmate had any question about his grievance, he must submit it in writing to the grievance box and the grievance officer would call the inmate down to handle it. She explained that no inmate is allowed to approach a staff member and that when they do try, they are told to go away and submit the request or their question in writing in the mailbox outside the grievance office. Debyah testified that inmates are told not to approach her when she is walking in the hallway because it is not permitted. The only way an inmate would speak with a grievance officer would be if the inmate submitted a written request. A grievance officer could call the console to open the cell door and request that the inmate come down, and the grievance

officer himself would go to the locked gate to escort the inmate either to the grievance office or discuss the issue at the gate. An inmate could not otherwise enter the grievance office to talk to inmate clerks about a grievance because it is not permitted and the inmate would not get through the doorway. Inmate clerks are not allowed to be in the back room of the grievance office without the grievance officer present.

Debyah testified that she never spoke with Plaintiff about any grievances he filed at Upstate. She explained that she knew that this did not happen because that was not the procedure at Upstate. She also testified that she never told Plaintiff that his grievance would be passed along to Great Meadow because that is not in accord with Directive 4040. She denied ever meeting with Plaintiff in the law library while delivering documents or being in the law library at all; she testified that all documents are delivered to inmates through the mail. Debyah testified that she never goes in the law library as part of her duties, and in fact has never been in the law library. Debyah testified that there is no relationship between the work inmates do in the law library and the work she does in the grievance office.

Debyah testified that McLeod is an inmate clerk who had worked in the grievance office. While Plaintiff could ask another inmate about a status of a grievance outside of the grievance office, that inmate would not know the status of a grievance. Debyah did not have a conversation with McLeod about the status of Plaintiff's grievance.

C.    Analysis

Both parties submitted pre-hearing briefing. (Dkt. No. 69, 72). Defendant Bennett argues that Plaintiff has failed to produce any evidence of the grievance he allegedly submitted to Upstate concerning the December 26, 2016 incident, and that, in any event, even if he did submit a grievance, he was obligated to appeal when he did not receive an answer. (Dkt. No. 72, at 3, 8). Plaintiff argues that administrative remedies were unavailable to him because he submitted a

timely grievance regarding the December 26, 2016 incident by placing it in the "grievance box" at Upstate, but he never received a response. (Dkt. No. 69, at 3).

Having considered all of the evidence and the demeanor of the witnesses who testified at the evidentiary hearing, the Court credits the testimony of the defense witnesses, and does not credit Plaintiff's testimony about having filed a grievance or having spoken to Debyah about a grievance. The Court finds that Debayh's credible descriptions of the standard processes at Upstate are irreconcilable with Plaintiff's testimony.

At the outset, the Court credits Debyah's testimony that she would not have had any information about Plaintiff's grievance because grievances from the general population unit where Plaintiff was housed are placed in a locked box to which only one grievance officer has a key. That officer is the one who processes and codes those grievances. Debyah only handled the grievances for inmates housed in SHU, and would not have known the status of a grievance from an inmate outside of SHU.

Moreover, if Plaintiff had, as he testified in his deposition, submitted a grievance complaining about the conditions of confinement at Great Meadow, as well as physical abuse there, he would have been asked to separate the physical abuse complaint into a separate grievance. Debyah explained that because allegations of staff misconduct are automatically processed to be directed to the superintendent's office, an inmate who submitted a grievance that included allegations of staff misconduct amongst other allegations would be asked to separate those issues into difference grievances and resubmit them. This did not happen in this case.

In light of Debyah's testimony regarding Upstate's practice and procedure not to allow oral inquiries regarding grievances, the Court does not credit Plaintiff's testimony that he followed up on his grievance verbally through at least ten conversations with IGRC inmate

16

clerks, correction officers, and civilian personnel who worked inside the grievance office, including Debyah. The Court credits Debyah's testimony that she did not speak with Plaintiff about his grievance. The Court does not credit Plaintiff's testimony that he stepped into the grievance office to ask about the status of his grievance, in light of Debyah's testimony that the only way an inmate could get inside the grievance office is if he was escorted by a grievance officer.

The Court further notes that at the hearing, Plaintiff testified, for the first time, that he submitted *two* grievances while at Upstate: one to the grievance department at Upstate; and one that he put in the mailbox to be sent to Great Meadow. Plaintiff never mentioned sending a grievance to Great Meadow in either his complaint, (Dkt. No. 15, ¶ 46 ("On December 27, 2016, At Upstate, I submitted a grievance for the broken toilet and light, as well as the physical abuse that I received at Great Meadow.")), or in his deposition, (Dkt. No. 46-5, at 106-08 (only describing filing a single grievance on December 27, 2016 at Upstate by placing the grievance in a grievance box "on the wall in front of the grievance office")). Neither office had any record of a grievance having been filed, and the Plaintiff's new testimony about having filed *two* grievances makes his assertions here even less credible.

The documents Plaintiff submitted in support of his claim that he filed a grievance in December 2016, (Pl. Ex. 6-10), do not change this result. The earliest of these documents, a letter sent to the Upstate IGRC, was dated September 5, 2018, approximately nineteen months after the alleged incident occurred and one month after Defendants filed a motion to dismiss for failure to exhaust administrative remedies. (Dkt. No. 24-1, at 14). Plaintiff testified that he eventually wrote to the Upstate IGRC because he was not receiving proper responses to his many verbal inquiries about the status of his grievance. However, this fails to explain why he waited so long

17

to seek out any information on his grievance in writing.[5] Given Plaintiff's history of receiving a timely response to his previously-filed grievance, (Def. Ex. 2), and his understanding of the grievance process, and all of the other evidence, the Court does not find it credible that Plaintiff filed a grievance on December 27, 2016, but waited over a year to make a written inquiry.

Thus, having considered all of the evidence and the demeanor of the witnesses who testified at the evidentiary hearing, the Court finds that administrative remedies were available to Plaintiff, but that he failed to pursue them prior to filing this action. Accordingly, Defendant's motion to dismiss the Eighth Amendment excessive force claim against Defendant Bennett for failure to exhaust administrative remedies is granted.

Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004). Because Plaintiff failed to exhaust his administrative remedies for the December 26, 2016 incident, and the 21-day time limit and 45-day period for requesting an exception to the time limit have long expired, this defect cannot be cured and Plaintiff's claim is dismissed with prejudice. *See Thomas v. Kinderman*, No. 17-cv-00425, 2017 WL 8293605, at *6, 2017 U.S. Dist. LEXIS 199892, at *14 (N.D.N.Y. Dec. 4, 2017) ("[I]f a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile."), *report and recommendation adopted* 2018 WL 1441336, 2018 U.S. Dist. LEXIS 46799 (Mar. 22, 2018).

---

[5] Even if the Court were to credit Plaintiff's uncorroborated testimony that the September 5, 2018 letter was his second written inquiry, and that he sent a handwritten letter to Upstate concerning his grievance "around" 2018, Plaintiff still waited over a year to inquire about the status of his grievance.

### D.       The Doe Defendants

Plaintiff has not identified the three remaining Doe Defendants. On May 29, 2018, in its decision accepting Plaintiff's Second Amended Complaint for filing, the Court instructed the New York State Attorney General's Office to produce information regarding the identities of the Doe Defendants. (Dkt. No. 17, at 14). The New York State Attorney General's Office reported on June 29, 2018, that "despite good-faith efforts made," it was unable to identify the Doe Defendants. (Dkt. No. 22). On July 31, 2018, the Court added the Superintendent of Great Meadow as a defendant to this action to afford Plaintiff an opportunity to conduct discovery regarding the identity of the Doe Defendants. (Dkt. No. 26, at 3-4). In that Order the Court informed Plaintiff that in order to pursue his claim against a Doe Defendant "he must take reasonable steps to ascertain [the Doe Defendant's] identity through discovery or otherwise" and that, upon learning a Doe Defendant's identity, Plaintiff must amend his complaint to properly name him as a defendant. (Dkt. No. 26, at 4). The Court warned Plaintiff that this action will be dismissed as to a Doe Defendant "[i]f Plaintiff fails to ascertain the identity of any Doe Defendant so as to permit the timely service of process." (*Id.*).

Rule 41 of the Federal Rules of Civil Procedure provides, "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). Courts have recognized that the rule does nothing to abrogate a district court's inherent power to *sua sponte* dismiss a plaintiff's complaint for failure to prosecute. *Saylor v. Bastedo*, 623 F.2d 230, 238-239 (2d Cir. 1980); *see also* N.D.N.Y. L.R. 41.2(a). "Fed. R. Civ. P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the

Court." *Groves v. Knight*, No. 05-cv-0183, 2009 U.S. Dist. LEXIS 133174, at *15 (N.D.N.Y. Aug. 4, 2009) (citation omitted).

Whether to dismiss for failure to comply with an order of the court or the procedural rules of the court under Rule 41(b) is determined in light of five factors: "(1) the duration of the plaintiff's failure to comply with the court order [or the court's procedural rules], (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal." *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996).

Here these factors weigh in favor of dismissal of the Doe Defendants. Plaintiff had over two years to ascertain the identities of the Doe Defendants and serve them in accordance with the Court's order, and has failed to do so. Plaintiff was warned that this action would be dismissed as to the Doe Defendants if he failed to ascertain their identities "so as to permit timely service of process." (Dkt. No. 26, at 4). The Doe Defendants, who have still not been identified or served, would likely be prejudiced by any further delay. *See Georgiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y. 1996). The Court finds that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this matter. The Court has considered all less drastic sanctions and finds them to be inadequate under the circumstances.

The Court further finds that dismissal of Plaintiff's claims against Doe Defendants is warranted "on its own initiative" under Fed. R. Civ. P. 4(m) because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on the Doe

Defendants. *See Branch v. Greene*, 06-cv-0846, 2009 WL 385552, at *1, 2009 U.S. Dist. LEXIS 10231, at *2-3 (N.D.N.Y. Feb. 11, 2009) (dismissing four John Doe defendants under Rule 4(m) and Local Rule 4.1(b)).

Lastly, even if Plaintiff had properly named John Doe #1, it would be of no consequence because Plaintiff has failed to exhaust his administrative remedies on his excessive force claim against John Doe #1.[6]

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment as to Defendant Bennett (Dkt. No. 46) is granted, and Plaintiff's Eighth Amendment excessive force claim against Defendant Bennett is **DISMISSED with prejudice** for failure to exhaust administrative remedies; and it is further

**ORDERED** that the Doe Defendants are **DISMISSED without prejudice** under Fed. R. Civ. P. 41(b) and Fed. R. Civ. P. 4(m) for failure to prosecute, failure to comply with a court order and failure to serve; and it is further

**ORDERED** that the Clerk of the Court is directed to serve copies of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: February 22, 2021
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[6] Plaintiff raised other Eighth Amendment claims against the two Jane Doe Defendants. (Dkt. No. 15).